No. 22-56050

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

PAUL SNITKO, ET AL., *Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL., *Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-04405-RGK-MAR
Hon. R. Gary Klausner

_____

APPELLANTS' OPENING BRIEF

_____

Robert P. Frommer
Joseph Gay
Michael Greenberg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Email: rfrommer@ij.org
    jgay@ij.org
    mgreenberg@ij.org

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Email: rjohnson@ij.org

Nilay U. Vora
Jeffrey A. Atteberry
THE VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Phone: (424) 258-5190

*Attorneys for Appellants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT RESPECTING ORAL ARGUMENT ................................ ix

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 4

STATEMENT OF ISSUES ........................................................................ 5

PERTINENT CONSTITUTIONAL PROVISION .................................... 5

STATEMENT OF THE CASE .................................................................. 6

     A.    Innocent People Store Property at U.S. Private Vaults ......... 6

     B.    The Government Hatches A Scheme To Forfeit All Valuable Property At USPV .................................................... 8

     C.    The Government Conceals The Existence Of Its Forfeiture Scheme In Its Warrant Application .................... 10

     D.    The Government Prepares To Search The Boxes In Furtherance Of Its Forfeiture Scheme ................................. 13

     E.    Dozens Of Government Agents Spend Multiple Days Conducting An "Inventory" Of The USPV Boxes ................. 16

     F.    The Government Is Eventually Forced To Return Seized Property But Retains Records Of The Contents Of Every USPV Box ............................................................. 21

     G.    The District Court Certifies A Class But Finds That Class Members' Fourth Amendment Claims Fail On The Merits ............................................................................. 24

SUMMARY OF THE ARGUMENT ....................................................... 28

STANDARD OF REVIEW .................................................................... 31

ARGUMENT ......................................................................................... 32

    I.     The Inventory Doctrine Does Not Permit A Dragnet
          Search Of Hundreds Of Safe Deposit Boxes ......................... 32

    II.    The FBI Misled The Magistrate And Disregarded The
          Express Limitations Of The Warrant ................................... 37

          A.     The FBI Misled The Magistrate In The Warrant
                  Application. ................................................................. 38

          B.     The FBI Exceeded The Scope Of The Warrant,
                  Which Specifically Stated That It Did Not
                  Authorize A "Criminal Search or Seizure." ................ 43

          C.     The FBI Did Not, As It Promised, Stop Its
                  Examination of Box Contents After Finding
                  Information Identifying Box Holders. ......................... 53

    III.   Even If The Inventory Doctrine Applied, The Search
          Here Was Not A Permissible Inventory. .............................. 55

          A.     The Search Was Not Conducted Pursuant To
                  Standard Procedures ................................................... 56

          B.     The FBI Adopted Special Procedures, Just For
                  This Search, With A Programmatic Purpose Of
                  Obtaining Evidence ..................................................... 59

          C.     The "Inventory" Did Not Produce A Meaningful
                  Inventory Of The Property In The Vault .................... 62

          D.     The FBI Used Its "Inventory" As An Excuse To
                  Rummage For Evidence And Forfeitable Property. .... 67

IV.    The Appropriate Remedy For This Violation Is To Order The FBI To Sequester Or Destroy Its "Inventory" Records. .................................................................. 71

CONCLUSION ................................................................... 72

STATEMENT OF RELATED CASES .................................. 74

CERTIFICATE OF COMPLIANCE ...................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.G. v. Paradise Valley*,
    815 F.3d 1195 (9th Cir. 2016) ....................................................... 32

*Alexander v. City & County of San Francisco*,
    29 F.3d 1355 (9th Cir. 1994) .................................................. 48, 49

*Bumpers v. Cleveland*,
    653 F. Supp. 2d 1202 (D. Utah 2009) ........................................... 65

*City of Indianapolis v. Edmond*,
    531 U.S. 32 (2000) .......................................................................... 59

*Demaree v. Pederson*,
    887 F.3d 870 (9th Cir. 2018) ......................................................... 49

*Florida v. Wells*,
    495 U.S. 1 (1990) ............................................................. 56, 62, 64

*Harmelin v. Michigan*,
    501 U.S. 957 (1991) ....................................................................... 71

*Illinois v. Lafayette*,
    462 U.S. 640 (1983) ....................................................................... 33

*People v. Taube*,
    864 P.2d 123 (Colo. 1993) ............................................................. 35

*Perez Cruz v. Barr*,
    926 F.3d 1128 (9th Cir. 2019) ................................................ 60, 61

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ........................................................... 4

*South Dakota v. Opperman,*
  428 U.S. 364 (1976) ....................................................... 33, 36, 62

*United States v. $124,570 U.S. Currency,*
  873 F.2d 1240 (9th Cir. 1989) .................................................. 59, 60

*United States v. Adams,*
  845 F. Supp. 1531 (M.D. Fla. 1994) ............................................. 35

*United States v. Becker,*
  929 F.2d 442 (9th Cir. 1991) ..................................................... 32

*United States v. Bowhay,*
  992 F.2d 229 (9th Cir. 1993) ..................................................... 32

*United States v. Comprehensive Drug Testing, Inc.,*
  621 F.3d 1162 (9th Cir. 2010) (*en banc*) ....... 3, 25, 31, 39, 49, 50, 72

*United States v. Depew,*
  210 F.3d 1061 (9th Cir. 2000) .................................................... 31

*United States v. Foster,*
  100 F.3d 846 (10th Cir. 1996) ................................................. 40, 41

*United States v. Garay,*
  938 F.3d 1108, 1112 (9th Cir. 2019) ........................................ 66, 67

*United States v. Grey,*
  959 F.3d 1166 (9th Cir. 2020) ............................................. 48, 51, 68

*United States v. Haro-Salcedo,*
  107 F.3d 769 (10th Cir. 1997) .................................................... 68

*United States v. James Daniel Good Real Prop.,*
  510 U.S. 43 (1993) ................................................................ 71

*United States v. Johnson,*
  889 F.3d 1120 (9th Cir. 2018) .................................................... 69

*United States v. Khoury,*
  901 F.2d 948 (11th Cir. 1990) ........................................................ 69

*United States v. Ladson,*
  774 F.2d 436 (11th Cir. 1985) ................................................... 34, 35

*United States v. Magdirila,*
  962 F.3d 1152 (9th Cir. 2020) ................................................... 66, 67

*United States v. Mancera-Londono,*
  912 F.2d 373 (9th Cir. 1990) ........................................................ 56

*United States v. McCarty,*
  648 F.3d 820 (9th Cir. 2011) ........................................................ 69

*United States v. Medlin,*
  842 F.2d 1194 (10th Cir. 1988) ..................................................... 41

*United States v. Mittelman,*
  999 F.2d 440 (9th Cir. 1993) ........................................................ 50

*United States v. Orozco,*
  858 F.3d 1204 (9th Cir. 2017) ................................................... 59, 68

*United States v. Rettig,*
  589 F.2d 418 (9th Cir. 1978) ................................................... 41, 42

*United States v. Roberts,*
  430 F. Supp. 3d 693 (D. Nev. 2019) ............................................... 64

*United States v. Santiago-Lugo,*
  904 F. Supp. 36 (D.P.R. 1995) ...................................................... 35

*United States v. Showalter,*
  858 F.2d 149 (3d Cir. 1988) ............................................... 35, 47, 48

*United States v. Tamura,*
  694 F.2d 591 (9th Cir. 1982) ........................................................ 41

*United States v. Taylor*,
636 F.3d 461 (8th Cir. 2011) .................................................. 65, 66

*United States v. Zucker*,
161 U.S. 475 (1896) ....................................................................... 44

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. 4 ........................................................................ 5

## STATUTES

18 U.S.C. § 983(j) .......................................................................... 37

18 U.S.C. § 1963(d) ........................................................................ 37

28 U.S.C. § 524(c) .......................................................................... 70

28 U.S.C. § 1291 .............................................................................. 4

28 U.S.C. § 1331 .............................................................................. 4

## RULES

Fed. R. Civ. P. 43(a) ...................................................................... 32

Fed. R. App. P. 4(a)(1)(B) ............................................................... 4

## OTHER AUTHORITIES

Apartment Seized by FBI as Alleged Site of Rampant Drug
Sales, *L.A. Times* (Apr. 25, 1990), https://lat.ms/40GnLRh .......... 33

DOJ, *Guide to Equitable Sharing* (July 2018), *available at*
https://perma.cc/DM4A-HAAK...................................................... 17

FBI, *Privacy Impact Assessment for the SENTINEL System*
(2014), https://perma.cc/8D9W-YFC5 .............................................. 2

## STATEMENT RESPECTING ORAL ARGUMENT

Plaintiffs-Appellants respectfully submit that oral argument is warranted in this case in light of the importance of these issues for the Named Plaintiffs, for the hundreds of class members who were likewise caught up in the FBI's dragnet search, and for the future interpretation of the Fourth Amendment.

## INTRODUCTION

The FBI in this case broke open seven hundred safe deposit boxes, searched the contents, and attempted to civilly forfeit everything worth over $5,000, all without ***any showing*** of individualized probable cause as to the box holders. The Fourth Amendment straightforwardly bars such a search. So the FBI devised a stratagem to circumvent constitutional limitations. The FBI indicted the company that operated the safe deposit box facility, obtained a seizure warrant for the metal rack containing the boxes, and claimed it had to "inventory" the contents of every box. Despite planning to scour the boxes for evidence and forfeitable property, the FBI explicitly told the magistrate it would not conduct any "criminal search or seizure" of the box contents—and the magistrate wrote that limit into the warrant.

The resulting "inventory" is useless to serve the actual purpose of an inventory. Agents used generic descriptions like "miscellaneous coins," "misc. jewelry," and even "general items" to describe boxes filled with valuable property. There is no way to tell from the inventory how much valuable property was contained in each box.

1

Yet the FBI's "inventory" contains plenty of other information. Among other things, the purported "inventory" forms contain observations that might link cash to drug activity; they contain the results of drug dog sniffs (which were run on all cash over $5,000); and they contain photographs recording the contents of documents found in the boxes, including legal documents, financial documents, handwritten notes, computer passwords, and personal letters. Agents conceded that they "inventoried" this information to bolster the FBI's plan to civilly forfeit valuable property in the boxes.

The FBI's forfeiture plans were largely frustrated in the district court, but the FBI still retains the records of its search. The records have been uploaded to Sentinel, an information system that "provides capabilities for search and intelligence analysis" and that "can be used to identify connections between cases and patterns of activity." FBI, *Privacy Impact Assessment for the SENTINEL System* (2014), https://perma.cc/8D9W-YFC5. The information will remain available indefinitely to be used for investigative purposes.

Plaintiffs represent a certified class of USPV box holders. They seek an order directing the FBI to segregate or destroy these records,

the same remedy this Court employed to redress a similar Fourth Amendment violation in *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (en banc) ("*CDT*"). The district court agreed that remedy would be appropriate if the FBI violated the Fourth Amendment but then upheld the search as a permissible "inventory." Although the district court agreed the FBI conducted its "inventory" with an improper investigative purpose, it held that improper purpose did not invalidate the "inventory" because it was not the "***only***" purpose for the search.

That decision was wrong. First, the district court based its analysis on cases applying the inventory doctrine, but that doctrine applies to arrestees and automobiles; it cannot be contorted to fit the suspicionless search of an entire safe deposit vault. Second, whatever rule might apply to a typical inventory, the FBI here promised the magistrate it would not conduct a "criminal search or seizure" of the boxes and violated the Fourth Amendment when it deliberately set out to do exactly that. Third, even under the rules that govern typical inventories, the search here violates the Fourth Amendment because it did not follow routine inventory procedures, did not produce a

meaningful inventory, and ultimately served as a pretext to rummage for evidence and forfeitable property.

If the FBI wanted to search these safe deposit boxes, it needed a warrant based on individualized probable cause. If the FBI's "inventory" ruse is instead upheld, it will become a blueprint to evade the Fourth Amendment—leaving all Americans' property vulnerable to just this kind of dragnet general search.

## JURISDICTIONAL STATEMENT

Because Plaintiffs seek equitable relief for a violation of the Fourth Amendment, the district court had jurisdiction under 28 U.S.C. § 1331. *See Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019). Because the district court entered final judgment on all claims, ER-2, this Court has jurisdiction under 28 U.S.C. § 1291. Finally, because judgment was entered on October 26, 2022, and the notice of appeal was filed on November 7, 2022, the appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B). ER-2, 1899.

## STATEMENT OF ISSUES

1.    Does the Fourth Amendment's inventory search doctrine extend to a suspicionless general search of hundreds of safe deposit boxes?

2.    Did the government violate the Fourth Amendment by misleading the magistrate about the purpose and scope of its planned "inventory" and by violating limitations included in the warrant?

3.    Did the "inventory" of Plaintiffs' safe deposit boxes violate the Fourth Amendment, such that Plaintiffs are entitled to the destruction or sequestration of records generated during the search?

## PERTINENT CONSTITUTIONAL PROVISION

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. 4.

## STATEMENT OF THE CASE

### A.    Innocent People Store Property at U.S. Private Vaults

Before the FBI's raid in March 2021, U.S. Private Vaults, Inc. ("USPV") operated a safe deposit box facility in Beverly Hills, California. ER-4. Like any such facility, USPV let individuals rent a locked, numbered box within a larger vault. ER-972. At the same time, the business also had less traditional features designed to provide additional privacy, security, and convenience. ER-4-5. Among other things, USPV used biometric scanning to limit vault access; gave customers all keys to their boxes (so that USPV retained no keys); and had expanded operating hours. *Id.*

Innocent people used USPV to store property. ER-5. For example, named plaintiffs Paul and Jennifer Snitko rented a box to store an antique railroad engineer watch, copies of legal documents, jewelry with sentimental value, and Paul's flight logs. ER-972, 977. Paul and Jennifer chose USPV because their bank had a waiting list to open a box. ER-972. They also appreciated USPV's convenient hours. *Id.*

Other named plaintiffs likewise used USPV to store legitimate property. Jeni Pearsons, who works at a Los Angeles-based nonprofit

theater, stored silver that she saved as a retirement investment. ER-995. Travis May, the CEO of a Los Angeles-based technology company, stored gold and cash as a hedge against uncertain future events. ER-1000. Tyler Gothier used his box to store silver and personal property. ER-982. And Joseph Ruiz, disabled and unemployed, used his box to store money that he received as proceeds of two settlements—including a settlement from the injury that led to his disability. ER-985. Joseph stored his money in cash because he did not trust the conventional banking system. *Id.*

Named plaintiffs were hardly alone. After the FBI seized the contents of every safe deposit box, the FBI ultimately returned the contents of hundreds of boxes—apparently because, despite its best efforts, it could not establish any basis to believe the property was linked to criminal activity. ER-585-600. As noted below, the class is defined so that only those boxes—the concededly innocent boxes—are at issue in the litigation.[1]

---

[1] This does not mean that the government has evidence that all other boxes were, in fact, linked to criminal activity. To the contrary, the owners of some boxes may simply have failed to file any claim to their

**B.    The Government Hatches A Scheme To Forfeit All Valuable Property At USPV**

Before opening its investigation of USPV the business, the FBI first focused on the customers. ER-6. Agents treated USPV as "an ant hill, or a honey pot," ER-178, and by pursuing investigations were able to successfully obtain warrants to access multiple customers' safe deposit boxes, ER-654-60.

Around 2019, however, the government grew impatient with this conventional approach to law enforcement. ER-178. So the government began working to build a case against the business. ER-179. In doing so, however, the government's ultimate focus remained on the customers; the government targeted the business "because they're the ones who are facilitating all of this activity." *Id.*

By 2020, the government believed it had sufficient evidence to bring charges against the business based on assistance USPV allegedly provided to some customers seeking to hide criminal proceeds. ER-6,

---

property, with the result that the property was forfeited by default. Particularly given that the raid occurred during a global pandemic, box owners may have had many reasons for such defaults.

843-52. On this basis, agents began preparing applications for the search and seizure warrants for the USPV raid.

At this time—**before** the warrant application was submitted to the magistrate—the government made plans to commence civil forfeiture proceedings against all valuable property contained in the boxes. ER-6-7. The FBI agent in charge spoke to the office's head of asset forfeiture in the summer of 2020 to ask whether the unit could handle the forfeiture of hundreds of box holders' property. ER-483-85. Then, before the government submitted the warrant application, the forfeiture head "determined that there was indeed probable cause to seize the contents of the safe deposit boxes." ER-7; *see also* ER-493-94.

In other words, as the forfeiture head explained, even before the search occurred, "[w]e had already determined that there was probable cause to move forward" with forfeiture actions against the box contents, and, consistent with that decision, "we initiated civil administrative forfeiture against *all of the boxes* that met the minimum monetary threshold." ER-520 (emphasis added); *see also* ER-518-22. That "minimum monetary threshold" was set at $5,000 because, for lower amounts, "the cost [to forfeit] would be more than the value of the

9

asset." ER-452. So long as the government would make money, it planned to forfeit every box holder's property, even though it had no idea who they were or what, if anything, they might have done.

The government also planned to uncover evidence of criminal wrongdoing during its search. The agent in charge of the search testified that "I was expecting a lot of criminals," ER-1632, and "anticipated that there would be criminal proceeds in the safe deposit boxes," ER-1634. For instance, "we contemplated the idea that cash and drugs might be in the same box," which would be "the easy case … for us." ER-1734. While the FBI believed it had probable cause to forfeit everything, information found inside the boxes would provide "supplemental information" to bolster that decision. ER-514-15.

## C. The Government Conceals The Existence Of Its Forfeiture Scheme In Its Warrant Application

Although the government had already internally decided to commence civil forfeiture against all valuable property inside the boxes, it did ***not*** seek a seizure warrant for the box contents. Nor did it seek a search warrant allowing it to look inside the boxes.

Instead, the government concocted a scheme to access the box contents without any need to demonstrate probable cause with respect

to box holders. The government indicted USPV, included allegations in the indictment seeking to forfeit the relatively worthless "nests" containing the boxes, and applied for a warrant to seize the nests. ER-751, 871. The application proposed that, having seized the nests, the government would "inventory" the boxes contained within. *Id.*; *see also* ER-835-36.

This proposal to "inventory" an entire vault of safe deposit boxes was unprecedented. None of the agents who testified had received training on how to conduct such an inventory; to the extent they had received any training on inventories, it focused on inventorying the possessions of an arrestee. ER-1326, 1328, 1586. The agent who signed the warrant application affidavit and oversaw the raid had never before conducted ***even a single*** inventory search but had conducted "dozens" of criminal searches. ER-1566-67, 1571; *see also* ER-1348.

Presumably because the government knew the magistrate might balk at this attempt to gain access to the boxes without a showing of individualized probable cause, the warrant application included language designed to reassure the magistrate. The supporting affidavit asserted that "[t]he warrants authorize the seizure of the nests of the

11

boxes themselves, ***not their contents***." ER-835 (emphasis added). It stated that agents would "follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner." *Id*. It claimed that agents would "notify the lawful owners of the property stored in the boxes [about] how to claim their property," *id.*, and that, pursuant to FBI policy, any "inspection" of the boxes "should extend no further than necessary to determine ownership." ER-836 n.40.

The government's draft seizure warrant contained additional language to reassure the magistrate. It stated that it "***does not authorize*** a criminal search or seizure of the contents of the safety deposit boxes." ER-751 (emphasis added). It instructed agents to "follow their written inventory policies to protect their agencies and the contents of the boxes," and it clarified that agents could "inspect the contents of the boxes," not to search for potential crimes, but simply to "identify their owners in order to notify them so that they can claim their property." *Id.*; *see also* ER-618-19 (same language in search warrant for USPV offices).

The magistrate approved the government's draft warrant, including its limiting language. ER-749. In applying for the warrant, the government never mentioned that it had already decided to civilly forfeit all property worth over $5,000; never mentioned its internal determination that it had probable cause to commence such forfeiture proceedings; did not ask the magistrate to review its internal probable cause determination; and expressly disclaimed any desire for a warrant to search or seize the box contents.

**D.    The Government Prepares To Search The Boxes In Furtherance Of Its Forfeiture Scheme**

With the warrant in hand, the government prepared to carry out the "criminal search" that it told the magistrate it would not do.

Underscoring the raid's unique nature, the agent who oversaw the search drew up special instructions for agents. ER-890-94. These "Supplemental Instructions on Box Inventory" provided that all cash over $5,000 should be run by drug dogs and stated that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." ER-893. Agents were directed to "note things such as how the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee,

chemical, etc.); if there appears to be drug residue present; if a gun is also present; or anything else of note." *Id.* Agents were also instructed to "tak[e] care to preserve possible fingerprint evidence." ER-892. The instructions provided that, when the inventory was complete, "[a] copy of the paperwork will go to Asset Forfeiture." *Id.*

The FBI also created a special form—distinct from the FBI's standard inventory form—for use at USPV. ER-1812. This bespoke form included a space for "Cash Observations" and, like the Supplemental Instructions, told agents to record "how the cash is bundled," "if it has a strong odor," and if "drug residue" or "a gun" is found with cash. *Id.* It also included space to record the results of a drug dog sniff. *Id.* And it prompted agents to record, as part of the inventory, "serial numbers on firearms or watches." *Id.*

The government admitted in discovery it wanted this information for use in forfeiture proceedings. ER-175; *see also* ER-505-06 (stating that the government wanted this evidence since it "could be probative later on regarding whether—you think there's probable cause to think this is forfeitable"). The forfeiture unit head admitted the FBI used the information "as part of the—as the asset forfeiture process." ER-514-15.

14

In contrast to these detailed instructions for gathering evidence, the "Supplemental Instructions on Box Inventory" offered only cursory guidance about conducting an inventory. They stated that agents should "identify the contents of each box, creating an inventory list" but offered no meaningful guidance as to *how* agents should go about "creating an inventory list." ER-892; *see also* ER-209. The lead case agent later stated in deposition that "I don't think there's a policy" as to how detailed an inventory should be. ER-208. As a result, "if I had 50 gold coins, the inventory would not necessarily record that I have 50 gold coins." ER-206-07.

The government has identified the FBI's Domestic Investigations and Operations Guide ("DIOG") as the relevant written inventory policy. ER-8. The DIOG states that agents should generate a "written summary" that "must include, but is not limited to, a description of the property" and should "provide receipts for all items retrieved during inventory searches." ER-860. However, the searching agents did not review the DIOG, ER-1359-60, and the agent who oversaw the search did not consult the DIOG when drawing up the Supplemental Instructions, ER-171-72.

15

**E.    Dozens Of Government Agents Spend Multiple Days Conducting An "Inventory" Of The USPV Boxes**

On March 22, 2021, the government carried out its raid of USPV. ER-10. The FBI took point but was assisted by agents from DEA, USPIS, and local police. ER-1660. In all, over a hundred agents spent multiple days conducting the "inventory." ER-1403-04.

Although the USPV indictment stated the government wanted to forfeit the nest containing the boxes—and this formed the basis for the seizure warrant—the government disassembled the nest in the process of the inventory. ER-1467.

In addition, while the warrant application stated that "inspection should extend no further than necessary to determine ownership," ER-836, agents continued to search even after finding identifying information. In many cases, box holders had taped an executor letter—identifying them and their beneficiary—to the outside of the box's interior sleeve. ER-1438-40. However, agents continued the search even after encountering these letters. ER-1444; *see, e.g.*, ER-1974-97.

After breaking into the boxes, agents (as the Supplemental Instructions instructed) used the special inventory form to document the condition of cash. *See, e.g.*, ER-1929 ("$20 bills bound by rubber

16

bands, portioned into $2000 bundles"), ER-1933 ("Assorted denomination held in bundles and wrapped in paper, with rubber bands"), ER-1943 ("sealed in bank pouches"), ER-1947 ("placed in different envelopes, broken down by ~1000, sticky notes w/amounts"). Agents also took photographs to document the condition of cash; for example, agents photographed handwritten financial ledgers found with cash. ER-1976, 1977, 2119, 2120, 2136, 2137.

Agents also (per the special instructions) ran all cash worth over $5,000 by drug dogs before processing it for forfeiture. ER-1426-27. Local police provided the dogs and, under an arrangement called "equitable sharing," stood to receive a cut of any eventual forfeiture proceeds. *See* DOJ, *Guide to Equitable Sharing* (July 2018), *available at* https://perma.cc/DM4A-HAAK. Agents noted positive alerts on the special "inventory" form, ER-1929, 1933, 1937, 1943, and affixed handlers' affidavits to inventory forms, ER-1930-31, 1938-40, 1944, 1948-49.

Agents also photographed sensitive information in the boxes. The "inventory" records contain photographs of online passwords, ER-2096, 2098, 2144, 2148; handwritten notes of financial transactions, ER-1935,

1936, 2059, 2063, 2136, 2138; debit cards and checks, ER-2090, 2092, 2093; vaccination records, ER-2141; a prenuptial agreement, ER-2091; a will, ER-2095; a letter to a judge in a family-law case, ER-2160; a receipt for goods deposited with a pawn shop, ER-2056-58; a commercial real estate agreement, ER-2094; a personal note concerning the establishment of a financial trust, ER-2060; trust documents, photographed alongside a receipt from a coin exchange, ER-2126; and a newspaper clipping about a legal case photographed alongside a personal note, ER-2062. One box's inventory record contains dozens of close-up photographs of intimate, personal documents, including receipts and personal ledgers containing handwritten notes, pay stubs, immigration paperwork, a marriage license, and bank statements. ER-1966-2049. Agents also photographed a "Receipt of Cremated Remains," ER-2142, and, in another box, opened and photographed a sack containing a relative's cremated remains, ER-1925-28.[2]

---

[2] The inventory records that Plaintiffs have moved to file under seal offer just a representative sample of the multiple thousands of pages of inventory records generated during the search. *See* ER-611.

Video records likewise show agents' intrusive foray into box holders' personal lives. One agent recorded password lists. ER-2186 at 11:15, 12:30, 12:50. Another held each document in a large stack up to the camera, flipping documents over so the camera would capture the text. ER-2180 at 5:55-9:15. Another held up each card in a stack of debit or credit cards to the camera, flipping some over so the camera could capture both sides. ER-2186 at 15:15-16:50. Another video shows an inventorying agent studying a document before holding it up for the camera. ER-2181 at 1:43-1:55.

On the other hand, agents made no real effort to create a meaningful "inventory" of the boxes. Rather than documenting details to guard against claims of theft and loss—like an item's quantity or specific description—agents used terms like "miscellaneous coins" and "miscellaneous jewelry." *E.g.*, ER-2050-55 ("Miscellaneous coins" and "Miscellaneous jewelry"); ER-2097 ("assorted jewelry and packaging" and "miscellaneous cash and coin"); ER-2149 ("misc. jewelry and metal bars/coin"). Even less helpfully, some forms refer only to "miscellaneous items." *E.g.*, ER-1962 ("Miscellaneous general items"), ER-1924 ("miscellaneous itmes [sic]"). The inventory and receipt forms generated

19

during the search are essentially identical, and both are equally unilluminating. *See, e.g.*, ER-1945, 1958, 2052, 2055, 2075, 2103.

Similarly, it is impossible to tell the amount of valuable property from photographs. *E.g.*, ER-2099-2104 (inventory lists "uncounted gold color coins" and photograph depicts a jumble of coins); ER-2072-84 (inventory lists "[y]ellow metal coins and silver-colored metal coins-uncounted" and photograph shows stacks of indeterminate height); ER-2105-12 (inventory lists "Jewelry" and photograph shows pile of bags); ER-2150-57 (inventory lists coins and jewelry, but no such items are photographed); *see also* ER-1950-57, 2113-17, 2127-33 (similar).

During depositions, multiple agents stated that the FBI relied on the overall integrity of its procedures—***not*** the inventory—to protect against theft and loss. ER-1366, 1605-66. As a result, if box holders claim that the FBI returned less property than it seized, the "inventory" will be of little to no help in resolving the dispute.[3]

---

[3] Box holders have, in fact, brought such claims, and the FBI has raised threshold immunity defenses to avoid liability. *See* Def.'s Mot. to Dismiss, *Search & Seizure of Box No. 8309 v. United States*, No. 21-cv-3554-RGK (C.D. Cal. July 14, 2021) (Doc. 18).

**F.** **The Government Is Eventually Forced To Return Seized Property But Retains Records Of The Contents Of Every USPV Box**

Notwithstanding the warrant application's representation that the government would return seized property to box holders, the seizure in fact led to a prolonged process during which the government sought to compel box holders to prove their own innocence to get their property back. *See, e.g.*, ER-986.

In keeping with its (undisclosed) forfeiture plans, the FBI commenced civil forfeiture proceedings against over $100 million in property seized from individuals' boxes. These proceedings were commenced using a single "omnibus" forfeiture notice, which the FBI sent on May 20, 2021. *See* ER-1276-93. The notice targeted over $85 million in cash plus millions more in gold and other property. *Id.*

The FBI also used information from the raid to investigate box holders. The agency used "evidence it collected on the agent observation notes form and in other ways, from box renters' boxes" as "part of the—as the asset forfeiture process." ER-514-15. Where box holders identified themselves, the FBI would also run their names through government databases. ER-1724. But the investigation was ultimately

21

driven by the information gleaned from the "inventory"; as the lead case agent testified, "if I'm looking at a pile of cash … I'm interested in where did that cash come from," so "it had less to do with the person than with the contents of the box." ER-1725.

The government's forfeiture plans were, however, largely frustrated in the district court. Plaintiffs filed this case on May 27, 2021, and filed an amended complaint on June 9, 2021. ER-1905, 1908. Plaintiffs alleged that the government's forfeiture process violated both the Fourth Amendment and procedural due process because the government had not provided box holders with any explanation of the factual or legal basis for forfeiture. The district court agreed and entered a TRO and, later, preliminary injunction ordering the government to show that it had a basis to keep the property or otherwise return it. Docs. 52, 60. The district court also entered an order in another case holding that box holders could claim property anonymously through counsel, frustrating the government's ability to

22

investigate box holders. *Does 1 et al. v. United States*, No. 21-cv-3254-RGK (C.D. Cal. June 7, 2021) (Doc. 29 at 3).[4]

Hundreds of box holders eventually recovered their property. ER-586-600. Boxes without significant monetary value were returned first; the Snitkos, for instance, had their property returned in June 2021. ER-973. Those whose boxes contained valuable property had to wait longer and jump through more hoops; Joseph Ruiz, for instance, recovered his cash in August, and only after he obtained a preliminary injunction. ER-986-87. Before returning the property, the government falsely accused Joseph of wrongdoing based on information obtained from his box. Doc. 64-1.

Even after returning seized property, the FBI retains records from its search. These records include agents' notes, drug dog handler affidavits, records of boxes containing jewelry and precious metals, and

---

[4] USPV, the business, also filed a claim to all the box contents in its capacity as bailee, which should have had the effect of terminating all administrative forfeiture proceedings. However, it appears the government forced USPV to withdraw that claim as a condition of its plea agreement—a dubious tactic that essentially used USPV's legal exposure to force USPV to compromise its duties to its customers. *United States v. U.S. Private Vaults, Inc.*, No. 2:21-cr-00106-MCS (C.D. Cal. Mar. 3, 2022) (Doc. 85 at 4-5).

photographs of box contents—photographs that in some cases contain strikingly personal information, as discussed above. The records can be used for investigative purposes, ER-238, and in fact the government has already used information from boxes to obtain search warrants, ER-940-67. All this information will be retained indefinitely. ER-236-37.

## G. The District Court Certifies A Class But Finds That Class Members' Fourth Amendment Claims Fail On The Merits

As discussed above, initial proceedings in this case focused on Plaintiffs' claims challenging the forfeiture process. Then, as the FBI returned seized property, focus shifted to Plaintiffs' Fourth Amendment challenge to the search. Count I of the First Amended Complaint—the only Count at issue on appeal—alleged both that the search cannot be justified as an "inventory" and that the government misled the magistrate and failed to follow the warrant. ER-1880-83.

On September 9, 2021, the district court denied the government's motion to dismiss. ER-1840-46. It held that the return of Plaintiffs' property did not moot the case, as Plaintiffs could still seek "an order directing the Government to return or destroy all records that the Government created during the course of its search and seizure," ER-

1843-44, pursuant to this Court's holding in *CDT*, 621 F.3d 1162, 1174 (9th Cir. 2010) (en banc).

Then, on October 12, 2021, the district court certified a class consisting of "[a]ll renters of U.S. Private Vaults safe deposit boxes who (a) had property within their safe-deposit box seized by the federal government on or around March 22, 2021; (b) have identified themselves to the FBI since the seizure; and [(c)] have had their property returned to them." ER-1832.

Finally, on September 29, 2022, the district court entered an opinion holding that the search did not violate the Fourth Amendment. ER-4.[5] It held that the case was governed by case law applying the

---

[5] The district court held what it termed a "Trial on the Briefs," meaning it decided the case based on deposition testimony and documentary evidence. Doc. 82 at 6. Plaintiffs argued this was proper only if the facts were uncontested; otherwise, Plaintiffs argued the post-discovery briefs should be addressed under the summary judgment standard. Doc. 135 at 13. Consistent with that view, while Plaintiffs agreed at the initial scheduling conference that it made sense to set "a briefing schedule," Doc. 122-13 at 3, the court indicated that it would decide after briefing "whether or not we have to have a hearing," *id.* at 4, and directed the parties to file a joint statement of disputed and undisputed facts, Doc. 82 at 6.

The court also set a short discovery schedule, and, when the parties sought more time on the ground that the government had not fully

25

inventory exception to the warrant requirement, ER-11-12, and held that, under such cases, an "inventory is pretextual when the 'only reason' law enforcement performs an inventory is to find evidence of criminality," ER-12. Thus, although there "can be no question that the Government expected, or even hoped, to find criminal evidence during its inventory," ER-14, the district court said that was not enough to violate the Fourth Amendment. Rather, in its view, the "impermissible investigatory motive must be the *only* reason the agents conducted the inventory." *Id.*

Having so framed the case, the district court held that Plaintiffs could not show that the government's impermissible motive was the **sole** basis for the search. The district court acknowledged extensive evidence of an impermissible motive but stated: "That the Government had a legitimate inventory motive is evidenced by the fact that the 4-day process, wherein agents recorded the contents of 700 boxes, resulted in the Government being able to successfully return property claimed by hundreds of box owners, including the class members." ER-

---

complied with its discovery obligations, denied the requested extension. Docs. 109, 110.

14. In its view, "It beggars belief that agents would have worked in this manner *solely* to invent a pretext for a criminal search of the box contents." *Id.*

The district court also upheld this "inventory" even though "agents would sometimes fail to specifically count the items that were in a box and instead use a catch-all descriptor on inventory forms such as 'miscellaneous general items.'" ER-15. The court found this did not invalidate the search, as "the FBI inventory policy does not require an enumerated list of all items being inventoried." *Id.*

Finally, the district court rejected the argument that the government misled the magistrate. It noted both that the warrant affidavit "was rife with details of prior investigations into individual USPV boxholders that resulted in forfeiture, and that the agents executing the warrant would inventory the contents of all individual boxes." ER-17-18. Based on this, the court concluded that "[a]ny reasonable magistrate would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture." ER-18.

## SUMMARY OF THE ARGUMENT

**I.** The search here was built on a false premise, as the inventory search doctrine cannot be stretched to fit a dragnet search of hundreds of safe deposit boxes. The doctrine applies to routine searches of arrestees or impounded automobiles. But courts have hesitated to extend it to other contexts, particularly where searches implicate the rights of innocent third parties. Rather than "inventory" the vault, the FBI should have simply allowed box holders to retrieve their property.

**II.** Presumably because the FBI knew it was on shaky constitutional ground, the FBI sought judicial preapproval for its "inventory" in its warrant application. But, in doing so, the FBI misled the magistrate and disregarded the warrant's limits.

The FBI misled the magistrate about the intended purpose and scope of its "inventory." The FBI represented that its purpose was to safely return the box contents, but, in fact, the FBI had *already decided* that it would seek to civilly forfeit everything in the boxes worth over $5,000. This matters because, if the FBI had sought approval for its actual plans, the magistrate almost certainly would have refused the

warrant on the ground that the FBI lacked probable cause for the box contents.

The FBI also disregarded the limitations of the warrant, which expressly did not authorize a "criminal search or seizure" of the box contents. Seizing property for forfeiture is a "criminal seizure." And this was also a "criminal search." Agents were instructed to gather information that would tie box contents to criminal wrongdoing, and agents took photographs of information (like the contents of documents) with no connection to a valid inventory. The government has candidly admitted that it sought to investigate box holders, to determine if they were guilty or innocent, before agreeing to return property. Even if mixed motives do not invalidate a normal inventory, they surely *do* invalidate the search here given the warrant's limiting language.

Further, the government also disregarded its commitment in the warrant application that the search would be no more intrusive than necessary to identify box holders. Many box holders had identifying letters taped outside their boxes, but agents continued searching even after finding that identifying information.

**III.** Even if this search is judged under the standards that apply to a normal inventory of an impounded automobile, it is unconstitutional. Courts hold that an inventory must be conducted pursuant to routine procedures, but the evidence showed that the FBI made up special procedures for this unprecedented raid.

Those special procedures had as their programmatic purpose the discovery of evidence and forfeitable property. The special instructions told agents to seek evidence of wrongdoing, including running property by drug dogs and recording observations for use in later forfeiture proceedings, while offering no meaningful instruction on how to conduct an inventory. Even if a single officer's improper motive does not invalidate an inventory, a law enforcement agency cannot design "inventory" procedures intended to uncover evidence and forfeitable property.

The fact that agents did not produce a meaningful inventory further confirms the search's pretextual nature. The FBI's written procedures state that agents must "describe" seized property and should generate a receipt for "all property." Yet the agents did nothing of the sort. An "inventory" should produce an inventory.

Ultimately, the FBI used its "inventory" as an excuse to rummage for evidence of crime and forfeitable property—something the cases do not permit. The FBI had no valid reason to break open the boxes; if it wanted to prevent theft and loss, it would have been far simpler to leave the boxes locked—allowing box holders to retrieve property in an orderly fashion. Or, at the very least, the FBI could have produced a meaningful inventory. The FBI instead "inventoried" the boxes because it wanted to see what was inside.

**IV.** Because the district court erred when it found no Fourth Amendment violation, this Court can reverse and remand for the district court to consider the appropriate remedy. But under *CDT* the remedy is clear: The records of this pretextual inventory should be segregated or destroyed, so they can no longer be used for investigative purposes.

## STANDARD OF REVIEW

The question whether the government violated the Fourth Amendment is an issue of law that is reviewed *de novo. See, e.g., United States v. Depew*, 210 F.3d 1061, 1066 (9th Cir. 2000); *United States v.*

*Becker*, 929 F.2d 442, 446 (9th Cir. 1991); *United States v. Bowhay*, 992 F.2d 229, 230 (9th Cir. 1993).

Because the facts are largely undisputed, the district court ordered the case submitted via a "Trial on the Briefs," meaning it did not hear live testimony and instead decided the case based on deposition testimony. But as Plaintiffs argued below, the Federal Rules do not allow for factfinding via such a procedure. *See* Fed. R. Civ. P. 43(a) ("At trial, the witnesses' testimony must be taken in open court … ."); *see also supra* n.5. Thus, to the extent that the appeal involves any disputed issues of fact, the decision below is best viewed as analogous to a grant of summary judgment, and, as on appeal from a grant of summary judgment, the court should view the evidence "in the light most favorable to the party against whom [judgment was] granted." *A.G. v. Paradise Valley*, 815 F.3d 1195, 1202 (9th Cir. 2016).

## ARGUMENT

## I.  The Inventory Doctrine Does Not Permit A Dragnet Search Of Hundreds Of Safe Deposit Boxes.

The inventory doctrine has never before been applied to allow the government to break open and search hundreds of safe deposit boxes, and it cannot be extended that far. The entire search was therefore

based on a false premise, and everything that flowed from that initial Fourth Amendment violation was irrevocably tainted.

The inventory exception to the warrant requirement has been applied in two circumstances—searches of people being booked into jail, *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983), and impounded automobiles, *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976). In both cases, the doctrine rests on the same logic: When arresting a person or automobile, a routinized, administrative search can help safeguard property that is necessarily encompassed within the seizure.

Imagine, however, that the government seized an apartment building based on allegations against the landlord.[6] And imagine that, having seized the building, the government then said it needed to "inventory" the contents of every tenant's apartment. Or imagine that the government seized a hotel and "inventoried" guests' possessions. Or seized a storage locker facility and proceeded to "inventory" every locker. This case is no different; a safe deposit box is just a small rented

---

[6] This is not a far-fetched hypothetical. *See* Apartment Seized by FBI as Alleged Site of Rampant Drug Sales, *L.A. Times* (Apr. 25, 1990), https://lat.ms/40GnLRh (detailing how FBI seized nine-unit apartment building based on allegations against the owner of the building).

space. And, like a home, safe deposit boxes can contain people's most private effects and sensitive information, including legal documents, financial documents, password lists, handwritten ledgers, personal notes from parents and lovers, and even relatives' cremated remains. *See supra* pp. 17-18. In each instance, the fundamental question is the same: Do tenants lose their Fourth Amendment rights just because their landlord is targeted by law enforcement?

The Eleventh Circuit confronted this question in *United States v. Ladson*, 774 F.2d 436, 440 (11th Cir. 1985), and drew a line in the sand: "if probable cause exists to enter the premises, obtain a warrant." In *Ladson*, the government sought to forfeit a home allegedly purchased with drug proceeds and obtained a seizure warrant. *Id.* at 438. The owner did not live in the house and had rented it to third parties. *Id.* Federal agents claimed that, as part of the seizure, they could "conduct a 'walk-through' inventory of the home's contents." *Id.* The Eleventh Circuit invalidated the search and noted that "[a]ny other rule would permit government agents to circumvent the safeguards provided by the fourth amendment." *Id.* at 440. This was particularly true because the inventory implicated the rights of "third parties unrelated to the

original seizure." *Id.* Of course that concern is amplified here; while *Ladson* involved the "inventory" of a single residence, this case involved **over seven hundred** safe deposit boxes rented by hundreds of third parties.

In another case involving the "inventory" of a home, the Third Circuit also expressed "substantial reservation" about whether the inventory exception applied. *United States v. Showalter*, 858 F.2d 149, 150-51 (3d Cir. 1988); *see also People v. Taube,* 864 P.2d 123, 130 (Colo. 1993) (observing that "courts generally have been reluctant to extend the application of the inventory search exception to intrusions into private residences").[7] Some subsequent decisions have suggested that agents may, in some circumstances, be able to obtain a warrant allowing an inventory of a home's contents; however, those decisions have typically involved homes that were owner-occupied. *See, e.g.*, *United States v. Santiago-Lugo*, 904 F. Supp. 36, 39 (D.P.R. 1995) (also noting that furnishings in the home might themselves be subject to

---

[7] *See also United States v. Adams*, 845 F. Supp. 1531, 1534 (M.D. Fla. 1994) (refusing to extend inventory search exception to the search of a mobile home).

seizure). Warrant or no, it would be extraordinary to allow the "inventory" of a tenant's property (be that a home or safe deposit box) just because the landlord allegedly violated the law.

When the Supreme Court fashioned the inventory doctrine in *Opperman*, the Court reasoned that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home *or office*." 428 U.S. at 367 (emphasis added). The Court thus indicated that other spaces besides the home (*i.e.* an office or safe deposit box) would fall outside the doctrine's scope. The Court also relied on "the obviously public nature of automobile travel," as well as the fact that automobiles (unlike a home or office) are subject to regular safety inspections. *Id.* at 368. But a locked safe deposit box is not "obviously public" in any sense. The extension of the inventory doctrine to allow a dragnet search of hundreds of safe deposit boxes is thus utterly alien to the rationale espoused in *Opperman*.

Moreover, just as with a home, the government here had a readily available alternative to an inventory. When the government seizes a home, it can evict the tenant—ordering them to take their possessions with them. Likewise, the government could have instructed box holders

36

to come to USPV to recover their possessions. It could easily have established procedures to allow for an orderly return of the property, including, potentially, the appointment of a receiver to wind down USPV's operations. *See* 18 U.S.C. §§ 983(j), 1963(d). In fact, the evidence established that box holders hoped for just such an approach: Box holders showed up at USPV during the raid and asked the government to let them retrieve their possessions, but they were turned away. ER-985, 1420-21. Given that obvious alternative to an "inventory," there was no reason to excuse the FBI from the baseline requirement to obtain a particularized warrant based on particularized probable cause. The inventory doctrine cannot be extended this far.

## II. The FBI Misled The Magistrate And Disregarded The Express Limitations Of The Warrant.

Presumably because the government recognized that it was on shaky doctrinal footing, it sought to bolster its position by seeking preapproval for its "inventory" in the seizure warrant. For all the reasons above, that warrant was invalid.

At the same time, the government's effort to cloak its search in a magistrate's approval led to another Fourth Amendment violation. The government misled the magistrate about the purpose of its search,

saying that it sought to return the box contents when—in fact—it had already decided to pursue forfeiture of all box contents worth over $5,000. Then, the government blew past the limitations placed in the warrant, which specifically stated it did not authorize a "criminal search or seizure" of the box contents and that any examination should be no more intrusive than necessary to identify box holders.

A.    The FBI Misled The Magistrate In The Warrant Application.

The government's warrant application represented that the warrant would "authorize the seizure of the nests of the boxes themselves, <u>not</u> their contents." ER-723 (emphasis in original). Further, according to the application, "[a]gents will attempt to notify the lawful owners of the property stored in the boxes how to claim their property" and would use the inventory to "look for contact information or something which identifies the owner." ER-723-24.

While the government represented that the purpose of its "inventory" was to facilitate return of property, the truth was the exact opposite. Even before the government submitted the warrant application, it had ***already decided*** that it had no intention of returning the property and would, instead, seek to civilly forfeit

everything worth over $5,000. ER-6-7. The FBI also drew up special instructions for its "inventory" that told agents to gather evidence to advance this forfeiture plan—including running all cash over $5,000 past drug dogs and recording any observations that would link cash to drug smuggling. ER-890-94. Thus, while the government told the magistrate its search would be designed to facilitate return of property, in fact it planned to take that property away forever. This was not merely an important omission; it was a misrepresentation.

The district court missed the point when it held that these misrepresentations did not invalidate the search because, reviewing the warrant application, "[a]ny reasonable magistrate would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture." ER-18. The FBI did not merely stumble on forfeitable property in "certain boxes"; the FBI deliberately set out to forfeit every piece of valuable property in every box. *See* ER-6-7, 10. A magistrate should not have to infer that the government would do exactly the opposite of what it promised; to the contrary, agents seeking a warrant owe a "duty of candor." *CDT*, 621 F.3d 1162, 1178 (9th Cir. 2010) (en banc) (Kozinski,

C.J., concurring). The government could have sought a warrant for its planned search and seizure, but, presumably because it knew no magistrate would have blessed its plans, it instead concealed its aims.[8]

The Tenth Circuit found a Fourth Amendment violation on analogous facts in *United States v. Foster*, 100 F.3d 846 (10th Cir. 1996). In that case, the government obtained a seizure warrant that "listed four firearms and marijuana as the items to be seized," but, in executing the warrant, undertook "a wholesale seizure of [the target's] property amounting to a fishing expedition for the discovery of incriminating evidence." *Id.* at 850 (cleaned up). And, just as the FBI here planned to seek forfeiture of anything worth over $5,000, the government in *Foster* "admitted that the officers 'took anything of value.'" *Id.* (cleaned up). The agents, in doing so, "flagrantly disregarded

---

[8] In doing so, the FBI violated its own policies, which provide that, "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents *must* obtain a search warrant when feasible." ER-860. After all, the FBI had already internally determined that it had probable cause to seize everything worth over $5,000. ER-6-7. Having made that determination, the FBI's policies required it to seek a warrant. Of course, the FBI's internal probable cause determination could never have survived a magistrate's review, but that is the point: The FBI concocted its "inventory" ruse precisely because it knew a magistrate would reject its plans.

the terms of the warrant." *Id.* at 851. *See also United States v. Medlin*, 842 F.2d 1194, 1195 (10th Cir. 1988) (similar); *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) (Fourth Amendment violated by "wholesale seizure for later detailed examination of records not described in a warrant" (emphasis omitted)).

The government's misrepresentations are also analogous to *United States v. Rettig*, 589 F.2d 418, 422 (9th Cir. 1978) (Kennedy, J.). There, after unsuccessfully applying for a warrant to search for evidence of cocaine trafficking, the officials asked a different court for a warrant to investigate marijuana possession. *Id.* at 420. Yet, in truth, the officials' focus remained on the initial cocaine charge. *Id.* at 421. The Ninth Circuit found this violated the Fourth Amendment, holding that, "[b]y failing to advise the judge of all the material facts, including the purpose of the search and its intended scope, the officers deprived him of the opportunity to exercise meaningful supervision over their conduct and to define the proper limits of the warrant." *Id.* at 422. The officers had failed "to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the

affidavits," and "all evidence seized during the search" was suppressed. *Id.* at 423.

As in *Rettig*, the misrepresentations in the USPV warrant application were intrinsically relevant to the magistrate's decision. To see why, imagine that the government had said: "We do not have probable cause as to any of the individual safe deposit boxes, but we are seeking a warrant to allow us to seize for civil forfeiture everything in those boxes worth over $5,000, and, in the course of doing so, we intend to search for evidence of wrongdoing." If the government had been honest, the warrant never would have issued.

The district court distinguished *Rettig* on the ground that, in addition to misrepresenting the search's purpose, the agents there exceeded the scope of the warrant. But that misreads this Court's decision. The Court in *Rettig* found it was "not possible" to identify any specific aspect of the search that exceeded the warrant's authorization. 589 F.2d at 423. Rather, the officers' failure to disclose their true purpose meant they "did not confine their search in good faith to the objects of the warrant," with the result that the warrant "became an instrument for conducting a general search." *Id.* The same is true here,

42

where the FBI carried out a "general search" in support of its undisclosed forfeiture plans. Moreover, even if the district court was correct about *Rettig*, the FBI **did** disregard the warrant's express limitations, as explained below.

B. The FBI Exceeded The Scope Of The Warrant, Which Specifically Stated That It Did Not Authorize A "Criminal Search or Seizure."

The government's draft warrant stated that the "warrant does not authorize a criminal search or seizure of the contents of the safety deposit boxes," ER-751, and the magistrate issued the warrant with that limiting language, ER-749. But the USPV raid blew past these limitations, as the FBI used the warrant's narrow authorization to seize property for forfeiture and to scour the boxes for criminal evidence.

At the outset, there can be no real question that the FBI carried out a criminal seizure of box holders' property. Seizing property for forfeiture—as the FBI did here—is undoubtedly a "criminal seizure," as it has been established for more than one hundred years that "suits for penalties and forfeitures" fall "within the reason of criminal proceedings for all the purposes of the fourth amendment." *United States v. Zucker*,

161 U.S. 475, 479 (1896). It is hard to imagine what else a "criminal seizure" of property would mean.

The USPV raid was also a "criminal search" designed and executed to uncover potential criminal wrongdoing by boxholders. The government admitted as much in a court filing immediately after the raid, where, opposing a request for a TRO to enjoin its search of one box, it candidly explained its view that "the majority of the box holders are criminals" and stated that to "distinguish between honest and criminal customers, the government must examine the specific facts of each box and each claim, precisely what the anonymous plaintiff wants to prevent."[9] This effort to "examine the specific facts of each box" to "distinguish between honest and criminal customers" is the essence of a criminal search.

Deposition testimony in this case confirmed that the government used the raid to seek evidence of criminal wrongdoing. Following the raid, the FBI was "investigating [box holders] so as to make a

---

[9] *Doe v. United States*, No. 21-cv-2803-RGK (C.D. Cal. Apr. 2, 2021) (Doc. 15 at 10). This filing was submitted approximately two weeks after the raid by the same Assistant U.S. Attorney who drafted the warrant application. *Id.* at 1; ER-1628.

determination about whether [it] viewed the contents of the box to be criminal proceeds or not," and this investigation "had less to do with the person than with the contents of the box." ER-1725-26; *see also* ER-224 (explaining that "initial box returns were returned, you know, based on the contents … there's nothing that suggests this is proceeds of a crime, give it back"). The agent in charge conceded that she asked agents to record observations that linked assets to drug trafficking, ER-175, and she instructed agents to run cash by drug dogs because she anticipated the results could be used in forfeiture proceedings, ER-1707-08. The forfeiture unit head, meanwhile, testified that her unit received a copy of the "inventory" forms agents created because they were "part of our probable cause story," ER-514, and were used "as part of the—as the asset forfeiture process," ER-515.

Even if the government had not made these admissions, the "criminal" nature of the USPV search would be obvious:

- The specially created instructions directed searching agents to record evidence that could be used to support allegations that cash was linked to drug trafficking. ER-893. Indeed, "[a]nything which

45

suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." *Id.*

- The instructions directed agents to run all cash over $5,000 (the threshold for forfeiture) by drug dogs, ER-893, with the government specially arranging to have drug dogs present, ER-109, 360-61.

- During the search, agents were specifically instructed to "tak[e] care to preserve possible fingerprint evidence." ER-892.

- The instructions provided that a copy of all "inventory" paperwork should be sent "to Asset Forfeiture." ER-892.

- During the search, agents photographed items in the box that might have possible evidentiary value, such as legal documents, personal letters, cryptocurrency keys, financial ledgers, and handwritten notes.

- Agents examined documents during the search and photographed their contents, retaining those photographs even after box contents were returned.

- When agents identified box holders, the FBI ran their names through a variety of databases in an effort to investigate them. ER-1724.

In contrast to the detailed instructions and extensive efforts made to ferret out evidence, the FBI made only a half-baked effort to "inventory" the property. The instructions provided agents no information at all on how the property should be inventoried, other than that the inventory should "identify the contents of each box." ER-892. The resulting inventory descriptions are often laughably general, including entries for "misc jewelry and metal bars/coin," ER-2149, or "[m]iscellaneous general items," ER-1962. And in contrast to the effort made to photograph the contents of notes and documents, agents photographed coins, gold, and jewelry in a way that made it impossible to determine their amount. *See supra* pp. 19-20 (citing examples). At depositions, agents admitted the FBI relied on the FBI's chain-of-custody procedures—not the "inventory"—to guard against theft and loss. ER-1372, 1606.

This conduct is analogous to *Showalter*, where the Third Circuit first expressed "substantial reservation" about whether the inventory doctrine extended to the search of a home, but then found it did not have to reach that issue because the search exceeded the scope of the court order authorizing an inventory. Much like the FBI here asked

47

local police with drug dogs to join the USPV raid, in *Showalter* the U.S. Marshals Service obtained court permission to "inventory" a seized home and then invited the DEA and state police to tag along (with those agents claiming to have smelled drugs during the search). 858 F.2d at 151. The investigative officers' presence and their "olefactory observations" exceeded the scope of an inventory. *Id.* at 154. This case is, if anything, more egregious than *Showalter*, given the sweeping invasion of box holders' privacy and the warrant's express injunction against a "criminal" search.

While not involving an inventory, this Court's decision in *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1360-61 (9th Cir. 1994), is also instructive.[10] In that case, officials obtained an "inspection warrant" for a home based on a possibly leaky sewer; but when officials executed the warrant, they intended to arrest the resident. This violated the Fourth Amendment, as "an administrative search may not be converted into an instrument which serves the very

_____

[10] *Alexander* also addressed separate questions about potential excessive use of force, and that aspect of *Alexander* has since been overruled. The relevant aspect of *Alexander* remains good law. *See United States v. Grey*, 959 F.3d 1166 (9th Cir. 2020).

different needs of law enforcement officials." *Id.* at 1361. If the police wanted to arrest the resident, they had to obtain an arrest warrant; having instead obtained an inspection warrant, they could not enter the home to make an arrest. Likewise, the FBI here violated the Fourth Amendment when it "converted" its limited warrant into a blanket authorization for a dragnet search. Indeed, this case is more egregious than *Alexander*, given the sweeping nature of the search and the warrant's express injunction against such a "criminal" search.

This Court also addressed similar disregard for the limitations written into a warrant in *CDT*, 621 F.3d 1162.[11] There, the government had probable cause to seize the records of ten baseball players but, to locate that data, searched a data system with records of hundreds more. *Id.* at 1167. The magistrate—sensitive to the rights of third parties—included language in the warrant directing the government to segregate third-party data. *Id.* The government, however, claimed that it could seize third-party data found in "plain view" during the search. *Id.* at

---

[11] *CDT* also included discussion of another issue, involving the timeliness of the appeal, which has since been overruled. *See Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018). The Fourth Amendment holding remains binding *en banc* precedent.

1171. This is strikingly similar to the government's theory here, where it argues that it could not simply ignore forfeitable property or possible evidence of wrongdoing in "plain view" during its inventory. In both cases, "agents obviously were counting on the search to bring constitutionally protected data into [their] plain view." *Id.* And, in both cases, agents included limiting language in the warrant to "reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize." *Id.* at 1172. The Court found that violated the Fourth Amendment as "an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *Id.*; *see also United States v. Mittelman*, 999 F.2d 440, 445 (9th Cir. 1993) (recognizing that wholesale suppression is appropriate where government flagrantly disregards limits in a warrant).

The district court found the "criminal" nature of the USPV search irrelevant because, in its view, a dual motive does not invalidate an inventory unless the impermissible purpose was the ***only*** reason for the search. *See* ER-14 (stating that the "impermissible investigatory motive must be the *only* reason the agents conducted the inventory"). But this

50

overlooks a key distinction between this case and typical inventory search cases: In this case, the search occurred in circumstances where (as explained in Part I) the government has no legitimate authority to conduct an inventory and where the search was only even arguably lawful to the extent that it hewed to a warrant that ***specifically prohibited*** the government from engaging in any kind of "criminal search" of box holders' property.

This Court's decision in *United States v. Grey*, 959 F.3d 1166 (9th Cir. 2020), discusses this question of mixed motives and confirms that the district court applied the wrong standard. *Grey* acknowledged cases applying a "but for" standard to warrantless inventory searches of automobiles but held that, based on the greater privacy interests involved, it would be inappropriate to apply that standard to the search of a home pursuant to an administrative (*i.e.* property code inspection) warrant. *Id.* at 1181-82. Instead, where an improper investigative motive was a "primary purpose" of the search, the government must "show that the improper motive did not affect the scope of the search or the manner in which [the] warrant was executed." *Id.* at 1183. Here, given the privacy interests involved and the presence of a warrant, the

Court should at the very minimum apply the *Grey* standard—a standard the government could not possibly meet.[12]

In fact, however, the Court should hold the government to an even higher standard given the warrant's limiting language. The government's investigative motive—"primary" or not—unequivocally violated the terms of the USPV warrant. It should go without saying that, when a warrant prohibits a "criminal search" of property, a law enforcement agency cannot turn around and expressly direct its agents to conduct a wide-ranging search to ferret out evidence of wrongdoing. Yet that is what the FBI did here. In doing so, the FBI violated the warrant's express terms and—accordingly—the Fourth Amendment.

_____

[12] Given all the factors mentioned above, *supra* pp. 45-46, there is no real question that the search for evidence was a "primary purpose" of the search. Even the district court seemed to acknowledge as much. *See* ER-14. Nor is there any real question that the search was more extensive than it would have been absent this improper motive, given the various aspects of the search (such as using drug dogs or photographing the contents of documents) that had no connection to the production of an inventory.

C.    The FBI Did Not, As It Promised, Stop Its Examination of Box Contents After Finding Information Identifying Box Holders.

The warrant contained another, more specific, limitation as well: It stated that, "in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property," ER-749, and the warrant application further explained that, under these policies, the inspection would "extend no further than necessary to determine ownership," ER-836.

Notwithstanding this representation, the agents continued with their detailed search of boxes' contents even after finding beneficiary letters identifying box holders. Each box's contents were in a plastic sleeve designed to fit inside the metal nest, with the beneficiary letters taped to the sleeve (meaning that, once the nest doors were opened, the letters could be accessed without viewing the box contents). *See, e.g.*, ER-1974. Yet, even after encountering these letters, agents continued scouring the boxes. *See, e.g.*, ER-1975-97; *see also* ER-13 (district court opinion acknowledging that "agents continued to examine box contents even after identifying the owners' identity").

53

The district court found this deviation from the warrant irrelevant because the warrant provided that, "*in addition* to examining box contents to identify owners, agents were to conduct an inventory of the boxes, which required them to examine the contents." ER-13 (emphasis in original). But this disregards the cursory nature of the FBI's inventories, which often listed just "miscellaneous items" or the like. The FBI could have produced these "inventories" by taking a quick look inside, without trawling through each box to photograph peoples' wills, trust documents, deeds, personal letters, and other personal effects. In fact, the FBI's warrant application told the magistrate that its examination would extend no further than necessary to identify the box holders. But, in the actual search, the FBI broke that promise as well.[13]

---

[13] The government has theorized that additional examination might be necessary because the beneficiary letter might be inaccurate. That is a red herring, as the government ultimately relied on the possession of a working key to prove ownership. ER-225. Indeed, in some cases the government returned property to anonymous box holders without *any* proof of ownership other than a working key. ER-229.

### III. Even If The Inventory Doctrine Applied, The Search Here Was Not A Permissible Inventory.

While the district court reasoned that the search passed constitutional muster under cases applying the inventory doctrine, the discussion above establishes that doctrine was doubly irrelevant. It was irrelevant first because the inventory doctrine does not apply to a safe deposit vault; and, second, because the search occurred pursuant to a warrant that limited the search's scope.

Even if this case was properly analyzed under the inventory doctrine, however, the search was unconstitutional. The evidence shows that the search was not conducted pursuant to standardized inventory procedures. Instead, it was conducted pursuant to special procedures—drawn up just for the USPV raid—that had a programmatic purpose to discover incriminating evidence. And, consistent with that programmatic purpose, the evidence shows that the FBI used the raid to engage in just the kind of indiscriminate rummaging that the Fourth Amendment does not allow.

A. The Search Was Not Conducted Pursuant To Standard Procedures.

Cases applying the inventory doctrine emphasize the importance of ensuring that the inventory is "conducted according to standard agency procedures." *United States v. Mancera-Londono*, 912 F.2d 373, 375 (9th Cir. 1990). So, for instance, the Supreme Court in *Florida v. Wells*, 495 U.S. 1 (1990), found that an inventory of a locked box (taken from an automobile) could not be justified under the doctrine because nothing in the governing policies required opening locked containers. The Court emphasized that the "policy or practice governing inventory searches should be designed to produce an inventory" and that the absence of detailed procedures would allow inventory searches to devolve into "a purposeful and general means of discovering evidence of crime." *Id.* at 4. Here, no "routine" procedures guided the FBI's search, leading to just that predicted result.

The district court pointed to the FBI's Domestic Investigations and Operations Guide ("DIOG") as providing the requisite policy. ER-8. But the DIOG provides vanishingly little guidance on how to conduct an inventory and does not endorse the most invasive aspects of the FBI's search. To be fair—presumably in response to *Wells*—the DIOG does

56

direct agents to open locked containers. ER-859. Beyond that, however, the DIOG does not require drug dogs; does not direct agents to make observations linking cash to drug trafficking; does not require agents to process all valuables over $5,000 for civil forfeiture; does not direct agents to photograph the contents of personal letters, legal documents, and other papers they encounter; and does not direct agents to take *any* photographs or video during an inventory. ER-859-60. All of this was a special procedure created just for USPV.

In fact, the agents who planned and conducted the search did not really consult the DIOG. The agent who oversaw the raid did not look at the DIOG when crafting the special instructions. ER-171-72. Another agent involved in the search was unaware if the FBI had "any guidance on how an agent is supposed to conduct an inventory," ER-1355, "did not review the DIOG prior to executing the seizure warrant," ER-1359, and could not recall any discussion of the DIOG prior to the raid, ER-1359-60. When asked if he had ever read the DIOG's discussion of inventory searches, he noted that "[t]he DIOG is, like, 10,000 pages long." ER-1370. The agent who oversaw the raid likewise described the

DIOG as a "big, fat manual" that she had consulted (on any topic) less than ten times in her career. ER-1545-46.[14]

The agents also had no relevant experience or training. The agent who oversaw the USPV raid, and who wrote the instructions, testified that she had **never before** conducted an inventory, although she had conducted many dozens of criminal searches. ER-1571. Another testified that, apart from searches incident to arrest, the USPV raid was the only "inventory" he had ever conducted. ER-1348. Agents involved in the raid—including the agent who oversaw the raid—could not recall ever receiving any training on how to conduct an inventory other than a search incident to arrest. *See* ER-1326, 1328, 1586. Agents had no training or experience as how to "inventory" hundreds of safe deposit boxes containing millions of dollars in valuable property.

---

[14] The record indicates that the only official who actually reviewed the DIOG's policy respecting inventories was the Assistant U.S. Attorney who drafted the warrant application. ER-1596. The application discussed the DIOG, to give the impression it would constrain the search, but that was simply not true.

B.   The FBI Adopted Special Procedures, Just For This Search, With A Programmatic Purpose Of Obtaining Evidence.

Rather than adhering to standardized inventory procedures, the FBI drew up special instructions for the USPV raid. Examination of these instructions shows that the USPV raid had, as its programmatic purpose, the discovery of evidence of potential criminal wrongdoing.

The Ninth Circuit has recognized that a "programmatic purpose" inquiry is appropriate where plaintiffs claim that a scheme of suspicionless administrative searches was driven by an improper motive—as opposed to the typical inventory search case where plaintiffs instead argue that a particular officer had an improper motivation for a particular search. *See United States v. Orozco*, 858 F.3d 1204, 1212 (9th Cir. 2017). The key case for this "programmatic purpose" inquiry is *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000), where the Court found that a traffic checkpoint program violated the Fourth Amendment because it had a "primary purpose of interdicting illegal narcotics," even if it also had a valid "secondary purpose" of promoting traffic safety. *See also United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1246-47 (9th Cir. 1989). Thus, when an invalid purpose appears at the programmatic level, it may invalidate the program even

if it is not the *only* motive for the search. Indeed, at that programmatic level, "[n]o one can serve two masters," and a "limited administrative search cannot also serve unrelated law enforcement purposes." *Id.* at 1247.

A "programmatic purpose" inquiry is appropriate here because the FBI adopted special procedures to guide its "inventory" of the seven hundred safe deposit boxes. Indeed, the government's 30(b)(6) witness agreed the supplemental instructions were the "operative policy" for the raid, meaning they articulated "the policy that was in place on the ground." ER-172. Given the hundreds of safe deposit boxes at issue, as well as the hundreds of officers involved in the raid, those special instructions are best viewed as establishing an entire program of searches.

Those special procedures, meanwhile, were specifically tailored to the FBI's goals of finding criminal evidence and forfeitable property. *See Perez Cruz v. Barr*, 926 F.3d 1128, 1143-44 (9th Cir. 2019) (finding search pretextual where planning documents showed that "arresting [ ] workers, and not obtaining the documents mentioned in the warrant, was the focus of the operation"). The special instructions called for the

use of drug dogs. ER-893. They said that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." *Id.* They directed agents to "tak[e] care to preserve possible fingerprint evidence." ER-892. And they instructed that, when the inventory was complete, "[a] copy of the paperwork will go to Asset Forfeiture." *Id.*

The district court rejected this argument on the ground that the special procedures "do not seem to contradict the DIOG." ER-16. But that misses the point: The point is not that these instructions **contradict** the DIOG. After all, the DIOG offers only vague guidance. Rather, the point is that these special instructions depart from the DIOG in a way that shifts the focus away from producing an inventory and towards seeking out evidence and forfeitable property.

This improper programmatic purpose is particularly important given the inventory doctrine's emphasis on adherence to routine procedure. In *South Dakota v. Opperman*, the Court first upheld an inventory search of an automobile on the ground that there was "no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an

61

investigatory police motive." 428 U.S. 364, 375-76 (1976). But the same cannot plausibly be said of the procedures drawn up by the FBI here. Far from being "designed to produce an inventory," *Wells*, 495 U.S. at 4, the procedures in this case were directed to an improper purpose.

Put differently, this is not a case where a single officer followed neutral inventory procedures but harbored a subjective desire to find evidence. Rather, hundreds of officers in this case engaged in a dragnet "inventory" pursuant to procedures that *themselves* were obviously designed to ferret out evidence of wrongdoing as well as forfeitable property. Those invalid procedures tainted every single "inventory" conducted at USPV.

> C. The "Inventory" Did Not Produce A Meaningful Inventory Of The Property In The Vault.

In addition to following *ad hoc* procedures found nowhere in the DIOG, agents also failed to comply with the DIOG's one clear requirement: To provide a "written summary" that "***must*** include, but is not limited to, a description of the property" and to "provide receipts for ***all*** items retrieved during inventory searches." ER-860 (emphases added). In short, the "inventory" did not produce a useful inventory.

62

The inventory forms the FBI produced do not provide a meaningful "description of the property," and they do not encompass "all items retrieved." Property is described in broad terms: "assorted jewelry," "miscellaneous coins," and even "miscellaneous general items." *See supra* p. 19. This was by design. The search's lead agent testified that, in her view, it was "not the policy of the United States to have the inventorying agents provide a complete list of all items seized." ER-206-07; *see also* ER-208-09 (stating that agents were not instructed regarding how specific to be in inventory); ER-1371 (testimony of agent who conducted inventory that, in his view, it was not necessary to "fully list out the items that were being seized").

Agents testified that, rather than listing all seized items, they relied on the integrity of the FBI's chain of custody procedures to guard against theft and loss. ER-1372, 1606. That, however, makes the inventory worse than useless. It would have been *safer* to leave the property secured in the USPV boxes, rather than taking on the risk of theft and loss that arose by transferring that property from the USPV vault to the FBI's evidence vault. Nor is the missing information in the inventories a trivial detail. A stack of coins could be worth $2 or $2

63

million (or anywhere in between), and the FBI's inventories make it impossible to tell. The FBI might easily misplace a gold bar worth $100,000, and the inventory forms would leave no trace of the loss. *See Mellein v. United States*, No. 21-cv-6588-RGK (C.D. Cal. Aug. 13, 2021) (action by USPV box holder alleging that box return was short gold coins worth $220,000).

The district court reasoned this did not invalidate the search because the DIOG does not require a detailed inventory. ER-15. But while the specific procedures drawn up just for the USPV search were not "designed to produce an inventory," *Wells*, 495 U.S. at 4, the FBI's written inventory policies in the DIOG do in fact require a degree of specificity. The DIOG requires a "written description" of the property— a requirement that is hardly satisfied by a blunderbuss entry like "miscellaneous general items." And, even more relevant, the DIOG states the inventory must produce a receipt for "all [seized] property." That makes this case exactly like *United States v. Roberts*, 430 F. Supp. 3d 693, 704-05 (D. Nev. 2019), where a court held that officers ran afoul of the inventory doctrine when they limited their inventory to valuable items despite a policy directing them to record "all property."

These deficiencies also were not cured by the photographic and video records created by the agents. To begin, the DIOG requires a "written description" and not a photographic record. ER-859-60. And even setting that aside—while the agents took care to photograph legal documents, account statements, or other items that might have possible evidentiary value—the photographs otherwise just show jumbles of property. *See supra* pp. 19-20 (citing examples); *see also* ER-1435-36 (stating that, in agent's view, it was not necessary for video to capture each box's full contents because, rather than relying on inventory, agents were relying on "the chain of custody, the bar codes"). In this respect, this case is just like *Bumpers v. Cleveland*, 653 F. Supp. 2d 1202, 1213 (D. Utah 2009), where, "despite fifty minutes of video recording, no protection was afforded against a claim of lost or stolen property" because "one cannot tell what is being viewed" and the "items were not cataloged." As in this case, such a non-inventory inventory "impermissibly exceeded the scope of an inventory search." *Id.*

This failure to produce a meaningful inventory is also akin to *United States v. Taylor*, 636 F.3d 461 (8th Cir. 2011). In that case, although a truck contained "hundreds of tools [and] several pieces of

65

equipment," the officer who conducted the search "wrote 'misc. tools' in the relevant section of the [inventory] form." *Id.* at 463. The Eighth Circuit held that this description did not comply with the requirement to produce an inventory: "Given the hundreds of valuable tools in Taylor's truck, [the] description of 'misc. tools' does not constitute a detailed, itemized inventory." *Id.* at 464. The district court distinguished *Taylor,* saying that the FBI's policy, unlike the policy in *Taylor*, did not require a detailed description of the property. But, as noted above, that misreads the DIOG—which requires a "written description" and specifically states that officers must generate a receipt for "all property." As in *Taylor*, the FBI's inventories here were transparently inadequate to serve their ostensible purpose.

The district court instead held that this aspect of the case was governed by cases holding that "administrative errors," *United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019), or a failure to "precisely comply" with an inventory policy, *United States v. Magdirila*, 962 F.3d 1152, 1157-58 (9th Cir. 2020), do not invalidate the search of an impounded automobile. In both cases, officers did not fill out an inventory form but did fill out other paperwork regarding the property.

66

938 F.3d at 1111; 962 F.3d at 1158. Here, by contrast, there was *no* form or combination of documents anywhere that fully described the contents of the boxes. And, in any event, paperwork errors by individual officers are not remotely comparable to the FBI's wholesale failure to generate a meaningful inventory for boxes containing nearly $100 million in property. While technical deviations from policy will not doom an inventory, law enforcement cannot justify a dragnet search of an entire safe deposit vault as an "inventory" without producing a meaningful inventory.

> D.    The FBI Used Its "Inventory" As An Excuse To Rummage For Evidence And Forfeitable Property.

Finally, the raid ran afoul of the principle that inventory searches "are consistent with the Fourth Amendment only if they are not used as an excuse to rummage for evidence." *Garay*, 938 F.3d at 1111. The district court—relying on cases involving the subjective motivations of individual officers engaged in routine searches—held that this principle was violated only if the impermissible purpose was the *only* reason for the inventory. Even if that was the proper standard, which it is not, the USPV search would violate the Fourth Amendment.

At the outset, inventory cases cited by the district court hold that the relevant question is whether the impermissible purpose was a "but for" cause of the inventory, not (as the district court held) whether it was the "*only*" cause. *See Orozco*, 858 F.3d at 1213. The two standards are distinct; something can be a "but for" cause even if not the sole cause. The district court seems to have been led astray by the fact that, in *Orozco*, the Court found as a factual matter that the impermissible purpose was the "only" reason for the inventory, but *Orozco* was clear that it applied a "but for" standard. *See id.*; *see also Grey*, 959 F.3d at 1179 (discussing *Orozco*). This confusion over the appropriate standard swayed the outcome below, as the district court ultimately based its decision on its conclusion that agents did not inventory the boxes "*solely* to invent a pretext.*" ER-14.

But even under the district court's "only reason" test, the FBI's "inventory" did not serve ***any*** inventory purpose. *See, e.g.*, *United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997). Typically, an inventory's purpose is to guard against claims of theft and loss. But the vague descriptions in the written inventory forms, even if combined with haphazard photographs of jumbles of valuable property, do not

serve that role. There also has been no serious suggestion that breaking open locked safe deposit boxes somehow promoted officer safety. Nor was the inventory needed to identify box holders, when the FBI returned property based on no more than a working key. ER-229. In fact, all these goals would have been served just as well—and probably better—by leaving the boxes securely locked.

On the other hand, many aspects of the search have **no** apparent purpose other than to further the agency's forfeiture and investigative plans. *See, e.g.*, *United States v. Johnson*, 889 F.3d 1120, 1127 (9th Cir. 2018). Why else note incriminating observations about currency and run cash by drug dogs? Why else photograph the contents of sensitive personal documents found within the boxes? This examination and photographing is similar to *United States v. McCarty*, 648 F.3d 820, 836 (9th Cir. 2011), where this Court held that agents' decision to open up a sealed envelope during an airport screening "clearly fell outside the permissible scope of the lawful administrative search and violated [the owner's] Fourth Amendment rights." *See also United States v. Khoury*, 901 F.2d 948, 958-59 (11th Cir. 1990) (no valid inventory where officer

examined contents of notebook). These significant aspects of the search had nothing to do with producing an inventory.

The broader context confirms the pretext. The FBI only began investigating USPV the company after deciding it was too difficult to establish probable cause for individual box holders. ER-178-79. Although the FBI's indictment claimed it wanted to forfeit the "nest," the FBI disassembled that nest during its search (impairing whatever meager value it might have held). ER-1467. And the FBI could never offer any explanation for why it broke open the boxes, rather than allowing individuals to reclaim their own property. The agent in charge testified that the FBI did "discuss[] taking over the business" but that "[w]hy we didn't choose something else, I don't—I can't really tell you that." ER-1641-42; *see also* ER-1644.

It is also impossible to ignore the financial incentive at play. When the Department of Justice seizes property for civil forfeiture, the proceeds go to a dedicated fund that is then available to fund the agency's operations. *See* 28 U.S.C. § 524(c). The Court should accordingly take a particularly skeptical eye to the government's motivation for a massive dragnet search and seizure of over $100

million in valuable property. After all, "it makes sense to scrutinize governmental action more closely when the [government] stands to benefit." *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) (citing cases); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55-56 (1993) (noting that procedural protections assume "particular importance" in the forfeiture context, where the government "has a direct pecuniary interest").

The district court reasoned that it would be nonsensical for so many agents to have spent so many days "inventorying" the boxes if the inventory was a sham. ER-14. But the opposite is true. If the agency was ***truly*** interested in guarding against theft and loss, it would have made sense to leave the boxes locked. At a minimum, it would have made sense to actually produce a meaningful inventory. The FBI did neither. Instead, it broke open the boxes because it wanted to know what was inside.

## IV.    The Appropriate Remedy For This Violation Is To Order The FBI To Sequester Or Destroy Its "Inventory" Records.

This Court's decision in *CDT* leaves no question that the appropriate remedy is to order the FBI to sequester or destroy the records of its search, so that they can no longer be used for investigative

purposes. The two cases are on all fours: The government in *CDT* made "representation[s] in the warrant … obviously designed to reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize." 621 F.3d at 1172. The government then "failed to follow the warrant's protocol." *Id.* And, as in this case, the *CDT* search was an "obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *Id.* The resulting dragnet search exhibited, as here, a "callous disregard for the rights of third parties." *Id.* at 1174.

Given these violations, the Court in *CDT* held the government "must not be allowed to benefit from its own wrongdoing by retaining the wrongfully obtained evidence or any fruits thereof." *Id.* So too here.

## CONCLUSION

The decision below should be reversed and the case should be remanded with instructions to enter appropriate relief.

72

Date: February 22, 2023          Respectfully submitted,

*s/ Robert E. Johnson*

Robert P. Frommer
Joseph Gay
Michael Greenberg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Email: rfrommer@ij.org
       jgay@ij.org
       mgreenberg@ij.org

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Email: rjohnson@ij.org

Nilay U. Vora
Jeffrey A. Atteberry
THE VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Phone: (424) 258-5190

*Attorneys for Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**: 22-56050

The undersigned attorney or self-represented party states the following:

[X ]   I am unaware of any related cases currently pending in this court.

[ ]   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:** s/ Robert E. Johnson        **Date:** February 22, 2023

74

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**: 22-56050

I am the attorney or self-represented party.

**This brief contains 13,993 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** s/ Robert E. Johnson          **Date:** February 22, 2023

75