No. 22-56050

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

PAUL SNITKO, ET AL., *Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL., *Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-04405-RGK-MAR
Hon. R. Gary Klausner

_____

## APPELLANTS' EXCERPTS OF RECORD
## <u>VOLUME III of IX</u>

_____

Robert P. Frommer
Joseph Gay
Michael Greenberg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Email: rfrommer@ij.org
    jgay@ij.org
    mgreenberg@ij.org

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Email: rjohnson@ij.org

Nilay U. Vora
Jeffrey A. Atteberry
THE VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Phone: (424) 258-5190

*Attorneys for Appellants*

Page 50

1      Q.    And what made you determine that
2   that cash was the result of drug proceeds?
3      A.    Defendant admissions.
4      Q.    Anything else?
5      A.    Manner in which it was packaged,
6   but mainly it's the defendant admitted
7   that that's what it was from.
8      Q.    Did you personally seize that
9   cash at U.S. Private Vaults?
10      A.    I'm trying to think.  It depends
11   on what you mean by "seized" again.  If --
12   if I was the one who physically took it
13   into custody, not on all of them, but I
14   might have been the case agent on the case
15   that -- that resulted in their forfeiture
16   in which case I would be listed as the
17   seizing agent because it was me who
18   processed the paperwork to get it
19   forfeited.
20      Q.    Got it.
21        So -- so just based on the
22   defendant admitting that it was the result
23   of drug proceeds and the manner that it
24   was packaged, you helped facilitate that
25   cash being forfeited?

1      A.     Yes.

2      Q.     Okay.  Were there any other box

3   holders that you were investigating at

4   U.S. Private Vaults around that time?

5      A.     Yes, I believe so.

6      Q.     Can you tell me about those

7   investigations?

8      A.     Again, similar to the ones that

9   started it.  They -- drug traffickers that

10  were looking for, you know, locations to

11  hide drug proceeds that began utilizing

12  this business and once it, you know,

13  became known that there was -- there was

14  multiple people that came across DEA's

15  radar that were -- that were identified as

16  clientele there.

17     Q.     Okay.  And just so I'm clear on

18  the timeline, what time period are we

19  talking for these next investigations?

20     A.     It would be between 2016, 2017.

21     Q.     Okay.  Were any other agencies

22  involved in investigating those box

23  holders at U.S. Private Vaults around that

24  time?

25     A.     Are you talking about in general

Page 52

```
 1    were other agencies involved in
 2    investigating box holders at U.S. Private
 3    Vaults are the same box holders that I'm
 4    investing?
 5         Q.    Let's do first the same box
 6    holders that you were investigating.  Were
 7    any other agencies investigating those
 8    same box holders?
 9         A.    Yes.
10         Q.    Which agencies were those?
11         A.    You would have to give me a
12    specific target of investigation because
13    as -- as is the case a lot in Los Angeles,
14    the same guys get investigated by multiple
15    agencies.  So to give you a specific
16    agency, I would need to have the specific
17    target of investigation.
18         Q.    Okay.  Can you just, I guess,
19    give me some examples of some of the other
20    agencies that were involved in
21    investigating these box holders with you?
22              MR. COLL:  Object to form.
23         A.    Of the federal agencies that I
24    had come across, either specifically with
25    the box holders that I was investigating,
```

Page 53

1    I would say FBI, DEA, state and locals,

2    whether it be Los Angeles Police

3    Department, Los Angeles County sheriffs,

4    HSI as well as Postal Inspector Service

5    and there may be some others that I'm

6    leaving out.

7    BY MR. GREENBERG:

8         Q.    I'm sorry.  You said HSI?

9         A.    Yeah, Homeland Security

10   Investigations.

11        Q.    Got it.

12        A.    Thanks.  And I believe IRS was a

13   common one as well.

14        Q.    And this is all in this that

15   2015-2017, I believe, you said period?

16        A.    Yes.

17        Q.    Okay.

18        A.    Oh, and I left out one that was

19   more or less came across quite a bit and

20   they've changed their name a few times,

21   but it's essentially the Department of

22   Consumer Affairs, Cannabis Enforcement

23   Unit of the State of California.

24        Q.    Interesting, okay.

25        A.    It's a newer agency.  They've

Case 2:21-cv-04405-RGK-MAR Document 285-4 Filed 08/19/22 Page 55 of 248

Page 54

```
 1    changed their acronym a few times.
 2        Q.    I imagine I can understand
 3    generally what they tend to investigate.
 4        A.    Correct.
 5        Q.    And so were all of these
 6    agencies working with you investigating
 7    the same box holders or were they
 8    conducting their own investigations into
 9    box holders?
10        A.    Again, that's -- you had a --
11    have to give me a specific -- a specific
12    target of investigation, but in some cases
13    like I've mentioned before, the Los
14    Angeles CLEAR deconfliction tool that we
15    all are supposed to use, a lot of times
16    they would hear that I had an
17    investigation on suspect X and then they
18    would call me and be like, Hey, we're also
19    investigating suspect X; what do you know
20    about them, and then we would discuss.
21    And then U.S. Private Vaults would come up
22    and they would say something to -- oh, one
23    of our surveillances, one of his workers
24    led us there.  So it was a lot of that.
25    It was a lot of kind of, you know, this
```

Exhibit N
1363

ER-321

1    agency's investigating this person.  They

2    didn't know about U.S. Private Vaults

3    until they followed their target there.

4    In some cases they had found indicia of or

5    other paperwork related to U.S. Private

6    Vaults in the course of search warrants

7    that they had conducted and had, you know,

8    asked to deconflict that target or it

9    shown up at the business and my agency or

10   myself had gotten the word.  A lot of

11   crossing paths like that as far as other

12   agencies.

13        Q.    Okay.  Can you tell me more

14   about the Los Angeles deconfliction tool

15   and exactly how it operates?  I'm not

16   quite sure I'm familiar with it.

17        A.    So in this -- there's an

18   apparatus for this that exists in almost

19   every city.  And it's to prevent what we

20   call "blue on blue," which means, in the

21   best way that I can articulate it is the

22   way that it was articulated to me.

23   There's an episode of some crime show

24   where you have this one agency that's

25   following this one guy and they trail him

Page 56

```
 1    to a business.  They go in to make the
 2    arrest and another agency arrests that
 3    other agency because that other -- the guy
 4    they were following was actually a cop and
 5    it turns out all four of them were
 6    investigating each other because nobody
 7    had deconflicted the -- the targets of
 8    investigation.  So LA CLEAR exists so that
 9    if I'm investigating suspect X and I'm
10    conducting surveillance on them and let's
11    say FBI is also doing the same thing and
12    in the course of their investigation, we
13    cross paths, well, we may, you know, we
14    may not know who each other are and then
15    when you start drawing guns in plain
16    clothes.  That can be dangerous.  So
17    apparatus like LA CLEAR, I don't know
18    exactly when they started.  I was hired on
19    2004 with Dallas PD and Dallas had a
20    similar situation, they just deconflicted
21    with HIDTA, High Intensity Drug
22    Trafficking Area.  So the nuts and bolts
23    of it is, it allows us to not step on each
24    other's toes, but it also allows us to
25    make investigative connections so that,
```

Page 57

1     you know, if -- if I'm investigating
2     somebody and somebody else is
3     investigating somebody as part of a much
4     bigger investigation, my investigation
5     doesn't compromise theirs and vice versa.
6          Q.    I understand.
7               So it's a very large law
8     enforcement coordination tool basically?
9          A.    Yes.
10         Q.    With these other agencies that
11    were also investigating U.S. Private
12    Vaults box holders, were you generally
13    working with the same people at those
14    other agencies or was it a mishmash of
15    contacts from those other agencies?
16              MR. COLL:  Object to form.
17         A.    I would say more of a mishmash,
18    you know, kind of -- a little bit of both,
19    like, there -- there was a couple of
20    investigators that I repeatedly talked to
21    and then I would get, you know, random
22    investigators that would come across that
23    tool.
24    BY MR. GREENBERG:
25         Q.    Do you recall any of the people

1    that you repeatedly came across in -- in

2    investigating U.S. Private Vaults in those

3    earlier days?

4         A.    Mainly Los Angeles County

5    sheriffs.

6         Q.    So no one at any of the federal

7    agencies that you saw repeatedly in that

8    2015-2017 time period?

9         A.    Well, FBI was a frequent cross,

10   but it would be different groups within

11   FBI.  So not the same group every time.

12   So lots of FBI agents, but not the same

13   FBI agent.

14        Q.    That makes sense.

15              So we're right about 2017 in the

16   investigation into box holders at U.S.

17   Private Vaults.  As time went on, did you

18   continue to investigate new box holders at

19   U.S. Private Vaults?

20        A.    I would say yes.

21        Q.    What was generally going on with

22   those investigations?  What was the result

23   of those investigations?

24              MR. COLL:  Object to form.

25        A.    Some of which are still ongoing

Case 2:21-cv-04405-RGK-MAR2/2023 Document 265-1 Filed 08/18/24, Page 60 of 145   Page ID
Case 2:21-cv-04405-RGK-MAR2/2023 Document 265-1 Filed 08/18/24, Page 60 of 148
#:5635

 1    and I'm no longer privy to the case file

 2    having transferred.  So at the risk of

 3    talking about ongoing investigations, I

 4    don't feel comfortable asking -- you know,

 5    answering any questions about those just

 6    because I don't know the status of those

 7    investigations right now.

 8    BY MR. GREENBERG:

 9         Q.    That's totally fair.

10               Were there others that resolved

11    themselves in that time period while you

12    were still there?

13         A.    Not that -- well, maybe the one

14    in 2019.  That one, yeah, he -- that one

15    was done.

16         Q.    And was that also a -- a bulk

17    cash seizure situation?

18         A.    Yes.

19         Q.    Okay.  And did that also lead to

20    that bulk cash being forfeited?

21         A.    Yes.

22         Q.    Okay.  About how many different

23    investigations into -- into box holders

24    would you say that you conducted in that

25    early 2015-2017 time period into box

1    holders at U.S. Private Vaults?

2         A.    Well, for the purposes of our

3    investigation, I would say, one, like

4    what -- depending on what your definition

5    of "investigation," like there's -- you

6    know, your -- your quick check kind of

7    like, Hey, this person was observed on

8    surveillance.  Let's look into them.

9    Either it was determined they weren't a

10   big enough target or they were somebody

11   else's target, you know, that -- in that

12   aspect, probably dozens, but as far as the

13   DEA actually pursued, just a handful that

14   I can remember.

15        Q.    About how many boxes at U.S.

16   Private Vaults in that time period would

17   you say that you or people you worked with

18   seized the contents of?

19        A.    The DEA seized that I took part

20   in, it would be three box holders for sure

21   that I can remember for -- and I believe

22   that would be five to six separate boxes.

23        Q.    Okay.  So based on your

24   understanding of the number of boxes at

25   U.S. Private Vaults, not a significant

Page 61

1    number of them; is that fair to say?

2                 MR. COLL:  Object to form.

3         A.    I mean, the boxes that DEA

4    searched were not significant, no.

5    BY MR. GREENBERG:

6         Q.    Okay.  So around this 2017 time

7    period, you investigated a number of U.S.

8    Private Vaults box holders.  What's your

9    kind of opinion of U.S. Private Vaults,

10   the company, around that time?

11                MR. COLL:  Object to form,

12        vague.

13        A.    Specifically what are you

14   talking about as far as my opinion of the

15   company?

16   BY MR. GREENBERG:

17        Q.    Yeah.  Sorry.  I'll rephrase.

18                From a law enforcement

19   perspective, did you have the impression

20   that only criminals would be renting from

21   U.S. Private Vaults boxes?

22                MR. COLL:  Object to form.

23        A.    My opinion was formed based on

24   my investigation from, you know, the

25   interviews of people that were arrested or

Page 62

1    had assets seized from U.S. Private

2    Vaults.  It was my opinion that the

3    business of -- was very attractive to

4    criminals looking to hide assets and

5    contraband.

6    BY MR. GREENBERG:

7        Q.    And so based on that opinion,

8    what happened next in your investigation

9    into U.S. Private Vaults's box holders or

10   the company itself?

11           MR. COLL:  Form.

12       A.    As far as my investigations

13   went, we continued to look at U.S. Private

14   Vaults as a business in which drug

15   traffickers would utilize to store bulk

16   proceeds as well as contraband, whether it

17   be drugs or guns or, you know, hard

18   drives, whatever, based on, you know, our

19   investigations, we heard that that's what

20   that business was used for by a large

21   majority of criminals in the Los Angeles

22   area.

23   BY MR. GREENBERG:

24       Q.    So it's fair to say that DEA

25   viewed U.S. Private Vaults as a place that

Page 63

```
 1   criminals would conduct business and kind
 2   of hide their business?
 3              MR. COLL:  Objection, vague,
 4        misstates prior testimony.
 5        A.    I don't believe the DEA as an
 6   organization had an opinion one way or the
 7   other in the initial stages of the
 8   investigation, but like I said, we had
 9   ascertained from, you know, proffered
10   statements as well as just informants and
11   undercovers that the business was very
12   attractive to the criminal element in
13   Southern California and Los Angeles in
14   particular.
15   BY MR. GREENBERG:
16        Q.    Okay.  So is it fair to say that
17   you, in your law enforcement capacity,
18   viewed U.S. Private Vaults as a place that
19   criminals conducted their business and hid
20   their criminal business?
21        A.    In my experience, yes.
22        Q.    Okay.  And that's because you
23   found in some boxes at U.S. Private
24   Vaults, criminal proceeds or indicia that
25   criminal proceeds were stored there?
```

Page 64

```
 1              MR.  COLL:   Misstates  prior
 2       testimony.
 3         A.     That  definitely  played  a  role  in
 4       why  I  believe  that  criminals  would  use  it,
 5       yes.
 6    BY  MR.  GREENBERG:
 7         Q.     It's  my  understanding  that  at  a
 8       certain  point,  the  focus  of  the
 9       investigation  into  U.S.  Private  Vaults
10       turned  from  individual  box  holders  to  the
11       company;  is  that  correct?
12         A.     Yes.
13         Q.     About  when  would  you  say  that
14       happened?
15         A.     Again,  without  having  the
16       reports  in  front  of  me  and  --  I  would
17       believe  it  was  shortly  after  a  particular
18       person  was  --  one  of  the  owners  was  --  was
19       observed  coming  and  going  when  he  was
20       identified  as  one  of  the  owners,  then  we
21       started  looking  at  it  as  a  potential
22       criminal  case  against  the  company.
23         Q.     Okay.   Can  you  tell  me  a  little
24       bit  more  about  how  that  flip  happened?
25       What  about  the  owner  coming  and  going  led
```

Page 65

1      to that flip?

2                MR. COLL:  Object to form.

3          A.    The particular owner that I'm

4      talking about in question was a known drug

5      trafficker.  He had been involved in

6      previous DEA and FBI cases and our

7      intelligence suggested that he was

8      actively recruiting members of his

9      criminal enterprise to become customers of

10     U.S. Private Vaults because the way the

11     business was set up is particularly

12     attractive to those trying to hide drug

13     proceeds and contraband.

14     BY MR. GREENBERG:

15         Q.    And so who was involved in that

16     decision to shift the focus of the

17     investigation from box holders to the

18     company itself?

19         A.    I believe it was a joint

20     investigation -- or joint -- joint

21     decision with all of the investigative

22     team.  So there was DEA involved, FBI,

23     U.S. Postal Inspectors that, you know,

24     were the heavy lifters on the

25     investigation, but it also involved some

Page 66

```
 1    local -- local law enforcement such as
 2    Beverly Hills PD, LAPD and LA County
 3    sheriffs.
 4        Q.   Do you remember who first came
 5    up with the idea of switching the
 6    investigation from box holders to the
 7    company?
 8        A.   I don't believe I can put a name
 9    on it because it was just the next logical
10    step and it was kind of seen as, yeah,
11    this is the next -- the next phase of the
12    investigation.
13        Q.   Okay.  Do you remember
14    specifically who was involved in that
15    conversation at least?
16        A.   It would have been myself, my
17    bosses, FBI, their chain of command,
18    postal, their chain of command, U.S.
19    Attorney's Office, that kind of thing.
20        Q.   Do you remember any particular
21    people in those agencies who was involved
22    in those conversations?
23        A.   Myself and Todd Boyett were the
24    DEA individuals, then Lynne Zellhart from
25    FBI and her boss Rich, his last name
```

Page 67

1  escapes me right now, and then Lyndon

2  Versoza from U.S. Postal, and his boss

3  Noah, and I want -- I can't remember his

4  last name either.  And from the U.S.

5  Attorney's Office, Anthony Brown and his

6  staff.

7       Q.    Might you be referring to Andrew

8  Brown?

9       A.    Did I say Anthony?  Yeah, I

10  meant Andrew.  Sorry.  I'm one year

11  removed.

12       Q.    It's all good.  It's a rather

13  common name as well so it totally happens.

14            Okay.  So that's a lot of people

15  involved in kind of making that decision.

16  What steps did the group take in kind of

17  shifting its focus from individual box

18  holders to the business?  What -- what

19  were the next steps then once the decision

20  to investigate the business took hold?

21            MR. COLL:  Hey, Mike, this is

22       Max, I just want to clarify the

23       question here.  We're talking about

24       before a conversation that included

25       Andrew Brown.  I just want to caution

Exhibit N
1376

ER-334

Page 68

```
 1          the witness, if you're still talking
 2          about that conversation to not divulge
 3          anything that is protected by the
 4          attorney-client privilege, but maybe
 5          you can clarify.  Are you talking
 6          outside of the conversation that
 7          you're just asking about or -- or
 8          where are you headed with this?
 9                MR. GREENBERG:  Yeah, I'm not
10          talking about any particular
11          conversation.  Just from -- from
12          Special Agent Carlson's perspective.
13     BY MR. GREENBERG:
14          Q.    What steps were taken next once
15     the focus from individuals to the business
16     took hold?
17                MR. COLL:  Okay.  So I'll allow
18          you to answer but not with respect to
19          what was discussed in that meeting,
20          but -- or outside of that meeting now,
21          you can respond to the question if you
22          understand.
23          A.    My understanding is you're
24     asking what did the individual
25     investigators do next; is that correct?
```

1    BY MR. GREENBERG:

2         Q.    That's -- that's great, yeah.

3         A.    So based on the intelligence

4    that we were getting from undercovers and

5    confidential sources and what we knew

6    about this new owner recruiting other

7    criminals that he had connections with to

8    the business, we began mainly

9    investigating that owner and making steps

10   like we would any other drug trafficker.

11   We're going to try to infiltrate that

12   organization whether it's with, you know,

13   the exploitation of bank records, the

14   exploitation of phones, insertion of

15   cooperating -- or sorry -- confidential

16   informants and undercovers.

17        Q.    And just so I'm clear, I want to

18   go back to some of that.  I thought I

19   heard you mention, you mentioned that this

20   was a new owner?

21        A.    Right, our understanding was

22   then at one point this owner bought out

23   half of the business and then it became,

24   you know, the -- just the two owners at

25   the time.

1       Q.    Okay.  And so it was when that
2   new owner came into the business that the
3   decision to shift the focus of the
4   investigation from individuals to the
5   business itself took hold?
6       A.    I don't know that the decision
7   was made before or after that because,
8   again, the investigation was leading up to
9   this business catering towards the
10  criminal element, but it was once this
11  owner came into place, then -- then I know
12  that the shift was -- from my perspective,
13  more directly focused at not just the
14  individuals as a drug trafficker, but the
15  individual drug trafficker as it pertained
16  to their role at U.S. Private Vaults.
17  Does that make sense?
18      Q.    Yeah.  Yeah, thanks for that.
19            So it was the new owner and the
20  new owner's kind of relationship to box
21  holders or to -- let's scratch that
22  question.
23            It was the new owner's
24  relationship to customers at U.S. Private
25  Vaults that played a role in shifting

Exhibit N
1379

```
 1    the -- the focus of the investigation to

 2    the company itself?

 3              MR. COLL:  Object to form.

 4         A.    I would say that it played a

 5    role in that it was one of, you know, a

 6    few different factors that we determined

 7    to utilize the -- or to direct the

 8    investigation as an investigation of a

 9    business.

10    BY MR. GREENBERG:

11         Q.    What other factors were

12    considered at that time?

13         A.    For us it was the -- just the

14    shear amount of law enforcement crossings.

15    So the deconflictions that we talked

16    about.  If we were conducting surveillance

17    at the business, it seemed like the vast

18    majority, and, again, this is not a

19    technical -- I didn't do any statistical

20    analysis of this, I'm just saying, from my

21    perspective, it seemed like the vast

22    majority of people we were seeing as

23    patrons of U.S. Private Vaults on our

24    surveillances had been or were currently

25    being investigated by one or more law
```

Exhibit N
1380

ER-338

1   enforcement agencies.  And when we came

2   into contact with these individuals, some

3   of them flat-out said, yeah, I heard about

4   U.S. Private Vaults from other criminals

5   and it's a great place to keep your money

6   to hide it from law enforcement.

7       Q.    And the reasons why they were

8   hiding their money from law enforcement is

9   because it was criminal proceeds?

10      A.    That was my understanding.

11      Q.    Okay.  And you said earlier

12  there was about a couple dozen box holders

13  that were connected to U.S. Private Vaults

14  that you were -- you and other federal

15  agencies were investigating around that

16  time before the switch of the focus to the

17  company itself?

18      A.    I -- yes, and I'm talking it --

19  when I say that I investigated, I mean I

20  did some sort of investigation into it.

21  Whether it meant that I just ran their

22  criminal history, checked it for wants and

23  warrants, you know, see if their phone

24  numbers that they had in public record had

25  been identified in any investigations, but

Exhibit N
1381

```
 1    there were several that once, you know, we
 2    ran a license plate, they immediately
 3    showed up on other people's investigations
 4    so we did no investigation.
 5         Q.   Okay.  And so it seemed like
 6    there was quite a bit of amount of time
 7    between the start of the shift of the
 8    investigation to the business and when the
 9    seizure warrant at U.S. Private Vaults was
10    executed.  Because I believe you said that
11    you started investigating the business
12    around 2018?
13         A.   Correct, there -- the -- the --
14    the focus of the -- of the investigation
15    being the business was somewhere around
16    the 2018-2019 or at least the possibility
17    of investigating -- of targeting the
18    business had been -- you know, had been
19    addressed.  But as you remember, something
20    happened in 2020 that delayed everything.
21    So the -- the investigation was
22    significantly delayed by COVID.
23         Q.   Totally makes sense.
24              So you mentioned the team that
25    kind of got involved in investigating the
```

Page 74

1   business or helped to make the decision to

2   investigate the business.  About when did

3   that team decide that it was ready to

4   apply for a seizure warrant?

5        A.    I would have to have the, you

6   know, the case documents in front of me to

7   give you a very specific date.  I know it

8   was prior to COVID that we were

9   considering it and looking at where our

10  probable cause was and -- and that kind of

11  thing.  So somewhere 2019, you know, early

12  2020, we were considering it.

13       Q.    Okay.  Were you involved in any

14  discussions about how to apply for that

15  seizure warrant?

16            MR. COLL:  Mike, I'm going to

17       step in here again.  Are you asking

18       about conversations that occurred with

19       the U.S. Attorney's Office?  It sounds

20       now you're getting into sort of legal

21       decisions here.

22            MR. GREENBERG:  I'm just asking

23       if he was involved in the decisions.

24       I'm not asking for any content

25       whatsoever.

Exhibit N
1383

ER-341

1              MR. COLL:  Okay.  I'm going to

2          let him answer this, but we kind of

3          ran into this in a previous deposition

4          where y'all, you know, asked

5          substance -- you asked if substance

6          was discussed.  It's kind of a gray

7          area here where you're getting into

8          potentially privileged conversations.

9          I'm going to let him answer this, but

10         just alerting you to that issue.

11         A.    So my input was taken, but the

12     decision was made above my pay grade.

13     BY MR. GREENBERG:

14         Q.    Okay.  Were you involved in any

15     discussions about how to apply for the

16     warrant?

17         A.    Once the -- once the decision

18     was made for FBI to be the lead agency on

19     that for -- as far as the agency that

20     would draft the warrant, information from

21     my previous cases was obviously utilized,

22     but the ultimate decision on how that

23     would be made and who would do it and how

24     the warrant would be structured was not up

25     to me, no.  It wasn't -- or I wasn't as

Page 76

```
 1    involved other than my previous case work.
 2         Q.    You're saying you weren't as
 3    involved.  Were you involved at all?  It
 4    sounds like you were involved a little bit
 5    maybe by giving input to your prior cases.
 6    Any involvement beyond that?
 7         A.    Not substantive.  I mean, my
 8    opinions, you know, were asked, but it
 9    wasn't -- it was more of wording of my
10    previous case work.
11         Q.    Okay.  You mentioned that it was
12    decided that FBI would be the lead agency
13    to draft a warrant; is that correct?
14              MR. COLL:  Mike, you know, I
15         think again you're asking about
16         content of communications that were
17         had with attorneys present.  I'm going
18         to instruct him not to answer that
19         question.
20              MR. GREENBERG:  I just want to
21         know if I'm understanding his previous
22         testimony correctly.
23              MR. COLL:  Okay.  You can ask
24         the question.  Go ahead.
25    BY MR. GREENBERG:
```

Page 77

1       Q.    You mentioned earlier that it

2    was decided that FBI would be the lead

3    agency to draft the warrant; is that

4    correct?

5       A.    Yes.

6       Q.    Who made that decision?

7          MR. COLL:  Again, I'm going to

8       instruct him not to answer that

9       question.  You're asking about the

10      content of conversations that were had

11      and decisions that were had during

12      conversations with attorneys present,

13      and I'm going to instruct him not to

14      answer that.

15         MR. GREENBERG:  Okay.

16    BY MR. GREENBERG:

17       Q.    When was that decision made?

18       A.    I don't know if there is a

19    formal time stamp when that was made, but

20    I believe it was in the months leading up

21    to the decision to file for the warrants

22    so probably summer of 2020, maybe into the

23    fall of 2020.

24       Q.    Okay.  So based on your earlier

25    experience with U.S. Private Vaults, was

Exhibit N
1386

ER-344

Case 2:21-cv-04205-RGK-MAR Document 265-1 Filed 08/08/24, Page 29 of 243 Page ID
Case 2:21-cv-04205-RGK-MAR Document 165-34 Filed 08/18/22, Page 79 of 148
#:5654

1    it your impression that a large amount of

2    criminal proceeds would be found at U.S.

3    Private Vaults when that warrant was

4    eventually executed?

5              MR. COLL:  Object to form.

6        A.    I don't know that it would be

7    classified as a large amount.  I knew

8    there would likely be some.  To what

9    extent, you know, that, you know, the

10   business being as large as it was, I guess

11   is subjective.  What do you consider large

12   could be different than what, you know, I

13   consider large, but I knew there would be

14   illegal proceeds and likely contraband

15   present.

16   BY MR. GREENBERG:

17       Q.    Okay.  And you expected criminal

18   proceeds and contraband inside the boxes

19   at U.S. Private Vaults; is that correct?

20             MR. COLL:  Object to form.

21       A.    Based on my investigation, I

22   believed there would be, yes.

23   BY MR. GREENBERG:

24       Q.    Okay.  Was it your impression

25   that the government would seek to use

```
 1    civil forfeiture against some of those
 2    criminal proceeds?
 3              MR. COLL:  Object to form,
 4         vague.
 5         A.    My understanding would be that
 6    to the extent that we identified criminal
 7    proceeds, that we would attempt to forfeit
 8    them if they were identified as criminal
 9    proceeds.
10    BY MR. GREENBERG:
11         Q.    And what was that understanding
12    based on?
13         A.    Based on understanding, I --
14    could you be a little more specific?  I'm
15    trying to understand what you're asking.
16         Q.    So it sounds like you just
17    testified earlier that it was your
18    understanding that, to the extent criminal
19    proceeds were found in the boxes at U.S.
20    Private Vaults, the government would seek
21    to have those proceeds forfeited using
22    civil forfeiture.  Where did you get that
23    understanding from?
24              MR. COLL:  Object to form.
25         A.    It's the same -- any inventory
```

Page 80

```
 1    search.  If I'm inventorying a vehicle
 2    that I'm seizing and in the course of that
 3    inventory, we look in the trunk and
 4    there's, you know, bulk cash that has
 5    in -- you know, is indicative of drug
 6    proceeds, then we would seek to forfeit
 7    it.  My understanding would be that the
 8    same process would take place at U.S.
 9    Private Vaults.  It's an inventory search,
10    but to the extent that we identify
11    suspected drug proceeds, we were prepared
12    to do the same thing that we would do if
13    we were inventorying a vehicle.
14    BY MR. GREENBERG:
15         Q.    Okay.
16              MR. GREENBERG:  Let's take a
17         five-minute break.  Let's come back at
18         I guess 3:06 your time, all right?
19              THE WITNESS:  Okay.
20              MR. GREENBERG:  Thanks.
21              (Whereupon, a brief recess is
22         taken.)
23    BY MR. GREENBERG:
24         Q.    So I want to shift forward in
25    our timeline a little bit now to the team
```

Case 2:21-cv-04405-RGK-MAR Document 265-3 Filed 08/18/24 Page 83 of 145 Page ID #:5657
Case 2:21-cv-04405-RGK-MAR Document 165-3 Filed 08/08/22 Page 82 of 248 Page ID
#:5657

Page 81

1   has drafted the affidavit for the warrant

2   and I want to get to the team's

3   preparation for executing the warrant now.

4   Were you assigned any particular role in

5   the lead-up to the execution of the

6   warrant at U.S. Private Vaults?

7        A.    DEA's primary function during

8   the execution of the warrant was the -- to

9   coordinate the videography of the

10  inventories.  So we -- we made

11  arrangements and provided digital cameras

12  to videotape inventory searches and our

13  personnel were also, you know, on hand to

14  assist as FBI needed.

15       Q.    Okay.  Was there a particular

16  reason why DEA was assigned that role?

17       A.    Just kind of division of labor,

18  like, you know, what -- what needed to be

19  done and who would do it was more just

20  kind of -- I don't want to say that it was

21  not intentional for one agency to handle

22  one thing or another, but it was just --

23  we knew we needed the inventories to be as

24  documented as we could possibly make them

25  and we made the decision that the best way

```
 1    to do that was through video and DEA had

 2    the video equipment.  So we, you know, we

 3    obviously volunteered to -- to be in

 4    charge of that particular aspect of it.

 5         Q.    Got it.

 6               I want to -- so -- so you were

 7    in charge of kind of gathering all the

 8    video and camera equipment basically?

 9         A.    Right, as far as pre-search

10    warrant and the preparation for the search

11    warrant and seizure warrant, yes, that's

12    one of our roles, yeah.

13         Q.    Okay.  And I just want to

14    clarify going forward.  When I use the

15    word "warrant," to the extent there's a

16    distinction in your head, I'm referring to

17    the seizure warrant rather than the search

18    warrant.

19               Were there any other particular

20    roles or tasks that you were assigned in

21    the lead-up to the execution of the

22    seizure warrant?

23         A.    Based on, you know, my previous

24    statements of, you know, informants,

25    undercovers and proffered statements of
```

Page 83

1    cooperating defendants suggesting that
2    there -- that the business had been and
3    previous -- right, that the business had
4    previously been utilized to store drugs
5    and other drug-related contraband.  DEA
6    was present to process anything like that.
7         Q.    So that was during the execution
8    of the four days of the seizure warrant
9    while all the boxes were being inventoried
10   or was this a separate time that you're
11   referring to?
12        A.    Both really.  So it was
13   determined ahead of time that there was a
14   high likelihood that during the seizure
15   warrant and the inventories that we would
16   come across -- and by "we," I mean the
17   investigative team comprised of all
18   agencies present -- would come into
19   contact with drugs and drug paraphernalia,
20   precursor chemicals, that kind of thing,
21   in which time -- so prior to the seizure
22   warrant, a determination was made that DEA
23   needed to be present at all times,
24   somebody from DEA needed to be present at
25   all times to make a determination as to

```
 1     maybe what the substance was, how
 2     dangerous it was, and that we would
 3     actually take it into custody and process
 4     it.
 5          Q.    Understood.  Okay.
 6                Okay.  I -- sorry.
 7                Any other particular roles other
 8     than video and processing and analyzing
 9     potential narcotics?
10          A.    Not specifically that I can
11     recall.
12          Q.    Okay.  I'd like to pull up a
13     document real quick.  I'm not sure --
14                MR. GREENBERG:  Did you guys get
15          Exhibit Share figured out on this --
16          on this new setup, Max?
17                MR. COLL:  Hold on.  We'll give
18          it a shot.
19                MR. GREENBERG:  All right.  Let
20          me go ahead and introduce something
21          and we'll see what happens.  Just bear
22          with me one moment.
23                MR. FROMMER:  What do we need?
24                MR. GREENBERG:  Exhibit 15.
25                (Exhibit 15, Agent Observations
```

Page 85

1           and Notes Bates numbered FBI0000301,

2           marked for identification.)

3     BY MR. GREENBERG:

4           Q.    I got a notification that my

5     exhibit has been introduced so let me know

6     if you guys are seeing it.

7                 MR. COLL:  Give us a moment.

8           We're trying to log on.  We got it

9           pulled up.  It's titled Agent

10          Observations and Notes?

11                MR. GREENBERG:  Yes, correct.

12    BY MR. GREENBERG:

13          Q.    Special agent Carlson, are you

14    familiar with this form, not

15    necessarily -- sorry.  I'll clarify.

16                Are you familiar with this form

17    in general, not necessarily this version

18    of it filled out, but this form in

19    general?

20          A.    No, this is an FBI form.

21          Q.    So you've never seen it before?

22          A.    It's not that I've never seen

23    it.  I'm not just that familiar with it.

24          Q.    But you have seen this before,

25    correct?

Exhibit N
1394

ER-352

```
 1        A.     Yes.

 2        Q.     Do you know who created it?

 3        A.     I don't know who by name created

 4   it, but I know it was an FBI -- an FBI

 5   form so I imagine somebody at FBI.

 6        Q.     Okay.  When have you seen it in

 7   the past?

 8        A.     I observed FBI agents filling

 9   them out during the inventory search,

10   searches of U.S. Private Vaults.

11        Q.     Okay.  And separate from this

12   form, were -- are you aware whether any

13   DEA agents were also conducting

14   inventories of boxes during the execution

15   of the seizure warrant?

16        A.     Yes.  DEA agents would

17   participate in inventory searches, yes,

18   because just the shear volume.

19        Q.     Okay.  Did you?

20        A.     Yes.

21        Q.     Okay.  Have you ever filled out

22   one of these forms before?

23        A.     I do not recall if I did

24   particularly.  I mean, it was, again, it

25   was four days of five hours of sleep at
```

Page 87

1    max, but I believe the FBI agents present
2    were the ones handling the paperwork.
3         Q.    Okay.  But you've observed this
4    doc -- sorry -- this document as being
5    filled out during the inventory of U.S.
6    Private Vaults boxes?
7              MR. COLL:  Vague.
8         A.    Yeah, the only time that I've
9    seen these are -- not the only time maybe,
10   I don't know, the only time I recall
11   seeing these -- these documents were
12   during the inventory searches at USPV.
13   BY MR. GREENBERG:
14        Q.    Okay.  And just to make sure I
15   understand what you just said, you said
16   you haven't or can't recall any other
17   times seeing this particular form?
18        A.    No.
19        Q.    Okay.  Can you -- I want to
20   point you to the heading Cash
21   Observations.  And I'm just going to read
22   some of the words here.  It says "e.g.,
23   Agents should note things such as how the
24   cash is bundled," and "if it has a strong
25   odor."  Are you seeing that text?

Page 88

```
 1        A.    Yes.

 2        Q.    Earlier you testified -- and I'm

 3    sure I'm paraphrasing -- but you testified

 4    that noting how cash is bundled or noting

 5    the odor of cash could help you determine

 6    whether it is -- it has any indications of

 7    criminality; is that basically right?

 8              MR. COLL:  Object to form,

 9        vague.

10        A.    Those are certainly things that

11    we would utilize in making a decision on

12    whether or not cash was potential drug

13    proceeds, yes.

14    BY MR. GREENBERG:

15        Q.    Okay.  So noting the way the

16    cash is bundled and whether it has an odor

17    could help inventorying agents at U.S.

18    Private Vaults understand or form an

19    opinion as to whether that cash is

20    potentially criminal proceeds; is that

21    fair to say?

22              MR. COLL:  Object to form.

23        A.    I mean, these are -- these are

24    generic things that we use in all

25    inventory searches when we come across
```

1    bulk cash is, you know, does it have

2    residue on it?  Does it smell, is it

3    rubber-banded, these are things that we

4    would use in any inventory search to

5    determine whether cash had the potential

6    to be bulked or to be drug proceeds.

7    BY MR. GREENBERG:

8        Q.    Okay.  And this form seems to be

9    asking agents to note the manner in which

10   cash is bundled and whether it has an odor

11   or something like that, correct?

12       A.    Yes.

13       Q.    Okay.  So asking kind of in an

14   off-kilter way earlier, just to confirm,

15   you were at U.S. Private Vaults while the

16   seizure warrant was being executed?

17       A.    For much of the time, yes.  I

18   would go home to sleep.  That's about it.

19       Q.    Yeah, I've heard it was a long

20   four days and, you know, eat, sleep and be

21   at U.S. Private Vaults basically, right?

22       A.    Yep.

23       Q.    So you mentioned that you helped

24   inventory some of the boxes; is that

25   right?

Page 90

```
 1        A.    Yes.
 2        Q.    Did you have any other role over
 3   the course of those four days of the
 4   seizure warrant being executed?
 5        A.    My primary role was just kind of
 6   making sure that the logistics of things
 7   were moving along.  You know, do we have
 8   enough forms and, if so or if not, I
 9   should say, I would get with somebody from
10   FBI to make sure that the inventory -- the
11   inventorying agents had what they needed
12   whether it was dry erase boards, dry erase
13   markers, water, kind of supervising shifts
14   of the DEA personnel that were coming and
15   going that were handling videography,
16   basically kind of just making sure things
17   were moving as efficiently and as smoothly
18   as possible.
19        Q.    Okay.  So kind of a supervisory
20   role?
21        A.    There were supervisors on-site
22   that were more supervisors as far as
23   making decisions on how things were done.
24   My role was mainly to kind of facilitate
25   those decisions.  So if the decision was
```

Page 91

1    made to start utilizing still cameras,

2    then I would make sure we had still

3    cameras and that we had memory chips for

4    those still cameras.  Whether they came

5    from DEA or whether they were brought in

6    by FBI or if, you know, if we needed more

7    water and, you know, somebody needed to go

8    get water, I would designate somebody to

9    go get water because my boss said we

10   needed more water.  That kind of thing.

11        Q.    And just so I'm clear, you

12   referenced your bosses at the time of the

13   execution.  Who are you referring to

14   exactly in doing so?

15        A.    So my -- my direct supervisor

16   was Todd Boyett.  He was on-site to

17   supervise DEA, you know, DEA's role, like

18   I said before, the identifying of

19   potential drugs, drug contraband,

20   precursor chemicals, whether it was safe

21   to handle, that kind of thing, as well as

22   the FBI supervisors that were present,

23   Rich and some of those guys.

24        Q.    Okay.  I want to go back now to

25   this Agent Observations and Notes form and

1    if I can have you look at the section just
2    below the cash observation section.  There
3    are four lines there that say K-9 Agency,
4    K-9 Handler, K-9 Name and K-9 Hit (Circle
5    One).  Is that right?
6         A.    Yes, that's what I'm observing,
7    yep.
8         Q.    So does that indicate that there
9    were drug-detection K-9s on-site during
10   the inventorying of boxes at U.S. Private
11   Vaults?
12        A.    Yes.
13        Q.    Whose idea was that to have
14   drug-detection K-9s during the
15   inventorying of boxes?
16        A.    I'm not sure who made the final
17   decision as to why we would have them, but
18   in preparation, we knew this was going to
19   be a big undertaking and when you're -- if
20   you're -- if you've ever investigated drug
21   crimes, like DEA and FBI, Postal has,
22   sometimes in LA, it can take hours to get
23   a drug-sniffing K-9 to the scene of an
24   arrest or a search warrant or anything
25   like that.  In anticipation of that, we

Exhibit N
1401

ER-359

Page 93

1    knew we needed to have them on scene.
2    Whose ultimate decision it was to -- to
3    have them there 24/7 was not my call to
4    make.  I just know that we needed to make
5    sure that we were working as efficiently
6    as possible and in so doing to be prepared
7    for all contingencies, and it's something
8    we do on every search warrant or seizure
9    warrant.  We -- we game plan.  What's the
10   worst case scenario that can happen?
11   What's the best scenario that can happen?
12   What's an anomaly that we may encounter?
13   And then we try to prepare for that well
14   in advance so that if and when it happens,
15   we are prepared so it doesn't prolong our
16   time in execution of our duties.
17        Q.    That makes sense.  Sounds like
18   something like Vince Lombardi would
19   probably profess or something like that.
20            So the decision to have K-9s
21   on-site was made prior to the beginning of
22   the warrant's execution?
23        A.    Yes.
24        Q.    Okay.  And the dogs were there
25   to facilitate the possible collection

Exhibit N
1402

Page 94

1    of -- of indicia of criminality attached
2    to cash found in boxes; is that correct?
3              MR. COLL:  Object to form.
4        A.    The K-9s were there in the event
5    that a box during its inventory alluded to
6    potential criminal activity, specifically
7    drug trafficking.
8    BY MR. GREENBERG:
9        Q.    Okay.  So to detect indicia of
10   that criminal activity specifically drug
11   trafficking?
12             MR. COLL:  Object to form.
13       A.    Yes, and the opposite as well.
14   To, you know, if the drug dog was used and
15   it didn't alert, then it's also not
16   indicating that it wasn't drug proceeds,
17   but obviously it's a double-edge sword
18   essentially.  So if a drug dog sniffs bulk
19   cash and the drug dog alerts, that could
20   be used as, you know, evidence of drug
21   trafficking, but the fact that a drug dog
22   did not alert could then be used as
23   evidence that it's not drug trafficking.
24   BY MR. GREENBERG:
25       Q.    Okay.  Fair.

```
 1              So -- but the reason for running
 2    a dogs over cash found in a box was to
 3    help determine whether that cash has any
 4    indicia of drug trafficking?
 5              MR. COLL:  Object to form.
 6    BY MR. GREENBERG:
 7       Q.    It's not necessarily -- sorry.
 8    I'll clarify.
 9              It's not necessarily to
10    eliminate the possibility but it's to
11    determine whether there might be any
12    indicia of drug trafficking?
13              MR. COLL:  Object to form.
14       A.    The -- the drug dogs were there
15    to add another -- I don't want to say
16    another level, but another indication.  So
17    if we observed two or three things during
18    the inventory that led us to believe that
19    it was criminal proceeds and the drug dogs
20    were used to do a sniff search, that was
21    just one more element to -- to the
22    determination.
23    BY MR. GREENBERG:
24       Q.    Okay.  So -- sorry.  Hang on one
25    second.
```

Page 96

1              MR. COLL:  No problem.  Take

2         your time.

3    BY MR. GREENBERG:

4         Q.    Okay.  Do you know if it was

5    practice for inventorying agents to run a

6    dog alert or run a dog sniff on all cash

7    found in boxes at U.S. Private Vaults?

8         A.    I can't speak to what FBI does.

9    I'm a drug detective or drug investigator.

10   So it's highly common when investigating

11   crimes of alleged drug activity to have a

12   drug dog on standby in the event that you

13   come across both currency or a locked

14   container or something that you need the

15   drug dog to determine whether or not that

16   potential -- or that particular item has

17   the potential to be involved in drug

18   trafficking.  It's something that, as a

19   DEA agent, we do very often in our

20   investigations is if it especially if a

21   search warrant of this scope that it's

22   going to be a large -- a large business, a

23   large house, a large storage container,

24   that because drug dogs are not a commodity

25   that can be called on, you know, short

Exhibit N
1405

ER-363

1    notice, sometimes -- most of the time, we

2    try to have them on standby if possible.

3        Q.    That makes sense and it makes

4    sense that it sounds like you were

5    investigating potential drug activity or

6    drug trafficking activity at U.S. Private

7    Vaults.  So I understand that, but do you

8    know if it was practice -- during the

9    inventorying of -- of U.S. Private Vaults'

10   boxes in particular, do you know if it was

11   practice of the inventorying agents to run

12   a dog sniff on all cash that was seized

13   from boxes or just whether it was practice

14   instead to only run a dog sniff on

15   particular cash found in boxes?  I'm just

16   trying to get a sense for -- for when dog

17   sniffs were run at U.S. Private Vaults, I

18   guess.

19            MR. COLL:  Objection, asked and

20        answered.

21        A.    I can't speak to if all cash was

22   sniff searched.  One, because I wasn't

23   there 24/7 and, two, I wasn't actually

24   partaking in every single inventory or

25   present for every single inventory.  So I

```
 1    can't -- I can't answer that question the
 2    way it was phrased.
 3    BY MR. GREENBERG:
 4         Q.    Okay.  And you're not aware of
 5    any, like, particular, like, pre-discussed
 6    policy for -- for how or -- sorry, scratch
 7    that.
 8              If -- you're not aware of any
 9    particular policy that the investigative
10    team came up with about what cash should
11    get a dog sniff and what cash should not
12    get a dog sniff at U.S. Private Vaults?
13         A.    It was my understanding that FBI
14    made that decision.  If they called us to
15    look into a box and we asked them that,
16    you know, anything that looked like drugs,
17    drug paraphernalia or precursor chemicals
18    or anything that -- that was of that
19    nature, then we would come in and make a
20    decision of how it would be handled mainly
21    because we experienced it more often and
22    we would know if it was fentanyl or some
23    sort of acetone that might harm the dog or
24    harm the inventory searchers, but as far
25    as any other determinations by DEA, that
```

```
 1    was not our call.
 2        Q.    And you're not aware of any
 3    conversations among, let's say, like Lynne
 4    Zellhart and you and Lyndon Versoza where
 5    a policy about which -- which cash would
 6    get a dog sniff and which cash would not
 7    took place?
 8        A.    I don't believe a discussion
 9    took place where any sort of observation
10    would be codified in a way that would
11    immediately warrant a sniff search or not.
12    I believe it was just going to be up to
13    the FBI agents conducting the inventory as
14    to which -- which boxes got sniff searched
15    or not.  That was my understanding.
16            MR. GREENBERG:  I'm going to
17        introduce a different exhibit now real
18        quick then.  Sorry.  Bear with me just
19        a second.  And this will be marked as
20        Exhibit 16.
21            (Exhibit 16, FBI 302 document,
22        marked for identification.)
23    BY MR. GREENBERG:
24        Q.    That should be coming up.
25            MR. GREENBERG:  Let me know when
```

Exhibit N
1408

ER-366

Page 100

1       you have it, Max.

2               MR. COLL:  We have it pulled up.

3               MR. GREENBERG:  Okay.  Great.

4       BY MR. GREENBERG:

5           Q.    Have you ever seen a form that

6       looked like this before?

7           A.    Is this 302 -- yeah, this to me

8       looks like an FBI 302.  I believe that's

9       what it is.  That's what it looks like.

10          Q.    Yeah, it is.  And this was

11      produced to us in discovery from the

12      government.

13              Are you familiar with this at

14      least in part because of the inventorying

15      of boxes at U.S. Private Vaults?

16          A.    I've worked multiple cases with

17      FBI even before U.S. Private Vaults and

18      their 302 is analogous to our DEA 6.  It's

19      their -- it's their report form.

20          Q.    Okay.  I just want to know if

21      you could see if you could read me the

22      line, the bottom middle in -- of this that

23      says "Agent Note" or begins with "Agent

24      Note"?

25          A.    So it's on page 1?

Page 101

```
 1        Q.    Yeah.  I think there's only one
 2     page here.
 3        A.    Oh, okay.  Okay.  So "Agent
 4     Note" says "DEA did not want to send money
 5     to dog."
 6        Q.    I recognize that you weren't at
 7     U.S. Private Vaults the entire time, but
 8     I -- I just wanted to ask about this.  Do
 9     you know why a note like that might be in
10     an FBI 302?
11        A.    Without knowing exactly what
12     they found, I can't speak to why this
13     particular 302 reads this or has this
14     statement in it, but normally when we make
15     a determination to specifically say do not
16     send this to the dog, it's because there
17     might be a hazard to the dog.  For
18     instance, if this was some sort of
19     chemical, you know, DEA does not -- itself
20     does not have drug dogs assigned to it,
21     but we obviously work with them quite a
22     bit, and we know certain things.  Like if
23     I find a kilo of powdered fentanyl, I'm
24     not going to send that to a drug dog
25     because it's a hazard.  So I could say
```

```
 1    that is one of the reasons why we wouldn't
 2    send it to a dog.  It might be that it's
 3    too sharp.  Dogs are hard to control.
 4    When they get excited, they start sniffing
 5    hard and sometimes a dog will just shove
 6    his nose into the seat of a car and, you
 7    know, there's a razor blade there and he
 8    cuts his face.  So if there's a note that
 9    says DEA did not want to send money to
10    dog, that could be one of the reasons
11    that -- that there was a hazard to the
12    dog.  But without knowing what was found
13    in this box, I couldn't tell you.
14        Q.   Okay.  Can you think of any
15    other instance where you personally told
16    FBI or anybody else not to send cash to a
17    dog at U.S. Private Vaults?
18        A.    I mean, I imagine we could have
19    made determinations in that, you know
20    there was indicia in the box that spoke to
21    the source of funds or there was indicia
22    in the box that, you know, could have led
23    that there was something on the money that
24    we don't want the dogs to come in to
25    contact with or that, you know, it just --
```

1    it wasn't a suspicious box, but, again,

2    without knowing this particular box

3    whatever was in 2601, I couldn't speak to

4    as why this particular note was made.

5        Q.   Yeah.  And I appreciate that.

6    I'm not asking you to speculate.  I was

7    just asking you if there were any, like,

8    concrete examples of -- that you can

9    recall of you personally telling someone

10   not to send cash to a dog at U.S. Private

11   Vaults?

12       A.   I don't remember a specific

13   situation where I told somebody not to

14   send it to -- to a dog, no.

15       Q.   Okay.  Is it generally fair to

16   say that it was more likely that cash

17   would be sent to a dog at U.S. Private

18   Vaults if there were more indicia of

19   criminality found in the box?

20            MR. COLL:  Objection, vague.

21       A.   I mean, it's up to the

22   inventorying agent as to what they

23   consider suspicious, you know, their

24   training and their observation but more

25   importantly their experience varies from

Exhibit N
1412

Page 104

1    agent to agent, so I can't speak to -- as

2    to why somebody would say yes or no one

3    way or the other.

4    BY MR. GREENBERG:

5        Q.    Okay.  But generally in that

6    agent's training and experience, is it

7    more likely they would have sent a -- cash

8    found in a box at U.S. Private Vaults to a

9    dog if they were suspicious of that cash?

10           MR. COLL:  Vague, calls for

11       speculation, asked and answered.

12       A.    It's my understanding that, as

13   the inventories were being conducted, if

14   the box arose suspicion of drug

15   trafficking, that a drug dog would be

16   available if possible to do a sniff

17   search.

18   BY MR. GREENBERG:

19       Q.    Okay.  Okay.

20           MR. GREENBERG:  Let's take five

21       and then we'll come back at 4:55.

22           (Whereupon, a brief recess is

23       taken.)

24   BY MR. GREENBERG:

25       Q.    Just one quick question on the

Exhibit N
1413

ER-371

1    execution of the warrant that I meant to

2    ask earlier:  Prior to the start of the

3    execution of the warrant, was the actual

4    warrant ever shared with you?

5         A.    I believe so.

6         Q.    Do you recall if you had a

7    chance to review it prior to the

8    execution?

9         A.    Yes.

10        Q.    Yes, you did or yes, you recall

11   and --

12        A.    Yes, I recall reviewing at least

13   the portions of the warrant that pertained

14   to my part of the investigation.

15        Q.    Do you remember which -- when

16   you reviewed the warrant, did anything in

17   particular stand out to you about it?

18             MR. COLL:  Objection, vague.

19        A.    And, no, not that I recall

20   anything.

21   BY MR. GREENBERG:

22        Q.    Okay.  Okay.  I want to go back

23   to our earlier conversation or kind of

24   brief conversation about your role or

25   DEA's role as being in charge of the video

1    recording.  As I recall, you said that DEA

2    was tasked with gathering and coordinating

3    the video equipment for inventorying boxes

4    just because DEA had a lot of that video

5    equipment.  Does that sound right?

6         A.    Yes.

7         Q.    Okay.  Was DEA also tasked with

8    maintaining recordings of the inventorying

9    of boxes after the execution of the

10   warrant was over?

11        A.    I know we turned the recordings

12   over to FBI and I'm -- I believe we may

13   have kept copies of that as well.

14        Q.    Okay.  Do you know who at DEA

15   has access to the copies of those

16   recordings?

17        A.    Right now, I do not.

18        Q.    What's your understanding of

19   what the video recordings of those box

20   inventories will be used for?

21        A.    My understanding is that the

22   video would be used to -- more or less for

23   the liability in case allegations were

24   made of theft or damage, we could review

25   the video to see if, in fact, anything was

Page 107

```
 1    stolen or damaged by the inventorying
 2    agents.
 3        Q.    Is there any reason, to your
 4    knowledge, that those videos couldn't be
 5    used for subsequent investigations into
 6    any particular box holder?
 7             MR. COLL:  Object to form.
 8        A.    The videos would be used in the
 9    same way we would use any surveillance
10    video or video of a search warrant that we
11    were conducting.  It's a way to go back
12    and refresh recollections of observations
13    but now you actually have the tangible
14    video to show what you saw.  So I would
15    imagine that the video served multiple
16    purposes, both to document the -- the
17    inventory, to, you know, be retained for
18    liability in the event that a box arose to
19    the suspicion that it might be involved in
20    criminal activity, to document the
21    observations of those agents.  It -- it
22    was kind of a cover-all for all of those
23    things.
24    BY MR. GREENBERG:
25        Q.    Got it.  That makes sense.
```

Exhibit N
1416

ER-374

```
 1              So basically any valid DEA
 2    purpose, those videos could be used for?
 3              MR. COLL:  Objection, misstates
 4       prior testimony, vague.
 5       A.    I mean, the videos would be used
 6    by whichever agency would be investigating
 7    that box holder or any kind of, you know,
 8    liability issues that came back.
 9    BY MR. GREENBERG:
10       Q.    Okay.  So by -- is there any DEA
11    policy that would require -- sorry --
12    scratch that question.
13              Are you aware of any DEA policy
14    that would require DEA to get rid of the
15    copies of those videos after some period
16    of time?
17       A.    I know it's DEA policy that once
18    a case is closed and there are no more
19    appeals left or -- or forfeiture aspects
20    or that essentially once the -- they have
21    no evidentiary purpose, then they are
22    destroyed.
23       Q.    So as long as there could be an
24    evidentiary purpose going forward, DEA, to
25    your understanding, will continue to
```

Exhibit N
1417

ER-375

Page 109

1    maintain videos like that?

2            MR. COLL:  Objection to the form

3        of the question.

4        A.    I can't speak to the videos for

5    this particular inventory or -- or seizure

6    warrant that was executed because DEA

7    wasn't the lead agency, but in the event

8    that DEA is the lead agency, we do not

9    destroy any kind of evidence until the

10   case is completely closed, there are no

11   more forfeitures, there are no more

12   appeals and there are no more

13   investigative leads to that case, at which

14   point we destroy all evidence to include

15   the drug evidence or whatever.  I think

16   the only exception to that would be

17   wiretap evidence.

18   BY MR. GREENBERG:

19       Q.    So you said something about you

20   can't speak to this particular case

21   because the DEA is not the lead agency on

22   it.  Does that mean that FBI or -- sorry,

23   that DEA is following the FBI's document

24   retention policy with regard to the videos

25   for this case?

Exhibit N
1418

ER-376

1      A.    I can't speak to what DEA is

2    doing with this evidence now because I'm

3    no longer the case agent.  I would, you

4    know, I'd have to point you in the

5    direction of the current case agent or

6    supervisor of the group that has the case.

7      Q.    Okay.  Before you transferred

8    from Los Angeles to Dallas, was there any

9    reason you were given to understand that

10   the typical DEA retention policy would not

11   hold for these videos?

12          MR. COLL:  Objection, vague.

13     A.    No discussion of that was -- was

14   brought to my attention.  We never

15   discussed how we would retain or not

16   retain the videos.

17   BY MR. GREENBERG:

18     Q.    Okay.  Just one other question

19   on videos.  You mentioned a bit earlier I

20   believe something about gathering still

21   cameras in addition to video cameras.  Am

22   I recalling that correctly?

23     A.    Yes, sir.

24     Q.    Okay.  It's the case that

25   some -- some box inventories were video

Page 111

1    recorded and some were photo
2    inventoried -- sorry, scratch that
3    question.
4            It's the case that some box
5    inventories were video recorded and some
6    were recorded with photographs; is that
7    correct?
8        A.    Yes.
9        Q.    Is there any particular reason
10   why a box would have been recorded with
11   video as opposed to a still photograph or
12   vice versa?
13       A.    No.  It was -- it was
14   essentially, we -- we realized that in
15   order to more efficiently conduct the
16   inventory, we needed more teams conducting
17   inventory.  So FBI brought in more people
18   to assist in this and in order to
19   facilitate that, we handed out or I say
20   we -- FBI handed out still cameras to
21   those teams and then whatever box they
22   inventoried, that team used a still
23   camera.  The boxes did not determine which
24   camera was used.  It was the teams that
25   dictated which camera was used.  Whatever

1          camera they were given is the camera they

2          used.

3               Q.     That makes sense.

4                      And then to your knowledge, so

5          is DEA also maintaining records of

6          photographs from box inventories or is it

7          just the video recordings that DEA has?

8               A.     Without actually looking in our

9          evidence or looking at the case file, I

10         can't tell you which stills we have.  I

11         know those were FBI cameras in some

12         instances that were used.  So because FBI

13         was the lead agency, I don't know that

14         they would give us stills unless we

15         requested them.  I know we obviously

16         turned over our video evidence to them or

17         our video recordings to them, but I'm not

18         a hundred percent sure as to whether or

19         not we got all still inventory photos.

20              Q.     Okay.  And then just one last

21         question on this.  In your experience with

22         DEA, I -- I -- I understand DEA's

23         retention policy with regard to videos in

24         a typical case.  Is that same policy true

25         with regard to photos?

Page 113

1              MR. COLL:  Objection, vague.

2        A.    As I said, DEA destroys evidence

3    once the case is closed and there are no

4    more investigative leads.  The only

5    exception to that is, to my understanding,

6    is going to be Title 3 wiretap intercepts

7    are retained for a certain period of time

8    after the case is closed.

9    BY MR. GREENBERG:

10       Q.    Understood.

11             And just one other question

12   speaking to your experience while you were

13   at U.S. Private Vaults during the

14   execution of the warrant, are you aware of

15   anyone who came to U.S. Private Vaults to

16   try to collect their property during the

17   execution of the warrant?

18       A.    Yes.

19       Q.    Do you know what happened in

20   that circumstance?

21       A.    I know the -- that in most

22   circumstances, we tried to get contact

23   information and by "we," I mean the

24   investigative team.  I may not have

25   personally been there.  And if they knew a

ER-380

Page 114

1    box number or something of that nature,

2    then we would -- we would document it so

3    that that could facilitate the later

4    transfer of items back to that individual

5    if applicable.

6         Q.    So those people could claim

7    their property and had it returned to them

8    at that time, though?

9              MR. COLL:  Object to form.

10        A.    No.

11             MR. GREENBERG:  I'm sorry.

12        Could you go back and read that last

13        answer before "no" for me?

14             (Requested portion of the record

15        is read back by the reporter.)

16   BY MR. GREENBERG:

17        Q.    Just curious, I missed

18   something.  What do you mean by if

19   applicable -- sorry?  That's the whole

20   question.

21        A.    So as you can imagine, a

22   business that operates with anonymous box

23   holders, it's very hard to determine if

24   the person walking up is the actual owner

25   of the box.  So we made it a policy that

Page 115

```
1    we wouldn't return things at the scene so
2    by "applicable," I mean if they are the
3    actual owner and they can prove it, then
4    the items would be returned to them if the
5    government deemed necessary, I guess.
6         Q.    What do you mean by "deemed
7    necessary"?
8         A.    So if the items were not
9    contraband or drug proceeds or evidence of
10   the crime that we were investigating of
11   U.S. Private Vaults, then the items could
12   be returned.
13        Q.    So the government would kind of
14   conduct an investigation into whether
15   perhaps the contents of that box were drug
16   proceeds first and if the government
17   determined that they were not, then the
18   government would return that property to
19   that box holder?
20             MR. COLL:    Objection, vague,
21        lacks foundation.
22        A.    So what I mean by returning the
23   items if they weren't evidence, I mean, it
24   didn't just qualify it for cash.  If there
25   was a kilo of fentanyl in your box, I'm
```

Exhibit N
1424

ER-382

1    not going to give it back to you.  So the

2    determination of whether or not items got

3    returned was, you know, the way the

4    question was phrased is a little too vague

5    because if it's, you know, evidence of a

6    crime, if it's a stolen firearm, if it's,

7    you know, child pornography, you know,

8    still photos, we're not going to give

9    those back.  That's evidence of a crime

10   and that they would be retained.

11   BY MR. GREENBERG:

12       Q.    That's totally fair.  I get that

13   you don't want to return contraband.

14   Let's put contraband to the side.  When it

15   was cash, would the government conduct an

16   investigation into whether that cash was

17   drug proceeds before deciding that it was

18   necessary to turn that property back to

19   the person who was claiming it?

20           MR. COLL:  Objection, vague,

21       lacks foundation.

22       A.    My understanding is that boxes

23   that arose to the suspicion of any

24   criminal activity would be investigated

25   before being returned.

Exhibit N
1425

ER-383

Page 117

1    BY MR. GREENBERG:

2         Q.    Got it.    That makes sense.

3              Okay.    Let's take a quick five.

4    I think I'm about done, but I just want to

5    confirm real quick and then we should be

6    wrapped up here pretty soon.    So let's go

7    off the record and come back at 4:20 in

8    Dallas.

9              (Whereupon, a brief recess is

10        taken.)

11             MR. GREENBERG:    That's all that

12        I have for the moment, Special Agent

13        Carlson.    I really appreciate you

14        taking the time to chat today.

15             Max, anything on your end?

16             MR. COLL:    No, that's fine.

17             MR. GREENBERG:    Okay.

18             MR. FROMMER:    Off the record.

19             THE COURT REPORTER:    Max, do you

20        want a rough draft and expedite?

21             MR. COLL:  Yes.

22             (Time noted:  4:20 p.m.)

23

24

25

Page 118

1      _____
              JUSTIN CARLSON

2

3

       _____
4      Subscribed and sworn to

       before me this _____

5      day of _____ 2022.

6      _____
              Notary Public

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 119

1                    CERTIFICATION

2

3       I, BELLE VIVIENNE, a Nationally

4    Certified Realtime Reporter, do hereby

5    certify:

6       That the witness whose testimony as

7    herein set forth, was duly sworn by me;

8    and that the within transcript is a true

9    record of the testimony given by said

10   witness.

11      I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome of

15   this matter.

16      IN WITNESS WHEREOF, I have hereunto

17   set my hand this 10th day of July 2022.

18       *Belle Vivienne*

19   _____

20   BELLE VIVIENNE, CRR, CCR, RPR

21

22              *      *      *

23

24

25

Page 120

1    Maxwell Coll, Esquire

2    maxwell.coll@usdoj.gov

3                         July 11, 2022

4    RE:    Snitko, Paul Et Al  v. United States Of America Et Al

5          7/6/2022, Justin Carlson (#5311223)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Exhibit N
1429

ER-387

```
                                              Page 121

1    Snitko, Paul Et Al  v. United States Of America Et Al
2    Justin Carlson (#5311223)
3                   E R R A T A  S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   Justin Carlson                              Date
25
```

Page 122

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Justin Carlson (#5311223)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Justin Carlson, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Justin Carlson                          Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

**[1 - agents]**                                                                    Page 1

| 1 | 299-5127 1:24 | 9s 92:9,14 93:20 | adjourn 10:16 |
|---|---|---|---|

**1**

**1** 25:9 100:25
**10,000** 27:6
**100** 31:15
**10:00** 1:14
**10th** 119:17
**11** 120:3
**14th** 2:11
**15** 3:14 84:24,25
**16** 3:17 49:1 99:20
99:21

**2**

**2** 25:9 28:8,21
**2,000** 27:15,17,24
28:2,18,22,25 29:6
29:11
**20** 122:15
**2004** 56:19
**2012** 11:25 13:16
18:6
**2015** 44:20 49:1
**2015-2017** 53:15
58:8 59:25
**2016** 51:20
**2017** 51:20 58:15
61:6
**2018** 73:12
**2018-2019** 73:16
**2019** 59:14 74:11
**2020** 14:22 73:20
74:12 77:22,23
**2021** 6:1 14:22
16:22 17:1
**2022** 1:13 118:5
119:17 120:3
**22203** 2:6
**24/7** 93:3 97:23
**25368** 119:18
**2601** 103:3

**3**

**3** 113:6
**30** 120:17
**302** 3:17 99:21
100:7,8,18 101:10
101:13
**312** 2:11
**3:06** 80:18
**3:15** 44:9

**4**

**4:20** 117:7,22
**4:55** 104:21

**5**

**5** 3:7 27:25 28:8
28:21
**5,000** 27:18 28:1,4
28:10,22
**5311223** 1:23
120:5 121:2 122:2

**6**

**6** 1:13 4:8 100:18

**7**

**7/6/2022** 120:5
**703.682.9320** 2:6
**77** 4:8

**8**

**84** 3:16
**866** 1:24

**9**

**9** 26:11 92:3,4,4,4
92:23
**900** 2:5
**90012** 2:12
**901** 2:5
**99** 3:17

**9s** 92:9,14 93:20
94:4

**a**

**a.m.** 1:14
**able** 9:6,16 11:4
37:20 39:3 41:20
**academy** 13:15
18:7,13,20,25 19:1
19:9,11 36:13
**accepted** 15:2
**access** 106:15
**accolades** 30:25
**account** 26:6,17
26:25 35:15 41:9
47:7
**accuracy** 120:9
**accurate** 8:23 9:7
9:17 11:2
**acetone** 98:23
**acknowledgement**
122:3
**acknowledgment**
120:12
**acronym** 54:1
**acting** 1:8
**action** 5:23 119:13
**actions** 46:24 48:1
**actively** 65:8
**activity** 31:1 48:11
94:6,10 96:11
97:5,6 107:20
116:24
**actual** 48:19 105:3
114:24 115:3
**actuality** 14:4
**add** 95:15
**addition** 110:21
**additional** 10:5
**additions** 122:6
**addressed** 73:19

**adjourn** 10:16
**administration**
5:14
**administrative**
21:1,7 29:22
**admissions** 50:3
**admitted** 50:6
**admitting** 50:22
**advance** 93:14
**affairs** 53:22
**affidavit** 81:1
**affirmative** 23:14
**agencies** 45:21
51:21 52:1,7,10,15
52:20,23 54:6
55:12 57:10,14,15
58:7 66:21 72:1
72:15 83:18
**agency** 38:5,6,19
38:20 39:21,21
40:13 52:16 53:25
55:9,24 56:2,3
75:18,19 76:12
77:3 81:21 92:3
108:6 109:7,8,21
112:13
**agency's** 55:1
**agent** 3:14 5:13,18
11:21 12:6,8
15:22 16:2 18:9
19:3,6 29:5 39:22
39:22 43:19,23
50:14,17 58:13
68:12 84:25 85:9
85:13 91:25 96:19
100:23,23 101:3
103:22 104:1,1
110:3,5 117:12
**agent's** 104:6
**agents** 37:17 42:2
42:15 43:6 44:1

Exhibit N
1432

**ER-390**

[agents - back]                                                                 Page 2

58:12 86:8,13,16
87:1,23 88:17
89:9 90:11 96:5
97:11 99:13 107:2
107:21
**ago** 7:20 44:21
**agreed** 9:15
**ahead** 11:13 76:24
83:13 84:20
**al** 120:4,4 121:1,1
122:1,1
**alert** 94:15,22 96:6
**alerted** 46:5,18
**alerting** 75:10
**alerts** 94:19
**allegations** 106:23
**alleged** 96:11
**allotted** 120:20
**allow** 68:17
**allowed** 18:17
**allows** 56:23,24
**alluded** 94:5
**america** 1:7 120:4
121:1 122:1
**amount** 27:7,9,11
27:19,19 29:23
71:14 73:6 78:1,7
**analogous** 100:18
**analysis** 71:20
**analyzing** 84:8
**andrew** 2:10 67:7
67:10,25
**angeles** 2:12 14:13
14:18 23:23 46:10
46:14,17 52:13
53:2,3 54:14
55:14 58:4 62:21
63:13 110:8
**anniversary** 12:4
**anomaly** 93:12

**anonymous**
114:22
**answer** 4:5 6:21
7:15,17,23 8:12,14
8:15,20,21 9:2,22
10:1,1 11:1,2 14:3
21:4,12 25:3
68:18 75:2,9
76:18 77:8,14
98:1 114:13
**answered** 97:20
104:11
**answering** 7:12
59:5
**answers** 6:14 8:23
**anthony** 67:5,9
**anticipation** 92:25
**anybody** 35:7
102:16
**anytime** 33:10
34:13
**apparatus** 55:18
56:17
**appeals** 108:19
109:12
**appended** 122:7
**apple** 43:24
**applicable** 25:9
26:8 27:8 114:5
114:19 115:2
120:8
**applied** 13:14
20:17 21:9 23:22
**applies** 32:21
**apply** 16:20 21:12
29:2,6 74:4,14
75:15
**applying** 21:24
**appreciate** 103:5
117:13

**area** 47:8 56:22
62:22 75:7
**argumentative**
38:17
**arisen** 34:12
**arlington** 2:6
**arose** 104:14
107:18 116:23
**arrangements**
14:8 81:11
**arrest** 19:23 20:2
20:14 27:15,17,18
27:23 28:2,5,11,23
56:2 92:24
**arrested** 28:3,19
32:19 33:21 34:6
34:8,20 61:25
**arrestee** 33:10
**arresting** 34:19
**arrests** 19:20
20:17 22:1 56:2
**articles** 42:16
**articulate** 39:22
40:15 42:21 55:21
**articulated** 37:11
42:18 55:22
**ascertained** 63:9
**asked** 43:1 55:8
75:4,5 76:8 97:19
98:15 104:11
**asking** 6:12 7:18
22:21 33:25 39:12
42:10 59:4 68:7
68:24 74:17,22,24
76:15 77:9 79:15
89:9,13 103:6,7
**aspect** 60:12 82:4
**aspects** 108:19
**asset** 2:11 22:16
23:4 24:8,19 25:1
25:13,24,25 26:5

26:12,16,19
**assets** 22:19 23:23
25:5 30:19,19
62:1,4
**assigned** 14:2
17:17 19:5 81:4
81:16 82:20
101:20
**assist** 6:15 81:14
111:18
**assistant** 1:10 2:10
**assume** 8:16
**assuming** 18:7
44:10
**attached** 94:1
120:11
**attempt** 79:7
**attention** 110:14
**attorney** 1:8,18
2:10 5:20 33:14
68:4 120:13
**attorney's** 66:19
67:5 74:19
**attorneys** 76:17
77:12
**attractive** 62:3
63:12 65:12
**audibly** 6:17
**audio** 6:20
**available** 104:16
120:6
**awards** 30:25 31:2
31:4
**aware** 86:12 98:4
98:8 99:2 108:13
113:14

**b**

**b** 3:10 22:8
**back** 6:1 8:8 13:24
15:12 20:11 30:3
40:20,21 41:8

Exhibit N
1433

ER-391

[back - case]  Page 3

44:9 69:18 80:17 91:24 104:21 105:22 107:11 108:8 114:4,12,15 116:1,9,18 117:7
**background** 11:15
**backpack** 33:11
**bags** 33:14,15
**ballpark** 21:3 31:12 32:7,9
**banded** 89:3
**bank** 69:13
**based** 50:21 60:23 61:23 62:7,18 69:3 77:24 78:21 79:12,13 82:23
**basic** 13:23 18:8
**basically** 12:10 15:20 19:5 38:7 43:17 57:8 82:8 88:7 89:21 90:16 108:1
**basics** 18:18
**basis** 16:1 17:13
**bates** 3:15 85:1
**bear** 84:21 99:18
**began** 51:11 69:8
**beginning** 93:21
**begins** 100:23
**believe** 13:16 14:25 16:22 17:6 24:1 27:16 28:7 29:20,23 41:21 45:11 49:6,13,20 51:5 53:12,15 60:21 63:5 64:4 64:17 65:19 66:8 73:10 77:20 87:1 95:18 99:8,12 100:8 105:5 106:12 110:20

**believed** 78:22
**belle** 1:21 119:3,20
**belongs** 35:12
**best** 6:16 7:3,11,16 28:15 36:4,24 37:1 55:21 81:25 93:11
**beverly** 66:2
**beyond** 76:6
**big** 60:10 92:19
**bigger** 16:4 57:4
**bit** 43:5 53:19 57:18 64:24 73:6 76:4 80:25 101:22 110:19
**blade** 102:7
**blood** 119:13
**blue** 55:20,20
**boards** 90:12
**bolts** 56:22
**book** 10:25
**boss** 66:25 67:2 91:9
**bosses** 66:17 91:12
**bottom** 100:22
**bought** 69:22
**box** 44:24 45:6,13 51:2,22 52:2,3,5,8 52:21,25 54:7,9 57:12 58:16,18 59:23,25 60:20 61:8 62:9 64:10 65:17 66:6 67:17 70:20 72:12 94:5 95:2 98:15 102:13 102:20,22 103:1,2 103:19 104:8,14 106:19 107:6,18 108:7 110:25 111:4,10,21 112:6 114:1,22,25

115:15,19,25
**boxes** 60:15,22,24 61:3,21 63:23 78:18 79:19 83:9 86:14 87:6 89:24 92:10,15 94:2 96:7 97:10,13,15 99:14 100:15 106:3,9 111:23 116:22
**boyett** 66:23 91:16
**break** 10:13,17,19 17:11 44:8 80:17
**brief** 5:15 9:11 15:13 16:13 44:13 80:21 104:22 105:24 117:9
**brought** 91:5 110:14 111:17
**brown** 2:10 67:5,8 67:25
**bulk** 48:21 49:9,15 59:16,20 62:15 80:4 89:1 94:18
**bulked** 89:6
**bundled** 87:24 88:4,16 89:10
**bureau** 1:10
**business** 51:12 55:9 56:1 62:3,14 62:20 63:1,2,11,19 63:20 65:11 67:18 67:20 68:15 69:8 69:23 70:2,5,9 71:9,17 73:8,11,15 73:18 74:1,2 78:10 83:2,3 96:22 114:22

**c**

**c** 2:1
**calendar** 10:24
**california** 1:1,9 2:12 13:19 53:23 63:13
**call** 45:23 54:18 55:20 93:3 99:1
**called** 96:25 98:14
**calls** 104:10
**camera** 82:8 111:23,24,25 112:1,1
**cameras** 81:11 91:1,3,4 110:21,21 111:20 112:11
**cannabis** 53:22
**capacity** 1:8,9 63:17
**car** 22:6 40:15 42:3,5,6,15 43:18 43:19 102:6
**career** 13:2,10
**carlson** 1:13 3:6 5:1,12,19 11:19 29:5 85:13 117:13 118:1 120:5 121:2 121:24 122:2,4,12
**carlson's** 68:12
**case** 21:11,21 24:12,13,15,25 25:2,8,9,9,17,17 25:20 31:6 46:2 47:2,4 48:12 50:14,14,16 52:13 59:1 64:22 74:6 76:1,10 93:10 106:23 108:18 109:10,13,20,25 110:3,5,6,24 111:4 112:9,24 113:3,8

Exhibit N
1434

ER-392

[cases - conducting]                                                                 Page 4

**cases** 13:12 16:4 31:7 54:12 55:4 65:6 75:21 76:5 100:16
**cash** 26:25 27:5,23 28:1,10,18,19,24 29:5,16 48:21 49:9,15,19 50:2,9 50:25 59:17,20 80:4 87:20,24 88:4,5,12,16,19 89:1,5,10 92:2 94:2,19 95:2,3 96:6 97:12,15,21 98:10,11 99:5,6 102:16 103:10,16 104:7,9 115:24 116:15,16
**catering** 70:9
**cause** 74:10
**caution** 67:25
**ccr** 1:21 119:20
**central** 1:1,9
**certain** 25:4 29:17 64:8 101:22 113:7
**certainly** 88:10
**certification** 119:1
**certified** 1:22 5:3 119:4
**certify** 119:5,11
**chain** 66:17,18
**challenge** 5:24
**chance** 105:7
**change** 121:4,7,10 121:13,16,19
**changed** 53:20 54:1
**changes** 120:10 122:6
**charge** 82:4,7 105:25

**charged** 16:6
**chat** 117:14
**check** 60:6
**checked** 72:22
**chemical** 101:19
**chemicals** 83:20 91:20 98:17
**child** 116:7
**chips** 91:3
**circle** 92:4
**circumstance** 113:20
**circumstances** 32:21 113:22
**city** 55:19
**civil** 20:25 21:6,11 21:20 22:15 30:5 30:8 79:1,22
**claim** 114:6
**claiming** 116:19
**claims** 35:19 36:2
**clarification** 10:6
**clarify** 8:8 21:8 67:22 68:5 82:14 85:15 95:8
**class** 5:23
**classified** 78:7
**classroom** 19:13
**clear** 6:25 7:4 25:3 38:15 45:23 51:17 54:14 56:8,17 69:17 91:11
**clearinghouse** 45:23
**clearly** 6:17
**client** 68:4
**clientele** 47:15 51:16
**close** 48:25
**closed** 108:18 109:10 113:3,8

**clothes** 56:16
**codified** 99:10
**coincidence** 46:17
**coll** 2:9 16:10 20:9 22:17 23:6 24:11 24:21 25:15 29:19 30:9 33:22 37:9 38:4,16 39:10,19 40:5 41:18 42:8 42:23 43:15 45:3 47:18 48:4 52:22 57:16 58:24 61:2 61:11,22 62:11 63:3 64:1 65:2 67:21 68:17 71:3 74:16 75:1 76:14 76:23 77:7 78:5 78:20 79:3,24 84:17 85:7 87:7 88:8,22 94:3,12 95:5,13 96:1 97:19 100:2 103:20 104:10 105:18 107:7 108:3 109:2 110:12 113:1 114:9 115:20 116:20 117:16,21 120:1
**collect** 30:7,10,12 113:16
**collecting** 24:7,18 30:4
**collection** 93:25
**college** 12:24
**color** 43:22
**come** 12:10 14:21 44:9 52:24 54:21 57:22 80:17 83:16 83:18 88:25 96:13 98:19 102:24

104:21 117:7
**comes** 40:17
**comfortable** 21:17 59:4
**coming** 64:19,25 90:14 99:24
**command** 66:17 66:18
**commodity** 96:24
**common** 32:12 34:3 53:13 67:13 96:10
**communications** 76:16
**company** 46:19 61:10,15 62:10 64:11,22 65:18 66:7 71:2 72:17
**complete** 8:23 9:7 9:17 13:23 122:8
**completed** 120:17
**completely** 7:24 109:10
**comprised** 83:17
**compromise** 57:5
**concerning** 5:24
**concrete** 103:8
**conduct** 20:2 32:12 37:14 38:3 39:14 63:1 111:15 115:14 116:15
**conducted** 31:9,14 31:18,25 32:8 33:7,18 34:4,7 46:1 55:7 59:24 63:19 104:13
**conducting** 40:2 41:14 48:5 54:8 56:10 71:16 86:13 99:13 107:11 111:16

Exhibit N
1435

ER-393

| | | | |
|---|---|---|---|
| **confidential** 69:5 69:15 | **continuing** 13:13 | **couple** 32:9 48:24 | **current** 110:5 |
| **confirm** 89:14 117:5 | **contraband** 62:5 62:16 65:13 78:14 78:18 83:5 91:19 115:9 116:13,14 | 49:7,13 57:19 72:12 | **currently** 14:20 18:3 71:24 |
| **congratulations** 12:3 | **control** 102:3 | **course** 13:10 55:6 56:12 80:2 90:3 | **custody** 34:23 35:8,14 40:9,22 41:5,10,16,23,24 50:13 84:3 |
| **connected** 23:9 24:8,19 72:13 | **conversation** 7:8 10:23 66:15 67:24 68:2,6,11 105:23 105:24 | **court** 1:1,22 5:6 6:13,22 7:21 8:3,7 9:9 21:10,14,20 117:19 | **customers** 47:23 48:2 65:9 70:24 |
| **connection** 22:5 | **conversations** 66:22 74:18 75:8 77:10,12 99:3 | **cover** 107:22 | **cut** 14:15 16:24 29:4 33:9 |
| **connections** 56:25 69:7 | **cool** 11:13 12:16 12:20 13:4 | **covid** 73:22 74:8 | **cuts** 102:8 |
| **connectivity** 25:6 | **cooperating** 69:15 83:1 | **created** 86:2,3 | **d** |
| **consent** 48:20 | **coordinate** 81:9 | **crime** 55:23 115:10 116:6,9 | **d** 3:2 |
| **consider** 38:21 39:6 78:11,13 103:23 | **coordinating** 106:2 | **crimes** 17:19 18:18 92:21 96:11 | **dallas** 12:15,17,22 13:9,22 14:21 15:6,16,19,20 16:18,20 18:1 23:24 24:3 32:2,4 44:10 45:24 46:4 46:7 56:19,19 110:8 117:8 |
| **considered** 71:12 | **coordination** 57:8 | **criminal** 12:11 48:10 63:12,20,24 63:25 64:22 65:9 70:10 72:9,22 78:2,17 79:2,6,8 79:18 88:20 94:6 94:10 95:19 107:20 116:24 | |
| **considering** 74:9 74:12 | **cop** 56:4 | | |
| **consistent** 23:12 | **copies** 106:13,15 108:15 120:14 | | **damage** 106:24 |
| **constitutional** 20:8 | **correct** 14:19 28:12,13,20 36:3 41:11 45:14 46:20 47:24 54:4 64:11 68:25 73:13 76:13 77:4 78:19 85:11 85:25 89:11 94:2 111:7 122:8 | **criminality** 30:12 30:22 36:8 88:7 94:1 103:19 | **damaged** 107:1 |
| **consumer** 53:22 | | | **dangerous** 56:16 84:2 |
| **contact** 72:2 83:19 102:25 113:22 | | **criminals** 61:20 62:4,21 63:1,19 64:4 69:7 72:4 | **date** 38:10 74:7 121:24 122:12 |
| **contacts** 57:15 | | | **day** 16:1,1 17:13 17:13 118:5 119:17 122:15 |
| **container** 96:14 96:23 | **corrections** 122:6 | **cross** 45:21 56:13 58:9 | |
| **content** 37:25 38:2 74:24 76:16 77:10 | **correctly** 27:22 29:1 49:16 76:22 110:22 | **crossing** 55:11 | **days** 58:3 83:8 86:25 89:20 90:3 120:17 |
| **contents** 60:18 115:15 | **counsel** 120:14 | **crossings** 71:14 | |
| **context** 31:17 32:12 34:11 | **count** 27:20 | **crr** 1:21,21 119:20 | **dea** 11:21,24 12:6 12:7,14 13:6,15,18 13:20,23 15:23 17:13 18:6,9,16 19:19 28:6 32:1,6 32:8,14 33:9 37:13 38:25 39:7 |
| **contexts** 33:6 | **county** 45:24 46:4 46:8,11,14,17 53:3 58:4 66:2 | **cs** 120:15 | |
| **contingencies** 93:7 | | **curious** 16:21 17:5 114:17 | |
| **continue** 58:18 108:25 | | **currency** 23:9 27:19 96:13 | |
| **continued** 47:1 62:13 | | | |

Exhibit N
1436

40:1 41:14 42:2
45:17 53:1 60:13
60:19 61:3 62:24
63:5 65:6,22
66:24 81:16 82:1
83:5,22,24 86:13
86:16 90:14 91:5
91:17 92:21 96:19
98:25 100:18
101:4,19 102:9
106:1,4,7,14 108:1
108:10,13,14,17
108:24 109:6,8,21
109:23 110:1,10
112:5,7,22 113:2
**dea's** 14:18 27:12
29:17 38:6 49:22
51:14 81:7 91:17
105:25 112:22
**decide** 23:2 74:3
**decided** 76:12
77:2
**deciding** 116:17
**decision** 65:16,21
67:15,19 70:3,6
74:1 75:12,17,22
77:6,17,21 81:25
88:11 90:25 92:17
93:2,20 98:14,20
**decisions** 74:21,23
77:11 90:23,25
**declare** 122:4
**deconflict** 55:8
**deconflicted** 56:7
56:20
**deconfliction**
45:20 54:14 55:14
**deconflictions**
71:15
**deemed** 22:3
25:14 115:5,6

122:6
**defendant** 50:3,6
50:22
**defendants** 1:11
2:8 83:1
**definitely** 64:3
**definition** 60:4
**delayed** 73:20,22
**department** 46:15
46:18 53:3,21
**depend** 24:25 25:1
**depending** 60:4
**depends** 24:12,15
24:25 50:10
**deponent** 120:13
122:3
**deposing** 120:13
**deposit** 44:24
**deposition** 1:13
4:2 6:2,4,9 7:10
8:25 75:3
**description** 3:13
**designate** 91:8
**destroy** 109:9,14
**destroyed** 108:22
**destroys** 113:2
**detect** 94:9
**detection** 92:9,14
**detective** 13:11
24:3 96:9
**determination**
83:22,25 95:22
101:15 116:2
**determinations**
98:25 102:19
**determine** 22:13
23:8 24:18 26:3
26:12,21 32:23
35:9,25 50:1 88:5
89:5 95:3,11
96:15 111:23

114:23
**determined** 34:16
49:22 60:9 71:6
83:13 115:17
**determining** 26:6
27:1
**dictated** 111:25
**differ** 38:19
**different** 21:18
25:5,8 58:10
59:22 71:6 78:12
99:17
**differently** 42:18
42:22 43:11,14
**differs** 38:5
**difficult** 7:8 9:1
**digital** 81:11
**direct** 71:7 91:15
**direction** 110:5
**directions** 4:5
**directly** 70:13
**director** 1:10
**discovery** 100:11
**discuss** 54:20
**discussed** 68:19
75:6 98:5 110:15
**discussion** 5:15
9:11 15:13 99:8
110:13
**discussions** 74:14
75:15
**dispensary** 45:10
**distinction** 82:16
**district** 1:1,1,9
**division** 1:2 13:23
14:21 81:17
**divulge** 68:2
**doc** 87:4
**document** 3:17
36:25 43:11 84:13
87:4 99:21 107:16

107:20 109:23
114:2
**documented** 39:17
40:4 41:16,23
81:24
**documenting** 42:4
43:9 44:4
**documents** 4:10
10:24 74:6 87:11
**dog** 94:14,18,19
94:21 96:6,6,12,15
97:12,14,16 98:11
98:12,23 99:6
101:5,16,17,24
102:2,5,10,12,17
103:10,14,17
104:9,15
**dog's** 30:18
**dogs** 93:24 95:2,14
95:19 96:24
101:20 102:3,24
**doing** 15:19,21,23
16:2 56:11 91:14
93:6 110:2
**double** 94:17
**dozen** 21:16,18
32:10 72:12
**dozens** 60:12
**draft** 75:20 76:13
77:3 117:20
**drafted** 81:1
**drawing** 56:15
**drive** 22:7
**drives** 62:18
**driving** 32:19
**drug** 5:13 15:23
16:2,5,7,8 18:18
22:4,6 23:4,10,13
23:15 24:8,20
25:6,7,14 26:1,7
26:11,13,21 27:1,7

Exhibit N
1437

27:13 30:16,17
34:17 47:19 49:23
50:2,23 51:9,11
56:21 62:14 65:4
65:12 69:10 70:14
70:15 80:5,11
83:5,19 88:12
89:6 91:19 92:9
92:14,20,23 94:7
94:10,14,16,18,19
94:20,21,23 95:4
95:12,14,19 96:9,9
96:11,12,15,17,24
97:5,6 98:17
101:20,24 104:14
104:15 109:15
115:9,15 116:17

**drugs** 22:7 23:17
62:17 83:4,19
91:19 98:16

**dry** 90:12,12

**duly** 5:2 119:7

**duties** 93:16

---

**e**

**e** 2:1,1 3:2,10
121:3,3,3

**e.g.** 87:22

**earlier** 10:6 30:15
30:17 58:3 72:11
77:1,24 79:17
88:2 89:14 105:2
105:23 110:19

**early** 17:1 59:25
74:11

**easily** 6:11

**easy** 14:3

**eat** 89:20

**edge** 94:17

**efficiently** 30:1
90:17 93:5 111:15

---

**eight** 13:7,8,25

**either** 8:7 22:4
38:8 52:24 60:9
67:4

**element** 63:12
70:10 95:21

**eliminate** 95:10

**else's** 60:11

**encounter** 93:12

**enforcement** 5:13
13:2 17:21 53:22
57:8 61:18 63:17
66:1 71:14 72:1,6
72:8

**enterprise** 65:9

**entire** 17:23 101:7

**episode** 55:23

**equipment** 82:2,8
106:3,5

**erase** 90:12,12

**errata** 120:11,13
120:17

**erratas** 120:15

**escapes** 67:1

**especially** 96:20

**esq** 1:18

**esquire** 120:1

**essence** 37:21
41:21 42:17

**essentially** 40:13
53:21 94:18
108:20 111:14

**established** 14:2

**et** 120:4,4 121:1,1
122:1,1

**event** 94:4 96:12
107:18 109:7

**eventually** 49:19
78:4

**evidence** 24:7,18
30:4,6,7,10,12

---

36:8 94:20,23
109:9,14,15,17
110:2 112:9,16
113:2 115:9,23
116:5,9

**evidentiary**
108:21,24

**exact** 21:4 31:13
43:7

**exactly** 37:21 41:2
47:5 49:3 55:15
56:18 91:14
101:11

**examination** 5:7

**examinations**
19:13

**example** 26:25
42:3

**examples** 52:19
103:8

**exception** 109:16
113:5

**excited** 102:4

**execute** 48:14

**executed** 15:1
20:20 22:2 48:23
73:10 78:4 89:16
90:4 109:6

**executing** 15:17
81:3

**execution** 5:25
17:3 81:5,8 82:21
83:7 86:14 91:13
93:16,22 105:1,3,8
106:9 113:14,17

**exhibit** 3:14,17
84:15,24,25 85:5
99:17,20,21

**exist** 29:13

**exists** 55:18 56:8

---

**expect** 42:4

**expected** 78:17

**expedite** 117:20

**experience** 22:12
22:19 25:19 63:21
77:25 103:25
104:6 112:21
113:12

**experienced** 98:21

**explain** 25:10
43:12,14

**exploitation** 69:13
69:14

**extent** 78:9 79:6
79:18 80:10 82:15

**eyes** 49:23

---

**f**

**face** 102:8

**facilitate** 50:24
90:24 93:25
111:19 114:3

**facilitating** 22:9

**facility** 35:9

**fact** 94:21 106:25

**factor** 26:14

**factors** 71:6,11

**fails** 120:19

**fair** 7:18,19 10:2,3
10:17,18 15:7
20:4 22:11 28:17
30:22 38:12,23
39:15 59:9 61:1
62:24 63:16 88:21
94:25 103:15
116:12

**faith** 8:15

**fall** 44:20 77:23

**familiar** 55:16
85:14,16,23
100:13

Exhibit N
1438

**family**  14:9
**far**  13:2 43:20
  55:11 60:12 61:14
  62:12 75:19 82:9
  90:22 98:24
**fbi**  3:17 53:1 56:11
  58:9,11,12,13 65:6
  65:22 66:17,25
  75:18 76:12 77:2
  81:14 85:20 86:4
  86:4,5,8 87:1
  90:10 91:6,22
  92:21 96:8 98:13
  99:13,21 100:8,17
  101:10 102:16
  106:12 109:22
  111:17,20 112:11
  112:12
**fbi's**  109:23
**fbi0000301**  3:16
  85:1
**federal**  1:10 13:14
  18:15,16,19 52:23
  58:6 72:14
**federally**  16:6
**feel**  59:4
**fentanyl**  98:22
  101:23 115:25
**field**  13:22 14:18
  15:16,21
**figured**  84:15
**file**  59:1 77:21
  112:9
**fill**  38:6
**filled**  85:18 86:21
  87:5
**filling**  86:8
**final**  92:16
**find**  101:23
**fine**  8:18 117:16

**finish**  7:17 8:20
  10:14
**finishing**  18:25
**firearm**  116:6
**firm**  5:22
**first**  5:2 21:13
  44:18 52:5 66:4
  115:16
**five**  60:22 80:17
  86:25 104:20
  117:3
**flat**  72:3
**flip**  64:24 65:1
**floor**  2:11
**flow**  7:7
**focus**  18:4 64:8
  65:16 67:17 68:15
  70:3 71:1 72:16
  73:14
**focused**  70:13
**follow**  48:6
**followed**  55:3
**following**  55:25
  56:4 109:23
**follows**  5:4
**foregoing**  122:5
**forfeit**  79:7 80:6
**forfeited**  49:21
  50:19,25 59:20
  79:21
**forfeiture**  2:11
  20:25 21:6,9,11,13
  21:19,20,25 22:8
  22:10,15,20 23:11
  23:20,22 25:21
  27:14 30:5,8,25
  50:15 79:1,22
  108:19
**forfeitures**  31:3
  109:11

**forgive**  43:5
**form**  20:9 22:17
  23:6 24:11,21
  25:15 29:19 30:9
  33:22 37:9 38:4
  40:5 41:18 42:23
  45:3 47:18 48:4
  52:22 57:16 58:24
  61:2,11,22 62:11
  65:2 71:3 78:5,20
  79:3,24 85:14,16
  85:18,20 86:5,12
  87:17 88:8,18,22
  89:8 91:25 94:3
  94:12 95:5,13
  100:5,19 107:7
  109:2 114:9
**formal**  17:6 18:24
  19:2 77:19
**formally**  37:4
**formed**  61:23
**forms**  86:22 90:8
**forth**  119:7
**forward**  22:15
  23:3 80:24 82:14
  108:24
**found**  23:16 28:20
  39:23 55:4 63:23
  78:2 79:19 94:2
  95:2 96:7 97:15
  101:12 102:12
  103:19 104:8
**foundation**  115:21
  116:21
**four**  13:25 14:24
  18:22 56:5 83:8
  86:25 89:20 90:3
  92:3
**frame**  16:23
**frequent**  58:9

**fresh**  10:9
**frommer**  2:4
  84:23 117:18
**front**  8:3 37:19
  41:20 49:2 64:16
  74:6
**froze**  14:17
**full**  5:10 8:22 9:6
  9:16 11:18 27:5
  41:9
**function**  81:7
**funds**  102:21
**further**  42:13
  119:11

**g**

**game**  93:9
**gamut**  17:23
**gathering**  82:7
  106:2 110:20
**general**  17:21
  20:22 21:22 30:10
  31:6 51:25 85:17
  85:19
**generally**  22:9
  23:7 54:3 57:12
  58:21 103:15
  104:5
**generic**  88:24
**gestures**  6:23
**getting**  11:15
  42:24 69:4 74:20
  75:7
**give**  9:6,16 11:1,2
  25:24 40:20,21
  41:7 42:20 52:11
  52:15,19 54:11
  74:7 84:17 85:7
  112:14 116:1,8
**given**  7:22 110:9
  112:1 119:9 122:9

Exhibit N
1439

[giving - holders]

Page 9

**giving** 76:5
**glebe** 2:5
**go** 6:8,15 11:12,13
13:24 16:11 43:20
56:1 69:18 76:24
84:20 89:18 91:7
91:9,24 105:22
107:11 114:12
117:6
**goes** 13:2
**going** 11:9 18:7
19:23 30:3 33:12
38:18,19 39:20,21
58:21 64:19,25
69:11 74:16 75:1
75:9 76:17 77:7
77:13 82:14 87:21
90:15 92:18 96:22
99:12,16 101:24
108:24 113:6
116:1,8
**good** 8:15 11:12
31:7,7 67:12
**gothier** 1:3
**gotten** 30:24 31:2
31:5 55:10
**government** 22:14
22:21 35:19 36:1
78:25 79:20
100:12 115:5,13
115:16,18 116:15
**government's** 5:24
**grade** 75:12
**gray** 43:24 75:6
**great** 9:19 69:2
72:5 100:3
**greenberg** 1:18
2:3 3:7 5:5,8,17
5:20 9:13 15:15
16:11,15 20:15
22:22 23:19 24:14

24:23 25:22 30:2
30:13 34:1 37:12
38:11,22 39:13,24
40:23 41:25 42:19
43:2 44:6,12,15
45:7 47:21 48:13
53:7 57:24 59:8
61:5,16 62:6,23
63:15 64:6 65:14
68:9,13 69:1
71:10 74:22 75:13
76:20,25 77:15,16
78:16,23 79:10
80:14,16,20,23
84:14,19,24 85:3
85:11,12 87:13
88:14 89:7 94:8
94:24 95:6,23
96:3 98:3 99:16
99:23,25 100:3,4
104:4,18,20,24
105:21 107:24
108:9 109:18
110:17 113:9
114:11,16 116:11
117:1,11,17
**ground** 6:9
**group** 14:6 17:21
58:11 67:16 110:6
**groups** 58:10
**guess** 21:12,14
25:2 42:10 52:18
78:10 80:18 97:18
115:5
**guidance** 37:13,17
**guns** 56:15 62:17
**guy** 55:25 56:3
**guys** 9:10 52:14
84:14 85:6 91:23

**h**

**h** 3:10 121:3
**half** 12:19 13:7
69:23
**hallmarks** 30:15
30:16
**hand** 81:13 119:17
**handed** 111:19,20
**handful** 60:13
**handle** 81:21
91:21
**handled** 98:20
**handler** 92:4
**handling** 87:2
90:15
**hands** 43:23
**hang** 95:24
**happen** 93:10,11
**happened** 46:23
47:11 49:18,19
62:8 64:14,24
73:20 113:19
**happening** 49:10
**happens** 10:7 11:5
67:13 84:21 93:14
**hard** 62:17 102:3
102:5 114:23
**harm** 35:6,7 98:23
98:24
**hash** 28:9
**hazard** 101:17,25
102:11
**head** 6:23,24
82:16
**headed** 68:8
**heading** 87:20
**hear** 9:10 44:18,22
54:16
**heard** 62:19 69:19
72:3 89:19

**heavy** 65:24
**held** 5:16 9:12
15:14 33:12 40:13
**help** 6:10,11 11:1
11:2,4 22:13 23:2
26:20 88:5,17
95:3
**helped** 50:24 74:1
89:23
**helpful** 38:13
**hereto** 122:7
**hereunto** 119:16
**hey** 54:18 60:7
67:21
**hid** 63:19
**hide** 51:11 62:4
63:2 65:12 72:6
**hiding** 72:8
**hidta** 18:3 56:21
**high** 23:9 56:21
83:14
**highly** 96:10
**hills** 66:2
**hire** 13:21,25 14:7
**hired** 13:15,22
14:3 56:18
**history** 72:22
**hit** 92:4
**hold** 67:20 68:16
70:5 84:17 110:11
**holder** 107:6
108:7 115:19
**holders** 51:3,23
52:2,3,6,8,21,25
54:7,9 57:12
58:16,18 59:23
60:1,20 61:8 62:9
64:10 65:17 66:6
67:18 70:21 72:12
114:23

**holding** 40:10
**home** 15:6,19
  89:18
**homeland** 53:9
**hour** 12:18 16:19
**hours** 86:25 92:22
**house** 14:7 96:23
**hsi** 53:4,8
**huh** 6:25
**hundred** 28:6
  112:18
**hunting** 14:8
**hypothetical** 42:9

**i**

**idea** 66:5 92:13
**identification**
  44:25 85:2 99:22
**identified** 47:20
  51:15 64:20 72:25
  79:6,8
**identify** 35:12
  39:3,8 80:10
**identifying** 22:19
  24:17 91:18
**ij.org** 2:7
**illegal** 78:14
**imagine** 54:2 86:5
  102:18 107:15
  114:21
**immediately** 73:2
  99:11
**impact** 18:4
**important** 8:22
**importantly**
  103:25
**impound** 32:20,22
**impression** 61:19
  78:1,24
**include** 109:14
**included** 67:24

**including** 32:1,3
**incomplete** 42:8
**independently**
  42:11
**index** 4:2
**indicate** 30:21
  92:8
**indicating** 94:16
**indication** 25:25
  26:10,11 30:18
  95:16
**indications** 88:6
**indicative** 80:5
**indicia** 35:13,14
  37:23 55:4 63:24
  94:1,9 95:4,12
  102:20,21 103:18
**individual** 38:20
  38:20 45:18,22,25
  47:2 48:9 64:10
  67:17 68:24 70:15
  114:4
**individuals** 42:11
  66:24 68:15 70:4
  70:14 72:2
**infiltrate** 69:11
**informally** 37:5
**informants** 63:10
  69:16 82:24
**information** 10:5
  75:20 113:23
**initial** 63:7
**input** 75:11 76:5
**insertion** 69:14
**inside** 78:18
**inspector** 53:4
**inspectors** 65:23
**instance** 13:22
  22:6 23:8,16
  42:14 101:18
  102:15

**instances** 34:4
  112:16
**institute** 2:5 5:21
**instruct** 76:18
  77:8,13
**instructs** 9:25
**intelligence** 65:7
  69:3
**intensity** 56:21
**intentional** 81:21
**intercepts** 113:6
**interest** 5:22
**interested** 13:12
  22:14 45:4 119:14
**interesting** 6:7
  53:24
**interviews** 61:25
**introduce** 84:20
  99:17
**introduced** 85:5
**introductory**
  18:14
**inventoried** 39:1
  41:8 42:3 83:9
  111:2,22
**inventories** 81:10
  81:23 83:15 86:14
  104:13 106:20
  110:25 111:5
  112:6
**inventory** 31:10
  31:18,24 32:7,13
  32:23 33:2,7,17,19
  34:4,7,15,22 35:1
  35:23 36:7,12,16
  37:3,14,18 38:3
  39:5,8,14,17 40:2
  40:4 41:15,17
  43:9 79:25 80:3,9
  81:12 86:9,17
  87:5,12 88:25

89:4,24 90:10
  94:5 95:18 97:24
  97:25 98:24 99:13
  107:17 109:5
  111:16,17 112:19
**inventorying**
  33:20 35:15 36:25
  42:12,22 43:7,8,18
  80:1,13 88:17
  90:11 92:10,15
  96:5 97:9,11
  100:14 103:22
  106:3,8 107:1
**investigate** 17:19
  17:22 18:17,18
  54:3 58:18 67:20
  74:2
**investigated** 52:14
  61:7 71:25 72:19
  92:20 116:24
**investigating**
  45:12,16,25 51:3
  51:22 52:2,6,7,21
  52:25 54:6,19
  55:1 56:6,9 57:1,3
  57:11 58:2 69:9
  72:15 73:11,17,25
  96:10 97:5 108:6
  115:10
**investigation** 1:10
  34:17 45:6,9,11,17
  47:15 52:12,17
  54:12,17 56:8,12
  57:4,4 58:16 60:3
  60:5 61:24 62:8
  63:8 64:9 65:17
  65:20,25 66:6,12
  70:4,8 71:1,8,8
  72:20 73:4,8,14,21
  78:21 105:14
  115:14 116:16

**investigations**
13:13 15:23 16:2
16:5,8 17:23
18:15 23:13 48:6
51:7,19 53:10
54:8 58:22,23
59:3,7,23 62:12,19
72:25 73:3 96:20
107:5
**investigative**
56:25 65:21 83:17
98:9 109:13 113:4
113:24
**investigator** 12:12
36:21 96:9
**investigators** 35:7
57:20,22 68:25
**investing** 52:4
**involved** 20:24
21:5 45:19 48:11
51:22 52:1,20
65:5,15,22,25
66:14,21 67:15
73:25 74:13,23
75:14 76:1,3,4
96:17 107:19
**involvement** 21:23
76:6
**involves** 34:5
**involving** 33:19
34:8
**irs** 53:12
**issue** 27:1 38:14
75:10
**issues** 6:20 108:8
**item** 25:20 35:5
40:3,11 41:4,15
42:12 96:16
**itemize** 35:25
**itemized** 35:15
38:7,13 39:18

**itemizing** 37:24
38:1
**items** 21:9,13,19
21:25 23:9 37:22
39:3,9,16,23 40:14
40:16,18 41:8
42:5 114:4 115:4
115:8,11,23 116:2

**j**

**jeni** 1:3
**jennifer** 1:3
**job** 1:23 24:10,22
36:24
**johnson** 1:9 2:4
**joined** 18:6
**joint** 65:19,20,20
**joseph** 1:3
**judge** 8:3
**judicial** 21:1,7
**july** 1:13 13:16
14:21,22 15:3
18:21 119:17
120:3
**justice** 2:5 5:21
**justin** 1:13 3:6 5:1
5:12 11:19 118:1
120:5 121:2,24
122:2,4,12

**k**

**k** 26:11 92:3,4,4,4
92:9,14,23 93:20
94:4
**keep** 36:20,20 72:5
**kept** 47:9 106:13
**kilo** 101:23 115:25
**kilter** 89:14
**kind** 6:8,9 7:6 10:5
11:9 14:1,14
17:12 18:12 19:1
19:6,12,14 21:23

22:23 23:1,17
25:10 31:4,8,17
32:16 33:14 34:11
37:16 38:2 44:24
45:9 48:10 54:25
57:18 60:6 61:9
63:1 66:10,19
67:15,16 70:20
73:25 74:10 75:2
75:6 81:17,20
82:7 83:20 89:13
90:5,13,16,19,24
91:10,21 105:23
107:22 108:7
109:9 115:13
**kindly** 6:18
**knew** 69:5 78:7,13
81:23 92:18 93:1
113:25
**know** 7:13 8:6,12
8:14 9:8 10:7,13
10:20 11:5 13:12
14:7 16:3 17:22
18:8,15,17 19:22
21:15 23:11,14,16
25:18,18 27:5
29:12 31:6,7,8
32:23 33:15,15
34:14 36:18 39:6
40:10,21 41:4,7
44:2 45:4 47:6,9
48:6,7,8 51:10,12
54:19,25 55:2,7
56:13,14,17 57:1
57:18,21 59:4,6
60:6,11 61:24
62:17,18 63:9
65:23 69:12,24
70:6,11 71:5
72:23 73:1,18
74:6,7,11 75:4

76:8,14,21 77:18
78:6,9,9,12 80:4,5
81:13,18 82:2,23
82:24 85:5 86:2,3
86:4 87:10 89:1
89:20 90:7 91:6,7
91:17 93:4 94:14
94:20 96:4,25
97:8,10 98:16,22
99:25 100:20
101:9,19,22 102:7
102:19,22,25
103:23 106:11,14
107:17 108:7,17
110:4 112:11,13
112:15 113:19,21
116:3,5,7,7
**knowing** 22:12
101:11 102:12
103:2
**knowledge** 40:1
107:4 112:4
**known** 51:13 65:4
**koons** 1:9
**kristi** 1:9

**l**

**l** 1:7
**la** 13:19 14:4 15:8
15:21 17:20 24:5
45:19,23 56:8,17
66:2 92:22
**labor** 81:17
**lacks** 115:21
116:21
**lapd** 66:2
**laptop** 43:19,24
**large** 57:7 62:20
78:1,7,10,11,13
96:22,22,23,23
**largest** 31:20

Exhibit N
1442

ER-400

late 16:25
laundering 16:7,8
17:15
law 5:22 13:1
18:16 20:14 57:7
61:18 63:17 66:1
71:14,25 72:6,8
lead 47:17 59:19
75:18 76:12 77:2
81:5 82:21 109:7
109:8,21 112:13
leading 70:8 77:20
leads 109:13 113:4
learn 18:16 20:1
36:15
learned 19:9 46:23
leave 38:8
leaving 53:6
led 46:2 47:19
54:24 64:25 95:18
102:22
left 9:14 13:15
14:20 15:3,16
16:16 44:25 53:18
108:19
legal 1:23 9:24
74:20 120:23
legalistic 41:1
level 13:14 18:19
95:16
liability 35:16,18
37:25 106:23
107:18 108:8
license 73:2
lifters 65:24
likelihood 83:14
limit 29:22
limiting 29:21
line 4:6,11,16,21
10:14 100:22
121:4,7,10,13,16

121:19
lines 92:3
links 23:15
list 40:19
listed 50:16
little 11:10 25:10
42:20 43:5,11,13
57:18 64:23 76:4
79:14 80:25 116:4
local 18:4 66:1,1
locals 53:1
locations 51:10
locked 96:13
log 85:8
logical 66:9
logistics 90:6
lombardi 93:18
long 11:23 15:8
18:20 27:18 89:19
108:23
longer 59:1 110:3
look 15:25 16:2
22:13,24 27:4
42:6 60:8 62:13
80:3 92:1 98:15
looked 14:16
98:16 100:6
looking 21:3 31:12
35:13 36:22 37:22
37:23 48:8 51:10
62:4 64:21 74:9
112:8,9
looks 27:9 100:8,9
los 2:12 14:13,18
23:23 46:10,14,17
52:13 53:2,3
54:13 55:14 58:4
62:21 63:13 110:8
lost 15:10 16:10
35:19 36:2 43:1

lot 11:8 32:18
34:18 52:13 54:15
54:24,25 55:10
67:14 106:4
lots 58:12
loved 33:13
lunch 10:19
lunchtime 10:21
lyndon 67:1 99:4
lynne 66:24 99:3

## m

madam 5:5
maintain 109:1
maintaining 106:8
112:5
major 24:9
majority 33:4,16
62:21 71:18,22
making 6:15 67:15
69:9 88:11 90:6
90:16,23
manner 23:12
50:5,23 89:9
march 6:1 15:1
marijuana 45:10
46:2
marine 12:24
mark 29:11
marked 4:20 85:2
99:19,22
markers 90:13
marriage 119:13
materials 10:24
11:4
matter 41:1
119:15
max 8:18,21 9:20
9:25 67:22 84:16
87:1 100:1 117:15
117:19

maxwell 2:9 120:1
maxwell.coll 2:12
120:2
mean 9:22 20:12
22:18 25:11 27:10
29:7 36:17 39:11
40:9 41:2,2 47:5
48:5 50:11 61:3
72:19 76:7 83:16
86:24 88:23
102:18 103:21
108:5 109:22
113:23 114:18
115:2,6,22,23
means 17:21 21:9
55:20
meant 43:13 67:10
72:21 105:1
medications 9:1,4
meeting 68:19,20
members 65:8
memo 29:9
memory 91:3
mention 69:19
mentioned 18:5,6
30:15,17 45:18
49:10 54:13 69:19
73:24 76:11 77:1
89:23 110:19
michael 1:18 2:3
michaels 1:4
middle 8:20 10:15
100:22
mike 5:19 67:21
74:16 76:14
mind 10:9 36:20
47:10
minute 44:8 80:17
mishmash 57:14
57:17

Exhibit N
1443
ER-401

**missed** 114:17
**misstates** 43:15
  63:4 64:1 108:3
**model** 43:21
**moment** 7:20
  16:12 84:22 85:7
  117:12
**money** 16:7 17:15
  72:5,8 101:4
  102:9,23
**month** 14:5
**months** 14:23,25
  15:17 18:22 77:20
**move** 23:3
**moved** 13:18
**moving** 22:15 90:7
  90:17
**multiple** 51:14
  52:14 100:16
  107:15

**n**

**n** 2:1 3:2
**name** 5:10,12,19
  11:16,18 53:20
  66:8,25 67:4,13
  86:3 92:4
**narcotics** 13:10,11
  17:23 47:9 84:9
**narrow** 32:5 33:8
**nationally** 1:22
  119:3
**nature** 33:16
  98:19 114:1
**nearly** 19:18
**necessarily** 36:7
  85:15,17 95:7,9
**necessary** 115:5,7
  116:18 122:6
**need** 28:11 38:3
  52:16 84:23 96:14

**needed** 81:14,18
  81:23 83:23,24
  90:11 91:6,7,10
  93:1,4 111:16
**never** 21:19 26:24
  85:21,22 110:14
**new** 14:10 58:18
  69:6,20 70:2,19,20
  70:23 84:16
**newer** 53:25
**nice** 12:20
**nj** 1:21
**nm** 1:21
**noah** 67:3
**nodding** 6:23
**nonprofit** 5:21
**normal** 7:7
**normally** 7:5
  101:14
**north** 2:5,11
**nose** 102:6
**notary** 118:6
  122:13,19
**note** 87:23 89:9
  100:23,24 101:4,9
  102:8 103:4
  120:10
**noted** 117:22
  122:7
**notes** 3:15 85:1,10
  91:25
**notice** 35:11 97:1
**notification** 85:4
**noting** 88:4,4,15
**november** 18:22
  49:1
**number** 21:17
  31:13 43:21 60:24
  61:1,7 114:1
**numbered** 3:15
  85:1

**numbers** 72:24
**nuts** 56:22

**o**

**oath** 7:22 8:1,3
**object** 20:9 22:17
  23:6 24:11,21
  25:15 29:19 30:9
  33:22 37:9 38:4
  40:5 41:18 42:23
  47:18 48:4 52:22
  57:16 58:24 61:2
  61:11,22 65:2
  71:3 78:5,20 79:3
  79:24 88:8,22
  94:3,12 95:5,13
  107:7 114:9
**objection** 9:23
  38:16 39:10,19
  42:8 43:15 63:3
  97:19 103:20
  105:18 108:3
  109:2 110:12
  113:1 115:20
  116:20
**objections** 9:21
**observation** 92:2
  99:9 103:24
**observations** 3:14
  84:25 85:10 87:21
  91:25 107:12,21
**observed** 48:9
  60:7 64:19 86:8
  87:3 95:17
**observing** 92:6
**obviously** 16:4
  20:13 75:21 82:3
  94:17 101:21
  112:15
**occasionally** 26:8
  33:3

**occurred** 74:18
**odor** 87:25 88:5,16
  89:10
**office** 13:21,24
  14:6,10,19 15:17
  15:21 19:4,7
  66:19 67:5 74:19
**officer** 12:15,22
  32:2,4 35:4,24
  37:22
**officers** 35:18 36:2
**official** 1:8 11:20
**oh** 6:7 17:17 18:23
  31:4,16 45:8
  53:18 54:22 101:3
**okay** 6:7 10:10,11
  11:6,7 17:9,17
  18:5,12,23 19:18
  20:16,24 21:22
  22:11 24:7,15,24
  26:15 28:9,14,24
  29:12 30:3,14,24
  31:9,16 32:5,25
  33:6 35:22 36:6
  36:11 37:2 38:1
  39:7,25 43:3 45:8
  46:10,22 48:1
  49:8 51:2,17,21
  52:18 53:17,24
  55:13 59:19,22
  60:23 61:6 63:16
  63:22 64:23 66:13
  67:14 68:17 70:1
  72:11 73:5 74:13
  75:1,14 76:11,23
  77:15,24 78:17,24
  80:15,19 81:15
  82:13 84:5,6,12
  86:6,11,19,21 87:3
  87:14,19 88:15
  89:8,13 90:19

Exhibit N
1444

[okay - pornography]                                                    Page 14

91:24 93:24 94:9
94:25 95:24 96:4
98:4 100:3,20
101:3,3 102:14
103:15 104:5,19
104:19 105:22,22
106:7,14 108:10
110:7,18,24
112:20 117:3,17
**once** 46:23 51:12
67:19 68:14 70:10
73:1 75:17,17
108:17,20 113:3
**one's** 44:2,2
**ones** 51:8 87:2
**ongoing** 58:25
59:3
**operates** 55:15
114:22
**opinion** 61:9,14,23
62:2,7 63:6 88:19
**opinions** 76:8
**opposed** 111:11
**opposite** 94:13
**order** 27:25 32:22
38:9 111:15,18
**ordinarily** 22:24
**organization** 63:6
69:12
**outcome** 119:14
**outside** 68:6,20
**overarching** 39:25
41:14
**owner** 40:12 64:25
65:3 69:6,9,20,22
70:2,11,19 114:24
115:3
**owner's** 70:20,23
**owners** 64:18,20
69:24

**ownership** 35:10
35:13,25 37:24

**p**

**p** 2:1,1
**p.m.** 117:22
**packaged** 23:12
25:24 30:19 50:5
50:24
**page** 3:13 4:6,11
4:16,21 100:25
101:2 121:4,7,10
121:13,16,19
**paperwork** 17:7
50:18 55:5 87:2
**paraphernalia**
83:19 98:17
**paraphrasing** 43:5
88:3
**part** 7:7 20:5
24:10,22 45:16
46:1 57:3 60:19
100:14 105:14
**partaking** 97:24
**participate** 86:17
**participated** 19:19
20:16
**particular** 17:18
17:18 22:16 23:4
24:19 25:20,20,23
26:4 44:17 47:2
63:14 64:17 65:3
66:20 68:10 81:4
81:15 82:4,19
84:7 87:17 96:16
97:10,15 98:5,9
101:13 103:2,4
105:17 107:6
109:5,20 111:9
**particularly** 65:11
86:24

**parties** 119:12
**paths** 45:21 55:11
56:13
**patrons** 71:23
**paul** 1:3 120:4
121:1 122:1
**pay** 75:12
**pd** 13:9 56:19 66:2
**pearsons** 1:4
**pending** 8:19
**people** 7:5 37:8
47:22 51:14 57:13
57:25 60:17 61:25
66:21 67:14 71:22
111:17 114:6
**people's** 73:3
**percent** 28:6
112:18
**period** 14:5 51:18
53:15 58:8 59:11
59:25 60:16 61:7
108:15 113:7
**periodically** 9:20
**person** 28:3,19
34:5,19 37:7 38:8
45:17 55:1 60:7
64:18 114:24
116:19
**person's** 34:20
**personally** 50:8
102:15 103:9
113:25
**personnel** 81:13
90:14
**perspective** 61:19
68:12 70:12 71:21
**pertained** 70:15
105:13
**phase** 66:11
**phone** 72:23

**phones** 69:14
**photo** 111:1
**photograph**
111:11
**photographs**
111:6 112:6
**photos** 112:19,25
116:8
**phrased** 98:2
116:4
**physically** 50:12
**pieces** 30:6,14
**pivot** 44:16
**place** 18:9 62:25
63:18 70:11 72:5
80:8 99:7,9
**plain** 56:15
**plaintiffs** 1:5,18
2:2 5:23
**plan** 93:9
**planning** 35:10
**plate** 73:2
**played** 64:3 70:25
71:4
**please** 5:11 6:21
6:25 7:11 8:6,13
8:20 10:7 11:3,5
11:18
**point** 22:7,8 64:8
69:22 87:20
109:14 110:4
**police** 12:15,22
24:3 32:2,4 53:2
**policy** 27:12 28:6
29:13 38:6 40:1
41:14,19,22 98:6,9
99:5 108:11,13,17
109:24 110:10
112:23,24 114:25
**pornography**
116:7

Exhibit N
1445
ER-403

**portion** 114:14
**portions** 105:13
**position** 11:20
 12:9
**positive** 30:18
**possession** 28:4
**possibility** 73:16
 95:10
**possible** 6:12,16
 7:4 37:1 47:9
 90:18 93:6,25
 97:2 104:16
**possibly** 36:24
 81:24
**postal** 53:4 65:23
 66:18 67:2 92:21
**potential** 30:5,7,15
 30:16,21 64:21
 84:9 88:12 89:5
 91:19 94:6 96:16
 96:17 97:5
**potentially** 75:8
 88:20
**powdered** 101:23
**practical** 19:12
**practice** 96:5 97:8
 97:11,13
**pre** 82:9 98:5
**precursor** 83:20
 91:20 98:17
**prefer** 10:14
**preliminary** 11:9
**preparation** 81:3
 82:10 92:18
**prepare** 93:13
**prepared** 80:11
 93:6,15
**present** 76:17
 77:12 78:15 83:6
 83:18,23,24 87:1
 91:22 97:25

**pretty** 17:22 117:6
**prevent** 55:19
**previous** 23:13
 65:6 75:3,21 76:1
 76:10,21 82:23
 83:3
**previously** 24:2
 34:16 83:4
**primary** 81:7 90:5
**prior** 12:13,21
 43:16 63:4 64:1
 74:8 76:5 83:21
 93:21 105:2,7
 108:4
**private** 6:1 14:24
 15:18 17:4 20:22
 44:17,19,23 45:13
 46:3,5,19,24 47:13
 47:17,23 48:3,15
 49:14 50:9 51:4
 51:23 52:2 54:21
 55:2,5 57:11 58:2
 58:17,19 60:1,16
 60:25 61:8,9,21
 62:1,9,13,25 63:18
 63:23 64:9 65:10
 70:16,24 71:23
 72:4,13 73:9
 77:25 78:3,19
 79:20 80:9 81:6
 86:10 87:6 88:18
 89:15,21 92:10
 96:7 97:6,9,17
 98:12 100:15,17
 101:7 102:17
 103:10,17 104:8
 113:13,15 115:11
**privilege** 68:4
**privileged** 75:8
**privy** 59:1

**probable** 74:10
**probably** 10:20
 32:9 38:19 42:17
 46:12 60:12 77:22
 93:19
**problem** 40:6 96:1
**proceedings** 20:25
 21:6 22:16 30:8
**proceeds** 16:9
 22:4 23:4 25:14
 26:1,7,13,22 27:2
 27:7,14 47:8
 49:24 50:2,23
 51:11 62:16 63:24
 63:25 65:13 72:9
 78:2,14,18 79:2,7
 79:9,19,21 80:6,11
 88:13,20 89:6
 94:16 95:19 115:9
 115:16 116:17
**process** 45:20 80:8
 83:6 84:3
**processed** 50:18
**processing** 84:8
**produced** 100:11
**production** 4:10
**profess** 93:19
**proffered** 63:9
 82:25
**prolong** 93:15
**proper** 39:14
**properly** 20:2
**property** 22:3
 33:20 34:5 35:20
 36:1,3 38:14,15
 39:1 43:7 44:4
 113:16 114:7
 115:18 116:18
**protect** 35:18 36:1
 40:11

**protected** 68:3
**prove** 115:3
**provide** 6:25 8:14
 38:10
**provided** 81:11
**proximity** 23:17
**pst** 1:14
**public** 5:22 72:24
 118:6 122:19
**pull** 15:11 84:12
**pulled** 85:9 100:2
**purpose** 9:23
 30:11 35:1,3 36:6
 108:2,21,24
**purposes** 9:25
 35:23 60:2 107:16
**purse** 33:11
**pursued** 60:13
**put** 15:1,4 16:19
 45:22 66:8 116:14
**putting** 21:17

**q**

**qualify** 115:24
**question** 4:20 6:3
 6:21 7:1,12,14,15
 7:18 8:6,9,10,13
 8:17,19,24 9:21,23
 10:1,6 11:1 20:10
 22:25 25:1 26:16
 26:20 27:4 33:23
 40:7 65:4 67:23
 68:21 70:22 76:19
 76:24 77:9 98:1
 104:25 108:12
 109:3 110:18
 111:3 112:21
 113:11 114:20
 116:4
**questioning** 10:14
**questions** 6:12,14
 6:15 7:23 9:3

Exhibit N
1446

ER-404

[questions - right]                                                Page 16

10:16 11:11 30:4
59:5
**quick**  10:16 60:6
84:13 99:18
104:25 117:3,5
**quite**  25:2 46:16
53:19 55:16 73:6
101:21

**r**

**r**  2:1 121:3,3
**radar**  51:15
**rambling**  11:8
**ran**  72:21 73:2
75:3
**random**  57:21
**razor**  102:7
**read**  8:7 20:10
41:20 87:21
100:21 114:12,15
120:9 122:5
**reads**  101:13
**ready**  11:12 74:3
**real**  22:3 84:13
99:17 117:5
**realized**  111:14
**really**  6:22 17:24
21:17 25:4 48:24
83:12 117:13
**realtime**  1:22 5:3
119:4
**reason**  9:5,15 15:4
20:5 29:10 81:16
95:1 107:3 110:9
111:9 120:11
121:6,9,12,15,18
121:21
**reasons**  36:18
37:25 72:7 102:1
102:10
**recall**  17:14 24:4
43:6 57:25 84:11

86:23 87:10,16
103:9 105:6,10,12
105:19 106:1
**recalling**  110:22
**receipt**  38:7,14
39:18 40:4 41:17
120:18
**receive**  18:13,24
19:25
**recess**  16:13 44:13
80:21 104:22
117:9
**recognize**  101:6
**recollection**  28:15
36:5
**recollections**
107:12
**record**  5:11,16
6:23 9:12,24
11:17 15:14 16:12
44:12,25 72:24
114:14 117:7,18
119:9
**recorded**  6:11
111:1,5,6,10
**recording**  6:13
106:1
**recordings**  106:8
106:11,16,19
112:7,17
**records**  38:2 39:7
69:13 112:5
**recruiting**  65:8
69:6
**referenced**  91:12
120:6
**referring**  67:7
82:16 83:11 91:13
**refresh**  107:12
**regard**  109:24
112:23,25

**regards**  49:12
**related**  26:1,13,21
48:12 55:5 83:5
119:12
**relationship**  70:20
70:24
**remember**  10:4
17:2 48:18 49:2
60:14,21 66:4,13
66:20 67:3 73:19
103:12 105:15
**remove**  40:14
**removed**  67:11
**renting**  61:20
**repeat**  14:14 33:23
42:25
**repeatedly**  57:20
58:1,7
**rephrase**  8:8
22:25 34:2 61:17
**report**  7:9 100:19
**reported**  1:20
**reporter**  1:22 5:3
5:6 6:13,22 7:21
8:7 9:9 20:11
114:15 117:19
119:4
**reports**  49:2 64:16
**represent**  5:22
**request**  4:10
**requested**  112:15
114:14
**requests**  40:18
**require**  44:24
108:11,14
**required**  122:13
**requires**  7:22
**residence**  14:1
**residue**  89:2
**resolved**  59:10

**resources**  29:24
29:25
**respect**  68:18
**respond**  68:21
**responses**  6:24 7:1
**responsibility**
36:23
**rest**  7:13
**result**  48:17 49:8
49:23 50:2,22
58:22
**resulted**  48:20
49:14 50:15
**retain**  38:9 110:15
110:16
**retained**  19:8
107:17 113:7
116:10
**retention**  109:24
110:10 112:23
**return**  35:11
115:1,18 116:13
120:13,17
**returned**  33:13
40:12 114:7 115:4
115:12 116:3,25
**returning**  115:22
**review**  105:7
106:24 120:7
**reviewed**  105:16
**reviewing**  105:12
**rfrommer**  2:7
**rich**  66:25 91:23
**rid**  108:14
**right**  11:21 12:11
17:10 18:10 36:9
40:24 44:11 58:15
59:7 67:1 69:21
80:18 82:9 83:3
84:19 88:7 89:21
89:25 92:5 106:5

106:17
**rights** 20:8
**risk** 59:2
**road** 2:5
**rob** 2:4
**robert** 2:4
**rodgers** 2:9
**role** 64:3 70:16,25
 71:5 81:4,16 90:2
 90:5,20,24 91:17
 105:24,25
**roles** 82:12,20
 84:7
**rough** 117:20
**roundabout** 12:18
**rpr** 1:21 119:20
**rubber** 89:3
**ruiz** 1:3
**rules** 6:9 28:16
**run** 6:10 96:5,6
 97:11,14,17
**running** 95:1

**s**

**s** 2:1 3:10 121:3
**safe** 91:20
**safekeeping** 33:12
**safety** 35:4,24
 37:23 44:23
**sake** 42:14
**saw** 58:7 107:14
**saying** 17:14 41:6
 43:6 71:20 76:2
**says** 87:22 100:23
 101:4 102:9
**scenario** 42:15
 93:10,11
**scene** 92:23 93:1
 115:1
**scope** 96:21
**scratch** 22:24
 23:21 26:18 31:22

70:21 98:6 108:12
 111:2
**search** 14:23 17:7
 20:14 22:2 31:10
 32:13 33:19 34:5
 34:7 35:1 36:7,8
 36:12,16 37:3,14
 37:18 39:8,15,17
 40:2 41:15 46:1
 48:19 55:6 80:1,9
 82:9,10,17 86:9
 89:4 92:24 93:8
 95:20 96:21 99:11
 104:17 107:10
**searched** 61:4
 97:22 99:14
**searchers** 98:24
**searches** 31:18,24
 32:7 33:7,17
 35:24 48:20,22
 49:14 81:12 86:10
 86:17 87:12 88:25
**searching** 35:6
**seat** 102:6
**second** 14:17
 95:25 99:19
**section** 2:11 92:1,2
**security** 53:9
**see** 29:4 47:14
 48:10 72:23 84:21
 100:21 106:25
**seeing** 71:22 85:6
 87:11,17,25
**seek** 78:25 79:20
 80:6
**seen** 66:10 85:21
 85:22,24 86:6
 87:9 100:5
**seize** 27:13,23 28:1
 28:10,18,24 29:5
 29:10 32:20 40:8

50:8
**seized** 29:3 39:9
 39:16 40:3,25
 42:5 50:11 60:18
 60:19 62:1 97:12
**seizing** 34:13,18
 38:9 40:9 50:17
 80:2
**seizure** 5:25 20:14
 34:14 35:11 59:1
 73:9 74:4,15
 82:11,17,22 83:8
 83:14,21 86:15
 89:16 90:4 93:8
 109:5
**seizures** 29:23
 48:21 49:9,15
**send** 101:4,16,24
 102:2,9,16 103:10
 103:14
**sense** 14:11 58:14
 70:17 73:23 93:17
 97:3,4,16 107:25
 112:3 117:2
**sent** 103:17 104:7
 120:14
**separate** 60:22
 83:10 86:11
**separately** 21:14
**serial** 43:20
**series** 10:15
**serve** 35:11
**served** 107:15
**service** 53:4
**set** 65:11 119:7,17
**setup** 84:16
**shaking** 6:24
**share** 84:15
**shared** 105:4
**sharp** 102:3

**shear** 71:14 86:18
**sheet** 120:11
**sheriff's** 46:15,18
**sheriffs** 53:3 58:5
 66:3
**shift** 65:16 70:3,12
 73:7 80:24
**shifting** 67:17
 70:25
**shifts** 90:13
**shoes** 20:7
**short** 96:25
**shortly** 17:7 64:17
**shot** 84:18
**shove** 102:5
**show** 23:11,14
 24:8 29:8 30:12
 55:23 107:14
**showed** 73:3
**showing** 25:5
**shown** 55:9
**shows** 29:9
**shy** 11:25 12:2
 13:8
**side** 116:14
**sign** 120:12
**signature** 119:18
**signed** 120:20
**significant** 60:25
 61:4
**significantly** 73:22
**similar** 51:8 56:20
**simply** 9:24
**single** 40:3 97:24
 97:25
**sir** 11:22 24:6
 110:23
**site** 90:21 91:16
 92:9 93:21
**situated** 14:9

Exhibit N
1448
**ER-406**

Case: 22-56049, 12/21/2022, ID: 12615894, DktEntry: 22-4, Page 92 of 291




**situation** 32:16 56:20 59:17 103:13
**situations** 33:4
**six** 60:22
**sleep** 86:25 89:18 89:20
**smell** 30:20 89:2
**smells** 26:5
**smoothly** 6:10,16 90:17
**sniff** 95:20 96:6 97:12,14,22 98:11 98:12 99:6,11,14 104:16
**sniffing** 26:11 92:23 102:4
**sniffs** 94:18 97:17
**snitko** 1:3,3 120:4 121:1 122:1
**solutions** 1:23 120:23
**somebody** 27:13 38:10 40:17 43:17 45:16 57:2,2,3 60:10 83:24 86:5 90:9 91:7,8 103:13 104:2
**somebody's** 25:6 32:18
**someone's** 20:8
**soon** 117:6
**sorry** 14:16 16:24 33:8,9 40:25 42:25 46:7 53:8 61:17 67:10 69:15 84:6 85:15 87:4 95:7,24 98:6 99:18 108:11 109:22 111:2 114:11,19
**sort** 72:20 74:20 98:23 99:9 101:18
**sound** 106:5
**sounds** 34:3 41:1,6 74:19 76:4 79:16 93:17 97:4
**source** 102:21
**sources** 69:5
**south** 12:19
**southern** 63:13
**southwest** 12:19
**speak** 6:17 96:8 97:21 101:12 103:3 104:1 109:4 109:20 110:1
**speaking** 113:12
**special** 5:13,18 11:21 12:5,7 15:22 16:1 18:9 19:3 29:4 42:2 68:12 85:13 117:12
**specialize** 17:15 17:24
**specific** 19:24 24:12 30:11 38:13 38:21,25 39:2,6 44:1,5 52:12,15,16 54:11,11 74:7 79:14 103:12
**specifically** 31:3 52:24 61:13 66:14 84:10 94:6,10 101:15
**specifics** 41:21 43:25
**speculate** 103:6
**speculation** 104:11
**spent** 13:7
**spoke** 102:20
**spring** 2:11 16:22 17:1
**staff** 67:6
**stages** 63:7
**stamp** 77:19
**stand** 105:17
**standby** 96:12 97:2
**start** 6:3 7:17 8:24 13:19 56:15 73:7 91:1 102:4 105:2
**started** 5:9 11:11 11:14,14 13:6,11 13:17 51:9 56:18 64:21 73:11
**state** 5:10 9:20 11:18 53:1,23
**stated** 11:16 36:18
**statement** 101:14
**statements** 63:10 82:24,25
**states** 1:1,7,8 2:10 120:4 121:1 122:1
**stating** 49:15
**statistical** 71:19
**status** 59:6
**stenographic** 5:3
**step** 56:23 66:10 74:17
**steps** 67:16,19 68:14 69:9
**stills** 112:10,14
**stipulations** 4:15
**stolen** 35:20 36:2 107:1 116:6
**stopped** 17:11
**stops** 48:8
**storage** 35:8 96:23
**storc** 1:4
**store** 47:8 62:15 83:4
**stored** 63:25
**straight** 14:4
**street** 2:11
**strong** 87:24
**structured** 75:24
**stuff** 11:10
**subject** 22:8,20 23:10 25:13,21 27:14 34:14
**subjective** 39:4 78:11
**submitted** 17:6 21:15
**subscribed** 118:4 122:14
**subsequent** 107:5
**substance** 75:5,5 84:1
**substantially** 42:6 43:10
**substantive** 76:7
**suggested** 65:7
**suggesting** 83:1
**suitcase** 27:5
**suite** 2:5
**summer** 77:22
**supervise** 91:17
**supervising** 90:13
**supervisor** 91:15 110:6
**supervisors** 90:21 90:22 91:22
**supervisory** 90:19
**support** 4:2
**supposed** 54:15
**sure** 19:8 27:21 28:7,17 33:24 35:5 39:11 40:21 41:9 46:13 49:4




Exhibit N
1449

55:16 60:20 84:13
87:14 88:3 90:6
90:10,16 91:2
92:16 93:5 112:18
**surveillance** 47:16
48:10 56:10 60:8
71:16 107:9
**surveillances**
47:13 54:23 71:24
**suspect** 54:17,19
56:9
**suspected** 80:11
**suspicion** 104:14
107:19 116:23
**suspicious** 103:1
103:23 104:9
**switch** 72:16
**switching** 66:5
**sword** 94:17
**sworn** 5:2 7:20
118:4 119:7
122:14

**t**

**t** 3:10 121:3,3
**take** 8:2 10:12
26:5,17,24 29:24
29:24 34:22 38:3
40:8 41:4,4 44:8
46:25 67:16 80:8
80:16 84:3 92:22
96:1 104:20 117:3
**taken** 1:17 6:4
16:14 38:15 39:1
40:18 41:10,15
42:5 44:14 68:14
75:11 80:22
104:23 117:10
**takes** 18:9
**talk** 7:5,6,9 8:18
**talked** 57:20 71:15

**talking** 8:21 16:17
17:12 20:21 43:25
51:19,25 59:3
61:14 65:4 67:23
68:1,5,10 72:18
**tangible** 107:13
**target** 45:5 52:12
52:17 54:12 55:3
55:8 60:10,11
**targeting** 73:17
**targets** 47:14 56:7
**tasked** 16:3,5,6
106:2,7
**tasks** 82:20
**taught** 37:2 38:25
**teach** 37:7
**team** 65:22 73:24
74:3 80:25 83:17
98:10 111:22
113:24
**team's** 81:2
**teams** 111:16,21
111:24
**technical** 71:19
**tell** 8:9 11:3 37:17
37:20 44:18 51:6
55:13 64:23
102:13 112:10
**telling** 103:9
**ten** 11:25 12:2
19:18
**tend** 33:16 54:3
**terms** 38:1
**testified** 5:4 21:20
79:17 88:2,3
**testify** 21:10
**testifying** 8:2
**testimony** 3:5 9:7
9:17 43:16 63:4
64:2 76:22 108:4
119:6,9 120:9,18

122:8
**texas** 13:18
**text** 87:25
**thank** 5:5,18 42:1
**thanks** 53:12
70:18 80:20
**theft** 106:24
**theirs** 57:5
**theme** 16:18
**thing** 7:4 23:18
24:16 29:22 31:8
33:14 56:11 66:19
74:11 80:12 81:22
83:20 91:10,21
**things** 22:23 23:1
25:12,16 26:2
30:20,20 33:15
37:10,16 43:14
87:23 88:10,24
89:3 90:6,16,23
95:17 101:22
107:23 115:1
**think** 7:13 9:14
10:23 16:16 17:10
23:25 40:6 45:1
47:12 50:10 76:15
101:1 102:14
109:15 117:4
**thorough** 36:19
**thought** 69:18
**three** 14:23 35:22
48:18 60:20 95:17
**threshold** 27:9,10
27:16 29:17
**thresholds** 28:7
29:13
**time** 10:13,21
11:17 16:23 17:20
29:17,24 32:1,3,6
33:1,5,8 34:6,9
48:15 51:4,18,24

58:8,11,17 59:11
59:25 60:16 61:6
61:10 69:25 71:12
72:16 73:6 77:19
80:18 83:10,13,21
87:8,9,10 89:17
91:12 93:16 96:2
97:1 101:7 108:16
113:7 114:8
117:14,22 120:19
**timeframe** 120:8
**timeline** 51:18
80:25
**times** 21:4 32:18
34:19 53:20 54:1
54:15 83:23,25
87:17
**title** 5:10 113:6
**titled** 85:9
**today** 6:2 9:3,7,17
117:14
**todd** 66:23 91:16
**toes** 56:24
**token** 7:16
**told** 102:15 103:13
**tool** 54:14 55:14
57:8,23
**totally** 8:18 28:17
59:9 67:13 73:23
116:12
**tow** 32:24
**track** 43:1
**tracy** 1:7
**traffic** 48:7
**trafficker** 65:5
69:10 70:14,15
**traffickers** 47:20
51:9 62:15
**trafficking** 22:5,6
23:5,10,15 24:9,20
25:7,7,14 34:18

Exhibit N
1450

[trafficking – verbal]                                                                                                    Page 20

56:22 94:7,11,21
94:23 95:4,12
96:18 97:6 104:15
**trail**  55:25
**trained**  20:5
**training**  13:24
18:8,12,24 19:2,4
19:12,13,15,25
20:12 25:19 36:11
103:24 104:6
**transcript**  119:8
120:6,20 122:5,8
**transfer**  15:2,5
16:20 46:12 114:4
**transferred**  16:17
59:2 110:7
**travis**  1:4
**tried**  113:22
**tries**  18:4
**trouble**  27:3
**true**  18:1 32:14
112:24 119:8
122:8
**trunk**  80:3
**truthfully**  7:23
**try**  8:8 23:11 39:2
40:15 46:13 69:11
93:13 97:2 113:16
**trying**  15:11 23:7
23:25 40:14 50:10
65:12 79:15 85:8
97:16
**turn**  116:18
**turned**  45:24
64:10 106:11
112:16
**turns**  56:5
**two**  14:5 42:2,11
42:15 43:6 48:18
69:24 95:17 97:23

**tyler**  1:3
**type**  17:18 22:10
25:2
**types**  13:13
**typical**  110:10
112:24
**typically**  31:18
32:25 39:8

## u

**u.s.**  5:25 14:24
15:18 20:21 44:16
44:18 45:13 46:2
46:5,19,23 47:13
47:17,23 48:3,15
49:14 50:9 51:4
51:23 52:2 54:21
55:2,5 57:11 58:2
58:16,19 60:1,15
60:25 61:7,9,21
62:1,9,13,25 63:18
63:23 64:9 65:10
65:23 66:18 67:2
67:4 70:16,24
71:23 72:4,13
73:9 74:19 77:25
78:2,19 79:19
80:8 81:6 86:10
87:5 88:17 89:15
89:21 92:10 96:7
97:6,9,17 98:12
100:15,17 101:7
102:17 103:10,17
104:8 113:13,15
115:11
**uh**  6:25
**ultimate**  75:22
93:2
**ultimately**  22:14
23:2
**undercovers**  63:11
69:4,16 82:25

**understand**  7:21
8:5,10,17 9:2 35:3
40:24 54:2 57:6
68:22 79:15 87:15
88:18 97:7 110:9
112:22
**understanding**
28:25 33:24 34:25
60:24 64:7 68:23
69:21 72:10 76:21
79:5,11,13,18,23
80:7 98:13 99:15
104:12 106:18,21
108:25 113:5
116:22
**understood**  42:1
84:5 113:10
**undertaking**  92:19
**unit**  17:18 53:23
**united**  1:1,7,8 2:10
120:4 121:1 122:1
**upcoming**  12:3
**usdoj.gov**  2:12,13
120:2
**use**  26:12 30:5,7
30:21 40:7 54:15
64:4 78:25 82:14
88:24 89:4 107:9
**uspv**  87:12
**utilize**  29:25 62:15
71:7 88:11
**utilized**  75:21 83:4
**utilizing**  51:11
91:1

## v

**v**  120:4 121:1
122:1
**vague**  39:10 42:9
61:12 63:3 79:4
87:7 88:9 103:20
104:10 105:18

108:4 110:12
113:1 115:20
116:4,20
**valid**  38:3 108:1
**value**  23:9 26:15
26:19
**varies**  25:17
103:25
**vary**  39:21
**vast**  33:4 71:17,21
**vaults**  6:1 14:24
15:18 17:4 20:22
44:17,19 45:14
46:3,5,19,24 47:13
47:17,23 48:3,15
49:14 50:9 51:4
51:23 52:3 54:21
55:2,6 57:12 58:2
58:17,19 60:1,16
60:25 61:8,9,21
62:2,14,25 63:18
63:24 64:9 65:10
70:16,25 71:23
72:4,13 73:9
77:25 78:3,19
79:20 80:9 81:6
86:10 87:6 88:18
89:15,21 92:11
96:7 97:7,9,17
98:12 100:15,17
101:7 102:17
103:11,18 104:8
113:13,15 115:11
**vaults's**  62:9
**vehicle**  32:13,19
32:20,22,24 33:1
34:15,21 40:16,19
42:13 80:1,13
**vehicles**  31:21
**verbal**  7:1,4

Exhibit N
1451

**ER-409**

[verbally - zoom]                                                                                    Page 21

**verbally**  6:22
**verdon**  1:4
**verify**  120:9
**veritext**  1:23
  120:14,23
**veritext.com.**
  120:15
**versa**  57:5 111:12
**version**  85:17
**versoza**  67:2 99:4
**vice**  57:5 111:12
**victor**  2:9
**victor.rodgers**
  2:13
**video**  15:10 16:10
  82:1,2,8 84:8
  105:25 106:3,4,19
  106:22,25 107:10
  107:10,14,15
  110:21,25 111:5
  111:11 112:7,16
  112:17
**videography**  81:9
  90:15
**videos**  107:4,8
  108:2,5,15 109:1,4
  109:24 110:11,16
  110:19 112:23
**videotape**  81:12
**videotaped**  1:13
**viewed**  62:25
  63:18
**vince**  93:18
**violate**  20:7
**virginia**  2:6
**vivienne**  1:21
  119:3,20
**volume**  86:18
**volunteered**  82:3
**vs**  1:6

**w**

**wa**  1:21
**wait**  7:14
**walk**  21:23
**walking**  114:24
**walks**  19:6
**want**  8:17 29:25
  41:7,8 44:16
  48:25 67:3,22,25
  69:17 76:20 80:24
  81:2,20 82:6,13
  87:19 91:24 95:15
  100:20 101:4
  102:9,24 105:22
  116:13 117:4,20
**wanted**  101:8
**wants**  72:22
**warrant**  5:25
  14:24 15:1,18
  17:4,8 20:22
  34:14 46:1 73:9
  74:4,15 75:16,20
  75:24 76:13 77:3
  78:3 81:1,3,6,8
  82:10,11,11,15,17
  82:18,22 83:8,15
  83:22 86:15 89:16
  90:4 92:24 93:8,9
  96:21 99:11 105:1
  105:3,4,13,16
  106:10 107:10
  109:6 113:14,17
**warrant's**  93:22
**warrants**  20:18,20
  22:2 48:14,19
  55:6 72:23 77:21
**water**  90:13 91:7,8
  91:9,10
**way**  13:20 25:5,23
  26:4 30:18,19
  41:3 42:25 55:21

55:22 63:6 65:10
  81:25 88:15 89:14
  98:2 99:10 104:3
  107:9,11 116:3
  119:14
**we've**  11:8 22:1
**weeks**  13:25
**went**  14:4 58:17
  62:13
**western**  1:2
**whatsoever**  74:25
**whereof**  119:16
**whichever**  108:6
**whoever's**  39:5
**wilkison**  1:8
**winter**  16:25
**wiretap**  109:17
  113:6
**wise**  12:23
**witness**  4:5 68:1
  80:19 119:6,10,16
  120:8,10,12,19
**wondering**  43:12
**word**  36:22 40:7
  40:25 55:10 82:15
**wording**  76:9
**words**  87:22
**work**  12:23 14:6
  14:12,18 15:20
  17:12,15 31:7
  76:1,10 101:21
**worked**  6:20 25:8
  60:17 100:16
**workers**  54:23
**working**  12:14,22
  13:6,11,17 16:4
  47:1,4 54:6 57:13
  93:5
**worst**  93:10
**worth**  29:17

**wound**  49:10
**wow**  6:7 31:16
  44:21
**wrapped**  117:6
**write**  29:9 43:20
**written**  19:13
**wrong**  44:2,3

**x**

**x**  3:2,10 54:17,19
  56:9

**y**

**y'all**  75:4
**yeah**  12:12 15:11
  15:24 16:23 22:23
  46:9 53:9 59:14
  61:17 66:10 67:9
  68:9 69:2 70:18
  70:18 72:3 82:12
  87:8 89:19 100:7
  100:10 101:1
  103:5
**year**  43:21 46:11
  49:3 67:10
**years**  12:1,2 13:8
  13:9 19:19 49:7
**yep**  89:22 92:7

**z**

**zellhart**  66:24
  99:4
**zoom**  1:13

Exhibit N
1452
ER-410

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is stenographically recorded, the deposition officer shall send written notice to the deponent and to all parties attending the deposition when the Original transcript of the testimony for each session of the deposition is available for reading, correcting, and signing, unless the deponent and the attending parties agree on the record that the reading, correcting, and signing of the transcript of the testimony will be waived or that the reading, correcting, and signing of a transcript of the testimony will take place after the entire deposition has been concluded or at some other specific time.

(b) For 30 days following each notice under subdivision (a), unless the attending parties and the deponent agree on the record or otherwise in writing to a longer or shorter time period, the deponent may change the form or the substance of the answer to a question, and may either approve the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the
deponent may change the form or the substance of
the answer to any question and may approve or
refuse to approve the transcript by means of a
letter to the deposition officer signed by the
deponent which is mailed by certified or registered
mail with return receipt requested. A copy of that
letter shall be sent by first-class mail to all
parties attending the deposition.

(d) For good cause shown, the court may shorten
the 30-day period for making changes, approving, or
refusing to approve the transcript.

(e) The deposition officer shall indicate on the
original of the transcript, if the deponent has not
already done so at the office of the deposition
officer, any action taken by the deponent and
indicate on the original of the transcript, the
deponent's approval of, or failure or refusal to
approve, the transcript. The deposition officer
shall also notify in writing the parties attending
the deposition of any changes which the deponent
timely made in person.

(f) If the deponent fails or refuses to approve
the transcript within the allotted period, the

Exhibit N
1454

ER-412

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**Exhibit N**
**1456**

ER-414

# Exhibit O

**to Declaration of Robert Frommer**

Page 1

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2
                Case No. 2:21-cv-04405-RGK-MAR
 3
 4      PAUL SNITKO, et al.,
 5                    Plaintiffs,
 6      vs.
 7      UNITED STATES OF AMERICA; TRACY
        L. WILKISON, in her official
 8      capacity as Acting United States
        Attorney for the Central
 9      District of California; and
        KRISTI KOONS JOHNSON, in her
10      official capacity as an
        Assistant Director of the
11      Federal Bureau of Investigation,
12                    Defendants.
        _____/
13
14
                   REMOTE DEPOSITION OF
15
         SUPERVISORY SPECIAL AGENT JESSIE MURRAY, AS A
16       30(B)(6) REPRESENTATIVE OF THE UNITED STATES OF
              AMERICA FEDERAL BUREAU OF INVESTIGATION
17
18                 Monday, July 11, 2022
                10:00 a.m. - 3:04 p.m. (PDT)
19
20
21
22
23               Stenographically Reported By:
24               Kimberly Fontalvo, RPR,CLR
25               Realtime Systems Administrator
```

```
                                                            Page 2

 1      APPEARANCES:

 2

 3      On behalf of Plaintiff:

 4      THE INSTITUTE FOR JUSTICE
        By:  ROBERT FROMMER, ESQ.

 5      By:  ROBERT E. JOHNSON, ESQ.
        By:  Michael Greenberg, ESQ>

 6      901 N. Glebe Road, Suite 900
        Arlington, VA 22203

 7

 8      On behalf of the Defendants:

 9      ASSISTANT UNITED STATES ATTORNEY
        ASSET FORFEITURE SECTION

10      By:  VICTOR RODGERS, ESQ.
        312 North Spring Street, 14th Floor

11      Los Angeles, California 90012

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit O
1459

ER-417

Page 3

1                      I N D E X

2

     Examination                                          Page

3

     SUPERVISORY SPECIAL AGENT JESSIE MURRAY

4    Direct              By Mr. Frommer                     3

5    Instruction not to answer                            73

6    Instruction not to answer                            74

7    Instruction not to answer                           113

8    Instruction not to answer                           114

9    Certificate of Oath                                 131

     Certificate of Reporter                             132

10   Read and Sign Letter to Witness                     133

     Errata Sheet (forwarded upon execution)             134

11

12                      EXHIBITS

13

14   No.                                                 Page

15   Exhibit 7       Supplemental Memorandum               91
                     on Box Inventory

16

     Exhibit 10      Agent Observations and               85

17                   Notes form

18   Exhibit 12      Plaintiffs' Amended                    9
                     Notice of 30(b)(6)

19                   Deposition

20   Exhibit 15      USPV Notice of Forfeiture            120

21

22

23

24

25

Page 4

1           THE COURT REPORTER:  Please raise your

2      right hand.

3           Do you swear that the testimony you are

4      about to give will be the truth, the whole

5      truth, and nothing but the truth?

6           THE WITNESS:  I do.

7                     DIRECT EXAMINATION

8   BY MR. FROMMER:

9      Q.   Hello.  Thank you for joining me today.

10          If you could, could you state your full

11   name, title, and address for the record, please?

12     A.   Jessie T. Murray, 4000 West Metropolitan

13   Drive, Suite 200, Orange, California 92868.

14     Q.   Thank you for that.

15          My name is Robert Frommer.  I'm an

16   attorney with The Institute for Justice.  We're a

17   non-profit public interest law firm.  And we're

18   representing the Plaintiffs in this class action

19   challenge concerning the government's execution of

20   seizure warrant at U.S. Private Vaults in

21   March 2021.

22          Before we begin, I want to go over some

23   ground rules with you for this deposition to make

24   sure that it -- we have the same understanding.

25          Actually, can I ask you a question before

Page 5

1    we begin?  Have you had your deposition taken

2    before?

3         A.    No.

4         Q.    Okay.  All right.  I am constantly

5    surprised by that.  A number of the government

6    officials haven't been deposed, and I figured you

7    guys did that all the time.

8              Okay.  Well, then, let me go through some

9    of the ground rules since you haven't done this

10   before.  And hopefully that will keep things smooth

11   and efficient.

12             So, I'm going to be asking you questions

13   and the court reporter is going to be recording both

14   my questions as well as your answers.  To assist the

15   court reporter, I'll be sure to speak clearly and

16   audibly, and would ask that you kindly do the same.

17   Okay?

18        A.    Okay.

19        Q.    All right.  Now, when you are answering

20   the questions make sure, please, to answer each

21   question verbally.  You can hear it with me right

22   now, the court reporter can't record gestures or

23   things like "uh-huh" or "huh-uh," stuff like that,

24   but, you know, even though that's part of our usual

25   conversation, we need to be careful to say, "yes,"

1    "no," so the court reporter can get that down.  So

2    will you be sure to provide clear and verbal

3    responses?

4         A.   Yes.

5         Q.   All right.  Great.

6              Normally, when we talk, like we're -- it's

7    not quite as bad on Zoom, but normally when we talk

8    with people, we often talk over each other, a lot of

9    cross-talk and interrupt as part of the normal flow

10   of conversation.  In normal circumstances that's

11   fine.  But with a Zoom deposition, that can make it

12   almost impossible for the court reporter to get down

13   what we're saying.

14             So, therefore, it's real important that

15   you wait until I finish a question before you begin

16   answering.  And I'd say that even if you think you

17   know where I'm going to go with the rest of it.  And

18   by the same token, I will do my best to make sure to

19   let you finish your answers before I start up with

20   another question.  Do you understand?

21        A.   Yes.

22        Q.   Okay.  Great.

23             Now, you were sworn in by Kimberly, the

24   court reporter, just a moment ago.  Do you

25   understand that you have given an oath that says you

1    have to answer my questions truthfully and

2    completely?

3         A.   Yes.

4         Q.   All right.  In fact, do you understand

5    that's the exact same oath you would be taking if

6    you were testifying in court in front of the judge?

7         A.   Yes.

8         Q.   All right.  Now, if you don't understand a

9    question I ask, which could very well happen, please

10    just let me know.  Depending on, well, if it was a

11    good question or not, I'll either ask the court

12    reporter to ask that question back or to repeat the

13    question back, or I will rephrase to try to clarify

14    the question.  So, please, will you tell me when you

15    don't understand a question?

16         A.   I will.

17         Q.   Okay.  Great.

18              Now, and if you don't know the answer to a

19    question, it's fine to say so.  It's fine to say "I

20    don't know."  But if you do know the answer, or if

21    you actually do know the answer, then under the oath

22    you just took, you have you to provide that answer,

23    a full and complete answer in good faith.  So I'm

24    going to assume, unless you say otherwise, that you

25    understand my questions when I ask them.

1          Now, if you want to talk to your lawyer,

2     Victor, that's fine.  The only thing I'd say is if

3     there's a question pending, or if you are in the

4     middle of a response, you have to finish your answer

5     and then we can take a break -- we can take a quick

6     break; you can speak to Victor.  Okay?

7          A.   Okay.

8          Q.   All right.  Because it's important to get

9     full, complete, and accurate testimony, I have to

10    ask, is there -- are you taking any medication that

11    would -- might make it difficult for you to

12    understand or answer my questions today?

13         A.   No.

14         Q.   Okay.  And is there any other reason why

15    you might not be able to give full, complete, and

16    accurate testimony today?

17         A.   No.

18         Q.   Now, sometimes the government's attorney,

19    Victor, may state an objection after I ask a

20    question.  That doesn't mean you don't have to

21    answer it.  If he's -- he will specifically instruct

22    you not to answer a question.  But an objection --

23    you still have to answer, even if Victor makes an

24    objection, because the purpose of the objection is

25    to simply record it so that if I want to use your

1    answer to a question later on, the government can

2    say that question was improper under the rules of

3    evidence.  Do you understand?

4         A.   Yes.

5         Q.   All right.  Sometimes -- happens all the

6    time -- after you've answered a question, you might

7    remember additional information or a clarification

8    about some earlier question.  If that happens, it's

9    fine, just let me know and -- that you would like to

10   add something, and we'll make sure to do that while

11   it's still fresh in your mind.  Okay?

12        A.   Okay.

13        Q.   If you would like to take a break at any

14   time, just let me know.  I will finish my line of

15   questioning, if we're in the middle of a line, and

16   let you finish your answer and then we can adjourn

17   for a break.  Okay?

18        A.   Okay.

19        Q.   All right.  Good.

20             And I understand that it's 10:09 out

21   there.  I will try to get you out for lunch around

22   noon, so we'll try to have a -- hard break in about

23   two hours, okay?

24        A.   Okay.

25        Q.   Now, during our conversation, you may

Exhibit O
1466

Page 10

1    think of some documents or materials like a calendar

2    or appointment book that might help you remember

3    your answer, if you can think of something like

4    that, please tell me about it because we might have

5    that material in our files and we might be able to

6    provide it to you.  Okay?

7         A.   Okay.

8         Q.   All right.  Now, with all that said, do

9    you have any questions for me?

10        A.   No.

11        Q.   All right.  Well, then, let's start out by

12   introducing an exhibit.

13             MR. FROMMER:  This is listed as

14        Exhibit 12.  It was previously introduced at

15        the deposition on June 30th.  It is an amended

16        30(b)(6) notice.

17             When you have a moment, if you could take

18        a look at that, get a chance to familiarize

19        yourself with the document, please.

20             (Thereupon, marked as Exhibit 12.)

21             MR. RODGERS:  For the record, I'm just

22        handing her a copy of the amended notice of

23        deposition that I have.

24             MR. FROMMER:  That's fine.

25

Page 11

1       BY MR. FROMMER:

2           Q.   When you are ready, just let me know.

3           A.   I'm ready.

4           Q.   Do you recognize this document?

5           A.   Yes.

6           Q.   Can you tell me what it is?

7           A.   Plaintiffs' Amended Notice of 30(b)(6)

8    Deposition.

9           Q.   Okay.  Is it your understanding that you

10   are appearing today on behalf of the United States

11   to answer questions regarding the topics listed in

12   this notice?

13          MR. RODGERS:  I'll speak for the witness.

14       She's here today to answer the questions on

15       Topic Numbers 8 and 10.

16     BY MR. FROMMER:

17          Q.   Okay.  Can you describe your

18   qualifications to speak on Topics 8 and 10 that are

19   listed in the exhibit?

20          A.   I am currently the supervisor of the asset

21   forfeiture units of the Los Angeles office of the

22   FBI.  I have been so since 2019.

23          Prior to that, I was a special agent on

24   the asset forfeiture squad for a number of years.

25   And going back to '96, for about four or five years,

Page 12

1    I was also an asset forfeiture agent.

2         Q.   Oh, so you've been -- and was this all at

3    the FBI?

4         A.   Correct, all at the FBI, Los Angeles

5    office.

6         Q.   Okay.  So how many years, total, while

7    you've been at the FBI field office in Los Angeles

8    office, have you been involved in work regarding

9    asset forfeiture?

10        A.   Approximately ten years as an agent, and

11   three years or so as a supervisor.

12        Q.   Okay.  All right.  And do you get training

13   to -- is there specialized training that's involved

14   with doing asset forfeiture work at the FBI?

15        A.   Yes.

16        Q.   Can you describe that for me?

17        A.   There are annual asset forfeiture

18   conferences and then there are different trainings

19   throughout the year on different topics in different

20   locations that you either are invited to or request

21   to attend.

22        Q.   So there's periodic trainings that occur

23   that are specific to asset forfeiture; is that

24   correct?

25        A.   Yes.

1          Q.   Okay.  And with all that, is there anyone

2     who you believe would be more knowledgeable than you

3     on -- to be able to discuss Topics 8 and 10 in the

4     amended 30(b)(6) notice?

5          A.   Do you mean more knowledgeable in the FBI

6     LA office or the FBI in general?

7          Q.   Well, Topic 8 is about the administrative

8     forfeiture process with regards to

9     U.S. Private Vaults.  Topic 10 is about how the

10    disposition -- disposition of forfeiture proceeds to

11    constituent agencies who were involved in the

12    U.S. Private Vaults action.  So I'm focused

13    specifically on the LA field office.

14               So with that, can you think of anyone who

15    would be more knowledgeable than you on Topics 8 and

16    10.

17         A.   I am qualified to speak on those topics.

18    I don't know if I would say I am the most qualified

19    person to speak on those topics.

20         Q.   Well, do you think there is someone who is

21    more qualified than you to speak on those topics?

22         A.   In the Los Angeles office, I am most

23    likely the person most knowledgeable about these,

24    but there are perhaps other people most qualified.

25    I wouldn't say that I am the best person

1    knowledgeable about all of these topics.

2         Q.   Okay.  I am not -- I understand.  I am not

3    trying to put you out to be like the world's

4    foremost authority on civil forfeiture.  But you do

5    have good knowledge about the administrative

6    forfeiture proceedings, both in this case and then

7    the forfeiture process generally; is that fair to

8    say?

9         A.   Yes.

10        Q.   Okay.  There you go.

11             Can you tell me:  What did you do to

12   prepare for today's deposition?

13        A.   I spoke with Victor and I also read this

14   Plaintiffs' Amended Notice of 30(b)(6) Deposition.

15        Q.   Did you read any other documents besides

16   the amended notice?

17        A.   Specifically with regards to

18   U.S. Private Vaults?

19        Q.   Specifically with regards to -- in

20   preparing for this deposition.

21        A.   No.

22        Q.   So you didn't happen to look at the -- any

23   of the -- scratch that.

24             So your preparation for today was talking

25   to the counsel for United States and reviewing the

Page 15

1    amended 30(b)(6) notice; is that correct?

2         A.   Yes.

3         Q.   All right.  But no other documents; is

4    that correct?

5         A.   Correct.

6         Q.   Before we begin talking, I understand that

7    you are here today as the representative of the

8    United States.  And what that means is that, unless

9    I say otherwise, your answers are the answers of the

10   United States.  But right now I want to get some

11   background about you, the person, as opposed to you

12   the representative.

13              You may have already done this, but could

14   you tell me your full name, please?

15        A.   Jessie.  My middle initial is T-S-U-I,

16   dash, S-H-I-H.  Last name, Murray, M-U-R-R-A-Y.

17        Q.   Okay.  Great.

18             Do you mind tell me your age, please?

19        A.   52.

20        Q.   And are you from Los Angeles originally?

21        A.   Yes.

22        Q.   So did you -- are you born and raised

23   Angeleno?

24        A.   Yes.

25        Q.   Where did you go to -- could you tell me

Exhibit O
1472

ER-430

Page 16

1     your school history, your educational history?

2          A.   Starting from where?

3          Q.   Oh, let's start with college.  I don't

4     need to know where you went to fourth grade.

5          A.   I went to and graduated from UC Irvine and

6     then I went to McGeorge Law School.

7          Q.   And did you finish law school?

8          A.   Yes.

9          Q.   So you have a law degree?

10         A.   Yes.

11         Q.   When did you graduate from McGeorge,

12    roughly?

13         A.   1994.

14         Q.   And can you tell me, after you got the

15    degree from McGeorge, what did you do after law

16    school?

17         A.   I held a temporary job while my

18    application process was going through at the FBI.

19         Q.   So you had applied immediately after law

20    school to become a special agent at the FBI?

21         A.   Yes.

22         Q.   And so when did you get accepted to join

23    the FBI?

24         A.   About a month before I started Quantico,

25    which was September 17, 1995.

Exhibit O
1473

ER-431

1      Q.   You know exactly where I'm going next.  So

2   you went to Quantico in September of '95.

3           How long does the FBI training at Quantico

4   last?

5      A.   Right now it's about four months.

6      Q.   How about when were you doing it?

7      A.   I graduated January 17th, so it was a

8   little bit longer back then, closer to five months.

9      Q.   Okay.  All right.  And what sort of

10  things -- is that where they teach you sort of the

11  nuts and bolts of being an FBI agent?

12     A.   Yes.

13     Q.   Okay.  And did you have practice doing

14  arrests in Hogan's Alley?

15     A.   Yes.

16     Q.   And did they teach you there how to, like,

17  execute a warrant, a search or seizure warrant?

18     A.   Yes.

19     Q.   And generally -- and did they teach you

20  about -- did they -- one thing I'm interested in

21  when you go through this FBI training is, are there

22  any modules about, like, constitutional rights,

23  like, here's people constitutional rights, here's

24  how we should act so as to avoid infringing on them?

25     A.   Yes.

Page 18

1          Q.   And did that, if you recall, include some

2     discussion of how to avoid violating someone's

3     Fourth Amendment rights?

4          A.   Yes.

5          Q.   And what is your official position name

6     now?

7          A.   Supervisory special agent.

8          Q.   Supervisory special agent.

9               And is that term basically a --

10    supervisory special agent is just -- it's, like, a

11    supervisor of multiple special agents, it's one

12    level up; is that an accurate description?

13         A.   Yes.

14         Q.   So who is it that you are supervising as a

15    supervisory special agent?

16         A.   The asset forfeiture squad of the

17    Los Angeles office.

18         Q.   Can you tell me a bit about that squad?  I

19    don't know much about it.  What is -- can you just

20    describe to me the asset forfeiture unit in the LA

21    FBI field office, like how many agents are there,

22    how -- just -- I mean, I just want you to sort of

23    tell me about it generally because I don't know

24    anything about it.

25         A.   There are two special agents on the squad

Page 19

1      and other staff positions.
2              Q.    And what do the special agents do?
3              A.    They work with the criminal case agents on
4      asset forfeiture investigations.
5              Q.    And are they -- so they work with criminal
6      investigators.  And is the -- what are the two
7      special agents' names?  Your two asset forfeiture
8      squad agents who work under you, what are their
9      names?
10             A.    Heather Campbell and Doris Webster.
11             Q.    And you said -- so you have two -- and
12     they're -- you said they're special agents, right,
13     so they're full FBI special agents.
14             And then you mentioned some other staff
15     positions, and I was wondering if you can tell me
16     who those people are?
17             A.    We have four paralegal specialists.
18             Q.    Okay.
19             A.    Do you want their names?
20             Q.    Sure.
21             A.    Judy Scott, Steven Olson, Karla Adachi
22     Adoche, and Katherine Pimentel.
23             Q.    Can you tell me:  What is their job, the
24     paralegal specialists, and how does it differ from
25     the special agents we talked about previously?

Page 20

 1          A.    The paralegal specialists are support

 2    staff positions and they process the case, they

 3    handle the paperwork, they get asset ID numbers, get

 4    reports, upload it, send letters, more of the

 5    administrative part of the asset forfeiture

 6    investigation.

 7          Q.    So they are the ones -- are they the ones

 8    who are, like, processing the evidence as part --

 9    I'm trying to figure out a good way to say this.

10          So the asset forfeiture paralegals, are

11    they involved in collecting and assembling the

12    evidence that could be used at a potential

13    forfeiture proceeding?

14          A.    No.

15          Q.    So what are they doing?  I really don't

16    understand then.

17          A.    They receive the reports, description of

18    the assets.  They work with the United States

19    Attorney's Office and the Marshals Service, with all

20    the various communications about the status of the

21    investigation, arranging the transfer of custody,

22    gathering reports, sending notice letters,

23    communicating with attorneys and sometimes claimants

24    and victims.  Doing petition investigations when

25    victims are requesting for money back that we've

Page 21

1    seized from the defendants.  So they handle the
2    paperwork, the processing of the case
3    administratively.
4        Q.   Okay.  So they're deeply involved in the
5    administrative processing of forfeiture matters in
6    your unit; is that right?
7        A.   Yes.
8        Q.   And so you said that they were -- you
9    mentioned a lot about reports and I'm little
10   confused what you mean by "a report" there.  So I'm
11   trying to understand this generally.
12           Let's just walk through -- I'm just trying
13   to understand what asset -- the special agents, I
14   think I understand.  Although can you describe to me
15   a little more clearly, you said that the special
16   agents, your two asset forfeiture special agents,
17   work in conjunction with the criminal investigators;
18   is that correct?
19       A.   Yes.
20       Q.   And what are they doing when they're
21   working in conjunction with the criminal
22   investigators?
23       A.   They're talking to them about their case.
24   They're either asking them or helping them identify
25   assets that could potentially be subject to seizure,

 1    reviewing bank records regarding tracing of the
 2    criminal proceeds to a particular type of assets.
 3    And at times they're working on seizure warrant
 4    affidavits and then getting those seizure warrant
 5    affidavits sworn out and executing seizure warrants.
 6        Q.   Okay.  So they're working pretty
 7    closely -- your asset forfeiture special agents, it
 8    sounds like they're working pretty close with the
 9    criminal investigators, helping the investigators
10    identify assets that might be subject to seizure and
11    potential forfeiture activity, and helping move that
12    process along, the potential of seizure and
13    forfeiture, that process along.  Is that an accurate
14    statement?
15        A.   That is a common role that they play.  And
16    it depends on the type of investigation.  Sometimes
17    they don't have that opportunity to be so fully
18    involved.  Sometimes we don't find out about
19    something until right before.  So it can vary the
20    level of involvement.
21        Q.   So it's better than -- it's best practice
22    to get your asset forfeiture people involved in
23    investigation as early as possible; is that
24    generally good practice?
25        A.   Yes.

Exhibit O
1479

1          Q.   If the asset -- and the reason -- I just

2     want to make this explicit because I want to make

3     sure I'm correct.  The reason is because if the

4     asset forfeiture people are brought into the process

5     too late, you might not be able to, like, capture

6     the information or otherwise gather the information

7     you would need to be able to make a meaningful

8     decision about whether to seize and/or forfeit a

9     particular item of property?

10          A.   That could be one of the reasons, yes.

11          Q.   What's another reason?

12          A.   We might not be able to get notice letters

13     out on time if we don't have the information on a

14     timely basis.  So that's another reason.

15          Q.   Oh, so you are saying that if the criminal

16     people don't loop you in early enough, it might be

17     that the statutory period for sending out an

18     administrative forfeiture notice might lapse before

19     you really have a chance to get involved?  Is that a

20     fair summary of what you are saying?

21          A.   Yes.

22          Q.   Makes sense to get you in early.

23          So you said before you became the

24     supervisory special agent, you were actually the

25     special agent on asset forfeiture; is that right?

Page 24

1          A.   One of the special agents on the asset

2     forfeiture squad.

3          Q.   And there's usually what, two?

4          A.   There have been three at times and more in

5     the past.  Right now there are two.

6          Q.   Okay.  Is there a reason that the number

7     of special agents tasked to asset forfeiture changes

8     over time, or is it just the demands of the job?

9          A.   That is a management question.

10         Q.   Okay.

11         A.   Higher level executive management, above

12    my pay grade.

13         Q.   Okay.  So you know times you've got two

14    agents, sometimes you've got three agents.  You

15    don't know why.  That's just what it is.

16              And then you said you have four paralegal

17    specialists right now; is that correct?

18         A.   Yes.

19         Q.   Is that number also subject to some

20    variations?

21         A.   That has stayed the same throughout my

22    time on the squad.

23         Q.   Okay.  All right.

24              It sounds to me like you are really

25    involved in asset forfeiture, like, stem to stern,

Page 25

1    like the whole process.  Would you say that's -- is

2    that accurate?  Are you familiar with the overall

3    forfeiture process?

4              MR. RODGERS:  Objection.  Vague and

5         ambiguous.  Beyond the scope of the topics.

6         A.   So now I answer, correct?

7      BY MR. FROMMER:

8         Q.   Yes.  Now you answer.

9         A.   I know, generally, the asset forfeiture

10   process.  I have been involved in the asset

11   forfeiture squad in the Los Angeles office for many

12   years.

13        Q.   So it's fair to say that you are familiar

14   with the process for seizing items for forfeiture

15   purposes, correct?

16        A.   From the agent's perspective, yes.

17        Q.   And you're familiar with the process of

18   sending out an administrative forfeiture notice,

19   correct?

20        A.   The agents don't send those out.  I am

21   familiar with the notice letter, but I don't have a

22   hand in those getting sent out.

23        Q.   Okay.  But have you a supervisory role,

24   correct?

25        A.   Yes.

Page 26

1        Q.   I understand that you yourself are not
2    writing out the administrative forfeiture notices,
3    but that's -- members of your staff do that; is that
4    correct?
5        A.   Not my staff.  They do not generate those
6    notice letters.
7        Q.   Oh, where do administrative forfeiture
8    notice letters get originated from then?
9        A.   From our headquarters in Washington, D.C.
10       Q.   Okay.  So an administrative forfeiture
11   notice that someone receives, comes out of the D.C.
12   headquarters; is that fair to say?
13       A.   Yes.
14       Q.   And now is that the case just for your
15   field office, or is that generally how it works for
16   the FBI altogether?
17           MR. RODGERS:  Objection.  Beyond the scope
18       of the deposition notices.
19       A.   Generally, all the FBI office
20   administrative forfeiture notices get sent from
21   headquarters in Washington, D.C.
22     BY MR. FROMMER:
23       Q.   So you're involved in the seizure
24   decisions.  I assume -- are you also involved in the
25   decision of whether to move for administrative

Page 27

1    forfeiture as to any given piece of property?

2         A.   I as a supervisor of the asset forfeiture

3    squad. I make the call, along with our special

4    agents, about whether or not we go forward.

5    Sometimes the agents make the decision on their own.

6    Sometimes we discuss it.

7         Q.   I'm actually -- I'm quite interested in

8    this because it's something that I just don't

9    understand.

10        So let's say that -- let's say the FBI has

11   seized an asset, okay?  And you are thinking maybe

12   potentially we want to pursue administrative

13   forfeiture on this.  Can you just walk mow through

14   the process by which you and your team decide

15   whether, in your opinion, the FBI should pursue or

16   not pursue administrative forfeiture?  I don't know

17   anything about this process.

18        MR. RODGERS:  Objection.  Calls for a

19   narrative.

20        A.   We look at the facts of the investigation

21   and whether or not there's probable cause for the

22   seizure.

23   BY MR. FROMMER:

24        Q.   So if there is -- okay.  Well, I get that.

25   Let's say you have a seized item.  The item has

```
 1    already been seized.  Then you -- so you have the
 2    seized item.  It's in some warehouse.  I don't know.
 3    And you are deciding whether to recommend -- whether
 4    to recommend pursuing administrative forfeiture on
 5    that property, on that piece of property.  Can you
 6    just -- what I'm trying to understand is sort of
 7    that process by which you make those determinations.
 8    Can you describe to me how you work with the special
 9    agents to decide whether, yes, we should recommend
10    that this go through administrative forfeiture or
11    instead it should be returned?
12         MR. RODGERS:  Same objection.
13         A.   It depends on if we have a seizure
14    warrant, then the seizure warrant, there's been an
15    affidavit that's been reviewed by a magistrate
16    judge, and the magistrate judge has signed off on
17    that, that's one of the ways.  And then another way
18    is a probable cause seizure pursuant to an arrest or
19    search warrant.  So we look at the facts of the
20    investigation to decide whether we pursue it.
21      BY MR. FROMMER:
22         Q.   Pursue it is what -- that's what I'm
23    getting at.  I'm not talking so much about the
24    seizure.  I'm assuming the FBI already has the item
25    in its custody.  I'm talking about more the decision
```

Page 29

1    on whether to move on forfeiture.  That's what I'm

2    trying to understand.  So I'm little confused by

3    your word "it" there.

4         A.   So if I have gone -- if we have gone

5    through the effort to get a seizure warrant, then

6    the decision has been made that we're going to seize

7    and attempt to ultimately forfeit that.  And the

8    same with a probable cause seizure via an arrest or

9    search warrant.

10             If the agent has decided at that time that

11   they are going to seize the items and that there's

12   probable cause to believe that the asset represents

13   proceeds of the criminal activity, then we have

14   decided to go forward with that the asset forfeiture

15   process.

16        Q.   Okay.  I think I understand.  So basically

17   once an item is in your custody, once the property

18   is in your custody, then you're determining do we

19   have probable cause to believe that this is -- this

20   property is either -- either criminal proceeds or,

21   you know, otherwise forfeitable.  And if that's the

22   case, then the office recommends pursuing

23   administrative forfeiture.  Is that an accurate

24   summary?

25        A.   Yes.

Exhibit O
1486

ER-444

Page 30

1     Q.   And you said that when you have a seizure

2  warrant, that's sort of already -- that's sort of

3  already answers that question?  I think that's what

4  you said.  Like when you have a seizure warrant,

5  that sort of already determines that, what, that you

6  can and should move forward on forfeiture?

7          MR. RODGERS:  Objection.  Beyond the scope

8      of the topics.

9     A.   For the most part, if we have a seizure

10 warrant, then there's been a determination that

11 there's probable cause for the seizure and we would

12 take that through the asset forfeiture process,

13 whatever asset has been seized pursuant to the

14 seizure warrant.

15   BY MR. FROMMER:

16    Q.   Okay.  Are there ever, like, situations

17 where there could be something seized pursuant to a

18 seizure warrant, but the government -- what I'm --

19 I'm a little confused by here is -- you are saying

20 you have the seizure warrant.  Once you seize the

21 item, then you basically have probable cause to move

22 forward on the forfeiture.

23          I'm wondering is there any subsequent

24 investigation by the special agents or paralegal

25 specialists into the facts and circumstances

Exhibit O
1487

ER-445

Page 31

1    surrounding the property that you are considering

2    whether to forfeit or not?

3              MR. RODGERS:  Objection.  Beyond the scope

4         of the topics.

5         A.   Yes, there are times when we do

6    investigations after the seizure has been effected.

7      BY MR. FROMMER:

8         Q.   And what kind of situations would you

9    conduct that sort of the investigation?

10             MR. RODGERS:  Same objections.

11        A.   Generally, those, in my experience, occur

12   when there's a probable cause seizure pursuant to an

13   arrest or search warrant.

14     BY MR. FROMMER:

15        Q.   Now, why is it more likely in that

16   situation as opposed to the one we talked about

17   before?

18             MR. RODGERS:  Same objection.

19        A.   For instance, if we execute a search

20   warrant, there may be items that we didn't expect to

21   find, but the investigation and perhaps items at the

22   search warrant or events that occurred at the search

23   warrant provide probable cause to seize that item.

24     BY MR. FROMMER:

25        Q.   And then in that situation, the special

Page 32

1   agents might conduct additional investigation to

2   determine whether to move forward on forfeiture or

3   not; is that correct?

4           MR. RODGERS:  Same objection.

5       A.   To do a little more investigation to

6   supplement the probable cause.

7     BY MR. FROMMER:

8       Q.   Oh, okay.  I see.

9           So you've seized the item, but you're

10  investigating to try to get a bit more evidence that

11  this is criminal proceeds or otherwise forfeitable,

12  and then if you can find that evidence, then you're

13  more likely to bring the administrative forfeiture

14  action; is that fair?

15          MR. RODGERS:  Same objections.

16      A.   Not always the probable cause will be

17  there, then it can strengthen the probable cause,

18  and sometimes just one piece of evidence leads to

19  other pieces of evidence, so there's still other

20  things, other stones left unturned, so there's going

21  to be some additional investigation sometimes after

22  the fact, after the seizure has been made.

23    BY MR. FROMMER:

24      Q.   Okay.  And all this requires, you know --

25  and I'm assuming to conduct this sort of

Page 33

1      investigation, you need to collect evidence; is that
2      fair to say?
3             MR. RODGERS:  Same objection.
4         A.   Not always will it be about collecting
5      evidence.  More investigation if it is warranted.
6       BY MR. FROMMER:
7         Q.   Well, yeah.  And by that I -- that's fair.
8      I mean, in that situation, you are conducting an
9      investigation to see if you can collect more
10     evidence that points to whether you should pursue
11     forfeiture or not.  Is that fair?
12            MR. RODGERS:  Same objection.
13        A.   Not always collecting evidence.  But doing
14     more work.
15        Q.   Okay.
16        A.   Because we can interview someone and write
17     a report, and I wouldn't characterize that as
18     collecting evidence.  To me, collecting evidence is
19     more I take a tangible object versus I'm
20     investigating and writing a report.
21      BY MR. FROMMER:
22        Q.   Okay.  That's fine.  But there is
23     sometimes subsequent investigation in order to make
24     a decision about whether to move for forfeiture or
25     not.

1          Can you explain to me one thing I'm a
2     little confused by in the overall forfeiture process
3     is the U.S. Marshals Service.  Can you explain to me
4     how -- what their role is in the forfeiture process?
5               MR. RODGERS:  Objection.  Beyond the scope
6          of the topics.
7          A.   The marshals have custody of the assets as
8     they go through the asset forfeiture process.
9       BY MR. FROMMER:
10         Q.   Okay.  So the marshals are the ones who
11    hold, physically possess the items that are going
12    through the forfeiture process?
13              MR. RODGERS:  Same objection.
14         A.   Yes, except for currency.  The currency
15    gets deposited into the bank.  So they don't
16    physically hold the currency in its original state.
17      BY MR. FROMMER:
18         Q.   So do the U.S. Marshals -- so the U.S.
19    Marshals, when you say they physically possess
20    property, other than currency, is that all property
21    that's been seized or is it just that property that
22    is potentially subject to forfeiture proceeding?
23              MR. RODGERS:  Objection.  Beyond the scope
24         of the deposition topics.
25         A.   The marshals take custody of seized assets

1    that are going through the asset forfeiture process.

2       BY MR. FROMMER:

3           Q.   Okay.  Other than currency?

4               MR. RODGERS:  Same objection.

5           A.   They take custody of it, but it's not the

6    physical asset anymore because the currency has been

7    deposited into the Marshals Service bank account.

8       BY MR. FROMMER:

9           Q.   Okay.  And I was wondering about this.  So

10   when there's currency, and the Marshals Service, you

11   know -- I understand that -- that you take the

12   currency and then you deposit it in a bank, into the

13   marshal -- into the marshal's account.  So is the

14   money -- so is that money at that point in the asset

15   forfeiture fund?  Or is it in a separate account

16   that's just controlled by the marshals?

17          A.   As far as I know, it's in the Marshals

18   Service bank account, and not the asset forfeiture

19   funds.

20          Q.   Okay.  Now, when that cash you said --

21   when that cash is seized and deposited, does all

22   cash that's seized and deposited get put into CATS?

23          A.   Each asset that is currency that gets

24   deposited with the Marshals Service has its own

25   CATS ID number.

1      Q.  And are there situations where cash would

2 not be deposited with the U.S. Marshals Service?

3      A.  In general, there may be -- I don't know

4 how broad you are asking. ████████████████████

5 ████████████████████████████████████████████

6 █████████████████████████████████████████████

7 ████████████████████

8      Q.  Well, that's why I was wondering, and let

9 me actually turn here because I know that with

10 U.S. Private Vaults, some money -- some currency

11 didn't get into CATS, it just went to -- from what I

12 understand, just went into evidence, and it didn't

13 get put into CATS.  Is that your understanding?

14         MR. RODGERS:  Objection.  Beyond the scope

15     of the topics.

16      A.  I know that there are some currency assets

17 that were seized and just went to our evidence and

18 did not go to the Marshals Service.

19   BY MR. FROMMER:

20      Q.  Do you know why?

21         MR. RODGERS:  Same objections.

22      A.  We have generally minimum monetary

23 threshold for our asset forfeiture seizures.

24   BY MR. FROMMER:

25      Q.  But why is that?

Page 37

1                    MR. RODGERS:  Objection.  Beyond the scope
2            of the topics.  Calls for speculation.
3            A.    Sometimes because the asset forfeiture
4    process is lengthy and involves a lot of resources,
5    if we seize a hundred dollars, we're not going to
6    take that through the asset forfeiture process
7    because it's more costly -- it's going to cost us
8    more than a hundred dollars to take that ultimately
9    through the asset forfeiture process.
10    BY MR. FROMMER:
11            Q.    So the government would end up losing
12    money pursuing that forfeiture?
13                    MR. RODGERS:  Same objection.  Poses an
14            incomplete hypothetical.
15            A.    Well, the cost would be more than the
16    value of the asset.
17    BY MR. FROMMER:
18            Q.    Okay.  I think we're on the same page with
19    that.
20                    Typically, where is that cut-off where the
21    value of the currency or the amount of currency
22    isn't enough to make the potentially, you know,
23    going through forfeiture worth it?
24                    MR. RODGERS:  Objection.  Beyond the scope
25            of the deposition topics.  Vague and ambiguous.

Exhibit O
1494

ER-452

Page 38

1          A.    For currency, it's $5,000.

2       BY MR. FROMMER:

3          Q.    Okay.  So $5,000 is -- is that the FBI's

4       policy?

5               MR. RODGERS:   Same objection.

6          A.    Yes.  Generally, that's our minimum

7       threshold.

8       BY MR. FROMMER:

9          Q.    Okay.

10              MR. FROMMER:   Let's just take a

11          five-minute break, if you don't mind.  Okay?

12              MR. RODGERS:   Sure.

13       (Recess was held from 10:53 a.m. until 11:01 a.m.)

14       BY MR. FROMMER:

15          Q.    Let's go back on the record.

16              Now, Special Agent Murray, you were

17       talking before about sometimes there would be an

18       investigation.  Sometimes there's an investigation

19       subsequent to the seizure of an asset in order to

20       determine whether to pursue forfeiture,

21       administrative forfeiture, judicial forfeiture.  And

22       I was -- can you tell me, when you are conducting

23       that investigation, what is it that your agents are

24       attempting to determine?

25              MR. RODGERS:   Objection.  Beyond the

1      scope.  Calls for a narrative.

2          A.    It's more not starting another

3      investigation.  It's continuing the same

4      investigation and it's just to find out additional

5      information.  Generally, that situation I spoke

6      about, is when we are executing a search warrant and

7      we come across an asset that we didn't know about,

8      but it's -- there's probable cause.  So then if it's

9      a car, then we might follow up with, you know,

10     title, registration, financing other -- gathering

11     facts about that asset that we did not know about

12     beforehand.  That's an example.

13      BY MR. FROMMER:

14          Q.    Okay.  And the purpose for that

15     investigation is to determine whether you believe

16     that there's probable cause that it's connected to

17     criminal activity and could be forfeited?

18          MR. RODGERS:  Same objection.

19          A.    When we've seized it, we've already made

20     that -- I've already -- we, agents, together, alone,

21     we've made that determination that there is probable

22     cause.  So this is just additional information that

23     will support the existing probable cause.

24      BY MR. FROMMER:

25          Q.    Okay.  So you are attempting to identify

Exhibit O
1496

Page 40

1      additional information through the subsequent

2      investigation to buttress the idea that there's

3      probable cause that this property is forfeitable; is

4      that accurate?

5              MR. RODGERS:  Same objection.

6          A.   Yes, to strengthen the probable cause.

7        BY MR. FROMMER:

8          Q.   All right.  Who does that subsequent

9      investigation you are talking about?

10         A.   Sometimes it's the paralegal specialists,

11     sometimes it's the criminal agents, sometimes it's

12     the asset forfeiture agent or other agents on the

13     squad, various people.

14         Q.   I'm trying to figure out, like, when

15     they're conducting this investigation, what are the

16     types of things that an agent or a paralegal

17     specialist would look at to potentially buttress the

18     probable cause determination?

19             MR. RODGERS:  Objection.  Calls for a

20             narrative.  Overbroad.  Beyond the scope of the

21             topics.

22         A.   Looking at interview reports, bank

23     records, other type of financial records, database

24     checks, things like that.

25

Page 41

1      BY MR. FROMMER:

2          Q.   When you say "database checks," like a

3      criminal -- like NCIC, would be an example of a

4      database that would be queried?

5               MR. RODGERS:  Same objections.

6          A.   Yes.

7      BY MR. FROMMER:

8          Q.   How about the FinCEN database?  Would that

9      be a database that would be queried?

10              MR. RODGERS:  Same objections.

11         A.   Sometimes.

12     BY MR. FROMMER:

13         Q.   Are there other databases that your agents

14     frequently query other than NCIC and FinCEN?

15         A.   DMV, LexisNexis, Accurint.

16         Q.   What is Accurint?  I haven't heard of

17     that.

18              MR. RODGERS:  Same objection.

19         A.   I think it's just one for addresses, phone

20     numbers, identifiers.

21     BY MR. FROMMER:

22         Q.   Okay.  And this is all part of

23     understanding how the government conducts its

24     administrative -- its investigation and initiation

25     of administrative forfeiture proceedings.

Exhibit O
1498

ER-456

Page 42

1          So you've seized an asset, the government

2     seized an asset.  It's conducted some subsequent

3     investigation.  It collects all the information.

4     And at that point, how does the government decide

5     whether to pursue administrative forfeiture as

6     against a particular asset?

7          MR. RODGERS:  Same objections.

8          A.   Once again, the acquisition of the seizure

9     warrant, that's one way where probable cause has

10    been determined and we're going to go forward.  And

11    then during the execution of the arrest or search

12    warrant, if we seize something based on probable

13    cause, at that time, that's when a decision has been

14    made that there's probable cause, that that asset

15    represents proceeds of criminal activity and we plan

16    to go forward with the asset forfeiture process.

17     BY MR. FROMMER:

18         Q.   And who is making the decision about

19    whether to pursue administrative forfeiture as to a

20    particular piece of property?  Is that happening at

21    the field office level or at the FBI headquarters?

22    If you could just provide me some explanation for

23    that.

24         A.   Generally, at the field office level.

25         Q.   And when would the decision to pursue

Page 43

```
1     forfeiture be made at the headquarters level instead
2     of the field office?
3          A.   There may be times where there's a
4     disagreement, if at the field office level I think
5     this there's enough PC and headquarters disagrees.
6          Q.   Okay.  And you keep saying -- so
7     probably -- is -- probable cause is the standard.
8     That's the standard that's used to decide whether to
9     pursue administrative forfeiture or not, whether the
10    government believes it has probable cause that this
11    property is tied to some forfeitable activity?
12         A.   Probable cause to believe that the asset
13    represents proceeds of criminal activity, yes, tied
14    to a forfeiture statute.
15         Q.   Okay.  All right.  I got that.
16              So now we've made the decision, and let's
17    say the government has decided to pursue
18    administrative forfeiture against a particular
19    asset, either at the field office level or HQ, or
20    everybody agrees.
21              Once that decision is made, can you tell
22    me, what does the government do next?
23         A.   Just a second.  We're making sure we are
24    plugged in because we have low battery.
25              (Discussion off the record.)
```

Page 44

1          MR. FROMMER:  Off the record for a second.

2          (Requested portion read back.)

3          MR. RODGERS:  Objection.  That question is

4     overbroad.  It is beyond the scope of the

5     topics.  It's vague and ambiguous.

6          But you can answer to the extent you can.

7          A.   We do the administrative part, assign a

8     CATS ID number, we gather reports, we figure out

9     who's going to get noticed, we input that

10    information into the FBI computer database.  We

11    write a probable cause statement.  There -- mainly

12    we gather the reports from the criminal case agents

13    to support the asset forfeiture process.

14      BY MR. FROMMER:

15          Q.   Okay.  So you're filling out the notice

16    and -- now, you said something about CATS ID numbers

17    because -- and I'm little confused, so maybe you can

18    explain this to me.

19          You said, during your answer just now,

20    that you would assign a CATS ID number.  Now, my

21    understanding from your previous testimony was that

22    cash -- all cash above 5,000 gets a CATS ID number

23    as it's processed in the system.

24          So when you are talking about CATS ID

25    numbers in this context, are you talking about for

Page 45

1      items which aren't currency?

2          A.   Every asset gets a CATS ID number,

3      currency or otherwise.

4          Q.   And when does that occur?

5          A.   Generally, at the time of seizure.

6          Q.   Okay.  All right.  So -- okay.  I think I

7      understand.

8              Is that the case even if something is

9      processed as evidence?  Does it gets a CATS ID

10     number even if it's been processed as evidence?

11         A.   Generally, no.

12         Q.   So in what situations does an asset get a

13     CATS ID number?

14         A.   When there's been a determination that the

15     asset is going through the asset forfeiture process.

16         Q.   Okay.  So CATS ID number is generated when

17     there's a preliminary determination that this asset

18     is going to go through the asset forfeiture process;

19     is that accurate?

20         A.   Yes.

21         Q.   And is that true for -- and that's also

22     true for cash over $5,000; is that accurate?

23         A.   Yes.

24         Q.   Now, would there be a situation where you

25     would find cash above $5,000, but it wouldn't result

1    in a CATS ID number being generated?

2         A.   If that cash is collected and seized as

3    part of the criminal investigation and retained as

4    evidence, then it's not going through the asset

5    forfeiture process, so it won't get a CATS ID

6    number.

7         Q.   Okay.  I see.  So once an item has been

8    determined that this asset is going through the

9    asset forfeiture process, that's when it gets -- at

10   that moment of determination, that's when a CATS ID

11   number is created for it; is that accurate?

12        A.   Yes.

13        Q.   All right.  So you prepare the

14   administrative forfeiture notice and you pursue the

15   administrative forfeiture notice -- you fill it out,

16   and then that gets sent out to -- who does that

17   administrative forfeiture notice get sent to?

18        A.   All interested parties.

19        Q.   And what does the government do to

20   determine which parties are interested?

21        A.   We review the reports from -- surrounding

22   the seizure to figure out who those parties are.

23        Q.   Okay.  And then the notice gets sent to

24   those people and they have -- how much time do they

25   have to respond once they receive the administrative

Page 47

1      forfeiture notice?  If you remember offhand.

2           A.   I don't.  Maybe 45 days.

3           Q.   Okay.  All right.

4                And it's my understanding that once

5      someone receives an administrative forfeiture

6      notice, that they have really three options:  One

7      would be to simply to walk away from the money or

8      the asset; the second would be to file -- submit a

9      judicial claim; and then the third one would be to

10     zero submit a petition for remission and/or

11     mitigation.  Is that accurate?

12          A.   Yes.

13          Q.   So let's say the FBI files an admin for

14     notice, sends it to a claimant, and a claimant files

15     a judicial claim.  What happens at that point?

16               MR. RODGERS:  Objection.  Vague and

17          ambiguous.

18          A.   When somebody receives a notice of

19     administrative forfeiture by the FBI, and they

20     respond by filing a valid claim with our office,

21     then we gather all of the reports from the field

22     office and we prepare a packet and refer it to the

23     United States Attorney's Office.

24       BY MR. FROMMER:

25          Q.   And then once they receive it, they

Exhibit O
1504

ER-462

1     independently review whether to pursue judicial

2     forfeiture; is that correct?

3             MR. RODGERS:  Objection.  Speculation.

4       Poses an incomplete hypothetical.

5       A.   We refer it to the United States

6     Attorney's Office and they decide whether or not to

7     continue the process.

8      BY MR. FROMMER:

9       Q.   And let's say instead that the property,

10     the claimant, instead files a petition for remission

11     or mitigation.  My understanding of that is -- can

12     you tell me -- scratch that.  Let me think how to

13     say this in a cleaner way.

14         Okay.  So let's say instead of filing a

15     claim, the titular property owner files a petition

16     for remission or mitigation.  Once the FBI receives

17     that petition, what are -- what next steps do the

18     FBI take?

19             MR. RODGERS:  Objection.  Beyond the scope

20       of the topics.

21       A.   Generally, conduct a petition

22     investigation.

23      BY MR. FROMMER:

24       Q.   And how does -- what is a petition

25     investigation?  How does that differ from the

Page 49

1    investigation we were talking about earlier where

2    the government is deciding --

3              (Discussion off the record.)

4     (Recess was held from 11:20 p.m. until 11:27 p.m.)

5              (Requested portion read back.)

6    BY MR. FROMMER:

7         Q.   I will finish it.  Which is, deciding

8    whether to pursue forfeiture in the first place?

9              MR. RODGERS:  Objection.  Vague and

10             ambiguous.  Beyond the scope of the topics.

11        A.   Additional investigation is completed to

12   find out if the petition should be granted and

13   oftentimes the petitioner will submit additional

14   documentation that is reviewed.

15   BY MR. FROMMER:

16        Q.   Okay.  So the remission investigation is

17   looking at any additional information to better

18   inform whether the permission -- the petition should

19   be granted or not; is that accurate?

20             MR. RODGERS:  Same objection.

21        A.   Yes.

22   BY MR. FROMMER:

23        Q.   Can you tell me what is the -- so

24   ultimately the government looks at all this

25   information, conducts this investigation, and it has

1    to make a decision about whether to grant or deny a

2    petition.  And I'm trying to figure out, like,

3    what's the standard by which the government decides

4    whether to grant a petition for remission or not?

5              MR. RODGERS:  Objection.  Beyond the scope

6         of the topics.  Calls for a legal conclusion.

7         A.   So we look at all the facts after probable

8    cause has been determined and are there other facts,

9    documentation, supporting evidence that warrant the

10   petition being granted and the money being returned

11   or some portion of it being returned.

12     BY MR. FROMMER:

13        Q.   I get that.  I guess what I'm trying to

14   figure out is, like, is the decision whether to

15   grant a petition something more than just a gut

16   call?  Are there objective indicia that the

17   government looks at in deciding whether to grant a

18   petition for remission?

19             MR. RODGERS:  Objection.  Beyond the scope

20        of the topics.  Calls for a legal conclusion.

21        Vague and ambiguous.

22        A.   I can only offer an explanation of, okay,

23   we have seized money from somebody.  We have

24   probable cause to believe that it's proceeds of drug

25   trafficking, but then the petitioner submits

Page 51

1      documentation showing that his grandmother just

2      bequeathed him the same amount of money that was

3      seized and he has additional supporting

4      documentation from the bank, maybe showing a

5      deposit, withdrawal, et cetera, to show that this

6      money, in his opinion, does not represent proceeds

7      of drug trafficking.  And then so that is viewed in

8      light of everything, and it's not really just a gut

9      instinct.  It's based on the facts whether or not

10     the petition should be granted.

11        BY MR. FROMMER:

12        Q.   Who makes that decision about whether to

13     grant a petition for remission?  Is that happening

14     at the agency level?  Well, it must be.  But who at

15     the agency is deciding whether to grant or deny a

16     petition for remission?

17             MR. RODGERS:  Objection.  Beyond the scope

18         of the topics.  Lacks foundation.

19        A.   At the field office level, the paralegal

20     specialist conducts the petition investigation and

21     recommends whether or not the petition should be

22     granted or denied, and that is forwarded to our

23     headquarters office and legal forfeiture unit makes

24     the ultimate decision.

25

Page 52

1     BY MR. FROMMER:

2          Q.   So the field office, the paralegals make

3     the initial investigation determination, and then

4     that is reviewed by officials at FBI headquarters;

5     is that accurate?

6               MR. RODGERS:   Same objection.

7          A.   The paralegal specialist makes the

8     recommendation.   It gets sent to headquarters.

9     Legal forfeiture unit and our Office of General

10    Counsel makes the ultimate determination.

11    BY MR. FROMMER:

12         Q.   Okay.  All right.  So let's say that

13    someone has gone through this process and a petition

14    for remission ultimately is denied.  At that point,

15    what happens to the seized funds at that point?  Or

16    property, I guess it could be -- it could be

17    property other than cash.

18              MR. RODGERS:   Objection.  Beyond the scope

19         of the topics.  Calls for a legal conclusion.

20         Lacks foundation.  Poses an incomplete

21         hypothetical.

22         A.   The asset remains in the custody of the

23    Marshals Service, and the asset forfeiture

24    process -- administrative asset forfeiture process

25    continues.

1      BY MR. FROMMER:

2          Q.   Well, I'm saying, like, the petition --

3      they filed an administrative forfeiture, they filed

4      a petition.  Let's say we only have one person

5      filing a petition.  And then the FBI denies that

6      petition.  It's my understanding at that point, the

7      forfeiture process is at an end; is that correct?

8              MR. RODGERS:  Objection.  Poses an

9          incomplete hypothetical.  Beyond the claims of

10         the class.  Irrelevant.  Assumes facts not in

11         evidence.

12         A.   If the petition is denied, the asset

13     forfeiture process continues.  And the asset remains

14     in the custody of the Marshals Service until the

15     conclusion of that process.

16     BY MR. FROMMER:

17         Q.   What remains in that process?  That's what

18     I'm confused about.  Let's say we have an asset that

19     was seized from somebody.  You think you have

20     probable cause, that it's forfeitable.  That person

21     submits a petition.  You deny that petition.  No

22     other claimants have come forward to file a petition

23     or a claim.  What's left of the process at that

24     point?

25             MR. RODGERS:  Same objections.

Exhibit O
1510

1          A.   We send out the notices.  We wait for a

2     time to expire.  We package up our part and it goes

3     to the legal forfeiture unit.  And so it's just

4     waiting out that process.  Just because a petition

5     investigation is denied, does not mean the next day

6     the process is done and the item is forfeited.

7       BY MR. FROMMER:

8          Q.   Well, that's what I'm wondering.  What

9     else is left after the -- because my understanding

10    is that by filling -- submitting a petition, the

11    claimant is, in essence, saying that the government

12    can forfeit this property and it's just asking that

13    it be returned to them.  And I'm wondering, like,

14    once the government says no to that, what -- I'm

15    still -- you keep saying that there's more to the

16    forfeiture process, but I'm not sure what of the

17    forfeiture process is left at that point.

18              MR. RODGERS:  Objection.  Speculation.

19         Beyond the scope of the topics.  Calls for a

20         legal conclusion.  Lacks foundation.

21         A.   Sometimes it's just time.  The legal

22    forfeiture unit has thousands of cases, so it's a

23    matter of workload and when they have that

24    particular case on their desk and make the final

25    determination.

Page 55

1    BY MR. FROMMER:

2         Q.   Okay.  I see.  I see.

3              And once that final determination is made,

4    is it at that point when the property, whether that

5    be funds or -- let me rephrase.

6              Once there's been a final determination

7    and the property is forfeited -- let's talk about

8    currency because it's simpler -- at that point, is

9    the now forfeited currency transferred from the U.S.

10   Marshals Service to the asset forfeiture fund?

11        A.   I don't know about the movement of money

12   once the declaration of forfeiture has been issued.

13   I'm just not familiar with that process.

14        Q.   Okay.  Does your -- so is that all

15   handled -- is that handled at all at the FBI field

16   office level, or is that all happening at FBI HQ?

17        A.   FBI HQ issues the declaration of

18   forfeiture.  Then we get the letter.  And then

19   that's really more the paralegal specialists, their

20   duties.  So then they ultimately inform the Marshals

21   Service of the declaration of forfeiture.  So I

22   don't know exactly what happens after that.

23        Q.   Okay.  All right.

24             Do you have -- do you have any familiarity

25   with the process by which money is released from the

1    asset forfeiture fund and sent to participating

2    agencies?

3        A.   Generally, after an item has been declared

4    forfeited and then if the local agency has submitted

5    their forms, then I know, generally, then they would

6    get the approved percentage.  How or what form,

7    whether it's check or wire, I don't know.

8        Q.   Oh, yeah, I don't care about the

9    particulars of how the -- how an agency ultimately

10   gets the money.  I am just wondering -- so if

11   there's an agency -- are you talking here

12   specifically about local agencies that might have

13   been involved in a seizure and forfeiture, or are

14   you also talking about the federal forfeiture

15   agencies that were involved?

16       A.   For anybody who is putting in a sharing

17   request, whether it's other federal agencies or

18   locals, after the declaration of forfeiture occurs,

19   then after that is when they would receive any

20   proceeds.  But like I said, I don't know the

21   particulars about that.

22       Q.   Okay.  Are you involved in that process at

23   all, the process of requesting forfeiture funds from

24   AFF?

25       A.   I am not involved in the process of

Exhibit O
1513

ER-471

1   requesting money.  I don't know -- do you mean the

2   sharing program?

3       Q.   Yeah, the sharing.  That's exactly that I

4   meant.  After the -- there's been a final

5   declaration of forfeiture.  Let's say there's

6   million dollars.  Let's just use a hypothetical just

7   because it's a little bit easier.

8           So let's say there's a million dollars.

9   There's been a final declaration of forfeiture.  And

10  then -- let's use the agencies here.  So you have

11  the DEA, USPIS, FBI, and some local agencies

12  involved.

13          I might be forgetting one.

14          In that situation, those agencies want to

15  get their share of the million dollars.  What do

16  they do?

17      A.   After the seizure, there's a timeline they

18  have to submit the DAG-71 form, and that is a form

19  requesting a certain percentage of the seized asset

20  based on -- and then they have to write a narrative

21  of the work that they did that contributed to the

22  asset seizure.

23      Q.   Are sometimes those DAGs will -- let's say

24  you have three our four agencies involved and they

25  have an agreement whereby they're going to split

1    whatever is forfeited by a certain percentage.  So

2    in that situation, would they -- would the

3    requesting agency on the DAG-71 include -- we have

4    a -- the participating agencies in the seizure and

5    forfeiture agreed to split the money, I don't know,

6    25 percent each four ways?  Or --

7                This is what I -- I don't understand this.

8    This is why I'm asking.  So the more you can help

9    explain it to me, the more helpful it would be.

10                MR. RODGERS:  Objection.  Assumes facts

11         not in evidence.  Poses an incomplete

12         hypothetical.  Lacks foundation.

13         A.   There's no agreement beforehand.  Each

14    agency requests a certain percentage based on the

15    work hours, various factors, manpower.  What -- did

16    they have confidential informant information?

17    What's unique assistance that contributed to the

18    seizure?  Did they do other types of investigative

19    activity that resulted in it?  So there's no

20    predetermined agreement.  They request from the lead

21    agency, FBI, that based on this narrative, I am

22    requesting 20 percent.

23       BY MR. FROMMER:

24         Q.   Gotcha.

25         A.   So each agency does that individually.

Exhibit O
1515

ER-473

1          Q.    Okay.  I think I understand.

2               And who -- so do they request -- so the

3     other agencies, here, just keeping with this, like

4     USPIS and DEA, they would send in requests to FBI;

5     is that correct?

6          A.    Yes, they fill out the DAG-71 form and

7     submit it to us.

8          Q.    And is that the like -- you know, I

9     mentioned, like, the DEA or USPIS, but is it the

10    overall agency that is sending the DAG71, or is it

11    the particular office that helped participate in the

12    seizure and forfeiture?

13         A.    I don't know who, whether it's, you know,

14    DEA headquarters or DEA local, but the local DEA

15    office is going to have the particulars of what they

16    contributed to the investigation.  But I don't know

17    who ultimately sends it to us.

18         Q.    Got it.  Okay.  That makes sense, right?

19    The locals would be the ones who actually have the

20    facts.  And I wasn't really asking about, like, who

21    is the one person who -- the agent -- whether it's

22    technically the agency that sends it to you or the

23    field office.  What I'm interested in is -- well,

24    let's say the FBI.  In an instance where the FBI --

25    you know, if the FBI were going to put in -- let's

1    say they were involved in a forfeiture and getting a

2    percentage, they're going to put in a DAG-71 to get

3    a percentage.  Would that DAG-71 -- am I using that

4    term right, by the way?  Is a DAG-71 a

5    cross-governmental form?

6         A.   I don't know, across what?

7         Q.   Okay.

8         A.   But, yes, it's familiar through the

9    federal agencies.

10        Q.   So what I'm wondering is, you know, FBI LA

11   field office participates in some activity, leads to

12   seizure, leads to forfeitures.  Let's say the

13   forfeiture of that million dollars that we were

14   talking about before.

15             Is it the FBI field office that sends --

16   that would fill out and send in the DAG-71 seeking a

17   certain percentage of that million dollars?

18             MR. RODGERS:  Objection.  Beyond the scope

19        of the topics.  Poses an incomplete

20        hypothetical.  Vague and ambiguous.  Overbroad.

21        A.   Yes.

22     BY MR. FROMMER:

23        Q.   And so let's say that DAG-71 has been

24   approved by whatever agency.  Does that percentage

25   of funds, you know -- you said 20 percent.  So let's

Page 61

1    say our 20 percent.  Does our 20 percent then go to

2    the FBI headquarters?  Or does it go to the FBI

3    field office?

4          MR. RODGERS:  Same objections.  Also vague

5       and ambiguous.

6    A.   After you submit the DAG, then that's just

7    part of the file.  Nothing gets distributed until

8    the declaration of forfeiture.

9    BY MR. FROMMER:

10    Q.   Yeah.

11    A.   And then I -- generally, I don't know.  I

12    think ours goes to the asset forfeiture fund, but I

13    don't know the particulars about where the money

14    goes, whether it goes back to FBI LA or

15    headquarters.  My understanding is that it goes into

16    our general asset forfeiture fund.

17    Q.   Okay.  Well, I understand that the funds

18    get into the AFF once there's been a declaration of

19    forfeiture.  Marshal sends that over into the AFF.

20         I'm wondering, like, when the FBI says we

21    want -- we think we deserve 20 percent of what was

22    forfeited because of our activities, because of our

23    participation in the investigation.  And what I'm

24    wondering is at that point, you know, you submit the

25    DAG-71, it's reviewed by the primary agency, they

Exhibit O
1518

ER-476

1    approve it, money is released -- that 20 percent is

2    released from the AFF, and I'm just wondering, does

3    it go to the FBI -- does it go into the FBI overall

4    budget?  Does it go into the budget for the LA field

5    office?  That's why -- I'm just trying to figure

6    that out.

7            MR. RODGERS:  Same objections.

8        A.   I don't know.

9      BY MR. FROMMER:

10       Q.   Do you have any idea who might know

11   something like that?

12       A.   Perhaps our headquarters legal forfeiture

13   unit.

14       Q.   Who is your main point of contact with the

15   legal forfeiture unit?

16       A.   Stephanie Woods.

17       Q.   Do you think she would be the right person

18   to ask -- do you think she would know the answers to

19   these questions?

20           MR. RODGERS:  Objection.  Speculation.

21       A.   I don't know.  I think she might.

22      BY MR. FROMMER:

23       Q.   Okay.  But you are saying, sitting here as

24   the representative of the U.S., you are not sure

25   whether forfeiture proceeds would go to the

Page 63

1    individual field office that participated in the

2    seizure versus the overall agency; is that correct?

3              MR. RODGERS:   Objection.  Beyond the scope

4         of the topics.  Lacks foundation.  Calls for

5         speculation.

6         A.   My understanding is it goes to the general

7    asset forfeiture fund.  And I am not aware of LA

8    office, in particular, getting disbursements as the

9    declaration of forfeitures are issued.

10     BY MR. FROMMER:

11        Q.   Okay.  And you said that that process that

12   we have been discussing applies both to federal and

13   local agencies that were involved in the seizure of

14   the forfeited asset; is that correct?

15        A.   Local agencies and federal agencies can

16   both submit a DAG for one of our investigations if

17   sharing is appropriate.

18        Q.   And do you know who makes the

19   determination of whether the sharing would be

20   appropriate?

21        A.   It depends on if it's a civil

22   administrative case, the FBI does; or civil judicial

23   case, then the United States Attorney's Office does.

24        Q.   Okay.  So how the property was forfeited

25   determines who considers the request that are

1    encompassed on the DAG-71; is that accurate?

2         A.   Right.  And it also depends on the amount.

3    So under a million, civil administrative, the FBI is

4    the final decision maker.  Under a million, civil

5    judicial, United States Attorney's Office is the

6    final decision maker, but they take into account

7    what the lead law enforcement agency recommends.

8         Q.   I see.  And then for amounts above a

9    million, is it that -- is headquarters that's making

10   that determination?

11        A.   Over a million and under five, it's the

12   chief of the AFMLS.  And over five million, it's the

13   Assistant Attorney General that is the final

14   decision maker.

15        Q.   Is there a document that sort of contains

16   that sort of information in it?

17        A.   I'm sure that there's an asset forfeiture

18   policy guide or some sort of manual.

19        Q.   Do you have, like, an asset forfeiture

20   policy manual that you reference in conjunction with

21   your work?

22        A.   I do have an asset forfeiture policy guide

23   that I reference.

24        Q.   And does that -- is that your document in

25   particular, or is this the asset forfeiture manual,

Exhibit O
1521

ER-479

1     this -- is this an FBI publication?

2          A.   I got it through my work at the FBI.  I

3     don't know.

4          Q.   If you don't know --

5          A.   Yeah.

6          Q.   Yeah, if you don't know whether it's FBI

7     or DOJ, that's fine.

8               But do you remember what that document is

9     called?

10         A.   I think it's the Asset Forfeiture Policy

11    Guide.

12         Q.   Okay.  All right.

13              And do you recall -- I understand that you

14    can't recall everything about how money gets

15    released to constituent -- or to participating

16    agencies, but is it your understanding or is it your

17    belief that the asset policy -- asset forfeiture

18    policy manual you are discussing would talk about

19    that?

20         A.   I think it would reference sharing.

21         Q.   Okay.  All right.  Great.

22              MR. FROMMER:  Now, you guys are almost

23         near lunchtime; is that right?  It's 11:53?

24              MR. RODGERS:  Yeah.  But do you have any

25         indication as to how much more you have.

Exhibit O
1522

Page 66

1       Because I think our preference is to just keep
2       going through.
3              MR. FROMMER:  You guys are going to want
4       to do lunch.  I have more to do than -- more to
5       do than -- you should go get lunch.
6              MR. RODGERS:  Do you think you have more
7       than a couple of hours?
8              MR. FROMMER:  At least more -- I mean, it
9       all depends on how it goes.  But at least a
10      couple of hours.
11             MR. RODGERS:  Okay.  Let's do lunch then.
12      When should we come back?
13             MR. FROMMER:  Why don't you be back at --
14      it's 11:54 your time now, so how about
15      1:00 p.m. your time?
16             MR. RODGERS:  Okay.
17             MR. FROMMER:  Okay?  Thank you so much,
18      Agent Murray.  I'll see you in about an hour.
19       (Recess was held from 11:54 p.m. until 12:59 p.m.)
20       BY MR. FROMMER:
21       Q.   All right.  So this morning we were
22      talking a bit about forfeiture generally and now I
23      want to talk a little bit more specifically about
24      the U.S. Private Vaults matter.
25             Let me just start with this:  When did you

1    first hear about U.S. Private Vaults?

2         A.   I don't remember what month and I believe

3    that it was 2020.

4         Q.   So you -- could it have been, perhaps, in,

5    like, the summer of 2020, sometime around then?

6         A.   The summer sounds about right.

7         Q.   Can you tell me what you heard about

8    U.S. Private Vaults back in summer of 2020?

9         A.   The first time I heard about

10   Private Vaults was on a phone call with my SAC.  And

11   he told me a summary of the facts in the

12   investigation.

13        Q.   Who was your -- SAC is special agent in

14   charge?

15        A.   Yes.

16        Q.   And who is your SAC?

17        A.   At that time the SAC that spoke to me

18   about it wasn't my SAC.  It was the criminal SAC.

19   Matt Moon, M-O-O-N.

20        Q.   So, Matt Moon, who is the SAC for the

21   criminal side in FBI, called you up and told you

22   about the background of the U.S. Private Vaults

23   investigation; is that right?

24        A.   Yes.

25        Q.   What else did he talk about?  Did he talk

Page 68

1    about any plans going forward?

2         A.   He talked about what agency was going to

3    lead the seizure of assets in the case.

4         Q.   And did he tell you that the FBI was going

5    to be the lead agency on the seizure warrant?

6              MR. RODGERS:  Go ahead and answer.

7         A.   That was what we were discussing, who was

8    going to be the --

9      BY MR. FROMMER:

10        Q.   Oh, so had it not yet been determined

11   which agency would be the lead agency?

12             MR. RODGERS:  Objection.  Speculation.

13        A.   Not at the time of that phone call.

14     BY MR. FROMMER:

15        Q.   So what exactly was he advising you of on

16   that call?

17        A.   He wasn't advising me of anything.  He was

18   telling me the facts of the investigation and asking

19   me if the Los Angeles asset forfeiture unit was

20   capable of handling a possible large-scale seizure.

21        Q.   Oh, okay.  So in summer of 2020, Matt Moon

22   called you, talked to you about the

23   U.S. Private Vaults investigation, and asked whether

24   the FBI LA field office had the capacity to handle

25   civil forfeiture regarding U.S. Private Vaults; is

Exhibit O
1525

ER-483

Page 69

1    that accurate?

2              MR. RODGERS:  Objection.  Slight

3         mischaracterization with respect to the date.

4         A.   During that phone call, that's what we

5    discussed.

6         Q.   Okay.

7              (Discussion off the record.)

8      BY MR. FROMMER:

9         Q.   So he asked, like, does the LA field

10   office have capacity to handle civil forfeiture with

11   regards to the nest of safe-deposit boxes?  Is that

12   accurate?

13        A.   Yes.

14        Q.   And what did you tell him?

15        A.   I told him yes.

16        Q.   And why did you think that the LA field

17   office had capacity to handle processing civil

18   forfeiture proceedings for the hundreds of safe-

19   deposit boxes at U.S. Private Vaults?

20             MR. RODGERS:  Objection, slight

21        mischaracterization of her testimony.

22             Go ahead and answer.

23        A.   We were capable of handling a large-scale

24   seizure because we have an established asset

25   forfeiture unit, and have had that unit for many,

Exhibit O
1526

ER-484

1    many years, and we have a large complement of asset

2    forfeiture employees capable of handling and

3    processing this type of large-scale seizure.

4        BY MR. FROMMER:

5        Q.   Okay.  And that makes sense, because you

6    said you've been in that of office for number of

7    years, and it sounds like you have a decent number

8    of both special agents and paralegal specialists

9    that you have in the unit.

10            So when were you discussing could the LA

11   field office handle civil forfeiture with regards to

12   U.S. Private Vaults, the two of you were -- is it

13   fair to say that you two were -- the two of you were

14   referencing not just necessarily any property owned

15   by U.S. Private Vaults, the company, but also

16   potentially the contents of some of the safe-deposit

17   boxes?

18        A.   Correct.

19        Q.   All right.  Now, were you involved -- let

20   me just ask you this.  This is just a little aside.

21   I think the answer is almost certainly no.

22            Did you help investigate

23   U.S. Private Vaults at all prior to the securing of

24   the indictment in March 2021?

25        A.   No.

1       Q.   I figured not.  Just wanted to clear that

2   up.

3       Were you involved in discussions about

4   applying for a seizure warrant -- for the seizure

5   warrant for the U.S. Private Vaults nest of boxes?

6       A.   No.

7       Q.   Okay.  So you didn't have any

8   conversations about getting a seizure warrant?

9       A.   I was not involved in conversations

10   regarding the substance of the affidavit which would

11   lead to the seizure warrant.  But I have discussed

12   and have had discussions regarding the seizure

13   warrant.

14       Q.   Okay.  But not that -- but was that after

15   the government got the seizure warrant or was that

16   beforehand?

17       A.   It was leading up to and, you know,

18   regarding the execution of the seizure warrant.

19       Q.   Okay.  So you -- you weren't involved in

20   the discussions about applying for a seizure

21   warrant.

22       So after your initial discussion with

23   Special Agent in Charge Matt Moon, when was the next

24   time you recall discussing the potential use of

25   civil forfeiture with respect to the nest of

Exhibit O
1528

Page 72

1    safe-deposit boxes at U.S. Private Vaults?

2         A.    There was a conference call and I don't

3    remember what the date was.  Obviously prior to the

4    execution of the search and seizure warrants.  But a

5    conference call where we were discussing the

6    logistics of effecting the warrants.

7         Q.    So was that call, was that close in time

8    to the actual execution of the warrant in

9    March 2021?

10        A.    Yes.

11        Q.    So do you recall between the time you

12   spoke with Special Agent in Charge Matt Moon

13   regarding U.S. Private Vaults in summer of 2020 and

14   this conference call that was -- sounds like it was

15   occurring in the run-up to the execution of the

16   warrant, so probably in, like, March of 2021, do you

17   remember any other conversations about the potential

18   use of civil forfeiture with regards to box renters'

19   property at U.S. Private Vaults?

20        A.    I recall that there was one other

21   conference call and that occurred prior to the phone

22   call/conference call that you referenced right

23   before the takedown, so I would guess that that

24   occurred late in 2020.

25        Q.    I'm assuming that these different calls

1    had slightly different purposes and conversations.
2    Like the one that happened right before the
3    execution obviously is probably really focused in
4    on, like, how are we going to execute this.
5          This call that we're talking about in fall
6    of 2020, sometime in fall, late fall of 2020, what
7    was the focus of that conversation?
8          MR. RODGERS:  I want to -- I'm sorry.  Go
9       ahead.
10     BY MR. FROMMER:
11     Q.   Well, let me ask first:  Who -- with
12    whom -- who was on that -- in that conversation with
13    you?
14     A.   Asset forfeiture, the criminal side, the
15    other partnering agencies, some locals, some
16    federals.  Did I mention the United States
17    Attorney's Office?  Maybe even our legal forfeiture
18    unit at headquarters in D.C. and some of my squad as
19    well and maybe some FBI evidence personnel.
20     Q.   Oh, wow.  This is a big call.  It seems
21    like a lot -- do you usually have calls of that
22    size?
23     A.   When we have a large-scale investigation,
24    we have a large conference call with lots of
25    parties.

Page 74

1          Q.   Makes sense.  That's fair.

2               And this was considered a large-scale

3     investigation; is that correct?

4          A.   I considered this a large-scale

5     investigation.

6          Q.   I think that's fair to say by any account.

7               So in that fall conversation, where you

8     had the other agencies and some of the locals and

9     your asset forfeiture people, and I think you said

10    legal forfeiture, and the USAO, what was the topic

11    of conversation in that fall -- fall 2020 phone

12    call?

13               MR. RODGERS:  Objection.  Instruct the

14          witness not to call on the attorney-client

15          privilege grounds.

16               MR. FROMMER:  I'm asking about the general

17          subject matter of the -- I'm not asking about

18          any particular attorney statements.  I'm just

19          asking what was the general topic of

20          conversation on that call.

21               MR. RODGERS:  If you want to go through

22          the topics one by one, that is fine.  The

23          problem with the way you asked the question is

24          it requires the witness to advise you of the

25          topics.  That advice to you may, in fact,

Exhibit O
1531

ER-489

1          disclose the contents of an attorney-client

2          communication.  I'm not willing to allow her to

3          speak generally about the topics without more

4          directed questions.

5       BY MR. FROMMER:

6          Q.   Okay.  Did you discuss -- were the

7       different people on that fall 2020 call, were they

8       talking about potential use of civil forfeiture

9       at -- strike that.

10              On that fall 2020 call, were participants

11      in that call discussing the potential use of civil

12      forfeiture as to the nest of safe-deposit boxes at

13      U.S. Private Vaults?

14              MR. RODGERS:  Objection.  Instruct the

15          witness not to answer that question.  Clearly

16          requires the witness to disclose the contents

17          of attorney-client communications.

18       BY MR. FROMMER:

19          Q.   After that fall 2020 call, was it your

20      understanding that you were going to pursue -- not

21      you personally -- but that the FBI was going to

22      pursue civil forfeiture against some or all of the

23      contents of the safe-deposit boxes?

24              MR. RODGERS:  Would you repeat that

25          question, please?

1        (Requested portion read back.)

2        A.   Generally speaking, that was an option,

3   but in the fall of 2020, that wasn't determined

4   because I needed to see the final draft of the

5   affidavit before I would make a determination as to

6   whether or not there was probable cause.

7     BY MR. FROMMER:

8        Q.   Okay.  And so you needed to evaluate the

9   affidavit that was submitted in support of the

10  seizure warrant in order to determine whether you

11  felt that there was probable cause to move forward

12  with potential forfeiture actions?  Is that

13  accurate?

14       A.   Yes.

15       Q.   Okay.  And you had not seen that -- the

16  affidavit in support of a seizure warrant at that

17  point; had you?

18       A.   I don't know when I saw the first draft,

19  if it was late 2020 or early 2021.  But I wanted to

20  wait, and did wait, until I saw the finalized

21  version of the affidavit.

22       Q.   Okay.  So you are -- in the fall of 2020,

23  after this meeting, is it fair to say that the

24  United States was prepared to move forward with the

25  potential use of civil forfeiture as to the nest of

Page 77

1    safe-deposit boxes, provided that, in your opinion,

2    the seizure warrant affidavit supplied sufficient

3    probable cause to do so?

4         MR. RODGERS:  Objection.  Poses an

5              incomplete hypothetical.  Calls for

6              speculation.  Beyond the scope of the topics of

7              this deposition.

8              Go ahead and answer.

9         A.   Yes.

10     BY MR. FROMMER:

11        Q.   So during that -- during any of your calls

12   or meetings in the run-up to the -- well, actually,

13   let me scratch that.

14             So you ultimately ended up reviewing the

15   seizure warrant affidavit; is that correct?

16        A.   Yes.

17        Q.   And do you remember when that was,

18   approximately?

19        A.   I would estimate early 2021, maybe

20   February.

21        Q.   Okay.  So this would have been, like, a

22   draft version of the affidavit, because it hadn't

23   yet been submitted, right?

24        A.   Right.

25        Q.   Okay.  And you said you reviewed that

Exhibit O
1534

ER-492

1    affidavit to determine whether there was probable

2    cause to proceed with potential civil forfeiture as

3    against the nest of safe-deposit boxes, right?

4         A.    Yes.

5         Q.    And what was your conclusion having

6    evaluated that seizure warrant affidavit?

7         A.    Having evaluated the seizure warrant

8    affidavit, the finalized version that was going to

9    be presented to the magistrate, I made a

10   determination that there was probable cause to

11   proceed on assets seized in the investigation from

12   U.S. Private Vaults.

13        Q.    Now, when you say "assets seized," are you

14   making any distinction between assets that were

15   owned by United States Private Vaults, the company,

16   versus items that were stored inside the nest of

17   safe-deposit boxes, or did you just feel that there

18   was probable cause to move for forfeiture on all of

19   it?

20             MR. RODGERS:  Objection.  Beyond the scope

21        of the topics.  Poses an incomplete

22        hypothetical.

23             You can answer.

24        A.    I was looking at all of the assets of

25   U.S. Private Vaults, and within that I was

Exhibit O
1535

1     considering the contents of the boxes.

2       BY MR. FROMMER:

3          Q.   Okay.  And when you were considering the

4     contents of the boxes, as opposed to the rest of

5     U.S. Private Vaults' assets, were you looking at the

6     same sort of evidence to make that probable cause

7     determination?

8              MR. RODGERS:  Objection.  Vague and

9          ambiguous with respect to same sorts of

10         evidence.

11       BY MR. FROMMER:

12          Q.   Well, sorry if my question is unclear.

13          What I'm trying to figure out is you said

14     you reviewed the seizure warrant affidavit, and

15     based on that, you had determined that there was

16     probable cause to move forward with potential

17     forfeiture as to the assets at U.S. Private Vaults.

18          I'm just asking, did you do one analysis

19     as to all the property, or do you do a separate

20     probable cause analysis as to U.S. Private Vaults,

21     the company's property, versus the nest of

22     safe-deposit boxes and the property therein?

23              MR. RODGERS:  Objection.  The question

24         goes beyond the scope of the topics.  Lacks

25         foundation.

Exhibit O
1536

ER-494

Page 80

1          You can answer.

2     A.    Prior to the takedown, I was looking at

3     probable cause, the same lens for both the assets of

4     U.S. Private Vaults and the contents of the box,

5     after the takedown was a different analysis.

6     BY MR. FROMMER:

7     Q.    But prior to the takedown, you had

8     determined -- or at least -- you had determined that

9     there was probable cause to potentially pursue

10    forfeiture against some of the property contained

11    within the nest of safe-deposit boxes.  Is that

12    accurate?

13          MR. RODGERS:  Same objections.

14    A.    I determined that there was probable cause

15    to seize the assets of U.S. Private Vaults and the

16    contents of the boxes at that location.

17    BY MR. FROMMER:

18    Q.    Okay.  So I think I understand that.  Now

19    I want to -- want to figure out -- okay.  So let's

20    move past the fall -- that fall 2020 and let's get a

21    little bit closer in time towards the takedown, as

22    you call it, the execution of the seizure warrant.

23          So as the FBI was preparing to execute the

24    seizure warrant, can you just describe to me, how

25    was your asset forfeiture team involved in the

Page 81

1    preparations to execute the warrant?

2        A.   We weren't involved in preparations to

3    execute the warrants.  We were involved in once the

4    warrants were executed and assets were seized, then

5    what was happening after that.

6        Q.   During this preparation stage, did you --

7    were there any discussions about what evidence

8    agents should collect from the individual

9    safe-deposit boxes?

10       A.   I don't recall any particular conversation

11   about that topic.

12       Q.   Well, do you recall anybody ever saying,

13   you know, we should have the agents -- we should

14   have them note if any currency that's in there

15   smells like marijuana.  Do you remember any

16   conversations like that?

17       A.   I do not.

18       Q.   Do you recall any conversations about

19   maybe we should take notes about how the money was

20   packaged or bundled?

21       A.    I don't remember a particular conversation

22   about that.

23       Q.   Do you recall -- do you recall more

24   generally discussions about, you know, once we're

25   opening these boxes and going through there, we

Exhibit O
1538                                              ER-496

Page 82

1    really should, you know, make observations, we
2    should record our observations, make some notes
3    about the box for potential future use?
4         A.   I don't recall any ticking conversation
5    about that.
6         Q.   You don't ever recall discussing this with
7    Lynne Zellhart?
8         A.   No.
9         Q.   When was the first time you recall talking
10   with Lynne Zellhart about the U.S. Private Vaults
11   investigation?
12        A.   Sometime after that first phone call with
13   SAC Moon, so I would estimate it could be to be fall
14   of 2020.
15        Q.   Okay.  And can you tell me, did -- I'm
16   just going to ask this rather generally.  What, if
17   anything, can you recall from that conversation?
18        A.   It was a while ago, so I don't recall any
19   specifics.  Just generally, this is -- these are the
20   facts of the investigation against
21   U.S. Private Vaults to date and we're planning a
22   takedown.  In general, that's what I recall.
23        Q.   And why did -- what was Lynne's purpose in
24   talking to you about this?
25             MR. RODGERS:  Objection.  Speculation.

Page 83

1      BY MR. FROMMER:
2          Q.    What is your understanding as to why you
3      spoke with Lynne Zellhart about the
4      U.S. Private Vaults matter in late-summer 2020?
5                MR. RODGERS:  Same objection.  Lacks
6          foundation.
7          A.    It was because her investigation could
8      lead to the seizure of assets.
9      BY MR. FROMMER:
10         Q.    Okay.  And was she touching base with you
11     sort of early in the process so as to make sure she
12     did things -- that the government collected the
13     information it might need for potential forfeiture
14     proceedings?
15               MR. RODGERS:  Objection.  Speculation.
16         Lacks foundation.
17         A.    It was just touching base to make sure if
18     that was the direction that we were headed, that I
19     as the supervisor of the asset forfeiture squad,
20     that I had people in place to process and handle if
21     we ended up having a large-scale seizure.
22     BY MR. FROMMER:
23         Q.    Now, did she -- at that point, were there
24     any conversations during that phone call or later
25     about what steps agents should take to help

Page 84

1    facilitate the potential use of civil forfeiture as

2    to -- I'll leave it there.

3         A.   I don't remember the particulars because

4    it was a little bit of time ago.  So I don't recall.

5         Q.   Let me ask you this:  Is the asset

6    forfeiture unit that you run, do you generally

7    advise agents about how to -- about best practices,

8    what are best practices in preparing for potential

9    use of civil forfeiture?

10             MR. RODGERS:  Objection.  Beyond the scope

11        of the topics.  Overbroad.  Poses an incomplete

12        hypothetical.

13        A.   Yes.

14    BY MR. FROMMER:

15        Q.   What kinds of things does your office tell

16    agents who are contemplating the potential future

17    use of civil forfeiture about what they should do to

18    help ensure that they're able to do that.

19             MR. RODGERS:  Same objections.

20        A.   Generally, is first to talk to us as soon

21    as they think that they might have some assets in

22    their investigation, share with us their probable

23    cause and their records, keep us in contact with

24    regards to the date of the takedown and other law

25    enforcement activities taking place.  Is it a

Page 85

1    search, an arrest?  Are there multiple locations?

2    Is it just our office, other offices involved, other

3    agencies involved?  On the day of the takedown,

4    looking at receipts, taking pictures, where the item

5    came from, what room, completion of reports, the

6    parties that are present.

7      BY MR. FROMMER:

8        Q.   Okay.  And is the purpose of all that

9    advice so as to help facilitate the potential use of

10   civil forfeiture potentially against the property

11   being seized?

12            MR. RODGERS:  Same objections.

13       A.   Not necessarily to facilitate, but just to

14   have a complete record of what happened.  But, yes,

15   if we pursue asset forfeiture, then we're going to

16   rely on those facts and reports and observations.

17            MR. FROMMER:  I want to actually introduce

18            another exhibit.  Give me just a second,

19            please.

20            You should have a new exhibit.

21            Unfortunately, it's listed as Exhibit 0.  But

22            it's really Exhibit 10 from a previous

23            deposition.

24            MR. RODGERS:  Hold on just a second.

25            We're trying to get into ExhibitShare.

1           MR. FROMMER:  Oh, okay.  There should be

2      one that just says Exhibit 10.

3           Are you having problems?

4           MR. RODGERS:  Yeah, we are logging into

5      ExhibitShare.

6           MR. FROMMER:  Let's just go off the record

7      for a minute.

8           (Discussion off the record.)

9           MR. RODGERS:  We have Exhibit 10.

10           MR. FROMMER:  Yeah, it's the same

11      document.

12           (Thereupon, marked as Exhibit 10.)

13    BY MR. FROMMER:

14      Q.   Special Agent Murray, have you had a

15    chance to look over Exhibit 10?

16      A.   Yes.

17      Q.   Have you seen not this specific document

18    before, but have you seen this agent observations

19    and notes from before?

20      A.   Yes.

21      Q.   When did you see it?

22      A.   Post-takedown.

23      Q.   Post-takedown.  How did you see it?

24      A.   As we were receiving the cases, each --

25    each box that we received had one of these

Exhibit O
1543

1  attachments.

2      Q.  Okay.  So this was a form that was filled

3  out for each box, to your understanding; is that

4  correct?

5      A.  Yes.

6      Q.  Now, if you could, do you see this -- it's

7  four down.  It's called "Cash Observations."

8      A.  Yes.

9      Q.  Okay?  And it says:  "Agents should note

10  things such as how the cash is bundled; if it has a

11  strong odor; if there appears to be drug residue

12  present; a gun is also present; or anything else of

13  note."

14          And since you work in asset forfeiture,

15  and you have years of experience in this area, I

16  wanted to ask a few questions.  So is how cash is

17  bundled, is that probative as to whether it's

18  potentially forfeitable criminal proceeds?

19      A.  It is a factor.

20      Q.  Can you explain to me?  Why is it a

21  factor?

22      A.  It's part of the overall picture that I'm

23  looking at for probable cause.  So just that in and

24  of itself may not be, as you said, probative, but

25  it's part of the overall picture to determine

1    whether probable cause has been met.

2         Q.   So, is it fair to say then that cash

3    might -- it might be more likely to be criminal

4    proceeds if it's bundled using rubber bands, for

5    instance?  Is that generally -- is that your general

6    understanding?

7         A.   Can you please repeat the question?

8         Q.   Yeah.  It was a bad question.

9              Can you explain to me how cash is bundled,

10   how is that -- how does that relate to whether funds

11   are potential criminal proceeds?

12        A.    In most of the times where that is

13   relevant is drug trafficking cases, narcotics cases.

14   And how they're bundled, whether they're with

15   PAYOU sheets, whether there's a sticky note with a

16   dollar amount and a name, maybe this is money that's

17   going to someone to purchase drugs, maybe it's money

18   received from someone to purchase drugs, and how

19   it's bundled is just part of the overall picture of

20   what I'm looking at when I do a probable cause

21   assessment.

22        Q.   Okay.

23        A.   Because --

24        Q.   So information like -- oh, sorry.  Please

25   go ahead.  I didn't mean to cut you off.

1          A.    It's okay.

2                Individuals dealing with large amounts of

3     currency, that, to me, would fit the bill of someone

4     who is a narcotics trafficker.  That doesn't

5     necessarily mean that's definite, but it's just one

6     factor.

7          Q.    Okay.  So even this -- even if it's not

8     determinative, this is evidence which may either

9     bolster the idea that there's probable cause that

10    this is criminal proceeds or not; is that right?

11         A.    Yes.

12         Q.    And how about the next part where it says:

13    "If it has a strong odor, marijuana, soil, gas" --

14    you'll have to explain the soil one to me --

15    "gasoline, coffee and chemical."

16                How -- is that information, noting that

17    cash smells of marijuana or soil or gasoline or

18    coffee or chemicals, is that also information that's

19    useful in determining whether there's probable cause

20    to believe that property is criminal proceeds or

21    otherwise forfeitable?

22         A.    Yes.

23         Q.    And I would assume if drug residue appears

24    on money, that that's pretty probative of -- that

25    this might be criminal proceeds, right?

Exhibit O
1546

1      A.   Yes.

2      Q.   So all of these cash observations, is it

3  fair to say that all these cash observations are

4  looking for information which might help show that

5  there is probable cause to believe that the cash at

6  issue is criminal proceeds?  Is that fair?

7      A.   No, because it's really just noting the

8  cash because once we give it to the marshals, that

9  cash -- if we're going to process as a forfeiture,

10 that cash, we can no longer refer to it to see how

11 does it look, how does it smell, what was near it,

12 what was of note, how was it bundled, what were --

13 you know, what did it look like.  So these are

14 observation notes because this is the last time --

15 generally this is the last time it's going to be in

16 that form because then it's going to go to the

17 Marshals Service and get deposited to the bank

18 account.

19     Q.   Yeah, and then the money is gone and you

20 wouldn't be able to collect any of that information

21 afterward, right?

22     A.   Yes.

23     Q.   Okay.  So this is your one opportunity to

24 record information that could be probative later on

25 regarding whether -- you think there's probable

Exhibit O
1547

1    cause to think this is forfeitable currency, right?

2         A.   Yes.

3         Q.   And let's go down a little bit.  You see

4    all the canine, canine, canine, and this is

5    relatively straightforward.

6              I know, as we talked about, you're an

7    expert in asset forfeiture.  You've done asset

8    forfeiture for a number of years.  You've done a lot

9    of asset forfeiture cases, I presume.  Is that fair

10   to say?

11        A.   I have done a lot of asset forfeiture

12   cases.  Even though I have done asset forfeiture

13   investigations for a long time, I wouldn't be so

14   bold as to classify myself as an expert.

15        Q.   That's fine.  That's fine.  And I don't

16   want to -- I don't mean to classify you as an

17   expert.  But you do have a good familiarity with

18   asset forfeiture.  You've been involved with it for

19   a number of years.

20             And I think you would agree with me

21   whether a canine unit does a sniff, a positive sniff

22   versus a negative sniff on currency, that is often

23   probative as to whether that currency is potentially

24   criminal proceeds, correct?

25        A.   That is a factor that we look at to

Exhibit O
1548

Page 92

1    determine probable cause.

2        Q.   And this is another example of the money

3    was going to go to Loomis and then to the marshals,

4    it was going to disappear, so if you wanted to get a

5    canine sniff and record that, you had to do it

6    before the money left the facility; is that correct?

7        A.   We had to do it before it went to the

8    Marshals Service, yes.

9        Q.   So that's why there were canine units on

10   site at U.S. Private Vaults, right, to collect that

11   information before the money went off to the

12   Marshals Service?

13       A.   Correct.

14           MR. FROMMER:  Give me just a second.  I am

15       going to introduce another exhibit.  Hopefully

16       I do a better job of it this time.  I'm just

17       going to copy this.  You should see what is

18       labeled now as Exhibit 7.

19           (Thereupon, marked as Exhibit 7.)

20           MR. FROMMER:  Let me know when you have

21       run across that.

22           MR. RODGERS:  We have it.

23     BY MR. FROMMER:

24       Q.   All right.  Take a minute, Special Agent

25   Murray, and familiarize yourself with the document,

Exhibit O
1549

ER-507

1    if you wouldn't mind.  Just let me know when you are

2    ready.

3         A.   Okay.  I'm ready.

4         Q.   All right.  Have you seen this document

5    before?

6         A.   It looks familiar.  I think it was

7    included in something I received, probably in the

8    big attachment of paperwork close in time to the

9    actual takedown.

10        Q.   So you think you would have received this

11   close in time to the execution of the seizure

12   warrant?

13        A.   Yes.

14        Q.   Do you remember reviewing this at all?

15        A.   No.

16        Q.   Do you know who wrote this?

17        A.   I don't know who drafted -- who authored

18   this.

19        Q.   Okay.  Did you have any involvement in

20   helping create this?

21        A.   No.

22        Q.   I figured not, given you barely remember

23   it.

24             Let me see.  Okay.  If you could go to

25   page -- it's 58.  It's FBI 58, which I think is like

Page 94

1      Page 3 or 4 of this thing.
2           A.   Okay.
3           Q.   The bottom paragraph here, okay, it says:
4      "FBI evidence techs and asset forfeiture agents will
5      be working to enter evidence into Sentinel and
6      generate CATS ID numbers for all cash."
7                So you had asset forfeiture agents on
8      site; is that correct?  At U.S. Private Vaults?
9           A.   I was the only one on-site.  The other
10     members of the team were paralegal specialists.
11          Q.   So you were the only asset forfeiture
12     agent on site.  Is that fair to say?
13          A.   Yes.
14          Q.   And then you had -- your asset forfeiture
15     paralegals were on-site.  And what were they doing
16     there?
17          A.   There was one of us present at all times,
18     so we took shifts.  We received the asset and
19     assigned a CATS number to each bag, which
20     represented each box, and we gave a deposit ticket
21     with the CATS ID number to go with that bag, so it
22     could get tracked to Loomis.
23          Q.   And is your understanding that bags is
24     when there was more than $5,000 in currency?
25          A.   No.  Everything was bagged.  Whether or

Page 95

1    not --

2          Q.    Even $50?

3          A.    Yes, everything was bagged.

4          Q.    Everything was bagged.  Okay.

5                And so you had -- so the currency would

6    get bagged -- well, you were on site, so you can

7    tell me this.

8                Can you just walk me through the process.

9    The currency gets bagged.  And then what would

10   happen with the currency?

11         A.    The contents were bagged and heat-sealed.

12   A label was put on.  Then they came over to the tent

13   and we gave them the CAPS number ID assigned to that

14   asset, and generated a Loomis ticket to go with that

15   bag.  And then they were compiling the bags and when

16   there was a large enough group of bags, then there

17   was -- there were agents that transported the

18   multiple bags to Loomis.

19         Q.    Yeah, I understand that, I think Special

20   Agent Palmerton was in charge of that aspect.

21               Now, I do have a question about the

22   timing.  When the bags are brought to you, were they

23   getting CATS ID numbers before they were subjected

24   to a dog sniff or after or would it really be either

25   way?

Exhibit O
1552

ER-510

1      A.    I believe it was after the dog sniff.

2      Q.    And regardless of now the dog sniff turned

3    out, it would get a CATS ID number and get shipped

4    off to Loomis; is that correct?

5      A.    Only if there was estimated to have money

6    over $5,000.

7      Q.    Had this is what I want to explore.

8    Because a second ago you said that they bagged all

9    money.  But then you are saying that only money that

10   was over $5,000 ended up at Loomis.  I'm trying to

11   end up to that sub $5,000.

12     A.    That money got bagged and went to

13   evidence.

14     Q.    Okay.  And that money would not have

15   generated -- you would not have generated a CATS ID

16   for that money, correct?

17     A.    Correct.

18     Q.    Okay.  Got it.

19           Did you ever inventory any boxes yourself?

20     A.    No.

21     Q.    Can you look on 59, it's the next page.

22   It's about halfway down.  It's the last sentence of

23   the big paragraph, "Search/inventory agents."

24           And it reads:  "Anything which suggests

25   the cash may be criminal proceeds should be noted

1    and communicated to the admin team."

2              And I just had a question.  Is that

3    consistent with your general understanding of how

4    whenever you execute a seizure warrant, that you

5    would note this information and communicate it to an

6    administrative -- sorry.  I'm going all over the

7    place.  Let me clean this up.

8              When they say "admin team" here, should we

9    understand that to mean your asset forfeiture

10   paralegals?  Or someone else?

11             MR. RODGERS:  Objection.  Calls for

12       speculation.  Lacks foundation.

13        A.   I think she means case agents,

14   supervisors, so Lynne or whoever, Madison, basically

15   people familiar with the case that were this charge

16   of the case.  Because there were agents who didn't

17   belong to Lynne's squad that were helping since it

18   was a 24/7 operation for multiple days.  So admin

19   team is someone who is privy to the case and the

20   investigation.

21     BY MR. FROMMER:

22        Q.   Okay.  All right.  So that's different

23   then than your asset forfeiture paralegals?

24             MR. RODGERS:  Same objection.

25        Speculation.  Lacks foundation.

Page 98

1           A.    It could include us, but not necessarily.

2       BY MR. FROMMER:

3           Q.    Okay.  So it might -- this sentence might

4       mean that anything that suggests that cash may be

5       criminal proceeds, the agent should note that and

6       provide it to your team, the asset forfeiture team?

7               MR. RODGERS:  Objection.  Lacks

8               foundation.  Calls for speculation.

9           A.    No, not necessarily our team, just someone

10      familiar with the case, whether it's the case agent,

11      or it could include me or the paralegal specialists.

12      But not necessarily.

13      BY MR. FROMMER:

14          Q.    And then let me just go back to 58,

15      Page 58, so one page up.  It's the paragraph in the

16      middle that starts "team leader."  And it -- I think

17      it's the fourth sentence.  It's halfway in the

18      paragraph.

19              And it basically is talking about all the

20      paperwork that should be prepared, and it says:  "A

21      copy of the paperwork will go to asset forfeiture."

22              And my question is, why is a copy of all

23      the paperwork being created here going to asset

24      forfeiture?

25              MR. RODGERS:  Objection.  Lacks

1          foundation.  Assumes facts not in evidence.

2          Calls for speculation.  Beyond the scope of the

3          topics.

4          A.   A copy of the paperwork is the seizure 302

5     or those agent observations that you referenced as

6     an exhibit because that's part of our probable cause

7     story.

8       BY MR. FROMMER:

9          Q.   Your probable cause story as to whether

10     there's probable cause to think that the assets in

11     question are forfeitable or not?

12          MR. RODGERS:  Same objections.

13          A.   A determination was already made that

14     there was probable cause, so any other information

15     supplements the existing probable cause.  So this

16     would be supplemental information.

17       BY MR. FROMMER:

18          Q.   Okay.  All right.  Give me just one

19     second, please.

20          Now, I understand that the government

21     collected this information.  It was a bit of a

22     use-it-or-lose-it situation, and so the government

23     was collecting this information that's on the

24     observation -- agent observation notes and other

25     forms.

Page 100

1           Is it fair to say the United States has

2      used the evidence it collected from box renters'

3      boxes in forfeiture proceedings against some box

4      renters' property?

5               MR. RODGERS:  Objection.  Beyond the scope

6          of the topics of this deposition.  If this

7          question is limited to administrative

8          forfeiture proceedings, that is fine, but to

9          the extent --

10              MR. FROMMER:  Yes.  Okay.  Fine.  Victor,

11         I get you.  Let me rephrase.  I'll just

12         rephrase it then.  I'm fine with what you are

13         saying.

14              MR. RODGERS:  Okay.  Sure.

15       BY MR. FROMMER:

16         Q.   So has the United States used evidence it

17      collected on the agent observation notes form and in

18      other ways, from box renters' boxes, to pursue

19      administrative forfeiture against some box renters'

20      property?

21         A.   We used it as part of the -- as the asset

22      forfeiture process and part of the probable cause

23      story as supplement to the probable cause, yes.

24         Q.   And do you know if the United States has

25      used the evidence it collected from box renters'

Page 101

1    boxes to apply for other search and/or seizure

2    warrants?

3         A.   I don't know.

4         Q.   Okay.  That's fine.  How many days were

5    you at U.S. Private Vaults?

6         A.   I had a shift that started on Tuesday

7    until Friday.

8         Q.   How many hours a day?

9         A.   I think we did maybe six-hour or

10   eight-hour shifts.  I don't recall.

11        Q.   Okay.  And so if you could, just -- and we

12   talked about this a little, but I just want to come

13   back to it.

14             Can you sort of just tell generally what

15   were your responsibilities during the execution of

16   the warrant, of the seizure warrant?

17        A.   I was there as an asset forfeiture body

18   doing a shift, along with the paralegal specialists,

19   so just assigning CATS numbers to the bags and

20   logging them into our logbook what CATS number

21   equaled what box.

22        Q.   So you were processing the bags of

23   currency, giving them CATS numbers, sending them

24   along to Loomis.  Were you collecting these agent

25   observation and notes forms and 302s?

Exhibit O
1558

ER-516

Page 102

1      A.   Not at the takedown site or that week.

2   They came to me later on.

3      Q.   So subsequent to the time of the execution

4   of the seizure warrant.  Do you remember about how

5   long after the warrant was executed that asset

6   forfeiture, your team, got copies of the 302s and

7   other paperwork?

8      A.   They would come in batches, but we were

9   getting them as soon as the week after, and then

10   they would come -- there were a lot of boxes, a lot

11   of paperwork, so they were coming in in phases.

12      Q.   I'm sure.  So now you have the -- let's

13   move a little bit past the takedown, as you call it.

14      So now the boxes have all been processed.

15   You finally get to leave Olympic and you are back at

16   the office.  You start getting the 302s and other

17   paperwork that's associated with the takedown.  And

18   at that point, I'm wondering what did the asset

19   forfeiture unit do next with regard to investigating

20   the boxes and their owners?

21      A.   We were drafting up probable cause

22   statements for each box.  We were inputting the

23   information into the CATS database for notice

24   purposes.  We were communicating with the criminal

25   side as to other information pertaining to each box,

1    if they had additional information.

2         Q.   And when you say that, when you say you

3    were interfacing with the criminal side to see if

4    they had additional information, is that if you are

5    not quite sure whether there's probable cause to

6    move forward as to forfeiture for a particular piece

7    of property, you would interface with the criminal

8    people to see if they had any additional evidence?

9    Is that accurate?

10        A.   No.   There was already a determination

11   that probable cause has been met, and so any other

12   information that was coming from the criminal side

13   or coming from the agent observation and notes at

14   the takedown, then all of that was to supplement

15   what we already had.

16        Q.   Well, let me ask this.   The one thing I

17   guess I'm confused by.   We've talked about this

18   probable cause determination.   Was the probable

19   cause determination done box by box and property by

20   property, or was it one determination across the

21   entire U.S. Private Vaults entity and customers?

22        A.   The probable cause determination was based

23   on the finalized version of the affidavit and it was

24   for U.S. Private Vaults as that business and its

25   contents as its business assets.

Page 104

1        Q.   Well, I guess that's what I'm getting at.

2    Is the stuff that's inside people's rented

3    safe-deposit boxes, was that considered part of the

4    business' assets?

5        A.   Yes.

6        Q.   All right.  So when you are deciding -- so

7    I get it, you are evaluating the evidence, you are

8    looking at the evidence to decide.  And I think you

9    previously testified that the administrator

10   forfeiture determination about whether to pursue

11   administrative forfeiture, it happens at the field

12   office level, but we can explore that.

13        What I'm wondering is -- so you are doing

14   this investigation.  You've got the evidence, you

15   are doing further investigation -- oh, that's a good

16   question.

17        Your team, your asset forfeiture team, are

18   they conducting additional investigation as to box

19   renters to -- for potential additional evidence to

20   support a probable cause determination?

21        A.   No.

22        Q.   Are they investigating or are they looking

23   at box -- are they doing any investigation of box

24   holders or box renters?

25        A.   We did not for this case.

Exhibit O
1561

ER-519

1    Q.   So when you were making your probable

2    cause determination about what pieces of property to

3    move forward on through administrative forfeiture,

4    what was it that your team, you and your team were

5    looking at?

6    A.   We had already determined that there was

7    probable cause to move forward and the factor

8    whether or not it was going to our shop versus

9    evidence was if it met the minimum monetary

10   threshold.

11   Q.   Okay.  Is there any box that had -- is

12   there any amount of currency that was above $5,000

13   that the FBI did not move for administrative

14   forfeiture upon?

15   A.   No, we initiated civil administrative

16   forfeiture against all of the boxes that met the

17   minimum monetary threshold.

18   Q.   Okay.  Thank you.

19        That initial administrative forfeiture

20   determination, whether they get on the only omnibus

21   list or not, is that your team, is that the LA field

22   office making that call, or is that FBI

23   headquarters?  Just if you can give me some idea?

24   A.   I don't know what you mean by who gets on

25   the omnibus --

1    Q.   Oh, sorry.  Sorry.  I know that there's

2    ultimately an omnibus administrative forfeiture

3    notice that was sent to U.S. Private Vaults that had

4    about 400 boxes on it.

5    A.   Okay.

6    Q.   And I don't really want to talk about

7    that.  What I'm trying to determine is when -- there

8    was a determination made that, yes, we should move

9    on admin forfeiture, we should pursue administrative

10   forfeiture against this particular box, was that a

11   decision that was being made solely by the LA field

12   office?  Was that decision that was also being made

13   at FBI HQ?  That's what I'm trying to get more

14   understanding of.

15   A.   It was made at the field office level.

16   Q.   Okay.  And I understand about cash.  And I

17   understand that you said that basically any cash

18   that was seized that was above the -- that $5,000

19   FBI minimum, that the FBI pursued administrative

20   forfeiture against that.  Is that a fair statement?

21   A.   Yes.

22   Q.   Okay.  Now I have a slightly different

23   question about, you know, the gold and the silver in

24   there, you know, non-currency property.  How did

25   your office determine whether to pursue

Page 107

1    administrative forfeiture as against, you know,
2    precious metals or jewelry or other valuables of
3    that nature.
4         A.   Generally, we proceeded against all of the
5    non-currency valuables if it looks like it was
6    worth -- if the value would meet our minimum
7    monetary threshold.  If there was one little tiny
8    ring that looked like it came from Cracker Jack box,
9    then we wouldn't.  If there was one coin, one-dollar
10   gold coin, then we wouldn't.  But the boxes that
11   contained silver bars and gold nuggets, then those
12   got bagged and went to valuable evidence.
13        Q.   And so long as -- is it fair to say then,
14   so long as the asset -- your asset forfeiture team
15   looked at that gold or silver that was in the box
16   and it was above the jurisdictional minimum of
17   $5,000, that, in those situations, you would pursue
18   administrative forfeiture against that gold or
19   silver?  Is that fair?
20        A.   We didn't review every single bag.  The
21   agents would make that determination.  If it was a
22   close call, they might come and say, hey, this bag
23   has this in it.  Yes or no.
24        Q.   Okay.
25        A.   But many of the bags were getting --

Page 108

1    having that determination made by the agents

2    themselves.

3         Q.   And by the agents, you are talking

4    Lynne Zellhart and Madison MacDonald; is that right?

5         A.   The agents at the search -- at the

6    takedown.

7         Q.   The agents at the takedown were themselves

8    determining whether they thought the precious metals

9    were potentially forfeitable through administrative

10   forfeiture?

11        A.   Yes, because they received their tasking

12   and guidelines before of this is what's going to go

13   to asset forfeiture, this is what's going to go to

14   evidence.  So an agent was able to determine this

15   bag containing 20 silver bars, you know, that's

16   going to go through asset forfeiture.

17        Q.   Okay.  So they run it -- it's your

18   agent -- I get what are you saying.  So you have the

19   agent with the box.  And the agent is going through

20   the box and sees a bunch of gold and silver that

21   appears to be like $10,000 worth.  Just off the top

22   of my head.  In that situation, what would that

23   agent do?  I'm trying to figure out, like, would

24   that agent then somehow note that the gold and

25   silver was above the jurisdictional minimum?  How

Exhibit O
1565

ER-523

Page 109

1    would they communicate that to you?

2         A.   They would bring it to the table and say,

3    I need a CATS ID.

4         Q.   So gold and silver that was above the

5    jurisdictional minimum was getting CATS ID numbers?

6         A.   Yes.

7         Q.   And that was happening on site?

8         A.   Yes.

9         Q.   I'm assuming, though, that you took that

10   silver and gold, instead of taking it to Loomis,

11   that just went to your valuables vault; is that

12   correct?

13        A.   Yes.

14        Q.   But the agents are saying -- so to your

15   understanding, the agents were instructed, open the

16   box, if the box has -- obviously if it has more than

17   $5,000 in cash, bag, it bring it out, we'll CATS

18   number it.

19             If it's gold and silver, if you think it's

20   above 5,000, then come and ask for a CATS ID number

21   and we'll get it in the asset forfeiture system.  Is

22   that a fair summary?

23        A.   Yes.

24             MR. FROMMER:  Let me take like five

25        minutes.  We've got a little bit more to go,

Page 110

1          Victor, but it won't be all that terrible.  Let

2          me get five minutes, okay?

3               (Recess was held from 2:15 p.m. until

4          p.m.)

5       BY MR. FROMMER:

6          Q.   Thank you so much.  Sorry for the quick

7      break.

8               I had a question -- I want to jump back

9      for a second to the petition process.  When people

10     would file a petition, is it fair to say they would

11     often provide paperwork in support of their

12     petition?

13         A.   That's what they're supposed to do.

14     Sometimes petitioners just say, I would like my

15     money back and provide no additional information.

16         Q.   Okay.  I understand that.  Some people

17     just file bare-bones petition, don't provide

18     anything in support.  But let's talk about the

19     people who, you know, put actual paperwork in place.

20              What I'm trying to do is, okay, so you get

21     a petition for remission or mitigation, and it has

22     some papers attached to it, you know, some documents

23     that are filed in support.  What happens to those --

24     who reviews those documents?

25              MR. RODGERS:  I just want to object.

Exhibit O
1567

ER-525

Page 111

1           Beyond the scope of the topics.  And beyond the
2           scope of this proceeding.
3                Go ahead.
4           A.   The paralegal specialist receives them and
5      reviews them.
6        BY MR. FROMMER:
7           Q.   And does that paperwork get uploaded into
8      some file system?
9                MR. RODGERS:  Same objections.
10          A.   Yes, it does.
11       BY MR. FROMMER:
12          Q.   So is it fair to say that papers that
13     people file as part of the petition process, are
14     those retained on FBI servers, those documents?
15               MR. RODGERS:  Objection.  Beyond the scope
16          of this litigation.  Objection beyond the
17          topics in the deposition notice.  Lacks
18          foundation.  Irrelevant.
19               You can answer.
20          A.   It's on our FBI computer.
21       BY MR. FROMMER:
22          Q.   Is it held -- do you know if those
23     documents are held inside Sentinel?
24               MR. RODGERS:  Same objections.
25          A.   Our documents go in Sentinel.

Page 112

1      BY MR. FROMMER:

2          Q.   Your document -- so these documents would

3      go into Sentinel.

4               Is it your understanding that -- scratch

5      that.

6               Are you aware of any mechanism by which

7      documents are -- that people submit as part of the

8      petition process, are they ever removed from

9      Sentinel?

10               MR. RODGERS:  Objection.  Beyond the scope

11          of the topics.  Beyond the scope of this

12          litigation.  Pertains to topics for which this

13          witness has not been offered today.  Lacks

14          foundation.  Assumes facts not in evidence.

15          Calls for speculation.

16               You can answer.

17          A.   Not that I'm aware of.

18      BY MR. FROMMER:

19          Q.   Now I can't remember what my question was.

20               MR. FROMMER:  Can you repeat my question,

21          please?

22               (Requested portion read back.)

23          A.   The answer is not that I'm aware of.

24      BY MR. FROMMER:

25          Q.   I thought that's what you said before.  I

Exhibit O
1569

ER-527

Page 113

1    just wanted to make sure.

2              Let me jump a little bit.  And we were

3    talking about this before.  I want to go back to

4    that -- it sounded like there were sort of three

5    meetings that occurred around -- prior to the

6    takedown, as you call it.  And I understand that

7    there was a meeting, a big multi-agency meeting in

8    fall.  I think said it was with the other agencies,

9    with some local agencies, and some people from the

10   USAO.

11             Do you recall the meeting that I'm talking

12   about?

13        A.   Yes.

14        Q.   Okay.  And what I want to figure out is

15   did any of the local agencies discuss or ask -- why

16   were the local agencies there?  Why were local

17   agencies at that fall 2020 meeting?

18             MR. RODGERS:  Objection.  Calls for

19        speculation.  To the extent the reason that

20        these local agencies were at the meeting was at

21        the request of any attorney, I instruct you not

22        to answer.

23        A.   Because they were a part of the

24   investigation.

25

Exhibit O
1570

ER-528

Page 114

1      BY MR. FROMMER:

2          Q.   And how were they part of the

3      investigation?

4          A.   I am not privy to how each local agency

5      contributed to the investigation.  I just know that

6      there were locals and postal and DEA, and I don't

7      know how they played a part, but that they were part

8      of the investigation.

9          Q.   Okay.  That's fair.  I understand that you

10     weren't involved in the investigatory part of the

11     case.

12          So did the -- at that meeting, were the

13     local agencies asked about -- to be involved in the

14     takedown, as you call it?

15          MR. RODGERS:  Objection.  Instruct the

16          witness not to respond on attorney-client

17          privilege grounds.

18          MR. FROMMER:  I didn't ask any contents of

19          any attorney communication.  I simply asked --

20          I asked an operative thing.  Were these local

21          agencies asked to be part of the takedown?

22          MR. RODGERS:  You asked whether those

23          local agencies during the course of a meeting

24          in which attorneys were present asked to be

25          part of the takedown.  That is the exact

Page 115

1        content of a conversation.

2    BY MR. FROMMER:

3        Q.   Do you recall any non-attorney discussing

4    the potential use of civil forfeiture at that fall

5    2020 meeting?

6            MR. RODGERS:  Same objection.  Same

7            instruction.

8            MR. FROMMER:  Victor, I would like to

9            point out now that I've asked numerous

10           questions that don't go to any attorney-client

11           communication.  You're using the privilege to

12           simply prevent any inquiry into meetings where

13           attorneys were simply present, even though

14           that's not the -- that is simply not the

15           contour of the attorney-client privilege.

16           MR. RODGERS:  My instruction stands.  You

17           can ask questions and you already have.  It is

18           obvious locals were at the execution of the

19           warrant.  I'm not sure why there's a need to go

20           into attorney-client communications concerning

21           the locals.  Because you already have the

22           information from another source.

23           MR. FROMMER:  Let me ask a different

24           question then.

25

Exhibit O
1572

ER-530

Page 116

1     BY MR. FROMMER:

2         Q.   Were the local agencies told if they

3     participated in the excuse of the seizure warrant,

4     that they would be entitled to receive some of the

5     asset forfeiture proceeds that may accrue as a

6     result?

7         A.   Not that I'm aware of.

8         Q.   Do you know how the local agencies got

9     paid for their time that they spent at

10    U.S. Private Vaults during the takedown?

11            MR. RODGERS:  Objection.  Speculation.

12        A.   I presume they were paid --

13            MR. RODGERS:  Don't presume.  If you know,

14        tell him.  It doesn't help if you guess.  But

15        if you have an estimate, please go ahead and

16        say it.  But if not, please don't speculate.

17        A.   They got paid by their employer to do

18    their job.

19     BY MR. FROMMER:

20        Q.   Have you received any DAG-71s from any of

21    the local agencies that participated in the takedown

22    at U.S. Private Vaults?

23        A.   Yes.

24        Q.   Which agencies?

25        A.   I don't remember all of them.  I think

Page 117

1    Beverly Hills, maybe Almonte, DEA, postal, maybe

2    Monrovia.  I don't remember.

3            Q.   And in those DAG-71s, are they requesting

4    a certain percentage of any and all property that

5    was seized and forfeited from the nest of security

6    boxes?

7            MR. RODGERS:  Objection.  Overbroad.

8            You can answer.

9        A.   They requested percentage of particular

10   assets.

11     BY MR. FROMMER:

12       Q.   Particular assets?

13       A.   Right.  So one at a time.  So a DAG for

14   each asset.

15       Q.   Okay.  So as assets are forfeited and

16   become -- get deposited in the asset forfeiture

17   fund, then these local agencies will submit DAG-71s

18   for a percentage of the particular asset that's been

19   forfeited; is that correct?

20       A.    No, you have to submit the DAG within a

21   certain amount of days after the time of seizure.

22   So you have to put that in place.  And then you wait

23   to see if the assets gets forfeited.

24       Q.   Okay.  So these agencies then, did they

25   send in, like -- did they each send in, like, 400 or

Page 118

1     400 different DAG-71s?  Did they send in a different

2     DAG-71 for each and every box?

3         A.   I am not privy to the inner workings of

4     the DAG form, but it's online, so I -- however you

5     submit it.  But my understanding is that you have to

6     submit a request for each asset.  But you may be can

7     do that with one push of a button.

8         Q.   So when you say "asset," would they --

9     these local agencies, would they be -- by the term

10    "asset," do we mean like -- because you said before

11    that currency got a CATS ID.  And gold and silver,

12    for instance, that appeared to be above the

13    jurisdictional minimum would get a CATS ID.

14         So when referring to an asset, like they

15    are asking for a percentage of the asset, does that

16    tie back to the specific CATS number that was

17    assigned?  Is that -- I just want to make sure we're

18    using the term "asset" the same way.

19         A.   Yes.

20         Q.   Okay.  So there would be a CATS number

21    for, let's say, $100,000 of currency, that gets --

22    and then within a certain amount of time of the

23    seizure of that $100,000, all these local agencies

24    would submit DAG-71s asking for a certain percentage

25    of whatever is ultimately forfeited; is that

Exhibit O
1575

ER-533

Page 119

1    correct?

2        A.   Yes.

3        Q.   And then, I guess, you sit and wait to see

4    what ultimately happens to the asset and then

5    distribute if the asset is ultimately forfeited.  Is

6    that an accurate statement?

7        A.   Once the declaration of forfeiture has

8    been issued, then -- I don't know how soon after,

9    but then the sharing occurs.

10       Q.   And this is for the state and locals.  So

11   you would have received then -- I think I asked this

12   before, so I apologize.  So roughly how many DAG-71s

13   has your office received as a result of the actions

14   of U.S. Private Vaults?

15       A.   I am not -- once again, I don't know -- I

16   don't work in that database that has the DAG, but

17   every asset that we had in U.S. Private Vaults, if

18   someone put in a request, then they put in a request

19   for all of the assets that we seized.

20       Q.   Okay.

21       A.   But I don't get 500 pieces of paper across

22   my desk.  In the database.

23       Q.   Yeah, I get that.  I'm just trying to

24   figure out how many DAG-71s actually got filed with

25   you, I guess.  Because it sounds like there's

Exhibit O
1576

ER-534

1     different DAG-71 for everything that has its own

2     CATS ID number.  And then you have, for each asset

3     with its own CATS ID, you have multiple agencies

4     that were involved in the takedown.  So it seems, if

5     you multiply those numbers together, that you have

6     potentially thousands of DAG-71s that you have

7     received as -- that the LA field office has received

8     as a consequence of U.S. Private Vaults' takedown.

9     I'm just asking if that seems accurate.

10            MR. RODGERS:  Objection.  Speculation.

11     Lacks foundation.

12     A.   There's a lot of DAGs but they're in the

13     database.  They get submitted online.  So they're

14     there, but I'm not seeing them across my desk on a

15     daily basis.

16     BY MR. FROMMER:

17     Q.   Okay.

18     A.   But all of the agencies that put in for

19     sharing for all of the Private Vaults assets, that

20     information is in whatever database holds the DAG.

21     Q.   Okay.  All right.  I got that.  I was just

22     asking more a number question.  I was just trying to

23     get at -- how many -- you are in a unique position

24     to know this.  How many assets got CATS ID numbers

25     as a result of the U.S. Private Vaults takedown?

Exhibit O
1577

Page 121

1    I'm not asking you for a precise number.  Just give

2    me a ballpark.

3            MR. RODGERS:  Objection.  Lacks

4        foundation.  Calls for speculation.

5        A.   I think there was around 400.

6    BY MR. FROMMER:

7        Q.   And were all of those 400 CATS ID numbers,

8    did they -- let me rephrase.

9            The government put out an administrative

10   forfeiture notice in late May of 2021, correct?

11       A.   I don't know the exact dates, but I know

12   they sent out notice.

13       Q.   And actually, let me go back.  Let me

14   introduce that because I do want to --

15           MR. FROMMER:  I'm going to introduce

16       another exhibit.  Give me just a second.

17           I think we're on 15.  You should have that

18       in a just a second.  Let me know when you have

19       received it.  This is, I think, Exhibit 15.

20           (Thereupon, marked as Exhibit 15.)

21           MR. RODGERS:  We have it.

22   BY MR. FROMMER:

23       Q.   Just take a look at it.  Take a minute and

24   look through it.

25       A.   I see the date of May 20.

Page 122

```
1          Q.   And are you familiar with this document?
2          A.   Yes.
3          Q.   Can you describe to me what this document
4     is?
5          A.   It's the initial -- the start of our
6     administrative forfeiture process for FBI and this
7     is for U.S. Private Vaults.
8          Q.   Were you involved in putting this
9     together?
10         A.   I was not involved in putting this
11    together.  Staff members on my squad input the
12    information that then fills, populates, this notice
13    letter that I said gets sent out by our headquarters
14    in Washington, D.C.
15         Q.   Okay.  So this document would have been
16    transmitted by asset forfeiture headquarters in
17    D.C.; is that correct?
18         A.   I think it's the FSPU, forfeiture seized
19    property unit, they generate the notice letters.  In
20    Washington, D.C., at our headquarters.
21         Q.   What's their name again?
22         A.   It's the FSPU, forfeiture and seized
23    property unit.
24         Q.   Never heard of that before.  Forfeiture
25    and seized property unit.
```

Exhibit O
1579

ER-537

Page 123

1          And what is their -- what is their -- what
2     are their responsibilities?  Do they process
3     forfeiture notices?  Is that their job?
4          A.   They process the notices and they process
5     the cases from our office.
6          Q.   What do you mean when they process the
7     cases from your office?
8          A.   They generate the notice letters.  They
9     oversee the information that we put in on the case.
10    They send letters to us about deadlines or things
11    that have been accomplished in the case.  They kind
12    of oversee the field office as a forfeiture cases.
13         Q.   So they are a unit in the headquarters.
14    They are providing support and also helping oversee
15    the asset forfeiture process.
16          So this would have come out of the FSPU
17    based on information that you and your team
18    collected and input; is that correct?
19         A.   Yes.
20         Q.   And this reflects you and your team's
21    judgments about property for which there was
22    probable cause to move for forfeiture; is that
23    correct?
24         A.   Well, every case that we submitted to
25    them, that was our statement that we believed there

Exhibit O
1580

ER-538

Page 124

1   was probable cause for asset forfeiture.

2        Q.   Do you recall if there are any boxes or

3   any CATS ID numbers, assets, that you submitted

4   saying we believe there's probable cause for

5   forfeiture here, where the FSPU overruled you or

6   said, no, this property should just be returned?

7        A.   Are you asking about just Private Vaults?

8        Q.   Yeah, just Private Vaults.

9        A.   The entity that would do that is the legal

10  forfeiture unit, and, no, they did not in the

11  U.S. Private Vaults case.

12       Q.   So the legal forfeiture unit took your

13  list of we believe these assets should be pursued

14  via administrative forfeiture, and they approved it

15  and didn't disapprove any of your suggestions; is

16  that correct?

17            MR. RODGERS:  Objection.  Lacks

18       foundation.  Calls for speculation.

19            You can answer.

20       A.   They did not order us to return any

21  particular box and they approved our cases going

22  forward.

23    BY MR. FROMMER:

24       Q.   And once the government sent out -- can

25  you explain to me how -- I do want to walk back a

Exhibit O
1581

ER-539

Page 125

```
1      little bit just for a second on the administrative
2      forfeiture process because I -- I understand there's
3      a thing called a petition.  Then I understand
4      there's a thing called a claim.  And I think you
5      testified earlier that once a claim is filed, then
6      the property has to go through judicial forfeiture;
7      is that correct?
8           A.   No, it doesn't have to.  Once a claim is
9      filed, the case goes from civil administrative, then
10     we refer it to the United States Attorney's Office
11     for them to decide whether or not it should continue
12     as a civil judicial case.
13          Q.   That's what I meant.  Thank you for that.
14               So do you understand if
15     U.S. Private Vaults, the company, did it file any
16     sort of judicial claim in response to this asset
17     forfeiture notice?
18               MR. RODGERS:  Objection.  Beyond the
19          scope.
20               You can answer.
21          A.   I think it did.
22        BY MR. FROMMER:
23          Q.   So you terminated -- pursuant to what you
24     are saying then, you terminated all the
25     administrative forfeiture proceedings that were
```

Page 126

1    underway and forwarded the information along to
2    Victor and the U.S. Attorney's Office, correct?
3              MR. RODGERS:  Objection.  Calls for a
4        legal conclusion.  Potentially deals with
5        matters that invoke the work-product doctrine.
6              I will allow you to -- I will allow the
7        witness to answer the question yes or no.
8              THE WITNESS:  Can you repeat the question,
9        please?
10             MR. FROMMER:  I'd love to know what the
11       question was myself.
12             (Requested portion read back.)
13       A.    Yes.
14     BY MR. FROMMER:
15       Q.    So you terminated all the administrative
16   forfeiture proceedings that were underway?
17             MR. RODGERS:  Objection.  Calls for a
18       legal conclusion.  The witness doesn't
19       terminate proceedings.  The law terminates
20       proceedings.
21             But the witness can answer the question,
22       without speculating, whether all these cases
23       were transferred to the United States
24       Attorney's Office, if the witness knows.
25       Because this is beyond the scope of the

Page 127

1    deposition notice.

2         A.   I know not all of them were because we

3    still have administrative forfeiture cases going

4    forward from U.S. Private Vaults.

5      BY MR. FROMMER:

6         Q.   You still have administrative forfeiture

7    proceedings going forward?

8         A.   Yes.

9         Q.   Is there any like time limit about how

10   long an administrative forfeiture proceeding can

11   last?

12              MR. RODGERS:  Objection.  Calls for a

13         legal conclusion.  Calls for speculation.

14         Lacks foundation.

15        A.   I don't know if there's a timeline that it

16   has to be concluded.  But there are timelines for,

17   you know, notice, and then response timelines, and

18   there are timelines within that process, but I don't

19   know from start to finish if there is a set

20   deadline.

21     BY MR. FROMMER:

22        Q.   Approximately how many administrative

23   forfeiture cases that involve U.S. Private Vaults

24   would you say are still circulating within the FBI?

25              MR. RODGERS:  Okay.  Objection.  This goes

Page 128

```
 1              beyond the scope of any topic.  This witness
 2              isn't prepared to testify on this issue,
 3              doesn't know anything about this issue.  It's a
 4              legal conclusion.
 5                   This is a case involving property that has
 6              been returned to people.  Those have all been
 7              terminated.  This question has anything to do
 8              with that.
 9              A.   I don't know.
10        BY MR. FROMMER:
11              Q.   Okay.  That's fine.  I just had a
12        question.  That's all there was.
13                   MR. FROMMER:  I think we're almost done.
14              Why don't you give me five minutes so I can
15              sort of collect myself.  If we have more
16              questions, I think it's probably only a few
17              more.  Okay?
18          (Recess was held from 2:56 p.m. until 3:00 p.m.)
19                   MR. FROMMER:  I do think that we are
20              pretty much done.  I do have one or two more
21              questions and that should be it.
22        BY MR. FROMMER:
23              Q.   I just want to go back.  We were talking a
24        little bit before about when someone receives a
25        petition or receives an administrative forfeiture
```

1    notice and they file a petition with papers in

2    support.  You had testified that those papers make

3    their way into Sentinel and they stay there for some

4    indeterminate time.

5            My question is:  Let's say someone instead

6    of filing a petition for remission, they file a

7    judicial claim and provide documents in support of

8    their judicial claim.  What happens to those

9    documents they filed in support in that

10   circumstance?

11       A.   It's just a claim.  So when somebody

12   receives notice of an administrative forfeiture

13   case, and they file a claim, it comes to us, and

14   then we make copies of our files and we fill out a

15   referral notice, request, letter, and we send it to

16   United States Attorney's Office, and they get a copy

17   of everything that we have on the case, and then we

18   also keep that in our FBI database and note that

19   claim was filed, case was referred to United States

20   Attorney's Office, judicial packet, and that's noted

21   in our case database.

22       Q.   Got it.  So it sounds like in that

23   situation, judicial claim -- you get a judicial

24   claim, FBI keeps a copy of the paperwork that was

25   filed in support of the claim, and also sends a copy

Exhibit O
1586

Page 130

```
 1    of that paperwork to the United States Attorney's
 2    Office along with the referral.  Is that accurate?
 3         A.   The claim, yes.  Not judicial claim, but
 4    just, yes, straight claim, yes, we keep a copy, and
 5    then we make a copy and we send it to the United
 6    States Attorney's Office.
 7         Q.   Okay.  And the copy that you keep, that
 8    goes into Sentinel, I guess, I'm assuming; is that
 9    right?
10         A.   Yes.
11         Q.   So it ends up the same place that papers
12    submitted in support of a petition ends up.  Because
13    you said previously those go into Sentinel, too.
14         A.   It goes to Sentinel.
15         Q.   Okay.  All right.
16              MR. FROMMER:  All right.  You know, I
17         think that's it.  I think I have what I need.
18         I will say thank you so much, Special Agent --
19         Supervisory Special Agent Murray for coming.  I
20         really appreciate it.  I hope not to have to
21         bring you back, but there were a lot, as you
22         know, Victor and I had some back and forth
23         about attorney-client privilege and whether
24         that was appropriate.  It might be that I need
25         to bring you back depending on how that
```

Exhibit O
1587

ER-545

Page 131

1          resolves itself.  But for today, we're all

2          done.  Thank you so much for your testimony.

3          It's been very, very helpful.

4                  THE WITNESS:  Thank you.

5                  MR. RODGERS:  Thank you.

6                  (Discussion off the record.)

7                  MR. RODGERS:  I believe so.  But, quite

8          frankly, I have to have my paralegal get in

9          touch with you.

10         (The deposition concluded at 3:04 p.m. PDT)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit O**
**1588**

**ER-546**

```
                                              Page 132

1                    CERTIFICATE OF OATH

2

3

4

5

6              I, the undersigned authority, certify

7

8     that SUPERVISORY SPECIAL AGENT JESSIE MURRAY

9

10    appeared remotely before me and was sworn on the

11

12    11th day of July, 2022.

13

14              Signed this 13th day of July, 2022.

15

16

17

18

19

20              _____

21

22              KIMBERLY FONTALVO, RPR

23              Notary Public, State of Colorado

24              My Commission No. 20214007135

25              Expires: 2/23/2025
```

Page 133

1                    CERTIFICATE OF REPORTER

2

3         STATE OF COLORADO

4

5                    I, KIMBERLY FONTALVO, Registered

6         Professional Reporter, do hereby certify that I

7         was authorized to and did stenographically report

8         the foregoing remote deposition of SUPERVISORY

9         SPECIAL AGENT JESSIE MURRAY; that a review of the

10        transcript was requested; and that the transcript

11        is a true record of my stenographic notes.

12                   I FURTHER CERTIFY that I am not a

13        relative, employee, attorney, or counsel of any

14        of the parties, nor am I a relative or employee

15        of any of the parties' attorneys or counsel

16

17        connected with the action, nor am I financially

18

19        interested in the action.

20

21                   Dated this 13th day of July, 2022.

22

23

24

25                   KIMBERLY FONTALVO, RPR, CLR

Page 134

1    Victor Rodgers, Esquire

2    victor.rodgers@usdoj.gov

3                          July 14, 2022

4    Snitko, Paul Et Al  v. United States Of America Et Al

5        7/11/2022, Jessie  Murray (#5312932)

6        The watermarked transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 135

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Jessie  Murray (#5312932)

3            E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Jessie  Murray                              Date

25

Page 136

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Jessie  Murray (#5312932)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Jessie  Murray, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____     _____

12   Jessie  Murray                           Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

[0 - acknowledgment]

| 0 | 2 | | 8 |
|---|---|---|---|

**0**

**0** 85:21
**04405** 1:2

**1**

**10** 3:16 11:15,18
13:3,9,16 85:22
86:2,9,12,15
**10,000** 108:21
**100,000** 118:21,23
**10:00** 1:18
**10:09** 9:20
**10:53** 38:13
**11** 1:18
**113** 3:7
**114** 3:8
**11:01** 38:13
**11:20** 49:4
**11:27** 49:4
**11:53** 65:23
**11:54** 66:14,19
**11th** 132:12
**12** 3:18 10:14,20
**120** 3:20
**12:59** 66:19
**131** 3:9
**132** 3:9
**133** 3:10
**134** 3:10
**13th** 132:14
133:21
**14** 134:3
**14th** 2:10
**15** 3:20 121:17,19
121:20
**17** 16:25
**17th** 17:7
**1994** 16:13
**1995** 16:25
**1:00** 66:15

**2**

**2/23/2025** 132:25
**20** 58:22 60:25
61:1,1,21 62:1
108:15 121:25
136:15
**200** 4:13
**2019** 11:22
**2020** 67:3,5,8
68:21 72:13,24
73:6,6 74:11 75:7
75:10,19 76:3,19
76:22 80:20 82:14
83:4 113:17 115:5
**2021** 4:21 70:24
72:9,16 76:19
77:19 121:10
**20214007135**
132:24
**2022** 1:18 132:12
132:14 133:21
134:3
**22203** 2:6
**24/7** 97:18
**25** 58:6
**2:15** 110:3
**2:21** 1:2
**2:56** 128:18

**3**

**3** 3:4 94:1
**30** 1:16 3:18 10:16
11:7 13:4 14:14
15:1 134:17
**302** 99:4
**302s** 101:25 102:6
102:16
**30th** 10:15
**312** 2:10
**3190** 133:24

**3:00** 128:18
**3:04** 1:18 131:10

**4**

**4** 94:1
**400** 106:4 117:25
118:1 121:5,7
**4000** 4:12
**45** 47:2

**5**

**5,000** 38:1,3 44:22
45:22,25 94:24
96:6,10,11 105:12
106:18 107:17
109:17,20
**50** 95:2
**500** 119:21
**52** 15:19
**5312932** 134:5
135:2 136:2
**58** 93:25,25 98:14
98:15
**59** 96:21

**6**

**6** 1:16 3:18 10:16
11:7 13:4 14:14
15:1

**7**

**7** 3:15 92:18,19
**7/11/2022** 134:5
**71** 57:18 58:3 59:6
60:2,3,4,16,23
61:25 64:1 118:2
120:1
**71s** 116:20 117:3
117:17 118:1,24
119:12,24 120:6
**73** 3:5
**74** 3:6

**8**

**8** 11:15,18 13:3,7
13:15
**85** 3:16

**9**

**9** 3:18
**900** 2:6
**90012** 2:11
**901** 2:6
**91** 3:15
**92868** 4:13
**95** 17:2
**96** 11:25

**a**

**a.m.** 1:18 38:13,13
**able** 8:15 10:5
13:3 23:5,7,12
84:18 90:20
108:14
**accepted** 16:22
**accomplished**
123:11
**account** 35:7,13
35:15,18 64:6
74:6 90:18
**accrue** 116:5
**accuracy** 134:9
**accurate** 8:9,16
18:12 22:13 25:2
29:23 40:4 45:19
45:22 46:11 47:11
49:19 52:5 64:1
69:1,12 76:13
80:12 103:9 119:6
120:9 130:2
**accurint** 41:15,16
**acknowledgement**
136:3
**acknowledgment**
134:12

**acquisition** 42:8
**act** 17:24
**acting** 1:8
**action** 4:18 13:12
32:14 133:17,19
**actions** 76:12
119:13
**activities** 61:22
84:25
**activity** 22:11
29:13 39:17 42:15
43:11,13 58:19
60:11
**actual** 72:8 93:9
110:19
**adachi** 19:21
**add** 9:10
**additional** 9:7
32:1,21 39:4,22
40:1 49:11,13,17
51:3 103:1,4,8
104:18,19 110:15
**additions** 136:6
**address** 4:11
**addresses** 41:19
**adjourn** 9:16
**admin** 47:13 97:1
97:8,18 106:9
**administrative**
13:7 14:5 20:5
21:5 23:18 25:18
26:2,7,10,20,25
27:12,16 28:4,10
29:23 32:13 38:21
41:24,25 42:5,19
43:9,18 44:7
46:14,15,17,25
47:5,19 52:24
53:3 63:22 64:3
97:6 100:7,19
104:11 105:3,13

105:15,19 106:2,9
106:19 107:1,18
108:9 121:9 122:6
124:14 125:1,9,25
126:15 127:3,6,10
127:22 128:25
129:12
**administratively**
21:3
**administrator**
1:25 104:9
**adoche** 19:22
**advice** 74:25 85:9
**advise** 74:24 84:7
**advising** 68:15,17
**aff** 56:24 61:18,19
62:2
**affidavit** 28:15
71:10 76:5,9,16,21
77:2,15,22 78:1,6
78:8 79:14 103:23
**affidavits** 22:4,5
**afmls** 64:12
**afterward** 90:21
**age** 15:18
**agencies** 13:11
56:2,12,15,17
57:10,11,14,24
58:4 59:3 60:9
63:13,15,15 65:16
73:15 74:8 85:3
113:8,9,15,16,17
113:20 114:13,21
114:23 116:2,8,21
116:24 117:17,24
118:9,23 120:3,18
**agency** 51:14,15
56:4,9,11 58:3,14
58:21,25 59:10,22
60:24 61:25 63:2
64:7 68:2,5,11,11

113:7 114:4
**agent** 1:15 3:3,16
11:23 12:1,10
16:20 17:11 18:7
18:8,10,15 23:24
23:25 29:10 38:16
40:12,16 59:21
66:18 67:13 71:23
72:12 86:14,18
92:24 94:12 95:20
98:5,10 99:5,24
100:17 101:24
103:13 108:14,18
108:19,19,23,24
130:18,19 132:8
133:9
**agent's** 25:16
**agents** 18:11,21,25
19:2,3,7,8,12,13
19:25 21:13,16,16
22:7 24:1,7,14,14
25:20 27:4,5 28:9
30:24 32:1 38:23
39:20 40:11,12
41:13 44:12 70:8
81:8,13 83:25
84:7,16 87:9 94:4
94:7 95:17 96:23
97:13,16 107:21
108:1,3,5,7 109:14
109:15
**ago** 6:24 82:18
84:4 96:8
**agree** 91:20
**agreed** 58:5
**agreement** 57:25
58:13,20
**agrees** 43:20
**ahead** 68:6 69:22
73:9 77:8 88:25
111:3 116:15

**al** 1:4 134:4,4
135:1,1 136:1,1
**alley** 17:14
**allotted** 134:20
**allow** 75:2 126:6,6
**almonte** 117:1
**altogether** 26:16
**ambiguous** 25:5
37:25 44:5 47:17
49:10 50:21 60:20
61:5 79:9
**amended** 3:18
10:15,22 11:7
13:4 14:14,16
15:1
**amendment** 18:3
**america** 1:7,16
134:4 135:1 136:1
**amount** 37:21
51:2 64:2 88:16
105:12 117:21
118:22
**amounts** 64:8 89:2
**analysis** 79:18,20
80:5
**angeleno** 15:23
**angeles** 2:11 11:21
12:4,7 13:22
15:20 18:17 25:11
68:19
**annual** 12:17
**answer** 3:5,6,7,8
5:20 7:1,18,20,21
7:22,23 8:4,12,21
8:22,23 9:1,16
10:3 11:11,14
25:6,8 44:6,19
68:6 69:22 70:21
75:15 77:8 78:23
80:1 111:19
112:16,23 113:22

**[answer - back]** Page 3

117:8 124:19 125:20 126:7,21
**answered** 9:6
**answering** 5:19 6:16
**answers** 5:14 6:19 15:9,9 30:3 62:18
**anybody** 56:16 81:12
**anymore** 35:6
**apologize** 119:12
**appearances** 2:1
**appeared** 118:12 132:10
**appearing** 11:10
**appears** 87:11 89:23 108:21
**appended** 136:7
**applicable** 134:8
**application** 16:18
**applied** 16:19
**applies** 63:12
**apply** 101:1
**applying** 71:4,20
**appointment** 10:2
**appreciate** 130:20
**appropriate** 63:17 63:20 130:24
**approve** 62:1
**approved** 56:6 60:24 124:14,21
**approximately** 12:10 77:18 127:22
**area** 87:15
**arlington** 2:6
**arranging** 20:21
**arrest** 28:18 29:8 31:13 42:11 85:1
**arrests** 17:14

**aside** 70:20
**asked** 68:23 69:9 74:23 114:13,19 114:20,21,22,24 115:9 119:11
**asking** 5:12 21:24 36:4 54:12 58:8 59:20 68:18 74:16 74:17,19 79:18 118:15,24 120:9 120:22 121:1 124:7
**aspect** 95:20
**assembling** 20:11
**assessment** 88:21
**asset** 2:9 11:20,24 12:1,9,14,17,23 18:16,20 19:4,7 20:3,5,10 21:13,16 22:7,22 23:1,4,25 24:1,7,25 25:9,10 27:2,11 29:12,14 30:12,13 34:8 35:1,6,14,18,23 36:5,23 37:3,6,9 37:16 38:19 39:7 39:11 40:12 42:1 42:2,6,14,16 43:12 43:19 44:13 45:2 45:12,15,15,17,18 46:4,8,9 47:8 52:22,23,24 53:12 53:13,18 55:10 56:1 57:19,22 61:12,16 63:7,14 64:17,19,22,25 65:10,17,17 68:19 69:24 70:1 73:14 74:9 80:25 83:19 84:5 85:15 87:14 91:7,7,9,11,12,18

94:4,7,11,14,18 95:14 97:9,23 98:6,21,23 100:21 101:17 102:5,18 104:17 107:14,14 108:13,16 109:21 116:5 117:14,16 117:18 118:6,8,10 118:14,15,18 119:4,5,17 120:2 122:16 123:15 124:1 125:16
**assets** 20:18 21:25 22:2,10 34:7,25 36:16 68:3 78:11 78:13,14,24 79:5 79:17 80:3,15 81:4 83:8 84:21 99:10 103:25 104:4 117:10,12 117:15,23 119:19 120:19,24 124:3 124:13
**assign** 44:7,20
**assigned** 94:19 95:13 118:17
**assigning** 101:19
**assist** 5:14
**assistance** 58:17
**assistant** 1:10 2:9 64:13
**associated** 102:17
**assume** 7:24 26:24 89:23
**assumes** 53:10 58:10 99:1 112:14
**assuming** 28:24 32:25 72:25 109:9 130:8
**attached** 110:22 134:11

**attachment** 93:8
**attachments** 87:1
**attempt** 29:7
**attempting** 38:24 39:25
**attend** 12:21
**attorney** 1:8 2:9 4:16 8:18 64:13 74:14,18 75:1,17 113:21 114:16,19 115:3,10,15,20 130:23 133:13 134:13
**attorney's** 20:19 47:23 48:6 63:23 64:5 73:17 125:10 126:2,24 129:16 129:20 130:1,6
**attorneys** 20:23 114:24 115:13 133:15
**audibly** 5:16
**authored** 93:17
**authority** 14:4 132:6
**authorized** 133:7
**available** 134:6
**avoid** 17:24 18:2
**aware** 63:7 112:6 112:17,23 116:7

**b**

**b** 1:16 3:18 10:16 11:7 13:4 14:14 15:1
**back** 7:12,13 11:25 17:8 20:25 38:15 44:2 49:5 61:14 66:12,13 67:8 76:1 98:14 101:13 102:15 110:8,15 112:22

113:3 118:16
121:13 124:25
126:12 128:23
130:21,22,25
**background** 15:11
67:22
**bad** 6:7 88:8
**bag** 94:19,21
95:15 107:20,22
108:15 109:17
**bagged** 94:25 95:3
95:4,6,9,11 96:8
96:12 107:12
**bags** 94:23 95:15
95:16,18,22
101:19,22 107:25
**ballpark** 121:2
**bands** 88:4
**bank** 22:1 34:15
35:7,12,18 40:22
51:4 90:17
**bare** 110:17
**barely** 93:22
**bars** 107:11
108:15
**base** 83:10,17
**based** 42:12 51:9
57:20 58:14,21
79:15 103:22
123:17
**basically** 18:9
29:16 30:21 97:14
98:19 106:17
**basis** 23:14 120:15
**batches** 102:8
**battery** 43:24
**behalf** 2:3,8 11:10
**belief** 65:17
**believe** 13:2 29:12
29:19 39:15 43:12
50:24 67:2 89:20

90:5 96:1 124:4
124:13 131:7
**believed** 123:25
**believes** 43:10
**belong** 97:17
**bequeathed** 51:2
**best** 6:18 13:25
22:21 84:7,8
**better** 22:21 49:17
92:16
**beverly** 117:1
**beyond** 25:5 26:17
30:7 31:3 34:5,23
36:14 37:1,24
38:25 40:20 44:4
48:19 49:10 50:5
50:19 51:17 52:18
53:9 54:19 60:18
63:3 77:6 78:20
79:24 84:10 99:2
100:5 111:1,1,15
111:16 112:10,11
125:18 126:25
128:1
**big** 73:20 93:8
96:23 113:7
**bill** 89:3
**bit** 17:8 18:18
32:10 57:7 66:22
66:23 80:21 84:4
91:3 99:21 102:13
109:25 113:2
125:1 128:24
**body** 101:17
**bold** 91:14
**bolster** 89:9
**bolts** 17:11
**bones** 110:17
**book** 10:2
**born** 15:22

**bottom** 94:3
**box** 3:15 72:18
80:4 82:3 86:25
87:3 94:20 100:2
100:3,18,19,25
101:21 102:22,25
103:19,19 104:18
104:23,23,24
105:11 106:10
107:8,15 108:19
108:20 109:16,16
118:2 124:21
**boxes** 69:11,19
70:17 71:5 72:1
75:12,23 77:1
78:3,17 79:1,4,22
80:11,16 81:9,25
96:19 100:3,18
101:1 102:10,14
102:20 104:3
105:16 106:4
107:10 117:6
124:2
**break** 8:5,6 9:13
9:17,22 38:11
110:7
**bring** 32:13 109:2
109:17 130:21,25
**broad** 36:4
**brought** 23:4
95:22
**budget** 62:4,4
**bunch** 108:20
**bundled** 81:20
87:10,17 88:4,9,14
88:19 90:12
**bureau** 1:11,16
**business** 103:24
103:25 104:4
**button** 118:7

**buttress** 40:2,17

**c**

**calendar** 10:1
**california** 1:1,9
2:11 4:13
**call** 27:3 50:16
67:10 68:13,16
69:4 72:2,5,7,14
72:21,22,22 73:5
73:20,24 74:12,14
74:20 75:7,10,11
75:19 80:22 82:12
83:24 102:13
105:22 107:22
113:6 114:14
**called** 65:9 67:21
68:22 87:7 125:3
125:4
**calls** 27:18 37:2
39:1 40:19 50:6
50:20 52:19 54:19
63:4 72:25 73:21
77:5,11 97:11
98:8 99:2 112:15
113:18 121:4
124:18 126:3,17
127:12,13
**campbell** 19:10
**canine** 91:4,4,4,21
92:5,9
**capable** 68:20
69:23 70:2
**capacity** 1:8,10
68:24 69:10,17
**caps** 95:13
**capture** 23:5
**car** 39:9
**care** 56:8
**careful** 5:25
**case** 1:2 14:6 19:3
20:2 21:2,23

[case - complete]                                                                    Page 5

26:14 29:22 44:12
45:8 54:24 63:22
63:23 68:3 97:13
97:15,16,19 98:10
98:10 104:25
114:11 123:9,11
123:24 124:11
125:9,12 128:5
129:13,17,19,21
**cases** 54:22 86:24
88:13,13 91:9,12
123:5,7,12 124:21
126:22 127:3,23
**cash** 35:20,21,22
36:1,5 44:22,22
45:22,25 46:2
52:17 87:7,10,16
88:2,9 89:17 90:2
90:3,5,8,9,10 94:6
96:25 98:4 106:16
106:17 109:17
**cats** 35:22,25
36:11,13 44:8,16
44:20,22,24 45:2,9
45:13,16 46:1,5,10
94:6,19,21 95:23
96:3,15 101:19,20
101:23 102:23
109:3,5,17,20
118:11,13,16,20
120:2,3,24 121:7
124:3
**cause** 27:21 28:18
29:8,12,19 30:11
30:21 31:12,23
32:6,16,17 39:8,16
39:22,23 40:3,6,18
42:9,13,14 43:7,10
43:12 44:11 50:8
50:24 53:20 76:6
76:11 77:3 78:2

78:10,18 79:6,16
79:20 80:3,9,14
84:23 87:23 88:1
88:20 89:9,19
90:5 91:1 92:1
99:6,9,10,14,15
100:22,23 102:21
103:5,11,18,19,22
104:20 105:2,7
123:22 124:1,4
**central** 1:1,8
**certain** 57:19 58:1
58:14 60:17 117:4
117:21 118:22,24
**certainly** 70:21
**certificate** 3:9,9
132:1 133:1
**certify** 132:6
133:6,12
**cetera** 51:5
**challenge** 4:19
**chance** 10:18
23:19 86:15
**change** 135:4,7,10
135:13,16,19
**changes** 24:7
134:10 136:6
**characterize** 33:17
**charge** 67:14
71:23 72:12 95:20
97:15
**check** 56:7
**checks** 40:24 41:2
**chemical** 89:15
**chemicals** 89:18
**chief** 64:12
**circulating** 127:24
**circumstance**
129:10
**circumstances**
6:10 30:25

**civil** 14:4 63:21,22
64:3,4 68:25
69:10,17 70:11
71:25 72:18 75:8
75:11,22 76:25
78:2 84:1,9,17
85:10 105:15
115:4 125:9,12
**claim** 47:9,15,20
48:15 53:23 125:4
125:5,8,16 129:7,8
129:11,13,19,23
129:24,25 130:3,3
130:4
**claimant** 47:14,14
48:10 54:11
**claimants** 20:23
53:22
**claims** 53:9
**clarification** 9:7
**clarify** 7:13
**class** 4:18 53:10
**classify** 91:14,16
**clean** 97:7
**cleaner** 48:13
**clear** 6:2 71:1
**clearly** 5:15 21:15
75:15
**client** 74:14 75:1
75:17 114:16
115:10,15,20
130:23
**close** 22:8 72:7
93:8,11 107:22
**closely** 22:7
**closer** 17:8 80:21
**clr** 1:24 133:25
**coffee** 89:15,18
**coin** 107:9,10
**collect** 33:1,9 81:8
90:20 92:10

128:15
**collected** 46:2
83:12 99:21 100:2
100:17,25 123:18
**collecting** 20:11
33:4,13,18,18
99:23 101:24
**collects** 42:3
**college** 16:3
**colorado** 132:23
133:3
**come** 39:7 53:22
66:12 101:12
102:8,10 107:22
109:20 123:16
**comes** 26:11
129:13
**coming** 102:11
103:12,13 130:19
**commission**
132:24
**common** 22:15
**communicate** 97:5
109:1
**communicated**
97:1
**communicating**
20:23 102:24
**communication**
75:2 114:19
115:11
**communications**
20:20 75:17
115:20
**company** 70:15
78:15 125:15
**company's** 79:21
**compiling** 95:15
**complement** 70:1
**complete** 7:23 8:9
8:15 85:14 136:8

| | | | |
|---|---|---|---|
| **completed** 49:11 134:17 | **considers** 63:25 | **copy** 10:22 92:17 | 89:25 90:6 91:24 |

completed 49:11
134:17
completely 7:2
completion 85:5
computer 44:10
111:20
concerning 4:19
115:20
concluded 127:16
131:10
conclusion 50:6,20
52:19 53:15 54:20
78:5 126:4,18
127:13 128:4
conduct 31:9 32:1
32:25 48:21
conducted 42:2
conducting 33:8
38:22 40:15
104:18
conducts 41:23
49:25 51:20
conference 72:2,5
72:14,21,22 73:24
conferences 12:18
confidential 58:16
confused 21:10
29:2 30:19 34:2
44:17 53:18
103:17
conjunction 21:17
21:21 64:20
connected 39:16
133:17
consequence
120:8
considered 74:2,4
104:3
considering 31:1
79:1,3

considers 63:25
consistent 97:3
constantly 5:4
constituent 13:11
65:15
constitutional
17:22,23
contact 62:14
84:23
contained 80:10
107:11
containing 108:15
contains 64:15
contemplating
84:16
content 115:1
contents 70:16
75:1,16,23 79:1,4
80:4,16 95:11
103:25 114:18
context 44:25
continue 48:7
125:11
continues 52:25
53:13
continuing 39:3
contour 115:15
contributed 57:21
58:17 59:16 114:5
controlled 35:16
conversation 5:25
6:10 9:25 73:7,12
74:7,11,20 81:10
81:21 82:4,17
115:1
conversations
71:8,9 72:17 73:1
81:16,18 83:24
copies 102:6
129:14 134:14

copy 10:22 92:17
98:21,22 99:4
129:16,24,25
130:4,5,7
correct 12:4,24
15:1,4,5 21:18
23:3 24:17 25:6
25:15,19,24 26:4
32:3 48:2 53:7
59:5 63:2,14
70:18 74:3 77:15
87:4 91:24 92:6
92:13 94:8 96:4
96:16,17 109:12
117:19 119:1
121:10 122:17
123:18,23 124:16
125:7 126:2 136:8
corrections 136:6
cost 37:7,15
costly 37:7
counsel 14:25
52:10 133:13,15
134:14
couple 66:7,10
course 114:23
court 1:1 4:1 5:13
5:15,22 6:1,12,24
7:6,11
cracker 107:8
create 93:20
created 46:11
98:23
criminal 19:3,5
21:17,21 22:2,9
23:15 29:13,20
32:11 39:17 40:11
41:3 42:15 43:13
44:12 46:3 67:18
67:21 73:14 87:18
88:3,11 89:10,20

89:25 90:6 91:24
96:25 98:5 102:24
103:3,7,12
cross 6:9 60:5
cs 134:15
currency 34:14,14
34:16,20 35:3,6,10
35:12,23 36:10,16
37:21,21 38:1
45:1,3 55:8,9
81:14 89:3 91:1
91:22,23 94:24
95:5,9,10 101:23
105:12 106:24
107:5 118:11,21
currently 11:20
custody 20:21
28:25 29:17,18
34:7,25 35:5
52:22 53:14
customers 103:21
cut 37:20 88:25
cv 1:2

**d**

d 3:1
d.c. 26:9,11,21
73:18 122:14,17
122:20
dag 57:18 58:3
59:6 60:2,3,4,16
60:23 61:6,25
63:16 64:1 116:20
117:3,13,17,20
118:1,2,4,24
119:12,16,24
120:1,6,20
dag71 59:10
dags 57:23 120:12
daily 120:15
dash 15:16

**database** 40:23
41:2,4,8,9 44:10
102:23 119:16,22
120:13,20 129:18
129:21
**databases** 41:13
**date** 69:3 72:3
82:21 84:24
121:25 135:24
136:12
**dated** 133:21
**dates** 121:11
**day** 54:5 85:3
101:8 132:12,14
133:21 136:15
**days** 47:2 97:18
101:4 117:21
134:17
**dea** 57:11 59:4,9
59:14,14,14 114:6
117:1
**deadline** 127:20
**deadlines** 123:10
**dealing** 89:2
**deals** 126:4
**decent** 70:7
**decide** 27:14 28:9
28:20 42:4 43:8
48:6 104:8 125:11
**decided** 29:10,14
43:17
**decides** 50:3
**deciding** 28:3 49:2
49:7 50:17 51:15
104:6
**decision** 23:8
26:25 27:5 28:25
29:6 33:24 42:13
42:18,25 43:16,21
50:1,14 51:12,24
64:4,6,14 106:11

106:12
**decisions** 26:24
**declaration** 55:12
55:17,21 56:18
57:5,9 61:8,18
63:9 119:7
**declare** 136:4
**declared** 56:3
**deemed** 136:6
**deeply** 21:4
**defendants** 1:12
2:8 21:1
**definite** 89:5
**degree** 16:9,15
**demands** 24:8
**denied** 51:22
52:14 53:12 54:5
**denies** 53:5
**deny** 50:1 51:15
53:21
**depending** 7:10
130:25
**depends** 22:16
28:13 63:21 64:2
66:9
**deponent** 134:13
136:3
**deposed** 5:6
**deposing** 134:13
**deposit** 35:12 51:5
69:11,19 70:16
72:1 75:12,23
77:1 78:3,17
79:22 80:11 81:9
94:20 104:3
**deposited** 34:15
35:7,21,22,24 36:2
90:17 117:16
**deposition** 1:14
3:19 4:23 5:1 6:11
10:15,23 11:8

14:12,14,20 26:18
34:24 37:25 77:7
85:23 100:6
111:17 127:1
131:10 133:8
**describe** 11:17
12:16 18:20 21:14
28:8 80:24 122:3
**description** 18:12
20:17
**deserve** 61:21
**desk** 54:24 119:22
120:14
**determination**
30:10 39:21 40:18
45:14,17 46:10
52:3,10 54:25
55:3,6 63:19
64:10 76:5 78:10
79:7 99:13 103:10
103:18,19,20,22
104:10,20 105:2
105:20 106:8
107:21 108:1
**determinations**
28:7
**determinative**
89:8
**determine** 32:2
38:20,24 39:15
46:20 76:10 78:1
87:25 92:1 106:7
106:25 108:14
**determined** 42:10
46:8 50:8 68:10
76:3 79:15 80:8,8
80:14 105:6
**determines** 30:5
63:25
**determining** 29:18
89:19 108:8

**differ** 19:24 48:25
**different** 12:18,19
12:19 72:25 73:1
75:7 80:5 97:22
106:22 115:23
118:1,1 120:1
**difficult** 8:11
**direct** 3:4 4:7
**directed** 75:4
**direction** 83:18
**director** 1:10
**disagreement** 43:4
**disagrees** 43:5
**disappear** 92:4
**disapprove** 124:15
**disbursements**
63:8
**disclose** 75:1,16
**discuss** 13:3 27:6
75:6 113:15
**discussed** 69:5
71:11
**discussing** 63:12
65:18 68:7 70:10
71:24 72:5 75:11
82:6 115:3
**discussion** 18:2
43:25 49:3 69:7
71:22 86:8 131:6
**discussions** 71:3
71:12,20 81:7,24
**disposition** 13:10
13:10
**distinction** 78:14
**distribute** 119:5
**distributed** 61:7
**district** 1:1,1,9
**dmv** 41:15
**doctrine** 126:5
**document** 10:19
11:4 64:15,24

**Exhibit O**
**1600**

[document - fair]  Page 8

65:8 86:11,17 92:25 93:4 112:2 122:1,3,15

**documentation** 49:14 50:9 51:1,4

**documents** 10:1 14:15 15:3 110:22 110:24 111:14,23 111:25 112:2,7 129:7,9

**dog** 95:24 96:1,2

**doing** 12:14 17:6 17:13 20:15,24 21:20 33:13 94:15 101:18 104:13,15 104:23

**doj** 65:7

**dollar** 88:16 107:9

**dollars** 37:5,8 57:6 57:8,15 60:13,17

**doris** 19:10

**draft** 76:4,18 77:22

**drafted** 93:17

**drafting** 102:21

**drive** 4:13

**drug** 50:24 51:7 87:11 88:13 89:23

**drugs** 88:17,18

**duties** 55:20

**e**

**e** 2:5 3:1 135:3,3,3

**earlier** 9:8 49:1 125:5

**early** 22:23 23:16 23:22 76:19 77:19 83:11

**easier** 57:7

**educational** 16:1

**effected** 31:6

**effecting** 72:6

**efficient** 5:11

**effort** 29:5

**eight** 101:10

**either** 7:11 12:20 21:24 29:20,20 43:19 89:8 95:24

**employee** 133:13 133:14

**employees** 70:2

**employer** 116:17

**encompassed** 64:1

**ended** 77:14 83:21 96:10

**ends** 130:11,12

**enforcement** 64:7 84:25

**ensure** 84:18

**enter** 94:5

**entire** 103:21

**entitled** 116:4

**entity** 103:21 124:9

**equaled** 101:21

**errata** 3:10 134:11 134:13,17

**erratas** 134:15

**esq** 2:4,5,5,10

**esquire** 134:1

**essence** 134:11

**established** 69:24

**estimate** 77:19 82:13 116:15

**estimated** 96:5

**et** 1:4 51:5 134:4,4 135:1,1 136:1,1

**evaluate** 76:8

**evaluated** 78:6,7

**evaluating** 104:7

**events** 31:22

**everybody** 43:20

**evidence** 9:3 20:8 20:12 32:10,12,18 32:19 33:1,5,10,13 33:18,18 36:6,12 36:17 45:9,10 46:4 50:9 53:11 58:11 73:19 79:6 79:10 81:7 89:8 94:4,5 96:13 99:1 100:2,16,25 103:8 104:7,8,14,19 105:9 107:12 108:14 112:14

**exact** 7:5 114:25 121:11

**exactly** 17:1 55:22 57:3 68:15

**examination** 3:2 4:7

**example** 39:12 41:3 92:2

**excuse** 116:3

**execute** 17:17 31:19 73:4 80:23 81:1,3 97:4

**executed** 81:4 102:5

**executing** 22:5 39:6

**execution** 3:10 4:19 42:11 71:18 72:4,8,15 73:3 80:22 93:11 101:15 102:3 115:18

**executive** 24:11

**exhibit** 3:15,16,18 3:20 10:12,14,20 11:19 85:18,20,21 85:22 86:2,9,12,15

**92:15,18,19 99:6 121:16,19,20

**exhibits** 3:12

**exhibitshare** 85:25 86:5

**existing** 39:23 99:15

**expect** 31:20

**experience** 31:11 87:15

**expert** 91:7,14,17

**expire** 54:2

**expires** 132:25

**explain** 34:1,3 44:18 58:9 87:20 88:9 89:14 124:25

**explanation** 42:22 50:22

**explicit** 23:2

**explore** 96:7 104:12

**extent** 44:6 100:9 113:19

**f**

**facilitate** 84:1 85:9 85:13

**facility** 92:6

**fact** 7:4 32:22 74:25

**factor** 87:19,21 89:6 91:25 105:7

**factors** 58:15

**facts** 27:20 28:19 30:25 39:11 50:7 50:8 51:9 53:10 58:10 59:20 67:11 68:18 82:20 85:16 99:1 112:14

**fails** 134:19

**fair** 14:7 23:20 25:13 26:12 32:14

33:2,7,11 70:13
74:1,6 76:23 88:2
90:3,6 91:9 94:12
100:1 106:20
107:13,19 109:22
110:10 111:12
114:9
**faith** 7:23
**fall** 73:5,6,6 74:7
74:11,11 75:7,10
75:19 76:3,22
80:20,20 82:13
113:8,17 115:4
**familiar** 25:2,13
25:17,21 55:13
60:8 93:6 97:15
98:10 122:1
**familiarity** 55:24
91:17
**familiarize** 10:18
92:25
**far** 35:17
**fbi** 11:22 12:3,4,7
12:14 13:5,6
16:18,20,23 17:3
17:11,21 18:21
19:13 26:16,19
27:10,15 28:24
42:21 44:10 47:13
47:19 48:16,18
52:4 53:5 55:15
55:16,17 57:11
58:21 59:4,24,24
59:25 60:10,15
61:2,2,14,20 62:3
62:3 63:22 64:3
65:1,2,6 67:21
68:4,24 73:19
75:21 80:23 93:25
94:4 105:13,22
106:13,19,19

111:14,20 122:6
127:24 129:18,24
**fbi's** 38:3
**february** 77:20
**federal** 1:11,16
56:14,17 60:9
63:12,15
**federals** 73:16
**feel** 78:17
**felt** 76:11
**field** 12:7 13:13
18:21 26:15 42:21
42:24 43:2,4,19
47:21 51:19 52:2
55:15 59:23 60:11
60:15 61:3 62:4
63:1 68:24 69:9
69:16 70:11
104:11 105:21
106:11,15 120:7
123:12
**figure** 20:9 40:14
44:8 46:22 50:2
50:14 62:5 79:13
80:19 108:23
113:14 119:24
**figured** 5:6 71:1
93:22
**file** 47:8 53:22
61:7 110:10,17
111:8,13 125:15
129:1,6,13
**filed** 53:3,3 110:23
119:24 125:5,9
129:9,19,25
**files** 10:5 47:13,14
48:10,15 129:14
**filing** 47:20 48:14
53:5 129:6
**fill** 46:15 59:6
60:16 129:14

**filled** 87:2
**filling** 44:15 54:10
**fills** 122:12
**final** 54:24 55:3,6
57:4,9 64:4,6,13
76:4
**finalized** 76:20
78:8 103:23
**finally** 102:15
**financial** 40:23
**financially** 133:17
**financing** 39:10
**fincen** 41:8,14
**find** 22:18 31:21
32:12 39:4 45:25
49:12
**fine** 6:11 7:19,19
8:2 9:9 10:24
33:22 65:7 74:22
91:15,15 100:8,10
100:12 101:4
128:11
**finish** 6:15,19 8:4
9:14,16 16:7 49:7
127:19
**firm** 4:17
**first** 49:8 67:1,9
73:11 76:18 82:9
82:12 84:20
**fit** 89:3
**five** 11:25 17:8
38:11 64:11,12
109:24 110:2
128:14
**floor** 2:10
**flow** 6:9
**focus** 73:7
**focused** 13:12 73:3
**follow** 39:9
**fontalvo** 1:24
132:22 133:5,25

**foregoing** 133:8
136:5
**foremost** 14:4
**forfeit** 23:8 29:7
31:2 54:12
**forfeitable** 29:21
32:11 40:3 43:11
53:20 87:18 89:21
91:1 99:11 108:9
**forfeited** 39:17
54:6 55:7,9 56:4
58:1 61:22 63:14
63:24 117:5,15,19
117:23 118:25
119:5
**forfeiture** 2:9 3:20
11:21,24 12:1,9,14
12:17,23 13:8,10
14:4,6,7 18:16,20
19:4,7 20:5,10,13
21:5,16 22:7,11,13
22:22 23:4,18,25
24:2,7,25 25:3,9
25:11,14,18 26:2,7
26:10,20 27:1,2,13
27:16 28:4,10
29:1,14,23 30:6,12
30:22 32:2,13
33:11,24 34:2,4,8
34:12,22 35:1,15
35:18 36:6,23
37:3,6,9,12,23
38:20,21,21 40:12
41:25 42:5,16,19
43:1,9,14,18 44:13
45:15,18 46:5,9,14
46:15,17 47:1,5,19
48:2 49:8 51:23
52:9,23,24 53:3,7
53:13 54:3,16,17
54:22 55:10,12,18

Exhibit O
1602
ER-560

55:21 56:1,13,14
56:18,23 57:5,9
58:5 59:12 60:1
60:13 61:8,12,16
61:19 62:12,15,25
63:7 64:17,19,22
64:25 65:10,17
66:22 68:19,25
69:10,18,25 70:2
70:11 71:25 72:18
73:14,17 74:9,10
75:8,12,22 76:12
76:25 78:2,18
79:17 80:10,25
83:13,19 84:1,6,9
84:17 85:10,15
87:14 90:9 91:7,8
91:9,11,12,18 94:4
94:7,11,14 97:9,23
98:6,21,24 100:3,8
100:19,22 101:17
102:6,19 103:6
104:10,11,17
105:3,14,16,19
106:2,9,10,20
107:1,14,18
108:10,13,16
109:21 115:4
116:5 117:16
119:7 121:10
122:6,16,18,22,24
123:3,12,15,22
124:1,5,10,12,14
125:2,6,17,25
126:16 127:3,6,10
127:23 128:25
129:12
**forfeitures** 60:12
63:9
**forgetting** 57:13

**form** 3:17 56:6
57:18,18 59:6
60:5 87:2 90:16
100:17 118:4
**forms** 56:5 99:25
101:25
**forth** 130:22
**forward** 27:4
29:14 30:6,22
32:2 42:10,16
53:22 68:1 76:11
76:24 79:16 103:6
105:3,7 124:22
127:4,7
**forwarded** 3:10
51:22 126:1
**foundation** 51:18
52:20 54:20 58:12
63:4 79:25 83:6
83:16 97:12,25
98:8 99:1 111:18
112:14 120:11
121:4 124:18
127:14
**four** 11:25 17:5
19:17 24:16 57:24
58:6 87:7
**fourth** 16:4 18:3
98:17
**frankly** 131:8
**frequently** 41:14
**fresh** 9:11
**friday** 101:7
**frommer** 2:4 3:4
4:8,15 10:13,24
11:1,16 25:7
26:22 27:23 28:21
30:15 31:7,14,24
32:7,23 33:6,21
34:9,17 35:2,8
36:19,24 37:10,17

38:2,8,10,14 39:13
39:24 40:7 41:1,7
41:12,21 42:17
44:1,14 47:24
48:8,23 49:6,15,22
50:12 51:11 52:1
52:11 53:1,16
54:7 55:1 58:23
60:22 61:9 62:9
62:22 63:10 65:22
66:3,8,13,17,20
68:9,14 69:8 70:4
73:10 74:16 75:5
75:18 76:7 77:10
79:2,11 80:6,17
83:1,9,22 84:14
85:7,17 86:1,6,10
86:13 92:14,20,23
97:21 98:2,13
99:8,17 100:10,15
109:24 110:5
111:6,11,21 112:1
112:18,20,24
114:1,18 115:2,8
115:23 116:1,19
117:11 120:16
121:6,15,22
124:23 125:22
126:10,14 127:5
127:21 128:10,13
128:19,22 130:16
**front** 7:6
**fspu** 122:18,22
123:16 124:5
**full** 4:10 7:23 8:9
8:15 15:14 19:13
**fully** 22:17
**fund** 35:15 55:10
56:1 61:12,16
63:7 117:17

**funds** 35:19 52:15
55:5 56:23 60:25
61:17 88:10
**further** 104:15
133:12
**future** 82:3 84:16

**g**

**gas** 89:13
**gasoline** 89:15,17
**gather** 23:6 44:8
44:12 47:21
**gathering** 20:22
39:10
**general** 13:6 36:3
36:4 52:9 61:16
63:6 64:13 74:16
74:19 82:22 88:5
97:3
**generally** 14:7
17:19 18:23 21:11
22:24 25:9 26:15
26:19 31:11 36:22
38:6 39:5 42:24
45:5,11 48:21
56:3,5 61:11
66:22 75:3 76:2
81:24 82:16,19
84:6,20 88:5
90:15 101:14
107:4
**generate** 26:5 94:6
122:19 123:8
**generated** 45:16
46:1 95:14 96:15
96:15
**gestures** 5:22
**getting** 22:4 25:22
28:23 60:1 63:8
71:8 95:23 102:9
102:16 104:1
107:25 109:5

Exhibit O
1603

**give** 4:4 8:15 85:18 90:8 92:14 99:18 105:23 121:1,16 128:14
**given** 6:25 27:1 93:22 136:9
**giving** 101:23
**glebe** 2:6
**go** 4:22 5:8 6:17 14:10 15:25 17:21 27:4 28:10 29:14 34:8 36:5,7,18 38:15 42:10,16 45:18 61:1,2 62:3 62:3,4,25 66:5 68:6 69:22 73:8 74:21 77:8 86:6 88:25 90:16 91:3 92:3 93:24 94:21 95:14 98:14,21 108:12,13,16 109:25 111:3,25 112:3 113:3 115:10,19 116:15 121:13 125:6 128:23 130:13
**goes** 36:6 54:2 61:12,14,14,15 63:6 66:9 79:24 125:9 127:25 130:8,14
**going** 5:12,13 6:17 7:24 11:25 16:18 17:1 29:6,11 32:20 34:11 35:1 37:5,7,23 42:10 44:9 45:15,18 46:4,8 57:25 59:15,25 60:2 66:2,3 68:1,2,4,8 73:4 75:20,21

78:8 81:25 82:16 85:15 88:17 90:9 90:15,16 92:3,4,15 92:17 97:6 98:23 105:8 108:12,13 108:16,19 121:15 124:21 127:3,7
**gold** 106:23 107:10,11,15,18 108:20,24 109:4 109:10,19 118:11
**good** 7:11,23 9:19 14:5 20:9 22:24 91:17 104:15
**gotcha** 58:24
**government** 5:5 9:1 30:18 37:11 41:23 42:1,4 43:10,17,22 46:19 49:2,24 50:3,17 54:11,14 71:15 83:12 99:20,22 121:9 124:24
**government's** 4:19 8:18
**governmental** 60:5
**grade** 16:4 24:12
**graduate** 16:11
**graduated** 16:5 17:7
**grandmother** 51:1
**grant** 50:1,4,15,17 51:13,15
**granted** 49:12,19 50:10 51:10,22
**great** 6:5,22 7:17 15:17 65:21
**greenberg** 2:5
**ground** 4:23 5:9

**grounds** 74:15 114:17
**group** 95:16
**guess** 50:13 52:16 72:23 103:17 104:1 116:14 119:3,25 130:8
**guide** 64:18,22 65:11
**guidelines** 108:12
**gun** 87:12
**gut** 50:15 51:8
**guys** 5:7 65:22 66:3

**h**

**h** 15:16,16 135:3
**halfway** 96:22 98:17
**hand** 4:2 25:22
**handing** 10:22
**handle** 20:3 21:1 68:24 69:10,17 70:11 83:20
**handled** 55:15,15
**handling** 68:20 69:23 70:2
**happen** 7:9 14:22 95:10
**happened** 73:2 85:14
**happening** 42:20 51:13 55:16 81:5 109:7
**happens** 9:5,8 47:15 52:15 55:22 104:11 110:23 119:4 129:8
**hard** 9:22
**head** 108:22
**headed** 83:18

**headquarters** 26:9 26:12,21 42:21 43:1,5 51:23 52:4 52:8 59:14 61:2 61:15 62:12 64:9 73:18 105:23 122:13,16,20 123:13
**hear** 5:21 67:1
**heard** 41:16 67:7,9 122:24
**heat** 95:11
**heather** 19:10
**held** 16:17 38:13 49:4 66:19 110:3 111:22,23 128:18
**hello** 4:9
**help** 10:2 58:8 70:22 83:25 84:18 85:9 90:4 116:14
**helped** 59:11
**helpful** 58:9 131:3
**helping** 21:24 22:9 22:11 93:20 97:17 123:14
**hereto** 136:7
**hey** 107:22
**higher** 24:11
**hills** 117:1
**history** 16:1,1
**hogan's** 17:14
**hold** 34:11,16 85:24
**holders** 104:24
**holds** 120:20
**hope** 130:20
**hopefully** 5:10 92:15
**hour** 66:18 101:9 101:10

Exhibit O
1604
ER-562

**hours** 9:23 58:15 66:7,10 101:8

**hq** 43:19 55:16,17 106:13

**huh** 5:23,23

**hundred** 37:5,8

**hundreds** 69:18

**hypothetical** 37:14 48:4 52:21 53:9 57:6 58:12 60:20 77:5 78:22 84:12

**i**

**idea** 40:2 62:10 89:9 105:23

**identifiers** 41:20

**identify** 21:24 22:10 39:25

**immediately** 16:19

**important** 6:14 8:8

**impossible** 6:12

**improper** 9:2

**include** 18:1 58:3 98:1,11

**included** 93:7

**incomplete** 37:14 48:4 52:20 53:9 58:11 60:19 77:5 78:21 84:11

**independently** 48:1

**indeterminate** 129:4

**indication** 65:25

**indicia** 50:16

**indictment** 70:24

**individual** 63:1 81:8

**individually** 58:25

**individuals** 89:2

**inform** 49:18 55:20

**informant** 58:16

**information** 9:7 23:6,6,13 39:5,22 40:1 42:3 44:10 49:17,25 58:16 64:16 83:13 88:24 89:16,18 90:4,20 90:24 92:11 97:5 99:14,16,21,23 102:23,25 103:1,4 103:12 110:15 115:22 120:20 122:12 123:9,17 126:1

**infringing** 17:24

**initial** 15:15 52:3 71:22 105:19 122:5

**initiated** 105:15

**initiation** 41:24

**inner** 118:3

**input** 44:9 122:11 123:18

**inputting** 102:22

**inquiry** 115:12

**inside** 78:16 104:2 111:23

**instance** 31:19 59:24 88:5 118:12

**instinct** 51:9

**institute** 2:4 4:16

**instruct** 8:21 74:13 75:14 113:21 114:15

**instructed** 109:15

**instruction** 3:5,6,7 3:8 115:7,16

**interest** 4:17

**interested** 17:20 27:7 46:18,20 59:23 133:19

**interface** 103:7

**interfacing** 103:3

**interrupt** 6:9

**interview** 33:16 40:22

**introduce** 85:17 92:15 121:14,15

**introduced** 10:14

**introducing** 10:12

**inventory** 3:15 96:19,23

**investigate** 70:22

**investigating** 32:10 33:20 102:19 104:22

**investigation** 1:11 1:16 20:6,21 22:16,23 27:20 28:20 30:24 31:9 31:21 32:1,5,21 33:1,5,9,23 38:18 38:18,23 39:3,4,15 40:2,9,15 41:24 42:3 46:3 48:22 48:25 49:1,11,16 49:25 51:20 52:3 54:5 59:16 61:23 67:12,23 68:18,23 73:23 74:3,5 78:11 82:11,20 83:7 84:22 97:20 104:14,15,18,23 113:24 114:3,5,8

**investigations** 19:4 20:24 31:6 63:16 91:13

**investigative** 58:18

**investigators** 19:6 21:17,22 22:9,9

**investigatory** 114:10

**invited** 12:20

**invoke** 126:5

**involve** 127:23

**involved** 12:8,13 13:11 20:11 21:4 22:18,22 23:19 24:25 25:10 26:23 26:24 56:13,15,22 56:25 57:12,24 60:1 63:13 70:19 71:3,9,19 80:25 81:2,3 85:2,3 91:18 114:10,13 120:4 122:8,10

**involvement** 22:20 93:19

**involves** 37:4

**involving** 128:5

**irrelevant** 53:10 111:18

**irvine** 16:5

**issue** 90:6 128:2,3

**issued** 55:12 63:9 119:8

**issues** 55:17

**item** 23:9 27:25,25 28:2,24 29:17 30:21 31:23 32:9 46:7 54:6 56:3 85:4

**items** 25:14 29:11 31:20,21 34:11 45:1 78:16

Exhibit O
1605
ER-563

| j | | | |
|---|---|---|---|

**j**

**jack** 107:8
**january** 17:7
**jessie** 1:15 3:3
  4:12 15:15 132:8
  133:9 134:5 135:2
  135:24 136:2,4,12
**jewelry** 107:2
**job** 16:17 19:23
  24:8 92:16 116:18
  123:3
**johnson** 1:9 2:5
**join** 16:22
**joining** 4:9
**judge** 7:6 28:16,16
**judgments** 123:21
**judicial** 38:21 47:9
  47:15 48:1 63:22
  64:5 125:6,12,16
  129:7,8,20,23,23
  130:3
**judy** 19:21
**july** 1:18 132:12
  132:14 133:21
  134:3
**jump** 110:8 113:2
**june** 10:15
**jurisdictional**
  107:16 108:25
  109:5 118:13
**justice** 2:4 4:16

**k**

**karla** 19:21
**katherine** 19:22
**keep** 5:10 43:6
  54:15 66:1 84:23
  129:18 130:4,7
**keeping** 59:3
**keeps** 129:24

**kimberly** 1:24
  6:23 132:22 133:5
  133:25
**kind** 31:8 123:11
**kindly** 5:16
**kinds** 84:15
**know** 5:24 6:17
  7:10,18,20,20,21
  9:9,14 11:2 13:18
  16:4 17:1 18:19
  18:23 24:13,15
  25:9 27:16 28:2
  29:21 32:24 35:11
  35:17 36:3,9,16,20
  37:22 39:7,9,11
  55:11,22 56:5,7,20
  57:1 58:5 59:8,13
  59:13,16,25 60:6
  60:10,25 61:11,13
  61:24 62:8,10,18
  62:21 63:18 65:3
  65:4,6 71:17
  76:18 81:13,24
  82:1 90:13 91:6
  92:20 93:1,16,17
  100:24 101:3
  105:24 106:1,23
  106:24 107:1
  108:15 110:19,22
  111:22 114:5,7
  116:8,13 119:8,15
  120:24 121:11,11
  121:18 126:10
  127:2,15,17,19
  128:3,9 130:16,22
**knowledge** 14:5
**knowledgeable**
  13:2,5,15,23 14:1
**knows** 126:24
**koons** 1:9

**kristi** 1:9

**l**

**l** 1:7
**la** 13:6,13 18:20
  60:10 61:14 62:4
  63:7 68:24 69:9
  69:16 70:10
  105:21 106:11
  120:7
**label** 95:12
**labeled** 92:18
**lacks** 51:18 52:20
  54:20 58:12 63:4
  79:24 83:5,16
  97:12,25 98:7,25
  111:17 112:13
  120:11 121:3
  124:17 127:14
**lapse** 23:18
**large** 68:20 69:23
  70:1,3 73:23,24
  74:2,4 83:21 89:2
  95:16
**late** 23:5 72:24
  73:6 76:19 83:4
  121:10
**law** 4:17 16:6,7,9
  16:15,19 64:7
  84:24 126:19
**lawyer** 8:1
**lead** 58:20 64:7
  68:3,5,11 71:11
  83:8
**leader** 98:16
**leading** 71:17
**leads** 32:18 60:11
  60:12
**leave** 84:2 102:15
**left** 32:20 53:23
  54:9,17 92:6

**legal** 50:6,20 51:23
  52:9,19 54:3,20,21
  62:12,15 73:17
  74:10 124:9,12
  126:4,18 127:13
  128:4 134:23
**lengthy** 37:4
**lens** 80:3
**letter** 3:10 25:21
  55:18 122:13
  129:15
**letters** 20:4,22
  23:12 26:6,8
  122:19 123:8,10
**level** 18:12 22:20
  24:11 42:21,24
  43:1,4,19 51:14,19
  55:16 104:12
  106:15
**lexisnexis** 41:15
**light** 51:8
**limit** 127:9
**limited** 100:7
**line** 9:14,15 135:4
  135:7,10,13,16,19
**list** 105:21 124:13
**listed** 10:13 11:11
  11:19 85:21
**litigation** 111:16
  112:12
**little** 17:8 21:9,15
  29:2 30:19 32:5
  34:2 44:17 57:7
  66:23 70:20 80:21
  84:4 91:3 101:12
  102:13 107:7
  109:25 113:2
  125:1 128:24
**local** 56:4,12 57:11
  59:14,14 63:13,15
  113:9,15,16,16,20

Exhibit O
1606

114:4,13,20,23
116:2,8,21 117:17
118:9,23
**locals** 56:18 59:19
73:15 74:8 114:6
115:18,21 119:10
**location** 80:16
**locations** 12:20
85:1
**logbook** 101:20
**logging** 86:4
101:20
**logistics** 72:6
**long** 17:3 91:13
102:5 107:13,14
127:10
**longer** 17:8 90:10
**look** 10:18 14:22
27:20 28:19 40:17
50:7 86:15 90:11
90:13 91:25 96:21
121:23,24
**looked** 107:8,15
**looking** 40:22
49:17 78:24 79:5
80:2 85:4 87:23
88:20 90:4 104:8
104:22 105:5
**looks** 49:24 50:17
93:6 107:5
**loomis** 92:3 94:22
95:14,18 96:4,10
101:24 109:10
**loop** 23:16
**los** 2:11 11:21 12:4
12:7 13:22 15:20
18:17 25:11 68:19
**lose** 99:22
**losing** 37:11
**lot** 6:8 21:9 37:4
73:21 91:8,11

102:10,10 120:12
130:21
**lots** 73:24
**love** 126:10
**low** 43:24
**lunch** 9:21 66:4,5
66:11
**lunchtime** 65:23
**lynne** 82:7,10 83:3
97:14 108:4
**lynne's** 82:23
97:17

### m

**m** 15:16 67:19
**macdonald** 108:4
**madison** 97:14
108:4
**magistrate** 28:15
28:16 78:9
**main** 62:14
**maker** 64:4,6,14
**making** 42:18
43:23 64:9 78:14
105:1,22
**management** 24:9
24:11
**manpower** 58:15
**manual** 64:18,20
64:25 65:18
**mar** 1:2
**march** 4:21 70:24
72:9,16
**marijuana** 81:15
89:13,17
**marked** 10:20
86:12 92:19
121:20
**marshal** 35:13
61:19
**marshal's** 35:13

**marshals** 20:19
34:3,7,10,18,19,25
35:7,10,16,17,24
36:2,7,18 52:23
53:14 55:10,20
90:8,17 92:3,8,12
**material** 10:5
**materials** 10:1
**matt** 67:19,20
68:21 71:23 72:12
**matter** 54:23
66:24 74:17 83:4
**matters** 21:5
126:5
**mcgeorge** 16:6,11
16:15
**mean** 8:20 13:5
18:22 21:10 33:8
54:5 57:1 66:8
88:25 89:5 91:16
97:9 98:4 105:24
118:10 123:6
**meaningful** 23:7
**means** 15:8 97:13
**meant** 57:4 125:13
**mechanism** 112:6
**medication** 8:10
**meet** 107:6
**meeting** 76:23
113:7,7,11,17,20
114:12,23 115:5
**meetings** 77:12
113:5 115:12
**members** 26:3
94:10 122:11
**memorandum**
3:15
**mention** 73:16
**mentioned** 19:14
21:9 59:9

**met** 88:1 103:11
105:9,16
**metals** 107:2
108:8
**metropolitan** 4:12
**michael** 2:5
**middle** 8:4 9:15
15:15 98:16
**million** 57:6,8,15
60:13,17 64:3,4,9
64:11,12
**mind** 9:11 15:18
38:11 93:1
**minimum** 36:22
38:6 105:9,17
106:19 107:6,16
108:25 109:5
118:13
**minute** 38:11 86:7
92:24 121:23
**minutes** 109:25
110:2 128:14
**mischaracterizat...**
69:3,21
**mitigation** 47:11
48:11,16 110:21
**modules** 17:22
**moment** 6:24
10:17 46:10
**monday** 1:18
**monetary** 36:22
105:9,17 107:7
**money** 20:25
35:14,14 36:10
37:12 47:7 50:10
50:23 51:2,6
55:11,25 56:10
57:1 58:5 61:13
62:1 65:14 81:19
88:16,17 89:24
90:19 92:2,6,11

Exhibit O
1607

ER-565

[money - obvious]                                                        Page 15

96:5,9,9,12,14,16
110:15
**monrovia** 117:2
**month** 16:24 67:2
**months** 17:5,8
**moon** 67:19,20
68:21 71:23 72:12
82:13
**morning** 66:21
**move** 22:11 26:25
29:1 30:6,21 32:2
33:24 76:11,24
78:18 79:16 80:20
102:13 103:6
105:3,7,13 106:8
123:22
**movement** 55:11
**mow** 27:13
**multi** 113:7
**multiple** 18:11
85:1 95:18 97:18
120:3
**multiply** 120:5
**murray** 1:15 3:3
4:12 15:16 38:16
66:18 86:14 92:25
130:19 132:8
133:9 134:5 135:2
135:24 136:2,4,12

**n**

**n** 2:6 3:1 67:19
**name** 4:11,15
15:14,16 18:5
88:16 122:21
**names** 19:7,9,19
**narcotics** 88:13
89:4
**narrative** 27:19
39:1 40:20 57:20
58:21

**nature** 107:3
**ncic** 41:3,14
**near** 65:23 90:11
**necessarily** 70:14
85:13 89:5 98:1,9
98:12
**necessary** 136:6
**need** 5:25 16:4
23:7 33:1 83:13
109:3 115:19
130:17,24
**needed** 76:4,8
**negative** 91:22
**nest** 69:11 71:5,25
75:12 76:25 78:3
78:16 79:21 80:11
117:5
**never** 122:24
**new** 85:20
**non** 4:17 106:24
107:5 115:3
**noon** 9:22
**normal** 6:9,10
**normally** 6:6,7
**north** 2:10
**notary** 132:23
136:13,19
**note** 81:14 87:9,13
88:15 90:12 97:5
98:5 108:24
129:18 134:10
**noted** 96:25
129:20 136:7
**notes** 3:17 81:19
82:2 86:19 90:14
99:24 100:17
101:25 103:13
133:11
**notice** 3:18,20
10:16,22 11:7,12
13:4 14:14,16

15:1 20:22 23:12
23:18 25:18,21
26:6,8,11 44:15
46:14,15,17,23
47:1,6,14,18
102:23 106:3
111:17 121:10,12
122:12,19 123:8
125:17 127:1,17
129:1,12,15
**noticed** 44:9
**notices** 26:2,18,20
54:1 123:3,4
**noting** 89:16 90:7
**nuggets** 107:11
**number** 5:5 11:24
24:6,19 35:25
44:8,20,22 45:2,10
45:13,16 46:1,6,11
70:6,7 91:8,19
94:19,21 95:13
96:3 101:20
109:18,20 118:16
118:20 120:2,22
121:1
**numbers** 11:15
20:3 41:20 44:16
44:25 94:6 95:23
101:19,23 109:5
120:5,24 121:7
124:3
**numerous** 115:9
**nuts** 17:11

**o**

**o** 67:19,19
**oath** 3:9 6:25 7:5
7:21 132:1
**object** 33:19
110:25
**objection** 8:19,22
8:24,24 25:4

26:17 27:18 28:12
30:7 31:3,18 32:4
33:3,12 34:5,13,23
35:4 36:14 37:1
37:13,24 38:5,25
39:18 40:5,19
41:18 44:3 47:16
48:3,19 49:9,20
50:5,19 51:17
52:6,18 53:8
54:18 58:10 60:18
62:20 63:3 68:12
69:2,20 74:13
75:14 77:4 78:20
79:8,23 82:25
83:5,15 84:10
97:11,24 98:7,25
100:5 111:15,16
112:10 113:18
114:15 115:6
116:11 117:7
120:10 121:3
124:17 125:18
126:3,17 127:12
127:25
**objections** 31:10
32:15 36:21 41:5
41:10 42:7 53:25
61:4 62:7 80:13
84:19 85:12 99:12
111:9,24
**objective** 50:16
**observation** 90:14
99:24,24 100:17
101:25 103:13
**observations** 3:16
82:1,2 85:16
86:18 87:7 90:2,3
99:5
**obvious** 115:18

**obviously** 72:3
73:3 109:16
**occur** 12:22 31:11
45:4
**occurred** 31:22
72:21,24 113:5
**occurring** 72:15
**occurs** 56:18
119:9
**odor** 87:11 89:13
**offer** 50:22
**offered** 112:13
**offhand** 47:1
**office** 11:21 12:5,7
12:8 13:6,13,22
18:17,21 20:19
25:11 26:15,19
29:22 42:21,24
43:2,4,19 47:20,22
47:23 48:6 51:19
51:23 52:2,9
55:16 59:11,15,23
60:11,15 61:3
62:5 63:1,8,23
64:5 68:24 69:10
69:17 70:6,11
73:17 84:15 85:2
102:16 104:12
105:22 106:12,15
106:25 119:13
120:7 123:5,7,12
125:10 126:2,24
129:16,20 130:2,6
**offices** 85:2
**official** 1:7,10 18:5
**officials** 5:6 52:4
**oftentimes** 49:13
**oh** 12:2 16:3 23:15
26:7 32:8 56:8
68:10,21 73:20
86:1 88:24 104:15

106:1
**okay** 5:4,8,17,18
6:22 7:17 8:6,7,14
9:11,12,17,18,23
9:24 10:6,7 11:9
11:17 12:6,12
13:1 14:2,10
15:17 17:9,13
19:18 21:4 22:6
24:6,10,13,23
25:23 26:10 27:11
27:24 29:16 30:16
32:8,24 33:15,22
34:10 35:3,9,20
37:18 38:3,9,11
39:14,25 41:22
43:6,15 44:15
45:6,6,16 46:7,23
47:3 48:14 49:16
50:22 52:12 55:2
55:14,23 56:22
59:1,18 60:7
61:17 62:23 63:11
63:24 65:12,21
66:11,16,17 68:21
69:6 70:5 71:7,14
71:19 75:6 76:8
76:15,22 77:21,25
79:3 80:18,19
82:15 83:10 85:8
86:1 87:2,9 88:22
89:1,7 90:23 93:3
93:19,24 94:2,3
95:4 96:14,18
97:22 98:3 99:18
100:10,14 101:4
101:11 105:11,18
106:5,16,22
107:24 108:17
110:2,16,20
113:14 114:9

117:15,24 118:20
119:20 120:17,21
122:15 127:25
128:11,17 130:7
130:15
**olson** 19:21
**olympic** 102:15
**omnibus** 105:20
105:25 106:2
**once** 29:17,17
30:20 42:8 43:21
46:7,25 47:4,25
48:16 54:14 55:3
55:6,12 61:18
81:3,24 90:8
119:7,15 124:24
125:5,8
**ones** 20:7,7 34:10
59:19
**online** 118:4
120:13
**open** 109:15
**opening** 81:25
**operation** 97:18
**operative** 114:20
**opinion** 27:15 51:6
77:1
**opportunity** 22:17
90:23
**opposed** 15:11
31:16 79:4
**option** 76:2
**options** 47:6
**orange** 4:13
**order** 33:23 38:19
76:10 124:20
**original** 34:16
**originally** 15:20
**originated** 26:8
**overall** 25:2 34:2
59:10 62:3 63:2

87:22,25 88:19
**overbroad** 40:20
44:4 60:20 84:11
117:7
**overruled** 124:5
**oversee** 123:9,12
123:14
**owned** 70:14
78:15
**owner** 48:15
**owners** 102:20

**p**

**p.m.** 1:18 49:4,4
66:15,19,19 110:3
110:4 128:18,18
131:10
**package** 54:2
**packaged** 81:20
**packet** 47:22
129:20
**page** 3:2,14 37:18
93:25 94:1 96:21
98:15,15 135:4,7
135:10,13,16,19
**paid** 116:9,12,17
**palmerton** 95:20
**paper** 119:21
**papers** 110:22
111:12 129:1,2
130:11
**paperwork** 20:3
21:2 93:8 98:20
98:21,23 99:4
102:7,11,17
110:11,19 111:7
129:24 130:1
**paragraph** 94:3
96:23 98:15,18
**paralegal** 19:17,24
20:1 24:16 30:24
40:10,16 51:19

Exhibit O
1609

ER-567

52:7 55:19 70:8
94:10 98:11
101:18 111:4
131:8
**paralegals** 20:10
52:2 94:15 97:10
97:23
**part** 5:24 6:9 20:5
20:8 30:9 41:22
44:7 46:3 54:2
61:7 87:22,25
88:19 89:12 99:6
100:21,22 104:3
111:13 112:7
113:23 114:2,7,7
114:10,21,25
**participants** 75:10
**participate** 59:11
**participated** 63:1
116:3,21
**participates** 60:11
**participating** 56:1
58:4 65:15
**participation**
61:23
**particular** 22:2
23:9 42:6,20
43:18 54:24 59:11
63:8 64:25 74:18
81:10,21 103:6
106:10 117:9,12
117:18 124:21
**particulars** 56:9
56:21 59:15 61:13
84:3
**parties** 46:18,20
46:22 73:25 85:6
133:14,15
**partnering** 73:15
**paul** 1:4 134:4
135:1 136:1

**pay** 24:12
**payou** 88:15
**pc** 43:5
**pdt** 1:18 131:10
**pending** 8:3
**people** 6:8 13:24
17:23 19:16 22:22
23:4,16 40:13
46:24 74:9 75:7
83:20 97:15 103:8
110:9,16,19
111:13 112:7
113:9 128:6
**people's** 104:2
**percent** 58:6,22
60:25 61:1,1,21
62:1
**percentage** 56:6
57:19 58:1,14
60:2,3,17,24 117:4
117:9,18 118:15
118:24
**period** 23:17
**periodic** 12:22
**permission** 49:18
**person** 13:19,23
13:25 15:11 53:4
53:20 59:21 62:17
**personally** 75:21
**personnel** 73:19
**perspective** 25:16
**pertaining** 102:25
**pertains** 112:12
**petition** 20:24
47:10 48:10,15,17
48:21,24 49:12,18
50:2,4,10,15,18
51:10,13,16,20,21
52:13 53:2,4,5,6
53:12,21,21,22
54:4,10 110:9,10

110:12,17,21
111:13 112:8
125:3 128:25
129:1,6 130:12
**petitioner** 49:13
50:25
**petitioners** 110:14
**phases** 102:11
**phone** 41:19 67:10
68:13 69:4 72:21
74:11 82:12 83:24
**physical** 35:6
**physically** 34:11
34:16,19
**picture** 87:22,25
88:19
**pictures** 85:4
**piece** 27:1 28:5
32:18 42:20 103:6
**pieces** 32:19 105:2
119:21
**pimentel** 19:22
**place** 49:8 83:20
84:25 97:7 110:19
117:22 130:11
**plaintiff** 2:3
**plaintiffs** 1:5 3:18
4:18 11:7 14:14
**plan** 42:15
**planning** 82:21
**plans** 68:1
**play** 22:15
**played** 114:7
**please** 4:1,11 5:20
7:9,14 10:4,19
15:14,18 75:25
85:19 88:7,24
99:19 112:21
116:15,16 126:9
**plugged** 43:24

**point** 35:14 42:4
47:15 52:14,15
53:6,24 54:17
55:4,8 61:24
62:14 76:17 83:23
102:18 115:9
**points** 33:10
**policy** 38:4 64:18
64:20,22 65:10,17
65:18
**populates** 122:12
**portion** 44:2 49:5
50:11 76:1 112:22
126:12
**poses** 37:13 48:4
52:20 53:8 58:11
60:19 77:4 78:21
84:11
**position** 18:5
120:23
**positions** 19:1,15
20:2
**positive** 91:21
**possess** 34:11,19
**possible** 22:23
68:20
**post** 86:22,23
**postal** 114:6 117:1
**potential** 20:12
22:11,12 71:24
72:17 75:8,11
76:12,25 78:2
79:16 82:3 83:13
84:1,8,16 85:9
88:11 104:19
115:4
**potentially** 21:25
27:12 34:22 37:22
40:17 70:16 80:9
85:10 87:18 91:23
108:9 120:6 126:4

Exhibit O
1610
ER-568

practice  17:13
  22:21,24
practices  84:7,8
precious  107:2
  108:8
precise  121:1
predetermined
  58:20
preference  66:1
preliminary  45:17
preparation  14:24
  81:6
preparations  81:1
  81:2
prepare  14:12
  46:13 47:22
prepared  76:24
  98:20 128:2
preparing  14:20
  80:23 84:8
present  85:6 87:12
  87:12 94:17
  114:24 115:13
presented  78:9
presume  91:9
  116:12,13
pretty  22:6,8
  89:24 128:20
prevent  115:12
previous  44:21
  85:22
previously  10:14
  19:25 104:9
  130:13
primary  61:25
prior  11:23 70:23
  72:3,21 80:2,7
  113:5
private  4:20 13:9
  13:12 14:18 36:10
  66:24 67:1,8,10,22

68:23,25 69:19
70:12,15,23 71:5
72:1,13,19 75:13
78:12,15,25 79:5
79:17,20 80:4,15
82:10,21 83:4
92:10 94:8 101:5
103:21,24 106:3
116:10,22 119:14
119:17 120:8,19
120:25 122:7
124:7,8,11 125:15
127:4,23
privilege  74:15
114:17 115:11,15
130:23
privy  97:19 114:4
118:3
probable  27:21
28:18 29:8,12,19
30:11,21 31:12,23
32:6,16,17 39:8,16
39:21,23 40:3,6,18
42:9,12,14 43:7,10
43:12 44:11 50:7
50:24 53:20 76:6
76:11 77:3 78:1
78:10,18 79:6,16
79:20 80:3,9,14
84:22 87:23 88:1
88:20 89:9,19
90:5,25 92:1 99:6
99:9,10,14,15
100:22,23 102:21
103:5,11,18,18,22
104:20 105:1,7
123:22 124:1,4
probably  43:7
72:16 73:3 93:7
128:16

probative  87:17
87:24 89:24 90:24
91:23
problem  74:23
problems  86:3
proceed  78:2,11
proceeded  107:4
proceeding  20:13
34:22 111:2
127:10
proceedings  14:6
41:25 69:18 83:14
100:3,8 125:25
126:16,19,20
127:7
proceeds  13:10
22:2 29:13,20
32:11 42:15 43:13
50:24 51:6 56:20
62:25 87:18 88:4
88:11 89:10,20,25
90:6 91:24 96:25
98:5 116:5
process  13:8 14:7
16:18 20:2 22:12
22:13 23:4 25:1,3
25:10,14,17 27:14
27:17 28:7 29:15
30:12 34:2,4,8,12
35:1 36:6 37:4,6,9
42:16 44:13 45:15
45:18 46:5,9 48:7
52:13,24,24 53:7
53:13,15,17,23
54:4,6,16,17 55:13
55:25 56:22,23,25
63:11 83:11,20
90:9 95:8 100:22
110:9 111:13
112:8 122:6 123:2
123:4,4,6,15 125:2

127:18
processed  44:23
45:9,10 102:14
processing  20:8
21:2,5 69:17 70:3
101:22
product  126:5
professional  133:6
profit  4:17
program  57:2
property  23:9
27:1 28:5,5 29:17
29:20 31:1 34:20
34:20,21 40:3
42:20 43:11 48:9
48:15 52:16,17
54:12 55:4,7
63:24 70:14 72:19
79:19,21,22 80:10
85:10 89:20 100:4
100:20 103:7,19
103:20 105:2
106:24 117:4
122:19,23,25
123:21 124:6
125:6 128:5
provide  6:2 7:22
10:6 31:23 42:22
98:6 110:11,15,17
129:7
provided  77:1
providing  123:14
public  4:17 132:23
136:19
publication  65:1
purchase  88:17,18
purpose  8:24
39:14 82:23 85:8
purposes  25:15
73:1 102:24

**pursuant** 28:18 30:13,17 31:12 125:23
**pursue** 27:12,15 27:16 28:20,22 33:10 38:20 42:5 42:19,25 43:9,17 46:14 48:1 49:8 75:20,22 80:9 85:15 100:18 104:10 106:9,25 107:17
**pursued** 106:19 124:13
**pursuing** 28:4 29:22 37:12
**push** 118:7
**put** 14:3 35:22 36:13 59:25 60:2 95:12 110:19 117:22 119:18,18 120:18 121:9 123:9
**putting** 56:16 122:8,10

**q**

**qualifications** 11:18
**qualified** 13:17,18 13:21,24
**quantico** 16:24 17:2,3
**queried** 41:4,9
**query** 41:14
**question** 4:25 5:21 6:15,20 7:9,11,12 7:13,14,15,19 8:3 8:20,22 9:1,2,6,8 24:9 30:3 44:3 74:23 75:15,25 79:12,23 88:7,8

95:21 97:2 98:22 99:11 100:7 104:16 106:23 110:8 112:19,20 115:24 120:22 126:7,8,11,21 128:7,12 129:5
**questioning** 9:15
**questions** 5:12,14 5:20 7:1,25 8:12 10:9 11:11,14 62:19 75:4 87:16 115:10,17 128:16 128:21
**quick** 8:5 110:6
**quite** 6:7 27:7 103:5 131:7

**r**

**r** 15:16,16 135:3,3
**raise** 4:1
**raised** 15:22
**read** 3:10 14:13,15 44:2 49:5 76:1 112:22 126:12 134:9 136:5
**reads** 96:24
**ready** 11:2,3 93:2 93:3
**real** 6:14
**really** 20:15 23:19 24:24 47:6 51:8 55:19 59:20 73:3 82:1 85:22 90:7 95:24 106:6 130:20
**realtime** 1:25
**reason** 8:14 23:1,3 23:11,14 24:6 113:19 134:11 135:6,9,12,15,18 135:21

**reasons** 23:10
**recall** 18:1 65:13 65:14 71:24 72:11 72:20 81:10,12,18 81:23,23 82:4,6,9 82:17,18,22 84:4 101:10 113:11 115:3 124:2
**receipt** 134:18
**receipts** 85:4
**receive** 20:17 46:25 47:25 56:19 116:4
**received** 86:25 88:18 93:7,10 94:18 108:11 116:20 119:11,13 120:7,7 121:19
**receives** 26:11 47:5,18 48:16 111:4 128:24,25 129:12
**receiving** 86:24
**recess** 38:13 49:4 66:19 110:3 128:18
**recognize** 11:4
**recommend** 28:3 28:4,9
**recommendation** 52:8
**recommends** 29:22 51:21 64:7
**record** 4:11 5:22 8:25 10:21 38:15 43:25 44:1 49:3 69:7 82:2 85:14 86:6,8 90:24 92:5 131:6 133:11
**recording** 5:13

**records** 22:1 40:23 40:23 84:23
**refer** 47:22 48:5 90:10 125:10
**reference** 64:20,23 65:20
**referenced** 72:22 99:5
**referencing** 70:14
**referral** 129:15 130:2
**referred** 129:19
**referring** 118:14
**reflects** 123:20
**regard** 102:19
**regarding** 11:11 12:8 22:1 68:25 71:10,12,18 72:13 90:25
**regardless** 96:2
**regards** 13:8 14:17,19 69:11 70:11 72:18 84:24
**registered** 133:5
**registration** 39:10
**relate** 88:10
**relative** 133:13,14
**relatively** 91:5
**released** 55:25 62:1,2 65:15
**relevant** 88:13
**rely** 85:16
**remains** 52:22 53:13,17
**remember** 9:7 10:2 47:1 65:8 67:2 72:3,17 77:17 81:15,21 84:3 93:14,22 102:4 112:19 116:25 117:2

Exhibit O
1612

**remission**  47:10 48:10,16 49:16 50:4,18 51:13,16 52:14 110:21 129:6

**remote**  1:14 133:8

**remotely**  132:10

**removed**  112:8

**rented**  104:2

**renters**  72:18 100:2,4,18,19,25 104:19,24

**repeat**  7:12 75:24 88:7 112:20 126:8

**rephrase**  7:13 55:5 100:11,12 121:8

**report**  21:10 33:17 33:20 133:7

**reported**  1:23

**reporter**  3:9 4:1 5:13,15,22 6:1,12 6:24 7:12 133:1,6

**reports**  20:4,17,22 21:9 40:22 44:8 44:12 46:21 47:21 85:5,16

**represent**  51:6

**representative**  1:16 15:7,12 62:24

**represented**  94:20

**representing**  4:18

**represents**  29:12 42:15 43:13

**request**  12:20 56:17 58:20 59:2 63:25 113:21 118:6 119:18,18 129:15

**requested**  44:2 49:5 76:1 112:22 117:9 126:12 133:10

**requesting**  20:25 56:23 57:1,19 58:3,22 117:3

**requests**  58:14 59:4

**required**  136:13

**requires**  32:24 74:24 75:16

**residue**  87:11 89:23

**resolves**  131:1

**resources**  37:4

**respect**  69:3 71:25 79:9

**respond**  46:25 47:20 114:16

**response**  8:4 125:16 127:17

**responses**  6:3

**responsibilities**  101:15 123:2

**rest**  6:17 79:4

**result**  45:25 116:6 119:13 120:25

**resulted**  58:19

**retained**  46:3 111:14

**return**  124:20 134:13,17

**returned**  28:11 50:10,11 54:13 124:6 128:6

**review**  46:21 48:1 107:20 133:9 134:7

**reviewed**  28:15 49:14 52:4 61:25

**77:25 79:14**

**reviewing**  14:25 22:1 77:14 93:14

**reviews**  110:24 111:5

**rgk**  1:2

**right**  4:2 5:4,19,21 6:5 7:4,8 8:8 9:5 9:19 10:8,11 12:12 15:3,10 17:5,9 19:12 21:6 22:19 23:25 24:5 24:17,23 40:8 43:15 45:6 46:13 47:3 52:12 55:23 59:18 60:4 62:17 64:2 65:12,21,23 66:21 67:6,23 70:19 72:22 73:2 77:23,24 78:3 89:10,25 90:21 91:1 92:10,24 93:4 97:22 99:18 104:6 108:4 117:13 120:21 130:9,15,16

**rights**  17:22,23 18:3

**ring**  107:8

**road**  2:6

**robert**  2:4,5 4:15

**rodgers**  2:10 10:21 11:13 25:4 26:17 27:18 28:12 30:7 31:3,10,18 32:4,15 33:3,12 34:5,13,23 35:4 36:14,21 37:1,13 37:24 38:5,12,25 39:18 40:5,19 41:5,10,18 42:7

**44:3 47:16 48:3** 48:19 49:9,20 50:5,19 51:17 52:6,18 53:8,25 54:18 58:10 60:18 61:4 62:7,20 63:3 65:24 66:6,11,16 68:6,12 69:2,20 73:8 74:13,21 75:14,24 77:4 78:20 79:8,23 80:13 82:25 83:5 83:15 84:10,19 85:12,24 86:4,9 92:22 97:11,24 98:7,25 99:12 100:5,14 110:25 111:9,15,24 112:10 113:18 114:15,22 115:6 115:16 116:11,13 117:7 120:10 121:3,21 124:17 125:18 126:3,17 127:12,25 131:5,7 134:1

**role**  22:15 25:23 34:4

**room**  85:5

**roughly**  16:12 119:12

**rpr**  1:24 132:22 133:25

**rubber**  88:4

**rules**  4:23 5:9 9:2

**run**  72:15 77:12 84:6 92:21 108:17

**s**

**s**  15:15,16 135:3

**sac**  67:10,13,16,17 67:18,18,20 82:13

**safe** 69:11,18
  70:16 72:1 75:12
  75:23 77:1 78:3
  78:17 79:22 80:11
  81:9 104:3
**saw** 76:18,20
**saying** 6:13 23:15
  23:20 30:19 43:6
  53:2 54:11,15
  62:23 81:12 96:9
  100:13 108:18
  109:14 124:4
  125:24
**says** 6:25 54:14
  61:20 86:2 87:9
  89:12 94:3 98:20
**scale** 68:20 69:23
  70:3 73:23 74:2,4
  83:21
**school** 16:1,6,7,16
  16:20
**scope** 25:5 26:17
  30:7 31:3 34:5,23
  36:14 37:1,24
  39:1 40:20 44:4
  48:19 49:10 50:5
  50:19 51:17 52:18
  54:19 60:18 63:3
  77:6 78:20 79:24
  84:10 99:2 100:5
  111:1,2,15 112:10
  112:11 125:19
  126:25 128:1
**scott** 19:21
**scratch** 14:23
  48:12 77:13 112:4
**sealed** 95:11
**search** 17:17
  28:19 29:9 31:13
  31:19,22,22 39:6
  42:11 72:4 85:1

96:23 101:1 108:5
**second** 43:23 44:1
  47:8 85:18,24
  92:14 96:8 99:19
  110:9 121:16,18
  125:1
**section** 2:9
**securing** 70:23
**security** 117:5
**see** 32:8 33:9 46:7
  55:2,2 64:8 66:18
  76:4 86:21,23
  87:6 90:10 91:3
  92:17 93:24 103:3
  103:8 117:23
  119:3 121:25
**seeing** 120:14
**seeking** 60:16
**seen** 76:15 86:17
  86:18 93:4
**sees** 108:20
**seize** 23:8 29:6,11
  30:20 31:23 37:5
  42:12 80:15
**seized** 21:1 27:11
  27:25 28:1,2
  30:13,17 32:9
  34:21,25 35:21,22
  36:17 39:19 42:1
  42:2 46:2 50:23
  51:3 52:15 53:19
  57:19 78:11,13
  81:4 85:11 106:18
  117:5 119:19
  122:18,22,25
**seizing** 25:14
**seizure** 4:20 17:17
  21:25 22:3,4,5,10
  22:12 26:23 27:22
  28:13,14,18,24
  29:5,8 30:1,4,9,11

30:14,18,20 31:6
  31:12 32:22 38:19
  42:8 45:5 46:22
  56:13 57:17,22
  58:4,18 59:12
  60:12 63:2,13
  68:3,5,20 69:24
  70:3 71:4,4,8,11
  71:12,15,18,20
  72:4 76:10,16
  77:2,15 78:6,7
  79:14 80:22,24
  83:8,21 93:11
  97:4 99:4 101:1
  101:16 102:4
  116:3 117:21
  118:23
**seizures** 36:23
**send** 20:4 25:20
  54:1 59:4 60:16
  117:25,25 118:1
  123:10 129:15
  130:5
**sending** 20:22
  23:17 25:18 59:10
  101:23
**sends** 47:14 59:17
  59:22 60:15 61:19
  129:25
**sense** 23:22 59:18
  70:5 74:1
**sent** 25:22 26:20
  46:16,17,23 52:8
  56:1 106:3 121:12
  122:13 124:24
  134:14
**sentence** 96:22
  98:3,17
**sentinel** 94:5
  111:23,25 112:3,9
  129:3 130:8,13,14

**separate** 35:15
  79:19
**september** 16:25
  17:2
**servers** 111:14
**service** 20:19 34:3
  35:7,10,18,24 36:2
  36:18 52:23 53:14
  55:10,21 90:17
  92:8,12
**set** 127:19
**share** 57:15 84:22
**sharing** 56:16 57:2
  57:3 63:17,19
  65:20 119:9
  120:19
**sheet** 3:10 134:11
**sheets** 88:15
**shift** 101:6,18
**shifts** 94:18
  101:10
**shipped** 96:3
**shop** 105:8
**show** 51:5 90:4
**showing** 51:1,4
**side** 67:21 73:14
  102:25 103:3,12
**sign** 3:10 134:12
**signature** 133:24
**signed** 28:16
  132:14 134:20
**silver** 106:23
  107:11,15,19
  108:15,20,25
  109:4,10,19
  118:11
**simpler** 55:8
**simply** 8:25 47:7
  114:19 115:12,13
  115:14

Exhibit O
1614

**single**  107:20
**sit**  119:3
**site**  92:10 94:8,9
   94:12,15 95:6
   102:1 109:7
**sitting**  62:23
**situation**  31:16,25
   33:8 39:5 45:24
   57:14 58:2 99:22
   108:22 129:23
**situations**  30:16
   31:8 36:1 45:12
   107:17
**six**  101:9
**size**  73:22
**slight**  69:2,20
**slightly**  73:1
   106:22
**smell**  90:11
**smells**  81:15 89:17
**smooth**  5:10
**sniff**  91:21,21,22
   92:5 95:24 96:1,2
**snitko**  1:4 134:4
   135:1 136:1
**soil**  89:13,14,17
**solely**  106:11
**solutions**  134:23
**somebody**  47:18
   50:23 53:19
   129:11
**someone's**  18:2
**soon**  84:20 102:9
   119:8
**sorry**  73:8 79:12
   88:24 97:6 106:1
   106:1 110:6
**sort**  17:9,10 18:22
   28:6 30:2,2,5 31:9
   32:25 64:15,16,18
   79:6 83:11 101:14

113:4 125:16
   128:15
**sorts**  79:9
**sounded**  113:4
**sounds**  22:8 24:24
   67:6 70:7 72:14
   119:25 129:22
**source**  115:22
**speak**  5:15 8:6
   11:13,18 13:17,19
   13:21 75:3
**speaking**  76:2
**special**  1:15 3:3
   11:23 16:20 18:7
   18:8,10,11,15,25
   19:2,7,12,13,25
   21:13,15,16 22:7
   23:24,25 24:1,7
   27:3 28:8 30:24
   31:25 38:16 67:13
   70:8 71:23 72:12
   86:14 92:24 95:19
   130:18,19 132:8
   133:9
**specialist**  40:17
   51:20 52:7 111:4
**specialists**  19:17
   19:24 20:1 24:17
   30:25 40:10 55:19
   70:8 94:10 98:11
   101:18
**specialized**  12:13
**specific**  12:23
   86:17 118:16
**specifically**  8:21
   13:13 14:17,19
   56:12 66:23
**specifics**  82:19
**speculate**  116:16
**speculating**
   126:22

**speculation**  37:2
   48:3 54:18 62:20
   63:5 68:12 77:6
   82:25 83:15 97:12
   97:25 98:8 99:2
   112:15 113:19
   116:11 120:10
   121:4 124:18
   127:13
**spent**  116:9
**split**  57:25 58:5
**spoke**  14:13 39:5
   67:17 72:12 83:3
**spring**  2:10
**squad**  11:24 18:16
   18:18,25 19:8
   24:2,22 25:11
   27:3 40:13 73:18
   83:19 97:17
   122:11
**staff**  19:1,14 20:2
   26:3,5 122:11
**stage**  81:6
**standard**  43:7,8
   50:3
**stands**  115:16
**start**  6:19 10:11
   16:3 66:25 102:16
   122:5 127:19
**started**  16:24
   101:6
**starting**  16:2 39:2
**starts**  98:16
**state**  4:10 8:19
   34:16 119:10
   132:23 133:3
**statement**  22:14
   44:11 106:20
   119:6 123:25
**statements**  74:18
   102:22

**states**  1:1,7,8,16
   2:9 11:10 14:25
   15:8,10 20:18
   47:23 48:5 63:23
   64:5 73:16 76:24
   78:15 100:1,16,24
   125:10 126:23
   129:16,19 130:1,6
   134:4 135:1 136:1
**status**  20:20
**statute**  43:14
**statutory**  23:17
**stay**  129:3
**stayed**  24:21
**stem**  24:25
**stenographic**
   133:11
**stenographically**
   1:23 133:7
**stephanie**  62:16
**steps**  48:17 83:25
**stern**  24:25
**steven**  19:21
**sticky**  88:15
**stones**  32:20
**stored**  78:16
**story**  99:7,9
   100:23
**straight**  130:4
**straightforward**
   91:5
**street**  2:10
**strengthen**  32:17
   40:6
**strike**  75:9
**strong**  87:11 89:13
**stuff**  5:23 104:2
**sub**  96:11
**subject**  21:25
   22:10 24:19 34:22
   74:17

Exhibit O
1615

**subjected** 95:23
**submit** 47:8,10 49:13 57:18 59:7 61:6,24 63:16 112:7 117:17,20 118:5,6,24
**submits** 50:25 53:21
**submitted** 56:4 76:9 77:23 120:13 123:24 124:3 130:12
**submitting** 54:10
**subscribed** 136:14
**subsequent** 30:23 33:23 38:19 40:1 40:8 42:2 102:3
**substance** 71:10
**sufficient** 77:2
**suggestions** 124:15
**suggests** 96:24 98:4
**suite** 2:6 4:13
**summary** 23:20 29:24 67:11 109:22
**summer** 67:5,6,8 68:21 72:13 83:4
**supervising** 18:14
**supervisor** 11:20 12:11 18:11 27:2 83:19
**supervisors** 97:14
**supervisory** 1:15 3:3 18:7,8,10,15 23:24 25:23 130:19 132:8 133:8
**supplement** 32:6 100:23 103:14

**supplemental** 3:15 99:16
**supplements** 99:15
**supplied** 77:2
**support** 20:1 39:23 44:13 76:9 76:16 104:20 110:11,18,23 123:14 129:2,7,9 129:25 130:12
**supporting** 50:9 51:3
**supposed** 110:13
**sure** 4:24 5:15,20 6:2,18 9:10 19:20 23:3 38:12 43:23 54:16 62:24 64:17 83:11,17 100:14 102:12 103:5 113:1 115:19 118:17
**surprised** 5:5
**surrounding** 31:1 46:21
**swear** 4:3
**sworn** 6:23 22:5 132:10 136:14
**system** 44:23 109:21 111:8
**systems** 1:25

**t**

**t** 4:12 15:15 135:3 135:3
**table** 109:2
**take** 8:5,5 9:13 10:17 30:12 33:19 34:25 35:5,11 36:5 37:6,8 38:10 48:18 64:6 81:19 83:25 92:24

109:24 121:23,23
**takedown** 72:23 80:2,5,7,21 82:22 84:24 85:3 86:22 86:23 93:9 102:1 102:13,17 103:14 108:6,7 113:6 114:14,21,25 116:10,21 120:4,8 120:25
**taken** 5:1
**talk** 6:6,7,8,9 8:1 55:7 65:18 66:23 67:25,25 84:20 106:6 110:18
**talked** 19:25 31:16 68:2,22 91:6 101:12 103:17
**talking** 14:24 15:6 21:23 28:23,25 38:17 40:9 44:24 44:25 49:1 56:11 56:14 60:14 66:22 73:5 75:8 82:9,24 98:19 108:3 113:3 113:11 128:23
**tangible** 33:19
**tasked** 24:7
**tasking** 108:11
**teach** 17:10,16,19
**team** 27:14 80:25 94:10 97:1,8,19 98:6,6,9,16 102:6 104:17,17 105:4,4 105:21 107:14 123:17
**team's** 123:20
**technically** 59:22
**techs** 94:4
**tell** 7:14 10:4 11:6 14:11 15:14,18,25

16:14 18:18,23 19:15,23 38:22 43:21 48:12 49:23 67:7 68:4 69:14 82:15 84:15 95:7 101:14 116:14
**telling** 68:18
**temporary** 16:17
**ten** 12:10
**tent** 95:12
**term** 18:9 60:4 118:9,18
**terminate** 126:19
**terminated** 125:23 125:24 126:15 128:7
**terminates** 126:19
**terrible** 110:1
**testified** 104:9 125:5 129:2
**testify** 128:2
**testifying** 7:6
**testimony** 4:3 8:9 8:16 44:21 69:21 131:2 134:9,18 136:8
**thank** 4:9,14 66:17 105:18 110:6 125:13 130:18 131:2,4,5
**thing** 8:2 17:20 34:1 94:1 103:16 114:20 125:3,4
**things** 5:10,23 17:10 32:20 40:16 40:24 83:12 84:15 87:10 123:10
**think** 6:16 10:1,3 13:14,20 21:14 29:16 30:3 37:18 41:19 43:4 45:6

Exhibit O
1616

ER-574

[think - understand]  Page 24

48:12 53:19 59:1
61:12,21 62:17,18
62:21 65:10,20
66:1,6 69:16
70:21 74:6,9
80:18 84:21 90:25
91:1,20 93:6,10,25
95:19 97:13 98:16
99:10 101:9 104:8
109:19 113:8
116:25 119:11
121:5,17,19
122:18 125:4,21
128:13,16,19
130:17,17
**thinking** 27:11
**third** 47:9
**thought** 108:8
112:25
**thousands** 54:22
120:6
**three** 12:11 24:4
24:14 47:6 57:24
113:4
**threshold** 36:23
38:7 105:10,17
107:7
**ticket** 94:20 95:14
**ticking** 82:4
**tie** 118:16
**tied** 43:11,13
**time** 5:7 9:6,14
23:13 24:8,22
29:10 42:13 45:5
46:24 54:2,21
66:14,15 67:9,17
68:13 71:24 72:7
72:11 80:21 82:9
84:4 90:14,15
91:13 92:16 93:8
93:11 102:3 116:9

117:13,21 118:22
127:9 129:4
134:19
**timeframe** 134:8
**timeline** 57:17
127:15
**timelines** 127:16
127:17,18
**timely** 23:14
**times** 22:3 24:4,13
31:5 43:3 88:12
94:17
**timing** 95:22
**tiny** 107:7
**title** 4:11 39:10
**titular** 48:15
**today** 4:9 8:12,16
11:10,14 14:24
15:7 112:13 131:1
**today's** 14:12
**token** 6:18
**told** 67:11,21
69:15 116:2
**top** 108:21
**topic** 11:15 13:7,9
74:10,19 81:11
128:1
**topics** 11:11,18
12:19 13:3,15,17
13:19,21 14:1
25:5 30:8 31:4
34:6,24 36:15
37:2,25 40:21
44:5 48:20 49:10
50:6,20 51:18
52:19 54:19 60:19
63:4 74:22,25
75:3 77:6 78:21
79:24 84:11 99:3
100:6 111:1,17
112:11,12

**total** 12:6
**touch** 131:9
**touching** 83:10,17
**tracing** 22:1
**tracked** 94:22
**tracy** 1:7
**trafficker** 89:4
**trafficking** 50:25
51:7 88:13
**training** 12:12,13
17:3,21
**trainings** 12:18,22
**transcript** 133:10
133:10 134:6,20
136:5,8
**transfer** 20:21
**transferred** 55:9
126:23
**transmitted**
122:16
**transported** 95:17
**true** 45:21,22
133:11 136:8
**truth** 4:4,5,5
**truthfully** 7:1
**try** 7:13 9:21,22
32:10
**trying** 14:3 20:9
21:11,12 28:6
29:2 40:14 50:2
50:13 62:5 79:13
85:25 96:10 106:7
106:13 108:23
110:20 119:23
120:22
**tuesday** 101:6
**turn** 36:9
**turned** 96:2
**two** 9:23 18:25
19:6,7,11 21:16
24:3,5,13 70:12,13

70:13 128:20
**type** 22:2,16 40:23
70:3
**types** 40:16 58:18
**typically** 37:20

**u**

**u** 15:15,16
**u.s.** 4:20 13:9,12
14:18 34:3,18,18
36:2,10 55:9
62:24 66:24 67:1
67:8,22 68:23,25
69:19 70:12,15,23
71:5 72:1,13,19
75:13 78:12,25
79:5,17,20 80:4,15
82:10,21 83:4
92:10 94:8 101:5
103:21,24 106:3
116:10,22 119:14
119:17 120:8,25
122:7 124:11
125:15 126:2
127:4,23
**uc** 16:5
**uh** 5:23,23
**ultimate** 51:24
52:10
**ultimately** 29:7
37:8 49:24 52:14
55:20 56:9 59:17
77:14 106:2
118:25 119:4,5
**unclear** 79:12
**undersigned** 132:6
**understand** 6:20
6:25 7:4,8,15,25
8:12 9:3,20 14:2
15:6 20:16 21:11
21:13,14 26:1
27:9 28:6 29:2,16

35:11 36:12 45:7
58:7 59:1 61:17
65:13 80:18 95:19
97:9 99:20 106:16
106:17 110:16
113:6 114:9 125:2
125:3,14
**understanding**
4:24 11:9 36:13
41:23 44:21 47:4
48:11 53:6 54:9
61:15 63:6 65:16
75:20 83:2 87:3
88:6 94:23 97:3
106:14 109:15
112:4 118:5
**underway** 126:1
126:16
**unfortunately**
85:21
**unique** 58:17
120:23
**unit** 18:20 21:6
51:23 52:9 54:3
54:22 62:13,15
68:19 69:25,25
70:9 73:18 84:6
91:21 102:19
122:19,23,25
123:13 124:10,12
**united** 1:1,7,8,16
2:9 11:10 14:25
15:8,10 20:18
47:23 48:5 63:23
64:5 73:16 76:24
78:15 100:1,16,24
125:10 126:23
129:16,19 130:1,5
134:4 135:1 136:1
**units** 11:21 92:9

**unturned** 32:20
**upload** 20:4
**uploaded** 111:7
**usao** 74:10 113:10
**usdoj.gov** 134:2
**use** 8:25 57:6,10
71:24 72:18 75:8
75:11 76:25 82:3
84:1,9,17 85:9
99:22 115:4
**useful** 89:19
**uspis** 57:11 59:4,9
**uspv** 3:20
**usual** 5:24
**usually** 24:3 73:21

**v**

**v** 134:4 135:1
136:1
**va** 2:6
**vague** 25:4 37:25
44:5 47:16 49:9
50:21 60:20 61:4
79:8
**valid** 47:20
**valuable** 107:12
**valuables** 107:2,5
109:11
**value** 37:16,21
107:6
**variations** 24:20
**various** 20:20
40:13 58:15
**vary** 22:19
**vault** 109:11
**vaults** 4:20 13:9
13:12 14:18 36:10
66:24 67:1,8,10,22
68:23,25 69:19
70:12,15,23 71:5
72:1,13,19 75:13
78:12,15,25 79:5

79:17,20 80:4,15
82:10,21 83:4
92:10 94:8 101:5
103:21,24 106:3
116:10,22 119:14
119:17 120:8,19
120:25 122:7
124:7,8,11 125:15
127:4,23
**verbal** 6:2
**verbally** 5:21
**verify** 134:9
**veritext** 134:14,23
**veritext.com.**
134:15
**version** 76:21
77:22 78:8 103:23
**versus** 33:19 63:2
78:16 79:21 91:22
105:8
**victims** 20:24,25
**victor** 2:10 8:2,6
8:19,23 14:13
100:10 110:1
115:8 126:2
130:22 134:1
**victor.rodgers**
134:2
**viewed** 51:7
**violating** 18:2
**vs** 1:6

**w**

**wait** 6:15 54:1
76:20,20 117:22
119:3
**waiting** 54:4
**walk** 21:12 27:13
47:7 95:8 124:25
**want** 4:22 8:1,25
15:10 18:22 19:19
23:2,2 27:12

57:14 61:21 66:3
66:23 73:8 74:21
80:19,19 85:17
91:16 96:7 101:12
106:6 110:8,25
113:3,14 118:17
121:14 124:25
128:23
**wanted** 71:1 76:19
87:16 92:4 113:1
**warehouse** 28:2
**warrant** 4:20
17:17,17 22:3,4
28:14,14,19 29:5,9
30:2,4,10,14,18,20
31:13,20,22,23
39:6 42:9,12 50:9
68:5 71:4,5,8,11
71:13,15,18,21
72:8,16 76:10,16
77:2,15 78:6,7
79:14 80:22,24
81:1 93:12 97:4
101:16,16 102:4,5
115:19 116:3
**warranted** 33:5
**warrants** 22:5
72:4,6 81:3,4
101:2
**washington** 26:9
26:21 122:14,20
**watermarked**
134:6
**way** 20:9 28:17
42:9 48:13 60:4
74:23 95:25
118:18 129:3
**ways** 28:17 58:6
100:18
**we've** 20:25 39:19
39:19,21 43:16

Exhibit O
1618
ER-576

[we've - zoom]                                                    Page 26

103:17 109:25
**webster**   19:10
**week**   102:1,9
**went**   16:4,5,6 17:2
   36:11,12,17 92:7
   92:11 96:12
   107:12 109:11
**west**   4:12
**wilkison**   1:7
**willing**   75:2
**wire**   56:7
**withdrawal**   51:5
**witness**   3:10 4:6
   11:13 74:14,24
   75:15,16 112:13
   114:16 126:7,8,18
   126:21,24 128:1
   131:4 134:8,10,12
   134:19
**wondering**   19:15
   30:23 35:9 36:8
   54:8,13 56:10
   60:10 61:20,24
   62:2 102:18
   104:13
**woods**   62:16
**word**   29:3
**work**   12:8,14 19:3
   19:5,8 20:18
   21:17 28:8 33:14
   57:21 58:15 64:21
   65:2 87:14 119:16
   126:5
**working**   21:21
   22:3,6,8 94:5
**workings**   118:3
**workload**   54:23
**works**   26:15
**world's**   14:3
**worth**   37:23 107:6
   108:21

**wow**   73:20
**write**   33:16 44:11
   57:20
**writing**   26:2 33:20
**wrote**   93:16

| x |
|---|

**x**   3:1

| y |
|---|

**y**   15:16
**yeah**   33:7 56:8
   57:3 61:10 65:5,6
   65:24 86:4,10
   88:8 90:19 95:19
   119:23 124:8
**year**   12:19
**years**   11:24,25
   12:6,10,11 25:12
   70:1,7 87:15 91:8
   91:19

| z |
|---|

**zellhart**   82:7,10
   83:3 108:4
**zero**   47:10
**zoom**   6:7,11

Exhibit O
1619

ER-577

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit O**
**1622**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit O
1623**

ER-581

**THE INSTITUTE FOR JUSTICE**
Robert Frommer*
rfrommer@ij.org
Michael Greenberg*
mgreenberg@ij.org
Joseph Gay*
jgay@ij.org
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

* Admitted pro hac vice.

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC, and TRAVIS MAY,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**UNITED STATES OF AMERICA, TRACY L. WILKISON, in her official capacity as Acting United States Attorney for the Central District of California, and KRISTI KOONS JOHNSON, in her official capacity as an Assistant Director of the Federal Bureau of Investigation,**<br><br>Defendants. | Case No. 2:21-cv-04405-RGK-MAR<br><br>**DECLARATION OF ROBERT FROMMER IN SUPPORT OF PARTIES' JOINT SEPARATE STATEMENT OF FACTS AND IN FURTHER SUPPORT OF PLAINTIFFS' OPENING BRIEF**<br><br>Judge: Hon. R. Gary Klausner<br>Trial: August 23, 2022<br>Complaint Filed: May 27, 2021<br>Amended Complaint Filed: June 9, 2021 |

1    I, Robert Frommer, submit the following declaration in support of Plaintiffs'
2  Opening Brief.
3    1.    I am an active member of the State Bar of Virginia and a senior
4  attorney at the Institute for Justice. I am admitted *pro hac vice* in this proceeding,
5  and I submit this declaration in support of the parties' joint separate statement of
6  facts and in further support of Plaintiffs' Opening Brief.
7    2.    Attached as <u>Exhibit R</u> is a partially redacted copy of the government's
8  response to Plaintiffs' Interrogatory No. 9, which asked Defendants to "[i]dentify
9  all individuals who had property seized from the U.S. Private Vaults facility in
10  March 2021, whose identity is known to the FBI, and whose property was
11  subsequently returned.  For each individual, state the individual's name and U.S.
12  Private Vaults box number."  Plaintiffs obtained this response from Defendants in
13  discovery, and redacted identifying names so as to provide an estimate as to the size
14  of the overall class.
15    3.    Attached as <u>Exhibit S</u> is a copy of the government's response to
16  Plaintiffs' Request for Admission No. 5, which Plaintiffs obtained from the
17  government in discovery.
18
19    I declare under penalty of perjury under the laws of the United States that the
20  foregoing is true and correct.
21
22    Executed this 10th day of August, 2022.
23
24            /s/ Robert Frommer
              Robert Frommer
25
26
27
28

# Exhibit R

**to Declaration of Robert Frommer**

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
VICTOR A. RODGERS (Cal. Bar No. 101281)
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorneys
Major Frauds/Asset Forfeiture/
General Crimes Sections
    1100/1400/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102/2569/1785
    Facsimile: (213) 894-6269/0142/0141
    E-mail: Andrew.Brown@usdoj.gov
           Victor.Rodgers@usdoj.gov
           Maxwell.Coll@usdoj.gov

Attorneys for Defendants
UNITED STATES OF AMERICA, et al.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC, AND TRAVIS MAY,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES OF AMERICA, ET AL.,<br><br>        Defendants. | Case No. 2:21-CV-04405-RGK-MAR<br><br>**DEFENDANTS UNITED STATES OF AMERICA, ET AL.'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES** |

      Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants United States of America, Tracy L. Wilkison, in her official capacity as Acting United States Attorney for the Central District of California, and Kristi Koons Johnson, in her official capacity as an Assistant Director of the Federal Bureau of Investigation (collectively.

**Exhibit R**
**1631**

ER-585

1  "Defendants"), by their attorneys, hereby submit these supplemental responses to the
2  Plaintiffs' Second Set of Interrogatories as set forth below.

3  **INTERROGATORY NO. 9:**

4      Identify all individuals who had property seized from the U.S. Private Vaults
5  facility in March 2021, whose identity is known to the FBI, and whose property was
6  subsequently returned.  For each individual, state the individual's name and U.S. Private
7  Vaults box number.

8  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

9      Defendants maintain their original objections to this interrogatory but, without
10  waiving those objections, identify below each individual's name and U.S. Private Vaults
11  box number whose property seized from their boxes has been returned, or is assigned for
12  return, in its entirety even though some individuals may claim that some of their property
13  has not been returned because it is missing, converted or otherwise.  In addition, the
14  government notes that the identity of these individuals is not necessarily "known" to the
15  government (as requested by this interrogatory and is therefore overbroad because the
16  class is limited to persons who have "identified themselves" to the government) as the
17  government can only provide its best estimate of the identity of these persons based upon
18  the information available to it from information contained in their U.S. Private Vaults
19  box or other communication with the government, and U.S. Private Vaults had a
20  business model that allowed boxholders to open boxes at the facility anonymously.  The
21  information is as follows and is hereby designated as CONFIDENTIAL-SUBJECT TO
22  PROTECTIVE ORDER:

| Box Number | Box Holder |
|---|---|
| 3 | ████ 1 ████ |
| 20 | ████ 2 ████ |
| 22 | ████ 3 ████ , ████ 4 ████ |
| 24 | ████ 5 ████ |
| 31 | ████ 6 ████ |

**Exhibit R**
**1632**

**ER-586**





| 1 | 224 | 36 |
| 2 | 225 | 37 |
| 3 | 226 | 38 |
| 4 | 227 | 39 |
| 5 | 228 | 40 |
| 6 | 233 | 41 |
| 7 | 236 | 42 |
| 8 | 237 | 43 |
| 9 | 305 | 44 |
| 10 | 309 | 45 |
| 11 | 310 | 46 |
| 12 | 311 | 47 |
| 13 | 316 | 48 |
| 14 | 319 | 49 / 50 |
| 15 | 321 | 51 |
| 16 | 323 | 52 |
| 17 | 327 | 53 |
| 18 | 328 | 54 |
| 19 | 334 | 55 and/or 56 |
| 20 | 336 | 57 |
| 21 | 337 | 58 |
| 22 | 339 | 59 and 380 |
| 23 | 500 | 60 and 381 |
| 24 | 502 | 61 |
| 25 | 505 | 62 |
| 26 | 510 | 63 |
| 27 | 512 | 64 |
| 28 | 513 | 65 |

**Exhibit R**
**1634**

ER-588



| | | |
|---|---|---|
| 1 | 602 | 66 |
| 2 | 603 | 67 |
| 3 | 615 | 68 |
| 4 | 616 | 69 |
| 5 | 700 | 70 |
| 6 | 702 | 71 |
| 7 | 703 | 72 |
| 8 | 713 | 73 |
| 9 | 716 | 74 |
| 10 | 802 | 75 |
| 11 | 803 | 76 |
| 12 | 809 | 77 |
| 13 | 814 | 78 |
| 14 | 901 | 79 |
| 15 | 902 | 80 |
| 16 | 913 | 81 |
| 17 | 1000 | 82 |
| 18 | 1001 | 83 |
| 19 | 1102 | 84 |
| 20 | 1108 | 85 |
| 21 | 1110 | 86 |
| 22 | 1200 | 87 |
| 23 | 1208 | 88 |
| 24 | 1212 | 89 |
| 25 | 1300 | 90 |
| 26 | 1301 | 60 and 382 |
| 27 | 1302 | 91 and 92 |
| 28 | 1400 | 93 |

**Exhibit R**
**1635**

ER-589



| | | |
|---|---|---|
| 1 | 1402 | 94 |
| 2 | 1403 | 95 |
| 3 | 1503 | 96 |
| 4 | 1504 | 95 / 97 |
| 5 | 1600 | 98 |
| 6 | 1601 | 99 |
| 7 | 1602 | 100 |
| 8 | 1604 | 101 |
| 9 | 1607 | 102 |
| 10 | 1700 | 103 |
| 11 | 1703 | 104 |
| 12 | 1704 | 95 |
| 13 | 1801 | 106 |
| 14 | 1802 | 107 |
| 15 | 1803 | 108 |
| 16 | 1900 | 109 |
| 17 | 1902 | 110 |
| 18 | 1912 | 111 |
| 19 | 2000 | 112 |
| 20 | 2001 | 113 |
| 21 | 2004 | 114 |
| 22 | 2010 | 115 |
| 23 | 2100 | 116 |
| 24 | 2102 | 117 |
| 25 | 2105 | 118 |
| 26 | 2202 | 119 |
| 27 | 2301 | 120 |
| 28 | 2302 | 121 |

| | | |
|---|---|---|
| 1 | 2303 | 122 |
| 2 | 2309 | 123 |
| 3 | 2400 | 124 |
| 4 | 2401 | 125 |
| 5 | 2402 | 126 |
| 6 | 2408 | 127 |
| 7 | 2501 | 128 |
| 8 | 2503 | 129 |
| 9 | 2504 | 130 |
| 10 | 2505 | 131 |
| 11 | 2509 | 132 |
| 12 | 2512 | 133 |
| 13 | 2601 | 134 |
| 14 | 2610 | 135 |
| 15 | 2700 | 136 |
| 16 | 2701 | 137 |
| 17 | 2702 | 138 |
| 18 | 2712 | 139 |
| 19 | 2802 | 140 |
| 20 | 2808 | 141 |
| 21 | 2902 | 142 |
| 22 | 3000 | 143 |
| 23 | 3004 | 144 |
| 24 | 3010 | 145 / 146 / 147 |
| 25 | 3016 | 144 |
| 26 | 3017 | 95 |
| 27 | 3100 | 148 |
| 28 | 3103 | 149 |

**Exhibit R**
**1637**



| 1 | 3105 | 150 |
| 2 | 3106 | 151 |
| 3 | 3107 | 152 |
| 4 | 3201 | 153 |
| 5 | 3206 | 154 |
| 6 | 3301 | 155 and 156 |
| 7 | 3303 | 157 and 158 |
| 8 | 3304 | 159 |
| 9 | 3307 | 160 |
| 10 | 3404 | 161 |
| 11 | 3405 | 162 / 163 - |
| 12 | 3406 | 164 |
| 13 | 3500 | 165 |
| 14 | 3501 | 166 |
| 15 | 3503 | 167 |
| 16 | 3505 | 168 |
| 17 | 3600 | 169 |
| 18 | 3607 | 170 |
| 19 | 3700 | 171 |
| 20 | 3705 | 172 , 173 |
| 21 | 3706 | 174 |
| 22 | 3800 | 175 |
| 23 | 3801 | 176 |
| 24 | 3802 | 177 |
| 25 | 3803 | 178 |
| 26 | 3807 | 179 |
| 27 | 3900 | 180 |
| 28 | 3905 | 181 |

**Exhibit R**
**1638**



| | | |
|---|---|---|
| 1 | 3906 | 165 |
| 2 | 4004 | 182 |
| 3 | 4006 | 183 |
| 4 | 4100 | 72 |
| 5 | 4101 | 184 |
| 6 | 4107 | 185 |
| 7 | 4200 | 186 |
| 8 | 4204 | 187 |
| 9 | 4301 | 188 / 189 |
| 10 | 4307 | 108 |
| 11 | 4401 | 190 |
| 12 | 4404 | 171 |
| 13 | 4406 | 191 |
| 14 | 4500 | 121 |
| 15 | 4601 | 165 |
| 16 | 4605 | 192 |
| 17 | 4705 | 13 |
| 18 | 4807 | 193 |
| 19 | 4900 | 194 |
| 20 | 4901 | 195 |
| 21 | 4902 | 196 |
| 22 | 4906 | 171 |
| 23 | 5001 | 197 |
| 24 | 5006 | 198 |
| 25 | 5100 | 197 |
| 26 | 5104 | 200 |
| 27 | 5107 | 201 |
| 28 | 5154 | 202 |

**Exhibit R**
**1639**



| | | |
|---|---|---|
| 1 | 5155 | 203 |
| 2 | 5157 | 204 |
| 3 | 5158 | 205 |
| 4 | 5160 | 206 |
| 5 | 5163 | 207 |
| 6 | 5165 | 208 |
| 7 | 5202 | 209 |
| 8 | 5203 | 210 |
| 9 | 5210 | 211 |
| 10 | 5211 | 212 |
| 11 | 5212 | 213 |
| 12 | 5302 | 214 |
| 13 | 5306 | 215 |
| 14 | 5308 | 216 |
| 15 | 5311 | 217 |
| 16 | 5407 | 218 and 219 |
| 17 | 5410 | 220 |
| 18 | 5412 | 13 |
| 19 | 5505 | 221 |
| 20 | 5507 | 222 |
| 21 | 5508 | 223 |
| 22 | 5509 | 224 |
| 23 | 5511 | 225 |
| 24 | 5609 | 226 |
| 25 | 5610 | 227 |
| 26 | 5702 | 228 |
| 27 | 5703 | 229 |
| 28 | 5706 | 230 |

ER-594



| | | |
|---|---|---|
| 1 | 5709 | 231 |
| 2 | 5805 | 232 |
| 3 | 5807 | 233 |
| 4 | 5809 | 234 |
| 5 | 5810 | 235 and 236 |
| 6 | 5907 | 237 |
| 7 | 5908 | 238 |
| 8 | 5909 | 239 |
| 9 | 5910 | 240 |
| 10 | 6006 | 241 |
| 11 | 6007 | 242 |
| 12 | 6008 | 243 |
| 13 | 6009 | 244 |
| 14 | 6012 | 245 |
| 15 | 6104 | 246 |
| 16 | 6106 | 247 |
| 17 | 6207 | 248 |
| 18 | 6208 | 131 |
| 19 | 6210 | 249 |
| 20 | 6300 | 250 |
| 21 | 6312 | 251 |
| 22 | 6407 | 252 |
| 23 | 6409 | 253 |
| 24 | 6509 | 254 |
| 25 | 6512 | 255 |
| 26 | 6513 | 256 |
| 27 | 6514 | 257 |
| 28 | 6604 | 258 |





| 1 | 7312 | 275 |
| 2 | 7313 | 276 |
| 3 | 7315 | 277 |
| 4 | 7316 | 278 |
| 5 | 7407 | 279 |
| 6 | 7411 | 280 |
| 7 | 7413 | 281 |
| 8 | 7417 | 282 |
| 9 | 7420 | 283 |
| 10 | 7421 | 284 |
| 11 | 7509 | 285 |
| 12 | 7510 | 286 |
| 13 | 7512 | 287 |
| 14 | 7513 | 288 |
| 15 | 7515 | 289 |
| 16 | 7518 | 290 |
| 17 | 7519 | 291 |
| 18 | 7601 | 292 |
| 19 | 7602 | 293 / 294 |
| 20 | 7604 | 295 |
| 21 | 7605 | 296 |
| 22 | 7608 | 297 |
| 23 | 7612 | 298 |
| 24 | 7614 | 299 / 300 |
| 25 | 7616 | 301 / 302 |
| 26 | 7618 | 303 / 304 |
| 27 | 7619 | 305 |
| 28 | 7622 | 306 |

| | | |
|---|---|---|
| 1 | 7623 | 307 |
| 2 | 7626 | 308 |
| 3 | 7630 | 309 |
| 4 | 7700 | 310 |
| 5 | 7701 | 311 |
| 6 | 7704 | 312 |
| 7 | 7708 | 313 |
| 8 | 7713 | 254 |
| 9 | 7714 | 314 |
| 10 | 7717 | 315 or 316 |
| 11 | 7720 | 317 |
| 12 | 7721 | 318 |
| 13 | 7722 | 319 |
| 14 | 7723 | 320 |
| 15 | 7724 | 321, 322 |
| 16 | 7725 | 323 |
| 17 | 7727 | 324 |
| 18 | 7732 | 325 |
| 19 | 7800 | 326 |
| 20 | 7801 | 327 |
| 21 | 7802 | 328 |
| 22 | 7803 | 329 |
| 23 | 7809 | 330 |
| 24 | 7824 | 331 |
| 25 | 7825 | 332 |
| 26 | 7828 | 333 |
| 27 | 7829 | 334 |
| 28 | 7831 | 335 |

Exhibit R
1644

| | | |
|---|---|---|
| 1 | 7834 | 336 |
| 2 | 7902 | 337 |
| 3 | 7906 | 334 |
| 4 | 7912 | 338 |
| 5 | 7913 | 328 |
| 6 | 7914 | 339 |
| 7 | 7916 | 340 |
| 8 | 7917 | 341 |
| 9 | 7918 | 299 |
| 10 | 7920 | 342 |
| 11 | 7921 | 343 |
| 12 | 7922 | 344 |
| 13 | 8000 | 345 |
| 14 | 8003 | 346 |
| 15 | 8004 | 347 |
| 16 | 8005 | 348 |
| 17 | 8006 | 349 |
| 18 | 8008 | 350 |
| 19 | 8012 | 351 |
| 20 | 8013 | 352 |
| 21 | 8014 | 353 |
| 22 | 8016 | 354 |
| 23 | 8017 | 355 |
| 24 | 8018 | 356 |
| 25 | 8019 | 357 |
| 26 | 8020 | 358 |
| 27 | 8022 | 13 |
| 28 | 8108 | 359 |

1    8110    360

2    8111    361

3    8112    362

4    8113    363

5    8115    364

6    8116    365

7    8117    366

8    8121    367

9    8210    368

10    8211    369

11    8302    370

12    8303    371

13    8306    372

14    8307    373

15    8309    374

16    8311    375

17    8401    376

18    8402    377

19    8408    378

20    8409    379

21

22 **INTERROGATORY NO. 11:**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VERIFICATION**

I, Lynne Zellhart, hereby declare that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the above Defendants United States of America et. al.'s supplemental responses to plaintiffs' second set of interrogatories. As to the answers, I am informed and believe that the answers are true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 18, 2022 at Los Angeles, California.

_____
LYNNE ZELLHART

# **Exhibit S**

**to Declaration of Robert Frommer**

ER-602

1   TRACY L. WILKISON
    United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    ANDREW BROWN (Cal. Bar No. 172009)
4   VICTOR A. RODGERS (Cal. Bar No. 101281)
    MAXWELL COLL (Cal. Bar No. 312651)
5   Assistant United States Attorneys
    Major Frauds/Asset Forfeiture Sections
6        1100/1400/ United States Courthouse
         312 North Spring Street
7        Los Angeles, California 90012
         Telephone: (213) 894-0102/2569/1785
8        Facsimile: (213) 894-6269/0142
         E-mail: Andrew.Brown@usdoj.gov
9               Victor.Rodgers@usdoj.gov
                Maxwell.Coll@usdoj.gov
10
    Attorneys for Defendants
11  UNITED STATES OF AMERICA, et al.

12                  UNITED STATES DISTRICT COURT

13           FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                        WESTERN DIVISION

15  PAUL SNITKO, JENNIFER SNITKO,        Case No. 2:21-CV-04405-RGK-MAR
    JOSEPH RUIZ, TYLER GOTHIER,
16  JENI VERDON-PEARSONS,                **DEFENDANTS UNITED STATES OF**
    MICHAEL STORC, AND TRAVIS            **AMERICA, ET AL.'S RESPONSES TO**
17  MAY,                                 **PLAINTIFFS' SECOND SET OF**
                                         **REQUESTS FOR ADMISSIONS**
18          Plaintiffs,

19          v.

20  UNITED STATES OF AMERICA, ET
    AL.,
21
22          Defendants.
23

24          Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants United

25  States of America, Tracy L. Wilkison, in her official capacity as Acting United States

26  Attorney for the Central District of California, and Kristi Koons Johnson, in her official

27  capacity as an Assistant Director of the Federal Bureau of Investigation (collectively.

28

                              **Exhibit S**
                                 **1649**                              **ER-603**

"Defendants"), by their attorneys, hereby submit this response to the Plaintiffs' Second Set of Requests for Admissions, as set forth below.

## PRELIMINARY STATEMENT

Defendants have not at this time fully completed their discovery and investigation in this action. All responses contained herein are based solely upon such information and evidence as are presently available and specifically known to Defendants at this time and disclose only those factual contentions and legal conclusions which presently occur to Defendants at this time. Further discovery, investigation, research and analysis is expected to supply additional facts, add meaning to currently known facts, and establish entirely new factual contentions and legal conclusions, which may lead to substantial additions or changes to the information provided herein. Defendants reserve the right to add or change any and all responses herein as additional facts are ascertained, legal research is completed, and analyses are undertaken. The responses herein are made in a good faith effort to supply as much information as is presently known to Defendants in this action.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**Exhibit S**
**1650**

ER-604

1 ██████████████████████████████████████████████

2 ████████████

3 **REQUEST FOR ADMISSIONS NO. 5:**

4     Admit that, based on the government's "best estimate" as reflected in the

5 government's supplemental response to Interrogatory No. 9, the total number of persons

6 who are identified as "Box Holders" in that supplemental response exceeds 360 persons.

7 **RESPONSE TO REQUEST FOR ADMISSIONS NO. 5:**

8     Defendants object that this request is burdensome, oppressive and harassing and

9 seeks discovery disproportionate to the needs of this case.  Plaintiffs have served three

10 sets of interrogatories, four sets of document requests and two sets of requests for

11 admissions.  Defendants are not required to admit the statements already contained in

12 their responses to supplemental responses to particular interrogatories, which responses

13 speak for themselves.

14 Dated: May 25, 2022

                          TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

                               /s/
                        ANDREW BROWN
VICTOR A. RODGERS
MAXWELL COLL
Assistant United States Attorneys

                        Attorneys for Defendants
UNITED STATES OF AMERICA, et al.

**Exhibit S**

**1651**

**ER-605**

1    **PROOF OF SERVICE BY MAILING**

2         I am over the age of 18 and not a party to the within action.  I am employed by the

3    Office of the United States Attorney, Central District of California.  My business address

4    is 312 North Spring Street, 14th Floor, Los Angeles, California 90012.

5         On **May 25, 2022,** I served a copy of**: DEFENDANTS UNITED STATES OF**

6    **AMERICA, ET AL.'S RESPONSES TO PLAINTIFFS' SECOND SET OF**

7    **REQUESTS FOR ADMISSIONS** on each person or entity named below by enclosing

8    a copy in an envelope addressed as shown below and placing the envelope for collection

9    and mailing on the date and at the place shown below following our ordinary office

10   practices.

11   **TO:**

12   THE INSTITUTE FOR JUSTICE            THE INSTITUTE FOR JUSTICE
     Robert Frommer                        Robert E. Johnson
13   Joseph R. Gay                         16781 Chagrin Blvd, Suite 256
     901 N. Glebe Road, Suite 900          Shaker Heights, OH 44120
14   Arlington, VA 22203

15   THE VORA LAW FIRM, P.C.
     Nilay U. Vora
16   Jeffrey Atteberry
     201 Santa Monica Blvd., Ste. 300
17   Santa Monica, CA 90401

18   **X** I am readily familiar with the practice of this office for collection and processing

19   correspondence for mailing.  On the same day that correspondence is placed for

20   collection and mailing, it is deposited in the ordinary course of business with the United

21   States Postal Service in a sealed envelope with postage fully prepaid.

22        I declare under penalty of perjury under the laws of the United States of America

23   that I am employed in the office of a member of the bar of this Court, at whose direction

24   the service was made, and that the foregoing is true and correct.

25        Executed on **May 25, 2022,** at Los Angeles, California.

26                                          /s/ *Paul J. Read*
                                            _____
27                                          PAUL J. READ
                                            Paralegal, FSA

28

**Exhibit S**
**1652**

**ER-606**