No. 22-56050

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

PAUL SNITKO, ET AL., *Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, ET AL., *Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-04405-RGK-MAR
Hon. R. Gary Klausner

---

## APPELLANTS' EXCERPTS OF RECORD
## <u>VOLUME VI of IX</u>

---

Robert P. Frommer
Joseph Gay
Michael Greenberg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Email: rfrommer@ij.org
    jgay@ij.org
    mgreenberg@ij.org

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Email: rjohnson@ij.org

Nilay U. Vora
Jeffrey A. Atteberry
THE VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Phone: (424) 258-5190

*Attorneys for Appellants*

1  his handlers of these issues before they came to light, and when

2  initially confronted, did not disclose the full scope of his conduct.

3  There is also evidence that CS-3 fraudulently used another person's

4  credit card.

5      31.  CS-3 has provided information to the DEA since 2018 and,

6  aside from the problems set forth above, has proven reliable.  His

7  work led the seizure of drugs and weapons.  In the instant

8  investigation, CS-3's information has been regularly corroborated by

9  independent sources such as law enforcement database checks, review

10  of other records, recordings, surveillance, interviews and

11  information and operational assistance provided by other Confidential

12  Sources, unknown to CS-3.  As described below, CS-3 was repeatedly

13  paired with an undercover task force officer, who was also a witness

14  to CS-3's undercover work.

15      GEORGE VASQUEZ

16      32.  CS-3 has had numerous conversations with USPV manager,

17  GEORGE VASQUEZ.  Many of those conversations reveal that VASQUEZ is

18  aware that USPV customers engage in unlawful activity and maintain

19  the proceeds of unlawful activity in their USPV safe deposit boxes.

20  Conversations between CS-3 and VASQUEZ on June 28, August 9, and

21  August 22, 2019, were all consensually recorded and reviewed by

22  investigators.  The following examples demonstrate VASQUEZ's

23  knowledge and awareness of the criminal activity which USPV

24  facilitates.

25      33.  On June 28, 2019 CS-3 spoke to VASQUEZ about the purchase

26  of marijuana vape cartridges (discussed more fully herein).  During

27  the conversation, CS-3 said, "I don't know about this shit [vape

28  cartridges].  I'm just the money laundering *mijo*.  The real big thing

1   is the other shit [drugs, not marijuana] for me." During this

2   conversation, CS-3 unambiguously stated that he/she is the "money

3   laundering *mijo*." This statement conveys specific knowledge to

4   VASQUEZ that CS-3 is engaged in criminal activity, specifically money

5   laundering. Additionally, CS-3 contrasts his/her ignorance of the

6   cannabis oil business with his/her conduct in "other shit." Based on

7   my training and experience, as well as a comprehensive de-brief of

8   CS-3, CS-3 was referring to hard drugs, not cannabis oil, when he

9   said "The real big thing is the other shit for me." Furthermore, CS-

10  3 believes that VASQUEZ was aware that CS-3 was referring to non-

11  cannabis drug trafficking.

12          5.   VASQUEZ warns CS-3 about "asset forfeiture"

13          34.  On August 9, 2019, CS-3 spoke to USPV manager GEORGE

14  VASQUEZ about difficulties in transporting cash. VASQUEZ told CS-3

15  that USPV owners planned to expand their business into other cities,

16  including Chicago[18]. CS-3 said, "So let me tell you what I'm doing.

17  I can't fuckin' drive with this kind of cash, from fuckin' east coast

18  down here . . . 'cause I get pulled over, just like you just said."

19

20          [18] Based on my experience investigating drug trafficking and
21  money laundering organizations, I know that drug trafficking and
    money laundering activities are concentrated in certain cities.
22  These include cities on or near the U.S.-Mexico border, such as
    Laredo, San Diego and Los Angles. In addition, other cities
23  throughout the United States serve as "hubs," or center points where
    drug distribution and money collection are concentrated. For example,
24  drugs are often sent to Chicago, Illinois, before being further
    distributed to other cities in the mid-west, such as Cleveland or
25  Milwaukee. Likewise, the proceeds of drug sales are often collected
    and concentrated in Chicago as well. Based on my experience
26  investigating money laundering, I know that millions of dollars in
    drug proceeds are processed through banks in Chicago. Adding a USPV
27  branch in Chicago would likely be profitable in that it would further
    facilitate drug trafficking and money laundering. USPV owner Michael
28  POLIAK expressed this to CS-1 numerous times during conversations
    with him/her in late 2019.

USAO 000170

**Exhibit F**
**448**

1   VASQUEZ added, "Asset forfeiture."  CS-3 continued, "And I just have

2   to fuckin' walk away.  And I'm not trying to take that loss anymore.

3   . . . . So anywhere that he's [MARK PAUL] willing, you know, to go in

4   to it [private vault business], I want dibs."  Based on my training

5   and experience, as well as a comprehensive debrief of CS-3, I believe

6   that CS-3 was telling VASQUEZ about the difficulties in transporting

7   drug proceeds (cash) across the United States, and the possibilities

8   of those proceeds being seized by law enforcement.  Further, I

9   believe that VASQUEZ was aware that CS-3 was referring to the

10  transport of criminal proceeds, and his comment, "Asset forfeiture"

11  demonstrates that he is aware that law enforcement can seize and

12  forfeit money that is criminally derived.

13          6.   VASQUEZ explains that USPV would not work in New York
                 because anonymous safety deposit box rentals there are
14               prohibited

15      35.  On August 9, 2019 CS-3 spoke to USPV manager GEORGE VASQUEZ

16  about expanding USPV's business.  During the course of the

17  conversation, VASQUEZ explained why USPV's business model would not

18  work in New York.  VASQUEZ said, "You know, we had already talked

19  about several cities, you know.  We tried New York . . . And it can't

20  be like us.  It can't be anonymous and private.  . . . In New York.

21  We tried that.  That's what Mike [POLIAK] wanted first[19].  New York

22  and Jersey and all that area around there."  Based on my training and

23  experience, as well as a comprehensive debrief of CS-3, I believe

24  VASQUEZ is aware of and referencing a New York state law which

25  prohibits operating private safe deposit box vault in the manner that

26

27  _____

28      [19] MICHAEL POLIAK is from the New York and New Jersey area and
    relocated to California.

**Exhibit F**
**449**

32

USAO 000171

1 USPV operates, with anonymity, the particular quality which appeals

2 to criminals.

    7. <u>VASQUEZ and CS-3 openly discuss drug trafficking,
       money movement and money laundering</u>

36. On August 22, 2019, CS-3 spoke to USPV manager GEORGE
VASQUEZ about crossing the US-Mexico border.  During the conversation
CS-3 asked VASQUEZ, "You drive through? [the US-Mexico border].
VASQUEZ replied, "Yeah."  CS-3 asked, "And they don't sweat you at
all?"  VASQUEZ replied, "Not really."  Later in the conversation,
VASQUEZ asked CS-3, "Do you go there [Mexico] much?"  CS-3 replied,
"I do, but now I got Primo who does that so like I'm not even trying
to fuck with any of that . . . he's the one who runs back and forth."
Based on my training and experience as well as a comprehensive
debrief of CS-3, CS-3 was discussing the challenges of crossing drugs
into the United States from Mexico. Further, CS-3 believes that
VASQUEZ understood that CS-3 was making references to smuggling drugs
across the US-Mexico border.

37. On August 22, 2019, USPV manager GEORGE VASQUEZ spoke to
CS-3 about the need to hide money from both law enforcement and
people in one's own organization.  During the conversation CS-3 said,
". . . buddy of mine just got fuckin' hit, not by fuckin' feds but by
fuck his own fuckin' team.  And what are you gonna do, call the
fuckin' cops?"  VASQEZ replied, "Yeah."  Later in the conversation
CS-3 said, "Doesn't even fuckin' trust anyone.  Everybody told him,
hey you're stupid, you fuckin', find a stash pad, something."
VASQUEZ replied, "Yeah.  That's what happened with Mike [POLIAK].
That's how Mike got here. You know.  He was referred by one of my
other clients . . . He's like, hey man, you're getting too big

USAO 000172

ER-1193

1  already . . . You guys go put it away somewhere.  That's how he came

2  by.  Most of my clients are word of mouth, you know?"  Based on my

3  training and experience as well as a comprehensive debrief of CS-3,

4  CS-3 was talking to VASQUEZ about the difficulties in hiding criminal

5  proceeds both from law enforcement and from individuals in one's own

6  criminal organization.  Additionally, VASQUEZ's comments show that

7  USPV co-owner MIKE POLIAK had difficulty finding a place to put large

8  amounts of cash, presumably criminal proceeds.  Finally, VASQUEZ

9  confirmed that most of the USPV clients learn about USPV from other

10  clients, who may also be engaged in criminal activity.

11      38.  On August 22, 2019, CS-3 spoke to USPV manager GEORGE

12  VASQUEZ about needing to move money.  During the conversation CS-3

13  said, "My biggest thing right now is how do I fuckin' move it [money]

14  out.  . . . because I told you, I bought a fuckin' car, but actually

15  it gets old after a while . . . And I can only buy a certain amount

16  of cars before I need a fuckin' dealer's license."  Based on my

17  training and experience as well as a comprehensive debrief of CS-3,

18  CS-3 was talking to VASQUEZ about finding ways to launder criminal

19  proceeds, specifically drug money.  CS-3 referenced purchasing

20  vehicles as a method for laundering criminal proceeds, and the

21  difficulties that poses.  CS-3 believes that VASQUEZ was aware and

22  understood that CS-3 was talking about ways to launder criminal

23  proceeds.

24      8.  <u>VASQUEZ acknowledges the likely storage of drug proceeds at USPV</u>

25

26      39.  During the course of this investigation, agents obtained

27  information and operational assistance from an undisclosed

28

USAO 000173

ER-1194

1  Confidential Source ("CS-4")[20].  On or about February 25, 2020, CS-4,

2  who had previously rented a large 10 x 10 box at USPV, spoke to

3  VASQUEZ about a sign at USPV saying they employed the use of drug-

4  sniffing dogs.  CS-4 asked VASQUEZ when was the last time they had a

5  drug dog in USPV, and VASQUEZ said he couldn't remember.

6  **I.   USPV Principals Brokered and Supplied Illegal Drugs (THC
       and Cocaine) from SUBJECT PREMISES Including USPV**

7

8  40.   In June 2019, CS-3 cultivated a friendly business

   relationship with USPV manager GEORGE VASQUEZ.  During that time, CS-

9  3 spoke to VASQUEZ about purchasing marijuana vaping products.

10 VASQUEZ offered to provide CS-3 with samples of vaping products.

11     1.   USPV Manager VASQUEZ displayed marijuana cartridges
            for sale in the private view room of USPV

12

13 41.   On June 28, 2019, CS-3 went to USPV in person to obtain the

14 vaping samples from VASQUEZ.  The meeting was consensually recorded

15 and subsequently reviewed by the Affiant.  At approximately 11:40

16 a.m. CS-3 arrived at USPV where he/she was immediately met at the

17 front door by VASQUEZ. VASQUEZ was holding a small cardboard box in

18 his hands and directed CS-3 back to the secure vault. VASQUEZ was

19 armed at the time of this transaction with a semiautomatic pistol

20 that was in an open carry holster on his right hip alongside an

21 unknown type of badge. Investigators have noticed that VASQUEZ is

22 always armed in this fashion during his work hours as part of his

23

24    [20] CS-4 has provided information to the FBI since 2015.
   Specifically, CS-4 has provided information which has identified
25 participants in various money-laundering schemes, as well as the
   methods for pursuing those schemes. CS-4's information and
26 operational assistance have been used in numerous investigations. CS-
   4's information has been corroborated by independent sources such as
27 law enforcement database checks, review of other records, recordings,
   surveillance, interviews and other investigative activity.  CS-4's
28 information has never been found to be false or misleading.  I
   believe CS-4's information is highly credible.

**USAO 000174**

1 purported duties as the security manager for USPV. VASQUEZ and CS-3

2 proceeded to the private viewing rooms in the back of the actual

3 vault.

4     42. Once inside the room VASQUEZ placed the box on the small

5 desk and opened it revealing six small packages of various sizes with

6 different advertising boxes. CS-3 knew this to be the Butane Hash Oil

7 ("BHO") containing THC vape cartridges he/she was there to acquire

8 from VASQUEZ. The cartridges were packaged differently and displayed

9 different brand names and TCH yields on the packaging. They appeared

10 ready for retail sale in a marijuana dispensary.

11     43. During the meeting, VASQUEZ said, "So I'll text you the

12 prices right now . . . They're like from ten to seven, the prices."

13 Later VASQUEZ said, "He [the supplier] told me do whatever you want.

14 He can make pretty much whatever you want." CS-3 asked for

15 information about the product and VASQUEZ said, "that's Danka

16 [brand]. I think that's like seven. . . . He says the ones that are

17 ten bucks, which is the Brass Knuckles [brand]—" CS-3 said, "Which is

18 probably the good stuff." VASQUEZ agreed, "The good stuff . . . The

19 good quality . . . these others are kind of cheesy quality. . . . The

20 VSOP and Eurekas are the good stuff . . . so check it out." CS-3

21 agreed and accepted the samples.

22     2. <u>USPV Manager VASQUEZ hints that USPV Owner POLIAK is</u>
<u>the source of the marijuana cartridges</u>

23

24     44. CS-3 then asked about making a larger purchase. "Like, he

25 [supplier] got supply? . . . like could he produce the numbers?"

26 VASQUEZ replied, "I can tell you this. He's a partner here." CS-3

27 and VASQUEZ then discussed having CS-3 speak directly with the

28

USAO 000175

**Exhibit F**
**453**

ER-1196

1  supplier.  VASQUEZ referred to the supplier as "Mike·," subsequently

2  identified as MICHAEL POLIAK, co-owner of USPV.

3      45.  Immediately after the meeting, DEA agents took into custody

4  six samples of BHO containing THC vape cartridges.  The samples

5  included 1) Dank Vapes, Green Crack (90.66% THC); 2) Kingpen,

6  Trainwreck (71.72% THC); 3) Space Vape, V.S.O.P. (98.4% THC); 4)

7  Eureka, Purple Punch (92.3% THC); 5) Space Vape, Alien Alaskan

8  Thunderfuck (91.18% THC) and 6) Brass Knuckles, Jack Herer (1000 mg

9  cannabis distillate).

10     3.  USPV Owner POLIAK meets a customer at USPV and then
           leads him to the USPV parking lot to view marijuana
11         cartridges

12     46.  On July 26, 2019, CS-3 went to USPV to purchase a large

13  quantity of BHO THC containing vape cartridges.  The meeting was

14  consensually recorded and subsequently reviewed by the Affiant.

15  Shortly after arriving at USPV and making contact with VASQUEZ, CS-3

16  was introduced to MICHAEL POLIAK.  During the conversation, POLIAK

17  said, "Hey it's [the vaping cartridges] in my trunk, in boxes. . . .

18  Like five boxes, two hundred each."  About three minutes after

19  arriving at USPV, agents observed CS-3 and POLIAK in the USPV parking

20  lot at POLIAK's vehicle, a white 2017 BMW 740i four door sedan

21  bearing California license plate ███████████████████████████

22  ███████████████████████████████████████████████████████████

23  ███████████████████).  Agents observed CS-3 and POLIAK transfer five

24  boxes from POLIAK's vehicle into CS-3's vehicle.

25     47.  After transferring the boxes, CS-3 and POLIAK went back

26  inside USPV.  CS-3 asked, "You got a money counter here, right? Yeah,

27  there it is right there.  Eight."  CS-3 then gave POLIAK $8,000 for

28  the five boxes, as previously agreed.  POLIAK said, "I can feel money

USAO 000176

already."  CS-3 said, "I'll let you know how it goes and I'll put in a bigger one for you, okay?"  CS-3 departed from USPV and provided DEA agents with 1000 units of BHO vape cartridges containing THC that was purchased by from Michael POLIAK and George VASQUEZ at USPV.  DEA took the boxes into evidence, and the DEA Lab determined that the products contained THC.

        4.   <u>USPV Owner POLIAK sold 1000 marijuana cartridges from the parking lot of POLIAK'S RESIDENCE</u>

48.  On October 31, 2019, CS-3 purchased an additional 1000 units of BHO THC-containing vape pen cartridges from USPV owner Michael POLIAK.  The operation was consensually recorded and reviewed by investigators.  CS-3 met POLIAK in the parking lot of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ adjacent to the residence of Michael POLIAK.  CS-3 purchased vape pen cartridges with brand name KingPen. KingPen has been identified by the California Department of Consumer Affairs (CDCA), Department of Investigations, as one of the several unlicensed brands of vape pen cartridges that have led to multiple hospitalizations nationwide.  Through this investigation, agents have determined that POLIAK is not a licensed marijuana distributor in California.

49.  The cartridges were immediately taken into DEA custody and sent to the DEA lab for analysis, where they tested positive for THC.

50.  Additionally, DEA sent eight samples of vape cartridges seized from each of the three transactions described above (June 28, July 26, and October 31) to the California Department of Public Health, Food and Drug Laboratory Branch for additional testing.  The testing showed that five of the eight samples contained Vitamin E acetate oil, which the Center for Disease Control has linked to lung

**Exhibit F**
**455**

1  damage and death.[21] This health crisis was particularly acute in the

2  summer and fall of 2019, when POLIAK and VASQUEZ sold these products

3  to CS-3.  At least one sample from each of the three transactions

4  tested positive for Vitamin E acetate oil.

5  51.  Based on conversations POLIAK had with CS-1 on December 17,

6  2019, which were recorded and reviewed by investigators, POLIAK is

7  clearly aware of the unlawful and dangerous nature of the BHO THC-

8  containing products he was selling.  During that meeting POLIAK told

9  CS-1, "I don't have anything.  Nothing to move.  I shut everything

10  down.  I'm not doing anything right now."  CS-1 asked, "Why?"  POLIAK

11  replied, "I don't want the liability.  . . . I mean, enough [money].

12  It's never enough, but I don't want the liability this stage of my

13  life cause I was making vapes.  . . . They brought lung diseases now.

14  People are having—- there's commercials, you know? I don't need the

15  liability."  This demonstrates POLIAK's awareness that the product he

16  was recently selling was linked to "lung diseases" and potential

17  liability.  POLIAK also seems to be referring to Public Service

18  Announcements (PSAs) alerting the public to the dangers of marijuana

19

20

21  [21] See *The New York Times*, "Vaping Illnesses are Linked to Vitamin E Acetate, C.D.C. Says," Denise Grady, November 8, 2019; www.nytimes.com/2019/11/08/health/vaping-illnes-cdc.html;

22  "A form of vitamin E has been identified as a 'very strong

23  culprit' in lung injuries related to vaping THC, health officials reported on Friday, a major advance in a frightening outbreak that has killed 40 people and sickened 2,051.  . . . The outbreak has

24  revealed the existence of a vast, unregulated, shadowy marketplace of illicit or bootleg vaping products that are essentially a stew of

25  unknown chemicals concocted, packed and sold by unknown manufacturers and sellers.  . . . Hundreds of state and federal health

26  investigators have been deployed to find out what has cause such extensive damage to patients' lungs, which researchers have likened

27  to the chemical burns suffered by soldiers attacked with mustard gas in World War I.  . . . Many of the products used by those who became

28  ill were illicitly obtained, public health experts have said, by patients who bought them from friends or on the street."

USAO 000178

1   vape products.  Additionally, during a discussion about the

2   kidnap/torture event (discussed above), POLIAK said, "He [NEYMAN] was

3   the one selling the cartridges and the packaging.  Not the oil, you

4   know?  I would make my own oil and inject."  Because the oil itself

5   is believed to be causing the lung damage, POLIAK effectively

6   admitted his role in manufacturing this dangerous product.

7               5.   USPV Owner POLIAK discussed with a USPV customer
                     selling flavored cocaine while at POLIAK'S RESIDENCE
8

9        52.  In October 2019, CS-3 and USPV co-owner MICHAEL POLIAK

10  first discussed the sale of "flavored cocaine" or "Flavado."  On or

11  about October 11, 2019, CS-3 and POLIAK met for lunch.  After lunch,

    they returned to POLIAK's RESIDENCE at ███████████████████████
12
    ██.  While approaching POLIAK's unit, they passed the mailboxes and
13
    POLIAK commented to CS-3 about the cocaine residue on his mailbox
14
    key.  POLIAK explained that he uses the key routinely to snort
15
    cocaine, and the key therefore has coke residue.  CS-3 expressed an
16
    interest in purchasing cocaine.
17
         53.  POLIAK then told CS-3 about "Flavado," with which CS-3 was
18
    unfamiliar.  POLIAK described it as flavored cocaine which softens
19
    the drug's effects, without diluting them.  POLIAK told CS-3 that
20
    women love it and he recommended the strawberry flavored coke. CS-3
21
    expressed an interest in purchasing flavored cocaine.  POLIAK called
22
    "Casey" in the presence of CS-3 and identified "Casey" as the person
23
    who could "hook [CS-3] up."  POLIAK told CS-3 that he would connect
24
    CS-3 with Casey when CS-3 was ready to buy, and CS-3 should just let
25
    POLIAK know.
26
         54.  On or about November 5, 2019, CS-3 contacted POLIAK and
27
    asked him if he could hook CS-3 up with Casey in order to purchase
28

USAO 000179

ER-1200

1   the flavored cocaine they had previously discussed.  POLIAK asked how

2   much CS-3 needed and CS-3 told him he was looking for "a zip" [one

3   ounce].  POLIAK told CS-3 that Casey didn't sell it like that—- he

4   breaks it down into per-use quantities.  CS-3 asked for $1000 worth

5   and POLIAK agreed.

6       55.  On or about November 15, 2019, CS called POLIAK to follow-

7   up on the requested cocaine purchase.  POLIAK advised that he was

8   having family issues he was dealing with, and didn't have time to

9   arrange the deal.

10      56.  On or about December 11, 2019, CS-3 and POLIAK again

11  discussed the purchase of flavored cocaine.  During that phone

12  conversation, POLIAK suggested CS-3 communicate with him using a

13  wireless application called "Signal."  CS-3 agreed, and further

14  discussion about the flavored cocaine purchase occurred over Signal,

15  an encrypted application popular with drug traffickers. POLIAK and

16  CS-3 continued to discuss the cocaine deal over Signal, often

17  including the third-party supplier; however, POLIAK never allowed CS-

18  3 to deal directly with anyone – POLIAK was always involved.  CS-3

19  believes this was intentional in order for POLIAK to protect his

20  financial cut in the deal.

21          6.   USPV Owner POLIAK set up a cocaine deal at USPV, but
                 then moved it when USPV Manager VASQUEZ Objected to
22               the location

23      57.  On or about December 16, 2019, POLIAK told CS-3, "Come to

24  the vault [USPV]; we'll do it [cocaine deal] here."  CS-3 agreed.

25  However, a little later, George VASQUEZ called CS-3 and expressed his

26  objection to CS-3 and POLIAK conducting a cocaine deal at USPV.

27  VASQUEZ felt that POLIAK was not being careful and that he was

28  possibly bringing unwanted attention from law enforcement onto the

USAO 000180

business.  VASQUEZ told CS-3 to "do the deal quickly – pick it up and get out of here," or words to that effect. Shortly after, POLIAK contacted CS-3 and said they could not do the deal at USPV.

58.  On or about December 18, 2019, in a conversation with CS-3, which was recorded and reviewed, POLIAK instructed CS-3 to meet with an unknown associate of his at ███████████████████ in order to obtain one ounce of flavored cocaine.  CS-3 was able to make arrangements for a DEA Task Force Officer, working in an undercover capacity ("TFO-UC"), and posing as an associate of CS-3, to make the purchase for $2,200.  TFO-UC arrived at the location and met with an individual who was later identified as Daniel SAVAGE and obtained a quantity of suspected cocaine in a white shopping bag, hidden beneath a pair of black gym shorts.  DEA agents took custody of the suspected cocaine which was in a clear plastic sandwich baggie that had been tied in a knot.  The white substance and the sandwich baggies weighed 29 grams.  The suspected cocaine was sent to the DEA lab for processing.  The substance tested positive for cocaine HCL.

**J.   USPV Owner Mark PAUL Leases Property for the Purposes of Manufacturing, Producing and Distributing Controlled Substances**

59.  On or about February 20, 2020, PAUL met with CS-1.  The meeting was consensually recorded and reviewed by investigators. During that meeting, PAUL told CS-1, "I've been doing cannabis deals," but then described himself as "just a landlord."  PAUL went on to describe one location as an "amazing property" that everyone in the marijuana business wanted because of its location.  However, it was located near a Gymboree – a business which falls under California Health & Safety Code 11362.3(3), prohibiting marijuana possession

USAO 000181
ER-1202

1    within 1,000 feet of a school, day care or youth center – so no one

2    in the cannabis business could buy the location.  PAUL then explained

3    how he bought the Gymboree, left the signage in place, and then

4    bought the "amazing property" for the dispensary.  He did not remove

5    the Gymboree sign until the dispensary was open for business. PAUL

6    told CS-1 that he paid $250,000 for the Gymboree (which he closed),

7    and $4.5 million for the other property, as well as $700,000 in

8    improvements.  PAUL told CS-1 that he earns $62,000 a month renting

9    the property to the dispensary owners[22].

10        60.  During the same consensually recorded meeting in February

11   2020, PAUL said, "I have another deal – I have a dispensary--" then

12   he stopped speaking abruptly, as though he thought better of

13   admitting that he had a marijuana dispensary.  PAUL then changed the

14   focus of his comments to the company in Oregon rather than his role.

15   PAUL went on to describe "the largest marijuana processing company in

16   Oregon" with whom he partnered.  PAUL told CS-1 that this business

17   could process 5 to 10 million pounds of marijuana a month with the

18   use of a kiln that quickly dries wet hemp.  Further, he told CS-1

19   that the group was conducting $2 million a month in business, but had

20   contracts for $10 million a month that they could not meet.  PAUL

21   told CS-1 that he invested $5.5 million in the business.

22

23

24   _____

25        [22] Based on specific descriptions, agents have identified the
     marijuana dispensary as The Atrium at 5441 Topanga Canyon, Woodland

26   Hills.  Mike POLIAK corroborated PAUL's association with this
     business to CS-1 in September 2020, telling CS-1 that PAUL purchased

27   land "up north" for a marijuana grow, but refused to finance the
     equipment.  Now, according to POLIAK, PAUL's partners are having

28   trouble paying the lease on the land, their "finance guy" has taken
     over the Atrium dispensary, and there is a power struggle for
     control.

Exhibit F
460

USAO 000182

ER-1203

61.  On or about April 22, 2020, CS-4 spoke with George VASQUEZ while at USPV to pay rent on a safe deposit box.  This conversation was not recorded, but was reported to the Affiant immediately after it occurred.  VAQUEZ informed CS-4 that "his boss" recently purchased six or seven hundred acres in Colorado for the cultivation of marijuana and was looking for individuals interested in providing security.  Based on conversations VASQUEZ has had with CS-3 and CS-4, VASQUEZ refers to Mark PAUL as his boss.

62.  During the course of this investigation, investigators reviewed and analyzed PAUL's business, banking and financial activity.  PAUL's businesses include MJ Real Estate Investors Inc. ("MJRE")[23], a marijuana real estate investment company; Emerald Fund, LLC; Bachelor Valley Fund LLC; and Mark Paul Holdings, Inc.  An analysis of banking records shows over $700,000 in transactions between MJRE and Antares Topanga Group, LLC, aka Valley Collective Care, which public records show doing business as The Atrium, a marijuana dispensary.  MJRE also conducts business with Emerald Fund LLC (both owned by PAUL).  Emerald Fund remitted funds for a 67-acre purchase in Oregon. Emerald also has financial transactions with Rogue Bioscience, a Medford-Oregon based industrial hemp processor. Bachelor Valley Fund has financial transactions with a company in Denver, Colorado. This analysis supports statements PAUL and VASQUEZ made to CS-1 and CS-4.

63.  Based on information provided by the California Department of Consumer Affairs – Cannabis Enforcement, which enforces marijuana

---

[23] USPV former owner and OLYMPIC GOLD & JEWELRY owner, Steve BARTH, is also a principal at MJRE.

laws in California, PAUL is not licensed to "have a dispensary" or otherwise participate legally in the cannabis industry.

**K.    USPV Owner Michael POLIAK is a Professional Criminal**

POLIAK's Criminal Activity

64.    In addition to brokering a cocaine deal for CS-3 and selling 1000 units of BHO THC-containing vape pen cartridges on two occasions (discussed above), POLIAK continues to engage in criminal activity.  The following examples demonstrate this:

1.    POLIAK studied how to commit deceptive online marketing

a.    During a December 2019 meeting with CS-1, which was recorded and reviewed by investigators, POLIAK described a possible new business deal, which involved fraud: "I have a guy that's a master at driving traffic on-line.  . . . But he does deceptive marketing.  He'll fake some shit, like he'll put Dr. Oz promoting his product or Ellen [DeGeneres] or some shit like that.  And he'll sell the fuck out of it, but you burn a lot of merchant accounts. . . . But merchant accounts is the problem.  It's – you burn a lot of them. You constantly need a flow of merchant accounts.  Cause the [credit card] charge-backs are gonna be like crazy."  POLIAK advised that he had a business meeting arranged with this person for the following day, in order to learn how to take over his business, before he goes to jail[24].  In January 2020, POLIAK introduced CS-1 to Allen NEYMAN, and they discussed possible business deals.  That meeting was recorded and reviewed by investigators.

---

[24] The person running the fraud scheme as described by POLIAK is ALLAN NEYMAN who was involved with the torture/kidnapping discussed above.

2.  POLIAK's Paycheck Protection Program scheme

b.  On or about September 15, 2020 CS-1 met with POLIAK. The meeting was consensually recorded and reviewed by investigators. During the meeting, POLIAK described obtaining almost $70,000 from Payroll Protection Plan (PPP) for his "employment" at MGP Management. POLIAK admitted to CS-1 that he only made $1,000 a month, and didn't have any employees, but submitted an application and received $68,700. When CS-1 asked how he did it, POLIAK replied "Cause I filed. That I had hardships."  Additionally, POLIAK applied for and received three SBA (Small Business Administration) loans for his other businesses, though he acknowledged they were loans.  POLIAK described them as "free money," and at an interest rate of 3.75%, could earn more than that through one of his "investments." Throughout this conversation, POLIAK bragged to CS-1 about committing fraud.

3.  POLIAK's marijuana trafficking

c.  On or about January 27, 2020 CS-1 met with POLIAK. The meeting was consensually recorded and reviewed by investigators. During the meeting, POLIAK spoke to Memory Buss using the speaker function on his cell phone.  CS-1 witnessed both sides of the conversation.  Based on my review of the conversation, as well as information provided by the California Department of Consumer Affairs ("CDCA"), Buss is licensed under CalCannabis for Provisional Adult Use – Nursery; Processor; and Specialty Indoor – but not retail or manufacturing.  Further, POLIAK leases property in Los Angeles which he subleases to Buss for use in her Cannabis business.

d.  Buss recently ended a partnership in her Cannabis business because her partners were operating outside the law.  She

USAO 000185

ER-1206

1   told POLIAK, "I'm staying compliant by getting rid of them.  I would

2   have lost my license if they would have stayed because they broke the

3   law so many times."

4           e.   During the conversation, POLIAK offered to sell Buss

5   filling machines for $5,000 each.  He first denied having any, "I

6   just got rid of everything when I closed out.  They weren't legal

7   anyway."  But then he said, "I have three laying around," which she

8   asked to buy.  Based on information provided by CDCA, "filling

9   machines" are outside the scope of Buss's license; POLIAK is not

10  licensed to possess these machines at all.

11          f.   POLIAK also offered to broker the sale of 20,000 pre-

12  rolled joints.  While POLIAK was adamant that he did not want to

13  "hold" more than a few samples –"you can drop off samples.  But I

14  don't need to store fuckin' tons of shit.  A couple samples, yeah, no

15  problem.  I'll just hand it over to the guy."  As the conversation is

16  wrapping up, POLIAK tells Buss to bring the samples and he'll give

17  them to a couple of guys.

18          g.   This demonstrates POLIAK's on-going business dealings

19  in the marijuana industry which are outside California law, as he is

20  not licensed.

21          4.   <u>USPV Owner POLIAK bragged about his drug cartel
             connections</u>

22

23      65.  In December 2019, POLIAK discussed with CS-1 his various

24  business deals, including one involving the import of produce from

25  Mexico.  During that conversation, which was recorded and reviewed by

26  investigators, POLIAK told CS-1 that he was affiliated with the

27  Beltran-Leyva drug cartel.  During a conversation, CS-1 said, "These

28  guys [referring to CS-1's phone], their mother is from cartel."

**Exhibit F**
**464**

USAO 000186

ER-1207

1    POLIAK responded, "That's how I am. I'm Beltran.  Beltran are my

2    people.  Google Beltran, you'll see how big they are.  Guadalajara."

3    POLIAK then told CS-1 that the cartels control everything in Mexico

4    and you can't work there without them.  POLIAK's self-proclaimed

5    association with a well-known Mexican drug cartel suggests his

6    participation in money laundering or drug trafficking.  While POLIAK

7    refers to the subject of this business as involving "produce" or

8    "avocadoes," based on my training and experience, produce is often

9    used by Mexican drug cartels as a "cover" load to disguise transport

10    of drugs or currency.

11        66.  During the course of this investigation, agents have

12    obtained and reviewed financial records related to USPV principals,

13    including records related to Michael G. POLIAK and numerous business

14    entities associated with him (e.g. MGP Consulting, MGP Management).

15    A review of financial records associated with MGP Consulting revealed

16    a January 25, 2019 check for $125,000 payable to AA Consulting Group,

17    Inc.  Public records show that AA Consulting Group, Inc. belongs to

18    Aram Abgaryan, who was arrested and charged with murder in October

19    2019.  Those charges stem from Abgaryan's involvement in an explosion

20    at a sophisticated cannabis extraction plant in Chatsworth,

21    California, which resulted in the death of one of the participants[25].

22

23

24    [25] See www.nbclosangeles.com\news, "Five Men Charged For Deadly Honey
Oil Lab Explosion in Chatsworth," October 31, 2019.

25

26    "Five men have been charged with murder following a deadly explosion at an illegal honey oil lab in
September that killed a man they were working with, authorities announced Thursday.

27

28    The defendants and the victim had been operating a lab in Chatsworth, where they extracted THC, the
high-inducing chemical found in marijuana, from cannabis plants for at least two months, the Los

That POLIAK was participating in this illegal and dangerous
enterprise is supported not only by the check he wrote to AA
Consulting, but by statements he made to CS-1 in December 2019.  In a
conversation between POLIAK and CS-1, which was recorded and reviewed
by investigators, POLIAK described an "unlucky" guy who used to "make
oil" for him using solvents.  According to POLIAK, the man had a
heart attack prior to the chemical explosion, but the others were
being charged with murder anyway because the death occurred during
the commission of a crime.

POLIAK's Money Laundering

67.  In multiple conversations with CS-1, which were
consensually recorded and reviewed by investigators, POLIAK admits to
laundering money, often referring to money as "clean" or "dirty," and
speaking plainly about the need to "clean my money."  The following
provide specific examples from conversations between CS-1 and POLIAK:

---

Angeles district attorney's office said in a statement.

The lab exploded Sept. 21 while four of the men and the victim, Dados Aroutiounov, 62, were inside.
Aroutiounov's remains, burned beyond recognition, were found the following day under a pile of debris
after investigators received information that someone may have been killed in the fire.

The cannabis allegedly was being turned into a potent concentrate known as hash oil or honey oil that
can be used in vape pens, edibles, waxes and other products.

A rise in vaping illnesses nationwide has caused federal investigators to probe the black market for
THC products, especially illegal vaping cartridges.

Aram Abgaryan, 30, Vadim Klebanov, 59, Arsen Terejyan, 43, Rafael Mailyan, 32, and Stepan
Mailyan, 65, were arrested Tuesday and charged with murder and manufacturing a controlled
substance, concentrated cannabis. Authorities also seized $3.2 million and gold bars Tuesday from a
storage unit connected to the case.

Each faces 23 years to life in prison. They remain in jail on $2 million bail."

USAO 000188

ER-1209

a.   During a meeting in December 2019, POLIAK told CS-1 that he has monthly income in the form of a $50,000 check.  "I get checks for fifty-thousand a month.  Forty-five gets me fifty."  Later in the conversation, CS-1 asked, "But how do you have fifty a month?"  POLIAK replied, "I'm telling you, between like all my things I'll make like six hundred this year."  CS-1 asked, "You give them cash, they give you check, is that what—"  POLIAK replied, "*No, no that's just to clean my money . . . that I don't even count as income.*"

        5.   USPV Owner POLIAK admits he uses a shell business to launder money

68.   POLIAK further discussed both the "forty-five-for-fifty" deal, and other aspects of money laundering with CS-1 on or about January 27, 2020, during a meeting which was recorded and reviewed by investigators.  After a detailed description of his involvement in the cannabis industry, POLIAK said, "I took home 200-something thousand in key money and ten thousand a month income every month."  CS-1 asked, "So how do you manage, where do you put your money?"  POLIAK exclaimed, "I own a vault!"  CS-1 asked, "I'm not talking about the cash."  POLIAK replied, "It's all cash!  It's all cash.  Why do you think I bought the vault?"   POLIAK then described some of his shell corporations: "I have MGP.  *Because I have to clean the money*.  Put money into MGP so I can pay half the rents.  Half the rent is in cash and half the rent is clean."

69.   Later in the same conversation with CS-1, POLIAK said, "I wash $50,000 through my consulting.  Remember, I pay 45 for 50?"  POLIAK continued, "So fifty thousand--" CS-1 finished, "you put into MGP."  POLIAK corrected, "No, I put into MGP Consulting.  MGP Consulting pays MGP Management for rent.  Talking about $10,000 a

USAO 000189

ER-1210

month.  And that goes to the landlords." CS-1 said, "So you're paying the landlords--" POLIAK finished, "--through my consulting." CS-1 said, "So you're getting paid cash . . . you give some fucker cash--" POLIAK finished, "He cuts me a check.  Fifty thousand for forty-five cash."  It is important to note POLIAK's use of various shell corporations such as MGP Management and MGP Consulting.  Based on my training and experience investigating money laundering organizations, I know that it is common for criminals to create multiple "shell" corporations to "layer" criminal proceeds, thereby obscuring their criminal origins.  Additionally, in this exchange, POLIAK again openly admits cleaning his money, something which does not need to be done with lawfully earned income.

70.  A review of Michael POLIAK's bank accounts (specifically MGP Consulting) corroborates his description of this activity. Between February 15, 2018 and January 2020, MGP Consulting received $50,000 a month (forty-two $25,000 checks) from Corporation A and Corporation B, both owned by the same individual.  I learned through conversations with FBI agents that the individual is the target subject of a current FBI Healthcare Fraud investigation (hereafter TS HCF)[26].  TS HCF's signature is on checks from both companies.  Based on conversations I've had with agents who investigate healthcare fraud, I know that those engaged in healthcare fraud schemes often need cash and will pay a premium for it (e.g. $50,000 for $45,000 in cash) because they need to make cash payments to "patients" seeking healthcare services which are being over-billed.  They cannot

_____

[26] FBI agents who are investigating TS HCF asked that the identity of the target of their investigation, as well as his/her related business entities, remain undisclosed in order to protect the integrity of their investigation.

Exhibit F
468
USAO 000190
ER-1211

1  withdraw the amount of cash they need without bringing attention to

2  their scheme.  This leads them to look for other sources of cash.

3     71.  POLIAK has a large amount of cash which he stores at USPV.

4  On or about December 17, 2019, CS-1 met with Michael POLIAK.  The

5  meeting was consensually recorded and subsequently reviewed by

6  investigators.  During the meeting POLIAK told CS-1 that as a

7  customer of USPV (prior to buying in to the business), POLIAK had

8  four boxes at USPV.  He further stated that he now has "six boxes in

9  the place myself!  I was a customer.  I'm telling you, I have six

10  ten-by-tens myself."   POLIAK added, "Let me put it this way, the

11  reason also why I wanted to buy it [USPV], I got a lot of fucking

12  money now."  Earlier in the conversation, POLIAK said, "I wish I had

13  fifty [million] right now.  That would be nice."  CS-1 replied,

14  "Yeah?  In your twenties or what?"  POLIAK said, "No, not even, bro.

15  Like ten.  . . .  I have like **two clean, eight like dirty**.  I put

16  most of it in the house."  Based on my review of the recording and a

17  debrief of CS-1, I believe that POLIAK has $10 million: $2 million

18  which he laundered through the purchase of property (discussed below)

19  and $8 million in cash stored in six 10 x 10 boxes at USPV.

20  Additionally, POLIAK himself describes the $8 million as "dirty," by

21  which I believe he means it was not legally derived and in the form

22  of cash – not laundered to appear legitimately earned.

23     72.  Based on my training and experience, my review of bank

24  records and recordings, I believe that the cash POLIAK is sending to

25  TS-HCF is the proceeds of his self-professed "illegal businesses,"

26  likely drug trafficking, which he stores at USPV.  Thus, drug

27  trafficking proceeds are being used to further healthcare fraud; and

28

USAO 000191

ER-1212

1   the fraud proceeds are being further laundered by POLIAK to make

2   purchases (such as USPV) and advance his other criminal interests.

3       73.   Michael POLIAK described efforts to launder his money

4   through a real estate purchase to CS-1.  On or about December 17,

5   2019 and again on September 15, 2020, Michael POLIAK met with CS-1.

6   The meetings were consensually recorded and reviewed by

7   investigators.  During those meetings, POLIAK described to CS-1 his

8   plans to launder cash through the purchase, renovation and sale of

9   property located at ███████████████████████████ .

10      74.   During the earlier conversation, POLIAK told CS-1 that the

11  property was listed at $2 million, but he offered the sellers $1.7

12  million "tomorrow – no inspection."  POLIAK said, "I literally did

13  one day close. Can you imagine?  One day close?"  In the subsequent

14  meeting, POLIAK further explained that he put $600,000 down and took

15  out a mortgage of about $1.2 million[27].  He also told CS-1 that he

16  spent about $1.5 million renovating the property.

17      75.   In September 2020, with renovations complete, POLIAK told

18  CS-1 he was listing the property for $3.6 million, but expected a

19  bidding war.  POLIAK believed the property was worth closer to $4

20  million.

21      76.   With regard to the property purchase and massive renovation

22  under way when CS-1 first saw the property in December 2019, CS-1

23  commented, "You could, basically what you could do is, one-point-

24  seven, you could easily clean your money through it."  POLIAK

25  replied, "That's what I'm doing with the construction.  Why do you

26  think I'm doing half a million construction?"  CS-1 said, "Half a

27  ─────────────

28      [27] This is supported by financial analysis which revealed a
    mortgage on this property.

USAO 000192

ER-1213

million cash." POLIAK said, "I want to do one or two projects like
this a year." CS-1 said, "That's a million dollar give-away. And
you-" POLIAK interrupted, "Ten-thirty-one-exchange[28]." POLIAK added,
"And I can wash it off the construction company. On top of the ten-
thirty-one exchange." CS-1 asked, "You're giving him cash?" POLIAK
said, "I write off Jacob," referring to his contractor. CS-1 said,
"Yeah, you take his check. You give him cash." POLIAK said, "Yep.
. . . We do profit sharing . . . Yeah, on the house. It's gonna be
like this and it comes back clean . . . I pay all his subs in cash.
I've been paying all his subs in cash all year already."

77. It is worth noting that POLIAK himself uses phrases such as
"I can **wash** it" and "it comes back **clean**," showing his own awareness
and acknowledgement of money laundering. Additionally, when CS-1
says "you could easily **clean** your money through it," POLIAK eagerly
agrees, saying "That's what I'm doing with the construction. Why do
you think I'm doing half a million construction?" Finally, by
admitting that he is paying sub-contractors ("subs") in cash and has
been doing so all year, POLIAK is specifically describing how he uses
(illegal) cash to increase the value of his property which he will
later sell for a profit and claim as legitimate income, thus
"cleaning" his "dirty" money.

78. Finally, during their September 2020 meeting, which was
recorded and reviewed, CS-1 inquired whether POLIAK's asking price
would be reduced if a buyer came in with a million or two million in
cash. POLIAK told CS-1 he would require "a premium" if someone came

---

[28] A 1031 Exchange refers to section 1031 of the IRS Code which
allows a real estate investor to avoid capital gains taxes as long as
the profit is used to purchase another "like kind property."

USAO 000193

1  in with cash – he would charge $4.2 million.  "I don't— Nobody needs
2  cash. . . . I have a ton of cash. . . . I'm doing business to get
3  rid of my cash."  This further demonstrates POLIAK's on-going efforts
4  to laundering money through his various projects.

   **L.   USPV Owner Michael POLIAK Used Criminal Proceeds to Buy His
         Interest in USPV**

7      79.  In April 2019, Michael POLIAK purchased a 50% ownership in
8  USPV.  POLIAK described the deal to CS-1 in a consensually recorded
9  conversation which investigators reviewed.  During that conversation,
10 CS-1 asked, "How did you meet him [PAUL], turn around and become a
11 partner? . . . Did you have to pay him?"  POLIAK replied, "Yeah, I
12 gave him $475,000.  . . .  two-seventy-five clean.  Two hundred
13 dirty."  Later in the conversation, POLIAK explained, "Mark [PAUL]
14 owned 75%.  Hillary [BARTH] and her husband [STEVE BARTH] owned 25%.
15 I bought twenty-five from Mark, and I bought twenty-five from them.
16 I said, 'Mark, I can't buy the place unless I get at least 50%.'"

17     80.  A review of bank records supports POLIAK's claim.  On April
18 2, 2019, $225,000 was deposited into USPV's JP Morgan Chase bank
19 account ending in #7511.  The deposit included a Wells Fargo Bank
20 cashier's check in the amount of $125,000, payable to U.S. Private
21 Vaults, purchased by Michael POLIAK; and a check issued from Michael
22 POLIAK's Wells Fargo Bank account #7496 in the name of MGP Consulting
23 LLC, for $100,000, payable to U.S. Private Vaults.  Based on POLIAK's
24 statements, agents believe that the remainder of the $475,000 was
25 paid in cash.  Agents also believe STEVE BARTH and HILLARY BARTH were
   paid in cash.

27     81.  As set forth above, there are numerous factors which
28 indicate that all of POLIAK's income is derived from illegal sources.

1    The cash in particular cannot be sourced to any lawful pursuit.

2    However, close examination of POLIAK's bank records reveal the

3    following:

4           a.   The check for $100,000 from MGP Consulting LLC, can be

5    traced to healthcare fraud, as described above. Between February 15,

6    2019 and April 1, 2019, POLIAK received three checks from Corporation

7    A, and one from Corporation B., each for $25,000, payable to MGP

8    Consulting. These checks are part of the "forty-five-for-fifty"

9    healthcare fraud/money laundering scheme POLIAK himself described.

10   These deposits funded the $100,000 check from MGP Consulting to U.S.

11   Private Vaults.

12          b.   In addition, the $125,000 cashier's check from

13   POLIAK's Wells Fargo account can be traced to a $300,000 E-deposit

14   made in New York on 10/20/2018. Financial investigators traced this

15   check to Alta Quality Growers, LLC of Elgin, Illinois, whose

16   principal is John Fasano of Brooklyn, NY. Fasano has a criminal

17   history which involves drug trafficking (marijuana and ecstasy), as

18   well as a financial history which includes a pattern of structured

19   deposits and withdrawals and large wires to Mexico, with no business

20   purpose. Additionally, Alta Quality Growers, LLC has no website and

21   little internet presence. It's notable that the company, supposedly

22   located in Illinois, has a (956) area code phone number – 956 covers

23   much of the Texas-Mexico border. Based on my training and experience

24   in both drug and money laundering investigations, I believe that Alta

25   Quality Growers, LLC is a drug/money laundering front. The money

26   therefore which funded POLIAK's Wells Fargo Bank account and was used

27   in part to purchase USPV, is likely also criminal proceeds.

28

**M.  None of the Individuals Associated with USPV, as Principals or Patrons, who are Participating in the Marijuana Industry, is Licensed by the State of California to do so.**

82.   During the course of this investigation, federal agents consulted with the California Department of Consumer Affairs, Cannabis Enforcement.  Through that consultation, we learned that none of the following individuals is licensed to participate in the California cannabis trade, either with regard to cultivation, manufacture, or retail[29]:  MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, STEVE BARTH, HILLARY BARTH, Allan NEYMAN, Matthew BEAVER, Aram ABGARYAN, Alta Quality Growers, John FASANO.

**N.  USPV Principals Have Counseled Clients on Strategies to Circumvent BSA Reporting Requirements and Have Themselves Failed to Comply with Reporting Requirements**

    1.  USPV Manager VASQUEZ instructs a customer to structure gold purchases to avoid currency transaction reports

83.   On August 9, 2019, CS-3 talked to USPV manager GEORGE VASQUEZ about buying gold at OLYMPIC GOLD & JEWELRY.  The conversation was consensually recorded and reviewed by investigators. During the conversation, CS-3 said, "My Primo's gonna want to talk to her [HILLARY BARTH] because we spoke about buying some gold. . . . He [Primo] needs to get rid of a lot of shit . . . and I'm hoping you guys have some fuckin' creative ideas on how to do it."  VASQUEZ clarified, "Well, depends on—what—okay—he's got to get rid of some money?"  CS-3 replied, "Yeah."  VASQUEZ said, "He wants to buy gold?" CS-3 said, "Yes."  VASQUEZ said, "Okay.  **Keep it at under ten thousand dollars.**"  CS-3 asked, "How often?"  VASQUEZ replied, "About – I would—it's, it's supposed to be every 24 hours . . . but I

---

[29] Valley Collective Care (Antares Topanga Group) which operates The Atrium at 5441 Topanga Canyon Blvd., Woodland Hills, CA, discussed herein is a licensed cannabis retailer.

USAO 000196

Exhibit F
474

ER-1217

1    suggest at least 48 hours." VASQUEZ added, "Yeah. But not all the

2    time. **So let's say like 9,000 or 9,500.**" CS-3 said, "**Break it**

3    **down.**" VASQUEZ replied, "Break it down . . . Cause **you don't want**

4    **that paperwork shit.**" (Emphasis added.) Based on my training and

5    experience, as well as a comprehensive debrief of CS-3, CS-3 was

6    talking to VASQUEZ about laundering criminal proceeds through the

7    purchase of gold. Furthermore, I believe that VASQUEZ understood

8    that CS-3 was talking about laundering criminal proceeds. Finally,

9    it is indisputable from this conversation that VASQUEZ was coaching

10   CS-3 how to "structure[30]" his purchases in order to avoid the Bank

11   Secrecy Act (BSA) reporting requirements, specifically telling CS-3

12   to "keep in under $10,000" because "you don't want that paperwork

13   shit."

14        84.  In addition to coaching CS-3 on how to avoid BSA

15   requirements, VASQUEZ's statements show a clear knowledge of and

16   participation in money laundering. USPV is using its co-located

17   business, OLYMPIC GOLD & JEWELRY as an outlet for USPV customers to

18   launder criminal proceeds, by exchanging cash for gold or silver.

19   That there is a pattern and practice of this is evidenced by the

20   seizure of gold and silver from USPV boxes in the cases described

21   earlier. Furthermore, based on my training and experience

22   investigating money laundering, I know that the purchase and sale of

23   gold and silver is a common method which criminals employ to launder

24   criminal proceeds. Gold and silver are difficult to trace, portable,

25

26   _____

27      [30] Structured deposits refers to multiple deposits under $10,000,
     made on the same day or consecutive days, which add up to over
     $10,000 – generally structured in order to avoid Bank Secrecy Act
28   (BSA) requirements, such as providing identification and filing a
     Currency Transaction Report (CTR), or IRS Form 8300.

USAO 000197

ER-1218

fairly easy to re-sell, and often traded in a manner which, like USPV, caters to criminals' need for anonymity.

 2. HILLARY BARTH and VASQUEZ instruct a customer to structure gold purchases to avoid currency transaction reports

85. On or about January 13, 2020 CS-4 went to USPV to pay rent on a previously-rented safe deposit box. While there, CS-4 spoke to HILLARY BARTH about the possibility of investing approximately $20,000 in gold or silver. This conversation was not recorded, but was reported to the Affiant immediately after it occurred. HILLARY BARTH, who had never previously met CS-4, told CS-4 that it didn't matter whether CS-4 purchased gold or silver – one came in coins, the other in bars – but he/she should not purchase $20,000 at one time. HILLARY BARTH specifically advised CS-4 not to purchase more than $10,000 worth of gold or silver at a time, otherwise, CS-4 would have to fill out the paperwork[31]. This shows that HILLARY BARTH is coaching USPV/OLYMPIC GOLD & JEWELRY clients on strategies for evading BSA reporting requirements. It's important to note that HILLARY BARTH had not previously met CS-4, because this suggests that she gives this advice to *all* USPV/OLYMPIC GOLD & JEWELRY clients.

86. On February 25, 2020, CS-4 went to USPV to access a previously-rented box. While there, CS-4 spoke to George VASQUEZ about the possibility of purchasing gold. This conversation was not recorded, but was reported to the Affiant immediately after it occurred. VASQUEZ asked how much CS-4 wanted to purchase and CS-4 said he/she might have about $23,000 to invest. CS-4 relayed to

---

[31] Note, CS-4 was not coached or prompted in any way to inquire about breaking up a purchase. CS-4 was instructed to mention that he/she expected to have $20,000 to invest and would like information about purchasing gold or silver.

USAO 000198

1   VASQUEZ what Hillary BARTH had previously told CS-4 -- that he/she

2   should keep the purchases under $10,000 in order to avoid doing

3   paperwork. VASQUEZ agreed with that and told CS-4 that he could help;

4   specifically, CS-4 could deposit $9,000 and give the rest to VASQUEZ,

5   who would make the deposits, so no paperwork would be filed. VASQUEZ

6   added that CS-4 should "throw me a little," meaning of the cash

7   because "I help you, you help me." VASQUEZ said he had such an

8   arrangement with someone else and it worked well[32]. VASQUEZ also added

9   that CS-4 would not even have to put his/her name on the receipt for

10  the gold; he/she could just use initials, and that way no one would

11  know -- there would be no paperwork.

12          3.    STEVE BARTH and VASQUEZ instruct a customer to
                  structure gold purchases to avoid currency transaction
13                reports

14      87.   Similarly, on January 28, 2020, a DEA employee, posing as a

15  potential customer, went to USPV to discuss purchasing gold.  The

16  meeting was recorded and reviewed by investigators.  The DEA Agent

17  first told George VASQUEZ that he wanted to purchase $18,000 worth of

18  gold. VASQUEZ then advised the Agent that, "You can buy that but I

19  advised you to buy under 10 [$10,000]. Because if you're buying under

20  10 [$10,000], we don't have to do paperwork. No information is going

21  to IRS. So you could buy 9 [$9,000], and a couple days, come buy

22  another 9 [$9,000]." VASQUEZ then logged on the computer and showed

23  the Agent the gold prices[33].  A few minutes later, STEVE BARTH arrived

24  _____

25      [32]   Note this conversation took place after the
        January/February gold purchase, discussed below, in which VASQUEZ was
26      "tipped" in cash for his assistance.
        [33]   The fact that VASQUEZ was able to go behind the counter of
27      OLYMPIC GOLD AND JEWELRY and log onto the computer led the Agent to
        believe that the VASQUEZ was an employee of both USPV and OLYMPIC
28      GOLD AND JEWELRY and/or the two businesses were essentially one.

USAO 000199

**Exhibit F**
**477**

1    at the business. VASQUEZ introduced STEVE BARTH to the Agent and

2    departed the display room. STEVE BARTH told the Agent that he sells

3    gold, silver, platinum and different types of gold. The Agent told

4    STEVE BARTH that he wanted to purchase $18,000 worth of gold. STEVE

5    BARTH advised the Agent, if someone gives you $10,000 or more there's

6    a form you have to fill out. "If you buy less than $10,000 then

7    there's no form." The Agent then told STEVE BARTH that he didn't

8    have any problem with filling out the form. STEVE BARTH then told the

9    Agent that, "Some people don't want to alert the IRS or whatever, so

10    they keep it under, most people." STEVE BARTH then advised the Agent,

11    "If you like to, you can buy $9,000 one day and then $9,000 you

12    know." The Agent then asked STEVE BARTH if he could purchase $9,000

13    of gold in one day then do another $9,000 worth of gold the very next

14    day. Steve BARTH said, "Yes, you could do that." Later, STEVE BARTH

15    added, "I recommend you stay under 10,000 in cash and then you could

16    just do some one day and a few days later you could do the other.

17    That's what I would recommend." STEVE BARTH then said, "Anytime,

18    there's more than 10,000 dollars in cash, they get suspicious, so

19    they want to know. You fill out the form and the form goes to the

20    government and even though, it's legitimate."

21      88. In addition to coaching customers on methods for evading

22    BSA requirements, HILLARY BARTH violated 31 U.S.C. §5331 by failing

23    to file IRS Form 8300 after conducting a cash transaction at OLYMPIC

24    GOLD & JEWELRY. On or about December 4, 2019, CS-1 purchased

25    jewelry from OLYMPIC GOLD & JEWELRY[34]. CS-1 and HILLARY BARTH

---

27

28      [34] The purchase was not recorded, but CS-1 exchanged text messages with HILLARY BARTH negotiating and leading up to the

USAO 000200

ER-1221

negotiated the sale for approximately $11,900. CS-1 paid for the jewelry in cash. HILLARY BARTH gave CS-1 a document certifying that the jewelry was authentic. However, HILLARY BARTH did not provide an invoice or obtain the information necessary to complete the Form 8300 (CS-1's identification, etc.). No Form 8300 was in fact filed, based on a database search for any Form 8300s filed (at any time) by either STEVE or HILLARY BARTH. I believe HILLARY BARTH is aware of the requirement to file Form 8300 for cash transactions in excess of $10,000 based on her discussions with CS-4 and others. Moreover, HILLARY BARTH's failure to provide CS-1 with a receipt, invoice or other paperwork suggests that the sale was "under the table" and that any income earned from the cash transaction was not declared to the IRS.

**O.    USPV Principals Laundered Cash Represented to be Criminal Proceeds Through OLYMPIC GOLD & JEWELRY**

1.    January/February 2020 Gold Buy

89. On or about January 29, 2020, CS-3 and TFO-UC (posing as an associate of CS-3) went to USPV to discuss the purchase of gold with cash purportedly derived from the sale of methamphetamine. The meeting was recorded and reviewed by investigators.

a.    After discussing the difference between gold coins and gold bars, CS-3 told George VASQUEZ that gold bars were more desirable for melting down, and mentioned that TFO-UC needed the gold bars as payment for a debt. CS-3 then asked VASQUEZ about crossing gold "down south" [Mexico]. VASQUEZ asked CS-3, "How much are you planning to take?" He then instructed CS-3 to, "Keep it under 10,"

purchase; investigators received and reviewed copies of the text messages.

**Exhibit F**
**479**

USAO 000201

ER-1222

referring to the monetary value of $10,000 in cash, when purchasing gold. VASQUEZ then instructed CS-3 and TFO-UC to conduct two separate "orders" under the amount of $10,000 each, when purchasing the gold. CS-3 then asked VASQUEZ, "What do you mean?" VASQUEZ then continued, "Yeah, if you keep it under $10,000, there is no paperwork. That way you don't have to give no social security, no ID. All that shit goes to the IRS." At this time, CS-3 and TFO-UC simultaneously expressed their interest in conducting the gold purchase without having to fill out paperwork.

   b.   CS-3 stated, "Nah.. Nah.. Nah.. fuck that! This is all 'skante' money. I can't even fuck with that." VASQUEZ then reiterated, "Keep it under 10. You want to buy gold? Keep it under 10."  Based on training and experience, TFO-UC recognized "skante[35]," to be street vernacular commonly utilized for crystal methamphetamine.

   c.   At this time, TFO-UC asked VASQUEZ, "Does she [HILLARY] know the get down?" TFO-UC was referring to HILLARY BARTH's understanding of the structuring of gold purchases under $10,000 to avoid any reporting paperwork. VASQUEZ responded, "Yeah.. Yeah.. Yeah.. She will tell you." VASQUEZ then referred to HILLARY BARTH'S husband, STEVE BARTH.  CS-3 indicated that STEVE BARTH instructed them on purchasing under $10,000 of gold at a time to avoid paperwork during a previous phone conversation.  VASQUEZ continued to instruct CS-3 and TFO-UC to "keep it under 10."  CS-3 then asked VASQUEZ if

---

   [35] The Urban Dictionary defines "skante" as slang for crystal meth. The DEA Drug Slang Code Words 2018 also defines "skante" as crystal meth.

1    HILLARY BARTH would question them in regards to where they obtained

2    the money. VASQUEZ responded by saying, "She don't need to know. She

3    ain't gonna ask you."

4           d.    TFO-UC then asked VASQUEZ what the turn-around was on

5    an order of gold. TFO-UC expressed to VASQUEZ he was under time

6    constraints. VASQUEZ indicated the gold would be ready by the

7    following morning, referring to January 30, 2020. TFO-UC stated he

8    needed to get the gold down to Mexico. VASQUEZ then asked, "You guys

9    are going to pay whoever you guys owe in gold? I am just curious."

10   CS-3 then explained to VASQUEZ, "I moved a bunch of skante, and I did

11   really good. The guy who fronted us is down south. He's gotta take

12   the paper back. We don't wanna go down with paper 'cause I got

13   pinched like that." VASQUEZ replied, "Right, so you'll take the

14   gold." CS-3 responded, "Gold, cause the fuckin' dog won't pick up on

15   it. VASQUEZ replied, "Right. Right. Whichever you like."

16          e.    Based my training and experience and a debrief of TFO-

17   UC, it was clear to TFO-UC that CS-3 was explaining to VASQUEZ that

18   the money was obtained by selling crystal methamphetamine.

19   Furthermore, CS-3 explained that the individual who sourced the

20   crystal methamphetamine was in Mexico, and expecting payment for the

21   crystal methamphetamine. CS-3 explained that TFO-UC was tasked with

22   paying the source of the methamphetamine, adding that CS-3 and TFO-UC

23   did not want to drive the bulk U.S. currency down to Mexico because

24   CS-3 had previously been detained transporting narcotic proceeds, and

25   lost the proceeds. Furthermore, CS-3 explained their desire to

26   convert the narcotic proceeds into gold to repay the outstanding drug

27   debt because the gold would more easily avoid detection by trained

28   narcotic detecting K9's utilized by law enforcement personnel

USAO 000203
ER-1224

f. Following the above referenced conversation, VASQUEZ escorted CS-3 and TFO-UC to HILLARY BARTH, who was waiting at the display of OLYMPIC GOLD AND JEWELRY. TFO-UC told HILLARY BARTH he wanted to convert $16,000 in cash into a gold purchase. TFO-UC stated there were time constraints due to needing to get the gold bars delivered. HILLARY BARTH expressed an ability to have the gold by the following morning. HILLARY BARTH then went on to describe the different types of gold product they offered and the current value. HILLARY BARTH then explained, "Now up to $10,000 cash, uh, up to that, uh, is not reportable. If you go, if you buy more than that with cash, there is a form you need to fill out, the government requires because they want to know where this cash is going. Uh, so anything under ten thousand there is no paperwork to fill out except that you're signing the purchase order for me, for my records. So that I show I am making a buy for a client. Uh, if you want to do your sixteen thousand all at once, uh, if you want to wire it, uh, I don't believe you have to fill out that form. It's a cash buy. We don't do credit, nobody would take a credit card or a check until it clears for bullion." HILLARY BARTH then explained for $10,000 TFO-UC could buy approximately "six," referring to ounces of gold, depending on what gold product TFO-UC was interested in purchasing. TFO-UC expressed an interest in purchasing the gold bars.

g. CS-3 asked HILLARY BARTH how long TFO-UC would have to wait to conduct a second purchase of gold, following the initial purchase of under $10,000. TFO-UC told HILLARY BARTH he was not interested in filling out any paper work for the gold purchase. HILLARY BARTH recommended waiting until "next week, a few days," adding, "it's not recommended, they say, don't come in every day,"

1    HILLARY BARTH went on to say, "what they look for is a pattern of

2    someone who with intention is trying to get around..." HILLARY BARTH

3    did not finish her sentence. Instead, she added, "I am just

4    disseminating information." During this communication, it was

5    apparent TFO-UC that HILLARY BARTH appeared uneasy with the

6    conversation. HILLARY BARTH consistently looked up and away from CS-3

7    and TFO-UC. Furthermore, HILLARY BARTH became selective in her word

8    choice, referring to "they" repeatedly when referring to the cash

9    transaction report process.

10          2.   VASQUEZ suggests splitting the $16,000 Cash Purchase
11               between CS-3 and TFO-UC to avoid the $10,000 reporting
                requirement

12        h.   During the conversation between HILLARY BARTH, CS-3,

13    and TFO-UC, VASQUEZ stood approximately five feet west of the Olympic

14    Gold and Jewelry display, listening to the transaction take place. As

15    HILLARY BARTH explained to keep the purchase under $10,000, she

16    advised TFO-UC he could purchase six gold bars for $9,840. TFO-UC

17    explained again, his time constraints to get all $16,000 worth of

18    gold delivered by Friday referring to January 31, 2020. At this time,

19    VASQUEZ motioned over to CS-3 to come talk to him. CS-3 approached

20    VASQUEZ, who in Spanish instructed CS-3 to have TFO-UC purchase "8"

21    referring to $8,000 in gold, and CS-3 purchase the other "8"

22    referring to $8,000 in gold. Thereby making two simultaneous

23    transactions by two parties that would both fall under the $10,000

24    threshold.

25        i.   CS-3 then returned to the display where BARTH was

26    explaining to TFO-UC that the purchase of nine gold ounce bars would

27    amount to approximately $14,760. She then reiterated if TFO-UC

28    conducted the purchase on one transaction "paper work," would have to

USAO 000205

1    be filled out. At this time, CS-3 motioned to TFO-UC to go and talk

2    to VASQUEZ. TFO-UC approached VASQUEZ, who instructed TFO-UC to split

3    the gold purchase into two separate transactions of $8,000. While

4    TFO-UC was speaking with VASQUEZ, HILLARY BARTH was explaining to CS-

5    3 that any cash transaction over $10,000 would require the cash

6    transaction report. HILLARY BARTH further explained, the cash

7    transaction report was the result of the Patriot Act. She added, she

8    "never" utilizes the cash transaction reporting form because her

9    clients do not typically purchase greater than $10,000.

10          3.    HILLARY BARTH agrees to the structuring so long as CS-
                  3 and TFO-UC hand her the cash separately

11

12          j.    At this time, TFO-UC returned and asked HILLARY BARTH

13    if he could split the purchase into two separate transactions

14    conducted separately by TFO-UC and CS-3. TFO-UC proposed that he

15    could purchase five gold bars and CS-3 could purchase four gold bars.

16    HILLARY BARTH indicated she would have to inquire to confirm if she

17    was capable of conducting such a transaction. She then proceeded to

18    operate her cellular phone through text messaging. She then stated,

19    "Yes, as long as you hand me the money," meaning separately. She then

20    explained she would fill out a receipt for the two separate

21    transactions, which would only require a first name and last initial.

22    HILLARY BARTH stressed the receipt was only for internal bookkeeping.

23          k.    CS-3 then asked if he/she would have to be present to

24    pick up the gold bars. HILLARY BARTH explained it would be okay for

25    TFO-UC to take possession of the total purchase by presenting both

26    receipts.  HILLARY BARTH explained to TFO-UC that he would have to

27    sign the receipts at the time of pick up. Following the agreement to

28    conduct the purchase of $14,760 worth of gold in two separate orders,

**Exhibit F
484**

USAO 000206

ER-1227

1  HILLARY BARTH suggested they conduct the transaction in the back

2  office for "privacy."

3       l.   At this time, HILLARY BARTH, TFO-UC, CS-3, and VAZQUEZ

4  entered the back office.  Once inside the office, TFO-UC sat next to

5  HILLARY BARTH to conduct the first gold purchase. HILLARY BARTH

6  advised TFO-UC the first transaction of six one ounce Suisse bars

7  would total $9,843. TFO-UC retrieved 99 one hundred dollar bills in

8  U.S. currency ($9,900) of Official Advanced Funds (OAF) from a black

9  backpack and handed it to HILLARY BARTH as payment for the gold bars.

10  HILLARY BARTH placed the U.S. currency in a money counter and

11  confirmed the total. HILLARY BARTH then asked TFO-UC for a first name

12  and last initial for a hand written receipt for the transaction. TFO-

13  UC advised BARTH his name was, "Andres V."  HILLARY BARTH proceeded

14  to hand write a receipt for the purchase (ORDER # 1001). HILLARY

15  BARTH then instructed TFO-UC to sign the "received by," section of

16  the handwritten receipt. TFO-UC then initialed "AV" in cursive

17  writing.

18       m.   For the second transaction, CS-3 sat down in the chair

19  closest to HILLARY BARTH. HILLARY BARTH advised CS-3 that the

20  transaction of three one ounce Suisse bars would total $4,920. TFO-UC

21  retrieved 61 one hundred dollar bills in U.S. Currency ($6,100) of

22  OAF from a black backpack and handed it to CS-3 in plain and direct

23  sight of HILLARY BARTH. At this time, CS-3 asked TFO-UC, "How much is

24  it?" TFO-UC responded, "61," referring to $6,100 in U.S. currency.

25  CS-3 then removed 11 one hundred bills in U.S. currency ($1,100) from

26  the OAF and handed it back to TFO-UC. CS-3 then handed HILLARY BARTH

27  50 one hundred dollar bills, ($5,000) as payment for the three gold

28  bars. HILLARY BARTH placed the U.S. currency in a money counter and

1   confirmed the total. HILLARY BARTH then asked CS-3 for a first name

2   initial and last name for a hand written receipt for the transaction.

3   CS-3 advised HILLARY BARTH to write, "D.Rossi."  HILLARY BARTH

4   proceeded to hand write a receipt for the purchase (ORDER # 1002).

5   HILLARY BARTH did not instruct CS-3 to sign the "received by" section

6   of the handwritten receipt. CS-3 then handed the receipt to TFO-UC in

7   direct and plain sight of HILLARY BARTH.

8           n.    TFO-UC confirmed with HILLARY BARTH that he, alone,

9   would be picking up the full order of gold the following day, January

10  30, 2020. HILLARY BARTH confirmed the entire order, nine gold Suisse

11  bars, would be available for pick up before 12:00 p.m.  The following

12  day, January 30, 2020, TFO-UC received nine ounces of gold bullion

13  from HILLARY BARTH at USPV.

14      87.  On February 5, 2020, TFO-UC returned to USPV and

15  compensated George VASQUEZ for his assistance in facilitating the

16  gold deal the previous week.  TFO-UC gave VASQUEZ $1000 cash and

17  said, "This is for you man.  I appreciate you walking us through that

18  shit.  It worked out fucking perfect, so uh . . . we'll probably do

19  it again."  TFO-UC suggested that he might conduct another gold

20  transaction soon.  VASQUEZ said he would let the BARTHS know ahead of

21  time.  TFO-UC said, "Just as long as I keep it under—" and VASQUEZ

22  interjected, "Yeah, yeah.  Keep it under 10.  And if you have to, do

23  it twice.  Now let's say you need more than 10, but you're by

24  yourself.  Come in.  Call me and say, "Hey George, I am gonna need

25  15.  Give me whatever, what else.  Break it in half.  Give me half.

26  And I'll have her buy it for me, and then I'll give it to you right

27  there."

28

**Exhibit F**
**486**

USAO 000208

ER-1229

**P.  VASQUEZ and STEVE BARTH Arrange to Launder Cash for Wire Transfers for CS-3 for 15%**

90.  In October 2020, CS-3 approached VASQUEZ about conducting a second gold purchase through OLYMPIC GOLD & JEWELRY.  CS-3 stressed to VASQUEZ that while he/she was cool with the earlier transaction, it had "too many moving parts" and he/she was looking for something simpler. CS-3 met VASQUEZ on or about October 8, 2020 to discuss this.  The meeting was recorded and reviewed by investigators, which showed:

a.  During the meeting CS-3 suggested to VASQUEZ that he/she provide VASQUEZ with the total amount of cash CS-3 wanted to use to purchase gold and VASQUEZ could structure the cash payment (under $10,000) over multiple days, on behalf of CS-3, so that CS-3 did not have to go to USPV multiple times in the same week.  VASQUEZ agreed to this saying, "that's my point, I don't want you to have to go all the time."

b.  CS-3 then said, "you don't even have to go get it. Just cut me a receipt that I purchased it, and then tax me whatever the fuck it is," i.e. charge a fee for converting the cash into a clean financial transfer.  VASQUEZ replied, "run that by me again. Do you want the gold or not?"  CS-3 indicated that he/she did not want the gold.  "I just want the receipt and then I sell it back to you, and you take your cut however it is."  CS-3 asked if this was possible, and VASQUEZ said, "Maybe."  He later added ". . . maybe, but I'm not sure.  I will have to talk to Steve, Hillary's husband." As noted elsewhere STEVE BARTH and HILLARY BARTH own and run OLYMPIC GOLD & JEWELRY.  CS-3 told VASQUEZ to "find out (from STEVE BARTH) and get back to me."

USAO 000209

ER-1230

1          c.  CS-3 and VASQUEZ continued discussing the proposed

2 deal and VASQUEZ clarified, "you just want to clean it." CS-3

3 replied, "that's exactly what it is." CS-3 added that he/she did not

4 want to continue laundering money through casinos, auctions and car

5 dealerships. VASQUEZ said, "Let me talk to Steve (BARTH), I don't

6 know, cause Steve is – as much as he can—" CS-3 said, "I get it," and

7 indicated that if they had to do it the way they did last time

8 (referring to the February 2020 transaction) that was fine, but "it's

9 about moving parts."

10         d.  Later in the conversation, VASQUEZ suggested CS-3

11 speak to Steve BARTH. CS-3 indicated that he/she preferred VASQUEZ

12 to speak to STEVE BARTH on his/her behalf. Your Affiant believes

13 this indicates that the decision to launder CS-3's money is STEVE

14 BARTH's decision and that VASQUEZ is subordinate to BARTH.

15         e.  VASQUEZ and CS-3 continued to discuss details such as

16 the percentage that CS-3 would be charged, whether CS-3 would receive

17 one check or multiple checks. VASQUEZ stated that the purchases

18 would have to be "under ten total. . . . I mean no paperwork and all

19 that stuff." CS-3 confirmed that the transaction would not be

20 reported. VASQUEZ said, "they have to at least take your first name

21 down." VASQUEZ added that he would "talk to Steve. I won't talk to

22 Hillary." Finally, VASQUEZ concluded, "we can do it. I think we

23 can. We do it that way a couple of times and it helps you out. We

24 all make a little bit."

25         f.  As the meeting was wrapping up, VASQUEZ said, "I will

26 talk to Steve." CS-3 said, "if you can do me a favor, just try to

27 fucking wash my shit." VASQUEZ said he would try.

28

Exhibit F
488

91. On or about November 12, 2020 CS-3 met with VASQUEZ at USPV to confirm the previously-discussed money laundering operation. The meeting was recorded and reviewed by investigators. During the meeting, CS-3 indicated that the money would be ready the following week, and they discussed the date and time for the transaction. They also discussed the percentage which would be charged and VASQUEZ stated he still needed to talk to Steve (BARTH) to finalize that aspect. As VASQUEZ walked CS-3 to the door, CS-3 told VASQUEZ he/she appreciated the arrangement because he/she just sold a large load of "skante" for some people down south and he/she needed to clean the money as soon as possible. VASQUEZ told CS-3 not to worry about it and it would be taken care.

92. On or about November 17, 2020 CS-3 and TFO-UC went to USPV with $25,000 U.S. currency. They met with VASQUEZ. The meeting was recorded and reviewed by investigators. The following took place:

a. CS-3 asked VASQUEZ what percentage of the $25,000 would OLYMPIC GOLD AND JEWLERY charge, if they laundered all $25,000 at one time. VASQUEZ stated approximately 12 percent. CS-3 and TFO-UC initially balked at such a high percentage being charged. VASQUEZ replied by saying, "Well, first, we are not even supposed to be doing this, right? Second . ." VASQUEZ then stopped talking and utilized a calculator to determine the amount of money OLYMPIC GOLD AND JEWLERY would charge at a 12 percent rate. VASQUEZ then stated, "it's about three grand. We are going to go with 12 percent at this time, because we are going to have to go buy it (referring to the gold bullion)." VASQUEZ then inquired if CS-3 and TFO-UC were still interested in conducting the laundering of the $25,000. TFO-UC told VASQUEZ that he still wanted to do the transaction.

**Exhibit F**
**489**

USAO 000211

ER-1232

1      b.   TFO-UC then retrieved the $25,000 from a backpack and

2  handed it to VASQUEZ. VASQUEZ took possession of the U.S. currency

3  and placed it in a money counter on his desk. Upon verifying the

4  amount of $25,000, VASQUEZ remained in possession of the money.

5  VASQUEZ inquired if TFO-UC wanted a receipt for the transaction.

6  TFO-UC said that he did not want any paperwork at all.

7      c.   VASQUEZ then went on to explain based on the daily

8  fluctuation of the price of gold and that they won't know exactly how

9  much the business may earn and / or lose when purchasing and

10  reselling the gold bullion, which is why Steve [BARTH] is charging 12

11  percent for the transaction[36].  VASQUEZ explained that OLYMPIC GOLD

12  AND JEWLERY would utilize the $25,000 to purchase gold bullion, in

13  multiple structured purchases under $10,000 to avoid mandated

14  reporting paperwork.  VASQUEZ stated once the gold bullion is

15  purchased from a third party source, OLYMPIC GOLD AND JEWLERY would

16  then "sell" the gold bullion, and wire the transaction amount to an

17  account belonging to CS-3.  CS-3 and TFO-UC expressed to VASQUEZ they

18  did not want to touch nor see the gold bullion, and were only

19

20  _____

[36] CS-3's initial understanding of the deal, based on
21  conversations with VASQUEZ (which were not recorded) was that CS-3
   would give the cash to VASQUEZ who would give it to BARTH, who would
22  disguise the placement of the funds into the OLYMPIC GOLD AND JEWLERY
   business account as legitimate precious metals sales.  VASQUEZ told
23  CS-3 that STEVE BARTH would structure the funds to avoid reporting
   requirements and disguise the transactions on paper as anonymous gold
24  and silver purchases.  VASQUEZ assured CS-3 that no gold would
   actually change hands.  VASQUEZ further told CS-3 that once the money
25  had been structured into the OLYMPIC GOLD AND JEWLERY business
   account that a wire transfer, or series of wire transfers could be
26  utilized to return the money to CS-3 into a bank account that CS-3
   would provide VASQUEZ.  VASQUEZ told CS-3 that the wire transfer
27  would be made to look like a sale of precious metals to OLYMPIC GOLD
   AND JEWLERY.  VASQUEZ told CS-3 that the entire circle of
28  transactions would exist on paper only and would be clean and
   disguised as normal commerce.

Exhibit F
490                                                USAO 000212

                                                   ER-1233

interested in a time frame in which they could expect the money to be wired to the account.  VASQUEZ stated he understood and gave an approximate two week time frame for the approximate $22,000 to be wired to the account.  VASQUEZ explained the time frame depended on how much bullion was in stock at OLYMPIC GOLD AND JEWELRY and how much would have to be purchased from the third party source. VASQUEZ further stated he could only conduct one cash purchase of gold bullion under $10,000 a day and that OLYMPIC GOLD AND JEWELRY is only open twice a week.

    d. CS-3 then provided VASQUEZ with account information to receive the wire transfer.  VASQUEZ then inquired if TFO-UC wanted the $3,000 charge to come out of the $25,000 that he just handed VASQUEZ, or did he want to pay that separate, so that VASQUEZ knew how to structure the purchases.  CS-3 and TFO-UC advised VASQUEZ to take the 12 percent charge ($3,000) out of the $25,000 that TFO-UC just handed VASQUEZ.  VASQUEZ acknowledged he understood and indicated he would be in contact with CS-3 about updates.

    e. As TFO-UC and CS-3 were leaving USPV, CS-3 handed VASQUEZ $500 for facilitating the transaction.  VASQUEZ accepted the money.

    f. On or about December 2, 2020 CS-3 went to USPV to ask VASQUEZ when CS-3 would see the money.  This meeting was not recorded, but CS-3 reported it to investigators the same day, and also provided a "screen shot" of a later communication which corroborated his account, discussed below.  During the meeting, VASQUEZ told CS-3 he needed the address on CS-3's bank account because Steve BARTH needed it to complete the wire transfer.  CS-3 provided the information to VASQUEZ.  Later that day, CS-3 received a

**USAO 000213**

1    text message from VASQUEZ with a picture of a computer screen.  On

2    the screen CS-3 saw a tracking number – 0W0001073359382 and the words

3    "bullion purchase" and "pending."  Agents have preserved and reviewed

4    the photo which VASQUEZ sent.  In the photo, agents observed a

5    reflection of VASQUEZ looking over the shoulder of someone who

6    appears to be STEVE BARTH.

7         g.   VASQUEZ advised that the first wire transfer was for

8    $10,000.  The rest would follow.

9         h.   On December 4, 2020 agents received confirmation that

10   two wires, one for $10,000 and one for $12,000 had been wired into

11   the under-cover bank account which was being utilized for this

12   operation.

13        **Q.   USPV Principals Help Its Customers Evade Law Enforcement**

14        95.  During the period of time in which CW-1 rented safe deposit

15   boxes at USPV (2012-2015), federal agents were investigating CW-1 and

16   contacted MARK PAUL about CW-1's boxes.  According to CW-1, PAUL told

17   CW-1 that he stalled in replying to the FBI and instructed GEORGE

18   VASQUEZ to "slow down in order to alert people."  PAUL specifically

19   told CW-1 to get his/her stuff out of USPV because the FBI had come

20   by.  Furthermore, PAUL told CW-1 to call another USPV customer whom

21   CW-1 had referred, to tell that customer to remove the contents of

22   his boxes quickly before the FBI could execute warrants.

23        96.  On August 9, 2019, USPV manager GEORGE VASQUEZ counseled

24   CS-3 on how to evade law enforcement.  During a recorded conversation

25   between VASQUEZ and CS-3, VASQUEZ said, "Piece of advice for you.

26   You know where you keep that [USPV safety deposit box] key, here?

27   [indicating under his shirt on a chain around his neck] . . . Called,

28   uh, asset forfeiture.  You ever heard about that?"  CS-3 said, "No,

**USAO 000214**

**ER-1235**

1  what?" VASQUEZ explained, "Well. Let's say you get pulled over for a
2  [unintelligible], right? Cop checking you out, things like that.
3  Hey, empty your pockets. They see your key, they know it's a safe
4  deposit box. They don't know where. But then, they escalate it
5  towards – they'll call someone from their department, say hey, you
6  know what, we got this guy for whatever, whatever. . . . And then
7  they start looking in to things. You know, and then they'll say, oh
8  well, we'll confiscate whatever you have, this and that, and then
9  they'll scare you and say hey, you know, you don't tell us where this
10 key belongs to, you know, you're gonna do twenty, fifteen years."
11 Later in the conversation, VASQUEZ added, "It's happened before.
12 Just to let you know. . . . Yeah, just to give you a heads up.
13 That's why we—we make sure we – I take care of our people, man."
14 Based on my training and experience as well as a comprehensive
15 debrief of CS-3, I believe that VASQUEZ was coaching CS-3 on how to
16 evade law enforcement.

17      97.  On August 30, 2019, CS-3 spoke to USPV manager GEORGE
18 VASQUEZ.  The conversation was recorded and reviewed by
19 investigators.  During the conversation VASQUEZ coached CS-3 on how
20 to evade law enforcement.  VASQUEZ said, "Like I told you.  Be
21 careful when you go out.  This is between us.  Mike [POLIAK]—you know
22 he—he saw somebody get pulled over."  CS-3 asked, "Is it hot here or
23 what?  Should I be worried?"   VASQUEZ replied, "No, no, no.  No it's
24 just the people that do stuff."  CS-3 asked, "They get followed in?"
25 VASQUEZ replied, "Yeah!  They're fuckin' stupid.  You know.  Not,
26 not, not the place itself."  Later in the conversation, CS-3
27 remarked, "You got to tell everybody to fuckin', shit, fuckin' watch
28 their back."  VASQUEZ replied, "I tell everybody . . . I take care of

USAO 000215

1   people, man."  Later VASQUEZ, discussing a person who was pulled over

2   and then let go said, "But it's just that I tell them, even though

3   they let him go, like, why did they pull you over in the first place?

4   Has to be a reason . . . Cause you did something fuckin' stupid . . .

5   And one other guy said oh he had tinted windows – too tinted.  One

6   didn't have a fuckin' front license plate . . . Little shit."  CS-3

7   agreed, saying, "They'll find something to fuckin' jam you up and

8   then they find something and from that they run."  VASQUEZ replied,

9   "That's what I tell them, *perro*!  But what do I know?  Right?"

10      98.  In July 2019, CS-3 was at USPV.  While there, George

11  VASQUEZ showed CS-3 the USPV security monitors and pointed out a

12  number of vehicles which VASQUEZ said he believed belonged to law

13  enforcement.  VASQUEZ, in fact, identified a number of law

14  enforcement vehicles which were in the area due to CS-3's presence

15  there.  VASQUEZ explained to CS-3 that he looks for vehicles parked

16  in one spot too long; vehicles which park, but no one exits; tinted

17  windows; and other factors.

18      99.  On or about October 21, 2020, George VASQUEZ explicitly

19  warned CS-4 that law enforcement officers were asking about him/her

20  and that he/she should remove the contents of his/her box.  The

21  meeting between VASQUEZ and CS-4 was recorded and reviewed by

22  investigators.

23      a.  Specifically, on or about October 16, 2020 local law

24  enforcement officers went to USPV and represented themselves to be

25  narcotics investigators seeking information about a person they

26  asserted they had followed to USPV.  The officers presented VASQUEZ

27  with a photograph of CS-4.  VASUQEZ first indicated that he could not

28  give information about clients.  As the officers were leaving

**Exhibit F**
**494**

USAO 000216

ER-1237

1   however, VASQUEZ walked them out and stated that he had seen the

2   person in the photo at USPV.  He added that customers often remove

3   the contents of their boxes and never return.

4          b.   Shortly after the local law enforcement officers left

5   USPV, VASQUEZ contacted CS-3, who had talked about coming to USPV to

6   see VASQUEZ that day.  Using coded language and communicating via

7   text message, VASQUEZ told CS-3 not to come, that the area was "hot"

8   right now.

9          c.   On or about October 19, 2020, CS-4 sent VASQUEZ a text

10  message indicating that CS-4 intended to pay rent on his/her box that

11  week.  VASQUEZ replied via text message and told CS-4 to delete all

12  text communications between them.  This communication has been

13  reviewed and preserved.

14         d.   On October 21, 2020, CS-4 went to USPV to pay

15  quarterly rent on his/her box.  VASQUEZ spoke to CS-4 in the office[37]

16  area and coached him/her through a dialogue whereby VASQUEZ said,

17  "Pay close attention, okay? Pay attention.  It's going to be $5,000."

18  CS-4 expressed surprise and confusion.  VASQUEZ said, "Yes.  Pay

19  attention.  You say it's too expensive and you'd rather not do

20  business with me.  Okay?"  CS-4 was confused by this charade, but

21  followed VASQUEZ's instructions. When CS-4 asked why, VASQUEZ said,

22  "I'm doing you a favor, man.  . . .  I'm doing you a favor, dude,

23  don't say anything. Okay?"  VASQUEZ added, "When you leave here,

24  delete my number.  I'm doing you a favor, okay?  If you want to go in

25  the bathroom and leave something for me, that's fine."  CS-4

26

27         [37]  Conversations between CS-4 and VASQUEZ occurred in Spanish.

28  Calls were translated into English by Spanish-language translators
    working on behalf of the FBI.

continued to press for an explanation.  VASQUEZ said, "I'm telling
you, the heat is hot.   . . . Things are hot here, I want you to
cancel your box.  . . . They're after you, man."  CS-4 asked, "Who?"
VASQUEZ replied, "The cops, dude."  CS-4 asked whether he/she could
rent a box later.  VASQUEZ said, "Another day, later on.  While
things clam down. . . . I'm doing you a favor.  They'll come again.
. . .  They showed me your photo and everything, so."  CS-4 asked,
"And the owners are the ones who made the decision?"  VASQUEZ said,
"No, man.  I'm making it, to protect you, man. . . . I'm just telling
you because if they come here, they're after you.  Okay? . . .
They're going to come.  They already said that when they're after
you, they're going to come back."  CS-4 asked again about renting a
box later.  VASQUEZ concluded with "I know, dude.  They're looking
for you.  I don't know.  The cops are looking for you, for real.  I'm
not going to lie to you."  CS-4 agreed and left.  Conversations
between VASQUEZ and law enforcement, as well as CS-4 were
consensually recorded and reviewed.  Text messages have been reviewed
and preserved.

        e.   On November 12, 2020, VASQUEZ related these events to
CS-3, as well[38].  This communication between VASQUEZ and CS-3 was
recorded and reviewed by investigators.  During that conversation,
VASQUEZ described how the police had come to USPV looking for a USPV
customer (CS-4).  VASQUEZ speculated that the police had stopped the
customer and found his/her key or followed him/her to USPV.  VASQUEZ
assured CS-3 that he/she shouldn't worry about it, as the police had
not returned.

---

[38] CS-3 and CS-4 are completely unknown to each other.

USAO_000218

Exhibit F
496

ER-1239

1    100. Based on discussions Michael POLIAK had with CS-1, it

2    appears part of his motivation in buying into USPV was to protect

3    both his own money, and that of his "friends." In a December 2019

4    meeting which was recorded and reviewed by investigators, POLIAK told

5    CS-1, "the reason why I wanted to buy it [USPV], I got a lot of

6    fucking money now. Not only – I don't just want to be a customer, I

7    wanted to be the owner . . . cause that way, if anything fucking

8    happens, I know first. And it's good for all my customers that I

9    know first. Cause I'm not Mark [PAUL]." CS-1 said, "You see, I

10   mean, you only yourself have what, ten million, eight million?"

11   POLIAK said, "Yeah." CS-1 continued, "And your friends?" POLIAK

12   replied, "A lot." CS-1 said, "Think about that. Your friends. . . .

13   It's your ass. It's your friends." CS-1 said, "Worry-wise I don't

14   care, but again, you have to have your eyes in there because you have

15   to monitor their money, But if you're a client—" POLIAK added, "But

16   it's also – how many people trust anybody with that kind of money?

17   Anonymously? **I mean, it's not like we're Chase Bank. . . . So why**

18   **do they come?** Cause of me. They're like, Mike {POLIAK}? You're

19   there, okay. I'm good with that." This exchange suggests that POLIAK

20   anticipates being able to warn his "friends" if there is some reason

21   their money is in jeopardy.

22   101. On or about September 16, 2020, in a conversation which was

23   recorded and reviewed by investigators, Michael POLIAK told CS-1 that

24   he would remove all but $5,000 of the contents of a client's box, for

25   that client, if he became aware of pending legal process.

26   Specifically, POLIAK and CS-1 were talking about having "a guy like

27   me [POLIAK]" watching customers' money. POLIAK indicated that if

28   someone had a problem he would "move it to another box.

1    would leave like five grand in the box.  . . .  Five grand.  Take it.

2    See you later. At least they can't say 'Oh, it was empty.'"  POLIAK

3    then told CS-1 about agents from Homeland Security who came to USPV

4    with a subpoena.  POLIAK said the agents showed a picture of the

5    person whose box they were interested in, but POLIAK told them that

6    USPV has no information about who holds which box and the agents

7    needed to bring the person to USPV, physically, to have his eye

8    scanned.

9        **R.   It Would Be Irrational for Non-Criminal Customers to Choose
            USPV**

10       102.    As suggested above by USPV owner POLIAK, there is no

11   reason for non-criminal clients to use USPV, whose selling points

12   are: anonymity, instructions on how to structure cash transactions to

13   evade cash reporting requirements, tips on how to avoid asset

14   forfeiture, and ownership and management by drug traffickers.

15   Legitimate customers need not pay to store cash, but can receive

16   interest and insurance by depositing it in a money market or other

17   financial account.  Only those who wish to hide their wealth from the

18   DEA, IRS, or creditors would instead chose to *pay* to store actual

19   cash at a single storefront operation owned by the likes of MARK PAUL

20   and MICHAEL POLIAK who might go bankrupt, close the business for any

21   reason, or steal their valuables and run off.  No organization stands

22   behind the boxes at USPV in the way that Chase Bank, which has a

23   nearly 150-year history and almost 200,000 employees, stands behind

24   its safety deposit boxes, to say nothing of its bank accounts, which

25   are insured by the FDIC.  As stated by USPV owner POLIAK, it is his

26   standing among drug traffickers, as well as USPV's criminal-friendly

27

28

**Exhibit F
498**

91

USAO 000220

ER-1241

1   policies, that entice criminals to store their millions in cash, as

2   described earlier in the previous forfeitures section, at USPV.

3       **S.   USPV Falsely Claims It Either Returns the Unclaimed**
         **Contents of Boxes to a Designee, or Escheats it to the**
4        **State.**

5       103. On its company website USPV claims that the contents of

6   unclaimed boxes will be turned over to a designee or to the State of

7   California.  Specifically, under "Frequently Asked Questions – What

8   happens to the contents of my box if I die or become physically or

9   mentally incapacitated?" – USPV states,

10      "You should provide your attorney, beneficiary, or custodian

11      with information about the existence of your box (for an example

12      letter, visit our Customer Resources page). However, knowledge

13      of the existence of your box does not constitute permission to

14      access it. USPV will require a court authorization letter to

15      release the contents of your box to ANYONE other than the

16      renter.

17      "If you choose not to provide this information, USPV will open

18      your box due to nonpayment of rent (after a six month grace

19      period has elapsed). If you have provided contact information

20      within your box (suggested), USPV will attempt to locate you. If

21      no contact information is found, we will store the contents of

22      your box in our private safe for three years. Thereafter, we are

23      required to escheat (forward) the contents to the State of

24      California."

25      104. USPV employee GEORGE VASQUEZ, made similar statements to

26  FBI agents during an interview on or about July 1, 2016.

27  Specifically, VASQUEZ told agents that if a client fails to pay for

28  his/her safety deposit box for three months, USPV will drill out the

**USAO 000221**

lock and try to contact the client if they find identifying

documentation on the box. If not, USPV will keep the contents on hold

for three years and then forfeit it to the State of California.

105. CW-1 alleged that these assertions by USPV and its

principals are false. CW-1 reported that he/she and another

individual rented a USPV box to which CW-1 had both keys. CW-1 also

paid all the rent and fees for the box. Furthermore, CW-1 affixed a

sticker onto the box with instructions for CW-1's spouse or father to

be contacted in the event that CW-1 failed to pay rent on the box.

CW-1 has not paid rent on the box in five years because CW-1 is

incarcerated. Neither CW-1's spouse nor father were ever contacted.

The other person whose biometrics were used to rent the box has

passed away. The U.S. government did not seize the contents of the

box, and there is no record of the property being forfeited to the

State of California (which should not have happened because a

designee was identified). Thus it appears that USPV may have kept

the contents of CW-1's box. Furthermore, statements MARK PAUL made

to CW-1 support this, described below.

106. PAUL told CW-1 that in the event of non-payment, after

allowing a grace period, PAUL would drill open the box, a process he

said he would video record. In the absence of contact instructions,

he would place the contents into his own safe deposit box. CW-1

reported that PAUL himself has several USPV boxes. CW-1 believes

that PAUL keeps the contents of these boxes for himself. CW-1

believes that the USPV stated policy concerning unpaid rent is false.

1. <u>USPV Has Never Escheated Property</u>

107. Based on information obtained from the California State

Controller's Office – Unclaimed Property division, USPV has never

**Exhibit F**
**500**

USAO 000222

ER-1243

escheated property to the state[39].  USPV has been in business since
2012; discounting the six month and three year waiting periods, this
means that in approximately five years, no one who failed to identify
a contact person has ever 1) abandoned a box; 2) failed to pay rent
on a box; 3) been arrested; 4) been deported; 5) died; or 6) become
incapacitated.  This seems unlikely, particularly given the types of
customers using USPV, as described herein.   A more logical
explanation is that PAUL places the contents of abandoned boxes in
his own safe deposit box for the three-year waiting period, but never
releases them to the state.

**T.   NOTIFYING USPV CUSTOMERS HOW TO CLAIM THEIR PROPERTY**

108. The search and seizure warrants the government seeks list
the nests of safety deposit boxes at USPV among the items to be
seized.  These nests of safety deposit boxes are evidence and
instrumentalities of USPV's criminality.  The warrants authorize the
seizure of the nests of the boxes themselves, not their contents.  By
seizing the nests of safety deposit boxes, the government will
necessarily end up with custody of what is inside those boxes
initially.  Agents will follow their written inventory policies to
protect their agencies from claims of theft or damage to the contents
of the boxes, and to ensure that no hazardous items are unknowingly
stored in a dangerous manner.  Agents will attempt to notify the
lawful owners of the property stored in the boxes how to claim their
property, such as by posting that information on the internet or at

_____

[39] I ran a search on the Unclaimed Property Website and spoke
with a representative from the State Controller's Office, who also
ran a search.  Both searches revealed no results.  In other words,
USPV has never escheated property to the State of California, as it
claims.

Exhibit F
501

USAO 000223

ER-1244

1 USPV itself, or by contacting the owners directly.  In order to

2 notify the owners directly, agents will, in accordance with their

3 policies regarding an unknown person's property, look for contact

4 information or something which identifies the owner.[40]   (USPV

5 recommends that box renters include their or their designees'

6 telephone numbers on a note in the box in the event that USPV removes

7 the contents for nonpayment of rental fees.)

8    **U.   REQUEST FOR AFTER-HOURS SEARCH WARRANT FOR USPV LOCATION ONLY**

9

10   109.    I request permission to complete the search and seizure

11 warrants at the USPV location outside of normal searching hours.

12 Because that facility is secured and advertises that it is on a time-

13 lock, agents will not be able to begin executing any warrants there

14 until after its normal opening time, 10:00am.  Further, because it is

15 secured, I expect that removing some business equipment, especially

16 the nests of safety deposit boxes, will be unusually time consuming,

17 so that agents may not be able to complete their tasks before

18 10:00pm.  Accordingly, for the USPV location only, I request

19 permission for agents to continue executing search and seizure

20 warrants beyond 10:00pm.

21    **USPV OWNER MARK PAUL LIVES AT PAUL'S RESIDENCE**

22   110.  ████████████████████████████████

23 ████████████████████████████    ███████████

24 █████████████████████████████████████████

25 █████████████████████████████████████████

26 _____

27   [40] The FBI policy regarding taking custody of an unknown person's property provides, in part, that agents "inspect the property as necessary to identify the owner and preserve the property for

28 safekeeping."  The inspection "should extend no further than necessary to determine ownership."

USAO 000224

ER-1245



**USPV OWNER MICHAEL POLIAK LIVES AT POLIAK'S RESIDENCE**

111.

**USPV MANAGER GEORGE VASQUEZ LIVES AT VASQUEZ'S RESIDENCE**

112.

**HILLARY AND STEVE BARTH LIVE AT THE BARTHS' RESIDENCE**

113.

USAO 000225

ER-1246

1 ████████████████████████████████████████████████

2 ████████ ██████████████████████████████████████

3 ██████████████████████████████████████████

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ████████████████████████████████████████

8 ████████ .

## TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

114. In my training and experience, persons involved in money laundering, drug trafficking, and structuring must maintain records of their activities just to manage their day-to-day criminal business affairs, and to keep track of their finances. Commonly they maintain both written and electronic records, usually on computers and smart phones or tablets. Typically they store these records where they feel is safe and near at hand, most often their residences, places of business, and vehicles. Persons with illicit wealth often attempt to hide it from the authorities by storing it in the form of cash, precious metals, or digital currencies such as bitcoin. Persons involved in criminal conspiracies must of necessity maintain the contact information of their co-conspirators in the form of telephone numbers, email addresses, and user names for communication applications, such as Signal, WhatsApp, and Facebook. Most often they maintain this contact information on their computers or smart phones.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

115. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know

USAO 000226

ER-1247

1  that the following electronic evidence, inter alia, is often

2  retrievable from digital devices:

3        a.  Forensic methods may uncover electronic files or

4  remnants of such files months or even years after the files have been

5  downloaded, deleted, or viewed via the Internet.  Normally, when a

6  person deletes a file on a computer, the data contained in the file

7  does not disappear; rather, the data remain on the hard drive until

8  overwritten by new data, which may only occur after a long period of

9  time.  Similarly, files viewed on the Internet are often

10  automatically downloaded into a temporary directory or cache that are

11  only overwritten as they are replaced with more recently downloaded

12  or viewed content and may also be recoverable months or years later.

13        b.  Digital devices often contain electronic evidence

14  related to a crime, the device's user, or the existence of evidence

15  in other locations, such as, how the device has been used, what it

16  has been used for, who has used it, and who has been responsible for

17  creating or maintaining records, documents, programs, applications,

18  and materials on the device.  That evidence is often stored in logs

19  and other artifacts that are not kept in places where the user stores

20  files, and in places where the user may be unaware of them.  For

21  example, recoverable data can include evidence of deleted or edited

22  files; recently used tasks and processes; online nicknames and

23  passwords in the form of configuration data stored by browser, e-

24  mail, and chat programs; attachment of other devices; times the

25  device was in use; and file creation dates and sequence.

26        c.  The absence of data on a digital device may be

27  evidence of how the device was used, what it was used for, and who

28  used it.  For example, showing the absence of certain software on a

**Exhibit F**
**505**

USAO 000227

ER-1248

device may be necessary to rebut a claim that the device was being controlled remotely by such software.

　　　　d.　Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.　Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.　Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

　　116. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

　　　　a.　Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.　Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.　Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

　　　　b.　Digital devices capable of storing multiple gigabytes are now commonplace.　As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

**Exhibit F**
**506**

**USAO 000228**

**ER-1249**

117. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, and HILLARY and STEVE BARTH on the device(s); and (2) hold the device(s) in front of those persons' faces with their

USAO 000229

ER-1250

1   eyes open to activate the facial-, iris-, and/or retina-recognition

2   feature.

3       118. Other than what has been described herein, to my knowledge,

4   the United States has not attempted to obtain this data by other

5   means.

6                            **CONCLUSION**

7       119. Based upon the foregoing facts and my training and

8   experience, I believe there is probable cause to believe that

9   evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as

10  listed in Attachment B, will be found at the SUBJECT PREMISES.  I

11  further respectfully submit that there is probable cause to believe

12  that the business computers, money counters, nests of safety deposit

13  boxes and keys, digital and video surveillance and security equipment

14  and biometric scanners located at USPV, 9182 West Olympic Blvd.,

15  Beverly Hills, CA 90212 were used or intended to be used to

16  facilitate violations of 18 U.S.C. § 1956, 21 U.S.C. § 841, and 31

17  U.S.C. § 5324, and conspiracy to commit the same.  As a result, those

18  items are subject to seizure and forfeiture to the United States

19  pursuant to 18 U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C.

20  § 5317(c).

21

22  Attested to by the applicant in accordance
    with the requirements of Fed. R. Crim. P. 4.1

23  by telephone on this ___17___ day of March, 2021.

24

25

26

27  STEVE KIM
    UNITED STATES MAGISTRATE JUDGE

28

USAO 000230

ER-1251

FILED
03/09/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: DM DEPUTY

1

2

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                  January 2020 Grand Jury

11   UNITED STATES OF AMERICA,          CR 2:21-cr-00106-MCS

12          Plaintiff,                  I N D I C T M E N T

13          v.                          [18 U.S.C. § 1956(h): Conspiracy
                                        to Launder Money; 21 U.S.C. § 846:
14   U.S. PRIVATE VAULTS, INC.,         Conspiracy to Distribute
      California Corporate              Controlled Substances; 18 U.S.C.
15    Number C3405297,                  371: Conspiracy to Structure
                                        Transactions; 18 U.S.C.
16          Defendant.                  § 982(a)(1), 21 U.S.C. §§ 853 and
                                        881(a)(6), 28 U.S.C. § 2461(c) and
17                                      31 U.S.C. § 5317(c): Criminal
                                        Forfeiture]
18

19        The Grand Jury charges:

20                      COUNT ONE

21                   [18 U.S.C. § 1956(h)]

22   A.   INTRODUCTORY ALLEGATIONS

23        1.   At times relevant to this Indictment:

24             a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada

25   Corporation registered with the California Secretary of State, was in

26   the business of renting safety deposit boxes to individuals who

27   wished to do so anonymously.

28             b.   Co-conspirator USPV Officer was an officer of USPV and

1  one of its owners.  USPV Officer dealt in marijuana, in violation of

2  the laws of California, as well as cocaine.

3       c.   Co-conspirator USPV Manager was the manager of USPV.

4  USPV Manager helped USPV Officer arrange drug deals within USPV, and

5  helped USPV customers avoid detection by law enforcement, including

6  by advising them to structure their cash purchases to avoid reporting

7  requirements.

8       d.   Co-conspirator Gold Business was a dealer in precious

9  metals and jewelry, and shared the same space as USPV, as well as

10  some employees.  Gold Business helped USPV customers convert their

11  cash into gold, and structured their cash transactions to avoid

12  federal reporting requirements.

13       e.   Co-conspirator USPV Representative One was a

14  representative of USPV, and an owner of co-conspirator Gold Business.

15  USPV Representative One instructed USPV customers how to structure

16  transactions to avoid federal reporting requirements.

17       f.   Co-conspirator USPV Representative Two was a

18  representative of USPV, and an owner of co-conspirator Gold Business.

19  USPV Representative Two instructed USPV customers how to structure

20  transactions to avoid federal reporting requirements.

21  B.   THE OBJECTS OF THE CONSPIRACY

22       2.   Beginning in or before 2019, and continuing through the

23  date of this Indictment, in Los Angeles County, within the Central

24  District of California, and elsewhere, defendant USPV conspired with

25  others known and unknown to the Grand Jury to launder money, in

26  violation of Title 18, United States Code, Section 1956, namely:

27       a.   to knowingly conduct and attempt to conduct financial

28  transactions involving the proceeds of a specified unlawful activity,

**Exhibit F**
**510**

USAO 000232

ER-1253

1  that is, the distribution of controlled substances, with the intent

2  to promote the carrying on of that specified unlawful activity, in

3  violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4       b.  to knowingly conduct and attempt to conduct financial

5  transactions involving the proceeds of specified unlawful activity,

6  that is, the distribution of controlled substances, knowing that the

7  transactions were designed in whole or in part to conceal and

8  disguise the nature, location, source, ownership, and control of the

9  proceeds of specified unlawful activity, in violation of Title 18,

10 United States Code, Section 1956(a)(1)(B)(i); and

11      c.  to knowingly conduct and attempt to conduct financial

12 transactions involving the proceeds of specified unlawful activity,

13 that is, the distribution of controlled substances, knowing that the

14 transactions were designed in whole or in part to avoid a transaction

15 reporting requirement under Federal law, in violation of Title 18,

16 United States Code, Section 1956(a)(1)(B)(ii).

17 C.  <u>MANNER AND MEANS OF THE CONSPIRACY</u>

18      3.  The objects of the conspiracy were carried out and were to

19 be carried out, in substance, as follows:

20      a.  Defendant USPV would adopt business practices that

21 attracted customers in possession of proceeds from criminal offenses,

22 including drug trafficking, and not law-abiding persons.  Such

23 practices included: (1) touting the anonymity of the safety deposit

24 rentals that defendant USPV would provide, including by advertising

25 "we don't even want to know your name"; (2) boasting that, unlike

26 banks, its anonymous safety deposit box rentals did not require

27 customer information that "can be easily accessed by government

28 agencies (such as the IRS)"; (3) making arrangements for the payment

USAO 000233

**Exhibit F**
**511**

of the rental fees in cash and other ways that would be untraceable; (4) issuing safety deposit box keys that were unmarked and unnumbered so that law enforcement could not determine that the keys unlocked safety deposit boxes at USPV; and (5) charging safety deposit box rental rates several times higher than those at banks.

      b.   USPV Officer would capitalize defendant USPV with the proceeds of his illegal drug trafficking.

      c.   USPV Officer would invite other drug traffickers who knew and trusted him because of his illegal drug trafficking to store the proceeds of their drug trafficking at defendant USPV.

      d.   Employees of defendant USPV would conduct counter surveillance of the neighborhood and warn customers when they observed law enforcement.

      e.   Agents of defendant USPV would instruct customers to structure transactions to avoid currency transaction reports including by purchasing gold and other precious metals through Gold Business, which would structure transactions and not file required currency reports.

      f.   If agents of defendant USPV learned that law enforcement was interested in searching or seizing the contents of a particular customer's safety deposit box, they would attempt to warn the customer, delay law enforcement, or even remove all but a nominal amount of cash from the box for the customer, to prevent law enforcement from discovering and seizing the bulk of the cash.

      g.   Defendant USPV would deposit the cash proceeds it received from its customers for safety deposit box rentals, which included proceeds from the distribution of controlled substances, into its bank account, and then use those proceeds to maintain USPV's

USAO 000234

anonymous storage facilities for its criminal customers.

       h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

       i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

**Exhibit F**
**513**

**USAO 000235**

**ER-1256**

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

USAO 000236

1   defendant USPV could provide in bulk.

2       Overt Act No. 2:  On July 26, 2019, USPV Officer met

3   Confidential Informant 3 within USPV to sell him 1,000 vape

4   cartridges containing THC.  USPV Officer delivered the cartridges in

5   the parking lot of USPV, and received in exchange $8,000 in cash

6   within USPV's business location.

7       Overt Act No. 3:  On or about December 11, 2019, during

8   discussions for the sale of cocaine, USPV Officer instructed the

9   buyer, Confidential Informant 3, to use a wireless communication

10  application called "Signal," which is encrypted to communicate with

11  him regarding the transaction.

12      Overt Act No. 4:  On or about December 16, 2019, USPV Officer

13  instructed Confidential Informant 3 to come to USPV to complete the

14  exchange.

15      Overt Act No. 5:  On or about December 16, 2019, USPV Manager

16  called Confidential Informant 3 and explained that co-conspirator

17  USPV Officer was not being careful enough, and could bring unwanted

18  law enforcement attention to defendant USPV by conducting this drug

19  deal onsite.

20      Overt Act No. 6:  On or about December 18, 2019, USPV Officer

21  sold an ounce of cocaine to Confidential Informant 3 through

22  intermediaries.

23

24

25

26

27

28

**Exhibit F**
**515**

USAO 000237

ER-1258

COUNT THREE

[18 U.S.C. § 371]

8.     The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

9.     Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.    MANNER AND MEANS OF THE CONSPIRACY

10.     The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

11.     In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

not limited to the following:

Overt Act No. 1: On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2: On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3: On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4: On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each: "That way you don't have to give no social security, no ID. All that shit goes to the IRS." USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5: On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

USAO 000239

$10,000: "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . .."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

USAO 000240

ER-1261

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

     a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

     b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

     a.   The business computers;

     b.   The money counters;

     c.   The nests of safety deposit boxes and keys;

     d.   The digital and video surveillance and security equipment; and

     e.   The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)

1   defendant USPV shall forfeit substitute property, up to the value of

2   the property described in paragraph 2 above if, as the result of any

3   act or omission of defendant USPV, the property described in

4   paragraph 2 above or any portion thereof (a) cannot be located upon

5   the exercise of due diligence; (b) has been transferred, sold to, or

6   deposited with a third party; (c) has been placed beyond the

7   jurisdiction of the court; (d) has been substantially diminished in

8   value; or (e) has been commingled with other property that cannot be

9   divided without difficulty.

**USAO 000242**

**ER-1263**

1                    FORFEITURE ALLEGATION TWO

2          [21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

3              and 21 U.S.C. § 853]

4      1.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby

5 given to defendant U.S. PRIVATE VAULTS, INC. that the United States

6 will seek forfeiture as part of any sentence in accordance with Title

7 21, United States Code, Section 881(a)(6), Title 28, United States

8 Code, Section 2461(c), and Title 21, United States Code, Section 853,

9 in the event of defendant USPV's conviction under Count Two of this

10 Indictment.

11     2.  Defendant USPV shall forfeit to the United States the

12 following property:

13        a.  All right, title, and interest in any and all property,

14 real or personal:

15           i.   constituting, or derived from, any proceeds

16 obtained, directly or indirectly, as a result of the offense set

17 forth in Count Two of this Indictment, including, without limitation,

18 the property set forth in paragraph 3 below; or

19          ii.  used, or intended to be used, in any manner or

20 part, to commit, or to facilitate the commission of the offense set

21 forth in Count Two of this Indictment, including, without limitation,

22 the property set forth in paragraph 3 below; and

23        b.  A sum of money equal to the total value of the property

24 described in subparagraph a above.

25 ///

26

27

28

USAO 000243

ER-1264

1       3.    The Grand Jury finds probable cause to believe that the

2  following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST

3  OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on

4  one or more of the grounds set forth in paragraph 2 above:

5          a.    The business computers;

6          b.    The money counters;

7          c.    The nests of safety deposit boxes and keys;

8          d.    The digital and video surveillance and security

9  equipment; and

10         e.    The biometric scanners.

11       4.    Pursuant to Title 21, United States Code, Section 853(p),

12  as incorporated by Title 28, United States Code, Section 2461(c),

13  defendant USPV shall forfeit substitute property, up to the value of

14  the property described in paragraph 2 above if, as the result of any

15  act or omission of defendant USPV, the property described in

16  paragraph 2 above or any portion thereof (a) cannot be located upon

17  the exercise of due diligence; (b) has been transferred, sold to, or

18  deposited with a third party; (c) has been placed beyond the

19  jurisdiction of the court; (d) has been substantially diminished in

20  value; or (e) has been commingled with other property that cannot be

21  divided without difficulty.

USAO 000244

ER-1265

1                      FORFEITURE ALLEGATION THREE

2             [31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

3     1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby

4 given to defendant U.S. PRIVATE VAULTS, INC. that the United States

5 will seek forfeiture as part of any sentence in accordance with Title

6 31, United States Code, Section 5317(c), and Title 28, United States

7 Code, Section 2461(c), in the event of defendant USPV's conviction

8 under Count Three of this Indictment.

9     2.   Defendant USPV shall forfeit to the United States the

10 following property:

11        a.  All right, title, and interest in any and all property,

12 real or personal, involved in or traceable to the offense set forth

13 in Count Three of this Indictment, including, without limitation, the

14 property set forth in paragraph 3 below; and

15        b.  A sum of money equal to the total value of the property

16 described in subparagraph a above.

17     3.   The Grand Jury finds probable cause to believe that the

18 following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST

19 OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on

20 the grounds set forth in paragraph 2 above:

21        a.   The business computers;

22        b.   The money counters;

23        c.   The nests of safety deposit boxes and keys;

24        d.   The digital and video surveillance and security

25 equipment; and

26        e.   The biometric scanners

27     4.   Pursuant to Title 21, United States Code, Section 853(p),

28 as incorporated by Title 31, United States Code, Section

USAO 000245

**Exhibit F**
**523**

1   5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),

2   defendant USPV shall forfeit substitute property, up to the value of

3   the property described in paragraph 2 above if, as the result of any

4   act or omission of defendant USPV, the property described in

5   paragraph 2 above or any portion thereof (a) cannot be located upon

6   the exercise of due diligence; (b) has been transferred, sold to, or

7   deposited with a third party; (c) has been placed beyond the

8   jurisdiction of the court; (d) has been substantially diminished in

9   value; or (e) has been commingled with other property that cannot be

10  divided without difficulty.

                            A TRUE BILL

                                     /S/
                            _____
                            Foreperson

TRACY L. WILKISON
Acting United States Attorney


BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section

Exhibit F
524

USAO 000246

ER-1267

# Exhibit G

**to Declaration of Robert Frommer**

18.6.12.4    **(U) DEFINITION OF INVESTIGATIVE METHOD**

    18.6.12.4.1    *(U) DISTINCTION BETWEEN A TRASH COVER, A SEARCH OF ABANDONED PROPERTY IN A PUBLIC RECEPTACLE, AND ADMINISTRATIVE INVENTORY SEARCH[71] OF A LOST OR MISPLACED ITEM*

A) (U//FOUO) *Trash Cover:* The targeted search of a specific person's or entity's trash (where it is placed for collection and when such search implicates no reasonable expectation of privacy). A trash cover may be from a home or business and is designed to find information relevant to an ongoing investigation. A trash cover is a targeted effort to gather information regarding a particular person or entity by reviewing that person or entity's refuse. Generally, a trash cover is planned in advance based upon information indicating that a specific trash container will contain evidence or intelligence of an investigative interest within a specified period of time.

B) (U//FOUO) *Retrieval of Discarded or Intentionally Abandoned Property from a Public Receptacle:* Retrieval of discarded or abandoned property from a public trash receptacle (e.g. a public trash can) is not a "trash cover" as defined above. If, for example, an FBI employee observes an individual discarding anything of potential evidentiary value in a public trash receptacle or an FBI employee otherwise observes anything of intelligence or investigative value in any public trash receptacle, the FBI employee may recover the item(s) without having an Assessment or predicated investigation open at that time.

C) (U//FOUO) *Administrative Inventory Searches of Lost or Misplaced Items:* In the case of a lost or misplaced item, the owner has not intentionally abandoned his or her property. FBI employees who come across property under circumstances indicating the property is lost or misplaced (as opposed to intentionally abandoned) may inspect the property as necessary to identify the owner and preserve the property for safekeeping. An FBI employee must first have lawful access to the lost or misplaced item to search it for the purpose of identifying its owner. For example, a warrantless search of a presumably lost wallet found on the sidewalk or lost thumb drive found on a commuter train should extend no further than necessary to determine ownership. If, within the scope of the examination necessary to determine ownership, agents discover incriminating evidence or contraband, agents should seek a warrant to continue the search, absent emergency circumstances.

D) (U) *Inventory Searches Generally:* The purpose of an inventory search is to 1) protect the owner's property while it is in FBI custody; 2) protect the FBI against claims of lost or stolen property; or 3) protect FBI personnel from potential danger. As a threshold matter, in order for an inventory search to be valid, agents must first have lawful custody of the property. The justification for an inventory search is the production of an inventory of the property.

(U) As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents. A written

---

[71] The types of searches conducted under the inventory search authority are to be distinguished from the types of searches described in DIOG Section 19.7.3. Those searches, described as "Inventory of Personal Property," are conducted after an individual has been arrested and are therefore included in the portion of the DIOG relating to arrest procedures. Although the procedures for conducting an "inventory" of an arrestee's personal property and effects may in fact be similar, their legal justification is different and they must therefore be treated differently. Therefore, DIOG subsection 19.7.3 does not establish agency policy in general for purposes of conducting an "inventory search."

**Exhibit G**
**526**

USAO 000247

ER-1269

summary showing the results of the inventory must be recorded in an FD-302, an FD-597 ("Receipt for Property"), or an FD-653 ("Motor Vehicle Inspection Inventory Record"). The written summary must include, but is not limited to, a description of the property and the items secured for safekeeping. Agents must provide receipts for all items retrieved during inventory searches. Agents should also memorialize facts pertinent to other activities undertaken during the inventory process, such as an interview (i.e., FD-302), or a non-inventory-related search conducted and any evidence collected (i.e., FD-1087, "Collected Evidence Log" [Sentinel]) that are relevant to the investigation.

(U) Where practicable, the inventory search should be conducted by two agents/officers, particularly when dealing with property of significant monetary value (e.g. money, jewelry, electronics, vehicles, etc.). All personal property taken into FBI custody should be treated with reasonable care. Nonevidentiary items of significant value should be removed for safekeeping and afforded adequate security. Contraband or evidence found should be immediately seized and preserved in accordance with existing procedures governing the seizure of physical evidence. See *Field Evidence Management Policy Guide,* 0780PG.

(U) Agents may not perform inventory searches solely for investigative purposes. Whenever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible. Searches conducted pursuant to a warrant are presumptively valid. Obtaining a search warrant eliminates any later argument that the inventory search was conducted solely for investigative purposes and thus unjustified.

(U) See DIOG subsection 19.7 for guidance on search incident to arrest. See DIOG subsection 19.7.3 for guidance on inventory of personal property following arrest.

UNCLASSIFIED – FOR OFFICIAL USE ONLY
**Exhibit G**
**527**

USAO 000248
ER-1270

# Exhibit H

**to Declaration of Robert Frommer**

ER-1271

Home • U.S. Private Vaults Claim Form

# U.S. Private Vaults Claim Form

**U.S. Private Vaults
Claim Form**

To make a claim for property stored at U.S. Private Vaults in Beverly Hills, California, please provide the following information. An FBI agent will contact you for additional details.

## Contact Information

**First Name** ●

**Middle Name**

**Last Name** ●

**Best Contact Number** ●

**Alternate Contact Number**

**Email Address**

**Address Line 1**

**Address Line 2**

**City**

**State**

--------N/A---------

**Country**

**ZIP/Postal Code**

**I/We fully understand that it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning the facts on this form as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.**

**Captcha** ●

I'm not a robot
reCAPTCHA
Privacy - Terms

Submit

| Most Wanted | News | What We Investigate | Services | Additional Resources |
|---|---|---|---|---|
| Ten Most Wanted | Stories | Terrorism | CJIS | Accessibility |
| Fugitives | Videos | Counterintelligence | CIRG | eRulemaking |
| Terrorism | Press Release | Cyber Crime | Laboratory Services | Freedom of Information / Privacy Act |
| Kidnappings / Missing Persons | Speeches | Public Corruption | Training Academy | Legal Notices |
| Seeking Information | Testimony | Civil Rights | Operational Technology | Legal Policies & Disclaimers |
| Bank Robbers | Podcasts and Radio | Organized Crime | Information Management | Privacy Policy |
| ECAP | Photos | White-Collar Crime | | USA.gov |
| ViCAP | Español | Violent Crime | FBI Jobs | White House |
| | Apps | WMD | Submit a Tip | No FEAR Act |
| About | | | Crime Statistics | Equal Opportunity |
| Mission & Priorities | Resources | Contact Us | History | |
| Leadership & Structure | Law Enforcement | Field Offices | FOIPA | |

**Exhibit H
529**

ER-1272

Partnerships                    Businesses                  FBI Headquarters              Scams & Safety

Community Outreach              Victim Assistance           Overseas Offices              FBI Kids

FAQs                            Reports & Publications                                    FBI Tour





**FBI.gov Contact Center**

**Email updates**

Case 2:20-cv-04096-RGK-MAR Document 262-9, Filed 07/19/22 Page 86 of 295 Page ID

# Exhibit I

**to Declaration of Robert Frommer**

**Exhibit I**
**531**

**U.S. Department of Justice**

Federal Bureau of Investigation

*Washington, DC 20535*

FBI Case Number: 272E-LA-3123472

The items of property notated in the attached letter have not yet been appraised. A place holder value of $1.00 has been used in the letter. Another letter will be sent with updated values when the appraisal of those items has been completed.

**Exhibit I**
**532**                                                  **ER-1275**

**U.S. Department of Justice**

Federal Bureau of Investigation

_Washington, DC   20535_

U.S. Private Vaults
c/o Michael Singer
Singer & Larsen P.C.
1291 Galleria Drive
Suite 230
Henderson, NV 89014

# NOTICE OF SEIZURE OF PROPERTY AND INITIATION OF
# ADMINISTRATIVE FORFEITURE PROCEEDINGS

## SEIZED PROPERTY IDENTIFYING INFORMATION

| | |
|---|---|
| **Notice Date:**   May 20, 2021 | **Asset ID Number:**   Multiple Assets |
| **Notice Letter ID:**   263593 (use ID when searching for assets during online filing) | |
| **Description of Seized Property:**   See Attached List | |
| **Seizure Date and Location:**   See Attached List | |
| **Forfeiture Authority:**   See Attached List | |

I.   **THE GOVERNMENT MAY CONSIDER GRANTING PETITIONS FOR REMISSION OR MITIGATION, WHICH PARDONS ALL OR PART OF THE PROPERTY FROM THE FORFEITURE.**

**TO REQUEST A PARDON OF THE PROPERTY YOU MUST FILE A PETITION FOR REMISSION OR MITIGATION**

A.   **What to File**:   You may file both a claim (see section II below) and a Petition for Remission or Mitigation (Petition).   If you file only a petition and no one else files a claim, your petition will be decided by the seizing agency.

B.   **To File a Petition:**   A petition should be filed online or by mailing it via the U.S. Postal Service or a Commercial Delivery Service to the Federal Bureau of Investigation (FBI), Attn: Forfeiture Paralegal Specialist, 11000 Wilshire Blvd. Suite 1700, FOB, Los Angeles, CA 90024.   It must be received no later than 11:59 PM EST thirty (30) days of your receipt of this Notice. _See_ 28 C.F.R. Parts 8 and 9.

C.   **Requirements for Petition:**   The petition must include a description of your interest in the property supported by documentation and any facts you believe justify the return of the property and **signed under oath**, subject to the penalty of perjury or meet the requirements of an unsworn statement under penalty of perjury.   _See_ 28 U.S.C. § 1746.

D.   **Petition Forms:**   A petition need not be made in any particular form but a standard petition form and the link to file the petition online are available at https://www.forfeiture.gov/FilingPetition.htm.   If you wish to file a petition online for the assets referenced in the asset list of this letter, please use the Notice Letter ID referenced above.

E.   **Supporting Evidence**:   Although not required, you may submit supporting evidence (for example, title paperwork or bank records showing your interest in the seized property) to substantiate your petition.

F.   **No Attorney Required:**   You do not need an attorney to file a petition.   You may, however, hire an attorney to represent you in filing a petition.

G.   **Petition Granting Authority:**   The ruling official in administrative forfeiture cases is the Unit Chief, Legal Forfeiture Unit, Office of the General Counsel.   The ruling official in judicial forfeiture cases is the Chief, Money Laundering and Asset Recovery Section, Criminal Division, Department of Justice. _See_ 28 C.F.R. § 9.1.

H.   **Regulations for Petition:**   The Regulations governing the petition process are set forth in 28 C.F.R. Part 9, and are available at www.forfeiture.gov.

I.   **Penalties for Filing False or Frivolous Petitions:**   A petition containing false information may subject the petitioner to criminal prosecution under 18 U.S.C. § 1001 and 18 U.S.C. § 1621.

**Exhibit I**

**533**

**ER-1276**

U.S. Private Vaults                                        Notice of Seizure

    J.  **Online Petition Exclusions:** If you cannot find the desired assets online, you must file your petition in writing at the address listed above. For more details regarding what assets can be petitioned online, please see the Frequently Asked Questions at https://www.forfeiture.gov/FilingPetitionFAQs.htm.

## II. TO CONTEST THE FORFEITURE OF THIS PROPERTY IN UNITED STATES DISTRICT COURT YOU MUST FILE A CLAIM.

*If you do not file a claim, you will waive your right to contest the forfeiture of the asset. Additionally, if no other claims are filed, you may not be able to contest the forfeiture of this asset in any other proceeding, criminal or civil.*

    A.  **To File a Claim:** A claim must be filed to contest the forfeiture. A claim should be filed online or by mailing it via the U.S. Postal Service or a Commercial Delivery Service to the FBI, Attn: Forfeiture Paralegal Specialist, 11000 Wilshire Blvd. Suite 1700, FOB, Los Angeles, CA 90024.

    B.  **Time Limits:** A claim must be filed within 35 days of the date of this letter; therefore, you must file your claim by **11:59 PM EST on June 24, 2021.** *See* 18 U.S.C. § 983(a)(2). A claim is deemed filed on the date received by the agency at the address listed above.

    C.  **Requirements for Claim:** A claim must be filed online or in writing, describe the seized property, state your ownership or other interest in the property and be **made under oath,** subject to penalty of perjury or meet the requirements of an unsworn statement under penalty of perjury. *See* 18 U.S.C. § 983(a)(2)(C) and 28 U.S.C. § 1746.

    D.  **Claim Forms:** A claim need not be made in any particular form, but a standard claim form and the link to file the claim online are available at https://www.forfeiture.gov/FilingClaim.htm. *See* 18 U.S.C. § 983(a)(2)(D). If you wish to file a claim online for the assets referenced in the asset list of this letter, please use the Notice Letter ID referenced above.

    E.  **Supporting Evidence:** Although not required, you may submit supporting evidence (for example, title paperwork or bank records showing your interest in the seized property) to substantiate your claim.

    F.  **No Attorney Required:** You do not need an attorney to file a claim. You may, however, hire an attorney to represent you in filing a claim.

    G.  **When You File a Claim:** A timely claim stops the administrative forfeiture proceeding. The seizing agency forwards the timely claim to the U.S. Attorney's Office for further proceedings. You may also file a petition for remission or mitigation.

    H.  **Penalties for Filing False or Frivolous Claims:** If you intentionally file a frivolous claim you may be subject to a civil fine. *See* 18 U.S.C. § 983(h). If you intentionally file a claim containing false information, you may be subject to criminal prosecution. *See* 18 U.S.C. § 1001.

    I.  **If No Claim is Filed:** Failure to file a claim by **11:59 PM EST on June 24, 2021** may result in the property being forfeited to the United States.

    J.  **Online Claim Exclusions:** If you cannot find the desired assets online, you must file your claim in writing and send to the address listed above. For more details regarding what assets can be claimed online, please see the Frequently Asked Questions at https://www.forfeiture.gov/FilingClaimFAQs.htm.

## III. TO REQUEST RELEASE OF PROPERTY BASED ON HARDSHIP

    A.  **Hardship Release:** Upon the filing of a proper claim, a claimant may request release of the seized property during the pendency of the forfeiture proceeding due to hardship if the claimant is able to meet specific conditions. *See* 18 U.S.C. § 983(f); 28 C.F.R. § 8.15.

    B.  **To File Hardship Release:** The hardship request cannot be filed online and must be in writing. The claimant must establish the following:
- Claimant has a possessory interest in the property;
- Claimant has sufficient ties to the community to assure that the property will be available at the time of trial; and
- Government's continued possession will cause a substantial hardship to the claimant.

    C.  **Regulations for Hardship:** A complete list of the hardship provisions can be reviewed at 18 U.S.C. § 983(f) and 28 C.F.R. § 8.15. Some assets are not eligible for release.

**Exhibit I**
**534**

U.S. Private Vaults                              Notice of Seizure

**Asset List**

**Seizure Date and Location:** The asset(s) referenced in this notice letter were seized on March 22, 2021 by the FBI at U.S. Private Vaults in Beverly Hills, California.

**Forfeiture Authority:** The forfeiture of this property has been initiated pursuant to 18 USC 981(a)(1)(C) and the following additional federal laws: 19 U.S.C. §§ 1602-1619, 18 U.S.C. § 983 and 28 C.F.R. Parts 8 and 9.

| ASSET ID | ASSET DESCRIPTION | ASSET VALUE | ACCT/VIN/SERIAL NO |
|----------|-------------------|-------------|---------------------|
| 21-FBI-002917 | $100,000.00 U.S. Currency from Box #6712 | $100,000.00 | |
| 21-FBI-002918 | $97,000.00 U.S. Currency from Box #6415 | $97,000.00 | |
| 21-FBI-002919 | $726,300.00 U.S. Currency from Box #6516 | $726,300.00 | |
| 21-FBI-002920 | $325,680.00 U.S. Currency from Box #6615 | $325,680.00 | |
| 21-FBI-002921 | $499,800.00 U.S Currency from Box #6616 | $499,800.00 | |
| 21-FBI-002922 | $199,950.00 U.S. Currency from Box #6710 | $199,950.00 | |
| 21-FBI-002923 | $168,500.00 U.S. Currency from Box #6614 | $168,500.00 | |
| 21-FBI-002925 | $364,990.00 U.S. Currency from Box #7012 | $364,990.00 | |
| 21-FBI-002927 | $120,000.00 U.S. Currency from Box #7212 | $120,000.00 | |
| 21-FBI-002928 | $6,980.00 U.S. Currency from Box #6414 | $6,980.00 | |
| 21-FBI-002929 | $17,003.00 U.S. Currency from Box #7011 | $17,003.00 | |
| 21-FBI-002930 | $14,190.00 U.S. Currency from Box #6706 | $14,190.00 | |
| 21-FBI-002931 | $1,024,900.00 U.S. Currency from Box #8412 | $1,024,900.00 | |
| 21-FBI-002932 | $737,875.00 U.S. Currency from Box #8411 | $737,875.00 | |
| 21-FBI-002933 | $965,775.00 U.S. Currency from Box #8311 | $965,775.00 | |
| 21-FBI-002934 | $66,580.00 U.S. Currency from Box #6111 | $66,580.00 | |
| 21-FBI-002935 | $348,500.00 U.S. Currency from Box #8211 | $348,500.00 | |
| 21-FBI-002936 | $17,960.00 U.S. Currency from Box #6212 | $17,960.00 | |
| 21-FBI-002937 | $362,835.00 U.S. Currency from Box #8212 | $362,835.00 | |
| 21-FBI-002938 | $1,349,900.00 U.S. Currency from Box #7923 | $1,349,900.00 | |
| 21-FBI-002939 | $1,500,090.00 U.S. Currency from Box #5811 | $1,500,090.00 | |
| 21-FBI-002940 | $399,000.00 U.S. Currency from Box #5911 | $399,000.00 | |
| 21-FBI-002941 | $503,250.00 U.S. Currency from Box #7922 | $503,250.00 | |
| 21-FBI-002942 | $30,995.00 U.S. Currency from Box #8023 | $30,995.00 | |
| 21-FBI-002943 | $341,500.00 U.S. Currency from Box #5512 | $341,500.00 | |
| 21-FBI-002944 | $1,409,200.00 U.S. Currency from Box #5612 | $1,409,200.00 | |
| 21-FBI-002946 | $952,600.00 U.S. Currency from Box #5611 | $952,600.00 | |
| 21-FBI-002947 | $125,000.00 U.S. Currency from Box #5711 | $125,000.00 | |
| 21-FBI-002949 | $960,100.00 U.S. Currency from Box #5311 | $960,100.00 | |
| 21-FBI-002950 | $1,138,030.00 U.S. Currency from Box #8409 | $1,138,030.00 | |
| 21-FBI-002951 | $166,246.00 U.S. Currency from Box #5212 | $166,246.00 | |
| 21-FBI-002953 | $168,920.00 U.S. Currency from Box #41 | $168,920.00 | |
| 21-FBI-002954 | $1,856,800.00 U.S. Currency from Box #7321 | $1,856,800.00 | |
| 21-FBI-002955 | $241,410.00 U.S. Currency from Box #5163 | $241,410.00 | |
| 21-FBI-002956 | $274,030.00 U.S. Currency from Box #5006 | $274,030.00 | |
| 21-FBI-002957 | $6,672.00 U.S. Currency from Box #6906 | $6,672.00 | |
| 21-FBI-002958 | $99,800.00 U.S. Currency from Box #6604 | $99,800.00 | |
| 21-FBI-002959 | $300,000.00 U.S. Currency from Box #6508 | $300,000.00 | |
| 21-FBI-002960 | $719,710.00 U.S. Currency from Box #5160 | $719,710.00 | |
| 21-FBI-002961 | $149,400.00 U.S. Currency from Box #7315 | $149,400.00 | |
| 21-FBI-002962 | $48,000.00 U.S. Currency from Box #7311 | $48,000.00 | |
| 21-FBI-002963 | $300,000.00 U.S. Currency from Box #5159 | $300,000.00 | |
| 21-FBI-002964 | $126,200.00 U.S. Currency from Box #5155 | $126,200.00 | |
| 21-FBI-002965 | $1,194,750.00 U.S. Currency from Box #40 | $1,194,750.00 | |
| 21-FBI-002966 | $218,950.00 U.S. Currency from Box #5158 | $218,950.00 | |
| 21-FBI-002967 | $150,000.00 U.S. Currency from Box # | $150,000.00 | |

**Exhibit I**

**535**

U.S. Private Vaults                              Notice of Seizure

| | | |
|---|---|---|
| 21-FBI-002968 | $390,000.00 U.S. Currency from Box #28 | $390,000.00 |
| 21-FBI-002969 | $400,900.00 U.S. Currency from Box #39 | $400,900.00 |
| 21-FBI-002970 | $99,000.00 U.S. Currency from Box #331 | $99,000.00 |
| 21-FBI-002971 | $9,000.00 U.S. Currency from Box #7318 | $9,000.00 |
| 21-FBI-002972 | $9,832.00 U.S. Currency from Box #11 | $9,832.00 |
| 21-FBI-002973 | $59,080.00 U.S. Currency from Box #236 | $59,080.00 |
| 21-FBI-002974 | $406,500.00 U.S. Currency from Box #4907 | $406,500.00 |
| 21-FBI-002975 | $24,300.00 U.S. Currency from Box #10 | $24,300.00 |
| 21-FBI-002977 | $69,180.00 U.S. Currency from Box #5104 | $69,180.00 |
| 21-FBI-002978 | $288,820.00 U.S. Currency from Box #8 | $288,820.00 |
| 21-FBI-002980 | $399,700.00 U.S. Currency from Box #5007 | $399,700.00 |
| 21-FBI-002981 | $36,181.00 U.S. Currency from Box #4906 | $36,181.00 |
| 21-FBI-002982 | $53,840.00 U.S. Currency from Box #130 | $53,840.00 |
| 21-FBI-002983 | $62,000.00 U.S. Currency from Box #6 | $62,000.00 |
| 21-FBI-002984 | $500,000.00 U.S. Currency from Box #3106 | $500,000.00 |
| 21-FBI-002985 | $1,000,000.00 U.S. Currency from Box #4306 | $1,000,000.00 |
| 21-FBI-002986 | $252,900.00 U.S. Currency from Box #3105 | $252,900.00 |
| 21-FBI-002987 | $199,900.00 U.S. Currency from Box #4806 | $199,900.00 |
| 21-FBI-002988 | $190,100.00 U.S. Currency from Box #3 | $190,100.00 |
| 21-FBI-002990 | $32,111.00 U.S. Currency from Box #7409 | $32,111.00 |
| 21-FBI-002993 | $299,940.00 U.S. Currency from Box #48 | $299,940.00 |
| 21-FBI-002994 | $46,970.00 U.S. Currency from Box #233 | $46,970.00 |
| 21-FBI-002995 | $219,750.00 U.S. Currency from Box #44 | $219,750.00 |
| 21-FBI-002996 | $241,415.00 U.S. Currency from Box #3102 | $241,415.00 |
| 21-FBI-002997 | $150,900.00 U.S. Currency from Box #49 | $150,900.00 |
| 21-FBI-002998 | $43,460.00 U.S. Currency from Box #2205 | $43,460.00 |
| 21-FBI-002999 | $22,630.00 U.S. Currency from Box #815 | $22,630.00 |
| 21-FBI-003000 | $43,200.00 U.S. Currency from Box #38 | $43,200.00 |
| 21-FBI-003001 | $11,780.00 U.S. Currency from Box #229 | $11,780.00 |
| 21-FBI-003002 | $25,000.00 U.S. Currency from Box #716 | $25,000.00 |
| 21-FBI-003003 | $45,900.00 U.S. Currency from Box #3103 | $45,900.00 |
| 21-FBI-003004 | $18,450.00 U.S. Currency from Box #227 | $18,450.00 |
| 21-FBI-003005 | $50,000.00 U.S. Currency from Box #7517 | $50,000.00 |
| 21-FBI-003006 | $63,260.00 U.S. Currency from Box #713 | $63,260.00 |
| 21-FBI-003007 | $76,050.00 U.S. Currency from Box #224 | $76,050.00 |
| 21-FBI-003008 | $70,000.00 U.S. Currency from Box #3100 | $70,000.00 |
| 21-FBI-003009 | $46,900.00 U.S. Currency from Box #125 | $46,900.00 |
| 21-FBI-003010 | $62,400.00 U.S. Currency from Box #7515 | $62,400.00 |
| 21-FBI-003012 | $285,470.00 U.S. Currency from Box #1005 | $285,470.00 |
| 21-FBI-003013 | $69,900.00 U.S. Currency from Box #33 | $69,900.00 |
| 21-FBI-003014 | $25,000.00 U.S. Currency from Box #222 | $25,000.00 |
| 21-FBI-003017 | $810,000.00 U.S. Currency from Box #5005 | $810,000.00 |
| 21-FBI-003018 | $45,500.00 U.S. Currency from Box #22 | $45,500.00 |
| 21-FBI-003019 | $172,000.00 U.S. Currency from Box #117 | $172,000.00 |
| 21-FBI-003021 | $13,800.00 U.S. Currency from Box #1205 | $13,800.00 |
| 21-FBI-003022 | $50,650.00 U.S. Currency from Box #615 | $50,650.00 |
| 21-FBI-003023 | $121,900.00 U.S. Currency from Box #218 | $121,900.00 |
| 21-FBI-003024 | $21,901.00 U.S. Currency from Box #221 | $21,901.00 |
| 21-FBI-003025 | $30,000.00 U.S. Currency from Box #1304 | $30,000.00 |
| 21-FBI-003026 | $238,900.00 U.S. Currency from Box #316 | $238,900.00 |
| 21-FBI-003027 | $85,000.00 U.S. Currency from Box #7514 | $85,000.00 |
| 21-FBI-003028 | $15,000.00 U.S. Currency from Box #1404 | $15,000.00 |
| 21-FBI-003029 | $172,340.00 U.S. Currency from Box #321 | $172,340.00 |
| 21-FBI-003030 | $19,970.00 U.S. Currency from Box #1504 | $19,970.00 |

**Exhibit I**

536

U.S. Private Vaults                     Notice of Seizure

| | | |
|---|---|---:|
| 21-FBI-003031 | $26,000.00 U.S. Currency from Box #25 | $26,000.00 |
| 21-FBI-003032 | $105,200.00 U.S. Currency from Box #21 | $105,200.00 |
| 21-FBI-003033 | $628,740.00 U.S. Currency from Box #1805 | $628,740.00 |
| 21-FBI-003034 | $51,385.00 U.S. Currency from Box #20 | $51,385.00 |
| 21-FBI-003035 | $145,000.00 U.S. Currency from Box #1804 | $145,000.00 |
| 21-FBI-003036 | $696,575.00 U.S. Currency from Box #4207 | $696,575.00 |
| 21-FBI-003037 | $800,900.00 U.S. Currency from Box #2105 | $800,900.00 |
| 21-FBI-003038 | $70,360.00 U.S. Currency from Box #513 | $70,360.00 |
| 21-FBI-003039 | $224,700.00 U.S. Currency from Box #4206 | $224,700.00 |
| 21-FBI-003040 | $239,100.00 U.S. Currency from Box #2305 | $239,100.00 |
| 21-FBI-003041 | $219,220.00 U.S. Currency from Box #2404 | $219,220.00 |
| 21-FBI-003042 | $170,175.00 U.S. Currency from Box #4107 | $170,175.00 |
| 21-FBI-003043 | $50,000.00 U.S. Currency from Box #2505 | $50,000.00 |
| 21-FBI-003044 | $16,000.00 U.S. Currency from Box #614 | $16,000.00 |
| 21-FBI-003045 | $23,204.00 U.S. Currency from Box #2604 | $23,204.00 |
| 21-FBI-003046 | $21,110.00 U.S. Currency from Box #112 | $21,110.00 |
| 21-FBI-003047 | $334,200.00 U.S. Currency from Box #2804 | $334,200.00 |
| 21-FBI-003048 | $439,200.00 U.S. Currency from Box #409 | $439,200.00 |
| 21-FBI-003051 | $353,810.00 U.S. Currency from Box #4104 | $353,810.00 |
| 21-FBI-003052 | $200,000.00 U.S. Currency from Box #404 | $200,000.00 |
| 21-FBI-003053 | $333,000.00 U.S. Currency from Box #505 | $333,000.00 |
| 21-FBI-003056 | $600,980.00 U.S. Currency from Box #504 | $600,980.00 |
| 21-FBI-003057 | $149,825.00 U.S. Currency from Box #604 | $149,825.00 |
| 21-FBI-003058 | $669,980.00 U.S. Currency from Box #3804 | $669,980.00 |
| 21-FBI-003059 | $75,600.00 U.S. Currency from Box #809 | $75,600.00 |
| 21-FBI-003060 | $60,000.00 U.S. Currency from Box #111 | $60,000.00 |
| 21-FBI-003062 | $140,240.00 U.S. Currency from Box #3807 | $140,240.00 |
| 21-FBI-003063 | $400,000.00 U.S. Currency from Box #805 | $400,000.00 |
| 21-FBI-003064 | $11,800.00 U.S. Currency from Box #804 | $11,800.00 |
| 21-FBI-003066 | $96,900.00 U.S. Currency from Box #108 | $96,900.00 |
| 21-FBI-003067 | $63,408.00 U.S. Currency from Box #106 | $63,408.00 |
| 21-FBI-003068 | $24,300.00 U.S. Currency from Box #2712 | $24,300.00 |
| 21-FBI-003069 | $1,182,500.00 U.S. Currency from Box #3907 | $1,182,500.00 |
| 21-FBI-003071 | $163,051.00 U.S. Currency from Box #4706 | $163,051.00 |
| 21-FBI-003072 | $1,809,450.00 U.S. Currency from Box #4007 | $1,809,450.00 |
| 21-FBI-003075 | $34,200.00 U.S. Currency from Box #305 | $34,200.00 |
| 21-FBI-003077 | $175,100.00 U.S. Currency from Box #7732 | $175,100.00 |
| 21-FBI-003078 | $445,050.00 U.S. Currency from Box #3606 | $445,050.00 |
| 21-FBI-003079 | $210,000.00 U.S. Currency from Box #7630 | $210,000.00 |
| 21-FBI-003080 | $848,400.00 U.S. Currency from Box #4606 | $848,400.00 |
| 21-FBI-003081 | $48,800.00 U.S. Currency from Box #2810 | $48,800.00 |
| 21-FBI-003082 | $71,940.00 U.S. Currency from Box #8302 | $71,940.00 |
| 21-FBI-003083 | $73,700.00 U.S. Currency from Box #201 | $73,700.00 |
| 21-FBI-003084 | $914,700.00 U.S. Currency from Box #904 | $914,700.00 |
| 21-FBI-003085 | $25,000.00 U.S. Currency from Box #302 | $25,000.00 |
| 21-FBI-003086 | $38,000.00 U.S. Currency from Box #4905 | $38,000.00 |
| 21-FBI-003088 | $296,860.00 U.S. Currency from Box #3506 | $296,860.00 |
| 21-FBI-003089 | $841,170.00 U.S. Currency from Box #4904 | $841,170.00 |
| 21-FBI-003090 | $400,000.00 U.S. Currency from Box #503 | $400,000.00 |
| 21-FBI-003091 | $50,000.00 U.S. Currency from Box #603 | $50,000.00 |
| 21-FBI-003094 | $2,066,900.00 U.S. Currency from Box #3704 | $2,066,900.00 |
| 21-FBI-003095 | $41,600.00 U.S. Currency from Box #502 | $41,600.00 |
| 21-FBI-003096 | $489,940.00 U.S. Currency from Box #4506 | $489,940.00 |
| 21-FBI-003097 | $600,000.00 U.S. Currency from Box #501 | $600,000.00 |

**Exhibit I**

537

U.S. Private Vaults                                    Notice of Seizure

| | | |
|---|---|---|
| 21-FBI-003098 | $613,960.00 U.S. Currency from Box #4006 | $613,960.00 |
| 21-FBI-003099 | $457,500.00 U.S. Currency from Box #500 | $457,500.00 |
| 21-FBI-003100 | $524,370.00 U.S. Currency from Box #4805 | $524,370.00 |
| 21-FBI-003101 | $427,820.00 U.S. Currency from Box #401 | $427,820.00 |
| 21-FBI-003102 | $200,000.00 U.S. Currency from Box #703 | $200,000.00 |
| 21-FBI-003103 | $710,000.00 U.S. Currency from Box #4804 | $710,000.00 |
| 21-FBI-003104 | $1,083,740.00 U.S. Currency from Box #4704 | $1,083,740.00 |
| 21-FBI-003106 | $75,200.00 U.S. Currency from Box #7920 | $75,200.00 |
| 21-FBI-003107 | $73,890.00 U.S. Currency from Box #702 | $73,890.00 |
| 21-FBI-003109 | $105,000.00 U.S. Currency from Box #4604 | $105,000.00 |
| 21-FBI-003110 | $10,000.00 U.S. Currency from Box #4605 | $10,000.00 |
| 21-FBI-003111 | $143,900.00 U.S. Currency from Box #8005 | $143,900.00 |
| 21-FBI-003112 | $51,024.00 U.S. Currency from Box #3505 | $51,024.00 |
| 21-FBI-003113 | $340,050.00 U.S. Currency from Box #902 | $340,050.00 |
| 21-FBI-003114 | $10,000.00 U.S. Currency from Box #7917 | $10,000.00 |
| 21-FBI-003115 | $69,950.00 U.S. Currency from Box #7913 | $69,950.00 |
| 21-FBI-003118 | $76,550.00 U.S. Currency from Box #901 | $76,550.00 |
| 21-FBI-003119 | $358,400.00 U.S. Currency from Box #3507 | $358,400.00 |
| 21-FBI-003120 | $48,800.00 U.S. Currency from Box #7911 | $48,800.00 |
| 21-FBI-003121 | $443,000.00 U.S. Currency from Box #5002 | $443,000.00 |
| 21-FBI-003122 | $190,000.00 U.S. Currency from Box #4505 | $190,000.00 |
| 21-FBI-003124 | $18,200.00 U.S. Currency from Box #700 | $18,200.00 |
| 21-FBI-003125 | $748,840.00 U.S. Currency from Box #3305 | $748,840.00 |
| 21-FBI-003126 | $85,245.00 U.S. Currency from Box #4504 | $85,245.00 |
| 21-FBI-003129 | $109,550.00 U.S. Currency from Box #802 | $109,550.00 |
| 21-FBI-003130 | $595,000.00 U.S. Currency from Box #4404 | $595,000.00 |
| 21-FBI-003131 | $519,900.00 U.S. Currency from Box #3304 | $519,900.00 |
| 21-FBI-003132 | $170,000.00 U.S. Currency from Box #4305 | $170,000.00 |
| 21-FBI-003133 | $102,080.00 U.S. Currency from Box #800 | $102,080.00 |
| 21-FBI-003135 | $225,000.00 U.S. Currency from Box #3406 | $225,000.00 |
| 21-FBI-003136 | $175,900.00 U.S. Currency from Box #4901 | $175,900.00 |
| 21-FBI-003137 | $22,206.00 U.S. Currency from Box #5410 | $22,206.00 |
| 21-FBI-003138 | $370,170.00 U.S. Currency from Box #3404 | $370,170.00 |
| 21-FBI-003139 | $246,610.00 U.S. Currency from Box #4900 | $246,610.00 |
| 21-FBI-003140 | $81,100.00 U.S. Currency from Box #3605 | $81,100.00 |
| 21-FBI-003141 | $340,000.00 U.S. Currency from Box #5409 | $340,000.00 |
| 21-FBI-003142 | $144,620.00 U.S. Currency from Box #1003 | $144,620.00 |
| 21-FBI-003143 | $10,000.00 U.S. Currency from Box #3307 | $10,000.00 |
| 21-FBI-003144 | $63,820.00 U.S. Currency from Box #5407 | $63,820.00 |
| 21-FBI-003146 | $155,150.00 U.S. Currency from Box #3904 | $155,150.00 |
| 21-FBI-003147 | $244,400.00 U.S. Currency from Box #3206 | $244,400.00 |
| 21-FBI-003148 | $599,870.00 U.S. Currency from Box #1000 | $599,870.00 |
| 21-FBI-003149 | $1,207,685.00 U.S. Currency from Box #3707 | $1,207,685.00 |
| 21-FBI-003150 | $145,600.00 U.S. Currency from Box #3204 | $145,600.00 |
| 21-FBI-003151 | $144,100.00 U.S. Currency from Box #1102 | $144,100.00 |
| 21-FBI-003152 | $700,000.00 U.S. Currency from Box #3706 | $700,000.00 |
| 21-FBI-003153 | $63,660.00 U.S. Currency from Box #204 | $63,660.00 |
| 21-FBI-003154 | $570,000.00 U.S. Currency from Box #400 | $570,000.00 |
| 21-FBI-003155 | $36,000.00 U.S. Currency from Box #3705 | $36,000.00 |
| 21-FBI-003156 | $30,000.00 U.S. Currency from Box #4803 | $30,000.00 |
| 21-FBI-003157 | $1,039,900.00 U.S. Currency from Box #3019 | $1,039,900.00 |
| 21-FBI-003158 | $349,750.00 U.S. Currency from Box #4802 | $349,750.00 |
| 21-FBI-003159 | $250,000.00 U.S. Currency from Box #1101 | $250,000.00 |
| 21-FBI-003160 | $589,900.00 U.S. Currency from Box #4800 | $589,900.00 |

**Exhibit I**
**538**

U.S. Private Vaults                    Notice of Seizure

| | | |
|---|---|---|
| 21-FBI-003161 | $22,000.00 U.S. Currency from Box #5308 | $22,000.00 |
| 21-FBI-003162 | $10,100.00 U.S. Currency from Box #4701 | $10,100.00 |
| 21-FBI-003163 | $140,000.00 U.S. Currency from Box #4700 | $140,000.00 |
| 21-FBI-003164 | $15,000.00 U.S. Currency from Box #5307 | $15,000.00 |
| 21-FBI-003166 | $200,400.00 U.S. Currency from Box #5210 | $200,400.00 |
| 21-FBI-003167 | $690,000.00 U.S. Currency from Box #4503 | $690,000.00 |
| 21-FBI-003168 | $30,000.00 U.S. Currency from Box #3203 | $30,000.00 |
| 21-FBI-003169 | $709,900.00 U.S. Currency from Box #4502 | $709,900.00 |
| 21-FBI-003171 | $20,000.00 U.S. Currency from Box #1212 | $20,000.00 |
| 21-FBI-003172 | $153,100.00 U.S. Currency from Box #3201 | $153,100.00 |
| 21-FBI-003173 | $487,280.00 U.S. Currency from Box #4403 | $487,280.00 |
| 21-FBI-003174 | $129,000.00 U.S. Currency from Box #1208 | $129,000.00 |
| 21-FBI-003175 | $90,000.00 U.S. Currency from Box #3200 | $90,000.00 |
| 21-FBI-003176 | $79,009.00 U.S. Currency from Box #4500 | $79,009.00 |
| 21-FBI-003177 | $9,950.00 U.S. Currency from Box #1312 | $9,950.00 |
| 21-FBI-003178 | $30,914.00 U.S. Currency from Box #1306 | $30,914.00 |
| 21-FBI-003179 | $15,000.00 U.S. Currency from Box #3903 | $15,000.00 |
| 21-FBI-003180 | $305,000.00 U.S. Currency from Box #4303 | $305,000.00 |
| 21-FBI-003181 | $100,000.00 U.S. Currency from Box #3502 | $100,000.00 |
| 21-FBI-003182 | $60,200.00 U.S. Currency from Box #1412 | $60,200.00 |
| 21-FBI-003183 | $330,020.00 U.S. Currency from Box #4300 | $330,020.00 |
| 21-FBI-003184 | $50,000.00 U.S. Currency from Box #3501 | $50,000.00 |
| 21-FBI-003185 | $240,000.00 U.S. Currency from Box #4203 | $240,000.00 |
| 21-FBI-003186 | $40,200.00 U.S. Currency from Box #1810 | $40,200.00 |
| 21-FBI-003187 | $63,000.00 U.S. Currency from Box #3602 | $63,000.00 |
| 21-FBI-003188 | $392,530.00 U.S. Currency from Box #4202 | $392,530.00 |
| 21-FBI-003189 | $70,100.00 U.S. Currency from Box #1303 | $70,100.00 |
| 21-FBI-003190 | $100,206.00 U.S. Currency from Box #4200 | $100,206.00 |
| 21-FBI-003191 | $377,850.00 U.S. Currency from Box #3600 | $377,850.00 |
| 21-FBI-003192 | $321,500.00 U.S. Currency from Box #1302 | $321,500.00 |
| 21-FBI-003193 | $66,200.00 U.S. Currency from Box #3703 | $66,200.00 |
| 21-FBI-003195 | $254,120.00 U.S. Currency from Box #1301 | $254,120.00 |
| 21-FBI-003196 | $619,014.00 U.S. Currency from Box #3702 | $619,014.00 |
| 21-FBI-003197 | $170,000.00 U.S. Currency from Box #4100 | $170,000.00 |
| 21-FBI-003198 | $419,895.00 U.S. Currency from Box #3701 | $419,895.00 |
| 21-FBI-003199 | $516,900.00 U.S. Currency from Box #4002 | $516,900.00 |
| 21-FBI-003200 | $10,000.00 U.S. Currency from Box #1300 | $10,000.00 |
| 21-FBI-003201 | $107,524.00 U.S. Currency from Box #3700 | $107,524.00 |
| 21-FBI-003202 | $21,000.00 U.S. Currency from Box #3900 | $21,000.00 |
| 21-FBI-003203 | $8,560.00 U.S. Currency from Box #1903 | $8,560.00 |
| 21-FBI-003204 | $200,000.00 U.S. Currency from Box #3801 | $200,000.00 |
| 21-FBI-003205 | $223,040.00 U.S. Currency from Box #1402 | $223,040.00 |
| 21-FBI-003206 | $256,276.00 U.S. Currency from Box #1401 | $256,276.00 |
| 21-FBI-003207 | $284,792.00 U.S. Currency from Box #1400 | $284,792.00 |
| 21-FBI-003208 | $180,700.00 U.S. Currency from Box #5203 | $180,700.00 |
| 21-FBI-003209 | $218,000.00 U.S. Currency from Box #5202 | $218,000.00 |
| 21-FBI-003210 | $99,964.00 U.S. Currency from Box #5306 | $99,964.00 |
| 21-FBI-003211 | $680,000.00 U.S. Currency from Box #5509 | $680,000.00 |
| 21-FBI-003212 | $200,000.00 U.S. Currency from Box #1502 | $200,000.00 |
| 21-FBI-003213 | $224,800.00 U.S. Currency from Box #5508 | $224,800.00 |
| 21-FBI-003214 | $20,000.00 U.S. Currency from Box #2906 | $20,000.00 |
| 21-FBI-003216 | $389,900.00 U.S. Currency from Box #1500 | $389,900.00 |
| 21-FBI-003217 | $120,318.00 U.S. Currency from Box #5610 | $120,318.00 |
| 21-FBI-003219 | $117,200.00 U.S. Currency from Box #5609 | $117,200.00 |

**Exhibit I**
**539**

ER-1282

U.S. Private Vaults                            Notice of Seizure

| | | |
|---|---|---|
| 21-FBI-003220 | $78,116.00 U.S. Currency from Box #7626 | $78,116.00 |
| 21-FBI-003221 | $222,780.00 U.S. Currency from Box #5709 | $222,780.00 |
| 21-FBI-003222 | $103,615.00 U.S. Currency from Box #1603 | $103,615.00 |
| 21-FBI-003223 | $5,000.00 U.S. Currency from Box #7827 | $5,000.00 |
| 21-FBI-003224 | $52,250.00 U.S. Currency from Box #8016 | $52,250.00 |
| 21-FBI-003225 | $20,000.00 U.S. Currency from Box #5707 | $20,000.00 |
| 21-FBI-003226 | $300,000.00 U.S. Currency from Box #7210 | $300,000.00 |
| 21-FBI-003227 | $65,500.00 U.S. Currency from Box #5608 | $65,500.00 |
| 21-FBI-003228 | $106,000.00 U.S. Currency from Box #8014 | $106,000.00 |
| 21-FBI-003229 | $150,100.00 U.S. Currency from Box #5501 | $150,100.00 |
| 21-FBI-003230 | $70,000.00 U.S. Currency from Box #5706 | $70,000.00 |
| 21-FBI-003231 | $230,172.00 U.S. Currency from Box #5703 | $230,172.00 |
| 21-FBI-003232 | $40,000.00 U.S. Currency from Box #5702 | $40,000.00 |
| 21-FBI-003234 | $120,800.00 U.S. Currency from Box #5809 | $120,800.00 |
| 21-FBI-003235 | $40,000.00 U.S. Currency from Box #5807 | $40,000.00 |
| 21-FBI-003236 | $11,280.00 U.S. Currency from Box #7627 | $11,280.00 |
| 21-FBI-003237 | $61,780.00 U.S. Currency from Box #7727 | $61,780.00 |
| 21-FBI-003238 | $30,000.00 U.S. Currency from Box #5910 | $30,000.00 |
| 21-FBI-003239 | $32,000.00 U.S. Currency from Box #8017 | $32,000.00 |
| 21-FBI-003240 | $107,700.00 U.S. Currency from Box #8012 | $107,700.00 |
| 21-FBI-003242 | $63,900.00 U.S. Currency from Box #5909 | $63,900.00 |
| 21-FBI-003243 | $60,840.00 U.S. Currency from Box #8015 | $60,840.00 |
| 21-FBI-003244 | $8,000.00 U.S. Currency from Box #7110 | $8,000.00 |
| 21-FBI-003245 | $99,129.00 U.S. Currency from Box #5908 | $99,129.00 |
| 21-FBI-003246 | $24,800.00 U.S. Currency from Box #8013 | $24,800.00 |
| 21-FBI-003247 | $57,000.00 U.S. Currency from Box #7622 | $57,000.00 |
| 21-FBI-003249 | $29,500.00 U.S. Currency from Box #8116 | $29,500.00 |
| 21-FBI-003250 | $52,100.00 U.S. Currency from Box #7720 | $52,100.00 |
| 21-FBI-003251 | $50,000.00 U.S. Currency from Box #7812 | $50,000.00 |
| 21-FBI-003252 | $19,842.00 U.S. Currency from Box #8112 | $19,842.00 |
| 21-FBI-003253 | $15,118.00 U.S. Currency from Box #7207 | $15,118.00 |
| 21-FBI-003254 | $18,000.00 U.S. Currency from Box #7619 | $18,000.00 |
| 21-FBI-003255 | $26,000.00 U.S. Currency from Box #8113 | $26,000.00 |
| 21-FBI-003256 | $71,600.00 U.S. Currency from Box #7616 | $71,600.00 |
| 21-FBI-003257 | $20,900.00 U.S. Currency from Box #7617 | $20,900.00 |
| 21-FBI-003260 | $104,230.00 U.S. Currency from Box #1902 | $104,230.00 |
| 21-FBI-003262 | $72,980.00 U.S. Currency from Box #1901 | $72,980.00 |
| 21-FBI-003263 | $19,100.00 U.S. Currency from Box #7808 | $19,100.00 |
| 21-FBI-003264 | $173,700.00 U.S. Currency from Box #1803 | $173,700.00 |
| 21-FBI-003265 | $500,100.00 U.S. Currency from Box #6110 | $500,100.00 |
| 21-FBI-003266 | $475,440.00 U.S. Currency from Box #2003 | $475,440.00 |
| 21-FBI-003267 | $207,100.00 U.S. Currency from Box #2001 | $207,100.00 |
| 21-FBI-003268 | $549,820.00 U.S. Currency from Box #6109 | $549,820.00 |
| 21-FBI-003270 | $15,900.00 U.S. Currency from Box #2102 | $15,900.00 |
| 21-FBI-003271 | $33,120.00 U.S. Currency from Box #2101 | $33,120.00 |
| 21-FBI-003272 | $150,000.00 U.S. Currency from Box #3002 | $150,000.00 |
| 21-FBI-003273 | $165,000.00 U.S. Currency from Box #2100 | $165,000.00 |
| 21-FBI-003274 | $215,700.00 U.S. Currency from Box #3001 | $215,700.00 |
| 21-FBI-003275 | $480,000.00 U.S. Currency from Box #1703 | $480,000.00 |
| 21-FBI-003276 | $25,000.00 U.S. Currency from Box #7716 | $25,000.00 |
| 21-FBI-003277 | $10,000.00 U.S. Currency from Box #7707 | $10,000.00 |
| 21-FBI-003278 | $225,200.00 U.S. Currency from Box #6207 | $225,200.00 |
| 21-FBI-003279 | $50,000.00 U.S. Currency from Box #2206 | $50,000.00 |
| 21-FBI-003280 | $225,390.00 U.S. Currency from Box #3000 | $225,390.00 |

**Exhibit I**

540

U.S. Private Vaults                    Notice of Seizure

| | | |
|---|---|---|
| 21-FBI-003281 | $158,200.00 U.S. Currency from Box #2201 | $158,200.00 |
| 21-FBI-003282 | $500,600.00 U.S. Currency from Box #6310 | $500,600.00 |
| 21-FBI-003283 | $40,590.00 U.S. Currency from Box #2200 | $40,590.00 |
| 21-FBI-003285 | $194,900.00 U.S. Currency from Box #2901 | $194,900.00 |
| 21-FBI-003286 | $104,260.25 U.S. Currency from Box #1602 | $104,260.25 |
| 21-FBI-003287 | $92,350.00 U.S. Currency from Box #6306 | $92,350.00 |
| 21-FBI-003288 | $572,700.00 U.S. Currency from Box #1601 | $572,700.00 |
| 21-FBI-003290 | $29,200.00 U.S. Currency from Box #6108 | $29,200.00 |
| 21-FBI-003292 | $268,600.00 U.S. Currency from Box #1600 | $268,600.00 |
| 21-FBI-003293 | $69,610.00 U.S. Currency from Box #7704 | $69,610.00 |
| 21-FBI-003295 | $20,000.00 U.S. Currency from Box #2409 | $20,000.00 |
| 21-FBI-003296 | $35,000.00 U.S. Currency from Box #1701 | $35,000.00 |
| 21-FBI-003297 | $35,900.00 U.S. Currency from Box #7702 | $35,900.00 |
| 21-FBI-003298 | $237,555.00 U.S. Currency from Box #2610 | $237,555.00 |
| 21-FBI-003299 | $183,900.00 U.S. Currency from Box #7103 | $183,900.00 |
| 21-FBI-003300 | $50,100.00 U.S. Currency from Box #2512 | $50,100.00 |
| 21-FBI-003301 | $99,900.00 U.S. Currency from Box #7209 | $99,900.00 |
| 21-FBI-003302 | $83,860.00 U.S. Currency from Box #2302 | $83,860.00 |
| 21-FBI-003303 | $100,100.00 U.S. Currency from Box #7802 | $100,100.00 |
| 21-FBI-003304 | $20,000.00 U.S. Currency from Box #7010 | $20,000.00 |
| 21-FBI-003305 | $88,010.00 U.S. Currency from Box #6104 | $88,010.00 |
| 21-FBI-003306 | $89,700.00 U.S. Currency from Box #6203 | $89,700.00 |
| 21-FBI-003307 | $250,100.00 U.S. Currency from Box #2300 | $250,100.00 |
| 21-FBI-003308 | $35,000.00 U.S Currency from Box #7800 | $35,000.00 |
| 21-FBI-003309 | $56,800.00 U.S. Currency from Box #2403 | $56,800.00 |
| 21-FBI-003310 | $497,900.00 U.S. Currency from Box #7403 | $497,900.00 |
| 21-FBI-003312 | $79,900.00 U.S. Currency from Box #7306 | $79,900.00 |
| 21-FBI-003313 | $79,603.00 U.S. Currency from Box #2401 | $79,603.00 |
| 21-FBI-003314 | $37,700.00 U.S. Currency from Box #7601 | $37,700.00 |
| 21-FBI-003315 | $150,000.00 U.S. Currency from Box #2503 | $150,000.00 |
| 21-FBI-003316 | $86,700.00 U.S. Currency from Box #7109 | $86,700.00 |
| 21-FBI-003317 | $412,000.00 U.S. Currency from Box #7505 | $412,000.00 |
| 21-FBI-003318 | $100,000.00 U.S. Currency from Box #7700 | $100,000.00 |
| 21-FBI-003319 | $260,756.00 U.S. Currency from Box #2501 | $260,756.00 |
| 21-FBI-003320 | $95,315.00 U.S. Currency from Box #2502 | $95,315.00 |
| 21-FBI-003321 | $190,000.00 U.S. Currency from Box #7006 | $190,000.00 |
| 21-FBI-003324 | $288,700.00 U.S. Currency from Box #2010 | $288,700.00 |
| 21-FBI-003330 | 7 Pieces of Miscellaneous Jewelry from Box #6712 | $1.00 |
| | 1 Cartier Bracelet with Diamond | $1.00 |
| | 1 Cartier Bracelet - Nail Shape | $1.00 |
| | 1 Diamond Tennis Bracelet - Silver | $1.00 |
| | 1 Gold Necklace - 18" | $1.00 |
| | 1 2 Tone Rolex Men's Watch | $1.00 |
| | 1 Gold with Diamonds Rolex Men's Watch | $1.00 |
| | 1 Platinum Rolex Men's Watch | $1.00 |
| 21-FBI-003331 | 196 Miscellaneous Collectible Coins from Box #6516 | $1.00 |
| | 5 Gold Krugerands 1977, 1978, 1981 | $1.00 |
| | 3 1992- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 2 1993- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 2 1994- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 6 1997- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 10 1998- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 11 1999- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 3 2000- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 1 2001- Walking Liberty Gold 1oz. $50 Coin | $1.00 |

**Exhibit I**

541

U.S. Private Vaults                    Notice of Seizure

| | | | |
|---|---|---|---|
| | 1 | 2002- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 5 | 2003- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 10 | 2004- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 12 | 2005- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 4 | 2006- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 4 | 2008- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 18 | 2009- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 5 | 2010- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 13 | 2011- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 5 | 2012- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 11 | 2013- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 1 | 2014- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 17 | 2015- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 9 | 2016- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 6 | 2017- Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 9 | 1986- MCMLXXXII Roman Numeral - Walking Liberty Gold 1oz. $50 | $1.00 |
| | 8 | 1987- MCMLXXXVII Roman Numeral - Walking Liberty Gold 1oz. $50 | $1.00 |
| | 7 | 1988- MCMLXXXVIII Roman Numeral - Walking Liberty Gold 1oz. $50 | $1.00 |
| | 4 | 1989- MCMLXXXIX Roman Numeral - Walking Liberty Gold 1oz. $50 | $1.00 |
| | 2 | 1990- MCMXC Roman Numeral - Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| | 2 | 1991- MCMXCI Roman Numeral - Walking Liberty Gold 1oz. $50 Coin | $1.00 |
| 21-FBI-003332 | 880 Miscellaneous Collectible Coins & 1 piece of jewelry from Box #1304 | | $1.00 |
| | 240 | 2016- Walking Liberty 1oz Fine Silver - One Dollar Coin | $1.00 |
| | 80 | 2019- Walking Liberty 1oz Fine Silver - One Dollar Coin | $1.00 |
| | 140 | 2016- Walking Liberty 1oz Fine Silver - One Dollar Coin | $1.00 |
| | 160 | 2019- Walking Liberty 1oz Fine Silver - One Dollar Coin | $1.00 |
| | 30 | 2011- Liberty Indian Head 1oz Fine Gold - $50 Coin | $1.00 |
| | 40 | 2012 -Liberty Indian Head 1oz Fine Gold - $50 Coin | $1.00 |
| | 10 | 2017- Liberty Indian Head 1oz Fine Gold - $50 Coin | $1.00 |
| | 140 | 2016- Liberty Indian Head 1oz Fine Silver - $50 Coin | $1.00 |
| | 40 | 2019- Liberty Indian Head 1oz Fine Silver - $50 Coin | $1.00 |
| | 1 | Tiffany Key Pendant with Chain | $1.00 |
| 21-FBI-003333 | 10 Gold Bars from Box #44 | | $1.00 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209764 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209757 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209756 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209755 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 176927 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209750 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209751 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209752 |
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209753 |

**Exhibit I**

542

U.S. Private Vaults                                    Notice of Seizure

| | | | | |
|---|---|---|---|---|
| | 1 | 1oz Credit Suisse Gold Bar | $1.00 | 209754 |
| 21-FBI-003334 | 1 Gold Bar & 6 Pieces of Miscellaneous Jewelry from Box #5311 | | $1.00 | |
| | 1 | Metalor- 1 Kilo Gold Bar | $1.00 | 14258012 |
| | 1 | Cartier Love Rose Gold Bracelet | $1.00 | BUE349 |
| | 1 | Cartier Love 18kt Bracelet | $1.00 | AGA633 |
| | 1 | Cartier Love Ring | $1.00 | EFI594 |
| | 1 | Men's Ring - 18kt Yellow Gold | $1.00 | |
| | 1 | Tiger Eye- Unknown Metal Pendant | $1.00 | |
| | 1 | Cartier Nail Bracelet 18kt Rose Gold | $1.00 | DUD135 |
| 21-FBI-003335 | 1 Gold Bar from Box #224 | | $1.00 | |
| | 1 | UBS 1 Kilo Gold 999.9 | $1.00 | D276970 |
| 21-FBI-003336 | 15 Miscellaneous Collectible Coins from Box #10 | | $1.00 | |
| | 14 | 2012- Commemorative 1oz Silver Coin | $1.00 | |
| | 1 | Canada 1oz Fine Gold $50 Coin | $1.00 | |
| 21-FBI-003339 | 24 Miscellaneous Collectible Coins from Box #6614 | | $1.00 | |
| | 20 | Standing Liberty 1oz Fine Gold $50 Coin | $1.00 | |
| | 2 | Standing Liberty 1oz Fine Gold $50 Coin | $1.00 | |
| | 1 | Standing Liberty 1/2oz Fine Gold $25 Coin | $1.00 | |
| | 1 | 1914 Roman Head - Gold Coin - with 1 Container | $1.00 | |
| 21-FBI-003340 | 51 Miscellaneous Collectible Coins from Box #8311 | | $1.00 | |
| | 9 | $100 1oz Platinum Coins | $1.00 | |
| | 9 | $100 1oz Platinum Coins | $1.00 | |
| | 9 | $100 1oz Platinum Coins | $1.00 | |
| | 10 | $50 1oz Platinum Coins | $1.00 | |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257457 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257458 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257459 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257460 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257461 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257462 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257463 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257464 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257465 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257466 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257467 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257468 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257469 |
| | 14 | 1oz PAMP Suisse Fine Gold | $1.00 | C257470 |
| 21-FBI-003343 | 26 Miscellaneous Yellow and White Colored Coins from Box #1401 | | $1.00 | |
| 21-FBI-003344 | 385 Miscellaneous Yellow Colored Coins from Box #4100 | | $1.00 | |
| 21-FBI-003345 | 94 Miscellaneous Yellow Colored Coins and Bars from Box #1502 | | $1.00 | |
| 21-FBI-003347 | 59 Miscellaneous Yellow and White Colored Coins and Bars from Box #3900 | | $1.00 | |
| 21-FBI-003348 | 10 Miscellaneous Yellow Colored Coins from Box #8014 | | $1.00 | |
| 21-FBI-003349 | 325 Miscellaneous Yellow and White Colored Coins, and Miscellaneous Batch of Coins from Box #2906 | | $1.00 | |
| 21-FBI-003350 | 55 Pieces of Miscellaneous Jewelry, 48 Miscellaneous Yellow and White Colored Coins, and 9 Yellow Colored Bars from Box #3603 | | $1.00 | |
| 21-FBI-003351 | 6 Miscellaneous Pieces of Jewelry from Box #7812 | | $1.00 | |
| 21-FBI-003352 | 66 Miscellaneous Pieces of Jewelry from Box #7207 | | $1.00 | |
| 21-FBI-003353 | 71 Pieces of Miscellaneous Jewelry and 65 Yellow Colored Bars from Box #2004 | | $1.00 | |

## Exhibit I

543

U.S. Private Vaults                                        Notice of Seizure

| | | | |
|---|---|---|---|
| 21-FBI-003354 | 4 Miscellaneous Pieces of Jewelry from Box #8113 | | $1.00 |
| 21-FBI-003355 | 29 Miscellaneous Yellow Colored Coins from Box #8016 | | $1.00 |
| 21-FBI-003356 | 6 Miscellaneous Yellow Colored Bars from Box #5703 | | $1.00 |
| 21-FBI-003357 | 5 Miscellaneous Pieces of Jewelry from Box #5702 | | $1.00 |
| 21-FBI-003358 | 354 Yellow Colored Coins from Box #5909 | | $1.00 |
| 21-FBI-003359 | 67 Miscellaneous Pieces of Jewelry from Box #5910 | | $1.00 |
| 21-FBI-003360 | 1 Miscellaneous Piece of Jewelry and 6 Yellow Colored Gold Bars from Box #8112 | | $1.00 |
| 21-FBI-003361 | 3 Miscellaneous Yellow Colored Bars and 3 Miscellaneous Pieces of Jewelry from Box #1500 | | $1.00 |
| 21-FBI-003362 | 59 Miscellaneous Yellow and White Colored Coins from Box #6409 | | $1.00 |
| 21-FBI-003363 | 5 Miscellaneous Yellow Colored Coins from Box #1601 | | $1.00 |
| 21-FBI-003364 | 401 Miscellaneous Yellow and White Colored Coins and 9 Miscellaneous Yellow and White Colored Bars from Box #8307 | | $1.00 |
| 21-FBI-003365 | 62 Miscellaneous Yellow Colored Coins and Bars from Box #1602 | | $1.00 |
| 21-FBI-003367 | 86 Miscellaneous Yellow and White Colored Coins and Bar from Box #7808 | | $1.00 |
| 21-FBI-003368 | 24 Miscellaneous Pieces of Jewelry from Box #7010 | | $1.00 |
| 21-FBI-003369 | 8 Miscellaneous Yellow and White Colored Coins from Box #2302 | | $1.00 |
| 21-FBI-003370 | 39 Miscellaneous Yellow Colored Coins from Box #1600 | | $1.00 |
| 21-FBI-003371 | 19 Miscellaneous Pieces of Jewelry from Box #7109 | | $1.00 |
| 21-FBI-003372 | 7 Miscellaneous Yellow Colored Bars from Box #2501 | | $1.00 |
| 21-FBI-003373 | 170 Miscellaneous Yellow Colored Bars from Box #1803 | | $1.00 |
| 21-FBI-003375 | 77 Miscellaneous Yellow and White Colored Coins from Box #2502 | | $1.00 |
| 21-FBI-003376 | 60 Miscellaneous Yellow Colored Coins and Bars from Box #2503 | | $1.00 |
| 21-FBI-003379 | 5 Miscellaneous Collectible Coins from Box #6906 | | $1.00 |
| | 1 | 1876 George T. Morgan $100 1oz Pure Gold, Coin in Display Box | $1.00 |
| | 1 | 2007 Natural Series Gold Coin Set - 1 spot missing coin in display box | $1.00 |
| | 1 | 1893 Gold $10 Coin | $1.00 |
| | 1 | 1889 Gold $20 Coin | $1.00 |
| | 1 | 1910 Gold Liberty Indian Head $5 Coin | $1.00 |
| 21-FBI-003380 | 2 Miscellaneous Men's Watches from Box #6604 | | $1.00 |
| | 1 | Rolex Men's Silver Watch with Black Face | $1.00 |
| | 1 | Rolex Men's Watch 2-Tone with Blue Face with Green Felt Bag | $1.00 |
| 21-FBI-003381 | 26 Pieces of Miscellaneous Women's Jewelry from Box #3103 | | $1.00 |
| | 1 | 26 Pieces of Womens Jewelry | $1.00 |
| 21-FBI-003382 | 88 Miscellaneous Jewelry and Watches from Box #5158 | | $1.00 |
| | 6 | Men's Watches in Pouch | $1.00 |
| | 6 | Men's Watches in Pouch | $1.00 |
| | 6 | Men's Watches in Pouch | $1.00 |
| | 6 | Men's Watches in Pouch | $1.00 |
| | 7 | Men's Watches in Velvet Bag | $1.00 |
| | 1 | Watch in Velvet Bag | $1.00 |
| | 4 | Watches in Pouch | $1.00 |
| | 6 | Men's Watches in Pouch | $1.00 |
| | 6 | Men's Watches in Pouch | $1.00 |
| | 1 | Watch in Velvet Bag | $1.00 |

**Exhibit I**

544

U.S. Private Vaults                                    Notice of Seizure

|  |  |  |  |  |
|---|---|---|---|---|
|  | 6 | Watches in Velvet Bag | $1.00 |  |
|  | 5 | Watches in Velvet Bag | $1.00 |  |
|  | 3 | Watches in Velvet Bag | $1.00 |  |
|  | 25 | Ladies Jewelry | $1.00 |  |
| 21-FBI-003383 | 258 Gold Ingots & Gold Colored Coins from Box# 5005 | | $1.00 |  |
|  | 50 | PAMP Containers; 25 1oz Gold Ingots in each | $1.00 |  |
|  | 50 | PAMP Containers; 25 1oz Gold Ingots in each | $1.00 |  |
|  | 50 | Plastic Containters; 25 1oz Gold Ingots in each | $1.00 |  |
|  | 105 | Gold Colored Coins | $1.00 |  |
|  | 3 | PAMP Suisse Gold Ingots | $1.00 |  |
| 21-FBI-003384 | 22 Collectable Coins & 2 Silver Bars from Box #8 | | $1.00 |  |
|  | 5 | Silver Colored Coins | $1.00 |  |
|  | 17 | Gold Colored Coins | $1.00 |  |
|  | 1 | Johnson Matthey 10oz Silver Troy Bar | $1.00 | 612507 |
|  | 1 | 10,300 Troy oz Silver Bar | $1.00 |  |
| 21-FBI-003385 | Miscellaneous Precious Items from Box 5409 | | $4.00 |  |
|  | 58 | Coin, Yellow Metal Color | $1.00 |  |
|  | 19 | Ingot, 5g Yellow Metal Color | $1.00 |  |
|  | 6 | Ingot, 2.5g Yellow Metal Color | $1.00 |  |
|  | 14 | Ingot, 1g Yellow Metal Color | $1.00 |  |
| 21-FBI-003387 | 10 Gold Bars from Box #716 | | $1.00 |  |
|  | 10 | Gold Colored Bars | $1.00 |  |
| 21-FBI-003388 | 20 Miscellaneous Collectible Coins & 1 Gold Colored Bar from Box #713 | | $1.00 |  |
|  | 20 | Miscellaneous Gold Colored Coins | $1.00 |  |
|  | 1 | Gold Colored Bar | $1.00 |  |
| 21-FBI-003389 | 100 Gold Colored Coins ($50) from Box #4107 | | $1.00 |  |
|  | 100 | Gold Colored Coins ($50) | $1.00 |  |
| 21-FBI-003392 | 1 Gold Colored Bars & 2 Coins from Box #227 | | $1.00 |  |
|  | 19 | Gold Colored Bars | $1.00 |  |
|  | 10 | Gold Colored Coins | $1.00 |  |
| 21-FBI-003393 | 77 Miscellaneous Collectible Coins from Box #22 | | $1.00 |  |
|  | 42 | Miscellaneous Collectible Coins in Blue Box | $1.00 |  |
|  | 34 | Miscellaneous Collectible Coins in Blue Box | $1.00 |  |
|  | 1 | Miscellaneous Collectible Coins in Clear Box | $1.00 |  |
| 21-FBI-003394 | 13 Gold Colored Bars from Box #513 | | $1.00 |  |
|  | 13 | Gold Colored Bars | $1.00 |  |
| 21-FBI-003396 | 79 Miscellaneous Coins & 37 White Bars from Box #6512. | | $1.00 |  |
|  | 19 | Coins | $1.00 |  |
|  | 32 | 32 White Metal Bars | $1.00 |  |
|  | 5 | White Bars | $1.00 |  |
|  | 3 | 3 Containers | $1.00 |  |
| 21-FBI-003397 | Misc. Coins and Bars from Box #704 | | $1.00 |  |
|  | 2 | PAMP SUISSE 2.5g Fine Gold Ingot | $1.00 |  |
|  | 2 | American Eagle 1oz Fine Gold $50 Coins in Blue Display Box | $1.00 |  |
|  | 1 | Standing Liberty 1/2oz Fine Gold $25 Coins in Blue Display Box | $1.00 |  |
|  | 8 | Canadian $10 Gold 1/4oz Fine Gold Coin | $1.00 |  |
|  | 1 | 10oz Troy Silver 999 + Bar | $1.00 |  |
|  | 1 | Standing Liberty 1oz Fine Gold $50 Coin | $1.00 |  |

**Exhibit 1**

545

U.S. Private Vaults                                    Notice of Seizure

| | | | |
|---|---|---|---|
| | 9 | Grant Wood Commemorative Coins | $1.00 |
| | 5 | Marian Anderson Commemorative Coins | $1.00 |
| | 4 | $100 Canadian Gold Coins | $1.00 |
| | 1 | $50 Canadian Gold Coin | $1.00 |
| | 1 | $100 Canadian Gold Coin | $1.00 |
| | 2 | 1/2oz Gold Coins USA | $1.00 |
| | 2 | 1/2oz Canada Gold Coins | $1.00 |
| | 12 | 1/4oz Canada Gold Coins | $1.00 |
| | 3 | One Suisse Troy oz 999.9 Fine Gold Ingots | $1.00 |
| | 1 | One oz Krugerrand Fine Gold Coin | $1.00 |
| | 9 | $100 Australian Platinum Coins in Containers | $1.00 |
| | 2 | 1/2oz Canada Platinum Coins | $1.00 |
| | 4 | 1/2oz Liberty Platinum Coins | $1.00 |
| | 1 | 1oz Platinum Isle of Man Noble Coin | $1.00 |
| | 1 | 1oz Platinum Switzerland Coin | $1.00 |
| | 1 | 1oz Canada Platinum $50 Coin | $1.00 |
| | 2 | 1oz Canada Platinum $50 Coins | $1.00 |
| | 2 | 1oz Liberty Platinum $1 Coins | $1.00 |
| 21-FBI-003398 | | Misc. Coins and Bars from Box #6208 | $1.00 |
| | 17 | PAMP Suisse 1 Troy oz 999.9 Fine Gold Ingots | $1.00 |
| | 2 | Suisse 1oz Fine Gold 999.9 Ingots | $1.00 |
| | 3 | PAMP 2012 Lunar Calendar Series Dragon - Suisse 1oz Fine Gold 999.9 Ingots | $1.00 |
| | 11 | Miscellaneous Gold-Colored Coins | $1.00 |
| | 1 | Sunshine Minting Inc, 1 Troy oz Fine Gold .9999 Ingot | $1.00 |
| | 3 | Credit Suisse 1oz 999.9 Fine Gold Ingots | $1.00 |
| | 1 | Valcambi Suisse 1oz 999.9 Fine Gold Ingot | $1.00 |
| 21-FBI-003399 | | Misc. coins from Box # 2111 | $1.00 |
| | 63 | Gold-Colored $20 Coins in Individual Plastic Containers | $1.00 |
| | 2 | PAMP Suisse 1oz Fine Gold 999.9 | $1.00 |
| | 1 | NTR Metals .9999 Fine Gold, 1 Troy oz | $1.00 |
| | 1 | Canadian $50 Gold 1oz Fine Gold | $1.00 |
| | 1 | South Africa Krugerrand 1oz Fine Gold | $1.00 |
| | 25 | PAMP Suisse 1oz Fine Gold Rectangular Ingots in Container | $1.00 |
| | 25 | PAMP Suisse 1oz Fine Gold Ingots | $1.00 |
| 21-FBI-003421 | | Miscellaneous Precious Items from Box 3304 | $37.00 |
| | 1 | Wach, white and yellow metal color, black dial, labeled Rolex | $1.00 | J9K323777 |
| | 1 | Earring, one pair, white metal color studs with near colorless stones | $1.00 |
| | 1 | Watch, rose gold color metal labeled Piguet | $1.00 | I94438 |
| | 1 | Bracelet, rose gold color metal, threaded with nuts | $1.00 | EXC543 |
| | 1 | Chain, approx. 24 inch yellow metal, fancy rope | $1.00 |
| | 1 | Watch, white metal color near fully set with near colorless stone, labeled Patek Philippe | $1.00 |
| | 1 | Chain, approx. 30.5 inch yellow metal, curb link | $1.00 |

**Exhibit I**

546

U.S. Private Vaults                                   Notice of Seizure

| | | | |
|---|---|---|---|
| 3 | Coin, yellow metal color, foreign | $1.00 | |
| 1 | Bracelet, 8 inch metal curb link | $1.00 | |
| 1 | Bracelet, yellow metal color, nail style | $1.00 | DRY943 |
| 1 | Chain, approx. 22 inch yellow metal, curb link | $1.00 | |
| 1 | Coin, 1 oz. The Holy Land Mint gold color, 2012 | $1.00 | 17251367 |
| 1 | Ingot, 1 oz. silver color | $1.00 | |
| 1 | Chain, approx. 30 inch yellow metal, curb link with near colorless stones | $1.00 | |
| 1 | Chain, approx. 30 inch yellow metal, curb link | $1.00 | |
| 1 | Chain, approx. 20.5 inch yellow metal, byzantine link | $1.00 | |
| 1 | Chain, approx. 20.5 inch yellow metal, byzantine link | $1.00 | |
| 1 | Chain, approx. 20.5 inch yellow metal, byzantine link | $1.00 | |
| 1 | Bracelet, 7 inch silver color, tennis style with near colorless stone clusters | $1.00 | |
| 1 | Watch, rose gold color labeled Cartier | $1.00 | 94238QX |
| 1 | Chain, approx. 25 inch yellow metal, fancy rope | $1.00 | |
| 1 | Chain, approx. 25 inch yellow metal, fancy rope | $1.00 | |
| 1 | Chain, approx. 24 inch yellow metal, fancy rope | $1.00 | |
| 1 | Watch, yellow metal color labeled Rolex | $1.00 | 2M9F5013 |
| 1 | Ring, white metal color with colorless stones | $1.00 | |
| 1 | Watch, white and yellow metal color with near colorless index markers labeled Rolex | $1.00 | 4F2M8192 |
| 1 | Watch, yellow metal color labeled Rolex | $1.00 | 3638A6Y9 |
| 1 | Chain, approx. 24 inch yellow metal, curb link | $1.00 | |
| 1 | Chain, approx. 30.5 inch yellow metal, curb link with near colorless stones | $1.00 | |
| 1 | Watch, yellow metal color labeled Rolex | $1.00 | E8Z36482 |
| 1 | Necklace, damaged approx. 22 incgh white metal color with near colorless stones | $1.00 | |
| 1 | Chain, approx. 18 inch yellow metal, fancy link with circlet pendant of three figures | $1.00 | |
| 1 | Ring, rose gold color metal with colored and near colorless stones | $1.00 | |
| 1 | Chain, approx. 24 inch yellow metal, fancy rope | $1.00 | |
| 1 | Chain, approx. 28 inch yellow metal, curb link | $1.00 | |
| 1 | Watch, yellow metal color, white dial, labeled Rolex | $1.00 | V814048 |
| 1 | Pendant, white metal color, near fully set with near colorless stones (TRU) | $1.00 | |

21-FBI-003423   Miscellaneous Precious Items from Box 603          $4.00

| | | |
|---|---|---|
| 1 | Necklace, approx. 11.5 inch white metal colored with near colorless stones and white beads | $1.00 |

**Exhibit I**

547

U.S. Private Vaults

Notice of Seizure

| | | | |
|---|---|---|---|
| | 1 | Earring, one pair of white color metal with near colorless stones and white beads | $1.00 |
| | 1 | Necklace, approx. 16 inch white metal color, chevron design with near colorless stone | $1.00 |
| | 1 | Bracelet, approx. 7.5 inch white metal color, chevron design links with near colorless stone | $1.00 |
| 21-FBI-003424 | | Miscellaneous Precious Items Box 703 | $4.00 |
| | 1 | Watch, White color metal with black dial | $1.00 |
| | 1 | Watch, White color metal with near colorless bezel labeled Cartier | $1.00 | 486043YX |
| | 1 | Ring, White metal color with oval shaped blue colored stone surrounded by near colorless stones | $1.00 |
| | 363 | Coin, Yellow color metal, Walking Liberty, 2020 | $1.00 |
| 21-FBI-003427 | | Miscellaneous Precious Items from Box 4404 | $9.00 |
| | 4 | Ingot, 1g yellow metal color | $1.00 |
| | 128 | Ingot, 2.5g yellow metal color | $1.00 |
| | 150 | Ingot, 5g yellow metal color | $1.00 |
| | 2 | Ingot, 5g yellow metal color with frame | $1.00 |
| | 3 | Ingot, 5g yellow metal color | $1.00 |
| | 23 | Ingot, 10g yellow metal color | $1.00 |
| | 2 | Ingot, 1/2 oz. yellow metal color | $1.00 |
| | 2 | Ingot, 1 oz. yellow metal color | $1.00 |
| | 106 | Coin, various yellow metal color | $1.00 |
| 21-FBI-003428 | | Miscellaneous Precious Items from Box 7834 | $3.00 |
| | 43 | Coin, Silver Metal Color | $1.00 |
| | 51 | Coin, Yellow Metal Color | $1.00 |
| | 10 | Coin, Silver Metal Color | $1.00 |
| 21-FBI-003429 | | Miscellaneous Precious Items from Box 4203 | $10.00 |
| | 93 | Coin, Silver Metal Color | $1.00 |
| | 1 | Coin, Yellow Metal Color | $1.00 |
| | 5 | Ingot, 5g Yellow Metal Color | $1.00 |
| | 5 | Ingot, 1 oz. Yellow Metal Color | $1.00 |
| | 1 | Ingot, 100g Yellow Metal Color | $1.00 |
| | 1 | Ingot, 5-baht Yellow Metal Color | $1.00 |
| | 2 | Bar, 100g Silver Metal Color | $1.00 |
| | 15 | Ingot, 1 troy oz. Silver Metal Color | $1.00 |
| | 3 | Ingot, 1 troy oz. Silver Metal Color | $1.00 |
| | 2 | Bar, 100 troy oz. Silver Metal Color | $1.00 |
| 21-FBI-003430 | | Miscellaneous Precious Items from Box 4902 | $1.00 |
| | 269 | Coin, Yellow Metal Color | $1.00 |
| 21-FBI-003431 | | Miscellaneous Coins from Box 3505 | $3.00 |
| | 3 | Coin, Silver Metal Color | $1.00 |
| | 4 | Coin, Yellow Metal Color | $1.00 |
| | 1 | Coin, Bronze Metal Color labeled BitCoin | $1.00 |
| 21-FBI-003432 | | Miscellaneous Precious Items from Box 505 | $7.00 |
| | 10 | Ingot, 10 oz. Yellow Metal Color | $1.00 |
| | 12 | Coin, Yellow Metal Color | $1.00 |
| | 3 | Sheet, Yellow Metal Color | $1.00 |
| | 213 | Coin, Yellow Metal Color | $1.00 |
| 21-FBI-003433 | | Miscellaneous Precious Items from Box 805 | $4.00 |
| | 11 | Coin, Yellow Metal Color | $1.00 |
| | 1 | Bar, 32.150 troy oz. Yellow Metal Color | $1.00 |
| | 1 | Ingot, 1 oz. Yellow Metal Color | $1.00 |

**Exhibit I**

548

U.S. Private Vaults

Notice of Seizure

|  |  |  |  |
|---|---|---|---|
|  | 1 | Bar, 10 troy oz. Silver Metal Color | $1.00 |
| 21-FBI-003434 |  | Miscellaneous Coins from Box 809 | $1.00 |
|  | 30 | Coin, Silver Metal Color | $1.00 |
| 21-FBI-003435 |  | Miscellaneous Coins from Box 4803 | $2.00 |
|  | 200 | Coin, Silver Metal Color | $1.00 |
|  | 80 | Coin, Yellow Metal Color | $1.00 |
| 21-FBI-003436 |  | Miscellaneous Precious Items from Box 3501 | $4.00 |
|  | 5 | Ingot, 1 oz. Yellow Metal Color | $1.00 |
|  | 13 | Coin, Yellow Metal Color | $1.00 |
|  | 4 | Ingot, 1g Yellow Metal Color | $1.00 |
|  | 3 | Bar, 1000 Grain Silver Metal Color | $1.00 |
| 21-FBI-003437 |  | Miscellaneous Precious Items from Box 110 | $6.00 |
|  | 1 | Bar, 1000g Silver Metal Color | $1.00 | A090048
|  | 10 | Ingot, 100g Yellow Metal Color | $1.00 |
|  | 1 | Ingot, 1 troy oz. Yellow Metal Color | $1.00 |
|  | 2 | Ingot, 50 gram Yellow Metal Color | $1.00 |
|  | 1 | Ingot, 5 oz. Yellow Metal Color | $1.00 |
|  | 6 | Ingot, 1 oz. Yellow Metal Color | $1.00 |
| 21-FBI-003438 |  | Miscellaneous Precious Items from Box 3200 | $5.00 |
|  | 17 | Ingot, 1 oz. Yellow Metal Color | $1.00 |
|  | 1 | Ingot, 2g Yellow Metal Color | $1.00 |
|  | 4 | Ingot, 5g Yellow Metal Color | $1.00 |
|  | 3 | Ingot, 10g Yellow Metal Color | $1.00 |
|  | 1 | Ingot, 1/2 oz. Yellow Metal Color | $1.00 |
| 21-FBI-003439 |  | Miscellaneous Precious Items from Box 3503 | $1.00 |
|  | 4 | Bar, Misc. Silver Metal Color | $1.00 |
| 21-FBI-003440 |  | Miscellaneous Precious Items from Box #4106 | $16.00 |
|  | 8 | Miscellaneous 1 oz Gold Colored Ingots | $1.00 |
|  | 37 | Miscellaneous 1 Troy oz Gold Colored Ingots | $1.00 |
|  | 16 | 1 Oz Gold Colored Ingots | $1.00 |
|  | 76 | Miscellaneous 1 oz Gold Colored Ingots | $1.00 |
|  | 3 | Miscellaneous 1 oz Gold Colored Ingots | $1.00 |
|  | 87 | Miscellaneous Gold Colored Coins | $1.00 |
|  | 8 | Miscellaneous 10 oz Gold Colored Bars | $1.00 |
|  | 1 | 1 oz Gold Coin | $1.00 |
|  | 108 | Miscellaneous 1 oz Gold Colored Ingots | $1.00 |
|  | 27 | Miscellaneous 1 oz Gold Colored Ingots | $1.00 |
|  | 42 | 1 Troy oz Gold Colored Ingots | $1.00 |
|  | 3 | Miscellaneous 1 Troy oz Gold Colored Ingots | $1.00 |
|  | 13 | 1 Oz Gold Colored Coins | $1.00 |
|  | 10 | Miscellaneous Gold Colored Coins | $1.00 |
|  | 1 | Troy oz Gold Colored Bar | $1.00 |
|  | 12 | Miscellaneous 10 oz Gold Colored Bars | $1.00 |
| 21-FBI-003441 |  | Miscellaneous Precious Items from Box #4301 | $6.00 |
|  | 2 | Miscellaneous 1 Kilo Silver Colored Bars | $1.00 |
|  | 3 | Silver Colored Ingots | $1.00 |
|  | 8 | Miscellaneous 10 Troy oz Silver Colored Bars | $1.00 |
|  | 514 | Miscellaneous 1 Troy oz Silver Colored Coins | $1.00 |
|  | 86 | Miscellaneous 1 oz Silver Colored Coins | $1.00 |
|  | 54 | Miscellaneous Silver Colored Coins | $1.00 |
| 21-FBI-003442 |  | Miscellaneous Precious Items from Box #6711 | $2.00 |
|  | 25 | Miscellaneous 1 oz Walking Liberty Silver Colored Coins in US Mint Container | $1.00 |

Exhibit I

549

ER-1292

U.S. Private Vaults

Notice of Seizure

|  |  |  |  |  |
|---|---|---|---|---|
|  | 25 | Miscellaneous 1 oz Walking Liberty Silver Colored Dollar Coins in US Mint Container | $1.00 |  |
| 21-FBI-003443 |  | Miscellaneous Precious Items from Box #6312 | $13.00 |  |
|  | 140 | Miscellaneous Silver Colored Silver Dollar Coins | $1.00 |  |
|  | 20 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 240 | Miscellaneous Silver Colored Coins | $1.00 |  |
|  | 20 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 20 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 30 | Miscellaneous Silvered Coins 3" Diameter | $1.00 |  |
|  | 20 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 20 | Silver Colored Half Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 20 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 20 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 10 | Silver Colored Half Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
|  | 500 | Silver Colored $5.00 Coins in Yellow Container | $1.00 |  |
|  | 4 | Silver Colored Silver Dollar Coins in Professional Coin Grading Service Container | $1.00 |  |
| 21-FBI-003444 |  | Miscellaneous Poker Chips from Box #505 | $3.00 | Poker Chips |
|  | 47 | Poker Chip, Label Aria with $25,000 | $1.00 |  |
|  | 9 | Poker Chip, Label Aria with $5,000 | $1.00 |  |
|  | 1 | Poker Chip, Label Aria with $100,000 | $1.00 |  |

**Exhibit I**
**550**

ER-1293

# Exhibit J

**to Declaration of Robert Frommer**

Page 1

```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                          WESTERN DIVISION
 4
      PAUL SNITKO, JENNIFER SNITKO, )
 5    JOSEPH RUIZ, TYLER GOTHIER,    )
      JENI VERDON-PEARSONS, MICHAEL  )
 6    STORC, and TRAVIS MAY,         )  Case No.
                                     )  2:21-cv-04405-RGK-MAR
 7                   Plaintiffs,     )
                                     )
 8    vs.                            )
                                     )
 9    UNITED STATES OF AMERICA,      )
      TRACY L. WILKISON, in her      )
10    official capacity as Acting    )
      United States Attorney for     )
11    the Central District of        )
      California, and KRISTI KOONS   )
12    JOHNSON, in her official       )
      capacity as an Assistant       )
13    Director of the Federal        )
      Bureau of Investigation,       )
14                                   )
                     Defendants.     )
15    _____)
16
17
18            REMOTE DEPOSITION OF JUSTIN PALMERTON
19                       April 28, 2022
20
21
22
23
24
25    Reported By: Amy E. Simmons, CSR, RPR, CRR, CRC
```

Page 2

1              REMOTE DEPOSITION OF JUSTIN PALMERTON

2

3          BE IT REMEMBERED that the remote deposition of

4     JUSTIN PALMERTON was taken via videoconference by the

5     Plaintiffs before Veritext Legal Solutions, Amy E.

6     Simmons, Court Reporter and Notary Public in and for

7     the County of Ada, State of Idaho, on Thursday, the

8     28th day of April, 2022, commencing at the hour of

9     9:19 a.m. Pacific Daylight Time in the above-entitled

10    matter.

11

12

13    APPEARANCES (Remotely):

14

      For the Plaintiffs:   THE INSTITUTE FOR JUSTICE

15                          By:  Robert Frommer, Esq.

                                 Joseph R. Gay, Esq.

16                          901 North Glebe Road, Suite 900

                            Arlington, Virginia  22203

17                          Telephone:  (703) 682-9320

                            rfrommer@ij.org

18                          jgay@ij.org

19

                            THE INSTITUTE FOR JUSTICE

20                          By:  Robert E. Johnson, Esq.

                            16781 Chagrin Blvd., Suite 256

21                          Shaker Heights, Ohio  44120

                            Telephone:  (703) 682-9320

22                          rjohnson@ij.org

23

24

25

Page 3

1     APPEARANCES (Contd.):

2

      For the Defendants:    UNITED STATES ATTORNEY'S OFFICE

3                            By:  Victor Rodgers, AUSA
                                  Maxwell Coll, AUSA

4                                 Andrew Brown, AUSA
                             312 North Spring Street, 14th Floor

5                            Los Angeles, California  90012
                             Telephone:  (213) 894-2569

6                            Facsimile:  (213) 894-0142
                             victor.rodgers@usdoj.gov

7                            maxwell.coll@usdoj.gov
                             andrew.brown@usdoj.gov

8

9                            FEDERAL BUREAU OF INVESTIGATION
                             OFFICE OF GENERAL COUNSEL

10                           By:  Meghan Campbell
                             935 Pennsylvania Avenue N.W., Room 10140

11                           Washington, District Columbia  20535
                             Telephone: (202) 324-8952

12                           mcampbell5@fbi.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit J
554

ER-1297

Page 4

1                    I N D E X

2                E X A M I N A T I O N

3


   JUSTIN PALMERTON                                    PAGE

4

5   By:  Mr. Frommer......................................5

6

7                    E X H I B I T S

8   NO.                                                PAGE

9   1.   Excerpt from Domestic Investigations.............61

        and Operations Guide (2 pages)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit J

555

ER-1298

Page 5

1          P R O C E E D I N G S

2

3                    JUSTIN PALMERTON,

4     a witness having been first duly sworn remotely to

5     tell the truth, the whole truth and nothing but the

6     truth, was examined and testified as follows:

7

8                    EXAMINATION

9     BY MR. FROMMER:

10         Q.   Hello, Special Agent Palmerton.  I'm

11    Robert Frommer.  I'm a senior attorney at The

12    Institute For Justice.

13              Before we get started, could you just

14    please state your full name and title, please, for

15    the record.

16         A.   My name is Justin Palmerton.  I'm a

17    special agent with the FBI.

18         Q.   Okay.  And so, like I said, I'm Robert

19    Frommer.  I'm with The Institute For Justice, a

20    nonprofit public interest law firm, and we're

21    representing the Plaintiffs in this class action

22    challenge concerning the government's execution of

23    a seizure warrant at US Private Vaults back in May

24    of 2021.

25              MR. FROMMER:  Before we begin, actually,

Page 6

1    Victor, I had a question.  I know we tried to

2    reach out to you about the motion to continue and

3    the additional relief that we were talking about

4    the potential for a live trial and more -- and

5    also the -- clarifying the different orders, so

6    the scheduling conference versus the court's trial

7    order.

8              And I just wanted to know if you had any

9    updates on whether Defendants were willing -- were

10   opposed to that or unopposed.

11             MR. RODGERS:  If you want to go off the

12   record to discuss this, that is fine.  But we're

13   in a deposition today, and I'm not going to

14   discuss this during the deposition.

15             In addition, I want to note that you

16   said -- you talked about the execution of a

17   seizure or search warrant in May of 21.

18             MR. FROMMER:  My apologies.

19             MR. RODGERS:  It was March 2021.

20             MR. FROMMER:  Yes.  I realize I just said

21   the wrong word.  I apologize for that.

22             And, Victor, okay.  We'll follow up with

23   this once we hit a break.

24        Q.   (BY MR. FROMMER)  So, Special Agent

25   Palmerton, before we begin, let me ask you this:

1    Have you ever had your deposition taken before?

2         A.   No.

3         Q.   Oh, okay.  I figured given your history

4    with the FBI that you might have.

5              Let me go over some of the ground rules

6    for a deposition so we have the same

7    understanding.  Okay?

8              I'll be asking you questions, obviously.

9    And the court reporter will be recording my

10   questions as well as your answers.  To assist the

11   court reporter, I'll be sure to speak clearly and

12   audibly, and would kindly ask that you do the

13   same.

14             Also, please answer each question

15   verbally.  This is something in the natural course

16   of conversation often happens, that people will

17   say "uh-huh" or nod their head or shake their

18   head.  And of course the court reporter can't take

19   that down.  So make sure that you say "yes" or

20   "no" instead of things like "um-hmm" or

21   "huh-uh."

22             So will you be sure to provide clear and

23   verbal responses?

24        A.   Yes.

25        Q.   Okay.  Thank you.  And normally when we

```
 1    talk with people -- and I think this is
 2    particularly the case in the world of Zoom --
 3    we'll often talk over each other.  And it's hard
 4    to understand that in the real world, you know,
 5    for a court reporter to get that down in the real
 6    world; I think it's even harder in the Zoom
 7    deposition world.
 8              So we often will interrupt as part of the
 9    normal flow of conversation.  We want to avoid
10    that here.  So it's very important that you wait
11    until I finish my question before you begin
12    answering.  That's even if you think you know what
13    I'm about to ask.
14              And by the same token, I'll let you
15    finish your answer before I go on to another
16    question.
17              Do you understand?
18        A.   Yes.
19        Q.   Great.
20              MR. RODGERS:  I'm sorry, can we hold for
21    just a second?  I'm getting emails coming through,
22    and they're making noise, and I just want to turn
23    them off.  Can you give me a second to do that?
24              MR. FROMMER:  Yes.
25              (Brief pause in the proceedings.)
```

Page 9

1    Q.  (BY MR. FROMMER)  So Special Agent

2    Palmerton, you were sworn in a moment ago by the

3    court reporter.

4          Do you understand that you've been given

5    an oath that requires you to answer my questions

6    truthfully and completely?

7    A.  Yes.

8    Q.  I heard you say yes, but I think I'm

9    getting some delays in the video because I heard

10   you say yes.

11         MR. FROMMER:  Can we go off the record

12   for a second?

13              (Discussion held off the record.)

14   Q.  (BY MR. FROMMER)  So Special Agent

15   Palmerton, do you understand that the oath that

16   you just took is the same oath you'd take if you

17   were going to testify in court before a judge?

18   A.  Yes.

19   Q.  Now, if you don't understand a question,

20   please let me know, and I'll either ask the court

21   reporter to read it back or rephrase to clarify

22   the question.

23         So will you tell me if you do not

24   understand a question?

25   A.  Yes.

Page 10

1      Q.   Okay.  And if you don't know the answer
2    to a question, that's fine.  I mean -- and you can
3    say so.  But if you do know the answer to a
4    question, you have to provide that answer.  So
5    unless you say otherwise, I'll assume that you
6    understand my question.
7           Now, if you want to talk to Victor, your
8    lawyer, that's fine.  But if there's a question
9    pending or if you're in the middle of an answer,
10   you have to finish that answer before speaking to
11   your lawyer.
12          Because it's important to get full,
13   complete, and accurate answers, I have to ask, are
14   you taking any medication or is there any other
15   reason you wouldn't be able to give full and
16   complete and accurate testimony today?
17     A.   No.
18     Q.   Okay.  Good.  Now, periodically, Victor
19   or another one of the government's attorneys may
20   state objections after I ask a question.  That
21   doesn't mean that you don't have to answer that
22   question.  The purpose of the objection is simply
23   to record it so that if we have to use your answer
24   later on, the government can argue that the
25   question was improper based on the rules of

Page 11

1    evidence.

2            Do you understand?

3        A.    Yes.

4        Q.    Sometimes you'll remember additional

5    information or maybe some clarification that you

6    want to provide to an earlier question.  And that,

7    again, is fine.  But if it happens, please let me

8    know that, that you'd like to add something, and

9    we can do that while it's still fresh in your

10   mind.  Okay?

11       A.    Understood.

12       Q.    All right.  If you'd like to take a break

13   at any time, please just let me know.  I'll finish

14   my line of questions if we're in the middle of it,

15   and then I'll let you finish your answer and we

16   can then adjourn for a break.

17           Do you understand?

18       A.    Yes.

19       Q.    Okay.  Now, during our conversation, you

20   might think of some documents or materials like a

21   calendar or appointment book that would help you

22   provide a more accurate answer.  If that's the

23   case, tell me.  And it's possible that we might be

24   able to get those materials for you so you can

25   answer completely and accurately.

Exhibit J
562

ER-1305

1    Will you do that?

2    A.   Yes.

3    Q.   Okay.  Now, do you have any other

4    questions for me right now?

5    A.   No.

6    MR. FROMMER:  Okay.  And I would say -- I

7    want to make one point on the record, that we're

8    doing this deposition on April 28th.  We're doing

9    this deposition of Special Agent Palmerton largely

10   without any documents being produced in this

11   matter.

12   I know we can quibble about the few docs

13   that have been produced, but we substantially

14   haven't received documents in this case.  So there

15   is a potential that when we receive those

16   documents, we might have to reopen this

17   deposition.

18   Q.   (BY MR. FROMMER)  Now, before we begin

19   talking about everything, I just want to get

20   some -- well, some background about you.  I know

21   you're special agent Justin Palmerton.

22   Is "Justin Palmerton" your full name?

23   A.   Yes.

24   Q.   Okay.  And if you don't mind me asking,

25   how old are you?

Page 13

1          A.    I'm 33.

2          Q.    Okay.  And can you tell me a bit about

3     your education, maybe starting from -- you don't

4     have to tell me about high school and everything,

5     but after high school, what's your educational

6     background?

7          A.    Right.  So I have an undergraduate degree

8     in accounting and management information systems.

9          Q.    Where is that from?

10         A.    Western Washington University.

11         Q.    Oh, okay.  And was coming to the FBI your

12    first job out of college?

13         A.    No.

14         Q.    So what did you do -- why don't you give

15    me a history of where you have worked and what

16    you've done.

17         A.    Yes.  Prior to going to the FBI, I was a

18    CPA at a public accounting firm for approximately

19    five years.

20         Q.    And what kind of work were you doing

21    there?

22         A.    A variety of work.  Tax accounting and

23    auditing functions.

24         Q.    And so you said you were there for five

25    years?

Exhibit J
564

ER-1307

Page 14

1          A.    Approximately, yes.

2          Q.    And was it after -- and did you come to

3     the FBI immediately following, after those five

4     years?

5          A.    Yes.

6          Q.    Okay.  And can you tell me, your official

7     position name is special agent, correct?

8          A.    Correct.

9          Q.    All right.  And how long have you been in

10    your current position as a special agent?

11         A.    About four and a half years.

12         Q.    So is that pretty much the entirety of

13    your time after training?

14         A.    The entirety of my time after training is

15    about -- actually close to four years.

16         Q.    Okay.  So -- and you might -- it seems

17    that everyone there is named -- or has a title of

18    special agent.  It seems like a lot of people at

19    different -- who seem to be functioning at

20    different levels all have the title special agent.

21              So is there -- can you give me a general

22    idea of, like, for instance, in your office, like,

23    what's the structure of your office in terms of,

24    like, an organizational chart?  Like, who do you

25    report to, for instance?

Page 15

1          A.   So I report to my SSA, supervisory

2     special agent.

3          Q.   And who is that?

4          A.   Currently it's SSA Ryan Heaton.

5          Q.   Okay.  And who does Ryan report to?

6          A.   He reports to ASAC, or assistant special

7     agent in charge.

8          Q.   And when I'm asking that, I'm asking you,

9     like, what's the name of the person as well as the

10    title of the person.

11         A.   I don't recall off the top of my head.

12    She's relatively new.

13         Q.   Okay.  Don't know, relatively new.

14              And then who would that person report to?

15         A.   The special agent in charge, and that's

16    Matthew Moon.

17         Q.   Okay.  And so is Kristi Johnson the head

18    of the overall office?

19         A.   Yes.  She's the assistant director in

20    charge.

21         Q.   Okay.  And so would Matthew report to

22    Ms. Johnson?

23         A.   Yes.

24         Q.   Okay.  Can you tell me -- I'm just trying

25    to figure this out.  Can you tell me where -- do

Page 16

1     you report to Lynne Zellhart?

2          A.   I do not.

3          Q.   Now, why is that?  Are you in different

4     areas of the office?

5          A.   No.  Lynne's a special agent as well, so

6     I wouldn't report to another special agent.

7          Q.   I see.  So you and Lynne, for instance,

8     are sort of -- are at the same level within the

9     FBI office?

10         A.   Yes.

11         Q.   Okay.  And so does Lynne Zellhart, then,

12    report to Ryan Eden [sic]?

13         A.   Yes, and it's Ryan Heaton, with an H.

14    Sorry if I misspoke.

15         Q.   Thank you.  Ryan Heaton.  I'll try and

16    remember that.  Very good.

17              Okay.  And can you tell me, give me sort

18    of a general overview of what your

19    responsibilities are as a special agent at the

20    FBI?

21         A.   Yeah.  Generally, I mean, so the squad

22    that we work on is white collar crime.  So my job

23    is -- primarily as a special agent is to gather

24    and collect evidence related to white collar

25    crimes.

Page 17

1      Q.   Okay.  So were you involved in gathering

2   and collecting evidence on the US Private Vaults

3   matter?

4      A.   Yes.

5      Q.   And was that -- how far back would you

6   say your involvement in that went?  Was that prior

7   to the indictment?

8          MR. RODGERS:  Objection; lacks

9   foundation.

10     Q.   (BY MR. FROMMER)  Special Agent

11   Palmerton, you said that you worked on gathering

12   and collecting evidence with regards to US Private

13   Vaults, correct?

14     A.   Yes.

15     Q.   Can you tell me when -- what month and

16   year you began working to gather and collect

17   evidence on the US Private Vaults matter?

18     A.   Well, March 2021 was when I gathered and

19   collected evidence, but I did have initial -- at

20   least became aware of the case sometime in 2019.

21     Q.   Now, did you -- sorry.

22         MR. FROMMER:  Can you guys hear me still?

23         THE WITNESS:  Yes.

24         MR. FROMMER:  Can you see me?

25         THE WITNESS:  Yes.

Page 18

```
 1            MR. FROMMER:  Unfortunately, my computer

 2      continues to be rather --

 3            MR. JOHNSON:  Would it be possible --

 4            MR. FROMMER:  Let's go off the record for

 5      a moment.

 6                (Discussion held off the record.)

 7            (Break taken from 9:37 a.m. to 9:43 a.m.)

 8            MR. FROMMER:  Back on the record, please.

 9        Q.   (BY MR. FROMMER)  I think where we left

10      off was -- you were telling me when you started

11      gathering and collecting evidence on the US

12      Private Vaults matter.

13            And you said that you started gathering,

14      collecting evidence in March of 2021, but you

15      became aware of the matter in 2019.

16            Is that accurate?

17        A.   Yes.

18        Q.   Okay.  So did you have any involvement in

19      any of the investigatory work that led to the

20      indictment against US Private Vaults?

21        A.   No.

22        Q.   Okay.  All right.  We'll come back,

23      obviously, to that later on, find out what you've

24      done.  I just wanted to get sort of a sense of a

25      general timeline.
```

1            So let me ask this, more generally:  When

2       you joined the FBI, did you have to undertake some

3       sort of training?

4            A.   Yes.

5            Q.   Where did you take that training?

6            A.   It was at Quantico.

7            Q.   Okay.  And that was approximately five

8       years ago?

9            A.   About four and a half years ago.

10           Q.   And how long is the overall training?

11           A.   It's approximately -- I mean, it varies,

12      but my training was about five months.

13           Q.   About 20 weeks?

14           A.   Yes.

15           Q.   So what happens -- so I understand you go

16      through the training.

17                And are you called a cadet at that point?

18           A.   Our technical title is new agent trainee.

19           Q.   So what happens when you complete the 21

20      weeks or -- at Quantico?  What happens then?

21           A.   You go to your assigned field office.

22      And in my case, it was Los Angeles.

23           Q.   And so once you're done with the

24      training, you get denoted as special agent; is

25      that correct?

Page 20

1      A.   Yes, upon completion and training and

2    after the graduation ceremony, you're handed your

3    credentials and officially become a special agent.

4      Q.   And then they ship you off to where they

5    need you?

6      A.   Yes.

7      Q.   Okay.  Let me talk about that initial

8    training, because I'm interested in what they

9    train you -- how they train you in this.

10         Can you tell me, describe to me -- and

11    here I'm talking about, like, Quantico, your

12    initial training, not any kind of continuing

13    training.

14         But can you describe to me the topics or

15    subjects that the FBI trains you on at Quantico?

16      A.   Yes.  I mean, generally it's legal

17    training, firearms training, tactical training, a

18    lot of physical training, and defensive tactics

19    training.

20      Q.   Okay.  Maybe we can break these out one

21    by one.

22         So it sounded like you said legal

23    training, firearms training -- and what were the

24    other ones again?

25      A.   Tactical training.

Page 21

1      Q.    Yes.

2      A.    Sorry.  What was that?

3      Q.    Please go ahead.

4      A.    Defensive tactics.  And just physical

5    training, but that's just exercise.

6      Q.    Okay.  That one seems pretty straight

7    forward.

8      A.    It is.

9      Q.    So let me take these one at a time.

10           The firearms training, is that just to

11   become proficient in the use of a firearm?

12     A.    Yes.

13     Q.    For your, like, service weapon?

14     A.    Yes.

15     Q.    Okay.  Do they train you on other

16   firearms while you're there, or is it just your

17   sidearm?

18     A.    No, we're trained on a carbine rifle as

19   well as a shotgun.

20     Q.    Oh, okay.  And you mentioned tactical.

21   They train you on tactical.

22           Can you describe for me a little bit

23   about what that is?

24     A.    Tactical training is generally how to

25   clear rooms, deal with resisting subjects, deal

Page 22

1  with compliant subjects, execute arrests and

2  search warrants -- and this is primarily done at

3  Hogan's Alley.

4       Q.   Okay.  And Hogan's Alley is the -- it's

5  like a fake village, right, or a fake -- it's a

6  practice area that simulates a small town?

7       A.   Yes.

8       Q.   Okay.  And so when you're saying you

9  engage intact calendar training, like, for

10  instance, to execute a search warrant, is the

11  purpose of the tactical training to establish the

12  physical how you execute the warrant?

13       A.   Yes.

14       Q.   Okay.  And by that I mean not, like, any

15  of the legal details behind the warrant, but just

16  like how you go and execute a warrant.

17            For that, when you go through that, is it

18  all just hands-on training?  Or do they give you

19  materials that explain, like, how you're supposed

20  to clear a room or execute a warrant?

21       A.   Yes.  I mean, there were materials

22  provided, yeah.

23       Q.   Okay.  There were?  And I assume that's

24  the case, that materials were provided

25  for -- maybe not for physical training, but for

Page 23

1     all the areas that you previously mentioned, legal

2     firearms, tactical, and defensive tactics; is that

3     correct?

4          A.   Yes.

5          Q.   Okay.  Now, you mentioned -- how much

6     time does the FBI spend on each of those different

7     sort of topic areas during your 21 weeks?

8          A.   I couldn't tell you exactly how much time

9     on each.  They're interspersed kind of throughout

10    the 21 weeks.  I couldn't give you a definite

11    answer.

12         Q.   Oh, so on any given day, you might do

13    some legal, some firearms, some tactical; is that

14    correct?

15         A.   Yes.

16         Q.   Okay.  Now, you did mention legal as one

17    of the areas that they train you on.

18              Can you sort of generally describe to me

19    what that legal training is about?

20         A.   Yeah.  So a portion of it was on the

21    constitution and the parts that generally apply to

22    us and what our roles will be as special agents.

23              And then a good chunk of it was also on

24    our deadly force policy, a good chunk of it was

25    spent on that as well.

Exhibit J
574

ER-1317

Page 24

1      Q.   Understandable.  So why do they have the

2    sort of legal training at Quantico?

3           MR. RODGERS:  Objection; lacks

4    foundation, calls for speculation.

5           MR. FROMMER:  That's a fair point.

6      Q.   (BY MR. FROMMER)  So they have legal

7    training at Quantico.  And you said, for instance,

8    they train you on excessive force policy; is that

9    correct?

10     A.   Yeah, or deadly force policy, yes.

11     Q.   Deadly force policy, yeah.

12          And do they teach you or new cadets or

13   new trainees about the legality of, like, the

14   Fourth Amendment, for instance?

15     A.   Yes.

16     Q.   Okay.  And do they teach about -- and is

17   the purpose for that so that -- because when

18   you're out in the field you need to know how to

19   comport your activities consistent with the

20   constitution?

21     A.   Yes.

22     Q.   Okay.  So you mentioned legal, and I want

23   to drill down a little bit into that.

24          So is some of that legal training about

25   substantive law?  And by that I mean, like,

1    various offenses of law and what elements make up

2    those offenses?

3         A.   Yes.

4         Q.   Is some of the legal training -- and I

5    think you've already said this -- what I'd call

6    procedural law, such as how to investigate crime?

7         A.   Yes.

8         Q.   Okay.  Is it fair to say the reason or at

9    least part of the reason that you learn this

10   procedural law is so that when you're

11   investigating crime, you do so consistent with

12   people's constitutional rights?

13        A.   Yes.

14        Q.   Okay.  As part of that, do they teach you

15   how to make an arrest?

16        A.   Yes, they do.

17        Q.   Okay.  And is it the case, then, that the

18   tactical training would be about the physical act

19   of making an arrest?

20        A.   Yes.

21        Q.   And then the legal training would be

22   about when it's appropriate to make an arrest?

23        A.   Yes.

24        Q.   Okay.  And the tactical training, sounds

25   like you would need that for the physical act of

Page 26

1     arresting someone so that you and the arrestee

2     remain safe; is that correct?

3         A.   Yes.

4         Q.   And is the point, then, of the legal side

5     of the training regarding arrests to ensure that

6     you don't violate the arrestee's or other person's

7     rights in the course of making that arrest?

8         A.   Yes.

9         Q.   I'd like to go a little bit more

10    into -- when I say "procedural law," how you

11    investigate, how you comport yourself.

12         Do you understand what I mean generally

13    by that term?

14        A.   Yes.

15        Q.   Okay.  So I'm wondering if there are

16    other areas of legal training, procedural legal

17    training that -- outside of the arrest context

18    that they have you train on.

19         Do they teach you, for instance, like,

20    how you should apply for a search warrant?

21        A.   Yes.

22        Q.   Okay.  And do they teach you -- on the

23    legal side, that is -- about how to execute a

24    search warrant?

25        A.   Yes.

1     Q.   Okay.  And again, is that -- is the

2     purpose of that to make sure that when you're

3     applying for a search warrant or executing a

4     search warrant, you do so consistent with the

5     constitution?

6     A.   Yes.

7     Q.   Now, when you get into this procedural

8     law regarding arrests, applying for a warrant,

9     executing a warrant, for instance, do they use any

10    sort of educational materials for that?

11    A.   Yes.

12    Q.   Okay.  Could you give me sort of a

13    general sense of, like, what kind of materials

14    we're talking about?

15    A.   I'll think of an example.  There were

16    examples of case law, examples of warrants that

17    have been executed in the past.

18    Q.   Were there any kinds of training guides

19    or manuals?

20    A.   Yes.

21    Q.   Okay.  Do you recall, by any chance, the

22    names of any of those?

23    A.   I don't.

24    Q.   It's been four and a half years.  It's

25    understandable.

Page 28

1          Okay.  And so you do all this for 21

2     weeks or so at Quantico.  They give you your

3     diploma.  You're a special agent.

4     Congratulations.  They fly you out to California.

5          Is that the end of all your training?

6          A.   No.

7          Q.   Okay.  So you continue -- is there

8     continuing training obligations that you have as

9     an FBI special agent?

10          A.   Yes, there are.

11          Q.   Okay.  Can you give me some examples of

12     what types of continuing training they have you

13     undertake?

14          A.   There's -- I mean, just off the top of my

15     head, just document retention training; again,

16     deadly force training; certain training I guess I

17     can't discuss because it's secret, classified.

18          Q.   Well, I'm not asking the specifics of any

19     given training.  I'm just asking, like, the broad

20     categories of training that you're undertaking.

21     I'm not asking for any, like, secrets

22     about -- specific secrets.

23          A.   Yeah, I mean, it's -- administrative

24     training.  Again, I'm just thinking document

25     retention, because that was one of the last ones

Page 29

1     that I did.  But there was again, like, legal

2     training, legal updates, and firearms training

3     quarterly, defensive tactics training, and

4     tactical training.

5          Q.   Okay.  So it's fair to say, then, that a

6     range of subjects that you trained on at Quantico,

7     they continue to provide continuing training to

8     keep you updated; is that correct?

9          A.   Yes.

10          Q.   And it sounds to me -- you said legal

11     updates.  So when there's a change in the law,

12     does the FBI provide training so that you and

13     other special agents are -- know of that legal

14     change?

15          A.   Yes.

16          Q.   Okay.  Let me step back just for a second

17     because I'm talking now about, like, what you do

18     now that you're out in LA, but I want to go back

19     to Quantico.

20               And we talked a lot about the legal

21     training, you know, with regard to making arrests,

22     applying for search warrants, executing a search

23     warrant.

24               I wanted to ask, did they give you any

25     training at Quantico about how to conduct a -- do

Page 30

1     an inventory?

2          A.   Yes.

3          Q.   And if you could just tell me in sort of

4     broad strokes, like, what were the -- what did

5     they say -- I'm trying to figure out how to ask

6     this question.

7               What kind of subjects or lessons did they

8     provide as part of that how to properly do an

9     inventory?

10         A.   The primary one that comes to mind is an

11    inventory subject -- or incident to arrest.

12         Q.   Oh, when you have an arrestee and you

13    take -- have to inventory the personal property on

14    the arrestee?

15         A.   Yes.

16         Q.   And what do they say about that?  What

17    are you supposed to do in that situation?

18         A.   Generally after someone is arrested and

19    they have personal property on them, it's -- that

20    person becomes our responsibility along with the

21    items that are on them.

22              So we take inventory of what is on their

23    person, you know, generally, like a wallet with

24    cards in it or cash.  So we basically take custody

25    of that and keep it somewhere in FBI custody for

Page 31

1    safekeeping.

2        Q.   Okay.  So it's for safekeeping purposes,

3    primarily, to make sure that no property is lost

4    or gets misplaced?

5        A.   Yes.  And I didn't mention, but it's at

6    least our policy to give that person a receipt for

7    property listing out generally what was taken off

8    their person.

9        Q.   And in that training, did they have you

10   give that receipt sort of contemporaneously?  In

11   other words, you do the inventory and then

12   immediately give the receipt to the person?

13       A.   Yes.

14       Q.   Are the purposes behind inventories,

15   whether it's incident to an arrest or just an

16   inventory generally -- maybe you come across an

17   abandoned vehicle, for instance.  Are the purposes

18   of an inventory search the same in both

19   situations?

20            MR. RODGERS:  Objection; lacks

21   foundation, calls for a legal conclusion, and

22   calls for speculation.

23       Q.   (BY MR. FROMMER)  I understand that they

24   trained you on doing inventory searches incident

25   to an arrest.

Page 32

1           Did you do any legal training regarding

2     inventory searches that were not incident to

3     arrest?

4           A.   I don't recall.

5           Q.   You don't recall, okay.

6                So you said a second ago that you

7     continue to do continuing training on the various

8     areas that -- the legal firearms, tactical

9     defenses that you've trained on at Quantico; is

10    that correct?

11          A.   Yes.

12          Q.   Now, similar to what I asked about

13    Quantico, when they provide that continuing

14    training, does the FBI provide you with materials

15    for you to review and use?

16          A.   Yes.

17          Q.   Okay.  And again, what kinds of materials

18    are these?  Are these training guides?  Are they

19    manuals?  How would you describe them?

20          A.   I would call them manuals.

21          Q.   Okay.  And do those manuals go into

22    things like executing a search warrant or doing an

23    inventory?

24          A.   I couldn't say.  I don't know.

25          Q.   Okay.  Would those subjects be -- would

Page 33

1    executing a search warrant or doing an inventory

2    be something that would potentially be part of

3    continuing training, your continuing training?

4              MR. RODGERS:  Objection; calls for

5    speculation, lacks foundation.

6         Q.   (BY MR. FROMMER)  You can answer.

7         A.   It could be.

8         Q.   Okay.  Do you recall ever receiving any

9    training -- continuing training, that is -- on

10   either how to execute a warrant or to do an

11   inventory search?

12        A.   I don't.

13        Q.   Well, let me just clarify that.

14             So is it that you do not recall or

15   that -- is your answer that you haven't received

16   any continuing training on executing a warrant or

17   doing an inventory search?

18        A.   No, yeah, I just don't recall.

19        Q.   All right.  So you said you've been with

20   the FBI for about four and a half years; is that

21   right?

22        A.   Yes.

23        Q.   Okay.  And as a special agent, you said

24   that you gather and collect evidence of criminal

25   violations; is that correct?

1     A.    Yes.

2     Q.    Are there other things you do at the FBI?

3     A.    There is a -- yes.

4     Q.    Such as what?  Can you list for me, other

5     ████████████████████████████████████████████

6     ████████████████████████████████████████████

7     at the FBI?

8     A.    It's hard to say.  Generally it is

9     investigating crimes to which the U.S. is party.

10    That's the most general way I can think of stating

11    what I do on a day-to-day basis.

12    Q.    Okay.  So jumping back, I understand that

13    you had training at Quantico and potentially also

14    continuing training about how to do an inventory

15    that's incident to an arrest; is that correct?

16    A.    Yes.

17    Q.    Did you have any training either at

18    Quantico or since you've been a special agent

19    about how to conduct an inventory that is not

20    incidental to an arrest?

21    A.    I don't recall.

22    Q.    Okay.  So you don't recall any instances

23    in which you were providing training about how to

24    conduct an inventory outside the context of an

25    arrest?

Page 35

1          A.   No, I don't.  I don't recall.

2          Q.   Okay.  So you said you've been at the FBI

3      for four and a half years.  You said you were a

4      forensic accountant, right, before you came to the

5      FBI?

6               Do you ever use your forensic accounting

7      skills in your job as a special agent?

8               MR. RODGERS:  Objection.  Slightly

9      mischaracterizes his testimony.  I'm not sure he

10     said he was a forensic accountant.  I think he

11     said he was a CPA.

12              MR. FROMMER:  CPA, I'm sorry.  Let me

13     rephrase.

14         Q.   (BY MR. FROMMER)  Do you ever use any of

15     your CPA training and skills as part of your job

16     as a special agent?

17         A.   Yes.

18         Q.   Could you describe to me how you do that,

19     in what ways?

20         A.   Primary skill is just using Excel, just

21     having knowledge of terminology, financial

22     terminology, and just a basic understanding of tax

23     accounting is helpful in investigating a crime.

24         Q.   I would think so.  And you said you

25     specialize in sort of the white collar crime area,

1    right?

2         A.   Yes.

3         Q.   So that training would be particularly

4    useful there?

5         A.   Yes.

6         Q.   Have you participated in any arrests

7    since you've been a special agent?

8         A.   Yes.

9         Q.   How many?  Best guess.

10         A.   Dozens.  Dozens of arrests.

11         Q.   Okay.  We're at the point where a number

12    would not be -- giving me a single number would

13    not be really particularly accurate?

14         A.   Yes.

15         Q.   That's fine.  So when you were making

16    those arrests, how did you know what to do?

17         A.   Just using my -- I mean, the first arrest

18    was utilizing training as well as senior agents.

19    And then subsequent arrests was just building upon

20    that training and knowledge and information from

21    other agents.

22         Q.   Okay.  So when you're conducting these

23    arrests, you're relying on the training you

24    received both at Quantico and any continuing

25    training that you received; is that correct?

1          A.   Yes.

2          Q.   And have you applied for warrants before

3     during your time as a special agent?

4          A.   Yes.

5          Q.   Do you know how many, approximately?

6          A.   Again, not a specific number.  Probably

7     dozens as well.

8          Q.   Okay.  I really don't know very much

9     about this area.  What all is involved with

10    applying for either a search or seizure warrant?

11         MR. RODGERS:  Objection; calls for a

12    narrative.

13         You can answer.

14         Q.   (BY MR. FROMMER)  Well, please answer.

15         A.   I mean, generally it's taking the

16    evidence that we've collected during our

17    investigation, at least a portion of that

18    evidence, putting it into an affidavit, working

19    with the attorneys, the AUSAs, generally working

20    with AUSAs to then get that affidavit in front of

21    a judge who then swears me out and signs off on

22    the warrant, whether it's an arrest, search, or

23    seizure warrant.

24         Q.   Okay.  So when you're creating a warrant,

25    is it your responsibility to take the first pass

Page 38

1      at, for lack of a better term -- do you write the

2      warrant application yourself?

3              MR. RODGERS:  Objection; lacks

4      foundation.

5          Q.  (BY MR. FROMMER)  Who writes the warrant

6      application?

7              MR. RODGERS:  Same objection.

8          Q.  (BY MR. FROMMER)  Please answer.

9          A.  I would say it's a combination between

10      the agents and the attorneys.

11          Q.  And who has the primary responsibility

12      for drafting that affidavit?  In other words,

13      who -- is it your responsibility to put the

14      initial information in the affidavit in support of

15      the warrant application, and then you work with

16      the attorneys to put the full warrant application

17      together?

18              MR. RODGERS:  Same objection; overbroad.

19              THE WITNESS:  I'd say generally the agent

20      puts the facts down because they have a fair

21      amount of case knowledge, and then AUSAs review

22      it.  Again, it's a tandem project.

23          Q.  (BY MR. FROMMER)  Okay.  Just a quick

24      question:  Were you involved in helping put

25      together the warrant application for the seizure

Page 39

1    warrant in US Private Vaults?

2         A.   I was not.

3         Q.   You were not.  Do you know who was?

4         A.   I don't.

5         Q.   Do you know if Lynne Zellhart was

6    involved with that?

7         A.   Not specifically, no.

8         Q.   And by that you mean you don't know

9    whether she was or was not?  Not that she wasn't?

10        A.   Yeah, I just don't know.

11        Q.   Okay.  When you're applying for a

12   warrant, does that, again, rely upon your training

13   and the training you received at both Quantico and

14   the continuing training?

15        A.   Yes.

16        Q.   And I would assume it also relies on the

17   experience that you've obtained while on the job

18   as well, correct?

19        A.   Yes.

20        Q.   Okay.  The FBI is a big place.  I would

21   assume -- you can tell me if I'm wrong -- that

22   when you're doing a warrant application, writing

23   an affidavit, do you have to -- are you starting

24   with a completely blank piece of paper?

25             MR. RODGERS:  Objection; lacks

Exhibit J
590

ER-1333

1    foundation, overbroad.

2         Q.   (BY MR. FROMMER)  Please answer.

3         A.   No.  Generally not just a blank piece of

4    paper.

5         Q.   So when you begin an affidavit as part of

6    a warrant application, are you using some kind of

7    form or other example that your FBI office has?

8              MR. RODGERS:  Same objection.

9              THE WITNESS:  Yeah, we would

10   use -- generally I would use a previous warrant as

11   an example.

12        Q.   (BY MR. FROMMER)  Okay.  And that's so it

13   helps guide you when applying for the warrant?

14             MR. RODGERS:  Same objection.

15             MR. FROMMER:  Let me rephrase that.

16        Q.   (BY MR. FROMMER)  So when you use a

17   previous warrant as a template, if you will, is

18   that used so that it helps guide you when you're

19   applying for the warrant?

20             MR. RODGERS:  Same objection.

21             THE WITNESS:  Yeah, it can help guide

22   you.

23        Q.   (BY MR. FROMMER)  Okay.  And I know you

24   said you applied for one, and I know you've done a

25   lot of arrests.

Page 41

1        I don't recall -- did I ask how many

2    warrants do you think you've applied for?

3        A.   Yes, and I don't recall a specific

4    number.

5        Q.   Are we in the dozens and dozens?

6        A.   Yes, I would say dozens of warrants

7    applied for.

8        Q.   So you've arrested dozens and dozens of

9    people, and you've applied for warrants dozens and

10   dozens of times.

11       Have you executed search and/or seizure

12   warrants while at the FBI?  And I'm not talking

13   about the US Private Vaults one; I'm just talking

14   generally.

15       A.   Yes.

16       Q.   At the risk of hearing the same term, do

17   you have an idea of approximately how many search

18   and/or seizure warrants you have executed while

19   being a special agent?

20       A.   Again, I don't have an approximate

21   number.  Dozens, likely.

22       Q.   And are -- of those dozens -- and I know

23   we're dealing with a big number here -- are most

24   of those warrants that you helped execute, were

25   most of them search warrants or search -- warrants

Page 42

1    that provide for both search and seizure?  Let me
2    try and do this -- let me rephrase, because I want
3    to try and make sure this is understandable.
4            You said you have executed dozens and
5    dozens of warrants, correct?
6        A.   Yes.
7        Q.   What percentage of those would you say
8    are solely seizure warrants?
9        A.   I don't know.
10       Q.   Do you execute more seizure warrants than
11   search warrants or fewer?
12       A.   I don't know.  Or I don't recall.
13       Q.   Well, think back over your time.  If
14   you've done dozens and dozens, have you done
15   dozens and dozens of warrants that were just
16   seizure warrants?
17       A.   I've done seizure warrants.  And yes,
18   sometimes there are search and seizure warrants
19   that are the same.  So I would say if you're
20   looking at search and seizure warrants and search
21   warrants separated from just seizure warrants, I
22   would say I've done more just search warrants.
23       Q.   Okay.
24       A.   Than strictly seizure warrants.
25       Q.   So strictly seizure warrants you would

Page 43

1    say is in the minority of the overall warrants

2    you've executed?

3         A.   Yes.

4         Q.   And again, I'm fresh to all this.   I

5    don't really know much about how warrants get

6    executed.

7              But when the FBI executes a warrant, do

8    FBI agents execute that warrant solely with other

9    FBI agents?   Or are there times that the FBI would

10   work to execute the warrant in conjunction with

11   other agencies?

12             MR. RODGERS:   Objection; lacks

13   foundation, calls for speculation, overbroad.

14             THE WITNESS:   Yes, it would.

15        Q.   (BY MR. FROMMER)   I'm sorry.   I sort of

16   asked an either/or question, so "yes" doesn't

17   quite make sense there.

18             So when the FBI executes a warrant, on

19   some occasions does it do that, execute that

20   warrant in conjunction with other agencies?

21             MR. RODGERS:   Same objections.

22             THE WITNESS:   Sometimes we do, yes.

23        Q.   (BY MR. FROMMER)   And would those other

24   agencies with whom you execute the warrant be

25   federal agencies?

Page 44

1       A.    Sometimes, yes.  Sometimes state

2    agencies.

3       Q.    That was my next question is is it

4    sometimes state agencies as well.

5             Okay.  Let me take a step -- so you're

6    executing a warrant.  Let's say you're executing a

7    warrant, just you and another FBI agent, no other

8    agency involved.

9             Can you just walk me through the steps

10   you have to take when you're executing a warrant?

11            MR. RODGERS:  Objection; lacks

12   foundation, poses an incomplete hypothetical.

13      Q.    (BY MR. FROMMER)  Well, what I'm asking

14   here is tell me -- let's say you have a seizure

15   warrant in hand -- again, I'm just talking general

16   seizure warrant in hand -- and you are going to go

17   execute that warrant presumably with another FBI

18   agent.  Well, let me ask that.

19            Usually when you execute a warrant, a

20   seizure or search warrant, does one FBI agent tend

21   to do that on their own, or do they do that

22   alongside other FBI agents?

23            MR. RODGERS:  Objection; lacks

24   foundation, vague and ambiguous, incomplete

25   hypothetical.

Page 45

1          THE WITNESS:  It depends on the warrant.

2      Q.   (BY MR. FROMMER)  Okay.

3      A.   What we're seizing or searching.

4      Q.   So is there any instance when a single

5  FBI agent, special agent, would go execute a

6  warrant on his or her own --

7          MR. RODGERS:  Same objection.

8      Q.   (BY MR. FROMMER)  -- in your experience?

9          MR. RODGERS:  Same objections.

10          THE WITNESS:  Yes, there would be.

11      Q.   (BY MR. FROMMER)  Can you describe to me,

12  like, the circumstances in which an FBI agent

13  would execute a warrant by themselves without any

14  other agents?

15          MR. RODGERS:  Same objections.

16          THE WITNESS:  Seizure warrant for a bank

17  account in which there's fraudulent proceeds or

18  attempting to seize.  It could be as simple as

19  delivering the seizure warrant to the bank.  And

20  an agent could do that themselves.

21      Q.   (BY MR. FROMMER)  Okay.  A relatively

22  small -- so is it fair to say that a single agent

23  could execute a warrant when it's sort of a small,

24  discrete task that doesn't pose a threat of risk

25  or injury to the agent?

Page 46

1          MR. RODGERS:  Same objections,

2     mischaracterizes the testimony.

3          THE WITNESS:  It could.

4     Q.  (BY MR. FROMMER)  That's fine.  Let me go

5     back.  I got into a little aside about single

6     agents versus multiple agents.

7          But based on your training -- and I want

8     to understand this.  So let's say you've applied

9     for and obtained a seizure warrant.  Okay?  And

10    you and some other FBI special agents are going to

11    go execute that warrant.

12         Can you walk me through the steps of how

13    you and the other agents would plan on how to

14    execute that warrant?  Would there be

15    discussions -- let me ask -- I'll do this one step

16    at a time.

17         Prior to executing a warrant, would you

18    have discussions or meetings with other FBI agents

19    about how you wish to execute that warrant?

20         MR. RODGERS:  Objection; lacks

21    foundation, overbroad, assumes facts not in

22    evidence.

23         THE WITNESS:  Do you mean like a seizure

24    warrant, a search warrant?

25    Q.  (BY MR. FROMMER)  Well, let's start with,

Page 47

1    like, a search warrant, for instance, and then

2    we'll move to the seizure warrant.

3            So let's say you have a search warrant

4    for a residence and you are planning to execute

5    that warrant.

6            Is there going to be a meeting where you

7    discuss how to execute that warrant before its

8    execution?

9        A.   Yes.

10           MR. RODGERS:  The answer is already in,

11   but objection and motion to strike; poses an

12   incomplete hypothetical, assumes facts not in

13   evidence.

14       Q.   (BY MR. FROMMER)  And at that meeting

15   where you are -- you and other agents are

16   discussing how to execute the warrant, what are

17   the -- what are some of the subjects that would be

18   discussed?

19           MR. RODGERS:  Same objection.  In

20   addition, calls for speculation.

21           THE WITNESS:  Again, depending on -- if

22   this was just a search warrant, it could be the

23   approach -- if it's a residential search warrant,

24   the approach to the residence, any individuals

25   that might be inside, copies of the search

Page 48

1    warrants, and then -- I mean, a lot of it is
2    primarily regarding agent safety, but also items
3    to be searched or areas to be searched.
4        Q.   (BY MR. FROMMER)  And potentially seizure
5    if it's a search and seizure warrant, correct?
6        A.   Yes.
7        Q.   Okay.  So I just want to make sure I
8    understand this.
9             So you obtain a search warrant.  You
10   would then have a meeting or some other discussion
11   with the other FBI agents about how to execute
12   that warrant?
13            Would there be a memorandum or an action
14   plan that you and the other agents would put
15   together for how you plan to execute the warrant?
16            MR. RODGERS:  Same objection; poses an
17   incomplete hypothetical, overbroad.
18            THE WITNESS:  There would be what we call
19   an operational plan put in place, the details of
20   the plan in place to execute the warrant.
21       Q.   (BY MR. FROMMER)  An operational plan?
22   Okay.  So this is a plan that is meant to guide
23   the agents?
24       A.   Yes.
25       Q.   Okay.  So in any instance, have you,

1    alongside fellow FBI special agents, created an

2    operational plan, I believe you called it, for

3    executing a warrant?

4         A.   Yes.

5         Q.   And is creating an operational plan a

6    routine part of the execution process?

7              MR. RODGERS:   Objection; calls for

8    speculation, assumes facts not in evidence, lacks

9    foundation.

10        Q.   (BY MR. FROMMER)   In your experience, do

11   you regularly meet and confer with FBI agents and

12   create an operational plan prior to the execution

13   of a warrant?

14        A.   Yes.

15        Q.   Thank you.   And I want to walk through

16   that operational plan a little bit.

17             When you have conferred with other FBI

18   agents and created an operational plan in the

19   past, do you and the other agents discuss the

20   specific language appearing in the search warrant?

21        A.   I'm sorry.   Can you repeat it really

22   quick?

23        Q.   What I'm trying to figure out is, okay,

24   you have your warrant in your hand, and you're

25   starting the process of figuring out how you're

Page 50

1   going to execute this warrant.  So you and the

2   other FBI agents meet and start figuring out your

3   operational plan.

4           When you do that, would you regularly

5   look at the language in the warrant to see what it

6   authorizes or doesn't authorize?

7           MR. RODGERS:  Objection; overbroad, lacks

8   foundation, poses an incomplete hypothetical.

9           THE WITNESS:  During the preparation of

10  the ops plan, I don't think we would look at the

11  specific language in the warrant, no.

12      Q.   (BY MR. FROMMER)  But wouldn't that

13  warrant provide the parameters that guide the

14  contours of how you can execute that search

15  warrant?

16          MR. RODGERS:  Same objections, and calls

17  for a legal conclusion.

18      Q.   (BY MR. FROMMER)  Special Agent

19  Palmerton, you've been a special agent now for

20  four and a half years, correct?

21      A.   Yes.

22      Q.   And you've executed dozens of warrants,

23  correct?

24      A.   Yes.

25      Q.   I'm asking in your experience when you

Page 51

1    are developing an operational plan, in any

2    instance have you not consulted, not looked at the

3    language within the warrant?

4           MR. RODGERS:  Objection; vague and

5    ambiguous with respect to -- well, vague and

6    ambiguous and same objections.

7           THE WITNESS:  Possible, yeah, when

8    preparing the ops plan we've -- or I've looked at

9    or used, yeah, direct language from the warrant.

10      Q.   (BY MR. FROMMER)  I'm trying to figure

11   out, so is it true that in the majority of

12   instances where you have created an operational

13   plan in the past, you have referenced or referred

14   to the language in the warrant when coming up with

15   that operational plan?

16          MR. RODGERS:  Same objections.

17          THE WITNESS:  It's possible.

18      Q.   (BY MR. FROMMER)  What factors would

19   determine whether you would or would not consult

20   the language in the warrant when developing the

21   operational plan?

22      A.   Well, just the operational plan is purely

23   logistics of how to execute the warrant.  It's not

24   really referring to the details of the warrant

25   itself.

Page 52

1          The agents, we review the warrant prior

2     to the execution of the warrant.

3          Q.   Okay.  So you're saying -- let me make

4     sure I understand.

5          So you're saying that as -- to create the

6     operational plan, you might not refer to the

7     warrant.

8          But is it true that in every instance

9     when you have executed a warrant, you have

10     reviewed the language within that warrant?

11          A.   Yes.

12          Q.   And why do you do that?

13          A.   To understand the parameters for which,

14     you know, we're allowed or authorized to search.

15          Q.   So when you execute a warrant, do you

16     have to follow the instructions and limits that

17     are written into the warrant?

18          A.   Yes.

19          MR. FROMMER:  Let's take about, like, a

20     ten-minute break and we'll come on back.  Thank

21     you.

22          MR. RODGERS:  Okay.

23          (Break taken from 10:31 a.m. to 10:44 a.m.)

24          MR. FROMMER:  Back on the record.

25          Q.   (BY MR. FROMMER)  So we've talked a bit

1    about executing warrants and also how you plan for

2    them, how do you plan to execute them, how do you

3    actually execute them.

4           Let me shift gears a little bit.  We

5    talked about this a little bit, but I wanted to

6    come back to it.

7           So have you conducted inventory searches

8    before?  And let me clarify that, because I

9    understand that you've done inventories incident

10   to arrest.

11          I'm wondering, have you conducted

12   inventory searches before that were not tied to

13   any arrest?

14        A.   Not in -- no.

15        Q.   You have not?

16        A.   No.

17        Q.   Didn't you conduct an inventory search

18   with regards to US Private Vaults?

19        A.   My understanding is just an inventory,

20   not an inventory search.

21        Q.   Okay.  Sorry.  That's a fair point.  I

22   apologize for the nomenclature.

23          Have you conducted an inventory before

24   that wasn't incident to an arrest?

25        A.   Yes.

Page 54

1     Q.   How many times do you think you've
2  conducted an inventory that was not incident to an
3  arrest?
4     A.   I recall just the one at USPV.
5     Q.   So was US Private Vaults the first time
6  you had conducted an inventory that wasn't tied to
7  an arrest?
8     A.   Yes.
9     Q.   And so then I think it's fair to say that
10 you have not conducted sort of a warrantless
11 inventory?
12          MR. RODGERS:  Objection; mischaracterizes
13 the testimony.
14    Q.   (BY MR. FROMMER)  Was there a seizure
15 warrant in conjunction with the US Private Vaults
16 action?
17    A.   I don't recall specifically.
18    Q.   Well, under what authority did you go in
19 and seize things if there wasn't a warrant
20 authorizing that seizure?
21          MR. RODGERS:  Objection; mischaracterizes
22 the testimony, calls for a legal conclusion,
23 assumes facts not in evidence.
24    Q.   (BY MR. FROMMER)  Please answer.
25    A.   I recall we had a search warrant.  We had

Page 55

1    a search warrant for USPV, which then gave us

2    authority to go into the building.

3              And I assume --

4        Q.   Please continue.

5              MR. RODGERS:  If you have an estimate,

6    please answer.  Please do not speculate.

7              THE WITNESS:  I know we had a search

8    warrant and a seizure -- I just really don't

9    recall the specifics of that warrant.

10       Q.   (BY MR. FROMMER)  Do you recall reviewing

11   any sort of seizure warrant in conjunction with

12   the action at US Private Vaults?

13       A.   Yes.

14       Q.   Okay.  So before when you said the only

15   inventory you had done not incident to arrest was

16   at Private Vaults, that was done with a seizure

17   warrant; is that correct?

18       A.   I don't recall.

19       Q.   Okay.  Do you recall reviewing any

20   seizure warrant as part of the actions at US

21   Private Vaults?

22       A.   I don't recall specifically if it was a

23   seizure warrant.

24       Q.   Okay.  Stepping back for a second, are

25   you familiar with -- you're familiar with

Page 56

1   inventories, correct?

2          A.   Yes.

3          Q.   Okay.  Just from your training and

4   experience, can you tell me what the purposes for

5   an inventory are?

6               MR. RODGERS:  Objection; calls for a

7   legal conclusion, assumes facts not in evidence,

8   lacks foundation.

9          Q.   (BY MR. FROMMER)  Please answer.

10         A.   The purpose of an inventory -- and again,

11  this is incident to an arrest -- is safekeeping of

12  that person's property.

13         Q.   I understand that.  I'm asking when you

14  conduct an inventory that's not incident to

15  arrest.

16              From your training -- and just to loop

17  back, did you specifically have training on how to

18  conduct an inventory that was not part of an

19  arrest?

20         A.   I don't recall.

21         Q.   So is it fair to say, then, that -- are

22  you familiar with what purposes are behind doing

23  an inventory when it's not part of an arrest?

24              MR. RODGERS:  Same objection; lacks

25  foundation, poses an incomplete hypothetical,

Page 57

1    calls for speculation.

2            THE WITNESS:  My assumption would be that

3    it is -- per my understanding is that it is

4    similar to an inventory incident to an arrest, is

5    to take safekeeping of those items.

6        Q.   (BY MR. FROMMER)  Well, let me just walk

7    through that.

8            So do you think it's fair to say that the

9    purpose for an inventory is to protect the FBI

10   from any accusations that they lost or misplaced

11   property?

12           MR. RODGERS:  Objection; calls for a

13   legal conclusion, lacks foundation, poses an

14   incomplete hypothetical, calls for speculation,

15   overbroad.

16       Q.   (BY MR. FROMMER)  Please answer.

17       A.   My understanding is that, yes, we want to

18   take safekeeping of those items to protect us,

19   yeah, from any accusations.

20       Q.   Accusations of what?

21       A.   Of theft or -- I mean, primarily theft or

22   misplacing items.

23       Q.   Okay.  Is it fair to say that based on

24   your training and experience, that a purpose of an

25   inventory is to make sure that the property that's

 1    being stored in an FBI space doesn't pose a threat

 2    to agents or other FBI employees?

 3              MR. RODGERS:  Objection; poses an

 4    incomplete hypothetical, vague and ambiguous with

 5    respect to the time of inventory, lacks

 6    foundation, calls for a legal conclusion.

 7              THE WITNESS:  Yes, that would be part of

 8    it as well.

 9         Q.   (BY MR. FROMMER)  And is it fair to say

10    that part of an inventory, one of the purposes,

11    based upon your training and experience, is to

12    look for any contraband or evidence of criminal

13    violations?

14              MR. RODGERS:  Same objections.

15              THE WITNESS:  No, not to look for

16    contraband.

17         Q.   (BY MR. FROMMER)  Not to look for

18    contraband?  What about to look for evidence of

19    criminal wrongdoing?

20              MR. RODGERS:  Same objections.

21              THE WITNESS:  No.

22         Q.   (BY MR. FROMMER)  So let me just sort of

23    recap this so that I understand.

24              So based on your training and experience,

25    although -- based on your training and experience,

Page 59

1    you believe that the purpose for an FBI inventory

2    is to keep, you know, the person's property safe

3    from possible loss or theft, and also to keep FBI

4    agents safe when the property is stored; is that

5    correct?

6              MR. RODGERS:  Same objections, poses an

7    incomplete hypothetical, assumes facts not in

8    evidence, calls for a legal conclusion, vague and

9    ambiguous with respect to the type of inventory,

10   and calls for speculation.

11             THE WITNESS:  Yes, that's my

12   understanding.

13        Q.   (BY MR. FROMMER)  Are there any other

14   purposes for an inventory other than item

15   safekeeping and officer safety?

16             MR. RODGERS:  Same objections.

17             THE WITNESS:  No.  No, I think those are

18   the two primary -- or really the only two I can

19   think of.

20        Q.   (BY MR. FROMMER)  Okay.  Now, we talked

21   about this a little bit before.  You had

22   said -- and correct me if I'm wrong; I don't want

23   to misstate anything -- but you had had training

24   on how to do an inventory incident to an arrest;

25   is that correct?

Page 60

1       A.   Yes, I believe so.

2       Q.   Now, did you get training on how to do an

3    inventory that was not incident to an arrest?

4            MR. RODGERS:  Asked and answered.

5            THE WITNESS:  I don't recall.

6       Q.   (BY MR. FROMMER)  Okay.  So you don't

7    recall -- you wouldn't recall -- if you had such

8    training, you wouldn't recall when you received it

9    or from whom you received it; is that correct?

10           MR. RODGERS:  Same objections.

11           THE WITNESS:  That's correct, yes.

12      Q.   (BY MR. FROMMER)  And you wouldn't recall

13   whether you'd been provided any materials as part

14   of any such training; is that correct?

15      A.   That's correct.

16      Q.   Okay.  Let me ask you this:  You've been

17   at the FBI now for almost five years.  So I don't

18   know how much experience -- it seems like that's a

19   decent amount of time for the FBI.  I don't really

20   know the career paths there.

21           But given that you've been there for four

22   and a half years, have you ever taught anyone

23   else, another agent or anyone at the FBI, about

24   how to conduct an inventory that's not incident to

25   arrest?

Page 61

1          A.    No.

2          Q.    Okay.  And again, you know, I believe you

3     said this before.  Is it fair to say that the

4     inventory done at US Private Vaults was the first

5     time you had done an inventory that was not

6     incident to an arrest?

7          A.    Yes.

8          Q.    Do you know if there's any guidance for

9     how to conduct an inventory?  Let me rephrase

10    that.

11         Do you know if the FBI has any guidance

12    on how an agent is supposed to conduct an

13    inventory?

14         MR. RODGERS:  Objection; vague and

15    ambiguous, overbroad.

16         THE WITNESS:  I don't know.

17         MR. FROMMER:  Okay.  I'm going to

18    introduce an exhibit here.

19         (Deposition Exhibit No. 1 was marked.)

20         MR. FROMMER:  I've just introduced

21    Exhibit 1 for the Palmerton deposition.  You

22    should have access to that.  Please let me know.

23         MR. RODGERS:  I do not yet have access.

24    Let's go off the record.

25         (Break taken from 10:59 a.m. to 11:11 a.m.)

**Exhibit J**
**612**

ER-1355

Page 62

1          Q.   (BY MR. FROMMER)  So you should have in

2     front of you -- please tell me if I am correct in

3     this -- Exhibit 1, Palmerton, which I will purport

4     is a two-page excerpt from the 2016 Domestic

5     Investigations and Operations Guide which we

6     received in discovery from Defendants.

7               Can you take a look at that?  Does that

8     seem -- is that an accurate description of the

9     exhibit?

10         A.   Yeah, that seems accurate.

11         Q.   Okay.  So before I'd asked is there

12    guidance how to do an inventory, and I believe

13    your answer was that you weren't sure if there

14    was.

15              Now that you see Exhibit 1, which is the

16    excerpt from the DIOG, does this provide guidance

17    about how to perform an inventory?

18              MR. RODGERS:  Objection; lacks

19    foundation, calls for a legal conclusion, calls

20    for speculation.

21              THE WITNESS:  I mean, I'd have to review

22    it.

23         Q.   (BY MR. FROMMER)  I'm sorry.  Please,

24    take your time.  It's been a while.  So please

25    take a minute or two, review the document, and

Page 63

1      then I'll ask you questions about it.

2           A.   Yeah, I haven't seen it prior to today.

3           Q.   Okay.  So you haven't seen this before?

4           A.   No.

5           Q.   Okay.  Would you say it's accurate that

6      this guide discusses how to conduct an inventory?

7                MR. RODGERS:  Objection; lacks

8      foundation, assumes facts not in evidence, calls

9      for a legal conclusion.

10               THE WITNESS:  It appears so, yes.

11          Q.   (BY MR. FROMMER)  Now, can you look at

12     the -- in the footnote on the first page,

13     page 247, the next to last sentence, can you read

14     that for me?

15          A.   I believe "Although the procedures for

16     conducting an inventory of an arrestee's personal

17     property and effects may in fact be similar, their

18     legal justification is different and they must

19     therefore be treated differently."

20          Q.   Okay.  And before you had said you had

21     had training on how to do an inventory of

22     arrestee's personal property; is that correct?

23          A.   That's correct.

24          Q.   And is it fair to say that you have not

25     had training on how to conduct an inventory

Page 64

1   outside the context of an arrest?

2       A.   I don't recall any training.

3       Q.   Now, do you think you would remember if

4   you had had any training on how to conduct an

5   inventory?

6       A.   No.

7            MR. RODGERS:  Objection; calls for

8   speculation, lacks foundation.

9            THE WITNESS:  Not particularly.  We get a

10  ton of training, so...

11      Q.   (BY MR. FROMMER)  Okay.  But you don't

12  recall any training on how to do an inventory?

13           MR. RODGERS:  Vague and ambiguous, asked

14  and answered.

15           THE WITNESS:  Just aside from the

16  inventory incident to arrest, that's all I recall.

17      Q.   (BY MR. FROMMER)  But is it fair to say

18  that you've had no training about how to conduct

19  an inventory outside the context of an incident to

20  arrest?

21           MR. RODGERS:  Asked and answered.

22           THE WITNESS:  Again, I don't recall if I

23  had training on that or not.

24      Q.   (BY MR. FROMMER)  Okay.  Do you know if

25  there's other materials that the FBI provides that

Page 65

1    also provides guidance for how to conduct an

2    inventory outside the arrest context?

3         A.   I don't.

4         Q.   Are you familiar with the Legal Handbook

5    for Special Agents?

6         A.   Possibly.  If it's what I'm thinking of,

7    yes.

8         Q.   Okay.  Now, do you know if the Legal

9    Handbook for Special Agents, does it contain

10   information about how to do an inventory outside

11   the incident-to-arrest context?

12        A.   I don't know.

13        Q.   Okay.  Is it fair to say that you did not

14   review the DIOG prior to executing the seizure

15   warrant at US Private Vaults?

16        A.   Yes.

17        Q.   Is it fair to say you didn't consult the

18   Legal Handbook for Special Agents prior to

19   executing the seizure warrant at US Private

20   Vaults?

21        A.   Yes.

22        Q.   Did the team -- when you had meetings

23   about how to execute the seizure warrant at US

24   Private Vaults, was there any discussion of the

25   guidance in either the DIOG or legal handbook?

1        A.    I don't recall.

2        Q.    Do you think you would remember if that

3    had come up?

4              MR. RODGERS:  Objection; speculation,

5    lacks foundation.

6              THE WITNESS:  It may have come up, yeah.

7    Yes.

8        Q.    (BY MR. FROMMER)  But you can't recall if

9    it did, in fact, come up?

10        A.    Not specifically.

11        Q.    Okay.  Have you seen any exemplars of an

12    FD-597 that's been filled out pursuant to an

13    inventory?

14        A.    Yes.

15        Q.    And in what context have you seen those

16    exemplars?

17        A.    That would have been for searches

18    incident to arrest.  Our FD-597s are generally the

19    same.  I mean, the form is the same.

20        Q.    Okay.  Have you seen any exemplars of

21    FD-597s that were filled out for inventories

22    conducted outside the arrest context?

23        A.    I don't recall.

24        Q.    Okay.  Do you recall during preparation

25    for executing the seizure warrant at US Private

Page 67

1    Vaults any dissemination of a sample inventory

2    sheet in order to tell agents this is how your

3    inventory sheet should be put together?

4        A.   I don't recall.

5        Q.   Do you think you would recall if someone

6    had given you an example of how to conduct or how

7    to write out the inventory as one executing a

8    seizure warrant at US Private Vaults?

9             MR. RODGERS:  Objection; calls for

10   speculation, lacks foundation.

11            THE WITNESS:  I might, yes.

12       Q.   (BY MR. FROMMER)  You might what?  I'm

13   sorry.

14       A.   Yeah, I might recall.  I guess maybe if I

15   saw a document or something.

16       Q.   Okay.  Unfortunately I have no documents

17   to provide you.

18            But just so that I'm sure, so that I'm

19   clear, you do not recall seeing -- scratch that.

20            When preparing to execute the seizure

21   warrant at US Private Vaults, do you recall

22   seeing -- being provided with or discussing any

23   legal guidelines for inventory examples to help

24   guide how you would execute the warrant?

25       A.   I do have a vague recollection of prior

Page 68

1    to executing the seizure warrant discussing an

2    inventory search, like, "This is what this is

3    going to be."

4         Q.   And who did you have those discussions

5    with?

6         A.   I can't recall everyone that was there,

7    but I would say Agent Lynne Zellhart is one for

8    sure.  The others I couldn't recall.

9         Q.   Okay.  So is it fair to say, then, that

10   you did have meetings about how to execute the

11   seizure warrant prior to its execution on

12   March 22nd, 2021?

13        A.   Yes.

14        Q.   Do you recall if there was one meeting or

15   multiple meetings?

16        A.   I really just recall one meeting

17   specifically, and that's just -- our

18   preoperational execution briefing is what we call

19   it.

20        Q.   And when would that preoperational

21   briefing occur?  Did that occur immediately before

22   the execution of the warrant?

23        A.   Yeah.  So I don't recall specifically the

24   time, but it would have been the morning of, yeah,

25   execution of the warrant.

Page 69

```
 1        Q.   And when you were involved with the
 2    execution of the warrant -- this warrant was
 3    executed on the morning of March 22nd, 2021,
 4    correct?
 5             MR. RODGERS:  Objection; lacks
 6    foundation, calls for speculation.
 7             THE WITNESS:  Possibly, yes.  To the best
 8    of my knowledge, yes.
 9        Q.   (BY MR. FROMMER)  You were involved with
10    the execution of the warrant, right?
11        A.   Yes.
12        Q.   What time did you leave the FBI office to
13    execute the warrant?
14        A.   I mean, I want to say approximately
15    9:00 a.m.
16        Q.   Okay.  So any meeting to discuss
17    executing the warrant would have occurred that
18    morning prior to you leaving at approximately
19    9:00 a.m.?
20        A.   Yes.
21        Q.   And you said that you recall that Special
22    Agent Zellhart was there, but that you do not
23    recall who else was there?
24        A.   Not specifically, no.
25        Q.   How many people in total were at that
```

1      meeting, approximately, as I understand you don't

2      recall exactly?

3              A.    Approximately, I would say, there was a

4      handful.  Maybe approximately nine or ten.

5              Q.    And were they all FBI agents?

6              A.    I believe so, yes, or FBI employees.

7              Q.    Or FBI employees, okay.

8                    Do you recall anyone from any other

9      federal or state agencies being at that

10     preoperational meeting?

11             A.    No.

12             Q.    Do you think you would recall if they

13     were, in fact, there?

14             A.    Yeah, I think I would.

15             Q.    I would think so, because all of a sudden

16     it's a bunch of strangers coming into the FBI

17     building.  Who are these people?

18             A.    Yes.

19             Q.    So can you walk me through -- can you

20     just walk me through the general process of how

21     you conduct an inventory that is not part of the

22     incident to arrest context?

23                   MR. RODGERS:  Objection; lacks

24     foundation, assumes facts not in evidence.

25                   THE WITNESS:  The process, to my

Page 71

1   understanding, would be similar to the

2   incident-to-arrest inventory, and that we are

3   trying to take items for safekeeping and storage

4   to protect the agents.

5              So it would be to take the items, list

6   generally what was taken and then stored, produce

7   the FD-597 as well as just additional inventory

8   lists.  Like, you have a lot of

9   duplicates -- would have had duplicates of

10  everything to list, and then photographs and/or

11  video taken during the inventory.

12             And then those items are transported to

13  an FBI facility.

14      Q.   (BY MR. FROMMER)  And you were previously

15  a CPA, right?  You worked with numbers?

16      A.   Yes.

17      Q.   And so I assume that being an accountant

18  is a very sort of precise profession since you're

19  dealing with specific numbers, correct?

20      A.   Yes.

21      Q.   When you're putting together an inventory

22  that's meant to protect the FBI from complaints of

23  loss or theft, would that inventory need to be

24  fairly detailed in order to serve that purpose?

25             MR. RODGERS:  Objection; calls for a

1     legal conclusion, lacks foundation, assumes facts

2     not in evidence.

3             THE WITNESS:  No, not necessarily.

4         Q.  (BY MR. FROMMER)  Well, how would an

5     inventory that doesn't provide a complete and

6     accurate list of the items that have been taken

7     serve the purpose of protecting the FBI from

8     claims of theft and loss?

9             MR. RODGERS:  Objection; lacks

10    foundation, assumes facts not in evidence, poses

11    an incomplete hypothetical, calls for a legal

12    conclusion, argumentative.

13            THE WITNESS:  Well, again, I mentioned

14    the photos and videos of the items that are taken.

15            In addition to that, the FD-597 and

16    inventory property list is put together.

17            It's then handed to our evidence

18    technicians, and those items are then assigned a

19    bar code and they're sealed up.  And those -- then

20    they're shipped to, again, our facility.

21            So the bar code is connected to those

22    items which are connected to wherever we seized it

23    from or took it from.

24         Q.  (BY MR. FROMMER)  Okay.  I get that.

25            So you're saying that the inventory

Page 73

1    sheet, the FD-597 -- is it fair to say that the

2    FD-597 is one piece of evidence that the FBI uses

3    in order to protect itself against claims of loss

4    and theft?

5        A.   That's one piece, yes.

6        Q.   And that the videos and photographs would

7    be additional evidence they would use to protect

8    themselves against claims of loss and theft?

9        A.   Yes.

10       Q.   So to the extent you're going to use a

11   video for that purpose, the video would need to

12   completely and accurately capture the things that

13   are being seized, correct?

14       A.   Yes.

15       Q.   Thank you.

16            So how does the inventorying process

17   change, if at all, based on the value of the items

18   that are being inventoried?

19            MR. RODGERS:  Objection; lacks

20   foundation, calls for a legal conclusion, assumes

21   facts not in evidence, poses an incomplete

22   hypothetical.

23            THE WITNESS:  Yeah, so there are

24   different classifications of items in that --

25   there's general items and there's also valuable

1    items.  We would treat valuable items differently.

2         Q.   (BY MR. FROMMER)  How do you treat

3    valuable items differently?

4              MR. RODGERS:  Same objections.

5              THE WITNESS:  For one, they're sent to a

6    different storage facility that's more secure, and

7    they're also sealed up in plastic bags, sealed so

8    they can't be opened.  And if they are opened, it

9    has to be documented as to when and why they're

10   opened.

11        Q.   (BY MR. FROMMER)  I understand that.

12   That's once it's left the facility and is

13   being -- is put away for safekeeping.  I get that.

14             I'm talking about the inventory process

15   itself, when you're creating that inventory in the

16   first place.

17             How does that inventorying process, those

18   beginning stages of the inventorying process

19   change, if at all, based on the value of the items

20   being inventoried?

21             MR. RODGERS:  Objection; lacks

22   foundation, calls for a legal conclusion, assumes

23   facts not in evidence, poses an incomplete

24   hypothetical.

25             THE WITNESS:  My knowledge of the

Page 75

1    inventory process is the same.

2          Q.   (BY MR. FROMMER)  Do you know if there's

3    any requirement that multiple agents inventory

4    valuable items in the presence of one another?

5    And let me rephrase that because that's ugly.

6          When the FBI is inventorying items deemed

7    to be valuable, is it the case that the FBI is

8    supposed to have multiple agents do that review

9    and inventory process?

10         MR. RODGERS:  Assumes facts not in

11   evidence, lacks foundation, calls for a legal

12   conclusion, incomplete hypothetical.

13         THE WITNESS:  I don't know for inventory

14   specifically if another agent is required.

15         Q.   (BY MR. FROMMER)  Okay.  Can you look at

16   Palmerton Exhibit No. 1, second page,

17   second -- first full paragraph.  And can you read

18   me that first sentence, please.

19         A.   Yeah.  "Where practicable, the inventory

20   search should be conducted by two agents/officers

21   particularly when dealing with property of

22   specific monetary value."

23         Examples given are money, jewelry,

24   electronics, vehicles, et cetera.

25         Q.   So is it fair to say that you weren't

1    familiar with this particular requirement of the

2    DIOG?

3              MR. RODGERS:  Lacks foundation, poses an

4    incomplete hypothetical, calls for a legal

5    conclusion, assumes facts not in evidence.

6              THE WITNESS:  Yeah, I haven't seen this

7    document before today.

8         Q.   (BY MR. FROMMER)  You haven't seen this

9    previously; is that correct?

10        A.   No.  I haven't seen this document

11   specifically.

12        Q.   Oh, this is an excerpt.  So have you seen

13   the DIOG generally?

14        A.   Yes.

15        Q.   Okay.  You just haven't -- you don't

16   recall reviewing this particular section of the

17   DIOG previously; is that correct?

18        A.   No.  The DIOG is, like, 10,000 pages

19   long.

20        Q.   So does an inventory that you put

21   together, is it supposed to be complete in terms

22   of the items that were seized?

23             MR. RODGERS:  Objection, overbroad,

24   assumes facts, lacks foundation, poses an

25   incomplete hypothetical.

Exhibit J
627

```
 1              THE WITNESS:  Yeah, I don't know what you
 2      mean by complete.
 3         Q.   (BY MR. FROMMER)  Let's say I have 100
 4      items there -- okay? -- that are being seized.
 5              Should the inventory sheet be completed
 6      in the sense -- the FD-597, should that fully list
 7      out the items that were being seized?
 8              MR. RODGERS:  Same objections.
 9              THE WITNESS:  No.
10         Q.   (BY MR. FROMMER)  Why do you say no?
11         A.   That's just how we do it, or how I've
12      done it.
13         Q.   Would an incomplete inventory, FD-597, be
14      useful to protect the FBI against claims of loss
15      and theft?
16              MR. RODGERS:  Objection; poses an
17      incomplete hypothetical, argumentative, lacks
18      foundation, assumes facts not in evidence, calls
19      for a legal conclusion.
20              THE WITNESS:  Yeah, it's not an
21      incomplete 597 if it generally lists all of the
22      items that were there.
23         Q.   (BY MR. FROMMER)  What do you mean
24      by -- let's drill down on that word "generally,"
25      because I'm a little confused by that.
```

Exhibit J
628

ER-1371

1             So let's say I have -- I don't know.  I'm

2      just trying to come up with something.  Let's say

3      I have comic books in there.  Let's say I have 20

4      comic books.

5             Would it be sufficient just to write "20

6      comic books," or -- would that be sufficient on an

7      FD-597?

8             MR. RODGERS:  Objection.  Same

9      objections.

10            THE WITNESS:  That would be sufficient,

11     yes.

12        Q.   (BY MR. FROMMER)  What if it just

13     said -- what if the 597 just said "Miscellaneous

14     comic books," didn't provide a number?

15            MR. RODGERS:  Same objections.

16            THE WITNESS:  Yeah, I think that would be

17     sufficient.

18        Q.   (BY MR. FROMMER)  Why do you say that?

19            MR. RODGERS:  Same objections,

20     argumentative, calls for a legal conclusion.

21            THE WITNESS:  Partially because we're

22     relying on the other pieces of documentation that

23     we have in place to preserve.  So there's the

24     chain of custody, for one, which tracks that item,

25     as well as our evidence bar code and any photos

Exhibit J
629

1    and videos we took.

2         Q.   (BY MR. FROMMER)  How many -- well,

3    should FD-597s be consistent?

4              And by that I mean let's say you have the

5    same items that are being seized and you had two

6    different agents separately filling out FD-597s.

7              Should those FD-597s be similar or

8    consistent with one another in terms of what is

9    listed?

10             MR. RODGERS:  Objection; lacks

11   foundation, poses an incomplete hypothetical,

12   calls for speculation, legal conclusion.

13             THE WITNESS:  They could be consistent,

14   but different agents might do something different.

15        Q.   (BY MR. FROMMER)  Do you receive any

16   training about -- does the FBI provide any

17   training to ensure that agents provide

18   consistent -- or fill out FD-597s in a consistent

19   way?

20             MR. RODGERS:  Same objections.

21             THE WITNESS:  I don't know.

22        Q.   (BY MR. FROMMER)  Do you recall ever

23   receiving such training?

24        A.   I believe at Quantico I did.

25        Q.   You believe at Quantico you were

Exhibit J
630

Page 80

1    instructed as to how to fill out an FD-597?

2        A.   Instructed how to fill out an FD-597 in

3    regards to a search warrant.

4        Q.   The inventory to send back to the judge

5    on the return?  I'm just trying to understand.

6        A.   No.  So we -- the FD-597 is the receipt

7    for property.  And we provide an FD-597 for a

8    search and seizure, generally.  The items are

9    listed out and a receipt is given to the

10   individuals that -- let's just say the residents.

11       Q.   Okay.  So you believe that you received

12   some training on how to fill out an FD-597 at

13   Quantico; is that correct?

14       A.   Yes.

15       Q.   Do you recall receiving any training,

16   subsequent training, on how to fill out an FD-597

17   since you graduated from Quantico?

18       A.   I don't.

19       Q.   Do you believe you would recall having

20   received such training?

21       A.   I think I would.

22       Q.   Thank you.

23            MR. FROMMER:  You guys are at 11:40 your

24   time, right?  Let's go off the record.

25       (Lunch break taken from 11:41 a.m. to 12:46 p.m.)

1    Q.   (BY MR. FROMMER)  Welcome back, Special

2  Agent Palmerton.  I wanted to go back to something

3  we were talking about before.

4         We were talking about the whole inventory

5  chain, as it were, from the inventory, the

6  photographs, the videos.  And then you were

7  talking about some of the steps involved in the

8  chain of custody as part of it.

9         And I was wondering if you could sort of,

10  for my own edification, explain once an inventory

11  has been completed, what happens in terms of chain

12  of custody going forward.

13    A.   Once the inventory is complete, you have

14  the documentation prepared, we have the FD-597

15  inventory list and then we have the chain of

16  custodies prepared, which is essentially exactly

17  what it states, just chain of custody, keeping

18  track of that item, where it was discovered and

19  then where it went and where it, you know, could

20  go in the future, and then who may have

21  transported it or opened or had custody of it at a

22  certain time.

23         I mean, and generally, like, as an

24  example, it's collected at a spot, says it was

25  found here in this spot at this date and time by

Exhibit J
632

ER-1375

Page 82

1    this person.  And then it's transported to the FBI

2    evidence facility, and then it's checked into our

3    FBI evidence facility.  And that's it.  That's all

4    the chain of custody document is.

5         Q.   I wanted to explore that part of it.  You

6    say it's sent to the -- what do you call it,

7    evidence team?  Evidence unit at the FBI?  Is that

8    correct?

9         A.   Yeah.  I mean, I call it our evidence

10   facility.

11   ██ ████ ████████████████████████████

12   ██████████████████████████████████

13   ███████████████████████████████

14   ██████████████

15   █ ████████████████████████████

16   ███████████████ ████████████████

17   █████████████████████████

18   ███████████████████████████

19   ████████████████████████

20      ███████████████████████████

21   █████████████████████████████

22   █████████████████████████████

23   ████████████████ █████████████

24   ████████████████████

25   ██ ██████████████████████████

Exhibit J
633

ER-1376



Page 84

1 ████████████████████████████████████████

2 ████

     3      Q.   Okay.  So is it fair to say that the main

     4 way that the FBI guards against claims of theft

     5 and loss is through that chain of custody control?

     6      MR. RODGERS:  Objection; speculation,

     7 lacks foundation, calls for a legal conclusion.

     8      THE WITNESS:  I would say it's that as

     9 well as all the other documentation we use to

10 track pieces of evidence or items that are taken.

11      Q.  (BY MR. FROMMER)  Okay.  And that chain

12 of custody obviously, it keeps the items secure

13 only to the extent that they made it to the

14 evidence facility; is that correct?

15      MR. RODGERS:  Same objections.

16 ████████████    ████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ███████████████████  ███████████████

20 ████████████████████████████████████████

21 ██████████████████████████████████

22 ████████████

23      ████████████████████████████████████

24 ████████████████████████████████

25 ████████████████████████████████████

Exhibit J
635

ER-1378



Page 85

16    Q.    Okay.  All right.  Let me shift gears a

17  little bit.  And we talked about some of this

18  before.  So I beg your forgiveness if I ask some

19  questions -- if I thread upon ground we've already

20  walked upon.

21         I believe you said you first heard about

22  the US Private Vaults case or investigation back

23  in 2019; is that right?

24    A.    Yes.

25    Q.    Can you tell me what you recall hearing

1    in 2019 about the US Private Vaults matter?

2         A.   Yeah.  I mean, my first, I guess becoming

3    aware of the USPV case is from Agent Lynne

4    Zellhart.  She mentioned she was working a case

5    regarding USPV.  I was a newer agent at the time,

6    and she asked if I wanted to do what's called the

7    spot check, which is just a drive-by to kind of

8    note the location and any activity.

9              And then she just drove me there.  We

10   looked at it.  She said, you know, this is a spot

11   for, you know, potential money laundering, and

12   we're looking at investigating it, and then drove

13   me back to the office.

14             And that was the extent of my involvement

15   until basically March 2021 when the warrant was

16   executed.

17        Q.   Why did she take you out for this spot

18   check only to have no further involvement by you

19   on the investigation?

20             MR. RODGERS:  Objection; calls for

21   speculation.

22        Q.   (BY MR. FROMMER)  Well, okay.  Let me ask

23   this:  Did Special Agent Zellhart explain her

24   reason for taking you out to do that spot check?

25        A.   She did, yes.

Exhibit J
637

Page 87

1      Q.   What did she say?

2      A.   Initially I believe -- well, what she

3  told me was the plan was to have me become what's

4  called a co-case on the investigation.  And at the

5  time, I had more free time, but I ended up getting

6  more involved in my own cases and couldn't take on

7  that role.

8      Q.   And what was that term?  I hadn't heard

9  it before.

10      A.   Which term?

11      Q.   I think you said co-case?

12      A.   Right.  A co-case agent.

13      Q.   Oh, so you mean that she was potentially

14  asking you to help -- to join her in the

15  investigation; is that correct?

16      A.   Yes.  Yes.

17      Q.   Okay.  But you're saying that you had to

18  decline because you had your own matters that gave

19  you a full plate?

20      A.   Yes.

21      Q.   Okay.  I understand.  And after that spot

22  check, did you hear anything else about Private

23  Vaults before March of 2021?

24      A.   The only thing was maybe in February of

25  2021 discussing that there could potentially be a

Exhibit J
638

ER-1381

1    warrant sometime in March, to kind of prepare your
2    schedule accordingly.
3         Q.   And who was that conversation with?
4         A.   I don't recall specifically.
5         Q.   Was it with Special Agent Zellhart?
6         A.   It could have been.
7         Q.   Okay.  Do you recall what agents in your
8    office you spoke to about the USPV matter before
9    March of 2021?  Was it just Special Agent
10   Zellhart, or did you speak with other officials in
11   your office?
12        A.   I did speak with other agents, and I can
13   only think of one specifically.  And that's
14   Special Agent Madison MacDonald.
15        Q.   I'm always bad with names like Madison.
16   Is Madison MacDonald a he or a she?
17        A.   A she.
18        Q.   Okay.  Was Special Agent MacDonald, was
19   she helping to investigate US Private Vaults?
20             MR. RODGERS:  Objection; calls for
21   speculation.
22        Q.   (BY MR. FROMMER)  Well, to your
23   knowledge, was Special Agent MacDonald involved in
24   the US Private Vaults investigation at the time
25   you spoke to her?

Page 89

1          A.   I mean, yes.

2          Q.   Okay.  So Special Agent MacDonald was on

3     the US Private Vaults investigation prior to the

4     events of March 2021; is that correct?

5          A.   She was assisting with the investigation.

6          Q.   And who was the primary on the

7     investigation?

8          A.   That would have been Lynne Zellhart,

9     Agent Lynne Zellhart.

10         Q.   Okay.  So Special Agent MacDonald would

11    have been assisting Special Agent Zellhart on the

12    investigation.  Okay.  Thank you.

13              So it sounds -- and you can just tell me

14    if I'm correct.

15              Did you help investigate US Private

16    Vaults in any way other than that spot check you

17    were talking about prior to its indictment on

18    March 9th, 2021?

19         A.   No.

20         Q.   Okay.  And did you have any involvement

21    or did you help put together the application for

22    the seizure warrant for US Private Vaults?

23         A.   No.

24         Q.   Okay.  Now I want you to -- so once the

25    seizure warrant had been issued from Magistrate

Exhibit J
640

ER-1383

Page 90

1    Kim, can you describe to me what steps the FBI

2    office took to prepare to execute that warrant?

3              MR. RODGERS:  Objection; speculation.

4         Q.   (BY MR. FROMMER)  To the best of your

5    knowledge.

6         A.   Yeah.  I mean, I was not a primary

7    decision-maker in this at all.  I mean, so to the

8    best of my knowledge is it was a canvass for

9    agents to assist with a search.  And at the time

10   it was tentatively planned for sometime in March

11   2021.

12        Q.   And what do you mean by a canvass?  By

13   that do you mean there was just a broad call for

14   special agents to help execute the warrant?

15        A.   Yes.  So, yes.  Like a communication sent

16   out saying there's potentially going to be a

17   search at this location and, you know, we're

18   asking for agents to assist.

19        Q.   Okay.  Do you recall when that

20   communication was sent out approximately?

21        A.   No.

22        Q.   Do you happen to recall if it was during

23   the month of March 2021?

24        A.   I don't.  It could have been February.

25   It could have been March.  I don't know.

1      Q.   Okay.  Going back to the origins of this,

2   you said on the spot check, I believe it was

3   called, that Zellhart drove past and said that

4   there was suspicion of money laundering, and

5   that's what she was investigating.

6        Who exactly did she -- well, let me ask

7   this based on your knowledge:  Did she identify to

8   you who she suspected of engaging in money

9   laundering?

10      A.   I mean, I want to say it was the business

11   itself.

12      Q.   Are you just -- do you recall her saying

13   that, or are you just --

14      A.   No.

15      Q.   -- guessing?

16      A.   No, I don't recall specifically who she

17   said or what she said.  This was my recollection

18   of conversations I've had with Lynne, you know,

19   over the course of my time there in the

20   investigation.

21      Q.   I don't want to put words in your mouth.

22        So you believe that the investigation was

23   regarding money laundering offenses by US Private

24   Vaults, the corporation itself; is that correct?

25      A.   That was my understanding at the time.

Page 92

1      Q.   All right.  So I know you helped execute

2    the warrant.

3           Who else in your office at the FBI was

4    involved in executing the warrant at US Private

5    Vaults?

6      A.   I mean, there was dozens and dozens of

7    agents.  I couldn't tell you specifically every

8    person that was there.

9      Q.   And I wouldn't expect you to.  I couldn't

10   tell you everyone in a large crowd either.  But I

11   will ask, you know, to the extent -- can you

12   recall -- I'm sure you recall some of the

13   individuals, other individuals who were involved

14   since you work with these people every day.

15          I'm not asking for a global list, but to

16   the extent you can identify other FBI agents who

17   were involved in the execution of the warrant,

18   please provide their names.

19     A.   Yeah.  So there would have been

20   myself -- I mean, our squad, White Collar 1,

21   was -- that's our squad with Lynne.  There would

22   have been myself; Special Agent Mark Strickland,

23   at the time he was Special Agent Ryan Heaton, who

24   is now our supervisor; Special Agent Madison

25   MacDonald; Special Agent Kate Bailey; Special

Page 93

1     Agent Elias Guerrero; and Special Agent Young Oh.

2     Those are people from my squad I know participated

3     in it.

4             And then -- that's really all I can

5     recall right now.

6         Q.   Who was that last individual you said?

7     Was it Young Oh?

8         A.   Yes, Special Agent Young Oh.

9         Q.   Okay.  His last name is what, O-h?

10        A.   Her last name is O-h, yes.

11        Q.   Her, okay.  So the members of your

12    squad -- so I didn't realize this.

13            So you're organized at the FBI in terms

14    of squads; is that correct?

15        A.   I mean generally, yes, in our field

16    office, yes.

17        Q.   And those squads are tied to, like, the

18    specific kinds of cases that they work; is that

19    correct?

20        A.   Yes.

21        Q.   So you work, for instance, you said the

22    White Collar 1; is that right?

23            Is that also -- is there, like, a squad

24    leader?  Is there someone who's, like, in charge

25    of the squad?  Or is everyone in the squad sort of

Page 94

1    the same rank?

2         A.   The supervisor, the SSA, oversees the

3    squad.

4         Q.   Who's the SSA for White Collar 1?

5         A.   Ryan Heaton.

6         Q.   Ryan Heaton.  Okay.  I remember you

7    mentioning Mr. Heaton before.

8              Is Lynne Zellhart in White Collar 1?

9         A.   She is.

10         Q.   So is Ryan Heaton the current SSA?

11         A.   He is.

12         Q.   Who was the SSA in March 2021 when the

13    warrant was executed?

14         A.   It would have been SSA Richard Alexander.

15         Q.   Okay.  And you said that there were

16    also -- Mr. Alexander, or SSA Alexander, where is

17    he now?

18         A.   He retired.

19         Q.   He retired?  When did he retire?

20         A.   December of last year, 2021.

21         Q.   How long had he been at the FBI?

22         A.   I don't know.  It was a long, long time.

23    I'd say 20-plus years.

24         Q.   Okay.  So he was just retiring to enjoy

25    his golden years?

Exhibit J
645
ER-1388

Page 95

1          A.   Yes.

2          Q.   Okay.  I got it.

3               So you said the squad White Collar 1 was

4     involved in the execution of the warrant.

5               Were there other squads that were also

6     involved in executing the warrant?

7          A.   Yes.

8          Q.   Okay.  Do you recall the names of those

9     squads?

10         A.   There is only two I recall specifically.

11    I know there were other agents from other squads,

12    but it would have been White Collar 2 and White

13    Collar 5.

14         Q.   Okay.  How many white collar squads are

15    there?

16         A.   There are five.

17         Q.   Okay.  So 1, 2, and 5 were involved in

18    this?

19         A.   Yes.

20         Q.   Where were 3 and 4 at?

21         A.   I assume they were there, but I really

22    don't know.

23         Q.   That's fine.  And so I think you

24    said -- and correct me if I'm wrong -- that there

25    were dozens of agents involved in executing the

Page 96

1    warrant; is that right?

2         A.   Yes.

3         Q.   Do you know if any other state or federal

4    agencies were involved in executing the warrant?

5         A.   Yes.

6         Q.   What agencies are those that you recall?

7         A.   I recall DEA, U.S. Postal Service

8    Inspectors -- the U.S. Postal Inspector Service,

9    and Beverly Hills Police Department.  And that's

10   all I can recall specifically.  I know there were

11   other state agencies and possibly other federal

12   agents, but that's just what I recall.

13        Q.   Okay.  And obviously you were executing

14   the warrant; you wouldn't have that perspective.

15             Who would have that sort of perspective

16   about all the agencies who were involved in

17   executing the warrant?

18             MR. RODGERS:  Objection; speculation.

19        Q.   (BY MR. FROMMER)  Well, let me ask this:

20   Lynne Zellhart was in charge of the US Private

21   Vaults investigation, correct?  Or she was lead

22   investigator?  She is lead investigator on the US

23   Private Vaults matter?

24        A.   She was the FBI case agent for USPV, yes.

25        Q.   Would Special Agent Zellhart be in a

Page 97

1    better position than you to identify all the state

2    and federal agencies that were involved in

3    executing the warrant?

4        A.   Yes.

5        Q.   Okay.  Are there other individuals at the

6    FBI who you similarly think would be able to

7    provide a more complete accounting of all the

8    state and federal agencies involved in the

9    execution of the warrant?

10       A.   I would say our supervisor at the time,

11   Rich Alexander.

12       Q.   Okay.

13       A.   And that's who I think would have

14   been -- to the best of my knowledge, just where I

15   was at, that would be my, again, kind of a guess

16   as to who would have the best knowledge of the

17   agencies that participated.

18       Q.   Can you explain to me based on your

19   experience at the FBI, why were there agencies

20   other than the FBI involved in executing the

21   warrant?

22           MR. RODGERS:  Lacks foundation, calls for

23   speculation.

24           THE WITNESS:  I mean, the FBI, we work

25   with other agencies all the time, and especially

Page 98

1     in large-scale investigations.  It's primarily a

2     resource issue in that, you know, just

3     having -- typically it's like one case agents.

4     You might have two case agents on an

5     investigation.

6            It helps to have additional investigative

7     agencies and their capabilities to help with an

8     investigation.  They might just have tools or

9     people and processes that they can just assist us

10    in an investigation.  And just provide bodies to

11    execute search warrants or arrest warrants or any

12    other type of warrants.

13         Q.   (BY MR. FROMMER)  Okay.  So I think you

14    mentioned several different groups.  I think you

15    mentioned DEA, postal inspection; I think you said

16    Beverly Hills PD, and it sounds like there might

17    be others, but that you can't recall.

18            So what extent were agencies, like the

19    other agencies, the DEA or postal inspectors or

20    the Beverly Hills PD, to what extent were they

21    included in the FBI's discussions about how to

22    execute the warrant?

23         A.   I don't know.

24         Q.   Did you ever go to a meeting to discuss

25    how to execute the warrant at USPV where

1    representatives from those other agents, DEA,

2    USPIS, or Beverly Hills PD were there?

3        A.   No.

4        Q.   Okay.  And I recall before lunch you had

5    mentioned the day of you had a meeting.  I forget

6    what you called it.  Was it an operational control

7    meeting?  What was the term?  I don't want to

8    misspeak.

9        A.   Yeah, we call it just a briefing.

10        Q.   Okay.

11        A.   Pre-operation briefing.

12        Q.   Okay.  So there was a -- and I want to

13    make sure I get this correct.

14            So it was your testimony that the morning

15    of the US Private Vaults warrant execution, you

16    had a preoperational briefing with other FBI

17    officials; is that correct?

18        A.   Yes.

19        Q.   Did you have any other meetings regarding

20    execution of the warrant other than that

21    pre-operational briefing?

22        A.   I did not, no.

23        Q.   You did not?

24        A.   I didn't.

25        Q.   Are you aware of any other meetings about

Exhibit J
650

Page 100

1    how to execute the warrant at US Private Vaults?

2    Are you aware of any that occurred, even if you

3    didn't necessarily participate in them?

4         A.   Yes.  I'm aware that they occurred, but I

5    couldn't tell you who was there or when they

6    happened or what was discussed.

7         Q.   Then how are you aware that they

8    occurred?

9         A.   Just knowledge from, likely, Lynne

10   Zellhart.

11        Q.   Okay.  So you believe that Lynne Zellhart

12   informed you in some way that there had been other

13   meetings where the execution of the USPV warrant

14   was discussed?

15        A.   Yes.

16        Q.   Okay.  But for more information about

17   that, I should probably talk to Special Agent

18   Zellhart?

19        A.   Yes.

20        Q.   Okay.  So since you only had the

21   preoperational briefing, that's the only briefing

22   you recall attending about the warrant execution,

23   do you know if anyone at the FBI or elsewhere

24   discussed, like, possible alternatives for

25   executing the warrant in the way it was executed

Page 101

1    here?

2        A.   No.

3        Q.   Okay.  Like, for instance I was thinking,

4    like, if there was anyone -- if there was ever a

5    meeting or if anyone ever suggested that the FBI

6    could simply take over the business and install a

7    receiver.

8            Did you ever hear any discussion of that

9    possible option?

10       A.   No.

11       Q.   All right.  So you said at the

12   preoperational briefing.

13           That was just members of your fellow FBI

14   agents; is that correct?

15       A.   Yeah, to the best of my recollection, it

16   would have been FBI employees.

17       Q.   All right.  Do you recall if anyone ever

18   sent out instructions, like, written instructions

19   about how to execute the warrant at US Private

20   Vaults?

21       A.   I mean, no.  Aside from the operational

22   plan, no.  I don't recall.

23       Q.   So let me get back to that.  The

24   operational -- there is a lot of operations here,

25   so I'm trying to understand.  So there's the

1    preoperational briefing, and that's the meeting

2    that occurs the day -- the morning of the raid.

3    Then there is the operational -- what do you call

4    it?  Operational plan?  Is that correct?

5         A.   So at the preoperational briefing is when

6    the operational plan is discussed or reviewed by

7    the agents.

8         Q.   Okay.  So you're saying the day of

9    the -- of warrant execution you go to this

10   briefing in the morning, then they hand you a

11   piece -- do they hand you, like, a piece of paper

12   called the operational plan?

13        A.   It's usually -- and again, generally in

14   my experience it's either emailed to us the day

15   before and/or it's printed out and we get copies

16   of it the day of the operation or warrant.

17        Q.   Okay.  Do you recall in this instance

18   whether that was emailed to you or it was handed

19   to you at the meeting?

20        A.   Yeah, I don't recall.

21        Q.   Okay.  But by one of those methods you

22   would have gotten a copy of the operational plan,

23   either prior to or at the same time as the

24   preoperational briefing?

25        A.   Yes.

Page 103

1       Q.   And what is typically included in the

2   operational plan?  Let me be more specific in the

3   context of this.

4            What was included in the operational plan

5   for executing the USPV warrant?

6       A.   Yeah, this was, like, over a year ago.

7   But I recall it would have had the name of the

8   investigation.

9            It would have listed the case agent,

10  which was Lynne Zellhart, the actual address where

11  the warrant was going to be executed.

12           It would have listed the members of the

13  team, the operational team.

14           It would have reviewed our deadly force

15  policy, and we would have had a discussion about

16  how the building was going to be secured prior to

17  the search warrant being executed.

18      Q.   Do you know, as part of the operational

19  plan, if you were given a copy of the warrant?

20      A.   Yes.

21      Q.   You were?

22      A.   Yes.

23      Q.   Okay.  And was it expected that the

24  agents would review the warrant prior to executing

25  the warrant?

Page 104

1    A.   Yes.

2    Q.   Do you recall if you, in fact, reviewed

3  the warrant prior to its execution?

4    A.   Yes.

5    Q.   Okay.  So at that preoperational

6  briefing, a couple of things.

7         At the preoperational briefing or in the

8  operational plan, were you told what you

9  specifically were supposed to do at US Private

10 Vaults when the warrant -- as part of the warrant

11 execution process?

12   A.   Yes.  There is a portion in the ops plan

13 that details specific duties for each agent.

14   Q.   And what were your duties, if you recall?

15   A.   Mine was pretty general.  It was just to

16 search the office.  Search and then seize items

17 pursuant to the search and seizure warrant.

18   Q.   Okay.  So when you say "the office," you

19 mean the -- I haven't been inside the space, so

20 I'm trying to figure out -- when you say "the

21 office," is that a space that's separate and

22 distinct from the vaults themselves?

23   A.   Yes.

24   Q.   Okay.  And you were involved in going

25 through and looking for items listed in the

Page 105

1    seizure warrant that were in the office; is that

2    correct?

3          A.   Yes.

4          Q.   Okay.  In the operational plan or at the

5    preoperational briefing, since they seem to be

6    related, were there any instructions about how to

7    conduct the inventory at US Private Vaults?

8          A.   Not for the search of the office, no.

9    We -- I mean, we would have had a brief discussion

10   about the inventory of the boxes.

11         Q.   Do you recall anything about that

12   discussion?

13         A.   Not specifically.

14         Q.   Who do you think would be a better person

15   to speak to about that?

16         A.   Likely Agent Lynne Zellhart.

17         Q.   Okay.  Would the substance of the

18   preoperational briefing be fairly reflected in the

19   operational plan?

20         A.   Yeah, I would think so for sure.

21         Q.   Okay.  So a copy of the operational

22   plan -- how long is an operational plan?

23         A.   It depends on a variety of factors.

24         Q.   Well, let me make it more specific.

25              Do you recall how long the operational

Page 106

1    plan was for executing the warrant at US Private

2    Vaults?

3         A.   Not specifically, no.

4         Q.   Do you recall, since you've seen many of

5    these things, was it longer or shorter than the

6    usual operational plan?

7         A.   I would say -- I mean, I recall it being

8    pretty standard, like not longer or shorter than a

9    typical ops plan.

10        Q.   All right.  Give me just a second.  I

11   just want to go back, because I want to make sure

12   I've got this correctly.

13             You think that the preoperational

14   briefing had some discussion of how to inventory

15   the safe deposit boxes; is that correct?

16        A.   Yes.

17        Q.   Okay.  Do you recall if the operational

18   plan had instructions for how to inventory the

19   boxes?

20        A.   No.  I mean, I don't think so.

21        Q.   Okay.  But a review of the -- but looking

22   at the operational plan would clearly show that,

23   correct?

24        A.   It would, yes.

25        Q.   Okay.  Let's say we're past the

Page 107

1    operational briefing and you're on your way to

2    Olympic Boulevard.  I just want you to walk me

3    through step by step how the FBI -- actually, let

4    me back up.

5              To what extent were these other groups,

6    like DEA -- I understand they have different

7    capabilities.  But when the warrant was executed,

8    did they have delineated responsibilities as part

9    of that operation?

10             MR. RODGERS:  Speculation.

11        Q.   (BY MR. FROMMER)  To your knowledge, did

12   the operational plans merely discuss what the FBI

13   agents would be doing with regard to executing the

14   warrant, or did the operational plan also discuss

15   these other groups, they're going to be doing X

16   and Y?

17        A.   No.  It wouldn't delineate in our ops

18   plan.  The ops plan could have -- and again, I

19   don't recall specifically, but it could have

20   stated DEA or whatever other law enforcement

21   agencies were present, but it wouldn't state

22   specifically what -- at least to the best of my

23   knowledge it wouldn't state specifically what they

24   would be doing.

25        Q.   Well, when you got there, when you were

Page 108

1    actually executing the warrant, did you happen to

2    have opportunity to interact with any of the other

3    agencies that were there?

4        A.   Yes.

5        Q.   Okay.  And can you describe -- like,

6    which agencies did you have an opportunity to

7    interact with?

8        A.   Yeah, so it was just the ones that I

9    recalled:  DEA, Postal Service, Beverly Hills PD,

10   and yeah, the other state agencies that I just

11   don't recall.

12       Q.   That's fine.  For instance, was the DEA,

13   did the agents from the DEA, did they have a

14   different set of responsibilities when executing

15   the warrant than you and your squad?

16       A.   Yeah, I don't know.

17       Q.   Did you see, like, DEA agents doing the

18   same activities, the same inventorying that FBI

19   agents were doing?

20       A.   Yes, them and Postal.

21       Q.   Okay.  I'm going to come back to that.

22            So after the preoperational briefing,

23   you, as part of your squad and everyone else, you

24   go to Olympic, Olympic Boulevard, to the store

25   all together, not just FBI -- well, let me start

1     just in terms of number of FBI agents.

2              How many FBI officials were involved in

3     executing the search warrant or the warrant?  A

4     rough approximation.

5          A.   I mean, yeah, I would say dozens if not

6     over 100 different agents throughout the course of

7     that week.

8          Q.   So over 100 agents over the course of the

9     week, you think?

10         A.   Yeah.

11         Q.   And in terms of that, we're just talking

12    for that, just FBI agents, correct?

13         A.   Yes.

14         Q.   How many -- and again, I'm not trying to

15    pin you down on a specific number.  I understand

16    that's very difficult.

17              But approximately how many individuals

18    from agencies other than the FBI would you say

19    were involved in the execution of the warrant?

20         A.   I mean, yeah, total other agencies, yeah,

21    probably -- I mean, yeah, broken record, but I'm

22    thinking dozens of other law enforcement officers

23    and just officials, law enforcement employees.

24         Q.   So between the FBI agents involved and

25    individuals from other organizations, we're

Page 110

1      talking well over 100 individuals, it sounds like.

2              Is that a relatively accurate number?

3          A.   Yes.  And again, that's -- I just want to

4      clarify, over the course of the week.  So there

5      wasn't, like, over 100 people there in one day.

6          Q.   Oh, okay.  So let's say the day of, the

7      day everything got kicked off, which I believe was

8      March 22nd, how many FBI agents went to US Private

9      Vaults that morning, roughly?

10         A.   Our squad -- yeah, I mean, I would just

11     again say there were dozens of agents.  Our squad,

12     which was the agents I listed, as well as other

13     squads that showed up subsequent.

14         Q.   So there were dozens of FBI officials

15     down there on March 22nd?

16         A.   Yes.

17         Q.   Okay.  And is it fair to say there were

18     dozens of officials from other organizations also

19     there on March 22nd?

20         A.   Yes.

21         Q.   So a lot of people in a parking lot?

22         A.   There was a lot of people there, yes.

23         Q.   Do you recall when -- not you personally,

24     but when the FBI began to execute the warrant?

25         A.   It would have been -- yeah, I'm kind of

Page 111

1    speculating because I really can't recall.

2              MR. RODGERS:  Don't speculate.  If you

3    have an estimate, please provide it.  Please don't

4    speculate.

5         Q.   (BY MR. FROMMER)  Yeah.  Was it in the

6    morning?

7         A.   Yeah.  It would have been prior to us,

8    our squad heading there at around 9:00 a.m. or

9    whatever that was, later in the morning.

10        Q.   Oh, so your squad was not the

11   first -- was not the first presence of FBI agents

12   at US Private Vaults that day?

13        A.   No.

14        Q.   What group would have been?

15        A.   What I recall is it would be our SWAT

16   team secured the premises.  And then once the

17   premises was secured, we were given notification

18   the property was secure and safe and that we could

19   come and execute the actual warrant.

20        Q.   So was that FBI SWAT team, or that was,

21   like, from a local agency?

22        A.   I recall it being FBI SWAT.

23        Q.   Okay.  I didn't realize you guys had a

24   SWAT.  I know about hostage rescue, but I didn't

25   know you had a separate SWAT unit.

Page 112

1          Okay.  And so they have would gone first,
2     secured the location, and then called and said,
3     "Location is secure.  You can come down and start
4     executing the seizure warrant"?
5          A.   Yes.
6          Q.   So you said you arrived there at
7     approximately 9:00 a.m.?
8          A.   Yes.
9          Q.   Okay.  And if you can just walk me
10    through the steps you took once you got on
11    location.
12         A.   So we arrived there.  As noted, the
13    parking lot was very full, so parking was at a
14    premium.
15          Went and parked, walked into the
16    premises, got an idea of where things were at, and
17    then started bringing in our supplies to basically
18    execute the warrant in the office.
19          Because again, that was day one.  That
20    was putting out our evidence bags and tape, all
21    the different paperwork that we were going to need
22    to fill out.  And then just started searching the
23    office pursuant to the parameters of the warrant.
24         Q.   Do you know when you were executing the
25    warrant, was it done sequentially?

Page 113

1          And by that I mean first you went through

2     the office, seized items listed in the warrant.

3     And then, only then, moved onto, like, other areas

4     of the facility?  Or was this all happening at the

5     same time?

6          A.   I would say we started with the office.

7     And then later in the day the inventory process

8     for the boxes and the back began, yeah, sometime

9     in the afternoon.

10          Q.   The afternoon of March 22nd?

11          A.   Again, to the best of my knowledge.  I

12     was -- I mean, the majority of my time was spent

13     in the office, which was a separate part of the

14     building.  So I was aware that there were people

15     going in to where the boxes were at, other agents

16     and law enforcement officers.

17          Q.   Okay.  So it sounds like you're uncertain

18     as to whether there were other agents

19     operating -- executing the warrant in other areas

20     of US Private Vaults at the same time as you.

21          A.   Only there was other law enforcement

22     agents, yeah, other agents from our squad

23     executing the warrant in the office.  And then I

24     was aware they were working on the boxes in the

25     back, or starting to.

Page 114

1          Q.    Okay.  Were you aware of the presence of
2     a biometric scanner at US Private Vaults?
3          A.    Yes.
4          Q.    And it's my understanding that the
5     biometric scanner had been -- was disabled.  Is
6     that your understanding?
7          A.    Yes.
8          Q.    Do you know why the FBI disabled the
9     biometric scanner?
10         A.    I don't.
11         Q.    Who would be the right person to ask
12    about that?
13         A.    I don't know.
14         Q.    Would Special Agent Zellhart be the
15    person to talk to about that?
16         A.    She would have more knowledge than I
17    would about that decision.
18         Q.    Who would have -- well, let me ask that.
19              Who would be authorized to make a
20    decision like that to disable the biometric
21    scanner?
22         A.    Yeah, I don't know.
23         Q.    Okay.  So you said -- is it correct to
24    say that to fully execute the warrant at US
25    Private Vaults took five business days, from

Exhibit J
665

ER-1408

Page 115

1    March 22nd to March 26th?

2        A.   Yes.

3        Q.   Does it usually take that long to execute

4    a seizure warrant?

5             MR. RODGERS:  Objection; foundation.

6        Q.   (BY MR. FROMMER)  Let me ask this:  You

7    have engaged in executing many warrants.

8             Does it usually take five days to execute

9    a warrant?

10            MR. RODGERS:  Same objection.

11            THE WITNESS:  It depends on the warrant

12   and what we are searching for and what we are

13   attempting to seize, the size of the property.

14       Q.   (BY MR. FROMMER)  Okay.  Have you

15   previously been involved with execution of seizure

16   warrants that took five days to execute?

17       A.   No.

18       Q.   Okay.  So is it fair to say that

19   this -- that the execution of this warrant was the

20   longest in terms of time in your -- that you've

21   experienced?

22       A.   Yes.

23       Q.   Okay.  And since you were there and

24   you -- so I understand that you helped seize items

25   listed in the warrant from the office; is that

Exhibit J
666

ER-1409

Page 116

1    correct?

2         A.   Yes.

3         Q.   Did you also help inventory safe deposit

4    boxes while you were there?

5         A.   I did, yes.

6         Q.   Okay.  And you said the whole process

7    took five days.

8              What was it about US Private Vaults that

9    required that much time to execute the warrant, in

10   your opinion?

11        A.   Well, there was a couple different things

12   at hand we had to consider.  One, was it was tight

13   working quarters.  You could only get so many

14   bodies back there to work on the boxes.

15             Two, the boxes are secured within -- we

16   call them nests, these, like, metal platforms.

17             And then, three, the longest was just

18   opening and inventorying each and every box and

19   documenting all of that in the paperwork, which

20   we've already discussed, and trying to make sure

21   that all of our chains of custody and FD-597s and

22   all the paperwork was in order.

23        Q.   And do you have a rough idea of how many

24   safe deposit boxes -- not you personally, but were

25   inventoried as per the full execution of the

Page 117

1   warrant?

2        A.   I mean, it would have been hundreds of

3   boxes.

4        Q.   Okay.  And so it took so long because you

5   had to inventory hundreds of boxes; is that

6   correct?

7        A.   Yes, whether or not they were empty or

8   had items in them.

9        Q.   And how many agents were involved in

10  inventorying each box?

11       A.   I mean, again, it varied.  There could

12  have been teams of three or four to a box at any

13  given time.

14       Q.   Were there any boxes where it was just a

15  single agent responsible for the inventorying?

16       A.   I don't know.

17       Q.   Did you personally observe any instances

18  where a single agent was inventorying a box by him

19  or herself?

20       A.   No.

21       Q.   So how long did it take -- would it take

22  on average -- and I understand that some boxes

23  were empty, which makes it very quick -- but how

24  long on average would it take to inventory a box?

25            MR. RODGERS:  Lacks foundation.

```
 1              THE WITNESS:  Yeah, no, that's difficult
 2      to answer because an empty box could be as quick
 3      as five minutes, and then a box with a number of
 4      different items in it, valuables, could take half
 5      an hour, 40 minutes.
 6         Q.   (BY MR. FROMMER)  Okay.  Let me ask this.
 7      Let me ask it this way, then:  So is it true that
 8      inventorying a box could take as little as five
 9      minutes if the box were empty?
10              MR. RODGERS:  Lacks foundation,
11      speculation.
12         Q.   (BY MR. FROMMER)  I'm asking about your
13      lived experience doing this.
14         A.   Yes, I would say five to ten minutes if
15      it was an empty box.
16         Q.   And for those boxes that, you know, had a
17      lot of valuables and things like that in them,
18      what's the longest you recall it taking to
19      inventory a single box?
20         A.   Probably -- there may have been one that
21      was, like, 40, 45 minutes.
22         Q.   And walk me through that process.
23              Okay.  So you're at the box.  When you're
24      in the vault, was the process -- how did you get
25      access to the items that were within each box?
```

Exhibit J
669
ER-1412

Page 119

1    Sorry if that's a little vague.

2            I'm trying to figure out sort of the

3    step-by-step actions that were taken with regards

4    to the boxes.

5            Was the first step to take all the doors

6    off the boxes?

7        A.    Yeah.  And again, I'm just trying to go

8    back to that time.

9            No, the first step was basically breaking

10   apart the nests.  We call them nests because there

11   was -- like, each nest contained a number of

12   boxes, and it varied.

13           And we would take the nest out of the

14   vault, bring it to somewhere in the office or

15   somewhere on the premises, and then we proceed to

16   take off each -- from what I recall, my experience

17   was we would take off the door and then pull the

18   actual box out, which was -- sometimes it's metal;

19   oftentimes plastic.

20           And yeah, that was essentially the steps

21   for getting into each box.

22       Q.    Okay.  I'm a little confused here because

23   you say that the first thing you would do

24   is -- not you personally, but the team would

25   extract the nest, the superstructure containing

1    all the boxes, you would take that, remove it from

2    the vault, and take it into a different space?

3         A.   Yes.  Sorry.  There were some agents or

4    instances where you were opening the boxes or

5    gaining access to the boxes all in the vault.  And

6    then just trying to get more room, we would take a

7    nest of boxes out of the vault just so you could

8    have more bodies work on, like, that nest of

9    boxes.

10         Q.   Okay.  And was there any rhyme or reason

11    as to when a nest would be removed and taken out

12    of the vault versus where the agents would

13    inventory boxes while still inside the vault?

14         A.   Yeah, I don't know.

15         Q.   I don't want to sound like a broken

16    record, but who would be the right person to speak

17    to about that?  Would that be Special Agent

18    Zellhart?

19         A.   She would have more knowledge, yeah,

20    about those decisions than I would.

21         Q.   Let me ask this:  Who was in charge of

22    running the on-the-ground operations and executing

23    the warrant from March 22nd to March 26th?  Who

24    was the person in charge?

25         A.   I mean, yeah, I would say the case agent,

Page 121

1    Lynne Zellhart.  She was assisted by our

2    supervisor at the time as well as other members of

3    executive management.

4        Q.   What do you mean by "executive

5    management"?  I don't know that phrase.

6        A.   Just upper levels of our management to

7    include, like, our legal team, just in order to

8    make decisions.

9        Q.   Okay.  So the FBI had its legal team

10   there to advise Special Agent Zellhart and others

11   about how to conduct the warrant execution?

12       A.   I don't know if the legal team was there.

13   I just know that Lynne would have conferred with

14   our legal team.

15       Q.   But you're not sure if they were on-site?

16       A.   Yeah.  I mean, I didn't see them there.

17       Q.   Okay.  But you might have been talking

18   with them via telephone or other means?

19       A.   Yes.

20       Q.   Okay.  And obviously for more information

21   on that, I should speak to Special Agent Zellhart?

22       A.   Yes.

23       Q.   Okay.  Do you happen to know -- so how

24   did -- okay.  So you take the nest.  I understand

25   some agents did the inventorying inside the vault.

```
 1    But you take the nest and you remove it and take
 2    it to the office or some other space so there's
 3    more room.
 4            How, then -- what did you do to get
 5    access to the interior sleeves, into the actual
 6    interior sleeves inside the box?  How did you open
 7    those doors?
 8       A.   Yeah, I didn't -- I wasn't -- that wasn't
 9    my job.  I know there were people with the tools
10    and the skill set to open the box doors, or at
11    least get them unlocked.
12            And then generally it was just taking the
13    box door off -- after getting them detached from
14    the nest or whatever you call it, to get access to
15    the sleeves which contained the items.
16       Q.   Okay.
17       A.   I know there were power tools being used
18    to access -- you removed the nest and then you had
19    to get access to the sleeves in each side.
20       Q.   Is it fair to say that the process ended
21    up destroying the nests?  I mean, you're talking
22    about power tools and ripping doors off using
23    power tools.  It sounds like the nest wouldn't be
24    really much of a thing anymore after that.
25       A.   Yeah.  I mean, yeah, I don't know.  I'm
```

Page 123

 1    not, like, a structural engineer or something --
 2    or anything, but yeah, I don't know if you could
 3    use them again or not to store boxes.
 4        Q.   Do you think it's likely that you could
 5    reuse these nests after -- you saw what they did
 6    to them.  So do you think that you could put that
 7    back together again and it would be in working
 8    order?
 9        A.   Yeah, I don't know.
10        Q.   Well, I'm just asking because you were
11    there and you saw it.  I didn't see this.
12             MR. RODGERS:  Objection; asked and
13    answered.
14        Q.   (BY MR. FROMMER)  So, yeah,
15    after -- well, let me walk through the
16    door-opening process, because I want to understand
17    that.
18             The people who were involved in opening
19    the doors, did they just open up all the doors,
20    like, one after another?
21        A.   Yeah.  I think it was more they would cut
22    the nest out -- and again, this is just an
23    example.  They would cut, like, a nest out.  We'd
24    get it down using a forklift or something, into
25    the office.

Exhibit J
674

ER-1417

Page 124

1    And then once the nest was basically
2  taken off, then you could just open the door.  I
3  think we could just pop it open with, like, a
4  screwdriver.  And from there you would just go
5  door by door opening it open.
6    Q.  So okay.  I get it.  So there's these
7  power tools, and it sounds like the power tools
8  you used to sort of free the nest.
9    And you have a forklift that moves -- and
10  I understand this isn't for all of the boxes, but
11  for the ones you were dealing with, it moves the
12  nest into an office or some other space, and then
13  somebody comes with a screwdriver and pops off all
14  the doors?
15    Is that accurate?
16    A.  Yeah.  Or, like, each team was working on
17  a box.  You have a nest with let's say, for
18  example, 20 boxes, you know.  You say, okay,
19  here's box XYZ.  We pop open the door, pull the
20  sleeve out, inventory the contents, and then pull
21  the next one out.  We would open them
22  sequentially.
23    Q.  That's what I was wondering, if you were
24  popping all of them and then looking at the boxes
25  or if you'd only pop one door at a time and then

Page 125

1    inspect the boxes.

2             Well, when you were there and you saw

3    this nest after all the doors popped, what did

4    they look like?

5        A.   I mean, yeah, it's just a big -- again,

6    from what I recall, it's just a big chunk of

7    metal, like a square piece of metal with different

8    spots for each box.

9        Q.   Wouldn't popping the doors off with a

10   screwdriver, like, bust the hinges?

11       A.   Yeah.  I do recall, yes, some of the

12   hinges were busted.  They would break.  Other

13   times they wouldn't, and the door would just open.

14       Q.   So there was no way, though, that you

15   could then just reattach the doors and you have

16   a -- there is no easy way to just reattach the

17   doors and now all of a sudden the nest is good

18   again?

19            MR. RODGERS:  Speculation.

20            THE WITNESS:  Yeah, no.  I mean, yeah, I

21   don't know if there's an easy way to do it.

22       Q.   (BY MR. FROMMER)  Okay.  So I did want to

23   ask this:  Do you happen to know if anyone

24   came -- I mean like a member of the public or a

25   box holder -- came to try to collect their

Page 126

1    property?  Because I'm assuming some people might

2    have just shown up to do an ordinary transaction

3    to get something out of their box and all of a

4    sudden are confronted by you all.

5            Do you recall that ever happening?

6        A.   Yes.

7        Q.   Were those people allowed to come in and

8    get their items?

9        A.   Not to the best of my knowledge, no.

10       Q.   Okay.  So if somebody came with their key

11   and said, "Hey, my box is in there; I want to get

12   my stuff," the response would have been, "I'm

13   sorry; you can't go in; you have to leave"?

14           MR. RODGERS:  Objection; speculation,

15   lacks foundation.

16       Q.   (BY MR. FROMMER)  I'm asking based on

17   your knowledge and your experience at the event,

18   at the execution.

19       A.   Yes.  No, we wouldn't have let them come

20   in.

21       Q.   Why not?

22       A.   Well, it's kind of standard procedure

23   for -- when we're executing a search

24   warrant -- it's more for agent safety.

25           It would be like if we were executing a

1    search warrant at a residence and the neighbor

2    came by and said, "Hey, I want to get my lawnmower

3    out of the shed," we're not going to let that

4    individual go in there because we don't know if

5    there's a gun or something in there.

6          That would be like the same -- what if we

7    let someone go into their box and pull out a gun

8    and start firing on agents.  We're not going to

9    let that happen.

10    Q.   I understand that.  Well, we can

11    speculate on whether there were ways you could

12    have allowed that person to have access to their

13    stuff without running that risk, but I understand

14    that.

15          So essentially if anyone came to collect

16    their items, they were turned away; is that

17    correct?

18    A.   To the best of my knowledge, yes.

19    Q.   Okay.  And you said you did some work

20    executing the seizure warrant in the office, and

21    then you also helped with inventorying the safe

22    deposit boxes; is that correct?

23    A.   Yes.

24    Q.   Okay.  And when you were doing the

25    inventorying on the safe deposit boxes, were you

Exhibit J
678

Page 128

1     always part of the group that would work on, for

2     lack of a better term, the fork-lifted nests?  Let

3     me rephrase.

4           Did you ever do any inventorying inside

5     the vault itself?

6        A.   Yes.  No, I did.

7        Q.   You did?  Okay.  And I think you said

8     something about -- can you explain to

9     me -- because I think before you said it was

10    cramped in there.  Like I said, I haven't been in

11    there, so I don't know.

12         So can you describe what the physical

13    nature of the vault is?

14       A.   Yeah.  Again, I'm trying to remember.

15    There was a big vault door.  And you would go in,

16    and there was a pathway straight forward.

17         And then on each side there was, again,

18    these nests of boxes.

19         And in the middle there was multiple

20    nests of boxes stacked together.

21         So on each side of that middle piece you

22    had, like, a small pathway, and then in the back

23    part of that vault there were two rooms.  I want

24    to say there was, like, little tables in each

25    room, presumably for customers or people going in

Page 129

1    to look at their stuff.

2         Q.   That makes sense.

3         A.   But it was -- like, you couldn't walk two

4    people abreast down those little pathways along

5    the sides to the back rooms.

6         Q.   Oh, that sounds very cramped.

7         A.   Yes.  Yes.  I mean, you had less than

8    probably four feet between, like, the width of

9    those spaces.

10        Q.   Yeah.  And you said some teams of agents

11   would do inventorying while inside the vault?

12        A.   Yes.

13        Q.   That must have made for a very difficult

14   process.

15        A.   Initially, yes, until we -- until more of

16   the nests were removed and there was more space to

17   work.

18        Q.   Oh, I see.  So essentially you guys

19   fork-lifted out enough nests that there was

20   finally enough free space where you could spread

21   out a little bit inside the vault; is that

22   correct?

23        A.   Yes.

24        Q.   Okay.  And I understand the outside of

25   the vault, once you got the fork-lifted nests

Exhibit J
680

ER-1423

Page 130

1    outside, you'd pop them with a screwdriver.

2                Do you know how they would open the doors

3    for the nests that were inside the vault?

4        A.   No, I don't.  I know I worked on a

5    handful of them, but I want to say the doors were

6    already unlocked, at least by the time I got

7    there, on those ones that I was working on.

8        Q.   Oh, so there were boxes that had -- by

9    the time you got to them had already been opened?

10       A.   Only because there was, like, a team

11   working on it.  And I arrived, and they said,

12   "Hey, they need help in the back."  So I would go

13   and help that team.

14       Q.   Okay.  But you don't know how precisely

15   they opened those boxes?

16       A.   I don't.

17       Q.   Okay.  I mean, you saw what they did with

18   the boxes that they fork-lifted with the

19   screwdriver and popping it.

20               Did it look similar to the -- did the

21   state of the nests in the vault look -- post-door

22   removal look similar to the ones in the office?

23       A.   Yes, I would say they looked similar.

24       Q.   Okay.  So it's possible that they were

25   using the same technique?

1      A.   Yes.

2      Q.   Okay.  That doesn't seem like a very

3  secure vault if you could pop it with a

4  screwdriver.

5           Were you there all five days?

6      A.   Yes, I was.

7      Q.   Were you inventorying the entire time?

8      A.   Primarily the entire time.  I did have

9  transport duties of some of the cash we had

10  seized.

11     Q.   Okay.  So where did the cash go to?

12     A.   The cash went to a cash counting

13  facility.

14     Q.   Okay.  So you -- with the cash then, is

15  it fair to say that the FBI, during the

16  inventorying process, wasn't counting the cash on

17  site?

18  ████  ████  ███████████████████████████████

19  ██████████████████████████████████████████

20  ███████████████████████  ████████████████

21  ████████████████████████████████

22  ████████████████████████████████████

23  ██████████████████████████████████

24  █████████████████████████████████████

25  ████████████████████████████████

Page 132

1  ████████████████████████████████

2  ██████████████████████████████████████

3  █████████████████████████████████████

4  ██████████  ██████████████████████████

5  ████████████████

6          Q.    At the cash counting place?

7          A.    Correct.

8          Q.    Were you involved in the cash counting?

9          A.    I was for two of the runs.

10         Q.    Two of the runs, okay.

11               And so I've read in the declarations that

12    there were drug dogs there.

13               Were the drug dogs -- so you get cash out

14    of the box, right?

15         A.    Um-hmm.

16         Q.    And I know you're going to eventually

17    take it off to the cash counting place.

18               So when does the drug dog come into play

19    here?  You get the cash and then you take it over

20    to Fido?

21         A.    Yes.  So we would actually take

22    the -- again, I'm trying to remember exactly how

23    this worked, but once we inventoried everything,

24    had our paperwork in order, we would then take

25    everything out to our evidence technicians who

Page 133

1      were set up in the parking lot right outside the

2      facility.  We would go over to where the drug

3      dogs, the K-9s were at, have them sniff the cash

4      while those law enforcement officers would do

5      their process of having the cash sniffed by the

6      K-9s and let us know if they had hit or detected

7      drugs or not.

8              They would sign their little affidavit;

9      we would check a box on our paperwork; and then,

10     yeah, then the cash was sealed and then stored in

11     the back until transported to the cash counting

12     facility.

13          Q.   Okay.  So let me make sure I have all

14     this correct.

15              So you get the -- you do a particular

16     box.  There's a lot of cash in the box.

17              So you get all your items together; you

18     fill out your FD-597; then you take everything

19     out -- you said outside to the parking lot, right?

20          A.   Yes.

21          Q.   And in the parking lot is where the drug

22     dogs are.  Were they FBI drug dogs, or were they

23     from another agency?

24          A.   No, they were all from -- there was a

25     couple different or a few different state or local

Page 134

1    law enforcement agencies that were -- had the drug
2    K-9s.  We didn't have any of ours there.
3         Q.   Okay.  So some of the state agencies,
4    maybe the DEA?
5         A.   I actually don't think the DEA did.  I
6    think it was just -- again, to the best of my
7    recollection, it was local law enforcement.  And
8    the reason explained to me for the different
9    agencies was to rotate the dogs out so they
10   wouldn't get tired.
11        Q.   Okay.  Were there any dogs inside the
12   facility?
13        A.   None that I observed while I was there.
14        Q.   Okay.  And you were there all five days,
15   right?
16        A.   Yes.
17        Q.   So, I mean, unless one snuck in during
18   those brief times when you were making a run with
19   the cash, there weren't any dogs inside?
20        A.   Yeah, again, none that I saw.
21        Q.   Okay.  So I understand you were
22   inventorying pretty much most of the time.  You
23   did some cash runs.
24             And it sounds like you did several of
25   those; is that right?

Page 135

1          A.   Of the cash runs?

2          Q.   Yeah.

3          A.   No, I only did two.

4          Q.   Oh, two, okay.  Sorry.  I forgot

5     "several" means more than two.

6               Wow, you were there five days.  So how

7     many boxes -- and I'm not -- obviously I'm not

8     going to ask for a precise number here, but

9     approximately how many boxes did you personally

10    inventory as part of a team?

11         A.   Yeah, no, it's hard to remember

12    specifically.  At the risk of sounding repetitive,

13    I'd say dozens, dozens of boxes.

14         Q.   Makes sense.  But, like, if we look at

15    the 597s, you could have signed the 597, right?

16         A.   Yes.

17         Q.   So we could count up all the 597s with

18    your signature and deduce how many boxes you were

19    involved with?

20         A.   Yes.

21         Q.   Okay.  So you take the cash out; then you

22    take it over to the drug dog.  The drug dog does

23    whatever the drug dog is going to do, either

24    alerts or not alerts.  And you make a note of

25    that.  It sounds like you seal the cash, then.

Page 136

1          Was the cash sealed prior to coming out,

2     or was it --

3          A.   To evidence?

4          Q.   Yeah.

5          A.   Actually, no, we did have it sealed.  But

6     at least the bags I did, we did have it sealed,

7     but we would run the cash -- apparently -- my

8     understanding of what was explained to me is the

9     dogs could smell through the plastic what we had.

10    But just to make sure everything was good, we

11    would rub the cash on the outside of the plastic

12    bag before we sealed it and then sealed it up and

13    gave it to the K-9 handler and watched them send

14    their dogs out to sniff it.

15         Q.   Either alert or not alert, okay.

16              And then after the dog does that, and

17    whichever way it goes, then what happened to the

18    cash?

19         A.   Then we just took it back into

20    the -- those two rooms that were in the back, the

21    room on the right side, which is where we were

22    storing all the cash, we had an agent there posted

23    at all times keeping an eye on the bags of cash.

24    And once the room got full enough and we couldn't

25    fit any more, we would make what we called a cash

Page 137

1    run to the cash counting facility.

2         Q.   Okay.  Before the money was put back in

3    that room -- you might have just said that and it

4    slipped my mind -- it was sealed at that point?

5              Oh, you're saying it was sealed before

6    the dogs got it and you rubbed the cash on the

7    outside and then you took the bag after the dogs

8    did their business and took it to the room in the

9    back?

10        A.   Yes.

11        Q.   Until you got enough of it to justify a

12   cash run?

13        A.   Yes.  Yep.

14        Q.   Okay.  I got you.  So I remember you

15   saying, like, as part of the inventory process,

16   you have the FD-597, you have the photographs, and

17   you have video.

18             Did you videotape the inventory process,

19   you personally?

20        A.   No.

21        Q.   Were there other FBI agents who were

22   responsible for videotaping the inventory process?

23        A.   It was -- I actually want to say DEA may

24   have been doing the videotaping.

25        Q.   DEA might have been doing the

Page 138

1    videotaping.  Okay.

2                Now, from your understanding, the purpose

3    of that was -- of the videotaping was to help

4    create a complete record of what was seized; is

5    that correct?

6          A.    Yes.

7          Q.    Okay.  Do you happen to know if, like,

8    every box that was inventoried was -- let me try

9    to say this in a way that's actually good.

10               Was each and every box inventoried

11   videotaped during that inventory?

12         A.    No, it wasn't.

13         Q.    What percentage of boxes would be

14   videotaped during the inventory process?

15         A.    Yeah, I have no idea.

16         Q.    Well, you inventoried, it sounds like,

17   dozens and dozens of boxes.  So let's just talk

18   about the boxes you inventoried.

19               For the ones you inventoried, what

20   percentage -- again, I'm not asking for any

21   precision.  What percentage of those boxes, of

22   those inventoried, were videotaped?

23         A.    I don't recall any of mine being

24   videotaped.

25         Q.    And you did dozens and dozens, correct?

Page 139

1          A.    Yeah, we took photographs.

2          Q.    You took photographs?

3          A.    Yeah.

4          Q.    Okay.  So in some instances, the

5    inventorying process was videotaped; and in other

6    instances, the inventorying process was

7    photographed?

8          A.    Yes.  I want to say the boxes inside the

9    vault were the ones that were primarily

10   videotaped, that remained inside.

11         Q.    And why would they -- do you know why

12   they videotaped inside the vault as opposed to

13   outside the vault?

14         A.    I mean, I recall a conversation with

15   Lynne -- I mean, one of the larger boxes was

16   inside the vault, so I think we wanted a good

17   record of those.

18               But also it was kind of a resource issue

19   in that we only had so many of those

20   high-definition cameras for recording.

21         Q.    Okay.  So the ones in the vault were

22   generally videotaped; the ones outside the vault

23   were generally photographed.

24               Do you know if, for the inventorying of

25   each box, every box, that there is a videotape or

Page 140

1    photographs?

2         A.   I don't know for every box, but I would

3    say the majority, yes.

4         Q.   Say that again, please.  I'm sorry.

5         A.   I would say the majority of the boxes,

6    yes, they were either photographed or videotaped.

7         Q.   Were all the boxes you inventoried

8    photographed?

9         A.   Yes, to the best of my knowledge.

10        Q.   Okay.  Would you have been the one

11   responsible for photographing, or would that have

12   been someone else?

13        A.   It varied.  Sometimes I took photographs;

14   sometimes other agents or law enforcement officers

15   took the photographs.

16        Q.   Okay.  And so for those photos and

17   videos, like for those to be useful, those would

18   have to capture sort of everything you're doing,

19   right?

20             MR. RODGERS:  Objection; legal

21   conclusion.

22             MR. FROMMER:  Victor, fine, but it is not

23   a legal conclusion to ask him if -- for the camera

24   to serve the purposes the FBI put the cameras

25   there for, if they would need to actually be --

Page 141

1    complete a full videotape.

2         MR. RODGERS:  I'm not going to make

3    speaking objections.

4         Q.  (BY MR. FROMMER)  So let me ask this:  To

5    create a -- this isn't a legal conclusion.  I'm

6    just asking you as an FBI agent who has had years

7    of experience in this.

8         In order to create a complete record, the

9    camera, whether it's a video camera or, you know,

10   a regular camera taking photographs, would have to

11   capture -- substantively capture everything that

12   you're doing, correct?

13        MR. RODGERS:  Same objection.

14        THE WITNESS:  No, we're using it in

15   conjunction with the FD-597, the inventory list.

16        Q.  (BY MR. FROMMER)  So if a list says, you

17   know, stuff, it just says "Miscellaneous comic

18   books," going back to our example, if the video

19   camera doesn't capture an image or the photograph

20   doesn't capture an image of all my 20 comic books,

21   how can I have a complete record?

22        MR. RODGERS:  Objection; argumentative,

23   legal conclusion, assumes facts not in evidence,

24   incomplete hypothetical.

25        THE WITNESS:  We're, again, relying on

Page 142

1    all the other documentation we have in place to

2    track that -- the FD-597, the chain of custody,

3    the bar codes.  And then in addition to, you have

4    video and/or photographs of what was there.

5         Q.   (BY MR. FROMMER)  That's what I'm asking.

6    Wouldn't the photographs and videotape need to

7    sort of have a good view of everything you're

8    doing and the items that are being seized in order

9    to serve that purpose?

10             MR. RODGERS:  Same objections.

11             THE WITNESS:  I think they would

12   corroborate what was in our documentation.  So if

13   you took a video and it showed cash and we wrote

14   down "Comic books," that would be an issue.

15             But I would think the video would

16   corroborate if you videotaped and you showed comic

17   books, we wrote down "Comic books" and our

18   evidence facility had comic books.

19        Q.   (BY MR. FROMMER)  Well, I don't need to

20   belabor the point.

21             If the FD-597 just says "Miscellaneous

22   comic books," and the camera just captures, I

23   don't know, like a fleeting image where you can't

24   tell how many comic books are there, how can we

25   have a complete record of everything that was

Page 143

1    seized?

2            MR. RODGERS:  Same objections.

3            THE WITNESS:  I mean, the camera and the

4    photographs are not the end-all/be-all of our

5    records.

6       Q.  (BY MR. FROMMER)  Well, the FD-597 says

7    "Miscellaneous" and the camera does not show all

8    the comic books.

9       A.  Right.

10      Q.  How do I have a complete record?

11      A.  You have a chain of custody that says

12   that it was taken or seized by this agent on this

13   date at this time from this place.  This is the

14   evidence item.

15           Here's the FD-597 associated with that.

16           Here's the bar code associated with that

17   597.

18           Here's the chain of custody that shows it

19   being transported to our evidence facility where

20   it's been stored securely for X number of days.

21           And then here's a video that shows a

22   fleeting picture of what appears to be a comic

23   book.

24           To me, I think that's a pretty secure way

25   of determining what was in your box, if that's

Page 144

1   what we're discussing.

2       Q.   So you're relying, then, on the chain of

3   custody to do some of the work in terms of

4   preventing theft and loss; is that correct?

5       A.   Yes.

6       Q.   And in my hypothetical, it's doing a lot

7   of the work; isn't that correct?

8           MR. RODGERS:  Same objections; improper

9   hypothetical.

10          MR. FROMMER:  I'll withdraw it.

11          MR. RODGERS:  Thank you.

12      Q.   (BY MR. FROMMER)  So you said you

13  inventoried dozens of boxes, right?

14      A.   Um-hmm, yes.

15      Q.   Did you ever see any, like, slips or

16  envelopes on top of the boxes?  And by that I

17  mean, like, those interior sleeves.

18      A.   Yes.

19      Q.   Like, what percentage of the boxes that

20  you did, since you did dozens of them, would you

21  say had a slip or an envelope on top of that

22  interior sleeve?

23      A.   Best guess is maybe -- I mean, yeah, I

24  couldn't even give you a best guess.  I just know

25  I saw them on some of the boxes.

Page 145

1  Q. Would I be able to see that in the

2 photographs and videotapes?

3  A. On some of them, yes.

4  Q. Why not on all of them?

5  A. I mean, the photographs -- I mean, the

6 photographs just might not represent the box as it

7 was -- I mean, I guess I'm trying to think of

8 how -- if the box was taken out, there could have

9 been a piece of paper on it, but it could have

10 fallen off or something and we didn't see it until

11 later.  So then we took a picture of the box

12 without it having that piece of paper on it.

13  Q. So it's possible, in removing the box,

14 that, like, the envelope could have fallen away

15 and then you wouldn't have seen it?

16  A. Yes.  Or I know there were instances

17 where we would pull out the sleeve, and since it

18 was like -- tape was used, sometimes it would get

19 stuck to, like, the top of where the sleeve was

20 held, like, inside the nest, if that makes sense.

21  Q. Yeah.

22  A. And then we would find that thing later.

23  Q. Okay.  But there were a decent -- I

24 understand you can't give me a firm percentage,

25 and it's understandable.

Page 146

1              But at least some of the boxes had slips
2     or envelopes on the top of the interior sleeve; is
3     that right?
4          A.   Yes.
5          Q.   Okay.  And would you, as part of the
6     inventorying process, open that exterior envelope?
7          A.   Yes.
8          Q.   And I understand I'm not asking for the
9     100 percent, because who knows what people put in
10    those, but what would usually be in those
11    envelopes were be beneficiary forms; is that
12    correct?
13         A.   Yes.
14         Q.   And what kind of information was on those
15    forms?
16         A.   Usually some type of identifying
17    information for the beneficiary of that box, which
18    might include a name, phone number, or sometimes a
19    driver's license number, from what I recall.
20         Q.   From the box holder?
21         A.   The box holder and -- I'm assuming the
22    intended beneficiary of the contents of the box.
23         Q.   Okay.  So the beneficiary form would
24    have, like, basic contact information for both box
25    holder and the beneficiary?

Page 147

1    A.   Yes.   Sometimes either/or.   Sometimes

2    just for the box, and sometimes just for the

3    beneficiary.

4    Q.   Now, before you executed -- before you

5    began executing the warrant at Vaults, were you or

6    other people told that some of the boxes would

7    have slips or envelopes on top?

8        MR. RODGERS:   Compound.   Objection;

9    compound question.

10       THE WITNESS:   I don't think -- no, not

11   prior to the search, I don't remember being told

12   there would be slips of paper.

13   Q.   (BY MR. FROMMER)   Okay.   Were you

14   surprised when you first saw an envelope or a slip

15   of paper on top of an interior sleeve?

16       "Surprise" might be a strong word, but

17   was it -- was that something you had expected to

18   see?

19   A.   No, not something I expected.   I guess,

20   if anything, I would have expected it to be on the

21   inside of the box.

22   Q.   Okay.   Be on the inside of the box.

23       And you weren't told about these, the

24   presence of these envelopes ahead of time,

25   correct?

Exhibit J
698

ER-1441

Page 148

1          A.    No.

2          Q.    So then there wasn't anything that you

3     were told about what you should do if and when you

4     encountered, like, a slip or an envelope like this

5     with the box holder's contact information, for

6     instance?

7          A.    Not that I recall specifically, no.

8          Q.    Okay.  Do you recall when you would run

9     across those slips, those envelopes that had the

10    box holder's contact information or the

11    beneficiary or both on them, would you record any

12    of that information anywhere?

13         A.    Yes.

14         Q.    Where, if you could tell me?

15         A.    We had a -- I keep calling it an

16    inventory sheet, but it was essentially that sheet

17    I was talking about earlier where we could check

18    if the drug dog hit or detected drugs or not.

19    There was also a section that contained agent

20    notes, and that's where we would record the

21    identifying information for that person.

22         Q.    And that form, so that's not an FD-597,

23    right?

24         A.    No.

25         Q.    What is that form called?

1          A.    I call it our inventory sheet.  And then

2     again, it's re-createable, basically, on the

3     FD-597.  It would have a section for the drug dog

4     detection as well as agent notes.

5          Q.    Okay.  So it's reflective of the FD-597,

6     but it also has more additional information upon

7     it?

8          A.    Yes.

9          Q.    I got you.  So there would be an

10    inventory sheet, then, for each and every box; is

11    that correct?

12         A.    Yes.

13         Q.    Okay.  Would that even be for the empty

14    boxes?

15         A.    Yes.

16         Q.    Oh, really?  Okay.

17         A.    Yeah.  Those were the easy ones to fill

18    out.

19         Q.    Just nothing, nothing, nothing, sign,

20    done.  I bet you were happy every time you came

21    across an empty box.

22         A.    Yes.

23         Q.    Okay.  So you would see the slip or

24    envelope.  It would have, like, the box holder's

25    name on it.  And I know that you'd end up

Exhibit J
700
ER-1443

Page 150

1    reporting that information on the inventory sheet.

2         But would you continue to go through a

3    box after encountering one of those slips or

4    envelopes?  Would you continue the inventorying

5    process with respect to the rest of the -- to the

6    contents inside the interior sleeve?

7         A.   Yes.

8         Q.   Sorry, just give me a second.

9         All right.  So let's move past that

10   initial slip.  You've opened the interior sleeve,

11   and now you're looking at the contents of the box.

12        And let's say you found another envelope

13   inside, like, a letter, standard letter, envelope

14   that -- standard letter envelope.

15        Would you open an envelope that -- like

16   that that you found inside the box?

17        A.   Yes.

18        Q.   Were you instructed to do that?

19        A.   I don't recall if we were instructed to

20   do that.

21        Q.   Okay.  I guess the question is, why did

22   you do that?

23        A.   Kind of -- and I go back to the incident

24   to arrest inventory procedures, kind of for agent

25   safety.  We don't know if there's drugs in there,

Page 151

1    plus we don't know if there's valuables in there,

2    plus anything else that could be dangerous.  Also

3    just to accurately reflect what could be in that

4    envelope.

5        Q.   Okay.  So you're opening an envelope to

6    see if there's any, like --

7        A.   Drugs, valuables, or dangerous items,

8    essentially.

9        Q.   Yeah, like hazardous items or things that

10   you want to make sure don't disappear.  Okay.  I

11   get that.

12       So let's say you get into the envelope.

13   You open the envelope.  And surprise, surprise,

14   the envelope just has, you know, well, papers.

15   Just papers in it.  It doesn't have anything else.

16       What would you do at that point with the

17   letter?

18       A.   Honestly, it was kind of nice if we did

19   find something like that because we could just

20   write "Miscellaneous paper" as opposed to it being

21   a bunch of cash, drugs, or something dangerous,

22   because it was just less paperwork to fill out and

23   less steps to do.  So it would be "Miscellaneous

24   paperwork," and it goes in the general evidence

25   bag, which is sealed and sent to the general

Page 152

1    evidence facility.

2          Q.   Now, would you take, like, a picture of

3    the letter or anything like that?

4          A.   No.

5          Q.   Do you know if other agents did videotape

6    or photograph the letters that they came across?

7          A.   Not specifically, no.

8          Q.   What do you mean "not specifically"?

9          A.   I'm thinking they could have taken a

10   picture of -- you know, laid out all of the items

11   that are in the box and taken just an overview

12   shot of everything that was in there.  And yeah,

13   they may have opened the envelope and pulled the

14   papers out to show there was no cash inside the

15   envelope or any valuables or anything like that.

16         Q.   But you agree it would be inappropriate

17   to, like, record or take a photograph of a letter

18   such that you just have a photograph with that

19   letter?

20              MR. RODGERS:  Objection; calls for a

21   legal conclusion.

22         Q.   (BY MR. FROMMER)  I'm asking your

23   personal opinion.  Would that be appropriate or

24   not?

25              MR. RODGERS:  Same objection.  Poses an

Page 153

1     incomplete hypothetical as well.

2              THE WITNESS:  Yeah, I mean, my personal

3     opinion, I don't know if it would be improper,

4     necessarily.  I mean, just -- again, just depends

5     on what's on the letter.  If there's, like, a

6     manifest on there of, like, blowing something up,

7     I think we're going to take a picture of it.  You

8     can't turn a blind eye to something like that.

9         Q.   (BY MR. FROMMER)  Okay.  Would there be

10    any instance in which it would be appropriate for

11    you to read the letter?

12             MR. RODGERS:  Same objection.

13             THE WITNESS:  I just don't think we would

14    generally read the letter if we saw it was

15    miscellaneous paperwork.  We would probably move

16    on unless we saw -- if you opened it and you saw

17    something that said "kill" or "death" or "murder"

18    or something, then we would probably read the

19    letter.  But otherwise we were just confirming

20    there was nothing dangerous or valuable in that

21    envelope.

22        Q.   (BY MR. FROMMER)  Okay.  And you said you

23    never -- you only worked with -- you never worked

24    with -- did you ever inventory any boxes where it

25    was -- where the process was videotaped?

Page 154

1          A.   I don't think I did, no.

2          Q.   And that's consistent with what I think

3     you told me before, that you were -- that the

4     envelope -- sorry, not the envelopes, but the

5     boxes you inventoried were photographed by and

6     large; is that correct?

7          A.   Yes.  Yes.

8          Q.   Okay.  Do you know what agents happened

9     to work in the vault?

10         A.   I want to say I know that a couple agents

11    on my squad worked in a vault, and it would have

12    been -- really just Special Agent Mark Strickland,

13    I know he was in there.  That's really the only

14    agent I could think of.

15              Specifically, like, I know faces, but FBI

16    Los Angeles has a bunch of agents that I know the

17    face but I don't know the name.  And they came

18    from all over, Orange County, our other

19    sub-offices.  So I know their faces, but I just

20    don't know their names.

21         Q.   With everybody who was involved in the

22    inventory process, were they -- I mean the people

23    inside, not, like, the drug dogs and all that, but

24    everybody who was doing the inventory inside the

25    vaults, were they all FBI officials?

Page 155

1          A.    No.  It was DEA, U.S. Postal Service.

2     And again, there may have been other federal

3     agencies, like OOIG, possibly.  Again, that's --

4          Q.    OOIG?

5          A.    Office of Inspector General.

6          Q.    Okay.  So it's possible there were

7     multiple federal agencies inside US Private Vaults

8     during the inventorying process?

9          A.    Yes.

10         Q.    And potentially some state agencies as

11    well?

12         A.    Yes, possibly.

13         Q.    Okay.  And I'm starting to sound like a

14    broken record like this.

15              Who do you think would, at the FBI, have

16    better knowledge than you about this?

17         A.    Probably Lynne Zellhart.

18         Q.    Okay.  So you said you used a lot of

19    photographs when you were doing the inventory, not

20    that you were necessarily photographing yourself.

21              So let's say you came across a box where

22    inside the sleeve, you open it, there were a bunch

23    of gold coins.

24              Would you photograph -- or your team

25    would you photograph the gold coins?

Page 156

1        A.   Yes, we would.

2        Q.   Would you count the gold coins?

3        A.   I mean, me personally, based on the boxes

4    I did, I think I would just say

5    "Miscellaneous" -- and I would say "Yellow colored

6    coins," because I'm not a metallurgist.  I don't

7    know if they're gold or not.  But I would make the

8    assumption they were valuable and treat them as

9    valuables.

10       Q.   Sure.  That makes sense.  You come across

11   a gold-colored coin that somebody put in a safe

12   deposit box --

13       A.   Right.  Yeah.

14       Q.   All right.  So you would photograph.

15            Is it fair to say, then, if you came

16   across gold coins in a box, you'd photographed

17   them, but you wouldn't count them?  And on the

18   FD-597 you might write something like

19   "Miscellaneous" -- I think you said

20   "yellow-colored coins"?

21       A.   Yes.  I would say if we were going to

22   count them, it's because you opened them up and

23   there was, like, five.  You'd automatically write

24   "Five gold-colored coins" there.  I might write

25   that down.

1          Again, it just kind of varied.  If there

2     were a whole bunch of coins in a sleeve, we're not

3     going to count that, again.  We're trying to be

4     efficient and speedy about inventorying what was

5     in the boxes and move on to the next one.

6          Q.   I understand that.  There were hundreds

7     of boxes there, and this was taking multiple days.

8          So processing boxes quickly seems to have

9     been at a premium; is that right?

10         A.   Yes.

11         Q.   Yeah, 800 boxes, that's a lot of boxes.

12         So when you would photograph -- let's go

13    back to the thing -- like gold coins, for

14    instance.  You run into a bunch of gold coins, and

15    you're going to take a photograph of them.

16         Would you spread them out, so, like, from

17    the photograph it would be relatively

18    apparent -- like, if somebody went back to the

19    photograph, they could actually count out how many

20    coins there were?

21         A.   No.  I mean, again, it depended on the

22    box.  If the coins were already out, we might take

23    a photograph.  But if they were in all those

24    sleeves, we might just take a picture of -- here's

25    all the contents of the box.  You can see the gold

Page 158

1    coins and anything else that was in there.

2             And then we would note it in our

3    inventory sheet, the FD-597, and then I may move

4    on to the next box.

5        Q.   Okay.  And part of the reason you didn't

6    go through the laborious process of, like,

7    counting them all, is you can't stay there until

8    the end of the universe; you have to get this

9    process done in a relatively constrained time

10   frame?

11       A.   Yeah, we were taking up the whole parking

12   lot, and the local businesses were getting upset.

13   So we were trying to be cognizant of that and move

14   as quick as we could to get their lives back to

15   normal too.

16       Q.   Understandable.

17            Okay.  We talked about money before, if

18   it was less than 5,000, you would do it locally.

19   If it was more than 5,000, you'd send it to the

20   cash counting place.

21            And do you know whose idea it was to have

22   drug dogs out in the parking lot?

23       A.   No, I don't.

24       Q.   Is that another question for maybe

25   Zellhart?

Page 159

1              A.   Yes.

2              Q.   Okay.  And I'm assuming since you weren't

3       involved in getting the dogs there, you don't know

4       what types of drugs the dogs were trained to alert

5       on?

6              A.   I don't.  I think those were listed in,

7       like, the individual affidavits for each K-9 and

8       their handler.

9              Q.   Okay.  And were those included as part

10      of, like, in the inventory sheets?

11             A.   Yes.  So each box had a packet of

12      paperwork, which was the FD-597, the inventory

13      sheet.  That affidavit would have been included

14      had the drug dog detected.  That was pretty much

15      it.

16                  But then this is also reflected in our

17      FD302s, which essentially consolidates all that

18      documentation to include the videos and

19      photographs.

20             Q.   Oh, okay.  So there are FD-597s that you

21      created, but there are also FD-302s that you

22      created as part of this?

23             A.   Yes.

24             Q.   And so let me understand, like, what the

25      302s contained.

Page 160

1            So the 597 is just the -- is the listing

2      of the property found in the box.

3            Then the inventory sheet also has whether

4      the drug dog alerted, plus the agent's notes.

5            Is it correct to say, then, you would

6      then prepare a 302 that encapsulated all the

7      information in the 597 and inventory sheet?

8      A.    Yes.

9      Q.    And did you say also it would

10     incorporate, like, a summary of whatever the

11     photograph or videotape revealed?

12     A.    I don't know if I would say revealed.  I

13     think it would just note if that box had been

14     photographed or videoed, essentially just noting

15     it and that it was available to be looked at.

16     Q.    Okay.  So it would note, "We made a

17     videotape," or "We made photographs."

18           It wouldn't summarize -- attempt to

19     summarize what that video or photographs depicted,

20     though?  It would just say, "Here are these piles;

21     you can go look at them if you want"?

22     A.    Yeah, they're very bland and generic,

23     just saying -- for example, like, this box

24     number -- it would really list out what was in the

25     FD-597 and was the box photographed or videotaped.

Page 161

1    And I want to say that's pretty much it.  It was

2    very generic.

3         Q.   Okay.  But the 302 sounds like it would

4    be sort of -- for lack of a better term, a

5    one-stop shop in the sense that it has the

6    contents of the FD-597; it has the drug dog alert;

7    it has any notes you would have had; and it would

8    have a reference to any photographs or videotape

9    that was taken of the inventory for that box?

10        A.   Yeah.  So, I mean, when I say the FD-302

11   would have it, like, there's a 302, and then it

12   would have its attachments, including the FD-597

13   and the other documents.

14        Q.   But if I want to get a real overall,

15   overarching view of everything involved with a

16   box, I would want to look at that 302 and its

17   attachments?

18        A.   I mean, yeah, I would say that would be a

19   good spot to start.

20        Q.   Okay.  Because the 597 is just giving me

21   one piece of the overall picture?

22        A.   Yes.

23        Q.   Got it.  So when you did the 597s, were

24   you doing the 597s contemporaneous with the

25   inventorying process?

```
                                                     Page 162

 1          A.   Yes.

 2          Q.   You slipped into the nod --

 3          A.   Yeah.

 4          Q.   I know, it's been a while.  I'm sure I've

 5     done it too.

 6               So sorry, Ms. Simmons.

 7               Let me just -- I'll make that cleaner.

 8               Is it true that you would fill out the

 9     FD-597 contemporaneously throughout the

10     inventorying process?

11          A.   Yes.

12               MR. FROMMER:  Okay.  Let me just take a

13     five-minute break.

14          (Break taken from 2:42 p.m. to 2:50 p.m.)

15          Q.   (BY MR. FROMMER)  Thank you, Agent

16     Palmerton.  I have a few more questions.

17               A second ago, we had talked about, like,

18     the FD-302s, the FD-597s, the inventory sheets,

19     the photographs, the videotapes.

20               Where exactly would those things be kept

21     at the FBI?

22          A.   Yeah, primarily they would all be

23     serialized into the investigative case file in our

24     system that stores those.

25          Q.   Okay.  So would each box have its own
```

Page 163

1    separate investigative case file, or would there

2    be one overall?

3        A.    No, there would be one overall.  And

4    then -- and I just know this from looking at the

5    case file.  There's hundreds and hundreds of -- I

6    mean, if not thousands of entries into that

7    investigative case file.

8            So to answer your question, yeah, each

9    box would have its own 302 which would be in that

10   one investigative case file.

11       Q.   And the investigative case file, does

12   that include -- I assume from the name, that

13   includes everything related to the USPV

14   investigation from, like, 2019 when you first

15   heard about it on; is that correct?

16       A.   I would say it would have most of the

17   activity, potentially not all.  I mean, there

18   might be some stuff kept on, like, a shared file

19   on our internal servers, which -- I mean, I'm just

20   thinking that would include -- it's primarily the

21   file constraints on investigative file system.

22   Those, like, videos and photographs, they might be

23   retained on that shared file on the server.

24           So you would just reference it in the

25   FD-302 in the case file, and if you wanted to look

Page 164

1    at it, you'd just go on that shared folder to

2    review the video if needed.

3         Q.   Okay.  So the case file, that exists on,

4    like, some central server?

5         A.   Yes.

6         Q.   Is that Sentinel?

7         A.   It is Sentinel.

8         Q.   And but the files -- the videotapes and

9    the photographs, you're saying, would not be on

10   Sentinel?

11        A.   Some of the photographs could be on

12   there, but I just know that generally videos, just

13   due to the file constraints of uploading into the

14   software, it kind of will kick it back.

15             So, I mean, I know that most of the

16   videos, if not all of them, were kept on just a

17   shared folder where, you know, it would have a box

18   number that connected just with the 302.

19             So if you're looking at 302, it would say

20   "See video stored here," and you'd just go find

21   it.

22        Q.   Got it.  And that server, that's local to

23   the FBI office in LA?

24        A.   Yes.

25        Q.   Okay.  So are there access restrictions

Page 165

1    to Sentinel?  Can any FBI special agent go onto

2    Sentinel and pull up any case file?

3         A.   I mean, I don't know specifically.  I

4    know that there are access restrictions depending

5    on the case.  So you can restrict either certain

6    people or groups of people, or you can only allow

7    the case agent and maybe a supervisor to view the

8    case, just depending on what type of investigation

9    it is.

10        Q.   You mean like the sensitivity of the

11   investigation?

12        A.   Yes.  So, I mean, yeah, if it's like a

13   classified investigation involving something like

14   national security-related, it's very restricted.

15   But if it's just a standard bank fraud

16   investigation, generally most people in the FBI

17   could access that system.

18        Q.   Okay.  And where does this case fall?  I

19   would assume that this case falls in sort of the

20   more standard bank fraud area than, like, national

21   security.

22        A.   Yeah, I don't know.  And that's not to

23   say that criminal investigations can't be

24   restricted.  And this one could have been, but I

25   just don't know.

Page 166

1       Q.   But you don't know the access

2   restrictions for the case file here?

3       A.   I don't.

4       Q.   And I'm going to say what I've said many

5   times.  I'm assuming that Special Agent Zellhart

6   would be in a better position to talk about that?

7       A.   Yes.

8       Q.   Okay.  A moment ago you talked about that

9   you had recently reviewed the document retention

10   policies for the FBI.

11       A.   Yes, that was one of my more recent

12   trainings.

13       Q.   Oh, okay.  And can you tell me -- because

14   I'm interested in trying to figure out the -- you

15   know, the documents, photographs, other things

16   created as a result of the execution of the

17   warrant since you just went through this.

18        Can you give me some idea of, like, how

19   that document retention policy would apply to, for

20   instance, you know, documents referring -- either

21   describing what was in the box or maybe pictures

22   of a box?

23       A.   I mean, yeah, I couldn't specifically

24   tell you, because, again, it's almost more of an

25   administrative training.  I know the document

1    retention policies are pretty strict, and then we

2    try not to get rid of anything, obviously,

3    primarily for purposes of discovery because we

4    have to turn over pretty much everything to

5    defense counsel once an investigation moves to

6    that stage.

7          Generally everything is kept in its -- I

8    mean, the one thing I remember is it's supposed to

9    be kept safe and secure in the facility.  And for

10   us, that's usually on our servers, which I like to

11   think are fairly secure.  And they would be stored

12   there for a significant period of time until

13   they're required to be disposed of.

14         I want to say there's stuff going back to

15   2009, just administrative stuff still being held

16   onto, stuff that's case stuff.  There's stuff

17   going back to the '50s and '60s that's still out

18   there.

19   Q.   So the stuff in the individual case file

20   for this case could sit on Sentinel, then, for

21   decades, potentially?

22   A.   Potentially, yes.

23   Q.   Okay.  And honestly, depending on how the

24   case was classified, that would determine the

25   degree of access that could be had to those files;

Exhibit J
718
ER-1461

1    is that correct?

2         A.   Yes, and those restrictions, I mean, can

3    change over time too.

4         Q.   Let me move a little bit past that week.

5    Well, somewhat past that week.  Because I recall

6    the first time I was there, I saw, like, a page on

7    the front door.  And it said something about --

8    like if you want to file a claim to get your stuff

9    back from the FBI, go to this website and fill out

10   this information.

11        Did you have any role in that informal

12   claim process?

13        A.   No.

14        Q.   Do you know who did?

15        A.   That would have been Agent Zellhart.

16        Q.   Okay.  Do you know if she would have

17   consulted with anyone about that?

18        A.   Yes, she would have.  I couldn't tell you

19   exactly who.

20        Q.   Would that be SSA Alexander?

21        A.   Possibly.  I would say possibly also or

22   likely our legal team as well.

23        Q.   Okay.  The legal team?

24        A.   Yeah, and probably some folks at

25   headquarters in order to set up that website.

Page 169

1    Q.   Okay.  So potentially some folks

2    over -- are they still at the Hoover building?

3    That building still exists, right?  You're talking

4    the J. Edgar Hoover building over in D.C.?

5    A.   Yeah, that still exists.

6    Q.   Hasn't fallen down yet, somehow?

7    A.   No, not yet.

8    Q.   Okay.  So to put up that website, Special

9    Agent Zellhart would have probably talked with

10   some higher-ups in the field office and then also

11   some folks at headquarters in D.C.; is that

12   accurate?

13   A.   Yes.

14   Q.   And as with many other things in this, if

15   I wanted to get more information about it, I

16   should probably speak to Special Agent Zellhart?

17   A.   Yes.

18   Q.   Okay.  Now, as you might be aware, a few

19   months after the warrant was executed, there was a

20   notice -- there were notices of administrative

21   forfeiture put out for a subset of the boxes.  I

22   forget the amount.

23        But did you have any role in deciding

24   which boxes would be subject to administrative

25   forfeiture proceedings?

Page 170

1          A.    No.

2          Q.    Do you know who would?

3          A.    I don't, no.

4          Q.    Is that something the FBI would make a

5     determination of or would that be a determination

6     made by the USAO?

7          A.    Yeah, I don't know.

8          Q.    Okay.  Do you happen to know who's the

9     head of the forfeiture section of the United

10    States Attorney's Office?

11         A.    I don't.

12         Q.    Okay.  But they might have information

13    about who made those decisions, you would say?

14         A.    They might, yeah.

15         Q.    Okay.  So obviously you don't know what,

16    if any, sort of investigation they would have

17    under -- whoever decided would have undertaken

18    before making a decision about whether to engage

19    in administrative forfeiture proceedings?

20         A.    Yeah, I wouldn't know.

21         Q.    You weren't involved in any of that?

22         A.    No.

23         Q.    Okay.  And you don't really know who at

24    FBI might have been?  Maybe Lynne?

25         A.    Maybe Lynne.  Or she would have more

Page 171

1    information than I would have.

2        Q.   Okay.  Here's a little bit of a happier

3    part.  I know some of the stuff went to an

4    administrative forfeiture, and other boxes got

5    returned to, you know, to the box holders.

6             Now, I'm hoping -- were you involved in

7    the returning property to these folks?

8        A.   I did return a couple of boxes.

9        Q.   Okay.  You returned a couple of boxes?

10       A.   Yes.

11       Q.   And do you know, like, other agents who

12   helped return boxes?

13       A.   Yes.  We have -- I mean, there were other

14   agents that returned boxes, a number of agents

15   that returned boxes.

16       Q.   Okay.  Do you recall any by name, per

17   chance?

18       A.   I know Agent Zellhart.  We have a newer

19   agent who has handled a lot of the box returns,

20   Crystal Morelos, Agent Sarah Plantz.  And then

21   there was dozens of other agents that were

22   involved in box returns too.  There was so many,

23   the work was spread out.

24       Q.   Makes sense.  So you said you were

25   involved in at least a couple of returns, right?

Page 172

```
 1          A.   Yes.
 2          Q.   Can you tell me, how did you verify that
 3     the -- that you were giving the box to somebody
 4     who was entitled to have the contents of the box?
 5          A.   I want to say for my boxes, I looked at
 6     the FD-302, if there was, like, any identifying
 7     info in there, you would note it.
 8               And then the attorney -- in the instances
 9     I returned it, there was an attorney representing
10     the box holder.  The attorney was bringing a key
11     as well as copies of the -- some type of
12     identification, usually a driver's license that
13     matched identifying information we had in the box.
14               And then we tested the key to make sure
15     it worked, and then we returned the items
16     back -- in my case, back to the attorney.
17          Q.   So in both of your instances, was it an
18     attorney who was identifying his or her client?
19          A.   Yes.
20          Q.   Were there instances where there might be
21     an attorney but they didn't want to reveal the
22     name of their client who came to pick up property?
23          A.   Not that I recall.
24          Q.   So it sounds like the key, having the key
25     was an important part of getting property back; is
```

Page 173

1    that right?

2         A.   Yes.

3         Q.   Being able to show you had the key and it

4    fit the lock for the particular door of the nest;

5    is that correct?

6         A.   Yes.

7         Q.   I just realized something.  If you guys

8    were holding onto the keys -- or you weren't,

9    obviously, but in order for that to work, that

10   meant you were holding onto all of the doors;

11   isn't that correct?

12        A.   Yes.

13        Q.   So again, the nests are sitting there

14   basically with ripped-off doors, and they have

15   been ever since March of 2021?

16        A.   Yes.  I want to say they're stored in our

17   general evidence facility, actually, along with

18   the boxes.  We would take the box door, put it

19   inside the sleeve, tape it, tape it shut so we

20   knew if we needed it returned, we could easily

21   open the sleeve and have the key -- do a key test.

22        Q.   Okay.  But those poor nests are still

23   torn apart?

24        A.   Yes.

25        Q.   Okay.  And have you heard about any

Exhibit J
724

ER-1467

Page 174

1     claims from people who have said that their

2     property has gone missing after -- as a result of

3     the warrant execution?

4          A.   I've heard about it, but yeah, I couldn't

5     tell you specifically which boxes or which --

6          Q.   Oh, no, and I wouldn't expect you to.

7     I'm just wondering have you heard of stories like

8     that.

9          A.   Yes.

10          Q.   More than one?

11          A.   I really can just think of one that I was

12     told.

13          Q.   Well, what was that one?

14          A.   I think it was gold coins.  Someone said

15     they were missing gold coins.

16          Q.   All right.  But that's the only one you

17     can recall hearing about?

18          A.   Yes.

19          Q.   Okay.  Can you briefly tell me, who is

20     Bailey Dress?

21          A.   She is an agent on the squad.  I think I

22     said Agent Kate Bailey earlier is one of the

23     agents who participated.  She's Kate Bailey-Dress.

24     She was married right before that.  Anyway, it's

25     the same individual.

Exhibit J
725

ER-1468

Page 175

1    Q.   And she's on your squad, you said?

2    A.   She is.

3    Q.   Who is Desmond Beverly?

4    A.   I actually have no idea.

5    Q.   That's fair if you don't know.

6         So who is -- I think we talked about her

7    before, but Krysti Hawkins?

8    A.   Krysti was our assistant special agent in

9    charge until leaving just recently.  We have the

10   new ASAC that I mentioned earlier who I just

11   remembered her name.

12   Q.   Okay.  All right.  So Ms. Hawkins left?

13   A.   She did.

14   Q.   And I think we previously talked about

15   Richard Alexander.

16        He left as well, correct?

17   A.   Yes.

18   Q.   When did Ms. Hawkins leave?

19   A.   Krysti left -- she actually may have left

20   before Richard did, approximately around the end

21   of last year as well.  I really don't recall

22   specifically.

23   Q.   Okay.  And do you happen to know where

24   Ms. Hawkins is now?

25   A.   I don't.

Page 176

1       Q.   Okay.  So Ms. Hawkins, she didn't retire

2   like SSA Alexander, did she?  Did she go to a

3   different job?

4       A.   To the best of my knowledge, I think she

5   transferred to -- I believe headquarters,

6   actually.

7       Q.   Okay.  So you think she's still with the

8   FBI, just in D.C. rather than in LA?

9       A.   Yeah, again, to the best of my knowledge.

10      Q.   Okay.  And do you know who Todd Boyett

11  is?

12      A.   I don't.

13      Q.   Okay.  That's fine.  Or Noah Thompson?

14      A.   No.

15      Q.   And we've talked about Ryan Heaton.  And

16  he's your current SSA, right?

17      A.   He is, yes.

18      Q.   Okay.  I just want to make sure I

19  understood that.

20           Who is Jesse Murray?

21      A.   I think she's involved with our asset

22  forfeiture folks.  But actually I don't even

23  really know her personally, I think just by name

24  and reputation.

25      Q.   Okay.  In your LA office or at

Exhibit J
727

ER-1470

Page 177

1    headquarters?

2         A.   I think LA.

3         Q.   So you think she's part of the asset

4    forfeiture unit over in the LA FBI office?

5         A.   Yes.

6         Q.   Okay.  Thank you for that.

7              MR. FROMMER:  I think we're about done.

8    Let me take a very short break just to confer with

9    my colleagues and then hopefully we'll be able to

10   wrap things up.  Okay?

11             THE WITNESS:  Okay.

12             (Break taken from 3:12 p.m. to 3:15 p.m.)

13             MR. FROMMER:  We are, in fact, all done.

14   Thank you very much, Special Agent Palmerton.

15   You've been very helpful on this.  I appreciate

16   your time.  Thank you for taking the time on this.

17             And with that, I'll conclude the

18   deposition with the caveat that we might need to

19   call you back, depending on what the documents

20   that we have yet to obtain say.  I don't expect

21   that, but I just want to leave that as a

22   possibility.

23             With that, thank you for your attendance

24   today.

25             THE WITNESS:  Thank you.

1          (The remote deposition concluded at 3:15 p.m.)

2                              * * *

3                      (Signature was requested.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit J**
**729**

ER-1472

1                          VERIFICATION
2

    STATE OF _____)
3                            )  ss.
    COUNTY OF _____)
4

5       I, JUSTIN PALMERTON, being first duly sworn
6   remotely on my oath, depose and say:
7       That I am the witness named in the foregoing
8   remote deposition taken the 28th day of April, 2022,
9   consisting of pages numbered 1 to 178, inclusive; that
10  I have read the said deposition and know the contents
11  thereof; that the questions contained therein were
12  propounded to me; that the answers to said questions
13  were given by me, and that the answers as contained
14  therein (or as corrected by me therein) are true and
15  correct.
16

        Corrections Made:  Yes_____  No_____
17
18

        _____
19                  JUSTIN PALMERTON
20

    Subscribed and sworn to before me this _____
21

    day of _____, 2022, at _____, Idaho.
22
23

                    _____
24                  Notary Public for Idaho
                    Residing at_____, Idaho
25                  My Commission Expires: _____.

Page 180

1                    REPORTER'S CERTIFICATE

2

        STATE OF IDAHO  )
                        )  ss.
3       COUNTY OF ADA   )

4

5          I, AMY E. SIMMONS, Certified Shorthand Reporter

6      and Notary Public in and for the State of Idaho, do

7      hereby certify:

8          That prior to being examined, the witness named in

9      the foregoing deposition was by me duly sworn remotely to

10     testify to the truth, the whole truth and nothing but the

11     truth;

12         That said deposition was taken down by me in

13     shorthand at the time and place therein named and

14     thereafter reduced to typewriting under my direction, and

15     that the foregoing transcript contains a full, true

16     and verbatim record of said deposition.

17         I further certify that I have no interest in the

18     event of the action.

19         WITNESS my hand and seal this 3rd day of May,

20     2022.

21

22                         AMY E. SIMMONS
                           CSR, RPR, CRR, CRC and Notary
23                         Public in and for the
                           State of Idaho.

24

25     My Commission Expires: 06-13-2022

Page 181

1    Victor Rodgers, Esq.

2    victor.rodgers@usdoj.gov

3                    May 3, 2022

4    RE: Snitko, Paul Et Al  v. United States Of America Et Al

5        4/28/2022, Special Agent Justin  Palmerton (#5199043)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 182

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Special Agent Justin  Palmerton (#5199043)

3                E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____        _____

24    Justin  Palmerton                        Date

25

Exhibit J
733

Page 183

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Special Agent Justin  Palmerton (#5199043)

3                    ACKNOWLEDGEMENT OF DEPONENT

4      I, Special Agent Justin Palmerton, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Special Agent Justin  Palmerton          Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

Exhibit J
734

ER-1477

[04405 - accurate] Page 1

**0**

**04405** 1:6
**06-13-2022** 180:25

**1**

**1** 4:9 61:19,21
62:3,15 75:16
92:20 93:22 94:4
94:8 95:3,17
179:9
**10,000** 76:18
**100** 77:3 109:6,8
110:1,5 146:9
**10140** 3:10
**10:31** 52:23
**10:44** 52:23
**10:59** 61:25
**11030** 180:21
**11:11** 61:25
**11:40** 80:23
**11:41** 80:25
**12:46** 80:25
**14th** 3:4
**16781** 2:20
**178** 179:9

**2**

**2** 4:9 95:12,17
**20** 19:13 78:3,5
94:23 124:18
141:20 183:15
**2009** 167:15
**2016** 62:4
**2019** 17:20 18:15
85:23 86:1 163:14
**202** 3:11
**2021** 5:24 6:19
17:18 18:14 68:12
69:3 86:15 87:23
87:25 88:9 89:4
89:18 90:11,23
94:12,20 173:15

**2022** 1:19 2:8
179:8,21 180:20
181:3
**20535** 3:11
**21** 6:17 19:19 23:7
23:10 28:1
**213** 3:5,6
**22203** 2:16
**22nd** 68:12 69:3
110:8,15,19
113:10 115:1
120:23
**247** 63:13
**256** 2:20
**26th** 115:1 120:23
**28** 1:19
**28th** 2:8 12:8
179:8
**2:21** 1:6
**2:42** 162:14
**2:50** 162:14

**3**

**3** 95:20 181:3
**30** 181:17
**302** 160:6 161:3,10
161:11,16 163:9
163:25 164:18,19
172:6
**302s** 159:21,25
162:18
**312** 3:4
**324-8952** 3:11
**33** 13:1
**3:12** 177:12
**3:15** 177:12 178:1
**3rd** 180:19

**4**

**4** 95:20
**4/28/2022** 181:5

**40** 118:5,21
**44120** 2:21
**45** 118:21

**5**

**5** 4:5 95:13,17
**5,000** 131:19,21
158:18,19
**50s** 167:17
**5199043** 181:5
182:2 183:2
**597** 66:12 71:7
72:15 73:1,2 77:6
77:13,21 78:7,13
80:1,2,6,7,12,16
81:14 133:18
135:15 137:16
141:15 142:2,21
143:6,15,17
148:22 149:3,5
156:18 158:3
159:12 160:1,7,25
161:6,12,20 162:9
**597s** 66:18,21 79:3
79:6,7,18 116:21
135:15,17 159:20
161:23,24 162:18

**6**

**60s** 167:17
**61** 4:9
**682-9320** 2:17,21

**7**

**703** 2:17,21

**8**

**800** 157:11
**894-0142** 3:6
**894-2569** 3:5

**9**

**9** 136:13 159:7
**900** 2:16
**90012** 3:5
**901** 2:16
**935** 3:10
**9:00** 69:15,19
111:8 112:7
**9:19** 2:9
**9:37** 18:7
**9:43** 18:7
**9s** 133:3,6 134:2
**9th** 89:18

**a**

**a.m.** 2:9 18:7,7
52:23,23 61:25,25
69:15,19 80:25
111:8 112:7
**abandoned** 31:17
**able** 10:15 11:24
83:7 97:6 145:1
173:3 177:9
**abreast** 129:4
**access** 61:22,23
85:8 118:25 120:5
122:5,14,18,19
127:12 164:25
165:4,17 166:1
167:25
**account** 45:17
**accountant** 35:4
35:10 71:17
**accounting** 13:8
13:18,22 35:6,23
97:7
**accumulated**
132:2
**accuracy** 181:9
**accurate** 10:13,16
11:22 18:16 36:13

Exhibit J
735

ER-1478

[accurate - answer]                                                                    Page 2

62:8,10 63:5 72:6
110:2 124:15
169:12
**accurately** 11:25
73:12 151:3
**accusations** 57:10
57:19,20
**acknowledgement**
183:3
**acknowledgment**
181:12
**act** 25:18,25
**acting** 1:10
**action** 5:21 48:13
54:16 55:12
180:18
**actions** 55:20
119:3
**activities** 24:19
108:18
**activity** 86:8
163:17
**actual** 103:10
111:19 119:18
122:5
**ada** 2:7 180:3
**add** 11:8
**addition** 6:15
47:20 72:15 142:3
**additional** 6:3
11:4 71:7 73:7
98:6 149:6
**additions** 183:6
**address** 103:10
**adjourn** 11:16
**administrative**
28:23 166:25
167:15 169:20,24
170:19 171:4
**advise** 121:10

**affidavit** 37:18,20
38:12,14 39:23
40:5 133:8 159:13
**affidavits** 159:7
**afternoon** 113:9
113:10
**agencies** 43:11,20
43:24,25 44:2,4
70:9 96:4,6,11,16
97:2,8,17,19,25
98:7,18,19 107:21
108:3,6,10 109:18
109:20 134:1,3,9
155:3,7,10
**agency** 44:8
111:21 133:23
**agent** 5:10,17 6:24
9:1,14 12:9,21
14:7,10,18,20 15:2
15:7,15 16:5,6,19
16:23 17:10 19:18
19:24 20:3 28:3,9
33:23 34:18 35:7
35:16 36:7 37:3
38:19 41:19 44:7
44:18,20 45:5,5,12
45:20,22,25 48:2
50:18,19 60:23
61:12 68:7 69:22
75:14 81:2 86:3,5
86:23 87:12 88:5
88:9,14,18,23 89:2
89:9,10,11 92:22
92:23,24,25 93:1,1
93:8 96:24,25
100:17 103:9
104:13 105:16
114:14 117:15,18
120:17,25 121:10
121:21 126:24
136:22 141:6

143:12 148:19
149:4 150:24
154:12,14 162:15
165:1,7 166:5
168:15 169:9,16
171:18,19,20
174:21,22 175:8
177:14 181:5
182:2 183:2,4,12
**agent's** 160:4
**agents** 23:22 29:13
36:18,21 38:10
43:8,9 44:22
45:14 46:6,6,10,13
46:18 47:15 48:11
48:14,23 49:1,11
49:18,19 50:2
52:1 58:2 59:4
65:5,9,18 67:2
70:5 71:4 75:3,8
75:20 79:6,14,17
85:11,12 88:7,12
90:9,14,18 92:7,16
95:11,25 96:12
98:3,4 99:1
101:14 102:7
103:24 107:13
108:13,17,19
109:1,6,8,12,24
110:8,11,12
111:11 113:15,18
113:22,22 117:9
120:3,12 121:25
127:8 129:10
132:5 137:21
140:14 152:5
154:8,10,16
171:11,14,14,21
174:23
**ago** 9:2 19:8,9
32:6 103:6 162:17

166:8
**agree** 152:16
**ahead** 21:3 147:24
**al** 181:4,4 182:1,1
183:1,1
**alert** 136:15,15
159:4 161:6
**alerted** 160:4
**alerts** 135:24,24
**alexander** 94:14
94:16,16 97:11
168:20 175:15
176:2
**alley** 22:3,4
**allotted** 181:20
**allow** 165:6
**allowed** 52:14
126:7 127:12
**alongside** 44:22
49:1
**alternatives**
100:24
**ambiguous** 44:24
51:5,6 58:4 59:9
61:15 64:13
**amendment** 24:14
**america** 1:9 181:4
182:1 183:1
**amount** 38:21
60:19 169:22
**amy** 1:25 2:5
180:5,22
**andrew** 3:4
**andrew.brown**
3:7
**angeles** 3:5 19:22
154:16
**answer** 7:14 8:15
9:5 10:1,3,4,9,10
10:21,23 11:15,22
11:25 23:11 33:6

[answer – authorized]                                                                 Page 3

33:15 37:13,14
38:8 40:2 47:10
54:24 55:6 56:9
57:16 62:13 118:2
163:8
**answered**  60:4
64:14,21 123:13
**answering**  8:12
**answers**  7:10
10:13 179:12,13
**anymore**  122:24
**anyway**  174:24
**apart**  119:10
173:23
**apologies**  6:18
**apologize**  6:21
53:22
**apparent**  157:18
**apparently**  136:7
**appear**  83:1
**appearances**  2:13
3:1
**appeared**  131:19
**appearing**  49:20
**appears**  63:10
143:22
**appended**  183:7
**applicable**  181:8
**application**  38:2,6
38:15,16,25 39:22
40:6 89:21
**applied**  37:2 40:24
41:2,7,9 46:8
**apply**  23:21 26:20
166:19
**applying**  27:3,8
29:22 37:10 39:11
40:13,19
**appointment**
11:21

**appreciate**  177:15
**approach**  47:23
47:24
**appropriate**  25:22
152:23 153:10
**approximate**
41:20
**approximately**
13:18 14:1 19:7
19:11 37:5 41:17
69:14,18 70:1,3,4
90:20 109:17
112:7 135:9
175:20
**approximation**
109:4
**april**  1:19 2:8 12:8
179:8
**area**  22:6 35:25
37:9 165:20
**areas**  16:4 23:1,7
23:17 26:16 32:8
48:3 113:3,19
**argue**  10:24
**argumentative**
72:12 77:17 78:20
141:22
**arlington**  2:16
**arrest**  25:15,19,22
26:7,17 30:11
31:15,25 32:3
34:15,20,25 36:17
37:22 53:10,13,24
54:3,7 55:15
56:11,15,19,23
57:4 59:24 60:3
60:25 61:6 64:1
64:16,20 65:2,11
66:18,22 70:22
71:2 98:11 150:24

**arrested**  30:18
41:8
**arrestee**  26:1
30:12,14
**arrestee's**  26:6
63:16,22
**arresting**  26:1
**arrests**  22:1 26:5
27:8 29:21 36:6
36:10,16,19,23
40:25
**arrived**  112:6,12
130:11
**asac**  15:6 175:10
**aside**  46:5 64:15
101:21
**asked**  32:12 43:16
60:4 62:11 64:13
64:21 86:6 123:12
**asking**  7:8 12:24
15:8,8 28:18,19,21
44:13 50:25 56:13
87:14 90:18 92:15
118:12 123:10
126:16 138:20
141:6 142:5 146:8
152:22
**asset**  176:21 177:3
**assign**  84:24
**assigned**  19:21
72:18 82:15,18
131:25
**assist**  7:10 90:9,18
98:9
**assistant**  1:12 15:6
15:19 175:8
**assisted**  121:1
**assisting**  89:5,11
**associated**  143:15
143:16

**assume**  10:5 22:23
39:16,21 55:3
71:17 95:21
163:12 165:19
**assumes**  46:21
47:12 49:8 54:23
56:7 59:7 63:8
70:24 72:1,10
73:20 74:22 75:10
76:5,24 77:18
141:23
**assuming**  126:1
146:21 159:2
166:5
**assumption**  57:2
156:8
**attached**  181:11
**attachments**
161:12,17
**attempt**  160:18
**attempting**  45:18
115:13
**attendance**  177:23
**attending**  100:22
**attorney**  1:10 5:11
172:8,9,10,16,18
172:21 181:13
**attorney's**  3:2
170:10
**attorneys**  10:19
37:19 38:10,16
**audibly**  7:12
**auditing**  13:23
**ausa**  3:3,3,4
**ausas**  37:19,20
38:21
**authority**  54:18
55:2
**authorize**  50:6
**authorized**  52:14
114:19

Exhibit J
737

ER-1480

[authorizes - boxes]                                                              Page 4

**authorizes** 50:6
**authorizing** 54:20
**automatically**
  156:23
**available** 160:15
  181:6
**avenue** 3:10
**average** 117:22,24
**avoid** 8:9
**aware** 17:20 18:15
  86:3 99:25 100:2
  100:4,7 113:14,24
  114:1 169:18

**b**

**b** 4:7
**back** 5:23 9:21
  17:5 18:8,22
  29:16,18 34:12
  42:13 46:5 52:20
  52:24 53:6 55:24
  56:17 80:4 81:1,2
  85:22 86:13 91:1
  101:23 106:11
  107:4 108:21
  113:8,25 116:14
  119:8 123:7
  128:22 129:5
  130:12 131:24
  133:11 136:19,20
  137:2,9 141:18
  150:23 157:13,18
  158:14 164:14
  167:14,17 168:9
  172:16,16,25
  177:19
**background** 12:20
  13:6
**bad** 88:15
**bag** 83:2,13,19,20
  131:22 136:12
  137:7 151:25

**bags** 74:7 83:4
  112:20 136:6,23
**bailey** 92:25
  174:20,22,23
**bank** 45:16,19
  165:15,20
**bar** 72:19,21 78:25
  82:15,18 83:1
  131:25 142:3
  143:16
**based** 10:25 46:7
  57:23 58:11,24,25
  73:17 74:19 91:7
  97:18 126:16
  156:3
**basic** 35:22 146:24
**basically** 30:24
  86:15 112:17
  119:9 124:1 149:2
  173:14
**basis** 34:11
**becoming** 86:2
**beg** 85:18
**began** 17:16
  110:24 113:8
  147:5
**beginning** 74:18
**belabor** 142:20
**believe** 49:2 59:1
  60:1 61:2 62:12
  63:15 70:6 79:24
  79:25 80:11,19
  85:21 87:2 91:2
  91:22 100:11
  110:7 176:5
**beneficiary**
  146:11,17,22,23
  146:25 147:3
  148:11
**best** 36:9 69:7 90:4
  90:8 97:14,16

101:15 107:22
  113:11 126:9
  127:18 134:6
  140:9 144:23,24
  176:4,9
**bet** 149:20
**better** 38:1 97:1
  105:14 128:2
  155:16 161:4
  166:6
**beverly** 96:9 98:16
  98:20 99:2 108:9
  175:3
**big** 39:20 41:23
  125:5,6 128:15
**biometric** 114:2,5
  114:9,20
**bit** 13:2 21:22
  24:23 26:9 49:16
  52:25 53:4,5
  59:21 85:17
  129:21 168:4
  171:2
**bland** 160:22
**blank** 39:24 40:3
**blind** 153:8
**blowing** 153:6
**blvd** 2:20
**bodies** 98:10
  116:14 120:8
**book** 11:21 143:23
**books** 78:3,4,6,14
  141:18,20 142:14
  142:17,17,18,22
  142:24 143:8
**boulevard** 107:2
  108:24
**box** 116:18 117:10
  117:12,18,24
  118:2,3,8,9,15,19
  118:23,25 119:18

119:21 122:6,10
  122:13 124:17,19
  125:8,25 126:3,11
  127:7 132:14
  133:9,16,16 138:8
  138:10 139:25,25
  140:2 143:25
  145:6,8,11,13
  146:17,20,21,22
  146:24 147:2,21
  147:22 148:5,10
  149:10,21,24
  150:3,11,16
  152:11 155:21
  156:12,16 157:22
  157:25 158:4
  159:11 160:2,13
  160:23,25 161:9
  161:16 162:25
  163:9 164:17
  166:21,22 171:5
  171:19,22 172:3,4
  172:10,13 173:18
**boxes** 105:10
  106:15,19 113:8
  113:15,24 116:4
  116:14,15,24
  117:3,5,14,22
  118:16 119:4,6,12
  120:1,4,5,7,9,13
  123:3 124:10,18
  124:24 125:1
  127:22,25 128:18
  128:20 130:8,15
  130:18 135:7,9,13
  135:18 138:13,17
  138:18,21 139:8
  139:15 140:5,7
  144:13,16,19,25
  146:1 147:6
  149:14 153:24

**Exhibit J**
**738**

**ER-1481**

[boxes - claims]                                                                 Page 5

154:5 156:3 157:5
157:7,8,11,11
169:21,24 171:4,8
171:9,12,14,15
172:5 173:18
174:5
**boyett** 176:10
**break** 6:23 11:12
11:16 18:7 20:20
52:20,23 61:25
80:25 125:12
162:13,14 177:8
177:12
**breaking** 119:9
**brief** 8:25 105:9
134:18
**briefing** 68:18,21
99:9,11,16,21
100:21,21 101:12
102:1,5,10,24
104:6,7 105:5,18
106:14 107:1
108:22
**briefly** 174:19
**bring** 119:14
**bringing** 112:17
172:10
**broad** 28:19 30:4
90:13
**broken** 109:21
120:15 155:14
**brown** 3:4
**building** 36:19
55:2 70:17 103:16
113:14 169:2,3,4
**bunch** 70:16
151:21 154:16
155:22 157:2,14
**bureau** 1:13 3:9
**business** 91:10
101:6 114:25

137:8
**businesses** 158:12
**bust** 125:10
**busted** 125:12

**c**

**c** 5:1
**cadet** 19:17
**cadets** 24:12
**calendar** 11:21
22:9
**california** 1:2,11
3:5 28:4
**call** 25:5 32:20
48:18 68:18 82:6
82:9 90:13 99:9
102:3 116:16
119:10 122:14
149:1 177:19
**called** 19:17 49:2
86:6 87:4 91:3
99:6 102:12 112:2
136:25 148:25
**calling** 148:15
**calls** 24:4 31:21,22
33:4 37:11 43:13
47:20 49:7 50:16
54:22 56:6 57:1
57:12,14 58:6
59:8,10 62:19,19
63:8 64:7 67:9
69:6 71:25 72:11
73:20 74:22 75:11
76:4 77:18 78:20
79:12 84:7 86:20
88:20 97:22
152:20
**camera** 140:23
141:9,9,10,19
142:22 143:3,7
**cameras** 139:20
140:24

**campbell** 3:10
**canvass** 90:8,12
**capabilities** 98:7
107:7
**capacity** 1:10,12
**capture** 73:12
140:18 141:11,11
141:19,20
**captures** 142:22
**carbine** 21:18
**cards** 30:24
**career** 60:20
**case** 1:6 8:2 11:23
12:14 17:20 19:22
22:24 25:17 27:16
38:21 75:7 85:22
86:3,4 87:4,11,12
96:24 98:3,4
103:9 120:25
131:22 162:23
163:1,5,7,10,11,25
164:3 165:2,5,7,8
165:18,19 166:2
167:16,19,20,24
172:16
**cases** 87:6 93:18
**cash** 30:24 83:14
131:9,11,12,12,14
131:16,19 132:3,6
132:8,13,17,19
133:3,5,10,11,16
134:19,23 135:1
135:21,25 136:1,7
136:11,18,22,23
136:25 137:1,6,12
142:13 151:21
152:14 158:20
**categories** 28:20
**caveat** 177:18
**central** 1:2,11
164:4

**ceremony** 20:2
**certain** 28:16
81:22 165:5
**certificate** 180:1
**certified** 180:5
**certify** 180:7,17
**cetera** 75:24
**chagrin** 2:20
**chain** 78:24 81:5,8
81:11,15,17 82:4
83:25 84:5,11,17
84:22 85:1,2
142:2 143:11,18
144:2
**chains** 116:21
**challenge** 5:22
**chance** 27:21
171:17
**change** 29:11,14
73:17 74:19 168:3
182:4,7,10,13,16
182:19
**changes** 181:10
183:6
**charge** 15:7,15,20
93:24 96:20
120:21,24 175:9
**chart** 14:24
**check** 83:23 84:19
84:21 86:7,18,24
87:22 89:16 91:2
133:9 148:17
**checked** 82:2
**checking** 85:9
**chunk** 23:23,24
125:6
**circumstances**
45:12
**claim** 168:8,12
**claims** 72:8 73:3,8
77:14 84:4 174:1

[clarification - continue]                                                                 Page 6

clarification  11:5
clarify  9:21 33:13
  53:8 110:4
clarifying  6:5
class  5:21
classifications
  73:24
classified  28:17
  165:13 167:24
cleaner  162:7
clear  7:22 21:25
  22:20 67:19
clearly  7:11
  106:22
client  172:18,22
close  14:15
code  72:19,21
  78:25 82:15,18
  83:1 131:25
  143:16
codes  142:3
cognizant  158:13
coin  156:11
coins  155:23,25
  156:2,6,16,20,24
  157:2,13,14,20,22
  158:1 174:14,15
coll  3:3
collar  16:22,24
  35:25 92:20 93:22
  94:4,8 95:3,12,13
  95:14
colleagues  177:9
collect  16:24 17:16
  33:24 125:25
  127:15
collected  17:19
  37:16 81:24
collecting  17:2,12
  18:11,14 34:5

college  13:12
colored  156:5,11
  156:20,24
columbia  3:11
combination  38:9
come  14:2 18:22
  31:16 52:20 53:6
  66:3,6,9 78:2
  108:21 111:19
  112:3 126:7,19
  132:18 156:10
comes  30:10
  124:13
comic  78:3,4,6,14
  141:17,20 142:14
  142:16,17,18,22
  142:24 143:8,21
coming  8:21 13:11
  51:14 70:16 136:1
commencing  2:8
commission
  179:25 180:25
communication
  90:15,20
complaints  71:22
complete  10:13,16
  19:19 72:5 76:21
  77:2 81:13 97:7
  138:4 141:1,8,21
  142:25 143:10
  183:8
completed  77:5
  81:11 181:17
completely  9:6
  11:25 39:24 73:12
completion  20:1
compliant  22:1
comport  24:19
  26:11
compound  147:8,9

computer  18:1
concerning  5:22
conclude  177:17
concluded  178:1
conclusion  31:21
  50:17 54:22 56:7
  57:13 58:6 59:8
  62:19 63:9 72:1
  72:12 73:20 74:22
  75:12 76:5 77:19
  78:20 79:12 84:7
  140:21,23 141:5
  141:23 152:21
conduct  29:25
  34:19,24 53:17
  56:14,18 60:24
  61:9,12 63:6,25
  64:4,18 65:1 67:6
  70:21 105:7
  121:11
conducted  53:7,11
  53:23 54:2,6,10
  66:22 75:20
conducting  36:22
  63:16
confer  49:11 177:8
conference  6:6
conferred  49:17
  121:13
confirming  153:19
confronted  126:4
confused  77:25
  119:22
congratulations
  28:4
conjunction  43:10
  43:20 54:15 55:11
  141:15
connected  72:21
  72:22 164:18

consider  116:12
consistent  24:19
  25:11 27:4 79:3,8
  79:13,18,18 154:2
consisting  179:9
consolidates
  159:17
constitution  23:21
  24:20 27:5
constitutional
  25:12
constrained  158:9
constraints  163:21
  164:13
consult  51:19
  65:17
consulted  51:2
  168:17
contact  146:24
  148:5,10
contain  65:9
contained  119:11
  122:15 148:19
  159:25 179:11,13
containing  119:25
contains  180:15
contd  3:1
contemporaneous
  161:24
contemporaneou...
  31:10 162:9
contents  124:20
  146:22 150:6,11
  157:25 161:6
  172:4 179:10
context  26:17
  34:24 64:1,19
  65:2,11 66:15,22
  70:22 103:3
continue  6:2 28:7
  29:7 32:7 55:4