No. 22-56050

# United States Court of Appeals for the Ninth Circuit

PAUL SNITKO, ET AL.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA, ET AL.,

*Defendants-Appellees.*

Appeal from the District Court for the Central District of California,
No. 2:21-cv-04405-RGK-MAR (Hon. R. Gary Klausner)

## BRIEF FOR THE CATO INSTITUTE AS AMICUS CURIAE IN SUPPORT OF APPELLANT AND REVERSAL

Clark M. Neily III
Jay R. Schweikert
CATO INSTITUTE
1000 Mass. Ave. NW
Washington, DC 20001
(202) 216-1461
jschweikert@cato.org

Mark A. Perry
Joshua Halpern
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC 20036
(202) 682-7000
mark.perry@weil.com

Daniel M. Lifton
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. Amicus is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to amicus's participation.

# TABLE OF CONTENTS

Corporate Disclosure Statement .................................................... i

Amicus Curiae's Identity, Interest,  and Authority to File........................ 1

Summary of Argument..................................................................... 3

Argument ................................................................................. 6

   I.   The Facts of This Case Demonstrate How Civil Forfeiture Elevates the Pursuit of Profit over Justice ........................................ 6

      A.  Civil Forfeiture Incentivizes Law Enforcement to Disregard Property Rights and Circumvent Fourth Amendment Guardrails ................................................................... 7

      B.  A Profit Motive Informed the Government's Dragnet Search in This Case ................................................................... 9

  II.  The Government's Scheme to Forfeit All Valuable Property at USPV Violated the Fourth Amendment ......................................... 12

      A.  The Inventory Doctrine Does Not Authorize the Government to Search, Seize, and Forfeit the Contents of Hundreds of Safe Deposit Boxes ................................................................ 13

      B.  The Government Violated Its Duty of Candor by Concealing Its Intent to Forfeit All Valuable Property................................. 15

      C.  The Government Exceeded the Warrant's Limitations, Which Disclaimed Any Intent to Forfeit the Property.............. 20

Conclusion.............................................................................. 23

Certificate of Compliance ............................................................ 24

Certificate of Service................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Boyd v. United States,*
116 U.S. 616 (1886).................................................................... 19

*Franks v. Delaware,*
438 U.S. 154 (1978).................................................................... 15

*Harmelin v. Michigan,*
501 U.S. 957 (1991)................................................................ 4, 12

*Illinois v. Lafayette,*
462 U.S. 640 (1983)................................................................ 4, 13

*Leonard v. Texas,*
137 S. Ct. 847 (2017).......................................................... 3, 6, 7, 9

*Maryland v. Andrews,*
134 A.3d 324 (Md. Ct. Spec. App. 2016) ............................................. 15

*South Dakota v. Opperman,*
428 U.S. 364 (1976)............................................................ 4, 13, 14

*Timbs v. Indiana,*
139 S. Ct. 682 (2019)................................................................... 2

*United States v. Comprehensive Drug Testing, Inc.,*
579 F.3d 989 (9th Cir. 2009) ........................................................ 18

*United States v. Comprehensive Drug Testing, Inc.,*
621 F.3d 1162 (9th Cir. 2010) .................................................... 6, 16

*United States v. Hill,*
459 F.3d 966 (9th Cir. 2006) ........................................................ 16

*United States v. James Daniel Good Real Prop.,*
510 U.S. 43 (1993)................................................................ 4, 12

*United States v. Ladson,*
774 F.2d 436 (11th Cir. 1985) ...................................................... 14

*United States v. Perkins,*
850 F.3d 1109 (9th Cir. 2017) .................................................. 15, 17

*United States v. Rettig,*
   589 F.2d 418 (9th Cir. 1978) .................................................................. 15

*United States v. Shi Yan Liu,*
   239 F.3d 138 (2d Cir. 2000) ............................................................. 5, 13

**Statutes**

Pub. L. No. 98-473, 98 Stat. 1837 (codified at 28 U.S.C.
   § 524(c)) ................................................................................................. 7

**Other Authorities**

Dick M. Carpenter et al., *Policing for Profit: The Abuse of*
   *Civil Asset Forfeiture* (2d ed. 2015) ..................................................... 7, 9

Michael Finnegan, *FBI Says Fortune Seized in Beverly Hills*
   *Raid Was Criminals' Loot. Owners Say: Where's the*
   *Proof?*, L.A. Times (Sept. 19, 2021 7:00 AM),
   https://www.latimes.com/california/story/2021-09-19/fbi-
   seizure-cash-beverly-hills-vault-spawns-epic-court-battle .................. 11

John Malcolm & Zack Smith, Commentary, *FBI's Failure to*
   *Be 'Scrupulously Accurate' with FISA Information Under-*
   *mines Public Trust and the Process*, The Heritage Founda-
   tion (Apr. 4, 2020), https://www.heritage.org/crime-and-
   justice/commentary/fbis-failure-be-scrupulously-accurate-
   fisa-information-undermines ........................................................... 18, 19

Off. of the Inspector Gen., U.S. Dep't of Just., *Review of the*
   *Department's Oversight of Cash Seizure and Forfeiture Ac-*
   *tivities* (2017) ......................................................................................... 8

Roger Pilon & Trevor Burrus, *Civil Forfeiture Reform*, *in*
   Cato Handbook for Policymakers (9th ed. 2022),
   https://www.cato.org/sites/cato.org/files/2022-12/cato-hand-
   book-9th-edition-chapter-16.pdf ....................................................... 2, 8

Nick Sibilla, *Grandmother Who Lost Her Home Because Her Son Sold Marijuana Wins Pennsylvania Supreme Court Case*, Forbes (May 30, 2017 1:50 PM), https://www.forbes.com/sites/instituteforjustice/2017/05/30/ grandmother-who-lost-her-home-because-her-son-sold-marijuana-wins-at-pennsylvania-supreme-court/ ................................................................................ 8

*'So Many Lives Were Lost Because of this Lie': Breonna Taylor Warrant Details Deepen Mistrust in Police* (Oct. 8, 2022 9:39 AM), https://www.whas11.com/article/news/ investigations/breonna-taylor-case/breonna-taylor-case-louisville-kentucky-lmpd-police/417-37b276dd-5886-44b1-b00f-1704bdebce34 ................................................................................ 18

## AMICUS CURIAE'S IDENTITY, INTEREST,
## AND AUTHORITY TO FILE[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999 and focuses on the proper role of the criminal sanction in a free society, the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers. The Robert A. Levy Center for Constitutional Studies was established in 1989 to help restore the principles of limited constitutional government that are the foundation of liberty. To those ends, Cato conducts conferences and publishes books, studies, and the annual Cato Supreme Court Review. It also participates in litigation as amicus curiae around the country, including in cases involving forfeiture and

---

[1] All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting the brief, and no person or entity, aside from the Cato Institute, its members, or its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

1

the Fourth Amendment. *E.g.*, *Timbs v. Indiana*, 139 S. Ct. 682 (2019); *Sorenson v. Massachusetts*, No. 22-481 (filed Nov. 22, 2022).

Cato's scholars have written extensively about the abuses engendered by civil forfeiture and the imperative to reform a law-enforcement system that incentivizes the pursuit of profits over justice. *E.g.*, Roger Pilon & Trevor Burrus, *Civil Forfeiture Reform*, *in* Cato Handbook for Policymakers (9th ed. 2022), https://www.cato.org/sites/cato.org/files/2022-12/cato-handbook-9th-edition-chapter-16.pdf. Cato's writings show that civil forfeiture incentivizes the government to disregard the protections enshrined in the Fourth and Fifth Amendments of the U.S. Constitution, which in turn erodes public trust in the integrity of law enforcement. *See id.*

Cato thus has a strong interest in this case and in reversal of the judgment below. The district court's refusal to hold the government to account for its misdeeds threatens fundamental Fourth Amendment protections and incentivizes law enforcement to seek out forfeiture—and maximize profits—even when doing so may violate the Fourth Amendment. Cato also has a paramount interest in ensuring that the courts hold law enforcement accountable for deliberately misleading judicial officials and violating clear terms of a warrant, as they did in this case.

2

## SUMMARY OF ARGUMENT

This case involves the premeditated theft of private property owned by innocent citizens, committed by government agents who lied to a magistrate judge to obtain a warrant that they did not even pretend to follow. The conduct at issue is unconscionable, inexcusable, and blatantly unconstitutional. Yet the district court gave the government a pass. This Court should correct that injustice.

**I.** Civil forfeiture allows law enforcement to "seize property with limited judicial oversight and retain it for their own use." *Leonard v. Texas*, 137 S. Ct. 847, 848 (2017) (Thomas, J., respecting the denial of certiorari). That power can tempt law enforcement to pursue profits over justice, badly distorting the administration of the criminal justice system. This case is the paragon example of such governmental overreach. The government devised a scheme to forfeit over $85 million in cash from seven hundred individually rented safe deposit boxes. But the government concealed that plan from the magistrate judge: Its warrant application disclaimed any intent to seize the property, and it insisted that the property would merely be "inventoried" so that it could be promptly returned to its owners.

As it turns out, none of that was true, and the potential profits from the search were among the chief engines that drove the deception.

**II.** In cases like this one, where the government "stands to benefit" monetarily from its alleged misconduct, the government's conduct must be viewed with special scrutiny. *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) (Scalia, J., plurality opinion). The procedural protections of the Fourth and Fifth Amendments assume "particular importance" in the forfeiture context, where the government "has a direct pecuniary interest" in evading those constitutional limits. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55-56 (1993). That pecuniary interest drove the government here to commit at least three distinct Fourth Amendment violations in this case.

**A.** First, the government attempts to evade the Fourth Amendment by affixing the label "inventory search" to its dragnet search of hundreds of safe deposit boxes for valuable materials. But the government dramatically and unjustifiably overextends the "inventory" exception to the Fourth Amendment. That doctrine is generally restricted to cases involving impounded cars or persons booked at prison—that is, situations in which the universe of potential property and its owners is necessarily circumscribed. *See, e.g.*, *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976). Expanding the doctrine to cover the

4

contents of hundreds of independently rented safe deposit boxes finds no footing in either the traditional doctrine or its rationale. On the contrary, it would amplify the perverse incentives engendered by civil forfeiture, paving the way for the government to forfeit massive sums from myriad sources, all without probable cause.

**B.** Second, the government violated its duty of candor to the judiciary when it misled the magistrate judge about the intended purpose and scope of its "inventory." Magistrate judges cannot properly exercise their constitutionally mandated review of the warrant application, and authorization of the warrant itself, if the government fails to disclose—indeed, affirmatively conceals—its true intentions and purposes. In this case, the government thwarted the magistrate judge's discharge of these important functions by deliberately concealing its internal decision to commence civil forfeiture against all valuable property inside the boxes. The government must be held accountable for that breach of candor—because allowing such misconduct to stand unredressed would further undermine the public trust that law enforcement has already compromised when it misrepresents the contents of a search warrant.

**C.** Third, and finally, the government violated the warrant's terms when it carried out a criminal search and seizure of box holders' property. In the warrant application, the government disclaimed any intent to do so,

alleging instead that its intent was solely to "inventory" and promptly return the contents. That was false. Because the government's dragnet search was "indistinguishable from a general search," *United States v. Shi Yan Liu*, 239 F.3d 138, 141 (2d Cir. 2000), it violated the Fourth Amendment.

The executive overreach in this case was egregious, and it traces back directly to the perverse incentives engendered by civil forfeiture. Given the government's manifest conflict of interest, it is critical that the judiciary stand as a bulwark against executive overreach and ensure that the government cannot benefit from its misdeeds. The information unlawfully collected in this case should be ordered sequestered or destroyed. *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1174 (9th Cir. 2010) (en banc).

## ARGUMENT

### I.  The Facts of This Case Demonstrate How Civil Forfeiture Elevates the Pursuit of Profit over Justice

Civil forfeiture allows law enforcement to "seize property with limited judicial oversight and retain it for their own use." *Leonard*, 137 S. Ct. at 848 (Thomas, J., respecting the denial of certiorari). The practice has "led

6

to egregious and well-chronicled abuses," *id.*, of which this case is but the latest example—and one that cries out for correction by this Court.

## A. Civil Forfeiture Incentivizes Law Enforcement to Disregard Property Rights and Circumvent Fourth Amendment Guardrails

In 1984, Congress created the Asset Forfeiture Fund that permits the Department of Justice to keep all seized assets and to apportion 100% of the proceeds to departmental operations. Pub. L. No. 98-473, § 310, 98 Stat. 1837, 2052 (codified at 28 U.S.C. § 524(c)). The Forfeiture Fund has led to an explosion in the frequency of civil forfeitures, inviting the government to forfeit property first and ask questions later. *See Leonard*, 137 S. Ct. at 848 (Thomas, J., respecting the denial of certiorari) (noting civil forfeiture has "become widespread and highly profitable"). In 2014, the Department of Justice deposited *$4.5 billion* in forfeited assets into its forfeiture fund—a *1,000% increase* over deposits in 2001. Dick M. Carpenter et al., *Policing for Profit: The Abuse of Civil Asset Forfeiture* 10 (2d ed. 2015).

The profit-making incentives of the civil forfeiture regime distort the administration of criminal justice in multiple ways. When government agencies stand to benefit directly from seized assets, they acquire a powerful incentive to view the property they encounter as presumptively "suspicious" or otherwise subject to forfeiture. As a result, law enforcement tends to target individuals with little or no connection to criminal activity

in order to fill their coffers. This phenomenon is so pervasive that even the federal government has acknowledged its existence. *See* Off. of the Inspector Gen., U.S. Dep't of Just., *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* 20 (2017) (reviewing a sample of seizures that "provided evidence that many of the DEA's interdiction seizures may not advance or relate to criminal investigations").

Examples of such forfeiture abuses can be found across the country, infecting law enforcement policy and decision-making at both the state and federal levels. In Volusia County, Florida, for example, police regularly stop drivers on I-95 and confiscate any cash exceeding $100 on the generalized theory that the money *might* be used to buy drugs. Pilon & Burrus, *supra*, at 2. In Philadelphia, the police attempted to seize the home *and* car of an elderly woman, after her son sold less than $200 worth of marijuana from her house without her knowledge.[2] And in what has now become a case study on the abuses of civil forfeiture, "police in the town of Tenaha, Texas, regularly seized the property of out-of-town drivers passing through and collaborated with the district attorney to coerce them

---

[2] Nick Sibilla, *Grandmother Who Lost Her Home Because Her Son Sold Marijuana Wins Pennsylvania Supreme Court Case*, Forbes (May 30, 2017 1:50 PM), https://www.forbes.com/sites/instituteforjustice/2017/05/30/grandmother-who-lost-her-home-because-her-son-sold-marijuana-wins-at-pennsylvania-supreme-court/.

into signing waivers of their property rights." *Leonard*, 137 S. Ct. at 848 (Thomas, J.). The forfeiture proceeds in that case were used "to buy, among other things, a $500 popcorn machine, candy for a poultry festival and $400 worth of catering." Carpenter et al., *supra*, at 16. This case presents only the latest in a long line of cases in which law enforcement has exceeded its constitutional bounds in the pursuit of profit.

## B. A Profit Motive Informed the Government's Dragnet Search in This Case

This case is a paragon example of how the profit motive engendered by civil forfeiture causes the government to take actions for its own financial benefit that stray far beyond the bounds imposed by our Constitution. The government here applied for a warrant under false pretenses and then deliberately disregarded the warrant's limitations, all in pursuit of its plan to forfeit valuable property belonging to innocent people. The government concealed that effort in its warrant application, describing its goal as merely to "inventory" and return the contents of every box inside the rack, while implicitly disclaiming any intent to forfeit the contents. Its seizure and attempted retention of the property is nothing other than outright theft—a crime, if committed by a private citizen.

Months before seeking the search warrant against U.S. Private Vaults (USPV), the government had made plans to use civil forfeiture

against its customers' property and determined, internally, "that there was indeed probable cause to seize the contents of the safe deposit boxes." ER-7. Consistent with that determination, the government "initiated civil administrative forfeiture against all of the boxes" with more than $5,000, ER-520—because anything less would not turn a profit for the FBI, ER-452-53. At that point, the government had no idea who owned which boxes, what the boxes contained, or if any particular box was linked to any crime at all. Yet, the FBI was nonetheless determined to forfeit every box holder's property, so long as it served the FBI's financial self-interest to do so.

This profit-making scheme is shocking enough, but the government then exacerbated the problem by misrepresenting its actual motives to the court. Rather than disclose its true intentions to the magistrate judge, the government claimed in the search warrant application that it intended merely to "inventory" the contents of the boxes so that they could be returned promptly to their owners. *See* ER-835-36. That could not have been further from the truth: The government had already decided to civilly forfeit all property worth over $5,000, and it made an *internal* probable cause determination that it never allowed the magistrate judge to review. Worse yet, the government expressly disclaimed any desire for a warrant to search or seize the box contents. Its warrant application asserted that the

10

warrant would "authorize the seizure of the nests of the boxes themselves, *not* their contents," ER-835, and that any review of the boxes' contents "should extend no further than necessary to determine ownership," ER-836 n.40. But that was neither the true plan nor what actually transpired.

When FBI officials marched into USPV in March 2021, they broke into every safe deposit box and ran the cash past drug dogs, before processing it for forfeiture. ER-1426-27. Notwithstanding the warrant application's representation, the FBI commenced civil forfeiture proceedings against the contents, targeting over $85 million in cash plus millions more in gold and other property. *See* ER-1276-93. In effect, the FBI carried out a "bank heist in broad daylight."[3]

Though the victims in this case were fortunate to recover their property with the help of pro bono counsel from the Institute for Justice, ER-10-11, the taint of the government's conduct has not fully washed away. That is because the FBI has chosen to retain records from its search, which it may use—and has already used—for investigative purposes against the

---

[3] Michael Finnegan, *FBI Says Fortune Seized in Beverly Hills Raid Was Criminals' Loot. Owners Say: Where's the Proof?*, L.A. Times (Sept. 19, 2021 7:00 AM), https://www.latimes.com/california/story/2021-09-19/fbi-seizure-cash-beverly-hills-vault-spawns-epic-court-battle.

safe deposit box owners. ER-238; ER-940-67. By ordering those records sequestered or destroyed, this Court can meaningfully discipline the worst incentives engendered by civil forfeiture.

## II. The Government's Scheme to Forfeit All Valuable Property at USPV Violated the Fourth Amendment

The procedural protections of the Fourth and Fifth Amendment assume "particular importance" in the forfeiture context, where the government "has a direct pecuniary interest." *James Daniel Good Real Prop.*, 510 U.S. at 55-56. This Court must scrutinize closely the government's alleged infractions because, in Justice Scalia's words, "the State stands to benefit" directly from its infractions. *Harmelin*, 501 U.S. at 978 n.9 (plurality opinion). A searching review of the government's conduct here reveals at least three independent Fourth Amendment violations, each of which flows directly from the perverse incentives engendered by civil forfeiture.

*First*, the government extended the "inventory" doctrine well beyond its scope in order to authorize a dragnet search for valuable property in hundred safe deposit boxes over which it lacked probable cause. *Second*, the government violated its duty of candor when it misled the magistrate judge about the intended purpose and scope of its "inventory" by failing to disclose its intent to forfeit the most valuable property. And, *third*, the government violated the warrant's terms when it carried out a criminal

12

search and seizure of box holders' property in pursuit of its forfeiture objectives. Because the government's dragnet search was "indistinguishable from a general search," *Shi Yan Liu*, 239 F.3d at 141, it violated the Fourth Amendment.

### A. The Inventory Doctrine Does Not Authorize the Government to Search, Seize, and Forfeit the Contents of Hundreds of Safe Deposit Boxes

The government in this case seeks an unprecedented expansion of the Fourth Amendment's "inventory exception." According to the government, it decided to break into hundreds of safe deposit boxes over which it lacked probable cause, on the theory that it was merely taking "inventory." *See* ER-751. That is not just wrong, but dangerously so. The government's overbroad approach to the "inventory exception" would aggravate the profit motives engendered by civil forfeiture and sanction precisely the kinds of abuses at issue in this case.

As Plaintiffs explain (Br. 33-36), the "inventory exception" has traditionally been applied in situations where the universe of inventoried property is necessarily limited: to cases involving impounded automobiles, *Opperman*, 428 U.S. at 375, and to cases involving individuals booked in prison, *Lafayette*, 462 U.S. at 646. In cases like those, the scope of the property is limited, the owner of the property has a diminished "expectation of privacy" with respect to that property, and the inventory is designed solely

to safeguard that property and the integrity of the seizure process and protect the police from potential danger. *Opperman*, 428 U.S. at 367-69.

Here, by comparison, the government invokes the inventory exception to justify a dragnet search of hundreds of safe deposit boxes over which it plainly lacked probable cause, on the theory that the vault company may have committed a crime. On that extreme view, safe deposit box owners essentially lose their Fourth Amendment rights whenever the vault owner finds itself in the crosshairs of law enforcement. But, as the Eleventh Circuit has explained, that approach would plainly "permit government agents to circumvent the safeguards provided by the fourth amendment," *United States v. Ladson*, 774 F.2d 436, 440 (11th Cir. 1985), allowing the government to access people's private spaces, peruse their most intimate possessions, and forfeit any of the property whenever the government stands to turn a profit.

Mixing civil forfeiture and an unwarranted expansion of the "inventory exception" in this way makes for a lethal cocktail—one that would not only poison law-enforcement incentives, but also jeopardize the property interests of all who keep their prized possessions in the buildings of others.

14

This Court should not entertain the government's efforts to free itself from the constraints the Founders imposed through the Fourth Amendment.

## B. The Government Violated Its Duty of Candor by Concealing Its Intent to Forfeit All Valuable Property

Warrant proceedings, which are conducted *ex parte*, demand a heightened duty of candor from law enforcement in order to ensure that the magistrate judge properly exercises his constitutionally mandated review of the warrant application and authorization of the warrant itself. *See Maryland v. Andrews*, 134 A.3d 324, 338 (Md. Ct. Spec. App. 2016) (observing that a "prohibition on disclosure of information to the court . . . prevents the court from exercising its fundamental duties under the Constitution"). The Fourth Amendment generally requires that, before conducting a search, the government must submit a warrant application to a neutral and detached judicial official. Courts are "charged with upholding" the "safeguards of the fourth amendment" by independently evaluating the application. *United States v. Rettig*, 589 F.2d 418, 422 (9th Cir. 1978). This judicial review requirement is "[t]he bulwark of the Fourth Amendment." *Franks v. Delaware*, 438 U.S. 154, 164 (1978).

In order for the judge to ensure that the government's proposed search is reasonable, "[a]n officer presenting a search warrant application

has a duty to provide, in good faith, all relevant information to the magistrate." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (citing *United States v. Hill*, 459 F.3d 966, 971 n.6 (9th Cir. 2006)). If the government's recitation of the facts is "incomplete and misleading," it "effectively usurp[s] the magistrate's duty to conduct an independent evaluation." *Id.* at 1118; *see also Comprehensive Drug Testing*, 621 F.3d at 1178 (Kozinski, J., concurring) ("A lack of candor in . . . any . . . aspect of the warrant application must bear heavily against the government in the calculus of any subsequent motion to return or suppress the seized data.").

The government breached its duty of candor in this case by misleading the magistrate judge about the intended scope and purpose of the "inventory." The government concealed its internal decision to commence civil forfeiture against all valuable property inside the boxes, despite the FBI's policy providing that "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents *must* obtain a search warrant when feasible." ER-860 (emphasis added). Thus, the omission was not an inadvertent mistake; it was a calculated and deliberate decision. And it illustrates the extent to which the

16

government will divert from regular processes when civil forfeiture's profit motive is at play.

Before the district court, the government argued that it only had an obligation to disclose "known facts that have already occurred." Def.'s Opp'n Br. to Pls.' Opening Br. 16, ECF No. 122. But the FBI's decision to forfeit property found in customers' boxes had "already occurred." The FBI had drawn up special instructions for its "inventory" that told agents to gather evidence to advance this forfeiture plan—including running all cash over $5,000 past drug dogs and recording any observations that would link cash to drug smuggling. ER-890-94. And the forfeiture agent "determined that there was indeed probable cause to seize the contents of the safe deposit boxes." ER-7.

Nevertheless, the district court did not find the government's omission material because "[a]ny reasonable magistrate would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture." ER-18. That conclusion is not only dubious on its own terms, but also insupportable in view of the undisputed fact that the FBI had coupled its omission with an *affirmative* statement that the search was designed to facilitate the *return* of property it found in the safe deposit boxes. ER-835-36. The govern-

17

ment's intentional omission, combined with its misleading representa-
tions, "effectively usurped the magistrate's duty to conduct an independ-
ent evaluation," *Perkins*, 850 F.3d at 1118, rendering the ensuing warrant
unconstitutional.

As this Court is well aware, law enforcement undermines the public
trust when it conceals or misrepresents information to a judicial official,
who is "in the front line of preserving [our] constitutional freedoms."
*United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 1007
(9th Cir. 2009), *opinion revised and superseded,* 621 F.3d 1162 (9th Cir.
2010). To name just one recent example, several of the officers involved in
the tragic killing of Breonna Taylor had apparently conspired to falsify the
warrant that ultimately led to the botched and deadly raid of Ms. Taylor's
home.[4] That deception undoubtedly "disrupted the city's efforts to restore
trust in the police department."[5] The FBI did the same when it relied upon
"errors, omissions, and misstatements across four FISA applications" in

---

[4] *'So Many Lives Were Lost Because of this Lie': Breonna Taylor Warrant
Details Deepen Mistrust in Police*, WHAS11 (Oct. 8, 2022 9:39 AM),
https://www.whas11.com/article/news/investigations/breonna-taylor-
case/breonna-taylor-case-louisville-kentucky-lmpd-police/417-37b276dd-
5886-44b1-b00f-1704bdebce34.

[5] *Id.*

an effort "to place Trump campaign advisor Carter Page under surveillance."[6] As these high-profile examples make clear, any deception or material omission in the warrant application process "violate[s] the public's trust and damage[s] the public's perception of the integrity of" our justice system.[7] That is equally so here.

This Court should not further abuse the public's trust by countenancing the government's unconscionable acts. Rather, the only responsible outcome of this appeal is an order holding the government to account for its deception, in no uncertain terms, and ordering its records from the

---

[6] John Malcolm & Zack Smith, Commentary, *FBI's Failure to Be 'Scrupulously Accurate' with FISA Information Undermines Public Trust and the Process*, The Heritage Foundation (Apr. 4, 2020), https://www.heritage.org/crime-and-justice/commentary/fbis-failure-be-scrupulously-accurate-fisa-information-undermines.

[7] *Id.*

search sequestered or destroyed so that it does not continue to benefit from its own misconduct.

### C. The Government Exceeded the Warrant's Limitations, Which Disclaimed Any Intent to Forfeit the Property

The FBI committed a third and independent Fourth Amendment violation when it carried out a criminal search and seizure of box holders' property in pursuit of its forfeiture objectives.

The warrant explicitly provided that it did "*not* authorize a criminal search or seizure of the contents of the safety deposit boxes." ER-749 (emphasis added). The government clearly defied that limitation, because seizing property for forfeiture—as the FBI did here—is undoubtedly a "criminal seizure," as the Supreme Court has held for over a century. *See Boyd v. United States,* 116 U.S. 616, 633-34 (1886) (recognizing that "proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offenses committed by him . . . are in their nature criminal. . . . [S]uits for penalties and forfeitures, incurred by the commission of offenses against the law, are of this *quasi* criminal nature . . . ."). The facts of this case make the "criminal" nature of the search especially clear. *First,* FBI agents were instructed to record evidence that could be used to support allegations that cash was linked to drug trafficking. *See* ER-893 ("Anything which suggests the cash may be criminal proceeds

should be noted and communicated to the Admin team."). *Second*, the agents broke open the safe deposit boxes and ran the cash past drug dogs. ER-1426-27. And *third*, once the FBI identified box holders, it ran their names through a variety of databases in an effort to investigate them. ER-1724. The government cannot credibly argue that these actions were necessary to "inventory" the property.

The government exceeded the warrant in a second respect. The warrant explicitly stated that "agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property." ER-749. Yet, notwithstanding this limitation, the agents continued with their search of boxes' contents even after identifying box holders. *See* ER-13 (district court acknowledging that "agents continued to examine box contents even after identifying the owners' identity"). That was a clear violation of the warrant's scope.

These violations likewise flowed from the profit motive produced by civil forfeiture. The government conducted a more searching review—and exceeded the scope of the warrant—with the clear hope and expectation that, in the words of the agent in charge, "there would be criminal proceeds

in the safe deposit boxes" to forfeit. ER-1634. When the government pursues profit, as it did here, it invariably neglects the pursuit of justice.

\* \* \*

The government's pecuniary interests in this case engendered grievous violations of the Fourth Amendment that substantially undermine the public trust in our system of law and order. The government here applied for a warrant under false pretenses and deliberately disregarded the warrant's limitations by treating an "inventory" as a full-fledged criminal search. The government cannot be permitted to benefit from its misdeeds, including through the information it collected in its criminal database. Ordering the documents sequestered or destroyed would provide a necessary bulwark against executive overreach and counteract the perverse incentives of civil forfeiture.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to enter appropriate relief.

Respectfully submitted,

Clark M. Neily III
Jay R. Schweikert
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 216-1461
jschweikert@cato.org

/s/ Mark A. Perry

Mark A. Perry
Joshua Halpern
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
Mark.Perry@weil.com

Daniel M. Lifton
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

March 1, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 4,481 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Mark A. Perry*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
Mark.Perry@weil.com

March 1, 2023

24

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Mark A. Perry*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
Mark.Perry@weil.com

March 1, 2023