No. 22-56050

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUL SNITKO, ET AL.,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA, ET AL.,

*Defendants-Appellees*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CV 21-4405-RGK*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Division

ANDREW BROWN
VICTOR A. RODGERS
MAXWELL COLL
Assistant United States Attorneys

1400 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
(213) 894-2400
Victor.Rodgers@usdoj.gov

Attorneys for Defendants-
Appellees
UNITED STATES OF AMERICA, ET AL.

# TABLE OF CONTENTS

**DESCRIPTION**                                                      **PAGE**

I.    ISSUES PRESENTED ....................................................... 1

II.    STATEMENT OF THE CASE .......................................... 2

    A.    Jurisdiction and Timeliness .................................... 2

    B.    Statement of Facts and Procedural History .......................... 3

        1.    US Private Vaults successfully caters to criminals ...... 3

        2.    The government criminally investigates Private Vaults ................................................................ 5

        3.    Indictment of Private Vaults and search and seizure warrants ........................................................ 7

        4.    The FBI's written inventory policies ............................. 9

        5.    The execution of the search and seizure warrants ...... 12

        6.    The initiation of FBI administrative forfeiture proceedings ........................................................... 13

        7.    Plaintiffs' class certification and demand for destruction or segregation of evidence ......................... 14

        8.    The district court's decision ......................................... 16

III.    SUMMARY OF ARGUMENT ........................................ 22

IV.    ARGUMENT ................................................................... 25

    A.    Procedural Posture and Standards of Review ...................... 25

    B.    The District Court Correctly Found That the Government Did Not Exceed the Bounds of the Warrant ................................................................. 31

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                     **PAGE**

1. The district court correctly found that the inventory searches would have occurred even if the safe-deposit boxholders had not been suspected of criminal activity ...................................... 32

    a. Legal standards governing inventory searches ............................................................... 32

    b. The district court correctly applied the "but for" test ................................................................ 35

    c. Plaintiffs' claim that the district court should have applied a primary-purpose test ignores settled authority recognizing inventory searches are governed by the but-for test ................................................................. 39

    d. The district court correctly found the supplemental instructions did not supersede the Operations Guide inventory policy that contained standardized inventory procedures .......................................................... 44

2. The district court correctly found that the government conducted meaningful inventories .......... 50

C. The District Court Correctly Concluded That the Government Did Not Breach its Duty of Candor in the Warrant Application ............................................................ 54

D. Plaintiffs' New Legal Argument That the Inventory-Search Doctrine Does Not Apply to Safe-Deposit Boxes Was Waived and in Any Event Lacks Merit ......................... 60

## TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                       **PAGE**

E.    Even If Plaintiffs Had Established a Fourth
Amendment Violation, Ordering the Destruction of
Records Would Be Unwarranted ........................................... 64

F.    Plaintiffs' and Amicus Curiae's Generalized Assertions
Concerning Forfeiture's Alleged Evils are Unavailing ......... 66

V.    CONCLUSION ................................................................. 69

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

## Cases

*Anderson v. City of Bessemer*,
   470 U.S. 564 (1985) .................................................................. 28

*Bumpers v. Cleveland*,
   653 F. Supp. 2d 1202 (D. Utah 2009) .................................... 53

*Burum v. United States*,
   2014 WL 12596719 (C.D. Cal. Apr. 2, 2014) ........................ 64

*Campbell v. Washington Dep't of Soc. & Health Servs.*,
   671 F.3d 837 (9th Cir. 2011) .................................................. 27

*Casey v. Aetna Life Ins. Co.*,
   2008 WL 538486 (C.D. Cal. 2008) ......................................... 31

*Cigna Cas. Ins. Co. v. Polaris Pictures Corp.*,
   159 F.3d 412 (9th Cir. 1998) .................................................. 27

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000) .................................................................. 42

*Colorado v. Bertine*,
   479 U.S. 367 (1987) ................................................... 32, 36, 54

*Cooper v. Harris*,
   581 U.S. 285 (2017) ................................................................ 29

*Crittenden v. Chappell*,
   804 F.3d 998 (9th Cir. 2015) .................................................. 28

*E.E.O.C. v. Maricopa County Community College Dist.*,
   736 F.2d 510 (9th Cir. 1984) .................................................. 28

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                                      **PAGE(S)**

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................. 26

*Florida v. Wells*,
   495 U.S. 1 (1990) ..................................................... 32, 42, 50

*Franks v. Delaware*,
   438 U.S. 154 (1978) ................................................................. 55

*GoPets Ltd. v. Hise*,
   657 F.3d 1024 (9th Cir. 2011) ............................................... 60

*Greenlaw v. United States*,
   534 U.S. 237 (2008) ................................................................. 27

*Illinois v. Caballes*,
   543 U.S. 405 (2005) ................................................................. 50

*Illinois v. LaFayette*,
   462 U.S. 640 (1983) ................................................................. 54

*Kearney v. Standard Ins. Co.*,
   175 F.3d 1084 (9th Cir. 1999) ............................................... 30

*Miranda v. City of Cornelius*,
   429 F.3d 858 (9th Cir. 2005) ................................................. 54

*Mondaca-Vega v. Lynch*,
   808 F.3d 413 (9th Cir. 2015) ................................................. 27

*Muller v. First Unum Life Ins. Co.*,
   341 F.3d 119 (2d Cir. 2003) ................................................... 31

*Payton v. New York*,
   445 U.S. 573 (1980) ................................................................. 61

v

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*People v. Taube,*
 864 P.2d 123 (Colo. 1993) .................................................................. 62

*Perez Cruz v. Barr,*
 926 F.3d 1128 (9th Cir. 2019) ............................................................ 37

*Starsky v. Williams,*
 512 F.2d 109 (9th Cir. 1975) .............................................................. 28

*Stern v. Marshall,*
 564 U.S. 462 (2011) ............................................................................ 31

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,*
 574 U.S. 318 (2015) ............................................................................ 28

*United States v. $124,570 In U.S. Currency,*
 873 F.2d 1240 (9th Cir. 1989) ............................................................ 42

*United States v. $324,225.00 In U.S. Currency,*
 726 F. Supp. 259 (W.D. Mo. 1989) ..................................................... 62

*United States v. Bowhay,*
 992 F.2d 229 (9th Cir. 1993) .......................................................... 33, 34

*United States v. Bulacan,*
 156 F.3d 963 (9th Cir. 1998) .................................................... 41, 42, 43

*United States v. Bussell,*
 504 F.3d 956 (9th Cir. 2007) .............................................................. 29

*United States v. Comprehensive Drug Testing, Inc.,*
 621 F.3d 1162 (9th Cir. 2010) ..................................................... passim

*United States v. Elliott,*
 322 F.3d 710 (9th Cir. 2003) .............................................................. 29

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

*United States v. Foster,*
   100 F.3d 846 (10th Cir. 1996)..............................................59

*United States v. Garay,*
   938 F.3d 1108 (9th Cir. 2019)...........................................34

*United States v. Garcia-Cruz,*
   978 F.2d 537 (9th Cir. 1992).............................................55

*United States v. Gonzalez-Aparicio,*
   663 F.3d 419 (9th Cir. 2011)..............................................60

*United States v. Grey,*
   959 F.3d 1166 (9th Cir. 2020)................................... passim

*United States v. Haro-Salcedo,*
   107 F.3d 769 (10th Cir. 1997)...........................................38

*United States v. Hinkson,*
   585 F.3d 1247 (9th Cir. 2009)...........................................26

*United States v. Johnson,*
   889 F.3d 1120 (9th Cir. 2018)...............................33, 34, 37

*United States v. Khoury,*
   901 F.2d 948 (11th Cir. 1990)...........................................38

*United States v. Ladson,*
   774 F.2d 436 (11th Cir. 1985)......................................61, 62

*United States v. Lang,*
   149 F.3d 1044 (9th Cir. 1998)...........................................28

*United States v. Magdirila,*
   962 F.3d 1152 (9th Cir. 2020)...........................27, 33, 35, 53

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                            **PAGE(S)**

*United States v. McCarty,*
  648 F.3d 820 (9th Cir. 2011) .......................................................... 38, 43

*United States v. Medlin,*
  842 F.2d 1194 (10th Cir. 1988) ............................................................ 59

*United States v. Mezzanatto,*
  513 U.S. 196 (1995) ................................................................................ 30

*United States v. Mittelman,*
  999 F.2d 440 (9th Cir. 1993) ................................................................ 55

*United States v. Nieto-Rojas,*
  470 F. App'x 674 (9th Cir. 2012) ........................................................ 50

*United States v. One Parcel of Real Prop. Known as 2401 S. Claremont, Indep., Mo.,*
  724 F. Supp. 668 (W.D. Mo. 1989) ...................................................... 62

*United States v. Orozco,*
  858 F.3d 1204 (9th Cir. 2017) .................................................. 28, 33, 34

*United States v. Rettig,*
  589 F.2d 418 (9th Cir. 1978) ............................................. 21, 56, 58, 59

*United States v. Roberts,*
  430 F. Supp. 3d 693 (D. Nev. 2019) .................................................... 51

*United States v. Santiago-Lugo,*
  904 F. Supp. 36 (D.P.R. 1995) ............................................................. 62

*United States v. Showalter,*
  858 F.2d 149 (3d Cir. 1988) .......................................................... 61, 62

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

*United States v. Spilotro,*
   800 F.2d 959 (9th Cir. 1986)..................................................59

*United States v. Tamura,*
   694 F.2d 591 (9th Cir. 1982)..................................................59

*United States v. Williamson,*
   439 F.3d 1125 (9th Cir. 2006)................................................30

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ......................................................15, 25

*Whren v. United States,*
   517 U.S. 806 (1996) ............................................................53

*Wolfe v. United States,*
   798 F.2d 1241 (9th Cir. 1986)................................................28

**Statutes**

18 U.S.C. § 924(d)(1)................................................................68

18 U.S.C. § 983(c)(1) ........................................................14, 67

18 U.S.C. § 2254.......................................................................68

18 U.S.C. § 2323.......................................................................68

21 U.S.C. § 881(a)(6)................................................................68

28 U.S.C. § 524(c).....................................................................66

28 U.S.C. § 524(c)(4)(A) ..........................................................66

28 U.S.C. § 1291.........................................................................2

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                              **PAGE(S)**

28 U.S.C. § 1331 ................................................................................. 2

**Rules**

Fed. R. App. P. 4(a)(1)(B) ................................................................ 3

Fed. R. Civ. P. 23(b)(2) ............................................................. 15, 63

Fed. R. Civ. P. 43(a) ...................................................................... 30

Fed. R. Civ. P. 52 .......................................................................... 16

Fed. R. Civ. P. 52(a)(6) ................................................................. 27

Fed. R. Crim. P. 52(b) ................................................................... 60

Fed. R. Crim. P. 41(g) ......................................................... 14, 25, 65

No. 22-56050

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PAUL SNITKO, ET AL.,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA, ET AL.,

*Defendants-Appellees*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA DISTRICT COURT NO. CV 21-4405-RGK*

## GOVERNMENT'S ANSWERING BRIEF

# I

# ISSUES PRESENTED

A.     Whether the inventory search of seized safe-deposit boxes at US Private Vaults, a company that was a money laundering facilitator and magnet for criminal activity, was unlawful.

B.     Whether the government's warrant application, which stated that the government would inventory the seized safe-deposit boxes, misled the magistrate judge.

C.    Whether the government "callously disregarded" the rights
of the class-plaintiff boxholders.

## II

## STATEMENT OF THE CASE

Following a bench trial on the briefs and records in this civil
action, the district court entered judgment for the government
defendants on the demand by a class of plaintiffs that the government
destroy or sequester evidence obtained from a search of US Private
Vaults, a business based in Beverly Hills that provided secure,
anonymous safe-deposit boxes to criminals.  (1-ER-4-5.)[1]

### A.    Jurisdiction and Timeliness

The district court's jurisdiction rested on 28 U.S.C. § 1331.  This
Court's jurisdiction rests on 28 U.S.C. § 1291.  The district court
entered final judgment on October 26, 2022.  (CR 142; 1-ER-2-3.)
Plaintiffs filed a notice of appeal on November 7, 2022.  (CR 143; 8-ER-

---

[1] "AOB" refers to plaintiffs' opening brief, "ER" refers to his
excerpts of record, "SER" refers to the government's supplemental
excerpts of record, and "CR" refers to the Clerk's Record in the district
court.  Multiple citations are separated by semicolons, and parallel
citations are separated by commas.

1899-1900).  The notice of appeal was timely.  *See* Fed. R. App. P.

4(a)(1)(B).

## B.    Statement of Facts and Procedural History

### 1.    *US Private Vaults successfully caters to criminals*

US Private Vaults ("Private Vaults") rented safe-deposit boxes to

customers anonymously without requiring them to provide any form of

identification to rent a box.  (1-ER-4, 4-ER-643.)[2]  To further protect

customer anonymity, Private Vaults' customers kept all keys to their

boxes, Private Vaults could only access a rented box by drilling it open,

and Private Vaults' facilities were equipped with eye-scan vault access,

which allowed customers to access their boxes without disclosing their

identity.  (1-ER-4-5, 4-ER-647.)  In addition, Private Vaults was

outfitted with other significant security measures, including 24/7

electronic monitoring, 24/7 armed response, and a time lock on the vault

itself.  (1-ER-4-5, 4-ER-647.)  Private Vaults charged customers a

premium for its service because, unlike legitimate banks, Private

Vaults offered anonymity, assistance in avoiding law enforcement,

---

[2] Citations to 4-ER-640-746 are to the affidavit submitted by the government to the federal magistrate to obtain search and seizure warrants as to Private Vaults and its business equipment.

money-laundering services, and a place to store illegally obtained cash. (4-ER-653.)

Due to Private Vaults' rental of storage boxes anonymously, Private Vaults' boxes were routinely used by criminals to store their proceeds, a fact both known to and desired by Private Vaults' principals. (1-ER-5, 4-ER-662-67.) The company's website marketed Private Vaults to people acting outside the law, offering "Complete Privacy; Biometric Identification; No ID Required" to rent a safe-deposit box and boasting, "Our business is one of the very few where we don't even want to know your name. For your privacy and the security of your assets in our vault, the less we know [about our customers] the better." (1-ER-5, 4-ER-648.)

Similarly, Private Vaults bragged on its website that it was better than law-abiding banks: "Banks require clients to provide their social security number and a photo identification as a condition for renting a safe deposit box. . . . This information can be easily accessed by government agencies (such as the IRS) or attorneys armed with court orders." (1-ER-5, 4-ER-648-49.) Private Vaults stated in the same

4

website post that it was "not subject to federal banking laws and would only cooperate with the government under court order." (4-ER-649.)

Private Vaults' extensive use of its facility for illegal activities was reflected by law-enforcement activity at the premises. As the district court found, "[g]overnment investigations of individual boxholders resulted in the execution of numerous federal search warrants at USPV, along with the forfeiture of box contents that were criminal proceeds of, *inter alia*, ransoms, gambling and prostitution rings, drug operations, and identity theft schemes." (1-ER-5, 4-ER-654-60.)

### 2. *The government criminally investigates Private Vaults*

Between 2015 and 2019, various law enforcement agencies had individually investigated criminals who used Private Vaults "to store criminal proceeds." (1-ER-6, 7-ER-1618.) But after almost five years of investigating individual boxholders, these agencies concluded they "weren't doing anything effective," because the real problem "was the business itself." (1-ER-6, 7-ER-1619.) Private Vaults was a "money laundering facilitator," which "enable[d] . . . a lot of criminals, to conduct their criminal business." (1-ER-6, 7-ER-1619.) Accordingly, three federal law enforcement agencies commenced a criminal

investigation against Private Vaults, the business, in April 2019, the goal of which was to put it out of business. (1-ER-6, 7-ER-1620, 1635.)

Further investigation revealed that Private Vaults' principals were aware of, and actively solicited, use of Private Vaults' safe-deposit boxes by criminals, and that Private Vaults' principals were themselves engaged in criminal conduct. (1-ER-6, 4-ER-662-720.) The company's owner and founder privately admitted that Private Vaults' best customers were "bookies," "prostitutes," and "weed guys," and that Private Vaults' business was designed to help people hide money from the IRS and the FBI. (4-ER-645, 662.) But as another Private Vaults principal explained to an informant, "[Y]ou don't want every drug dealer in your place either. You need normal people too." (4-ER-666.) The company understood that it needed to attract and rent boxes to some non-criminal customers, as well, to avoid being too obviously a haven for criminals. (4-ER-645, 665-66.)

By June or July 2020, the government's investigation had uncovered "quite a lot of pretty good evidence" against Private Vaults, and agents began to discuss obtaining indictments and warrants against the company. (1-ER-6, 2-ER-184.) The agents wanted to seize

"the thing that made [the company] go" and take "their business out,"

which would involve seizing the "eye scanners, the money counter," and

"the nest[s] of safe deposit boxes." (1-ER-6, 2-ER-188.)

### 3. Indictment of Private Vaults and search and seizure warrants

The following spring, in March 2021, a federal grand jury

returned an indictment against Private Vaults, charging it with

conspiracy to launder money, distribute controlled substances, and

structure financial transactions. (1-ER-7, 4-ER-861-76.) The

indictment also contained forfeiture allegations reflecting the grand

jury's finding of "probable cause to believe" that Private Vaults'

business equipment, consisting of the business computers, money

counters, surveillance equipment, biometric scanners, and the nests of

safe-deposit boxes and keys at Private Vaults were "subject to

forfeiture." (*Id.*)

On March 17, 2021, the government submitted separate

applications for a search warrant for Private Vaults' premises and a

seizure warrant for Private Vaults' business equipment; the warrants

contained a common affidavit by the FBI's lead investigating agent. (1-

ER-7, 4-ER-627-746, 750-858.) The affidavit extensively discussed the

7

fruits of the Private Vaults criminal investigation and noted that the nests of boxes the government sought to seize were "evidence and instrumentalities of Private Vaults' criminality." (1-ER-7, quoting 4-ER-723.)

While the FBI lead agent's affidavit advised that the warrants would authorize the seizure of the box nests, the agent declared that she was not seeking a warrant to authorize the seizure of the contents of the boxes. (*Id.*) However, by seizing the box nests, the FBI lead agent noted that "the government will necessarily end up with custody of what is inside those boxes initially," and that "[a]gents will follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner." (*Id.*) The affidavit further stated that agents would, "in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner," and then would "attempt to notify the lawful owners of the property . . . how to claim their property." (1-ER 7, quoting 4-ER-723-24.)

The magistrate judge issued the warrants, which identified the items to be seized to include the "nests of safety deposit boxes and keys." (1-ER-7, 4-ER-618.) The warrants did not "authorize a criminal search or seizure of the contents of the safety deposit boxes," but they did allow agents, "[i]n seizing the nests of safety deposit boxes," to "follow their written inventory policies" to both "protect their agencies and the contents of the boxes." (1-ER-7, quoting 4-ER-618-19, 751.) In addition, the warrants provided that, "*[a]lso* in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so they can claim their property." (1-ER-7, quoting 4-ER-619, 751 (emphasis added).)

### 4.    *The FBI's written inventory policies*

The FBI's inventory policy is contained within its Domestic Investigations and Operations Guide. (1-ER-8, 4-ER-859-60.) The Operations Guide instructed agents that, "after lawfully taking custody of property," they "must conduct a prompt and through search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents." (1-ER-8, 4-ER-859.) In addition, the Operations Guide required a "written summary showing

9

the results of the inventory must be recorded" on a form that "must include, but is not limited to, a description of the property and the items secured for safekeeping." (1-ER-8, 4-ER-859-60.) "Agents must provide receipts for all items retrieved during inventory searches," and "[a]gents should also memorialize facts pertinent to other activities undertaken during the inventory process, such as . . . a non-inventory-related search conducted and any evidence collected." (1-ER-8, 4-ER-860.) The Operations Guide further instructed that agents may not conduct inventories "solely for investigative purposes," and that "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible." (*Id.*)

The FBI also has a policy on the procedure when agents come into possession of an unknown person's property, which provides that agents should "inspect the property as necessary to identify the owner and preserve the property for safekeeping," and such an inspection should "extend no further than necessary to determine ownership." (1-ER-8, 4-ER-724.) The unknown-person policy is separate from the FBI's inventory policy, and an inspection done to identify the owner "doesn't

10

stop [the FBI] from needing to inventory the [property] . . . to protect the property itself, to protect [the FBI] from accusations of loss or theft, [and] to protect [the FBI] from hazardous materials." (1-ER-8, 7-ER-1677.)

In this case, in preparation for execution of the warrants, the FBI lead agent also prepared supplemental instructions on inventory procedures, using the Operations Guide as a "reference," in order "to help the team focus on what they were doing and how they were doing it." (1-ER-9, 2-ER-171, 5-ER-1023-27, 7-ER-1669-70.) The supplemental instructions comported with the Operations Guide and contained additional details about how to perform inventories applicable to the particular facts of this case. (2-ER-169, 5-ER-1024-27.) The relevant supplemental instructions are set forth in the district court's opinion (1-ER-9-10), and included requirements to inventory the boxes in accordance with FBI policies and procedures, videorecord the search of each box, preserve fingerprint evidence, "identify the contents of each box, creating an inventory list," identify currency and drugs with special labels, look for contact information for the box's owner, specifically note any firearms, have a dog sniff any currency, and assign

11

a "forfeiture identification number" to any amount of currency over $5,000. (1-ER-9-10; *see also* 4-ER-860, 5-ER-1024-27 (instructing agents that HAZMAT team personnel were to handle any hazardous materials uncovered during the inventory).)

### 5. *The execution of the search and seizure warrants*

Hundreds of law-enforcement officers were at Private Vaults between March 22 and 26, 2021, executing the warrants and inventorying the contents of about 700 safe-deposit boxes; inventorying one box could take up to 45 minutes. (1-ER 10, 14, 6-ER-1403-04, 1408-09, 7-ER-1687.) "Occasionally," agents and officers found letters taped to the inside sleeve of a box "purportedly identifying" the owner, though consistent with policy they continued to conduct the inventory. (1-ER-10, 13, 4-ER-859, 6-ER-1438, 1444.) After opening the boxes, consistent with the supplemental instructions, agents would inventory box contents, take photographs and videorecord the inventory, and document the condition of any currency and present it to drug-sniffing dogs, noting whether the dogs alerted. (1-ER-10.)

### 6.    *The initiation of FBI administrative forfeiture proceedings*

On May 20, 2021, the FBI commenced administrative forfeiture proceedings against particular inventoried assets based on probable cause to forfeit them, notifying parties with a potential interest in those assets that they had a right to contest the FBI's concluding the forfeiture of the assets in the administrative proceeding by submitting a claim to the FBI, thereby requiring the government to file a judicial forfeiture action within 90 days (which requires proof by a preponderance-of-the-evidence) or else promptly release the assets.  (1-ER-10; 5-ER 915-33; 8-ER-1836.)  Four plaintiffs sought a temporary restraining order requiring the government to provide additional information in the forfeiture notice, which the district court granted June 22, 2021, but then denied a preliminary injunction as to two of the moving plaintiffs on July 16, 2022.  (1-ER-10; CR 52, 58.)

In denying the motion, the district court noted that the status quo had been preserved pending a judgment on the merits, as those plaintiffs had "submitted a claim to the FBI which stopped the administrative forfeiture proceeding as to their property."  (CR 58 at 3.) Within the 90-day statutory deadline, the government unilaterally

13

decided to return the four plaintiffs' property, because the government determined it could not meet the higher preponderance-of-the-evidence standard required under 18 U.S.C. § 983(c)(1) for judicial forfeiture.

### 7. *Plaintiffs' class certification and demand for destruction or segregation of evidence*

The plaintiffs filed six putative class claims, five of which the district court dismissed. (8-ER-1828-1846.) The surviving claim, Count I, alleged Fourth Amendment violations and sought an injunction ordering the government to destroy or sequester records generated during the inventory, which the district court construed as a claim for equitable relief under Fed. R. Crim. P. 41(g), as interpreted by *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) ("*CDT*") (en banc). (8-ER-1832; *see also* 1-ER-11.) According to *CDT*, Fed. R. Crim. P. 41(g) authorizes district courts to order the government to destroy evidence, including digital records, where the underlying property or originals have already been returned, if the government exhibited "callous disregard" for the Fourth Amendment in obtaining the evidence. (*See* 8-ER-1832 ("Plaintiffs cite no other authority . . . that would allow Plaintiffs to obtain their requested injunction.").)

14

The district court therefore certified, pursuant to Fed. R. Civ. P.

23(b)(2),[3] a class of plaintiffs that encompassed only those Private

Vaults clients who had their property seized and inventoried and

subsequently returned to them, because only those clients would

otherwise lack an adequate legal remedy (namely, a litigation forum) to

redress any injury to their privacy rights as a result of the government's

continuing possession of evidence about the contents of their Private

Vault safe-deposit boxes.  (8-ER-1832.)  The district court set forth the

relevant questions that it thought would be common to the class (8-ER-

1833 (formatting altered)):

> What was the scope of the inventory search authorized by
> the March 17, 2021 seizure warrant?
>
> Did the Government exceed the scope of the inventory search
> authorized by the seizure warrant and instead conduct a
> criminal investigatory search?

---

[3] Class certification under Fed. R. Civ. P. 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The rule "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011) (emphasis in original).

If so, did the Government's search violate the class members' Fourth Amendment rights?

[A]nd finally, if the Government violated the class members' Fourth Amendment rights, did the Government do so with callous disregard, such that the Government must now destroy its copies of illegally obtained records?

On November 8, 2021, the parties agreed to a trial-on-the-briefs at a scheduling conference (1-SER-15-20), and on November 12, 2021, the district court issued its trial-on-the-briefs order (1-SER-4, 9). After opening, opposition, and reply briefs were filed on July 19, August 9, and August 16, 2022, respectively (CR 112, 122 and 130), on August 22, 2022, the district court notified the parties the matter was submitted on the papers (CR 139).

### 8. *The district court's decision*

On September 29, 2022, the district court issued a written decision containing findings of fact and conclusions of law under Fed. R. Civ. P. 52, ruling that class plaintiffs failed to prove a Fourth Amendment violation. (1-ER-4-19.) The court concluded that the government neither exceeded the bounds of the seizure warrant nor violated its duty of candor in its warrant application. (*Id.*)

Because the warrants permitted agents to follow their written inventory policies "to protect their agencies and contents of the boxes"

16

and "to identify box owners," the district court recognized that plaintiffs had to show that the government (on a class-wide basis) failed to comply with its inventory policies in order to prove the government exceeded the bounds of the warrant. (1-ER-11, 4-ER-618-19, 4-ER-751.) That, in turn, required plaintiffs to prove that the inventory searches were constitutionally improper under inventory jurisprudence. (1-ER-11.)

The court found that the inventories were lawful and not "a sham—a mere pretext to rummage through box contents for evidence" as plaintiffs contended, applying a "but for" test for pretext and asking whether the government would have seized and inventoried the safe-deposit boxes "but for" the government's motive to criminally investigate the boxholders. (1-ER-11-16.) The court acknowledged that agents anticipated finding evidence of criminality in the boxes, but that the expectation or hope of finding evidence of criminality during an inventory (or the presence of drug dogs at an inventory) does not invalidate it. (*Id.* at 12-14.) Merely having a "dual" criminal investigative/inventorying motive, as the district court explained, "is not enough" to establish a constitutional violation. (*Id.* at 12, 14-15.)

17

The question is whether the inventory searches would have occurred in any event.

The district court found that they would have: once agents lawfully took the nests of safe-deposit boxes into custody pursuant to the warrant, their inventory policy mandated that they examine the locked containers therein, as the policy required agents to "conduct a thorough search of the contents of the property, *including searching any locked or unlocked containers,*" and that agents had no discretion in determining "which boxes should be inventoried and which should not." (1-ER-13 (emphasis in original); 4-ER-859-60.) The court cited agent testimony that the inventory "was intended to 'protect the FBI, [] to get an accounting of what's actually there, [] to protect us against an accusation of theft or loss, [] to protect us against hazardous material, and . . . to get a full, you know, a full accounting of what's there when we return it.'" (1-ER-14, 7-ER-1577-78.) Accordingly, "[i]t therefore seems clear that the agents would have cracked the deposit boxes and searched their contents whether or not they had an impermissible investigatory motive." (1-ER-13.)

The district court found this conclusion supported by the deposition testimony, which made clear that the government's purpose in seizing Private Vaults' safe-deposit boxes, as the warrant authorized, was to "take [Private Vaults] out of business." (1-ER 14, 7-ER-1635.) If agents had not taken the nests, Private Vaults "could have replaced the computers, the money counters, the eyeball scanners and they would have been back in business" a few days after the search. (1-ER- 14, 7-ER-1636; *see also* 2-ER-188.) The district court's decision also reflected agents' testimony that the "real problem" was the "money laundering facilitator, which" was "the business" itself, resulting in agents' opening the Private Vaults' criminal investigation in April 2019 with the goal of ending the company's operations. (1-ER-6; 7-ER-1619, 1635.)

As the district court further explained, the government's legitimate inventorying motive was evidenced by the fact that over the 4-day process and inventorying of about 700 boxes where inventorying of one box could take up to 45 minutes, the government was able to successfully return property claimed by hundreds of boxholders, and agents testified "[w]e were committed to getting the property back to the correct person." (1-ER-14-15, 7-ER-1679, 1687.) Accordingly, the

19

district court concluded it "beggars belief that agents would have worked in that manner *solely* to invent a pretext for a criminal search" of the boxes' contents. (1-ER-14 (emphasis in original).) The district court rejected plaintiffs' claim that an improper motive was shown by agents' use of catch-all descriptors in recording inventoried items, noting that FBI inventory policy did not require an enumerated, detailed list of all items inventoried, but instead only "a written summary" that must include "a description of the property and the items secured for safekeeping." (1-ER-15-16, 4-ER-859-60.)

As to plaintiffs' claim that the government violated the Fourth Amendment by breaching its duty of candor by misleading the magistrate judge in its warrant application, the district court concluded that plaintiffs had failed to prove that claim, as well. The court noted that plaintiffs did not show (or even argue) that the omission of the government's subsequent forfeiture plans were material to a finding of probable cause as to the warrants directed to Private Vaults. (1-ER-17.) The court also noted that the warrant affidavit was rife with details of prior investigations into individual Private Vaults boxholders that resulted in forfeiture and advised agents would be inventorying the

20

boxes, and therefore any reasonable magistrate would have inferred that the inventory could lead to the discovery of criminal proceeds, and thus result in forfeiture. (*Id.* at 18.) In addition, the district court found plaintiffs had not established the government's conduct was equal to or greater than the violative conduct in *CDT* or *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978), the cases upon which plaintiffs relied. (1-ER-17-18.) Here, unlike in *CDT*, "the Government did not exceed the scope of the warrant, much less blatantly disregard its strictures." (1-ER-18 n.8.)

**III**

**SUMMARY OF ARGUMENT**

The district court properly ruled that plaintiffs failed to establish the government exceeded the bounds of the warrant or misled the magistrate judge who issued them.

In order to prove the government exceeded the bounds of the warrant, plaintiffs were required to prove the inventory was constitutionally improper under the law governing inventory searches, because the warrants provided for seizure of the safe-deposit boxes at Private Vaults and authorized agents to follow their written inventory policies in inventorying the contents of the boxes. Those inventory policies, in turn, mandated that agents open, search, and inventory the contents of each safe-deposit box.

The district court's order reflects its factual finding that the government's motive to criminally investigate boxholders was not the "but for" cause of conducting the inventories. Plaintiffs do not attack this factual finding as clearly erroneous but instead incorrectly claim that the district court used the wrong legal standard, requiring them to prove that the government's sole motive in conducting the inventory

22

searches was to investigate the boxholders. The district court's opinion, however, makes clear the court applied a "but for" (not a "sole motive") standard to the facts of this case. Plaintiffs also ignore the warrants and inventory policy's terms, which set forth standard procedures for the agents to follow, as well as the fact that the execution of the warrants was the culmination of a multiyear investigation of Private Vaults, which succeeded in its primary goal of shutting down Private Vaults and permanently halting the illegal activity occurring at its facility. As the district court order explains, these facts show plaintiffs failed to establish that the inventory was impermissibly pretextual under the but-for test. Accordingly, the district court was not required to decide whether the government acted in "callous disregard" of the bounds of the warrant to potentially support the equitable remedy of destruction of documents based upon this Court's decision in *CDT*.

The district court also properly decided plaintiffs had not established that the government breached its duty of candor in the warrant application. As the district court recognized, plaintiffs' complaint about the government's failure to disclose its forfeiture plans had nothing to do with the existence or non-existence of probable cause

to search and seize Private Vaults' property, including the safe-deposit boxes, and the district court properly concluded that in any event a reasonable magistrate would recognize that some inventoried property might be subject to forfeiture given the obvious potential that some of the boxes contained contraband and the extensive prior forfeitures of individual boxes disclosed in the warrant application. The district court properly recognized that *CDT* and *Rettig*, the two decisions that plaintiffs relied upon as supporting their breach-of-candor argument, were far afield from the facts of this case.

Additionally, plaintiffs' new argument that inventory-search law is inapplicable to safe-deposit boxes, which they did not raise below, is both waived and belied by their own cases involving personal residences, which recognize inventory-search law can be applied to personal residences, which involve significantly greater privacy rights than safe-deposit boxes. Finally, plaintiffs' contentions regarding the alleged evils of forfeiture are largely irrelevant and certainly no substitute for proving the government's conduct *in this case* was unlawful; they also ignore the fact that the government has used

millions of dollars seized from Private Vaults to pay the victims of criminal activity.

## IV

## ARGUMENT

As the district court recognized (8-ER-1833), because this is a class action for an equitable remedy (i.e., destruction of records) under Fed. R. Crim. P. 41(g) and this Court's decision in *CDT*, plaintiffs were required to prove not only a Fourth Amendment violation common to all of them but a "callous disregard" for their rights. 621 F.3d at 1174; *see also Dukes*, 564 U.S. 338, 355-59 (commonality requirement for class actions). Based on the district court's factual findings—which plaintiffs do not attack as clearly erroneous—there was no Fourth Amendment violation, much less a "callous" or "blatant" one. (1-ER-4-18 & n.8.) The court's judgment should be affirmed.

### A.     Procedural Posture and Standards of Review

This is an appeal from the denial, following a bench trial, of a class-wide claim for equitable relief. (1-ER-4.) As described above, the class plaintiffs sought an injunction under *CDT* ordering the government to destroy any evidence collected from those Private Vault

25

renters whose property it had already returned. (*See* 8-ER-1832 ("an injunction enjoining the Government from continuing to retain the records generated and evidence collected during the search of Plaintiffs' Private Vaults boxes").)

"The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citation omitted). *See also CDT*, 621 F.3d at 1174 (whether to issue the injunction was "left to the discretion of the district court in the first instance"). For this Court "to reverse a decision as an abuse of discretion," it "must have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached." *Id.* at 1175 (citation and internal quotation marks omitted). The ruling below must be affirmed so long as the district court (1) "identified and applied the correct legal rule," and (2) made factual findings that were not "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

A district court's legal conclusions are reviewed de novo; its findings of fact are reviewed only for clear error. *Mondaca-Vega v. Lynch*, 808 F.3d 413, 422-23 (9th Cir. 2015) (en banc); Fed. R. Civ. P. 52(a)(6).

On legal issues, a district court's decision may be affirmed on any ground supported by the record, even if not relied upon by the district court. *Campbell v. Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 842 n.4 (9th Cir. 2011); *see also Cigna Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418-19 (9th Cir. 1998) (the decision may be affirmed "even if the district court relied on the wrong grounds or wrong reasoning") (citation and internal quotation marks omitted); *Greenlaw v. United States*, 534 U.S. 237, 250 n.5 (2008) ("An appellee or respondent may defend the judgment below on a ground not earlier aired") (citation omitted). Relatedly, "[w]here the district court does not make a finding on a precise factual issue relevant to the Fourth Amendment analysis," this Court will "uphold a trial court's denial of a motion to suppress if there was a reasonable view to support it." *United States v. Magdirila*, 962 F.3d 1152, 1156 (9th Cir. 2020) (internal quotation marks omitted).

With respect to the district court's factual findings, the clear-error standard applies even where (as here, with plaintiffs' consent) the court decided the case based on documentary evidence rather than hearing live, in-court testimony. *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985); *Crittenden v. Chappell*, 804 F.3d 998, 1006 (9th Cir. 2015) (clear-error review applies even where factual findings based on a "cold record, rather than testimony before the district judge"); *see also Wolfe v. United States*, 798 F.2d 1241, 1243 n. 2 (9th Cir. 1986) (where parties agreed that the district court could resolve all issues in the case based on a stipulated record, appellate court reviewed district court's fact findings for clear error); *E.E.O.C. v. Maricopa County Community College Dist.*, 736 F.2d 510, 513 (9th Cir. 1984) (same); *Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir. 1975) (same). The clear-error standard "applies to both subsidiary and ultimate facts," *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 324 (2015), including counterfactual questions such as whether a particular search would have occurred but for an investigatory motive, *see United States v. Orozco*, 858 F.3d 1204, 1215 (9th Cir. 2017); *cf. United States v. Lang*,

149 F.3d 1044, 1047 (9th Cir. 1998) (inevitable discovery is a factual question).

The clear-error standard is a demanding one. "Clearly erroneous" does not mean "maybe or probably wrong," but *very* wrong—the district court's finding will not be reversed unless it is so wrong that it stinks like an "unrefrigerated dead fish." *United States v. Bussell*, 504 F.3d 956, 962 (9th Cir. 2007) (citation omitted). "[T]he very premise of clear error review is that there are often two permissible—because two plausible—views of the evidence." *Cooper v. Harris*, 581 U.S. 285, 299 (2017) (streamlined). Choosing one such plausible interpretation of the facts cannot be clear error. *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003).

There is no merit to plaintiffs' argument that the civil summary judgment standard should apply to resolve all material disputed facts in their favor. (AOB 32.) As recounted above, plaintiffs agreed to a bench trial based on the parties' briefs and the documentary record in this case, which included witness depositions, inventory records and video of the inventory searches. (1-SER 15-20, November 8, 2021 scheduling conference transcript, reflecting counsels' agreement to trial-on-the-

briefs procedure rather than normal trial procedure; *see also* 1-SER-8, district court order, four days later, setting forth the procedure for a trial-on-the-briefs.)  Nor did plaintiffs "argue below" that the rules do "not allow for factfinding via such a procedure."  (AOB 32.)[4]  Indeed, plaintiffs fail to specifically or cogently advance such an argument before *this Court* on the issue: they simply cite Fed. R. Civ. P. 43(a), the live-testimony provision they waived.  *But see United States v. Williamson*, 439 F.3d 1125, 1138 (9th Cir. 2006) ("specific, cogent argument" is necessary).  Plaintiffs make no claim that the live-trial provision is unwaivable or that their waiver, though counsel, was somehow invalid.  *But cf. United States v. Mezzanatto*, 513 U.S. 196, 201 (1995) (rules "are presumptively waivable").  Parties are allowed to agree to "bench trials on records."  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999) (Fed. R. Civ. P. 43(a) does not

---

[4] Plaintiffs' citation to a footnote in their brief to this Court (AOB 25 n.5), in turn citing their opening brief before the district court (CR 135 at 13), does not support that statement: it contains a single paragraph, eight months *after* plaintiffs agreed to the trial-on-the-briefs procedure, setting forth the summary judgment standard and stating that any disputed facts would require live testimony.

preclude bench trials on records).[5]  Plaintiffs cannot now rescind their agreement to that procedure because they lost.  *Stern v. Marshall*, 564 U.S. 462, 482 (2011).

## B. The District Court Correctly Found That the Government Did Not Exceed the Bounds of the Warrant

The district court found that the warrant authorized agents to inventory the seized boxes, and that plaintiffs had failed to show the government exceeded the warrant's bounds, rejecting their claims that the inventory searches were impermissibly pretextual either as a matter of motivation or execution.  (1-ER-11-16.)  The district court was correct.

---

[5] The trial-on-the-briefs (and record) procedure is often used where there is an administrative record and no right to a jury trial.  *See generally Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (motion for judgment on administrative record is a bench trial on the papers); *Casey v. Aetna Life Ins. Co.*, 2008 WL 538486, *1 (C.D. Cal. 2008) ("[t]his matter is before the Court on the parties' trial briefs, the administrative record, declarations of counsel, and transcripts of depositions") (footnote omitted).

### 1. The district court correctly found that the inventory searches would have occurred even if the safe-deposit boxholders had not been suspected of criminal activity

The district court found, as a matter of fact, that "the challenged search[es]" would "have occurred" whether or not the government sought to investigate the boxholders. (1-ER-13-14.) That factual finding, which plaintiffs do not suggest was clearly erroneous, forecloses plaintiffs' argument. Instead, plaintiffs offer a number of legal complaints about the district court's analysis, none of which has merit. (AOB 43-54.)

### a. Legal standards governing inventory searches

Inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citation omitted). In order to avoid concerns about an inventory search being used as "a ruse for a general rummaging in order to discover incriminating evidence," the inventory must be conducted pursuant to an inventory policy that has "standard criteria," *Florida v. Wells*, 495 U.S. 1, 4 (1990), and those criteria must not give officers discretion in determining the scope of the search, *Bertine*, 479 U.S. at 375-76. (*See also* 1-ER-12.) Where officers follow an inventory

policy with standardized procedures that limit officer discretion, "the police conduct would have been the same regardless of the officer's subjective state of mind, [and] no purpose is served by attempting to tease out the officer's 'true' motivation." *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993). (*See also* 1-ER-12 (quoting *Bowhay*).)

However, an "inventory search is invalid if it was a pretext for an investigative search." *Bowhay*, 992 F.2d at 231. (1-ER-12.) Pretext exists when the "only reason" law enforcement performs an inventory is to find evidence of criminality. *Orozco*, 858 F.3d 1204, 1213. (1-ER-12.) As the district court noted, there is a critical wrinkle in analyzing pretext, in that " 'the mere presence of a criminal investigatory motive or a dual motive-one valid and one impermissible-does not render an . . . [inventory] search invalid[.]' " (1-ER-12, citing *Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020).)[6] "[I]nstead, the Court asks whether the

---

[6] *See also United States v. Johnson*, 889 F.3d 1120, 1126 (9th Cir. 2018) ("the mere presence of a criminal investigatory motive or a dual motive-one valid, and one impermissible-does not render an administrative stop or search invalid") (citation and internal quotation marks omitted); *Orozco,* 858 F.3d at 1213 ("[w]e emphasize that the presence of a criminal investigatory motive, by itself, does not render an administrative stop pretextual") (citations omitted); *Bowhay*, 992 F.2d

(continued  . . . .)

challenged search or seizure *would have occurred in the absence of an impermissible reason.'*" (*Id.*) (emphasis in original). In other words, an inventory is impermissibly pretextual if "officers would not have" conducted the inventory search "but for an impermissible motive." *Johnson,* 889 F.3d at 1126; *see also Orozco*, 858 F.3d at 1213.

As the district court explained, the key question is whether "the police raised the inventory search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019) (citations omitted). (1-ER-12.) Situations where "officers no doubt expected to find evidence of criminal activity . . . would not invalidate an otherwise reasonable inventory search." *Id.* at 1112-1113. (1-ER-12.) "Penalizing officers who are candid enough to admit that they hope to find evidence of a crime can only encourage obfuscation and dishonesty, without protecting reasonable expectations of privacy." *Bowhay*, 992 F.2d at 231. (1-ER-12.)

---

at 231 ("the presence of an investigative motive does not invalidate [an otherwise valid] inventory search").

### b. The district court correctly applied the "but for" test

Plaintiffs contend the district court erred by requiring them to prove the government's sole motive in conducting the inventory was to criminally investigate boxholders. (AOB 68.) However, a simple review of the district court's decision readily refutes their claim. The district court began its analysis by asking and answering the following question: "[w]hether an inventory was impermissibly pretextual hinges [on] one question: would the challenged search have occurred *but for* the Government's allegedly improper investigatory purpose? Here, the answer is yes." (1-ER-13 (emphasis added).)

Similarly, the district court's order provides, "[p]laintiffs must establish that the Government would not have seized the nests and opened the boxes *but for* the impermissible investigatory motive, and they have failed to do so here." (1-ER-14 (emphasis in original).) Further, the order provides that in analyzing pretext "the Court asks whether the challenged search or seizure *would have occurred in the absence of an impermissible reason*." (1-ER-12 (quoting *Magdirila*, 962 F.3d at 1157, emphasis in original).)

Despite these unambiguous statements, plaintiffs assert that the district court applied the wrong legal standard, because the district court allegedly concluded an inventory is unlawful "only if the impermissible purpose was the *only* reason for the inventory." (AOB 67.) (emphasis in original). But what the district court actually wrote was that "[a]n inventory is pretextual *when* the only reason law enforcement performs an inventory is to find evidence of criminality." (1-ER-12.) (emphasis added and citation omitted). *Accord Bertine*, 479 U.S. at 372 (inventorying officers must not act "for the sole purpose of investigation"). "When" is not the equivalent of "only if."

Plaintiffs claim the district court was "led astray" and confused by Ninth Circuit authority (AOB 68), but they are wrong. First, the district court noted plaintiffs' argument that the inventory was constitutionally improper because the "true motive" of the inventory was to uncover evidence of criminality. (1-ER-12.) Because plaintiffs ignored the government's legitimate inventorying motive, which is relevant under the "but-for" test, the district court responded to plaintiffs' argument: since plaintiffs focused solely on the government's motive to criminally investigate boxholders to establish the inventory

was unlawful, plaintiffs in that circumstance were required to show (as the cases note) that the government's sole reason in conducting the inventory was to criminally investigate the boxholders.

Second, if plaintiffs had proven the government's sole motive for inventorying was to criminally investigate, it necessarily follows that the inventory would not have been performed but for the investigatory motive. Indeed, after discussing the sole motive issue, the district court noted that *Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019), found a plaintiff's detention "would not have occurred *but for law enforcement's sole improper purpose* of deporting immigrant workers." (ER 15.) (emphasis added). *See also J*ohnson, 889 F.3d at 1128 (where officers sole motivation was to criminally investigate, "it is clear to us that the officers' decision to seize the money, bags, and cellphones . . . *would not have occurred* without an improper motivation to gather evidence of crime") (emphasis added).

None of plaintiffs' cases, which they contend prove a violation under the "sole motive" test (AOB 68-69), advance their position.[7] And

---

[7] *Johnson*, 889 F.3d at 1128 (officers motive was to criminally investigate "and not to further . . . permissible caretaking motives");

(continued . . . .)

U*nited States v. McCarty*, 648 F.3d 820 (9th Cir. 2011), invalidating a search where a TSA screener found incriminating evidence when she violated TSA protocols by continuing to search a bag after she concluded its contents posed no threat to air travel safety, is not relevant to any issue here.

As plaintiffs' rely solely on their mistaken claim the district court applied a sole-motive test, plaintiffs have not challenged the district court's factual analysis under the "but for" test in concluding plaintiffs failed to prove the government's motive for the inventory was impermissibly pretextual. Substantial record evidence supports the district court's analysis, including, as noted above, the government's

---

*United States v. Khoury*, 901 F.2d 948, 960 (11th Cir. 1990) (because officer had "satisfied the requisites" of the inventory search once he flipped through the pages of a notebook for items of value to determine whether valuable items needing inventorying were hidden inside the notebook, officer's subsequent search and reading of the pages in the notebook was unlawful because officer "had no purpose other than investigation in further inspecting the notebook") (footnote omitted); *United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997) (search could not be upheld as valid inventory where officer admitted he was unfamiliar with inventory policy and searching for incriminating evidence).

stated objective of shutting down criminal magnet Private Vaults.[8]

Plaintiffs do not argue otherwise.

> ### c. Plaintiffs' claim that the district court should have applied a primary-purpose test ignores settled authority recognizing inventory searches are governed by the but-for test

Because plaintiffs erroneously contend the district court applied

the sole-purpose test, they argue the district court should have applied

a primary-purpose test to the inventory. (AOB 51-52 and 59-60.) But

the district court correctly applied the but-for test, and the case

plaintiffs cite for the primary-purpose test (AOB 51) recognizes "there

appears to be little practical difference between *Alexander*'s primary

purpose test and the *Orozco* [but-for] test." *United States v. Grey*, 959

---

[8] Plaintiffs argue in a footnote agents could have stopped inventorying when they found letters identifying boxholders because the government returned property to some anonymous, unidentified boxholders based solely on their presentation of a working key. (AOB 54 n.13.) However, plaintiffs' contention is untrue, as the government required additional identifying information for anonymous boxholder returns, such as an attorney representation letter, a description of the box contents, or identification of the location of the box at Private Vaults. (ER 222-230.) Moreover, plaintiffs are comparing two radically different situations: the 4-day inventory of hundreds of safe-deposit boxes to later sporadic returns of property after the government declined to file a judicial forfeiture action against the property.

F.3d 1166, 1179 (9th Cir. 2020). Accordingly, even if the primary-purpose test were applied, the outcome would be the same.

In addition, *Grey* is inapplicable because that case involved investigating officers whose primary purpose was a criminal investigation when they assisted city inspectors in executing a warrant to inspect a private home for housing code violations. This Court emphasized that Supreme Court cases identify private residences as a location where in no instance "is the zone of privacy more clearly defined" and "privacy interests are especially strong." (*Id.* at 1181) Additionally, this Court noted that the Ninth Circuit had applied *Orozco*'s but-for test to inventory searches (*Grey*, 959 F.3d at 1179), and expressed reluctance "to extend the *Orozco* test" to the situation before it because "[t]he *Orozco* line of authority . . . address circumstances far afield from an administrative search of a private residence" (*Grey*, 959 F.3d at 1180).

To the extent plaintiffs' programmatic-purpose cases apply a primary-purpose test, those cases fare no better in advancing plaintiffs' claims, as they too recognize inventory searches fall outside their ambit. Unlike case-specific inventory searches, programmatic-purpose cases

require courts to "consider the entire class of cases permissible under the scheme" in determining whether the scheme is valid. *United States v. Bulacan*, 156 F.3d 963, 967 (9th Cir. 1998). (*See also* AOB 59.) "The scheme is only valid if the search serves a narrow but compelling administrative objective, and the intrusion is as limited . . . as is consistent with satisfaction of the administrative need that justifies [it]." *Id.* (citation and internal quotation marks omitted).

But an inventory is not a regulatory scheme and program and the laws and rationale governing programmatic-purpose cases are inapplicable. While officer expectation and hope of finding evidence of criminality and dual motives do not invalidate an inventory, the programmatic-purpose cases hold that an expectation of criminality and unlawful secondary motive *can* invalidate a search conducted under a regulatory scheme if they cause it to fall outside the "compelling administrative objective" for which the scheme was adopted.

For example, in *Bulacan*, this Court found unlawful a search conducted under a regulation that authorized screeners to search packages of persons entering federal buildings and allowed screeners unlimited discretion in deciding which packages to search, because the

41

regulatory scheme's purpose included not only a proper purpose to search for weapons and explosives but also an improper purpose to search for drugs. Plaintiffs' other programmatic-purpose cases (AOB 59-60) involve the same type of regulatory schemes under which a class of searches is conducted with dual motives, and not a case-specific analysis of an inventory.[9]

This Court has also distinguished programmatic-purpose cases from inventory searches, explaining "*Bowhay* involved an inventory search that comported with the constitutional limitations established by the Supreme Court in *Florida v. Wells*, 495 U.S. 1 (1990)." *Bulacan*, 156 F.3d at 970. Because of those limitations, inventory searches are approved "in part because no significant discretion is placed in the

---

[9] In *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), the Supreme Court held the City of Indianapolis could not justify its traffic checkpoint program by its secondary purpose of keeping drunk motorists off the road, when the City's admitted primary purpose for the program was the interdiction of narcotics. Likewise in *United States v. $124,570 U.S. Currency*, 873 F.2d 1240 (9th Cir. 1989), this Court invalidated a scheme whereby screeners were authorized to inspect luggage for air traffic safety concerns, because the program had a secondary criminal investigatory purpose since screeners received a monetary award for alerting law enforcement of passengers carrying contraband, evidence of crimes, and large sums of money.

42

hands of the individual officer [who therefore] has no choice as to the subject of the search or its scope" which "distinguish the search conducted in *Bowhay* from the search conducted here" by screeners under the regulatory scheme who had unlimited discretion in choosing which packages to search. *Bulacan*, 156 F.3d at 970.[10]

By contrast, the district court noted "agents had no discretion to determine which boxes should be inventoried and which should not" just like the officer in *Bowhay* and "indeed, a policy granting such discretionary authority would run afoul of the Supreme Court's inventory search jurisprudence." (1-ER-13.) Consistent with the constitutional limits under inventory-search jurisprudence, agents conducted the inventory under standardized inventory procedures, in order to ensure they had no discretion in performing their tasks and provided the protection against a forbidden general rummaging.

---

[10] *See also Grey*, 959 F.3d at 1182 (distinguishing *Bowhay* discretionless inventory searches from *$124,570 U.S. Currency* administrative search); *McCarty*, 648 F.3d at 833-34 (distinguishing *Bowhay* from *$124,750 U.S. Currency* and *Bulacan*).

43

### d. *The district court correctly found the supplemental instructions did not supersede the Operations Guide inventory policy that contained standardized inventory procedures*

The district court also correctly rejected plaintiffs' argument that the existence of supplemental instructions for the inventory searches rendered them unconstitutional. (1-ER-16 n.7; *see also* AOB 59-62.)

As the court found, the supplemental instructions "did not seem to contradict" the Operations Guide, but instead "provide[d] more detailed guidance," and so "it does not appear that agents failed to follow the FBI's written inventory policy merely because they *also* followed case-specific instructions." (1-ER-16 n.7 (emphasis in original)..[11] Similarly, the supplemental instructions provided that "[a]gents will search and inventory all boxes *according* to"—not instead of—"FBI policies and

---

[11] In explaining the lack of conflict between the Operations Guide and supplemental instructions, the district court noted that while plaintiffs pointed to the supplemental instructions' directives to agents to present seized cash to drug dogs and note drug-trafficking indicia relative to the funds, the Operations Guide contemplated "the discovery of contraband or evidence during an inventory, which 'should be immediately seized' " and required agents to " 'memorialize facts pertinent to other activities undertaken during the inventorying process' " including " 'any evidence collected . . . that are relevant to the investigation' " on a FBI evidence collection form. (1-ER-16 n.7, 860.)

procedures," and directed agents to complete the forms mentioned in the Operations Guide. (4-ER-891 (emphasis added).)

Plaintiffs do not contest the district court's factual conclusion that the supplemental instructions did not supersede the Operations Guide, which contains standardized inventory procedures. (AOB 61.) Instead, they merely reiterate that the supplemental instructions constituted the operative inventory policy, but add that agents conducted the inventory without standardized procedures because the supplemental instructions and the Operations Guide each lacked sufficient details to constitute a valid inventory policy and the supplemental instructions converted the inventory into a criminal investigation. (AOB 15, 56-57, 60-61). That is wrong, and certainly not enough to demonstrate clear error in the district court's rejection of their claim that "the investigating agents were not actually following their standardized inventory policies." (1-ER-16 n.7.)

While plaintiffs contend the Operations Guide contains "vanishingly little" and is "vague," and the supplemental instructions "offered only cursory" guidance about conducting an inventory (AOB 15, 56-57, 61), plaintiffs fail to identify what critical information is absent

45

from the Operations Guide.  Nor do they cite any caselaw even hinting

the Operations Guide omits essential standardized procedures for a

valid inventory or contest the district court's ruling that the

supplemental instructions did not supersede the Operations Guide.  By

properly considering the Operations Guide inventory policy, the district

court necessarily recognized its validity.[12]

Plaintiffs other arguments do not show the district court clearly

erred in its finding.  They argue the FBI lead agent did not have the

Operations Guide in front of her at the exact moment she drafted the

supplemental instructions.  (AOB 57.)  However, the FBI lead agent

testified that agents followed the Operations Guide when they

conducted the inventory, the supplemental instructions complied with

the Operations Guide, the agent understood the policy when she

prepared the supplemental instructions and used the Operations Guide

"as a 'reference' or a 'resource' " in creating the supplemental

---

[12] Plaintiffs' contention also misses the point.  The inquiry under inventory-search law is not whether some irrelevant, unidentified details are missing from a policy, but instead whether a policy includes sufficient details to delimit officer discretion while inventorying.  The Operations Guide policy easily passes this test.

instructions, which "were created to help the team focus in on what we were doing and how we were doing it." (1-ER-9, 2-ER-169, 171-72, 204.)

To the extent plaintiffs' arguments about agents' alleged lack of inventory experience and training have any relevance to plaintiffs' inventory policy invalidity claim, plaintiffs exaggerate the evidence supporting their arguments. Plaintiffs note the FBI lead agent had not conducted an inventory before Private Vaults (AOB 58), yet they omit the 16-year FBI lead agent's testimony that she was perfectly capable of overseeing the Private Vaults inventory because inventory procedures are the same as the procedures used for consent searches and searches pursuant to a warrant which the agent had done "many dozens of times." (5-ER-969, 7-ER-1566-67.)

As the agent testified, "[t]he 'bag and tag' procedures are the same" with both procedures requiring "creation of a chain of custody; an evidence log; labels on each item; evidence bar codes; an FD-597 receipt of property and an FD-302, documenting the process." (5-ER-969; *see also* 2-ER-204-06.) She also testified that the FD-597 form used for the Private Vaults inventory is "used in a variety of situations, whether it's an inventory search or another kind of search, or we're taking property,

or leaving property, or giving property back . . . if I saw one that was specific to an inventory search, it wouldn't be distinct from one that was prepared for some other purpose." (7-ER-1597.)

Likewise, plaintiffs allege that one of the hundreds of inventorying agents did not consult the Operations Guide before inventorying boxes. (AOB 57.) However, the agent testified that he attended a briefing by the FBI lead agent during which the inventorying procedures were discussed, and that the FD-597 form used at Private Vaults was the same form used for other searches, including inventories incident to arrest the agent had performed and for which the agent had been trained. (6-ER-1323-25, 1328, 1330, 1353-54, 1360-62, 1364-65 and 1410.)

Relying upon the inapplicable programmatic-purpose cases, plaintiffs contend the supplemental instructions depart from the Operations Guide in a way that shifted the focus from producing an inventory to seeking out evidence of criminality and forfeitable property. (AOB 59-61.) This argument is no different than plaintiffs' failed claim that the supplemental instructions superseded the Operations Guide. Moreover, even if the programmatic-purpose cases

were relevant, the supplemental instructions are not confined to instructing agents to find evidence of criminality, as plaintiffs suggest. As set forth above, the supplemental instructions contained extensive information and details regarding inventorying and evidence handling.

Ignoring these details entirely, plaintiffs note the supplemental instructions directed agents to preserve possible fingerprint evidence on the boxes' exterior and to note characteristics of the cash linking it to illegality, and provide that canines would be present and paperwork should be sent to asset forfeiture. (AOB 60-61.) But these facts do not invalidate four days of inventorying, which resulted in the creation of thousands of inventory records (4-ER-611); indeed, even if plaintiffs' facts stood alone, their argument would still fail. As to fingerprinting, the FBI lead agent testified that agents never actually fingerprinted any boxes but had planned to do so "in anticipation of really not knowing" boxholders' identity because of "the total anonymity of the property. So it would be one other possible thing that you could use to identify who the box holder is." (7-ER-1698-99.) And with respect to the drug dogs and noting cash characteristics, the district court recognized (and plaintiffs ignore) that agents' expectation and hope of

finding incriminating evidence does not render the inventory unlawful. (1-ER- 12 (citing *Garay* and *Bowhay*).) Indeed, the use of drug dogs during an inventory is generally not unreasonable under the Fourth Amendment, *United States v. Nieto-Rojas*, 470 F. App'x 674, 676 (9th Cir. 2012), since canine sniffs do not constitute criminal searches to begin with, *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005).[13]

### 2. *The district court correctly found that the government conducted meaningful inventories*

Plaintiffs also claim that the inventories were not properly executed and that the government "did not, in fact, meaningfully record the contents of the deposit boxes." (1-ER-15; AOB 62-67.) The district court found otherwise (1-ER-15-16), and its conclusion was not clearly erroneous.

As the district court recognized, an inventory search must be designed " 'to produce an inventory.' " (1-ER-12, citing *Wells*, 495 U.S. at 4.) Plaintiffs complain that the agents and officers here did not

---

[13] Plaintiffs also complain about the follow-up use of law-enforcement databases to search for names associated with the boxes. (AOB 46.) But there is no rule prohibiting follow-up investigation based on evidence found in an inventory search.

"produce a useful inventory." (AOB 62.) But as the district court found, law enforcement "took four days to document every box, write down the contents within, take photographs, and show the property to a video camera." (1-ER-16.) Nor does "FBI inventory policy . . . require an enumerated list of all items being inventoried. Rather, it simply mandates 'a written summary,' which must include 'a description of the property and the items secured for safekeeping.' " (1-ER-15; *see also* 4-ER-859-60.) Likewise, agents testified they were not required to set forth an exhaustive list of every single item within a category of items in a box. (6-ER-1370-72.) And given the context of this case, there is no reason to object to "catch-all descriptor[s]" for some items (such as coins): there were photographs and videotapes, chain-of-custody documents, and bar codes to assist in locating items. (6-ER-1366-68, 1372-73, 1375-76, 1378, 7-ER-1691.)

To support their argument that the Operations Guide required a detailed, itemized description of every item, plaintiffs cite a different sentence in the Operations Guide (which they did not cite below) and *United States v. Roberts*, 430 F. Supp. 3d 693 (D. Nev. 2019), neither of which advances their position.

51

Plaintiffs contend the sentence in the Operations Guide providing "Agents must provide *receipts* for all items retrieved during inventory searches" constitutes a detailed, itemized description provision forbidding use of the catch-all descriptions. (AOB 62 [emphasis added], 64; 4-ER-860.) But plaintiffs ignore that a preceding sentence, which requires agents to record "the results of the inventory in . . . an FD-597 ('*Receipt* for Property')" shows the "*receipts* for all items retrieved" provision pertains to the requirement that agents must provide the FD-597 receipts in addition to recording the results of the inventory on that form. (4-ER-859-60; *see also* 6-ER-1371-72.) Consistent with that, the supplemental instructions provided that agents were to leave a carbon copy of the FD-597 receipt of property forms at Private Vaults. (4-ER-892.) The "receipts" provision has nothing to do with the required level of detail for, or the items that must be listed in, the FD-597 form.

Similarly, plaintiffs' mistakenly claim that *Roberts* "held that officers ran afoul of the inventory doctrine when they limited their inventory to valuable items despite a policy directing them to record all items." (AOB 64.) However, *Roberts* does not address the detail necessary for the description of inventoried property. Instead, the court

found pretext not solely on the failure to inventory non-valuable items but also because officers' sole motive was to find evidence of a crime. *Id.* at 707 (citations omitted). As discussed above, the district court distinguished *Roberts* and correctly rejected plaintiffs' argument.[14]

While plaintiffs focus solely upon whether the descriptors violated policy in order to establish pretext, "it is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext." *Whren v. United States*, 517 U.S. 806, 816 (1996) (citation omitted and emphasis in original). Even if plaintiffs had proved that catch-all descriptors violated policy, the district court properly held that " 'minor noncompliance with department polices does not invalidate an otherwise lawful inventory search.' " (ER 15) (quoting *Magdirila*, 962 F.3d at 1157).)

---

[14] Plaintiffs' citation to *Bumpers v. Cleveland*, 653 F. Supp. 2d 1202 (D. Utah 2009), is also irrelevant, as, unlike here, there was no written inventory policy, written record of the items inventoried, or depiction of the items inventoried because the video failed to show the items inventoried.

Finally, plaintiffs' claim that it would have been safer to leave the box contents at Private Vaults (AOB 63) has nothing to do with the detail required in describing property inventoried and ignores that agents did consider alternatives (7-ER-1642-44) even though officers need not consider "the existence of alternative less intrusive means" before seizing and inventorying property. *Miranda v. City of Cornelius*, 429 F.3d 858, 866 n.6 (9th Cir. 2005) (quoting *Bertine*, 479 U.S. at 374). *Accord Illinois v. LaFayette,* 462 U.S. 640, 647 (1983) ("[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means").

## C. The District Court Correctly Concluded That the Government Did Not Breach its Duty of Candor in the Warrant Application

The government told the magistrate judge that it was going to inventory the contents of the seized safe-deposit boxes, and indeed the warrant specifically authorized it to do so. (1-ER-13, quoting 4-ER-618-19, 751.) Plaintiffs, however, allege that the government was *also* required to disclose its plans to seek forfeiture of any criminal proceeds

it found.  (AOB 39.)  The district court properly rejected the claim that
the magistrate judge had been misled.  (1-ER-17-18.)

As the district court explained, warrant affidavits must
demonstrate probable cause to issue a warrant: "[t]he test for
determining whether a false statement or omission was material is
whether an affidavit containing the omitted material" would still "have
provided a basis for a finding of probable cause."  (1-ER-17, citing
*United States v. Garcia-Cruz*, 978 F.2d 537, 540 (9th Cir. 1992).)  *See
also Franks v. Delaware*, 438 U.S. 154, 156 (1978).  But as the district
court recognized, plaintiffs' complaint about the government's forfeiture
plans had nothing to do with the existence or nonexistence of probable
cause.  (1-ER-17 ("Plaintiffs do not argue that the purported omission—
that the Government had made certain preparations to forfeit boxholder
contents—had any effect on the existence of probable cause to search
and seize USPV's property, including the nests of boxes.").)

Accordingly, even affirmative misstatements about "how [a]
search [will] be conducted" are not material under *Franks*, because they
do not affect the probable-cause determination or "whether a warrant
should issue" in the first place.  *United States v. Mittelman*, 999 F.2d

55

440, 444 (9th Cir. 1993). The district court recognized this (1-ER-17), and plaintiffs do not appear to have an answer (AOB 38-43).

Here, of course, there was no misstatement: only an omission of forfeiture plans that had nothing to do with the probable-cause determination. And as the district court pointed out, "[a]ny reasonable magistrate would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture." (1-ER-18.) But plaintiffs nonetheless press their breach-of-candor argument on appeal, relying (as they did below) on *CDT*, 621 F.3d 1162, and *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978).

As the district court explained, however, both involved very different circumstances. In *CDT*, the government failed to advise the magistrate that it had accepted defendant's representation to "keep the [computer] data intact," which "omission created the false impression that unless the data were seized at once, it would be lost," and caused the magistrate to issue a broad warrant the magistrate may not have otherwise issued. *CDT*, 621 F.3d at 1178 (concurring opinion). (1-ER-

56

17.)[15]  The false impression was material to the issuance of the warrant

and its scope.  (In addition to the fact, as noted, that the potential for

forfeiture of contraband found during the inventory searches was

obvious.)[16]

Plaintiffs also misinterpret the holding in *Rettig*, where this Court

found that officers' exceeding the bounds of a warrant established a

Fourth Amendment violation.  In *Rettig*, agents obtained a federal

---

[15] In *CDT*, the government sought a broad search warrant to search the defendant's computers which contained data on steroid tests conducted on baseball players, where the government only had probable cause to seize electronic records for ten of the players.  *Id.* at 1166.  (1-ER-17.)  In order to justify the broad seizure of all data on the defendant's servers, the government's warrant affidavit informed the magistrate that there was a significant risk the data would be destroyed.  *Id.* at 1168 and 1178.  (1-ER-17.)

[16] The district court's conclusion that "any reasonable magistrate" would recognize some inventoried contents might be subject to forfeiture was well-supported in the record.  The affidavit discussed prior forfeiture of proceeds of ransom, gambling, and prostitution rings, drug operations, and identity-theft crimes, noting that officers seized and forfeited from Private Vaults boxes 400 silver coins and 26 ten-ounce silver bars found September 9, 2015; $500,000, 22 gold bars and 15 gold coins seized October 28, 2015; $200,100 seized November 3, 2015; $1,543,400 seized in November 2015; $592,450 and $435,190 seized in September 2016, which funds were used to pay restitution to victims; $101,080 and 26 gold bars seized March 6, 2018; and $1,448,700 seized in July 2019. (4-ER-654-60.)  Forfeiture was not a secret.

arrest warrant for defendant on a cocaine-conspiracy charge involving an elaborate international cocaine-smuggling scheme. 589 F.2d at 420-21. When the magistrate denied a search warrant for defendant's residence because the evidence was stale, agents executed the arrest warrant, hoping defendant would flee with evidence the agents could seize. *Id.* When that did not occur, agents applied for and obtained a state warrant to search defendant's residence for marijuana, advising as the sole basis therefor that agents saw defendant flushing marijuana down the toilet during the arrest. *Id.* As would be expected in a search for evidence involving a large cocaine conspiracy, agents spent hours looking for evidence relating that conspiracy, instead of confining their search to discovering evidence regarding the simple marijuana-possession charge. *Id.* at 421. (1-ER-18.)

As the district court explained, *Rettig* is distinguishable. In *Rettig*, the Fourth Amendment violation occurred because "the agents did not confine their search in good faith to the objects of the warrant" and "substantially exceeded any reasonable interpretation of its provisions." 589 F.2d at 423. (1-ER-18.) Here, by contrast—for the reasons set forth above—the district court "found that the Government

58

did, in fact, confine its search to the warrants' requirements." (1-ER-18.) And as the district court explained, plaintiffs are wrong to suggest that the real violation in *Rettig* was the officers' secret "true purpose" in executing the warrant (AOB 42), i.e., to discover evidence relevant to the cocaine charge. What this Court said was that the "failure to disclose" this subjective purpose "enlighten[s] our review of the search and seizures *that actually took place* as we determine whether or not the agents went beyond the confines of the warrant." 589 F.2d at 422 (emphasis added). The district court understood that. (1-ER-18.)[17]

Accordingly, the district court properly concluded that plaintiffs had not established a Fourth Amendment violation, correctly rejecting

---

[17] On appeal, plaintiffs' offer additional, completely inapposite cases (AOB 40-41) involving clear instances of officers disregarding warrants. *United States v. Foster*, 100 F.3d 846 (10th Cir. 1996) (seizures beyond firearms and marijuana); *United States v. Medlin*, 842 F.2d 1194 (10th Cir. 1988) (seizures beyond firearms); *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982) (seizures beyond listed records). Likewise, plaintiffs' argument (AOB 40 n. 8) that the government should have sought a warrant for each box ignores, as the district court recognized, that the government could not feasibly have done so in light of the anonymous nature of the boxes and their contents, which prevented the government "from describing with particularity 'both the place to be searched and the . . . things to be seized.' " (1-ER-13, citing *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).)

plaintiffs' claim that the government breached its duty of candor in the warrant application.

## D. Plaintiffs' New Legal Argument That the Inventory-Search Doctrine Does Not Apply to Safe-Deposit Boxes Was Waived and in Any Event Lacks Merit

Plaintiffs also argue (AOB 32-37) that the inventory-search doctrine is inapplicable to safe-deposit boxes. The district court had no opportunity to address that argument, because plaintiffs failed to advance it below. (*See generally* CR 135 (plaintiffs' opening brief).)

Under the civil rules, the argument is waived. *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1033 (9th Cir. 2011) (failure to present argument in district court waives right to raise the argument on appeal). And even under the criminal rules, it would be reviewed only for plain error. Fed. R. Crim. P. 52(b); *see United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011) (no plain error "where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results") (citation and internal quotation marks omitted).

In any event, there was no error, much less plain error, since plaintiffs are wrong. No authority holds that the government cannot inventory seized safe-deposit boxes.

Instead, plaintiffs rely on cases that involve the inventorying of *private residences* (AOB 34-35), where privacy interests are especially strong:

> [Nowhere] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands that right of a man to retreat into his own home and there be free from unreasonable government intrusion." [18]

*Grey*, 959 F.3d at 1181 (quoting *Payton v. New York*, 445 U.S. 573, 589-90 (1980)). Thus where "a private residence is involved, the Supreme Court has repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches and seizures." *Grey*, 959 F.3d at 1181. Cases declining to apply inventory

---

[18] Plaintiffs' cases agree. *United States v. Showalter*, 858 F.2d 149, 153 (3d Cir. 1988) ("[i]t is beyond argument that the Fourth Amendment extends its greatest protection to the home"); *United States v. Ladson*, 774 F.2d 436, 440 (11th Cir. 1985) ("the protection of private dwellings lies at the very heart of the fourth amendment").

searches to private residences, where privacy rights are at their zenith, do not support a contention that all of inventory-search law is inapplicable to searches at other locations.

Moreover, while plaintiffs cite cases where courts declined to apply the inventory search doctrine to residences, even those cases recognize the inventory search doctrine *could* apply to a search of a home. *Showalter*, 858 F.2d at 152-54 (not holding inventory doctrine inapplicable, but instead finding government did not follow standardized inventorying procedures); *People v. Taube*, 864 P.2d 123, 129-31 (Colo. 1993) (same); *Ladson*, 774 F.2d at 440 ("[w]e do not hold that the government may never have good reason to inspect a seized house and conduct an inventory of its contents").  Indeed, some courts *have* found searches of homes to be lawful based on the inventory-search doctrine, including in one case plaintiffs themselves cite.  *See United States v. Santiago-Lugo*, 904 F. Supp. 36 (D.P.R. 1995) (upholding inventory of home pursuant to seizure warrant for home); *see also United States v. One Parcel of Real Property*, 724 F. Supp. 668 (W.D. Mo. 1989) (finding inventory of home lawful under the Fourth Amendment); *United States v. $324,225.00 in U.S. Currency*, 726 F.

Supp. 259, 261 (W.D. Mo. 1989) ("the government should be permitted to conduct a limited inventory search of a building or house *lawfully seized*) (emphasis in original).

Nor do plaintiffs' cases turn on whether a tenant is claiming privacy rights; instead, the cases address whether government activities at a residence are justified as an inventory. Plaintiffs are not deprived of their Fourth Amendment rights, as plaintiffs claim, simply because Private Vaults, whom plaintiffs characterize as the boxholders' landlord, conducts criminal activity.[19]

---

[19] Plaintiffs proffer a litany of items stored in Private Vaults boxes, and claim some of the stored items contained highly private matters. (AOB 17-18.) Even if true, this is a class action under Fed. R. Civ. P. 23(b)(2) whereby relief must be appropriate as to the class as a whole. To the extent particular class members have different privacy rights—in personal documents, for example (AOB 18)—class-wide relief is not appropriate. Additionally, plaintiffs' suggestion that agents recorded the full contents of documents is not correct; with respect to the prenuptial agreement, for instance, only the first pages were photographed, which is consistent with a search to identify boxholders under the unknown-person policy. (10-ER-2094, 2095, 2141, 2160.)

**E.     Even If Plaintiffs Had Established a Fourth Amendment Violation, Ordering the Destruction of Records Would Be Unwarranted**

Because plaintiffs failed to establish the government exceeded the bounds of the warrant, they necessarily did not show the government "callously disregarded" the class plaintiffs' rights under *CDT*.[20]

The facts here are additionally dissimilar to those in *CDT* because there, the magistrate judge added "significant restrictions on how the [government was to handle] seized data," including requiring government personnel with computer expertise (and not agents involved in the criminal investigation) to review and attempt to segregate the computer data on site.  *Id.* at 1168.  In *CDT*, however, the government "completely ignored" the magistrate's clear and specific factual restrictions and "utterly failed to follow the [search] warrant's protocol," as the case agent reviewed the computer records on site for all the players and "rooted out information pertaining to *all* professional

---

[20] A "*callous disregard* for Movant's constitutional rights is a higher threshold than a mere *violation* of Movant's constitutional rights. . . . if the government sought to comply with the terms [of the warrant] in good faith, a discrepancy would not constitute 'callous disregard' for Movant's constitutional rights."  *Burum v. United States*, 2014 WL 12596719, *4 (C.D. Cal. Apr. 2, 2014) (citations omitted and emphasis in original).

baseball players" in order to find players who had testing positive for steroids and their confidential drug-testing records. *Id.* at 1171-72 (emphasis in original). Leaks had already occurred about three famous players' positive steroid test results. *Id.* at 1174. And not one but *three separate district judges* found the government had callously disregarded the affected players' constitutional rights, which was a necessary prerequisite for the destruction-of-evidence remedy sought under Fed. R. Crim. P. 41(g). *Id.* at 1170 and 1174.

Here, the district court found no Fourth Amendment violation at all, following a trial, factual findings, and a written decision. Even if the district court was wrong, it did not abuse its discretion by declining to finding a "callous" or "blatant" violation. (1-ER-18.) Allowing an inventory search but not a "criminal search" comes nowhere close to the facts of *CDT*. Nor are the equitable considerations comparable: in *CDT*, having the public know about a baseball player's steroid use could seriously harm a ballplayer's career, and leaks had already occurred about three players' positive steroid test results. 621 F.3d at 1174 (noting these as "equitable considerations" justifying sequestration).

Plaintiffs offer no comparable considerations here.  (1-SER-29-31, 42-43, 48.)

**F.  Plaintiffs' and Amicus Curiae's Generalized Assertions Concerning Forfeiture's Alleged Evils are Unavailing**

Finally, plaintiffs and their amicus curiae contend generally, without citing evidence from this case, that asset forfeiture incentivizes agents to act illegally.  Their argument begins with the erroneous contention that as soon as property is seized for civil forfeiture, the property is transferred directly to a dedicated fund and is thereupon immediately available to fund law-enforcement operations.  (AOB 70 and Amicus Brief 7, citing 28 U.S.C. § 524(c).)

That argument is irrelevant to the issues in this case.  But in any event, the statute upon which they rely provides that property is not transferred upon seizure, but instead only if a final decision is entered forfeiting the property, either via a final judicial forfeiture judgment for contested claims or an administrative declaration of forfeiture for those that are uncontested.  28 U.S.C. § 524(c)(4)(A) and (11).  Plaintiffs and

their amicus also ignore procedural protections in place before the final forfeiture decision is entered.[21]

Moreover, plaintiffs ignore that once forfeited property is transferred to the dedicated fund, it is frequently used to pay victims of crimes. *See* 28 C.F.R. Part 9; (ER 657-68.)  Plaintiffs' innuendos that the government wanted to use forfeited property to enhance police department revenues lacks evidentiary support and is refuted by the government's transmission of millions of dollars seized during the Private Vaults inventory to pay crime victims and creditors of a bankruptcy estate.  (1-SER-54-61; *See In re Yaw Jong Tsai*, United States Bankruptcy Court, District of Nevada, Case No. 2:20-bk-14585-NMC, Dkt. No. 561.)

Nor are forfeiture laws restricted to valuable property.  Sometimes they reach items of little or no monetary value that, like the nests of safe-deposit boxes here, are seized to prevent ongoing criminal conduct

---

[21] As set forth above, administrative forfeiture is initiated on probable cause while judicial forfeiture requires proof under the higher preponderance-of-the-evidence standard.  *See* 18 U.S.C. § 983(c)(1). Accordingly, the government initiates judicial forfeiture actions on far fewer cases than those for which administrative forfeiture is commenced.

in order to protect the public at large. For example, the government forfeits computers used to transmit child pornography, firearms, stash houses used to store drugs and counterfeit knock-off goods. *See* 18 U.S.C. §§ 924(d)(1), 2254 & 2323; 21 U.S.C. § 881(a)(6).

In all events, however, plaintiffs' generalized claims about forfeiture's alleged evils are no substitute for their obligation to prove the government engaged in illegal conduct in *this* case. They did not do so, as the district court found in its thorough written decision.

# V

## CONCLUSION

The district court's judgment should be affirmed.

DATED: June 6, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

*/s/ Victor A. Rodgers*
ANDREW BROWN
VICTOR A. RODGERS
MAXWELL COLL
Assistant United States Attorneys

Attorneys for Defendants-Appellees
UNITED STATES OF AMERICA, ET AL.

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

# CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 12,802 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: June 6, 2023

*/s/ Victor A. Rodgers*
VICTOR A. RODGERS

Attorney for Defendants-Appellees
UNITED STATES OF AMERICA, ET AL.