No. 22-56050

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

PAUL SNITKO, ET AL., *Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL., *Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Central District of California
No. 2:21-cv-04405-RGK-MAR
Hon. R. Gary Klausner

_____

**APPELLANTS' REPLY BRIEF**

_____

Robert P. Frommer
Joseph Gay
Michael Greenberg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel.: (703) 682-9320
Email: rfrommer@ij.org
    jgay@ij.org
    mgreenberg@ij.org

Robert E. Johnson
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd. #256
Shaker Heights, OH 44120
Tel.: (703) 682-9320
Email: rjohnson@ij.org

Nilay U. Vora
Jeffrey A. Atteberry
THE VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Phone: (424) 258-5190

*Attorneys for Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 3

I.    The Inventory Doctrine Does Not Allow Mass, Suspicionless Searches Of Entire Safe Deposit Vaults. ................................. 3

II.    The FBI Misled The Magistrate And Disregarded The Express Limits Of The Warrant. ............................................ 7

    A.    The FBI Misled The Magistrate. .................................. 7

    B.    The FBI Exceeded The Scope Of The Warrant. ........... 13

III.    The FBI's Dragnet Search Was Not A Permissible Inventory. ........................................................................ 18

    A.    The FBI Did Not Follow Standardized Procedures. ..... 19

    B.    The FBI Followed Bespoke Procedures With A Programmatic Purpose To Obtain Evidence And Forfeit Property. ........................................................ 21

    C.    The "Inventory" Did Not Produce A Meaningful Inventory. ................................................................... 24

    D.    The FBI Used Its "Inventory" As An Excuse To Rummage. .................................................................. 27

IV.    The Appropriate Remedy For These Violations Is Sequestration Or Destruction Of The "Inventory" Records. ........................................................................ 32

CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. City & County of San Francisco,*
29 F.3d 1355 (9th Cir. 1994) ........................................................ 15

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000) ..................................................................... 23

*Florida v. Jardines,*
569 U.S. 1 (2013) ....................................................................... 17

*Florida v. Wells,*
495 U.S. 1 (1990) ..................................................... 22, 23, 24, 25

*Franks v. Delaware,*
438 U.S. 154 (1978) ...................................................................... 7

*Illinois v. Lafayette,*
462 U.S. 640 (1983) .................................................................... 19

*Perez Cruz v. Barr,*
926 F.3d 1128 (9th Cir. 2019) ....................................................... 5

*South Dakota v. Opperman,*
428 U.S. 364 (1976) ......................................................... 19, 23, 25

*United States v. Bowhay,*
992 F.2d 229 (9th Cir. 1993) ....................................................... 31

*United States v. Bulacan,*
156 F.3d 963 (9th Cir. 1998) ....................................................... 21

*United States v. Comprehensive Drug Testing, Inc.,*
621 F.3d 1162 (9th Cir. 2010) ........................................... 12, 32, 33

*United States v. Cotterman*,
709 F.3d 952 (9th Cir. 2013) ........................................................4

*United States v. Foster*,
100 F.3d 846 (10th Cir. 1996) ........................................ 9, 10, 11, 34

*United States v. Garay*,
938 F.3d 1108 (9th Cir. 2019) ......................................................27

*United States v. Grey*,
959 F.3d 1166 (9th Cir. 2020) .................................................. 15, 16

*United States v. Johnson*,
889 F.3d 1120 (9th Cir. 2018) ......................................................30

*United States v. Ladson*,
774 F.2d 436 (11th Cir. 1985) ........................................................4

*United States v. Magdirila*,
962 F.3d 1152 (9th Cir. 2020) ......................................................26

*United States v. Mittleman*,
999 F.2d 440 (9th Cir. 1993) ..........................................................9

*United States v. One 56-Foot Motor Yacht Named Tahuna*,
702 F.2d 1276 (9th Cir. 1983) ........................................................8

*United States v. Rettig*,
589 F.2d 418 (9th Cir. 1978) ...................................... 10, 11, 12, 34

*United States v. Sedaghaty*,
728 F.3d 885 (9th Cir. 2013) ..........................................................7

*United States v. Showalter*,
858 F.2d 149 (3d Cir. 1988)................................................ 16, 17, 18

*United States v. Stanert*,
762 F.2d 775 (9th Cir. 1985) ..........................................................9

*United States v. Thomas,*
  878 F.2d 383 (6th Cir. 1989) ..........................................................4

*United States v. Williams,*
  846 F.3d 303 (9th Cir. 2016) ..........................................................5

## Other Authorities

FBI, *Privacy Impact for the SENTINEL System* (2014),
  https://perma.cc/8D9W-YFC5 ......................................................32

# INTRODUCTION

The government effectively concedes (at 17) that its "inventory" was driven by an "expectation or hope of finding evidence of criminality." How could it not? There is no other way to explain the drug dogs, the "cash observations" form, the photographs recording the contents of written documents, and the instruction to process all property worth over $5,000 for civil forfeiture. And, responding to the "argument that the government should have sought a warrant for each box," the government (at 59 n.17) admits that it "could not feasibly have done so," as it lacked any basis for probable cause. There is really no dispute that the government used its "inventory" to sidestep the Fourth Amendment's bedrock probable cause requirement.

In its defense, the government draws an analogy: The government argues that its conduct here is no different from a case where an officer arrests a suspect (or impounds an automobile) and then proceeds to inventory the arrestee (or automobile) despite anticipating that the inventory will uncover evidence. But that analogy breaks down in almost every respect. When an officer conducts such an inventory, the officer does ***not*** invade the privacy of hundreds of innocent third parties

1

(*infra* Part I), misrepresent the nature and scope of the search to a magistrate (*infra* Part II.A), and disregard a warrant barring any "criminal search or seizure" (*infra* Part II.B). Such an officer **does** follow standard routine procedures (*infra* Part III.A); does **not** draw up special good-for-one-use-only procedures with a purpose of gathering evidence of wrongdoing (*infra* Part III.B); and **does** generate an actually useful inventory (*infra* Part III.C). The government here did not follow a path predetermined by routine procedures; it made a conscious choice to engage in an impermissible general search. (*Infra* Part III.D.)

These circumstances, together, demonstrate "callous disregard" for the Fourth Amendment rights of USPV box holders, justifying the segregation or destruction of all records generated during the search. (*Infra* Part IV.) The government twisted Fourth Amendment case law to devise a massive vault-sized loophole and, in an ultimately unsuccessful effort to fit within that loophole, misled a magistrate and disregarded the limits of a warrant. The result—by premeditated design—was precisely the kind of suspicionless fishing expedition the Fourth Amendment forbids.

The result, also, was a massive intrusion on the privacy and property rights of hundreds of innocent box holders. The government's "inventory" records, while useless as an inventory (because they do not record the quantity of valuable property), open a window into class members' lives—revealing the content of personal papers, legal papers, family heirlooms, financial records, valuable property, and even relatives' cremated remains. The "inventory" records also detail positive drug dog alerts and agents' own "cash observations." The FBI retains these "inventory" records in a networked criminal database, and information found during the "inventory" has been used to obtain other warrants and to seek forfeiture of additional assets. Unless this Court steps in, that invasion will continue indefinitely.

## ARGUMENT

### I.    The Inventory Doctrine Does Not Allow Mass, Suspicionless Searches Of Entire Safe Deposit Vaults.

The government's reliance on standard inventory case law breaks down at the outset, as the inventory doctrine applies to routine searches of arrestees and impounded automobiles and does not contemplate the mass search of an entire safe deposit vault. *See* Op. Br. 32-37.

The government (at 61-62) argues that cases declining to extend the inventory doctrine beyond arrestees and automobiles are distinguishable because they involve residences, where privacy interests are "especially strong." But the government does not cite *any* inventory case arising in *any* context remotely like this one. The government also ignores the significant privacy interest in safe deposit boxes, which often contain a person's most sensitive and important papers, possessions, and effects. *See United States v. Thomas*, 878 F.2d 383 (6th Cir. 1989) (unpublished) ("citizens have legitimate expectations of privacy in the contents of their safe deposit boxes"); *see also United States v. Cotterman*, 709 F.3d 952, 964 (9th Cir. 2013) (noting the "express listing of papers" in the Fourth Amendment). The boxes at USPV contained sensitive financial information, legal documents, valuable property, personal notes, relatives' cremated remains, and myriad other details of box holders' lives. *See* Op. Br. 17-18.

These compelling privacy interests are multiplied by the fact that this case involves *literally hundreds* of "third parties unrelated to the seizure." *United States v. Ladson*, 774 F.2d 436, 440 (11th Cir. 1985).

The government, as it did in the warrant application, *see* ER-832, throws mud on USPV box holders, implying that they are probably criminals, but the class members are all innocent box holders who (despite the government's best efforts) eventually had their property returned. And while the government argues that USPV itself was up to no good, that is not a reason to search the individual boxes—any more than a landlord's misconduct would justify searching an entire apartment building. The government's contrary view transforms the inventory doctrine into a tool to conduct precisely the "indiscriminate searches and seizures conducted under the authority of 'general warrants,'" *Perez Cruz v. Barr*, 926 F.3d 1128, 1140 (9th Cir. 2019) (citation omitted), that the Fourth Amendment was designed to forbid.

Alternately, the government (at 60) argues the proper limits of the inventory doctrine have been waived. However, Plaintiffs below challenged the validity of the government's inventory and, in pressing that claim on appeal, are "not limited to the precise arguments they made below." *United States v. Williams*, 846 F.3d 303, 311 (9th Cir. 2016). Plus, Plaintiffs did raise this argument in the district court. *See* Doc. 135 at 2 ("[T]he whole idea of inventorying the vault was

5

unreasonable on its face, as the best way to serve the purposes of an inventory would have been to leave the property safely locked away."); *id.* at 18-19 (search "cannot be squared with the premise of an inventory search"); Doc. 130 at 8-9 ("Cases involving inventory searches typically involve the search of a person or vehicle, ***not*** an entire safety deposit vault."); *see also* Doc. 33 at 35 ¶ 162.

The inventory doctrine's proper limits also provide essential context for Plaintiffs' other claims. Plaintiffs' primary point in this opening section of the argument is not that the government exhibited "callous disregard" for the Fourth Amendment merely by proposing such a search (though in fact it did). Rather, Plaintiffs' primary point is that the unprecedented nature of the search explains why the government went to such pains to obtain a warrant pre-approving its inventory (when typical inventories are warrantless) and to reassure the magistrate that its "inventory" would follow standard procedures and would not involve any "criminal search or seizure." ER-751. As explained below, the government exhibited "callous disregard" because, having made those critical representations to justify its extraordinary search, it blew right past them.

## II.     The FBI Misled The Magistrate And Disregarded The Express Limits Of The Warrant.

The inventory doctrine operates as an exception to the warrant requirement, so, if this was really a mechanical application of routine inventory procedures, then there was no reason to include it in the warrant. But the government was evidently unwilling to follow its arguments to their logical conclusion and, instead, sought to shield its "inventory" behind judicial preapproval. Having made that choice, the government was obligated to provide the magistrate with the information necessary "to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). And the government was also obligated to respect "the express limitations imposed by a magistrate in issuing the warrant." *United States v. Sedaghaty*, 728 F.3d 885, 913 (9th Cir. 2013). It did neither.

A.     <u>The FBI Misled The Magistrate.</u>

The government, in its brief, does not dispute that at the time of the warrant application the FBI had ***already decided*** to commence civil forfeiture against anything in the USPV boxes worth over $5,000; that it failed to disclose its forfeiture plans to the magistrate; and that it omitted from the warrant application any mention of its plans to use

the "inventory" to search for evidence to support forfeiture—including running all cash over $5,000 by drug dogs and looking for other evidence to show that property was somehow linked to criminal activity.

The government (at 55) argues these omissions are irrelevant because they "had nothing to do with the existence or nonexistence of probable cause." The problem with this argument is that it ignores the fact that, if the government had honestly described the scope of its planned search and seizure, then it would have had to establish **probable cause** as to the contents of the boxes. *See, e.g.*, *United States v. One 56-Foot Motor Yacht Named Tahuna*, 702 F.2d 1276, 1281 (9th Cir. 1983) (seizure of property for civil forfeiture requires probable cause). And the government (at 59 n.17) concedes it could not have made that showing. The government cannot possibly maintain that its omissions had nothing to do with the "nonexistence of probable cause" when, absent the omissions, the warrant would have been denied **for lack of probable cause**. The omitted facts were relevant to probable cause because they determined the nature and extent of the probable cause needed to support the search. And, because the omitted facts could "affect the determination of whether the warrant … should have

issued," *United States v. Mittleman*, 999 F.2d 440, 444 (9th Cir. 1993), they had to be disclosed.

The Opening Brief (at 40-43) cited cases where misrepresentations about the purpose and scope of a search invalidated a warrant; in each, as here, the government frustrated the magistrate's review by describing a different search or seizure than was in fact conducted. The government (at 59 n.17) writes off several such cases as "completely inapposite cases involving clear instances of disregarding warrants." Of course it is often true (and is true in this case, *see infra*) that when officers misrepresent the scope of a proposed search or seizure they ***also*** exceed the scope of the resulting warrant. *See, e.g.*, *United States v. Foster*, 100 F.3d 846, 851-52 (10th Cir. 1996). But the government's lack of candor is an independent violation, *see, e.g.*, *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), and is not lessened by the fact that the government also violated the Fourth Amendment in other ways.

The Tenth Circuit's *Foster* opinion makes the point. The court there held that the search exceeded the scope of the warrant for reasons that are directly applicable here, as the "seizure and removal of 'anything of value,'" which was not authorized by the warrant,

"transformed [the limited search warrant] into a general warrant thereby requiring suppression of all evidence seized under that warrant." 100 F.3d at 851 (citation omitted). But the court (responding to a dissent) also explained that the failure to disclose those plans meant the government had "obtain[ed] the warrant on a ruse." *Id.* at 852. The court found that the "officers obtained the warrant for a dual purpose: (1) a disclosed and legitimate search for illegal weapons and drugs in Foster's home; and (2) an undisclosed and improper 'fishing expedition' for evidence of additional crimes." *Id.* The omission of that undisclosed purpose justified a finding that the violation was the type of "extraordinary" violation justifying blanket suppression of all evidence gathered under the warrant. *Id.* Yet, despite the obvious similarity between *Foster* and this case, the government has nothing to say about *Foster* apart from its observation that the government in *Foster* exceeded the scope of the warrant.

This Court's opinion in *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978) (Kennedy, J.), is also on point. *See* Op. Br. 41-42. The Court there held that the failure "to advise the judge of all material facts, including the ***purpose of the search*** and its intended scope," had

improperly deprived the magistrate of "the opportunity to exercise meaningful supervision over [the officers'] conduct and to define the proper limits of the warrant." 589 F.2d at 422 (emphasis added). In response, the government cites additional language from *Rettig* holding that "the 'failure to disclose' this subjective purpose 'enlighten[s] our review of the search and seizures that actually took place as we determine whether or not the agents went beyond the confines of the warrant.'" Resp. Br. 59 (emphasis omitted) (quoting 589 F.2d at 422). That is certainly true, and the government's omissions should likewise "enlighten" this Court's review of whether the search here exceeded the scope of the warrant. But that language in no way detracts from *Rettig*'s conclusion that a magistrate "cannot perform the function of issuing a warrant particularly describing the places to be searched and the things to be seized … where the police fail to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the affidavits." 589 F.2d at 423. As in *Foster*, the omissions in *Rettig* meant that the government not only violated the Fourth Amendment but committed an extraordinary violation requiring blanket suppression

of all evidence seized under the warrant. *Id.* Here, for similar reasons, the government's omissions show callous disregard.

This Court concluded as much on analogous facts in *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (en banc) ("*CDT*"). The government (at 56) contends that *CDT* is distinct insofar as the government's misrepresentations "caused the magistrate to issue a broad warrant the magistrate may not have otherwise issued." But that is no distinction at all. As noted above, if the government had fairly described its planned search—involving the mass forfeiture of everything worth over $5,000, as well as the gathering of evidence to support those forfeiture plans—then presumably the magistrate would have denied the warrant for lack of probable cause. As in *CDT*, the deliberate omission of this information from the warrant application was (to borrow the government's words) "material to the issuance of the warrant and its scope." *Id.* at 57.

In an effort to justify these undisclosed forfeiture plans, the government (at 67) reports that it has "transmi[tted] millions of dollars seized during the Private Vaults inventory to pay crime victims." That, however, is a drop in the bucket compared to the ***hundreds of millions***

*of dollars* that the government tried to forfeit from box holders. *See* ER-1276-93. It is true that the government was forced to return most of that property, in part because the district court held that the government's forfeiture notice violated due process insofar as it did not tell box holders what they were accused of doing wrong. *See* Doc. 52 at 4-5. But the eventual failure of the government's cash grab does not change the fact that it should have been disclosed in the warrant application.

### B.   The FBI Exceeded The Scope Of The Warrant.

The government does not meaningfully respond to Plaintiffs' argument that its raid involved precisely the type of "criminal search or seizure" that the warrant disallowed. It does not squarely address Plaintiffs' argument that the seizure of everything worth over $5,000 for civil forfeiture was a "criminal seizure." Op. Br. 43-44. Nor does it squarely address Plaintiffs' argument that the "inventory" was a "criminal search" insofar as it was concededly designed to uncover potential criminal wrongdoing—or, as the government put it in a filing in a related case, to "'distinguish between honest and criminal customers.'" *Id.* at 44 (quoting *Doe v. United States*, No. 21-cv-2803-

13

RGK (C.D. Cal. Apr. 2, 2021) (Doc. 15 at 10)). Nor does it seriously dispute that its USPV-specific instructions for the search included steps, such as the use of drug dogs and the recording of "cash observations," with no discernible purpose other than to search for evidence of criminal wrongdoing, nor that it used the information found in the boxes to support its forfeiture plans.

Instead, the government (at 22) argues the warrant imposed **_no_** limitations on its search beyond those that would apply to any warrantless inventory. The government relies on language in the warrant stating that agents would "follow their written inventory policies to protect their agencies and the contents of the boxes," ER-751, but that language only says that agents will conduct an inventory according to written inventory policies. It does not preview any criminal search or seizure, and, to the contrary, furthers the impression that the government's "inventory" would be just that—an inventory. The government's contrary argument would rewrite the warrant, adding the following bolded language:

> This warrant does not authorize a criminal search or seizure of the contents of the safety deposit boxes**, but agents will _nonetheless_ engage in criminal searches and seizures except where prohibited under the inventory doctrine**. In

seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes, **and agents will *also* create special one-time "supplemental" procedures that are unrelated to protecting their agencies or the contents of the boxes, in order to "distinguish between honest and criminal customers."** Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property, **and agents will *also* search for evidence that they can use to take that property away forever.**

Of course that is not what the warrant said, and the government's *post hoc* revision of the warrant makes a mockery of its obligations to the magistrate.

The Opening Brief (at 47-52) cited cases finding a violation of the Fourth Amendment where the government exceeded the limitations of a warrant by transforming an approved administrative search into an unapproved criminal search. The government (at 39-40) seeks to distinguish some of those cases, including *United States v. Grey*, 959 F.3d 1166 (9th Cir. 2020), and *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994), as cases about property code inspections, rather than inventories. But that is a distinction without a difference, as the key point is that both warrants were issued for a limited purpose without probable cause. The cases teach that, having

15

obtained a limited warrant for a limited purpose, officials must "execut[e] the warrant in a manner consistent with the warrant's administrative purpose rather than using the inspection warrant as an opportunity to further its ongoing criminal investigation." *Grey*, 959 F.3d at 1184. The facts of those cases are if anything less egregious, as those warrants, while limited in scope, did not expressly disallow a criminal search or seizure.[1]

Given that most inventories are warrantless, it should not be surprising that Plaintiffs had to look beyond the inventory context to find cases discussing disregard for non-criminal warrants. If the government wants a case about an inventory, however, it need look no further than the Third Circuit's decision in *United States v. Showalter*, 858 F.2d 149 (3d Cir. 1988). There, after expressing doubt about whether the inventory doctrine could be applied to a residence, the

---

[1] These cases, as the Opening Brief explained (at 51), hold that if the government's investigatory motive is a "primary purpose" of the search, then the government bears the burden to "show that the improper motive did not affect the scope of the search or the manner in which a warrant was executed." *Grey*, 959 F.3d at 1183. The government does not even try to make such a showing. Nor could it, given the drug dogs, the forfeiture procedures, the "cash observations," and the photographs documenting the contents of documents found in the boxes.

Third Circuit found it unnecessary to reach that issue because the government had exceeded the scope of the court order approving the inventory. *Id.* at 152. Although the court had issued an order allowing the U.S. Marshals to inventory a seized home, the Third Circuit concluded that the Marshals exceeded the scope of that order by bringing in state police and DEA agents to search for evidence of wrongdoing—just as the FBI here (among other things) invited state police to bring drug dogs to run searches on seized property. *Id.* at 154.[2]

The government (at 61-62) does not even discuss this aspect of *Showalter*, instead distinguishing it as a case about a residence. But while *Showalter* involved a residence, it also involved disregard for the court order authorizing the search. *See* 858 F.2d at 151, 154. There is no reason why the government should be held to the limits of its judicial

_____

[2] The government (at 50) briefly argues that the use of drug dogs cannot transform the inventory into a "criminal search" because "canine sniffs do not constitute criminal searches." But that argument cannot be reconciled with *Florida v. Jardines*, 569 U.S. 1, 11-12 (2013), which held that the use of a drug dog to sniff the front porch of a private home is a search under the Fourth Amendment. If approaching a front door to conduct a drug dog sniff is a "criminal search," which it is under *Jardines*, then surely the same is true of breaking open a safe deposit box in order to run the contents by drug dogs.

authorization when "inventorying" a residence but not when "inventorying" hundreds of safe deposit boxes containing individuals' most sensitive and private possessions. If anything, the Fourth Amendment violation here is more egregious than the violation in *Showalter*, given the number of individuals affected, the breadth of the government's search for evidence of criminal wrongdoing, and the fact that, unlike the warrant in *Showalter*, the warrant here specifically cautioned that it did not authorize a "criminal search or seizure."

## III.   The FBI's Dragnet Search Was Not A Permissible Inventory.

The government's contrary theory is built on the warrant's statement that agents would "follow their written inventory policies to protect their agencies and the contents of the boxes," ER-751, which the government (at 22) stretches to mean that agents would engage in any and all conduct allowed under cases applying the inventory doctrine. Even that cannot save the government, however, as the government did ***not*** confine itself to the terms of its "written inventory policies" and did ***not*** adhere to inventory case law. Thus, even under the government's own twisted reading of the warrant, the government misled the magistrate and exceeded the warrant's limits.

A.   The FBI Did Not Follow Standardized Procedures.

To begin, notwithstanding the warrant's representation that agents would follow "written inventory policies," the search here did not apply any routine procedure. Op. Br. 56-58. Typical inventories of arrestees and autos involve "routine, neutral procedures of the stationhouse." *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983); *see also South Dakota v. Opperman*, 428 U.S. 364, 376 (1976) ("standard procedure, essentially like that followed throughout the country"). By contrast, the government here identifies no routine procedure that governed its unprecedented search.

As in the district court, the government claims the DIOG provided the required neutral procedure, and the government argues that Plaintiffs "fail to identify what critical information is absent from the [DIOG]." Resp. Br. 45-46. What is "absent," however, is ***anything*** requiring the various procedures the government deployed at USPV. Among other things, nothing in the DIOG instructed officers to run the contents of boxes by drug dogs; record specified details concerning the condition of cash; record photographs and video of box contents, including recording the contents of documents found in the boxes;

19

process all cash over $5,000 for asset forfeiture; and provide copies of inventory records to the asset forfeiture division. According to the government, the DIOG does not even provide guidance on how specific an inventory's list of property must be. ER-206-09. None of that is in the DIOG; nor is anything else that would tell agents how to "inventory" an entire vault.

These gaps in the written policy might not be fatal if the government could show that officers followed some standard unwritten procedure. But, as the Opening Brief explained (at 58), no evidence supports such an argument; to the contrary, the agents who "inventoried" the vault had no relevant training or experience. The government responds (at 47) that this lack of any prior training or experience is beside the point because these agents had plenty of experience conducting *criminal* searches, and "inventory procedures are the same as the procedures used for consent searches and searches pursuant to a warrant." That, however, only underscores the government's flagrant disregard for the limitations of the inventory doctrine, as well as the extent to which the government misled the

magistrate. If an inventory is "the same" as a criminal search, then it is just that—a criminal search.

The government's cited case law proves the point. The government (at 43) cites *United States v. Bulacan*, 156 F.3d 963 (9th Cir. 1998), for the proposition that an inventory is valid so long as the officer conducting the search "'has no choice as to the subject of the search or its scope'" and argues it meets that standard because the officers conducting the raid "had no discretion in performing their tasks." But the government does not cite any standard procedure that dictated how agents should go about inventorying the USPV vault. Everything—the use of drug dogs, the taking of video and photographs, the "cash observations," the special inventory form, and all the other myriad features of the "inventory"—emerged from the discretion left to the agents who designed and oversaw the raid.

B.   The FBI Followed Bespoke Procedures With A Programmatic Purpose To Obtain Evidence And Forfeit Property.

Rather than following standard procedures set out in the DIOG, in the run up to the search the government drafted and employed unique procedures, the "Supplemental Instructions for Box Inventory," that

had a programmatic purpose to gather evidence and forfeit property. Op. Br. 59-62. The government (at 49-50) concedes that these special procedures, including "drug dogs and noting cash characteristics," were driven by the "expectation and hope of finding incriminating evidence." And, notably, these Supplemental Instructions were nowhere disclosed in the warrant or warrant application. ER-751, 835-36.

The government (at 49) argues its Supplemental Instructions do not invalidate the "inventory" because they were "not confined" to a criminal search and *also* provided "extensive" instruction about "inventorying and evidence handling." The fact that the government felt compelled to include "evidence handling" in this statement is telling; evidence handling, of course, has nothing to do with producing an "inventory." In fact, the Supplemental Instructions provided vanishingly little guidance about how to conduct an inventory. *See* Op. Br. 13-15, 60-61. More fundamentally, the government cites no authority for its apparent view that inventory procedures can explicitly direct agents to engage in a criminal search so long as they are "not confined" to such activities. To the contrary, inventory procedures must be "designed to produce an inventory." *Florida v. Wells*, 495 U.S. 1, 4

(1990); *see also Opperman*, 428 U.S. at 376 (upholding inventory where there was "no suggestion" that "standard procedure … was a pretext concealing an investigatory police motive").

The Opening Brief discussed cases, including *City of Indianapolis v. Edmond*, 531 U.S. 32, 46 (2000), holding that roadside checkpoints and other similar programs establishing procedures for repeated searches are invalid where they have a "programmatic purpose" to search for evidence of crimes. Op. Br. 59-60. The government (at 41-42) argues these cases are distinct because they involve "regulatory schemes under which a class of searches is conducted with dual motives," whereas "an inventory is not a regulatory scheme and program." To the contrary, however, the rationale of the inventory doctrine is that an inventory ***should*** occur as part of a "regulatory scheme and program" applying set procedures in routine circumstances, in order to serve needs unrelated to gathering evidence. *See, e.g.*, *Wells*, 495 U.S. at 4. If the Supplemental Instructions are not part of a "regulatory scheme and program," then they are incompatible with the basic premise of an inventory. And if they are part of a "regulatory scheme and program," then cases addressing "programmatic purpose"

are relevant. Either way, these explicit instructions to use the inventory to gather evidence and forfeitable property violate the Fourth Amendment.

Ultimately, "regulatory program" or not, inventory cases are clear that inventory procedures should limit an inventory to prevent it from devolving into "a purposeful and general means of discovering evidence of a crime." *Wells*, 495 U.S. at 4. The Supplemental Instructions, by contrast, explicitly directed agents to engage in such a "purposeful and general" search. That distinguishes typical "inventory" cases, and it also exhibits "callous disregard."

C. The "Inventory" Did Not Produce A Meaningful Inventory.

The "inventory" here also did not result in a meaningful inventory, as agents made no effort to record the amount of valuable property in each box (such as the number or weight of gold coins) and described valuable property with generic descriptions like "miscellaneous items." Op. Br. 62-67. The paucity of the inventory contrasts, moreover, with the detailed record of facts (like the condition of cash or the contents of written documents) that could be used as evidence. *Id.* at 16-18.

The government (at 51) argues this non-inventory inventory was permissible because it complied with FBI policies, which supposedly do not require "an exhaustive list of every single item within a category of items in a box." However, agents here did not merely fail to create an "exhaustive list of every single item." Agents failed to produce a record capable of serving the inventory's purported purpose of guarding against claims of theft and loss; descriptions like "miscellaneous coins," "assorted jewelry," "uncounted gold color coins," and "[y]ellow metal coins" describe property that could be worth anywhere from $3 to $3 million. Op. Br. 19-20 (citing record). Whether FBI policies require an "exhaustive list" or not, it is black letter law that inventory procedures should be "designed to produce an inventory," *Wells*, 495 U.S. at 4, and an inventory should guard against claims of theft and loss, *Opperman*, 428 U.S. at 369. The government in fact represented, in its warrant application, that the inventory here would "protect their agencies from claims of theft." ER-835. The government's non-inventory inventory fails these basic requirements.

In any event, the government is wrong about the governing policies. The DIOG does provide that agents conducting an inventory

must generate "receipts for *all* items retrieved during inventory searches." ER-860 (emphasis added). The government (at 52) argues that provision relates to the receipt for seized property and not the inventory, but that is a distinction without a difference, as the DIOG states that the "written summary showing the results of the inventory must be recorded in … an FD-597 ('Receipt of Property')." ER-859-60. The inventory is recorded in the "receipt," and the receipt must list "all items." The FD-597 forms here did nothing of the sort.

The government is also wrong to invoke (at 53) cases holding that "minor noncompliance" with standard procedure does not invalidate an inventory. *E.g.*, *United States v. Magdirila*, 962 F.3d 1152, 1157-58 (9th Cir. 2020). This is not a case where a single officer was a little sloppy filling out an inventory form. Rather, the government here specifically broke open hundreds of safe deposit boxes with the stated aim of generating an "inventory," but, having done so, did not instruct its agents to produce a meaningful inventory—and on appeal, now takes the position that it was not even required to do so. There is nothing "minor" about the government's deliberate failure to meaningfully

inventory hundreds of millions of dollars in property that it only was able to access under the guise of conducting an "inventory."

D.    <u>The FBI Used Its "Inventory" As An Excuse To Rummage.</u>

The Opening Brief, finally, explained that the government ran afoul of inventory case law because it used its inventory as an "excuse to rummage for evidence." Op. Br. 67 (quoting *United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019)). The invasion of hundreds of safe deposit boxes, looking for forfeitable property and evidence of wrongdoing, is precisely the type of general search the case law does not permit.

The government spends the preponderance of its briefing on this issue, but, in doing so, avoids the central point. To begin, the government elides all the issues discussed above, as it takes for granted that this case is analogous to—and should be decided under the same standard as—a case where a single officer following routine inventory procedures harbors a subjective intent to discover evidence. Then, having so framed the case, the government (at 38) suggests the most important question is whether the district court applied the "but for" test that normally applies to cases involving a single officer's

investigatory intent or, instead, applied a more demanding "only purpose" test. The answer is that the district court **did** incorrectly apply an "only purpose" test. *See* ER-14-15.[3] But the government's suggestion (at 38) that Plaintiffs "rely solely" on that error is laughable given that the issue takes up less than a page of the Opening Brief (at 68). Similarly laughable is the government's suggestion (at 38) that Plaintiffs "have not challenged the district court's factual analysis under the 'but for' test." To the contrary, the Opening Brief (at 68-71) argued in detail that the district court erred under **any** possible standard.

Plaintiffs' actual key point here is that—whether the case is assessed under an "only reason" test, a "but for" test, or any other test—the government has never provided **any** legitimate explanation for why it decided to "inventory" the contents of the safe deposit boxes. *See* Op.

---

[3] The government (at 36) accuses Plaintiffs of misreading the district court's opinion, but the opinion is clear: "An impermissible investigatory motive must be the *only* reason the agents conducted the inventory." ER-14. "They must demonstrate that the improper investigative motive was the *only* reason that the Government opened the safety deposit boxes." ER-15. And, rejecting Plaintiffs' claims: "It beggars belief that agents would have worked in this manner *solely* to invent a pretext for a criminal search." ER-14. All of that was legal error.

Br. 68-71. Unlike a typical "inventory" case where the government has a routine practice of inventorying every arrestee or impounded automobile, such that an inventory occurs automatically without any need for a decision, the government here made a deliberate choice to "inventory" the vault. The lead agent, who was also the government's 30(b)(6) witness, conceded that the government discussed alternatives, including "taking over the business" to wind down its operations and return the property in an orderly fashion without opening the boxes. ER-1641. The agent said, "I know we had discussions about it, we had discussions about how can we do this" and that the government concluded that an inventory was "the best feasible way[] to achieve our goals." ER-1642. Apart from a vague insistence that allowing box holders to retrieve their own property would have been "less feasible than what we actually did," ER-1645, the agent was unable to offer any actual justification for that decision, stating, "[w]hy we didn't choose something else, I don't—I can't really tell you." ER-1642. This total lack of any justification is, moreover, exacerbated and underscored by the fact that the "inventory" *created* the very risk of theft and loss that an inventory is supposed to redress.

To the extent that the government addresses this issue at all, the government argues (at 23) that its desire to search the boxes was not a "but for" cause of the overall USPV raid—which, it says, was justified by its desire to shut down USPV's business. That argument, however, addresses the wrong question. Under the case law, an officer's impermissible motive invalidates an inventory if it was a "but for" cause of ***the inventory***, not the broader law enforcement action of which the inventory was a part. *See, e.g.*, *United States v. Johnson*, 889 F.3d 1120, 1127 (9th Cir. 2018) (although automobile was validly impounded, subsequent inventory was tainted by investigatory purpose). The fact that the government may have had a legitimate reason for prosecuting USPV is beside the point, as the government cannot justify its search by pointing to a legitimate basis for some ***other*** distinct law enforcement action. The decision that led to the inventory was the decision to "inventory" the vault—rather than leaving the boxes locked—and that decision has never been explained.

The government (at 28-29) also attempts to wrap the district court's factual findings in deference, arguing that the district court's "trial on the briefs" produced factual findings that can only be reversed

30

for clear error. The primary problem with this argument, however, is that the facts of this case are largely undisputed, and whether those facts "constitute a bona fide inventory search is reviewed *de novo*." *United States v. Bowhay*, 992 F.2d 229, 230 (9th Cir. 1993). There is no real dispute that the government has **never** provided any explanation for its decision to break open the boxes, rather than allowing property owners to retrieve their property directly from the vault. Whether those facts establish a pretext is a legal question reviewed *de novo* on appeal.[4] And, in any event, if "clear error" is required, it is amply demonstrated

---

[4] Even if that were not the case, this Court cannot defer to "fact finding" made after what amounts to summary judgment briefing. *See* Op. Br. 32. The government (at 30) argues that Plaintiffs waived any objection to such fact finding, but that is false. Plaintiffs below agreed that it made sense to set "a briefing schedule" at the end of discovery, SER-17, but the district court indicated that it would decide "whether or not we have to have a hearing" based on the briefs, SER-18, and the subsequent scheduling order included directions to prepare for trial, including witness and exhibit lists, SER-6, and directed the parties to file a statement of disputed and undisputed facts just as with any post-discovery summary judgment briefing, SER-9. Plaintiffs below took the position that post-discovery briefing should be assessed under the summary judgment standard, Doc. 135 at 13, and this appeal should likewise be treated as an appeal from a decision granting summary judgment.

here, where the government has offered no legitimate explanation whatsoever for the decision to "inventory" the vault.

## IV. The Appropriate Remedy For These Violations Is Sequestration Or Destruction Of The "Inventory" Records.

Absent court intervention, information about Plaintiffs' private safe deposit boxes will remain in a networked criminal database that "can be used to make potential linkages between incidents and investigations" and to "reveal previously unknown relationships among individuals and groups under investigation." FBI, *Privacy Impact for the SENTINEL System* (2014), https://perma.cc/8D9W-YFC5; *see also* ER-236-37, 1012, 1461. Already, records from the "inventory" have been used to obtain warrants and to support additional forfeiture actions. *See, e.g.*, *United States v. $217,825*, No. 22-cv-15 (C.D. Cal.); *United States v. Cryptocurrency*, No. 22-cv-556 (C.D. Cal.). As in *CDT*, 621 F.3d at 1174, the proper remedy for this ongoing invasion of hundreds of individuals' Fourth Amendment rights is an order directing the sequestration or destruction of the "inventory" records.

The government (at 65) argues that *CDT* is distinct because the Fourth Amendment violation here is not "'callous' or 'blatant.'" Not so. The government's callous disregard can be seen in its

misrepresentations to the magistrate, its disregard for the limits of the warrant, and its twisting of the inventory doctrine to an unprecedented circumstance never before contemplated. It can be seen in the government's fashioning of unique procedures, just for use in this one "inventory," with an evident purpose to search for evidence. And it can be seen in the government's wholesale failure to create a meaningful inventory. At bottom, this roving fishing expedition into the intimate papers and property of hundreds of innocent people—undertaken without ***any*** probable cause—is precisely the kind of general search the Fourth Amendment was enacted to prohibit.

These facts are closely akin to *CDT*. As in that case, the government made "representation[s] in the warrant … obviously designed to reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize," and then proceeded to do exactly the opposite, amounting to an "obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." 621 F.3d at 1172. This case also bears a striking resemblance to cases where courts have found "extraordinary"

violations of the Fourth Amendment, warranting wholesale suppression of all evidence generated during a search—including *Rettig*, where the government concealed its purposes from the magistrate and obtained a warrant that, as "interpreted and executed by the agents … became an instrument for conducting a general search," 589 F.2d at 423, and *Foster*, where the government's warrant application concealed its plans to "seize anything of value" and "ignore[d] the particularity requirement," 100 F.3d at 852. Given the number of people affected, and the sensitivity of the privacy interest at play, the violation here is only more extraordinary.

Stepping back, while the government seeks to distinguish Plaintiffs' cases, the government cites ***no*** case that even remotely approves its conduct. The government cites no case that approves an "inventory" of an entire safe deposit vault; no case that would excuse its failure to advise the magistrate that it planned to forfeit everything worth over $5,000, as well as to search the boxes for evidence; no case that would allow it to engage in such a search in the teeth of a warrant that ***expressly*** barred any "criminal search or seizure"; no case that would allow it to adopt special procedures, just for that "inventory,"

with a purpose to search for evidence; and no case that would excuse its failure to generate a meaningful inventory of hundreds of millions of dollars in valuable property. Such extraordinary facts are unheard of, which is precisely why they exhibit "callous disregard."

## CONCLUSION

The Court should reverse and remand for entry of appropriate relief.

35

Date:        July 27, 2023            Respectfully submitted,


                                      *s/ Robert E. Johnson*

                                      Robert P. Frommer
                                      Joseph Gay
                                      Michael Greenberg
                                      INSTITUTE FOR JUSTICE
                                      901 N. Glebe Rd., Suite 900
                                      Arlington, VA 22203
                                      Tel.: (703) 682-9320
                                      Email: rfrommer@ij.org
                                              jgay@ij.org
                                              mgreenberg@ij.org

                                      Robert E. Johnson
                                      INSTITUTE FOR JUSTICE
                                      16781 Chagrin Blvd. #256
                                      Shaker Heights, OH 44120
                                      Tel.: (703) 682-9320
                                      Email: rjohnson@ij.org

                                      Nilay U. Vora
                                      Jeffrey A. Atteberry
                                      THE VORA LAW FIRM, P.C.
                                      201 Santa Monica Blvd., Suite 300
                                      Santa Monica, CA 90401
                                      Phone: (424) 258-5190

                                      *Attorneys for Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-56050

I am the attorney or self-represented party.

**This brief contains** | 6,997 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Robert E. Johnson | **Date** | July 27, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*