**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL SNITKO; JENNIFER SNITKO; JOSEPH RUIZ; TYLER GOTHIER; JENI VERDON-PEARSONS; MICHAEL STORC; TRAVIS MAY, | No. 22-56050 |
| | D.C. No. 2:21-cv-04405-RGK-MAR |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| UNITED STATES OF AMERICA; E. MARTIN ESTRADA, in his official capacity as Acting United States Attorney for the Central District of California; DONALD ALWAY, in his official capacity as an Assistant Director of the Federal Bureau of Investigation, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted December 7, 2023
Pasadena, California

Filed January 23, 2024

Before:  CARLOS T. BEA, MILAN D. SMITH, JR., and
LAWRENCE VANDYKE, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Milan D. Smith, Jr.;
Partial Concurrence by Judge VanDyke

## SUMMARY[*]

### Fourth Amendment/Inventory Searches

The panel reversed the district court's judgment holding that plaintiffs' Fourth Amendment rights were not violated when the FBI "inventoried" 700 safe deposit boxes at US Private Vaults (USPV), and remanded for the FBI to sequester or destroy the records of its inventory search pertaining to the class members.

USPV operated a business which rented safe deposit boxes to customers. The government obtained a warrant to search and seize USPV's facilities, including its safe deposit boxes, as part of its investigation of USPV for various criminal activities. The warrant explicitly did not authorize a criminal search or seizure of box contents, and required agents to follow their written policies to inventory items and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contact box owners so that they could claim their property after the search.

Following the seizure of their property, plaintiffs filed suit alleging claims for return of property pursuant to Federal Rule of Criminal Procedure 41(b) and violations of their Fourth and Fifth Amendment rights. Although plaintiffs' property was returned, they continued to seek equitable relief requiring the government to return or destroy records of the inventory search. The district court denied plaintiffs' requested relief, finding that the government's "inventory" of the safe deposit contents was a constitutionally proper inventory search.

In Part I of its analysis, the panel held that the inventory search doctrine, an exception to the warrant requirement that allows authorities to search items within their lawful custody, did not apply. One of the most important features of the doctrine is the existence of standardized instructions, which limit the discretion of officers and apply consistently across cases. Here, in support of its warrant application, the government, in addition to submitting standardized instructions, also submitted Supplemental Instructions that were designed specifically for the USPV raid. The panel held that the Supplemental Instructions took this case out of the realm of a standardized "inventory" procedure.

In Part II of its analysis, the panel held that the government exceeded the scope of the warrant, which did not authorize a criminal search or seizure of the contents of the safe deposit boxes.

Concurring, Judge M. Smith wrote separately to address plaintiffs' additional argument that the origins and rationale of the inventory search doctrine makes it inapplicable to safe deposit boxes in a locked vault. Judge M. Smith would hold

that given the greater privacy interests and the implications of the rights of third parties, the inventory search doctrine does not extend to searches of the box contents in a locked vault.

Concurring in part, Judge VanDyke joined the majority's opinion except as to Part II of its analysis, which he viewed as unnecessary given the panel's resolution of Part I.

## COUNSEL

Robert E. Johnson (argued), Institute for Justice, Shaker Heights, Ohio; Robert P. Frommer, Joseph Gay, and Michael Greenberg, Institute for Justice, Arlington, Virginia; Nilay U. Vora and Jeffrey A. Atteberry, The Vora Law Firm PC, Santa Monica, California; for Plaintiffs-Appellants.

Victor A. Rodgers (argued), Assistant United States Attorney, Asset Forfeiture and Recovery Section; Maxwell K. Coll and Bram M. Alden, Assistant United States Attorneys; Mack E. Jenkins, Assistant United States Attorney, Criminal Division Chief; Martin E. Estrada, United States Attorney; Office of the United States Attorney, Los Angeles, California; for Defendants-Appellees.

Mark A. Perry, Weil Gotshal & Manges LLP, Washington, D.C., for Amicus Curiae Cato Institute.

# OPINION

M. SMITH, Circuit Judge, with whom BEA and VANDYKE, Circuit Judges, join as to Part I of the Analysis and with whom BEA, Circuit Judge, joins as to Part II of the Analysis:

This case arises out of the government's "inventory" of 700 safe deposit boxes at US Private Vaults (USPV), a company the government was investigating for various criminal activities, including money laundering. The government obtained a warrant to search and seize USPV's facilities and instrumentalities of its crime, including its "nests" of safe deposit boxes. The warrant issued by the magistrate judge explicitly "d[id] not authorize a criminal search or seizure of box contents," and required agents to follow their "written policies" to inventory items and contact box owners so that they could claim their property after the search.

After the search at USPV, non-criminal Plaintiffs Paul and Jennifer Snitko, Joseph Ruiz, Tyler Gothier, Jeni-Verdon Pearsons, Michael Storc, and Travis May (collectively, "Plaintiffs") made claims to the FBI seeking return of their property. The government refused to return their property, informing Plaintiffs that it sought to civilly forfeit their property instead. Plaintiffs filed suit, and, during the course of litigation, the government eventually returned all of Plaintiffs' property. However, Plaintiffs continued to press for equitable relief in the form of destruction of records, a remedy we approved in *United States v. Comprehensive Drug Testing, Inc*., 621 F.3d 1162, 1172 (9th Cir. 2010) (*CDT*), *overruled in part on other grounds as*

*recognized by Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018) (per curiam).

After a trial on the briefs, the district court granted judgment in favor of the government, holding that Plaintiffs' Fourth Amendment rights were not violated because the government's "inventory" was not pretextual pursuant to our case law regarding the inventory search exception to the warrant requirement. Plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## FACTS AND PROCEDURAL BACKGROUND

### I. USPV

USPV operated a business in Beverly Hills, California, which rented safe deposit boxes to customers. *See Snitko v. United States*, 2022 WL 20016427, at *1 (C.D. Cal. Sept. 29, 2022). Unlike banks, which also rent safe deposit boxes, USPV did not require customers to provide personal information, social security numbers, driver's licenses, or any other form of identification in order to rent a box. *Id*. Customers kept all keys to the boxes. *Id*. USPV's facility featured significant security measures, including iris-scan vault access, 24/7 electronic monitoring, 24/7 armed response, and a time lock on the vault itself. *Id*.

Protection of customers' anonymity was USPV's main selling point. On its website, the company explained: "Our business is one of very few where we don't even want to know your name. For your privacy and the security of your assets in our vault, the less we know the better." *Id*. The website even went so far as to say that it "would only cooperate with the government under court order."

Perhaps unsurprisingly, investigations by various government agencies of individual criminals resulted in the

execution of search warrants at USPV. *Id*. For example, past searches pursuant to a warrant of individual safe deposit boxes at USPV have uncovered proceeds of crimes such as drug trafficking, illegal gambling, and prostitution rings. *Id*.

## II.   The Government Investigation into USPV

After years of investigating individual USPV boxholders, agencies like the FBI, DEA, and USPIS concluded that the individual investigations "weren't doing anything effective" because the "real problem" was USPV, which they believed served as a "money laundering facilitator." *Id*. at *2. Accordingly, the agencies opened an investigation into USPV's business and its principals in April 2019. *Id*. at *2.

The investigation confirmed that the owners of USPV knew of its use by criminals to launder money, solicited illicit business, and committed several crimes themselves, not limited to money laundering. *Id*. at *2. The agencies thus began discussions about obtaining indictments and warrants against the company. Internally, the agencies discussed taking "[USPV's] business out," which they believed involved seizing "eye scanners, the money counter," and "the nest[s] of safe deposit boxes." *Id*. at *2.

In the summer of 2020, discussions among and within the agencies began regarding the civil forfeiture[1] of assets

---

[1] "Civil forfeiture is an *in rem* proceeding" against the object the government seeks to forfeit. *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011). "Criminal forfeiture is an *in personam* proceeding against the defendant personally and is part of the defendant's punishment." *Id*. "To achieve criminal forfeiture, the government first must prove, beyond a reasonable doubt, that the defendant is guilty of the crime. The government then must prove, by a preponderance of the evidence, a nexus between the property and the

they expected to find within the safe deposit boxes. *Id*. at *3. Special Agent in Charge (SAC) Matt Moon contacted Agent Jessie Murray about the USPV investigation and "asked whether the FBI LA field office had the capacity to handle civil forfeiture regarding [USPV]." *Id*. at *3. Murray responded that the office could handle a large-scale seizure, but she could not offer an opinion on whether there was probable cause to forfeit the assets until she reviewed the finalized warrant affidavit. *Id*. at *3. Upon reviewing the affidavit in February 2021 (prior to its submission to the magistrate judge), Murray determined that there was probable cause to seize the contents of the safe deposit boxes. *Id*. at *3.

## III.    Indictment and Warrant Application

On March 9, 2021, a grand jury returned an indictment against USPV. *Id*. at *3. The indictment charged USPV with conspiracy to money launder, distribute controlled substances, and structure financial transactions. *Id*. at *3. The indictment also included forfeiture allegations, which reflected a finding of "probable cause to believe" that certain items to be seized were "subject to forfeiture" such as "[t]he nests of safety [sic] deposit boxes and keys." The two forfeiture counts stated that "the United States will seek forfeiture" of USPV's property "in the event of defendant USPV's conviction under [the counts] of th[e] Indictment."

About a week and a half later, on March 17, 2021, the Government submitted applications to Magistrate Judge Steve Kim for search and seizure warrants, both of which

---

crime." *Id*. To achieve civil forfeiture, however, the government must only "prove, by a preponderance of the evidence, the culpability of the owner and a nexus between the property and the illegal activity." *Id*.

included a common affidavit by Special Agent Lynne
Zellhart, the agent in charge of the FBI's investigation. *Id*.
at \*3. The affidavit largely discussed how USPV's business
operated, including how its owners knew its boxes were
rented to facilitate money laundering. *Id*. at \*3. According
to an exchange between a confidential informant and an
owner of USPV, the owner stated, "Listen, you don't want
every drug dealer in your place either. You need normal
people too." The affidavit explained that this statement
"suggests that drug dealers comprise the majority of USPV
customers, and the business has to make an effort to attract
a non-criminal clientele as well, so as not to be too obvious
a haven for criminals."

The affidavit also noted that the Government sought to
seize the box nests as "evidence and instrumentalities of
USPV's criminality." *Id*. at \*3. It explained that "[t]he
search and seizure warrants the government seeks . . .
authorize the seizure of the nests of the [safe deposit] boxes
themselves, <u>not</u> their contents." *Id*. at \*3. But immediately
after that sentence, the affidavit read, "[b]y seizing the nests
of safety [sic] deposit boxes, the government will necessarily
end up with custody of what is inside those boxes initially."
*Id*. at \*3. "[T]o protect their agencies from claims of theft or
damage to the contents of the boxes," the affidavit stated that
"[a]gents will follow their written inventory policies." *Id*. at
\*3. The affidavit also stated that:

> Agents will attempt to notify the lawful
> owners of the property stored in the boxes
> how to claim their property, such as by
> posting that information on the internet or at
> USPV itself, or by contacting the owners
> directly. In order to notify the owners

>directly, agents will, in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner. (USPV recommends that box renters include their or their designees' telephone numbers on a note in the box in the event that USPV removes the contents for nonpayment of rental fees.)

A footnote in the affidavit explained that "[t]he FBI policy regarding taking custody of an unknown person's property provides, in part, that agents "inspect the property as necessary to identify the owner and preserve the property for safekeeping," and that the "inspection should extend no further than necessary to determine ownership."

Ultimately, the warrant issued by Judge Kim approved the following "items to seized," at USPV: "the business computers; [t]he money counters; . . . [t]he digital and video surveillance and security equipment; and [t]he biometric scanners," and the "nests of safety [sic] deposit boxes and keys." *Id*. at \*3. With respect to this last item, the warrant stated:

>This warrant does not authorize a criminal search or seizure of the contents of the safety [sic] deposit boxes. In seizing the nests of safety [sic] deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners

> in order to notify them so that they can claim
> their property[.]

Although the warrant provided that agents must "follow their
written inventory policies," the details of those written
policies were not included in the government's application
for a warrant, except for the one sentence above regarding
the "unknown persons policy." *Id*. at *3.

### i.  Written Inventory Policy

The FBI's inventory policy is contained in its Domestic
Investigations and Operations Guide ("DIOG"), which
Zellhart described as a "dictionary or a thesaurus" for FBI
agents.  The DIOG instructs the agents that, "after lawfully
taking custody of property," they must "conduct a prompt
and thorough search of the contents of the property,
including searching any locked or unlocked containers and
inventorying their contents." *Id*. at *4.  Agents must then
record the results of the inventory on certain specified forms,
and the summary "must include, but is not limited to, a
description of the property and the items secured for
safekeeping." *Id*. at *4.[2]

The DIOG provision further instructs that agents may not
conduct inventories "solely for investigative purposes," and
that "[w]henever there is probable cause to believe an
inventory search would also yield items of evidence or

---

[2] Under "Inventory Searches Generally," the DIOG provides: "The
purpose of an inventory search is to 1) protect the owner's property while
it is in FBI custody; 2) protect the FBI against claims of lost or stolen
property; or 3) protect FBI personnel from potential danger.  As a
threshold matter, in order for an inventory search to be valid, agents must
first have lawful custody of the property.  The justification for an
inventory search is the production of an inventory of the property."

contraband, agents must obtain a search warrant when feasible."

## ii. Policy Regarding Custody of an Unknown Person's Property

The warrant also referred to an FBI policy on the procedure to follow should agents come into possession of an "unknown person's" property. *Id*. at \*4. That policy states that agents should "inspect the property as necessary to identify the owner and preserve the property for safekeeping," and that such an inspection should "extend no further than necessary to determine ownership." *Id*. at \*4.

The district court below found that [t]he "unknown persons" policy is "separate from the FBI's inventory policy." *Id*. at \*4. However, the only written reference to language matching this "unknown persons" policy in the record is on the same page of the DIOG above, which discusses inventory searches. The language is contained in a provision titled "Administrative Inventory Searches of Lost or Misplaced Items." As with the inventory policy, these instructions state that "if, within the scope of the examination necessary to determine ownership, agents discover incriminating evidence or contraband, agents should seek a warrant to continue the search, absent emergency circumstances."

## IV.    Preparation and Execution of the Warrant

### i.    Preparation

The agencies prepared two relevant documents prior to applying for the warrant in preparation for the search at USPV. One is the "Operation Order Search Plan" document. That document states that "agents will seize and inventory the facilities of the business, including the nest of safe

deposit boxes, according to the federal seizure warrant" (which had not yet issued). The portion of the plan titled "Execution" explains that "Teams 1-4" would search the residences of the owners of USPV; "Team 5 will execute a search warrant at USPV" and "will seize evidence itemized in the warrant regarding underlying crimes (money laundering, fraud, drug trafficking, etc.)" Team 6 will "process and inventory the facilities of USPV, including the nest of boxes." The document then refers the reader to the second relevant document, "Supplemental Instructions on Box Inventory."[3]

The Supplemental Instructions begin by explaining that pursuant to the warrant (not yet) issued by Magistrate Judge Kim, "agents are authorized to seize the facilities of [USPV] and conduct an inventory of the contents therein." Agents were to "search and inventory all boxes according to FBI policies and procedures." All "inventoried contents [are to] be processed as described in [the] memo."

The first part of the memo, titled "General Procedure," provides instructions on how agents should conduct their inventory and log the contents of boxes. According to the memo, two teams of three agents were to "methodically open and inventory each box." This involved removing the box, labeling it, and "taking care to preserve possible fingerprint evidence." Teams would then "identify the contents of each

---

[3] In drafting the Supplemental Instructions, Zellhart, as the government's 30(b)(6) witness, testified that she did not "have the DIOG in [her] hand" but "understood the policy and [] wrote the supplemental instructions for the team to follow based on" it. In other words, while the DIOG was a sort of "general policy," Zellhart confirmed that the Supplemental Instructions were "sort of the operative policy, the policy that was in place on the ground."

box, creating an inventory list," and filling out various forms.

The memo states that "[e]ach inventory [would] likely include the following": the USPV box door with its lock, a form with emergency contact information, the physical deposit box, and the box's contents. Although the memo instructs agents to "identify" the box's contents, it does not provide further instructions on how to do so.

Separately, teams were to "note if the box includes a USPV notification form identifying a contact person for the box." The memo provides that agents "[could not] search the content of boxes for evidence, but [could] examine the contents to identify the box owner." Inventories of each box would be video recorded, and a copy of any paperwork would go to the Asset Forfeiture team.

The next part of the memo provides more specific instructions on how to secure and handle "evidence." For example, any amount of cash over $5,000 was to be placed in an "evidence bag" and given a "forfeiture identification number." Any cash would then be taken to a canine unit which was on the scene. Agents were to take notes on the "condition of cash," including how "the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.); if there appears to be a drug residue present; if a gun is also present; or anything else of note."

To facilitate the inventory, the FBI also created a form specifically for use at USPV. The form includes a space for "Cash Observations" and, like the Supplemental Instructions, tells agents to record "how the cash is bundled," "if it has a strong odor," and if "drug residue" or "a gun" is found with cash. It also includes space to record the results

of a drug dog sniff. And it prompts agents to record, as part of the inventory, "serial numbers on firearms or watches."

### ii. Execution

The Government executed the search and seizure warrants on-site at USPV from March 22 to March 26, 2021. During that time, the FBI inventoried the contents of over 700 safe deposit boxes. In performing the "inventory," agents found letters taped to the inside sleeve of the deposit box, identifying the owner of the box and providing the owner's contact information. The district court found, however, that "occasionally" "[e]ven after finding these letters, agents would break open the interior of the box and inventory the box's contents."

Per the Supplemental Instructions, agents used the inventory form to document the condition of cash; ran all cash over $5,000 by drug-sniffing dogs; tagged items with forfeiture numbers; and photographed objects found in the boxes. All cash was "taken to Loomis," which generated receipts, and the money was "wired to the US Marshals Service." All non-cash valuables were "transported to Evidence Control" for storage. All "general evidence [was] inventoried, processed, labeled and taken to FBI ECC [redacted] for storage. . . ."

## V.    Results of the Search

Despite the affidavit's assertion that "it would be irrational for non-criminal customers to choose USPV," it turned out that a number of non-criminals were customers at the facility. These include the following Plaintiffs:

- Paul and Jennifer Snitko, who used their USPV box to store legal documents, watches with

16          SNITKO V. USA

> sentimental value, hard-drive backups, coins, and gold jewelry. They used USPV "because [their] bank had a waiting list for a safe deposit box, [they] live in a wildfire prone area . . . and [they] require a place to store [their] wedding bands when engaging in sports activities . . . ."

- Tyler Gothier, who stored "silver and other personal property" in his box and used USPV due to its convenient location.

- Joseph Ruiz, who stored $57,000 in cash in his box and used USPV because he was concerned that "the COVID pandemic would make it impossible for [him] to withdraw [his] funds from a bank account."

- Michael Storc and Jeni-Verdon Pearsons, who stored "approximately $2,000 in cash, as well as approximately $20,000 worth of silver," along with "personal documents" in their box. They used USPV because they needed a safe place to keep the silver.

- Travis May, who stored $63,000 in cash, $100,000 in gold, and various documents in sealed envelopes in his box, and used USPV as an "alternative location to access valuables in case of emergencies."

*Snitko*, 2022 WL 20016427, at \*2. After the raid on USPV, Plaintiffs filed claims with the FBI seeking return of their seized property.**[4]** The government did not return the

---

[4] *See* Order re: Plaintiff's Ex Parte Application for a TRO at 2, *Paul Snitko v. United States of America et. al.*, 2:21-cv-4405, Dkt. No. 52

property in response to these claims; instead, it indicated that it was seeking to forfeit the property. Order re: Request for Preliminary Injunction at 2, *Paul Snitko v. United States of America et. al*., 2:21-cv-4405, Dkt. No. 58 (Jul. 16, 2021) (Dist. Dkt. No. 58). On May 20, 2021, the Government initiated administrative forfeiture[5] proceedings against any box contents that met a minimum monetary threshold of $5,000, by issuing a "Notice of Seizure of Property and

---

(Jun. 22, 2021) (Dist. Dkt. No. 52); Order re: Plaintiff's Motion for Preliminary Injunction at 2, *Paul Snitko v. United States of America et. al*., 2:21-cv-4405, Dkt. No. 60 (Jul. 23, 2021) (Dist. Dkt. No. 60) (explaining that Ruiz had filed a claim with the FBI on April 8, 2021).

[5] "As the term implies, in nonjudicial (administrative) forfeiture proceedings, the government may obtain title to forfeited property without any involvement by the courts." *Omidi v. United States*, 851 F.3d 859, 861 (9th Cir. 2017). The process works as follows:

> To start the administrative forfeiture process, the government must provide notice to interested parties after seizing the targeted property. 19 U.S.C. § 1607(a). If no one comes forward to claim an interest in the property within the deadline specified in the notice, the government may declare the property forfeited, at which point title passes to the United States. 18 U.S.C. § 983(a)(2)(B); 19 U.S.C. § 1609. If a claimant does come forward to claim an interest in the property, the administrative forfeiture process ceases and within 90 days the government must initiate a judicial forfeiture proceeding—a formal court action which, if successful, results in a court order declaring the property forfeited. 18 U.S.C. § 983(a)(3). The government may initiate judicial forfeiture proceedings in one of two ways: by filing a civil forfeiture complaint in the district court, or by obtaining a criminal indictment alleging that the property is subject to forfeiture.

*Id.* at 861–62.

Initiation of Admin. Forfeiture Proceedings" to USPV.[6] The Notice attached an "Asset List" of items seized from the USPV safe deposit boxes, and listed the deadline to contest forfeiture slightly over a month from the date the notice was issued, on June 24, 2021.

## VI.    Litigation

On June 9, 2021, Plaintiffs filed their First Amended Complaint against the government, alleging, inter alia, claims for return of property pursuant to Federal Rule of Criminal Procedure 41(g) and "violations of Plaintiffs' rights under the Fourth and Fifth Amendments."

A few plaintiffs also filed an Application for a Temporary Restraining Order asking the district court to enjoin the government from continuing with the forfeiture proceedings.  The district court granted the application because the forfeiture notice "put bluntly, provide[d] no factual basis for the seizure of Plaintiffs' property" as needed to comply with due process requirements under *Gete v. I.N.S.*, 121 F.3d 1285, 1297 (9th Cir. 1997).

During the litigation, nearly all Plaintiffs and class members ultimately had their physical property returned. The Government then moved to dismiss Plaintiffs' complaint, arguing that their action had become moot. Plaintiffs argued that their action was not moot because the government still retained records of its search, including the agents' notes and photos of box contents, and they sought an injunction ordering the government to "sequester and return" "or otherwise destroy" the records generated during the inventory of the USPV deposit boxes.

---

[6] The government sent notices to some, but not all, Plaintiffs.

The district court dismissed most of Plaintiffs' counts involving physical return of seized property as moot. However, the district court held that Plaintiffs' claim for "Return of Property Pursuant to [Federal Rule of Criminal Procedure] 41(g)" (Count VII) was not moot, citing our case law interpreting that rule, which allows, under certain circumstances, "an order requiring the government to return or destroy all copies of records that it has seized."**[7]** To understand this remedy, we must briefly discuss Rule 41(g) and our primary case interpreting it, *CDT*, 621 F.3d at 1172.

## VII.    Rule 41(g) and *CDT*

Federal Rule of Criminal Procedure 41(g) provides: "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). In *CDT*, we explained that, "[t]hough styled as a motion under a Federal Rule of Criminal Procedure, when [a Rule 41(g)] motion is made by a party against whom no criminal charges have been brought, such a motion is in fact a petition that the district court invoke its civil equitable jurisdiction." 621 F.3d at 1172.

Citing the advisory notes to the rule, the *CDT* panel explained that "[i]n some circumstances, [] equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized." *Id.* at 1174 (quoting Fed. R. Crim. P. 41 advisory committee notes (1989 amendments)). The *CDT* court did not list the "circumstances" in which such an order

---

[7] The district court also held that Plaintiffs' Count I, "violation of Fourth Amendment rights," was not moot, but construed that claim as part and parcel of their 41(g) claim.

is warranted, but instead provided that "[w]hat circumstances merit this remedy is left to the discretion of the district court in the first instance." *Id.* It went on to affirm the district court on two bases: (1) "equitable considerations" required sequestration and the return of copies of evidence because the risk of harm to the plaintiffs associated with disclosure of the evidence was great, and (2) when "the government comes into possession of evidence by circumventing or willfully disregarding limitations in a search warrant, it must not be allowed to benefit from its own wrongdoing by retaining the wrongfully obtained evidence or any fruits thereof." *Id.*

In reaching its conclusion, the *CDT* panel referenced the fourth factor of the *Ramsden* balancing test[8] typically applied to Rule 41(g) motions in criminal proceedings—whether "the government showed a callous disregard for the [Fourth Amendment] rights of third parties"—and explained that "[w]hen the district court determines that the government has obtained the evidence through intentional wrongdoing—rather than through a technical or good faith mistake—it should order return of the property without the need for balancing that is applicable in the more ordinary case." *Id.*

In a separate concurrence, five judges explained that the government had also violated its "duty of candor in presenting a warrant application," because it had created a "false impression" that if the magistrate judge did not issue the warrant soon, the evidence would be destroyed. *Id.* at

---

[8] The other three factors of the *Ramsden* test require the district court to consider whether the claimant is (1) plainly aggrieved by the deprivation, (2) is likely to suffer irreparable injury if the property is not returned, and (3) there is no adequate remedy at law. *CDT*, 621 F.3d at 1173.

1178 (Kozinski, C.J., concurring).  The concurrence stated that "[a] lack of candor in this or any other aspect of the warrant application must bear heavily against the government in the calculus of any subsequent motion to return or suppress the seized data." *Id.*

## VIII.  The District Court's Order

Having resolved the motion to dismiss, the district court certified a class of plaintiffs, defined as "[a]ll renters of U.S. Private Vaults safe deposit boxes who (a) had property within their safe-deposit box seized by the federal government on or around March 22, 2021; (b) have identified themselves to the FBI since the seizure; and (3) have had their property returned to them."  After all briefing was filed, the district court notified the parties that the matter was submitted on the papers for a "trial on the briefs."

On September 29, 2022, the district court issued its order granting judgment in favor of the government.  Plaintiffs had argued, among other things, that the Government "callously disregarded" their Fourth Amendment rights because "(1) the Government's search and seizure exceeded the limitations set out in the USPV warrant; and (2) that the Government breached its duty of candor by misleading Judge Kim in its warrant application."

The district court rejected both arguments.  First, it reasoned that "Plaintiffs' claim that the Government exceeded the bounds of the warrant hinges on whether the Government's actions were a valid inventory" pursuant to the inventory search exception to the warrant requirement. Because Plaintiffs failed to show under the rules governing that exception that the government's "improper investigatory motive was the *only* reason that the Government opened the safety [sic] deposit boxes," the

district court concluded that the Government's "inventory" was not pretextual.    Thus, "[h]aving found a valid inventory," the district court "necessarily f[ound] that the Government did not exceed the bounds of the warrant."

Second, the district court held that the government did not breach its duty of candor by misleading the magistrate judge in its application for a warrant.  Plaintiffs argued that the government omitted from the supporting affidavit that it intended not only to inventory the box contents at USPV, but to civilly forfeit them as well.  The district court held that this kind of omission was immaterial, however, and that "[a]ny reasonable magistrate judge would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture."   The district court therefore denied Plaintiffs' requested relief.

## STANDARD OF REVIEW

We review an order denying a motion made pursuant to Rule 41(g) by "part[ies] against whom no criminal charges have been brought," for an abuse of discretion.  *See CDT*, 621 F.3d at 1172.  A district court abuses its discretion when it makes "an error of law," *Strauss v. Comm'r of the Soc. Sec. Admin*., 635 F.3d 1135, 1137 (9th Cir. 2011), or its decision rests on an unreasonable finding of a material fact. *See Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021).  We review pure questions of law de novo.  *See, e.g.*, *United States v. Depew*, 210 F.3d 1061, 1066 (9th Cir. 2000).

## ANALYSIS

### I.    The Supplemental Instructions take this case out of the inventory search context.

As discussed above, the district court reasoned that "to determine whether the Government's search exceeded the bounds of the warrant, [it] must ascertain whether the Government conducted a constitutionally proper inventory search."    And, to "ascertain whether the Government conducted a constitutionally proper inventory search," the district court applied our court's precedents governing the inventory search exception to the warrant requirement, which includes the test for assessing when an inventory is "pretextual," and therefore invalid.

As a threshold matter, however, Plaintiffs argue that the district court should not have assumed that the inventory search doctrine extends to the context of this case. Specifically, they argue that the Supplemental Instructions—which were the "operative instructions"[9] on the ground—were not the kind of "standardized policy" the inventory search doctrine contemplates.

The inventory search doctrine is an exception to the warrant requirement that allows authorities to search items within their lawful custody. *South Dakota v. Opperman*, 428

---

[9] The district court stated in a footnote that it was "not convinced" that the Supplemental Instructions were the "operative policy," insofar as "the agents were not actually following their standardized inventory policies" because "the Supplemental Instructions . . . superseded the DIOG."  It proceeded to explain why it believed that the Supplemental Instructions were consistent with the DIOG.  But it did not dispute that, insofar as agents were following any directions on the ground, they were following the Supplemental Instructions (if not also the standardized instructions).

U.S. 364, 369 (1976); *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983); *Florida v. Wells*, 495 U.S. 1, 4–5 (1990). One of the most important features of the doctrine is the existence of standardized instructions. *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987). "Standardized" need not mean "written." Rather, our case law indicates that "standardized" instructions limit the discretion of officers and apply consistently across cases. *See Wells*, 495 U.S. at 4 (referring to "standardized criteria" or "established routine"); *see also Standardized*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/standardized ("brought into conformity with a standard: done or produced in a standard, consistent way").

For example, in *United States v. Mancera-Londono*, 912 F.2d 373, 375 (9th Cir. 1990), defendants sought to suppress the fruits of an inventory search they asserted followed policies which were "not sufficiently standardized," because they were unwritten. *Id*. The panel rejected that argument, noting that regardless of the policy's form, the oral policy was identical to those found in the DEA's manual for forfeiture, which required return of all rental cars to the rental agency and an inventory of the same prior to the return. *Id*. at 375-76.

The need for a "standardized" policy is necessarily a feature of the inventory search doctrine because, if an inventory is conducted pursuant to a standardized policy, a court knows that such a search would have been conducted regardless of the degree of suspicion an officer has of a person's (or an automobile's) criminality. *See United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (explaining that a "department's policies do not define constitutional rights," but instead "assist courts to determine whether an inventory search is legitimate, as opposed to pretextual"). In

other words, a court can be reassured that regardless of motive, an inventory will reveal what it will reveal, as it requires an officer to do the same thing every time. *See Bertine*, 479 U.S. at 367 ("In the present case, as in *Opperman* and *Lafayette*, there was no showing that the police, *who were following standardized procedures*, acted in bad faith or for the sole purpose of investigation.") (emphasis added); *see, e.g.*, *Wells*, 495 U.S. at 5 ("Our cases have required that inventory searches be 'sufficiently regulated,' so as to avoid the possibility that police will abuse their power to conduct such a search.") (Brennan, J., concurring) (internal citation omitted).

That presumably is a reason why, at least in this circuit, "dual motives" are permissible in the inventory search context. That is, in the case of inventory searches, "the mere presence of a criminal investigatory motive or a dual motive—one valid, and one impermissible—does not render an [inventory] search invalid." *United States v. Johnson*, 889 F.3d 1120, 1126 (9th Cir. 2018) (internal quotation marks omitted). If an officer follows a truly "standardized" policy, it is inevitable that he or she would find evidence of a crime, regardless of whether he or she intends it. *See, e.g.*, *Mancera-Londono*, 912 F.2d at 375 (holding that inevitable discovery doctrine permitted officers to seize items, because they followed a sufficiently "standardized" inventory and would have found the items pursuant to that inventory).

However, if an agency is given the discretion to create customized[10] inventory policies, based on the features of

---

[10] The antonyms of the word "standardized" are "tailored," "individualized." and "customized." *See Standardized*, Merriam-Webster Thesaurus, available at https://www.merriam-webster.com/thesaurus/standardized. Plaintiffs use the word "bespoke."

each car it impounds and each person detained, the ensuing search stops looking like an "inventory" meant to simply protect property, and looks more like a criminal investigation of that particular car or person, i.e., more like a "ruse." *See Wells*, 495 U.S. at 4 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.") Unlike the inventory policies followed in the leading inventory search cases, which were all "standardized" to the extent they pre-existed the search of the car or arrestee, and applied consistently across subjects of "inventories,"[11] the Supplemental Instructions in this case were designed *specifically* for the USPV raid. That is apparent from the title of the instructions, the testimony of their author, and the introduction which prefaces the instructions by explaining that agents were (to be) authorized to "seize the facilities of the target business (USPV) and conduct an inventory of the contents therein."

The district court, which recognized a difference between the Supplemental Instructions and the FBI's "standardized" ones, seemed to believe that the inventory search doctrine was nonetheless applicable because the agents merely followed the Supplemental Instructions "in addition" to the FBI's standardized ones. But once the government begins adding a set of "customized" instructions to a "standardized" inventory policy—particularly the type of custom instructions presented by this case—the entire search stops being conducted pursuant to a "standardized" policy, regardless of whether the customized instructions

---

[11] *See e.g., Bertine*, 479 U.S. at 369 ("The backup officer inventoried the van in accordance with local police procedures, which require a detailed inspection and inventory of impounded vehicles.")

conflict with the standardized ones. Here, the fact that the Supplemental Instructions were created specifically for the USPV search takes this case out of the realm of a standardized "inventory" procedure.

We note that it is particularly troubling that the government has failed to provide a limiting principle to how far a hypothetical "inventory search" conducted pursuant to customized instructions can go. At oral argument, for example, the government failed to explain why applying the inventory exception to this case would not open the door to the kinds of "writs of assistance" the British authorities used prior to the Founding to conduct limitless searches of an individual's personal belongings. It was those very abuses of power, after all, that led to adoption of the Fourth Amendment in the first place.

## II. The district court abused its discretion in holding that the government did not exceed the scope of the warrant.

The district court's incorrect assumption that the ordinary rules of the inventory search doctrine applied to this case also infected its analysis of other Fourth Amendment issues, such as Plaintiffs' claim that the government exceeded the scope of the warrant. Specifically, the district court concluded that whether the government exceeded the warrant's scope "hing[ed]" on whether the search it conducted fit within the inventory search exception, without considering how those two inquiries might not be one and the same.

They are not the same. *Compare Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019) (assessing whether search complied with administrative search exception to the warrant requirement) *with id*. at 1145 n.9 ("Even if some

initial detention during a search for documents could have
been justified under *Summers*, Perez Cruz's detention likely
exceeded anything that could be considered proper in scope,
because the ICE agents appear to have departed even from
the warrant itself.").[12]

As the district court recognized, the inventory search
doctrine as developed in our circuit tolerates "the [] presence
of a criminal investigatory motive" when conducting an
inventory, "or a dual-motive—one valid and one
impermissible."     The standard for determining the
permissibility of an inventory search is whether the search
would have occurred "but for" the Government's allegedly
improper investigatory purpose. *United States v. Orozco*,
858 F.3d 1204, 1210 (9th Cir. 2017).     By contrast, to
determine whether the government exceeded the scope of a
warrant, we compare the terms of the warrant to the search
actually conducted. *See, e.g.*, *United States v. Payton*, 573
F.3d 859, 864 (9th Cir. 2009) (concluding that search of
defendant's computer "exceeded the scope of that warrant"
because it was done "without explicit authorization in the
warrant"); *CDT*, 621 F.3d at 1166 (holding that government

---

[12] In a footnote, the district court rejected Plaintiffs' argument that "the
[inventory doctrine's] 'dual motive' analysis is only applicable to
warrantless searches," stating "the Ninth Circuit has recently applied the
dual-motive framework to searches conducted pursuant to a warrant."
*See Perez Cruz*, 926 F.3d at 1143. But as shown above, the court in
*Perez-Cruz* drew a distinction between whether the government
exceeded the scope of the warrant in that case and whether its search was
justified under the general principles of the administrative search
doctrine.    Moreover, the warrant in *Perez-Cruz*, unlike the one here,
actually *did* authorize a criminal search, so the precise question discussed
above—whether the government exceeds the scope of a warrant when
the warrant prohibits a "criminal search or seizure"—was inapplicable
there.

disregarded terms of warrant where it "failed to comply with the procedures specified in the warrant"); *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978) ("Where evidence is uncovered during a search pursuant to a warrant, the threshold question must be whether the search was confined to the warrant's terms.").

The warrant in this case "d[id] not authorize a criminal search or seizure of the contents of the safety [sic] deposit boxes."    The district court never analyzed what this prohibition in the warrant meant.  But it did, by all accounts, find that the search at USPV constituted a "criminal search or seizure" of box contents, i.e., "[a]n examination of a person's [] property, . . . for the purpose of finding evidence of a crime."   *Search*, Black's Law Dictionary (11th ed. 2019).

For example, the district court noted that "[g]iven th[e] [record] evidence, there can be no question that the Government expected, or even hoped, to find criminal evidence during its inventory."   The district court cited testimony by investigating agents who "candidly admitted" that they "fully expected there to be criminal customers at this business," and they anticipated "that there would be criminal proceeds in the safe deposit boxes."   It also found that the Supplemental Instructions drafted by Agent Zellhart "gave guidance on how to handle items with indicia of criminality, along with instructing agents on how to properly inventory the seized property."   And it noted that "[t]he agents executing the warrant also arranged for drug-sniffing dogs to be present at USPV, a tactic that would be unnecessary unless agents expected to discover drugs or drug-adjacent cash."

A look at the record, and the Supplemental Instructions in particular, confirms that the search was criminal in nature. The instructions required agents to not only write a summary of the items found in the safe deposit boxes, but in a section discussing preservation of "evidence," told them to tag items with forfeiture numbers; send them to "evidence control"; and take care to preserve "drug evidence" for fingerprints. *Cf. Johnson*, 889 F.3d at 1127 (invalidating purported "inventory search" where arrest report made references to "seiz[ing] . . . evidence" of a crime and "plac[ing] [items] into evidence."); *United States v. Grey*, 959 F.3d 1166, 1184 (9th Cir. 2020) (noting that the "conduct at issue" in the case "more closely resembled a criminal raid than an administrative inspection," given the "[defendant's] arrest, the number of deputies involved and the length of the 'protective sweep,'" which resulted in "a greater intrusion on [defendant's] privacy interests").

Moreover, the government has confirmed that the records of box contents can be used to investigate crimes, and that they have been stored on a criminal database called Sentinel and are to be kept there indefinitely. If there remained any doubt regarding whether the government conducted a "criminal search or seizure," that doubt is put to rest by the fact the government has already used some of the information from inside the boxes to obtain additional warrants to further its investigation and begin new ones. *CDT* at 621 F.3d at 1169 (noting that, contrary to government's representation in affidavit that it would segregate data, the case agent "himself reviewed the seized computer data and used what he learned to obtain the subsequent search warrants" (internal quotation marks omitted)). Because the district court's own findings show that the FBI conducted a "criminal search and seizure of box

contents," it abused its discretion in holding that the government did not exceed the scope of the warrant's terms. *See Saucillo v. Peck,* 25 F.4th 1118, 1129 (9th Cir. 2022).

In addition, the district court abused its discretion in holding that the government did not exceed the bounds of the warrant in this case because it clearly erred in finding that the government was incapable of following its own standardized instructions.  Recall that the warrant in this case required agents to follow their "written policies." Incidentally, the FBI's written policies *did* indicate what an agent should do in the event he or she (1) comes across evidence of criminality during an inventory search or (2) expects an inventory search to yield contraband.

Specifically, the inventory policy in the DIOG states: "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible."

As discussed above, the district court found that the government "fully expected there to be evidence of criminal proceedings" and that, during the course of the search, agents did find contraband, which they seized, tagged, inspected and secured, without obtaining a warrant.  That shows that the FBI exceeded the scope of the warrant—by failing to "follow their written policies," above. *See, e.g.*, *United States v. Ladson*, 774 F.2d 436, 438 (11th Cir. 1985) ("We hold only that absent exigent circumstances, the government must follow the advice in [its] own Guide to Forfeiture of Assets: if probable cause exists to enter the

premises, obtain a warrant."). The district court acknowledged this fact. In a footnote, it stated:

> The FBI's standardized policy tells agents that, "where feasible," they should obtain a warrant for property that may be subject to an inventory search. Here, the anonymous nature of the boxes prevented the Government from determining who owned a specific box or what was inside, and thus prevented them from describing with particularity "both the place to be searched and the . . . things to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

The district court's finding that "the anonymous nature of the boxes prevented the government from determining who owned a specific box or what was inside" was clearly erroneous.

First, unlike all other portions of the order which involve factual findings, this statement lacks any citation to the record. *See Oregon Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1492 (9th Cir. 1995), *as amended on denial of reh'g* (June 29, 1995) (district court abuses its discretion when "record contains no evidence on which [it] rationally could have based that decision"). Its conclusory nature is concerning, especially in light of the fact that "the anonymous nature of the boxes" apparently did not prevent the government from (1) obtaining and executing search and seizure warrants of safe deposit boxes in the past, (2) contacting owners of boxes when it issued its administrative forfeiture notices, and (3) applying for, and receiving, additional search and seizure warrants based off of the

contents of the items found in the safe deposit boxes after the entire USPV raid was complete.

Moreover, the statement is inconsistent with the government's representation in its affidavit that it would "notify [box] owners directly [by] look[ing] for contact information or something which identifies the owner. (USPV recommends that box renters include their or their designees' telephone numbers on a note in the box in the event that USPV removes the contents for nonpayment of rental fees.)"  The conclusion that the government would not be able to obtain warrants for individual boxes appears to merely be an adoption of a representation made by the government in its response brief below, which itself did not cite to anything in the record.

Because the district court's conclusion that the government was excused from following its standardized policy rested on its clearly erroneous finding that the government simply could not apply for warrants as to individual box holders, it abused its discretion in concluding that the government did not exceed the scope of the warrant for this reason as well.  *See Briseño*, 998 F.3d at 1022 ("A district court abuses its discretion when it . . . bases its decision on unreasonable findings of fact." (cleaned up)).

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's order which held that Plaintiffs' Fourth Amendment rights were not violated.  In light of the government's expressed willingness in its "Motion to Vacate and Remand with Instructions to Grant Plaintiffs' Requested Relief," to have the district court order the "FBI to sequester or destroy the records of its inventory search pertaining to class members" (ECF No. 48), we **REMAND** for the district court

to order the FBI to so dispose of the records, including copies of the records kept on the Sentinel database. *See CDT*, 621 F.3d at 1162. As such, the government's motion is **DENIED AS MOOT.**

　　**REVERSED AND REMANDED.**

---

M. SMITH, Circuit Judge, concurring:

　　I write separately to address Plaintiff's additional argument that the origins and rationale of the inventory search doctrine makes it inapplicable to this context, i.e., safe deposit boxes in a locked vault.[1]

　　The inventory search doctrine is an exception to the warrant requirement. The Supreme Court first established the doctrine in *Opperman*, after the criminal defendant's car was impounded for multiple parking violations. 428 U.S. at 365–66. The police, without a warrant, inventoried the car's contents pursuant to a department policy. *Id.* at 366. Inside

---

[1] The government argues that Plaintiffs waived their argument that the inventory search doctrine is inapplicable to safe deposit boxes because "plaintiffs failed to advance it below." Although there is "no bright line rule . . . to determine whether a matter has been properly raised below," *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016) (internal quotation omitted), I conclude that Plaintiffs preserved their argument here. Plaintiffs contended below that the government violated their Fourth Amendment rights, and in doing so, argued that the government proceeded in a manner that contravened "the purposes traditionally associated with an inventory," citing the leading case on the inventory search doctrine, *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). "[H]aving advanced its [impermissible search] theory before the district court," Plaintiffs are "able to make a more precise argument on appeal as to why" the inventory search doctrine should not be extended here. *United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016).

the car, the police discovered marijuana, for which the defendant was charged with possession and convicted. *Id.*

The Court in *Opperman* upheld the search, concluding that the exception to the warrant requirement was justified when balancing the privacy interests of the individual against the government interest in protecting itself. *Id.* at 367, 369. It noted that individuals have a lesser expectation of privacy in their automobiles than in "one's home or office," given "the obviously public nature of automobile travel," and the fact that "automobiles, unlike homes, are subjected to pervasive and continuing government regulations and controls, including periodic inspections and licensing requirements." *Id.* at 367-68.

Furthermore, the *Opperman* court noted that the "inherent mobility" of an automobile makes enforcing the warrant requirement challenging. *Id.* at 367. And it identified three governmental interests that the doctrine served: (1) to protect an owner's property while it is in the custody of the police, (2) to insure against claims of lost, stolen, or vandalized property, and (3) to guard the police from danger. *Id.* at 369. Justice Powell, in a concurrence that provided the deciding vote in the case, emphasized:

> Inventory searches, however, are not conducted in order to discover evidence of crime. The officer does not make a discretionary determination to search based on a judgment that certain conditions are present. Inventory searches are conducted in accordance with established police

> department rules or policy and occur
> whenever an automobile is seized.

*Id. at* 383 (Powell, J., concurring).　In other words,
"[u]pholding searches of this type provides no general
license for the police to examine all the contents of such
automobiles." *Id.* at 380.

Seven years later, the Court extended the inventory
search doctrine to routine administrative procedures incident
to incarcerating an arrested person. *See Illinois v. Lafayette*,
462 U.S. 640, 648 (1983) (discussing an inventory search of
the arrestee's shoulder bag revealing amphetamine pills). As
in *Opperman*, the Court explained that the search served
legitimate government interests and emphasized that the
inventory of containers must be done "in accordance with
established inventory procedures." *Id.*

Similarly, in *Colorado v. Bertine*, 479 U.S. 367, 368–69
(1987), the Court upheld a warrantless search of the contents
of petitioner's vehicle inventoried after he was arrested for
driving under the influence, and his car was impounded. *Id.*
The Court noted that, "as in *Opperman* and *Lafayette*, there
was no showing that the police, who were following
standardized procedures, acted in bad faith or for the sole
purpose of investigation." *Id*. at 372.　By contrast, in *Florida
v. Wells*, 495 U.S. 1, 4–5 (1990), the Court invalidated an
"inventory search" of a suitcase in a car because the Florida
Highway Patrol had "no policy what[so]ever with respect to
the opening of closed containers encountered during an
inventory search," and so was not permitted to search and
seize the items without a warrant under that doctrine. *Id*.

Unlike the administrative search exception,[2] which has been extended to sites like the border, traffic checkpoints, and certain highly regulated businesses, the inventory search exception has largely (if not exclusively) been confined to the context of searches of (1) individuals booked into jail, and (2) impounded vehicles. *Cf. United States v. Showalter*, 858 F.2d 149, 153 (3d Cir. 1988) (noting that the court did not "know of [any] authority which creates an inventory exception to the warrant requirement which pertains to one's home, rather than an automobile.")    Plaintiffs insist that extending the inventory doctrine to allow a search of hundreds of safe deposit boxes would take it too far afield from the "rationale [for the doctrine] espoused in *Opperman*."

I agree and would so hold.  As discussed above, a key rationale in *Opperman* was the lesser expectation of privacy in and the challenges posed by the "inherent mobility" of automobiles.  *Opperman*, 428 U.S. at 367–68.  Neither of those considerations is present here.  The government does not dispute that one has an expectation of privacy in the contents of his or her locked safe deposit box. Nor is there anything "inherently mobile" about the boxes, located at a

---

[2] Although our court has sometimes used the phrases "inventory search" and "administrative search" interchangeably, *see, e.g.*, *United States v. Orozco*, 858 F.3d 1204, 1211 (9th Cir. 2017), we recognized a difference between these two types of searches in *United States v. Grey*, 959 F.3d 1166, 1180 (9th Cir. 2020). *See id.* ("[W]e would hesitate to extend the *Orozco* test – applicable to border searches, inventory searches, and commercial inspections of vehicles and businesses – to an administrative search or seizure involving a private residence.")    The government does not assert that its search of USPV fits into the administrative search exception.

facility where the government successfully executed search warrants in the past.

It is true that *Opperman* and its progeny involved certain governmental interests which, at first blush, also appear present here. While the "inventory" approved did not "guard the police from [any] danger," it did purport to "protect . . . the contents of the boxes," "preserve the property for safekeeping," and "protect [] agencies from claims of theft or damage to the contents of the boxes." *See Opperman*, 428 U.S. at 369.

But that those governmental interests are served in the context of inventorying an impounded automobile or an arrested person makes much more sense than in the context of an "inventory" of a locked vault. Unlike the execution of search warrants at a stationary location, vehicles are typically impounded on an unplanned basis—explaining why we have justified impoundment by the community caretaking function. *See Miranda v. City of Cornelius*, 429 F.3d 858, 865–86 (9th Cir. 2005) (holding that impoundment is only appropriate where a car is "creating an[] impediment to traffic or threatening public safety," or where "the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle"); *United States v. Garay,* 938 F.3d 1108, 1111 (9th Cir. 2019) (noting that defendant did not dispute that the decision to tow the car was a reasonable and good-faith exercise of the officers' care-taking function where he had just been arrested and the car was totaled and lying in a ditch). And because the police must often seize the car without the owner's permission to take care of the community, it makes sense that performing an inventory in such an instance would protect against claims of theft or loss or protect property found in the car. *Cf. Miranda*, 429 F.3d at 865 (explaining that impounding a car "without regard to

whether the defendant can provide for its removal" may in fact be "patently unreasonable") (quoting *United States v. Duguay*, 93 F.3d 346, 353 (7th Cir. 1996)).

But in the context of stationary locations like the safe deposit boxes here—where authorities can generally plan searches ahead of time—it is less clear how the benefits of an "inventory" could outweigh the higher privacy interests at stake. *Cf. Miranda*, 429 F.3d at 864 (invalidating impoundment where car was "parked in the driveway of an owner who ha[d] a valid license"). To further illustrate this point, Plaintiffs analogize their situation to one in which the government seizes an apartment building based on allegations against the landlord, and, having seized the building, the government then searches the contents of every tenant's apartment—on the basis that it needed to "inventory" the items it found there to "protect" the items and protect itself "from claims of theft or loss." Without question, we would find such reasoning unconvincing, given that the apartment tenants were completely unrelated to the investigation, and their items were already "protected" against any harm, in their own homes.

In support of their argument, Plaintiffs note that some courts of appeals have already declined, or expressed a reluctance, to extend the inventory search doctrine outside of the context of cars and arrestees: the Eleventh Circuit in *United States v. Ladson*, 774 F.2d 436 (11th Cir. 1985), and the Third Circuit in *United States v. Showalter*, 858 F.2d 149 (3d Cir. 1988).

In *Ladson*, authorities obtained a warrant which ordered seizure of defendant's real property and directed the executing federal agent to "prepare a written inventory of the real estate and property thereon seized." 774 F.2d at 438.

The government went inside the home and proceeded to search its contents. *Id.* Because "[n]othing in the seizure warrant . . . expressly authorized the government to enter the house without permission," the government argued that it had to conduct a "walk-through" of the house to conduct the inventory. *Id*. at 439. The Eleventh Circuit rejected that reading of the warrant, and under its prior precedent, refused to use the inventory search exception "as a bootstrap to undermine the Fourth Amendment protections afforded the sanctity of the home." *Id*. at 440 (quoting *United States v. Parr*, 716 F.2d 796, 814 (11th Cir. 1983). It also noted that "[s]uch a result is particularly unappealing where, as here, it would sanction warrantless governmental intrusions into the homes of third parties unrelated to the original seizure." *Id.*

Similarly, in *Showalter*, the authorities had an order to go to a property "for the purposes of conducting an inspection of the property in order to note any hazardous conditions and to inventory any items which are affixed to the realty and are thereby subject to the forfeiture." 858 F.2d at 151. Looking to *Opperman*, the Third Circuit held that the search did not "satisfy the requirements that courts have established in applying the inventory exception." *Id*. at 152–53. It noted that the defendant had a greater expectation of privacy in his home than the defendants in automobile cases, and that the authorities did not conduct the search in a manner "pursuant to a uniform or standard procedure." *Id*. at 153. In particular, the panel found problematic the presence of federal troopers and DEA agents when they were "not necessary for either the taking of the inventory or the maintenance of security." *Id*. at 154.

The government's main response to these cases is that they involve searches of a private residence, where "privacy rights are at their zenith." But that does not mean that the

privacy rights Plaintiffs have in their safe deposit boxes are
akin to those that individuals have in cars or on their persons
when booked after arrest.  To the contrary, Plaintiffs do have
a significant privacy interest in their safe deposit boxes,
given that their conduct indicates they intended their items
to be "preserved . . . as private," and society generally views
the privacy expectations of items in safe deposit boxes as
reasonable. *United States v. Yang*, 958 F.3d 851, 858 (9th
Cir. 2020) (articulating test to determine privacy interest);
*see, e.g., United States v. Thomas*, 878 F.2d 383 (6th Cir.
1989) (unpublished) ("We recognize that Thomas is correct
in claiming that citizens have legitimate expectations of
privacy in the contents of their safe deposit boxes.")

I find the reasoning in *Ladson* and *Showalter* helpful in
deciding whether to apply the inventory search doctrine to
this context. *See, e.g.*, *Showalter*, 858 F.2d at 153 (looking
to "the factors which have been used to justify the
warrantless inventory search of an automobile" in deciding
whether to extend the doctrine).  In particular, I find
compelling the point made in *Ladson* that extension of the
inventory search doctrine here invades the rights of "third
parties unrelated" to the target of the search, such as
Plaintiffs. *Ladson*, 774 F.2d at 440; *cf. United States v.
Schesso*, 730 F.3d 1040, 1049 (9th Cir. 2013) (distinguishing
between the case before it and *CDT* because *CDT*
"involve[d] an over-seizure of data that could expose
sensitive information about other individuals not implicated
in any criminal activity").

Finally, I note that the district court's application of the
inventory search principles to this case demonstrates why the
doctrine should not extend to this context.  As the district
court explained, "[w]hether an inventory was impermissibly
pretextual hinges [on] one question: would the challenged

search have occurred but for the Government's allegedly
improper investigatory purpose?" The district court
concluded that the government's search would have
occurred "but for" any improper investigatory purpose,
reasoning:

> The warrant authorized the Government to
> seize the nests of deposit boxes and inventory
> the contents of those boxes in accordance
> with standardized policy. The FBI's
> inventory policy requires that when an agent
> "lawfully take[s] custody of property," he or
> she must "conduct a prompt and thorough
> search of the contents of the property,
> *including searching any locked or unlocked
> containers*." Thus, because the Government
> had lawfully taken custody of the box nests
> (due to the warrant's authorization to seize
> them), the inventory policy mandated that
> agents examine the locked containers within.
> Agents had no discretion to determine which
> boxes should be inventoried and which
> should not—indeed, a policy granting such
> discretionary authority would run afoul of the
> Supreme Court's inventory search
> jurisprudence. It therefore seems clear that
> the agents would have cracked the deposit
> boxes and searched their contents whether or

> not they had an impermissible investigatory
> motive.[3]

This passage illustrates the problem with applying the
inventory search doctrine to this case. The district court's
reasoning is illogical: The agents would have searched the
contents of the boxes regardless of whether they had a
criminal investigatory motive, because they had to inventory
the boxes pursuant to policy, as they had "lawful[] custody"
of them—*pursuant to a warrant which it obtained because
of its criminal investigatory motive.* That is the challenge of
comparing this case to an "inventory" conducted of an
impounded vehicle: the reason the government has "lawful
custody" of a car in those cases is because it does not have
an improper investigatory motive in obtaining custody of the
car in the first place, but rather takes custody of the car
because the car was blocking traffic, posed a danger,[4] or
otherwise required removal. *See United States v. Cervantes*,

---

[3] The district court also concluded: "That the Government had a
legitimate inventory motive is evidenced by the fact that the [search was
a] 4-day process, wherein agents recorded the contents of 700 boxes . . .
It beggars belief that agents would have worked in this manner solely to
invent a pretext for a criminal search of the box contents." The length
of time it takes to conduct an inventory is not legally relevant to whether
it was pretextual. Moreover, to the extent the inventory did take so long,
the point could easily cut the other way—it could have taken so long
because the government did not merely log the contents of the boxes, but
thoroughly inspected them using procedures such as dog sniffs. *Cf.
Grey*, 959 F.3d at 1184 (noting that the "conduct at issue" in the case
"more closely resembled a criminal raid than an administrative
inspection," given, in part, the "the [longer] length of the 'protective
sweep.'")

[4] *See, e.g.*, *Opperman*, 428 U.S. at 374 (explaining that, in another case,
"the police had reasonable grounds to believe a weapon might be in the
car, and thus available to vandals.")

703 F.3d 1135, 1141 (9th Cir. 2012) (noting that if "the government fail[s] to establish a community caretaking function for the impoundment" of a vehicle, it "fail[s] to establish the constitutional reasonableness of the seizure and subsequent inventory search." (internal quotation marks omitted)). Here, the only reason the government had "custody" of USPV and the safe deposit boxes therein was *because* of its investigatory motive. Ultimately, given the greater privacy interests at stake and the implication of the rights of third parties, I would hold that the inventory search doctrine does not extend to searches of box contents in a locked vault.

---

VANDYKE, Circuit Judge, concurring in part:

I join the majority's opinion except as to Part II, which I view as unnecessary given the panel's resolution of Part I.